IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| HALLMARK CARDS, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 08-0840-CV-W-ODS |
| | ) | |
| MONITOR CLIPPER PARTNERS, LLC, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

<u>ORDER AND OPINION GRANTING DEFENDANTS SULLIVAN & WORCESTER LLP'S
AND LAURA STEINBERG'S MOTION TO DISMISS</u>

Pending is a motion to dismiss filed by Defendants Sulivan & Worcester, LLP ("S&W") and Laura Steinberg. For the following reasons, the motion (Doc. # 104) is granted.

I. BACKGROUND

A. General Information

Plaintiff is a privately-held manufacturer of greeting cards. In 2001, Plaintiff and Monitor Company Group Limited Partnership ("Monitor") entered a contract whereby Monitor provided Plaintiff with certain consulting services. The contract required Monitor to maintain the confidentiality of information provided to it by Plaintiff.

Defendant Monitor Clipper Partners, LLC, ("Clipper") is a Delaware Limited Liability Company and a private equity investment firm. Most of Clipper's managing directors are also Monitor's limited partners, the entities are headquartered in the same building, and they share support systems and administrative functions. Monitor maintains a standing "case team" to assist Clipper in its business, and the entities publicly promote their working relationship. In November 2005, the media reported Clipper's interest in acquiring Recycled Paper Greetings, Inc. ("RPG"), one of Plaintiff's

competitors. Plaintiff contacted Monitor and sought assurances that the confidentiality provisions of their contract had been followed and that none of its proprietary information had been provided to Clipper. Clipper's efforts with regard to the RPG matter were directed by Adam Doctoroff, a principal at Clipper. Clipper eventually formed Monitor Clipper Equity Partners II, LP, a Delaware Limited Partnership ("Fund II") to acquire RPG; Fund II, in turn, created a holding company called RPG Investments, Inc., as a vehicle for purchasing RPG. The acquisition was completed in December 2005. Meanwhile, Plaintiff, Monitor and Clipper continued communicating about Plaintiff's concerns until January 23, 2006, at which time Plaintiff became dissatisfied with Monitor's and Clipper's responses and initiated an arbitration proceeding.

On March 21, 2007, the Arbitrator issued his decision finding Monitor breached the confidentiality provisions in a myriad of ways, not all of which involved Clipper. Nonetheless, the Arbitrator found Monitor made Plaintiff's confidential information available to Clipper. "Even after Hallmark wrote to Monitor on November 22, 2005, expressing its concerns about Monitor's potential misuse of Hallmark's confidential information, Monitor continued to improperly disseminate Hallmark's information." Award, ¶ 43. In addition, Movant maintained the information on databases that were accessible by people who were not supposed to have access; "[m]any of those documents were also available to Monitor Clipper, even while it was contemplating and consummating the acquisition of" RPG. Award, ¶ 44. Clipper specifically sought the information in question: "To analyze the potential acquisition [of RPG], Monitor Clipper promptly contacted Monitor personnel who had worked on the Hallmark project because they had 'relevant experience' in the greeting card industry. Monitor assisted in this process by identifying and referring Monitor Clipper to the Monitor consultants who had, through their consulting experience with Hallmark, specific expertise in the areas of concern to Monitor Clipper." Award, ¶ 58. Clipper contacted at least five of those consultants, who then provided advice to Clipper based on the confidential information or, in some instances, provided the information itself. Award, ¶¶ 59-79.

2

In March 2007, the Arbitrator issued a ruling in Plaintiff's favor (although it did not find in Plaintiff's favor on all of the claims asserted) and granted Plaintiff monetary and injunctive relief.  In May 2007, Plaintiff and Monitor jointly filed an action in this Court (*Hallmark Cards, Inc. v. Monitor Company Group Limited Partnership*, No. 07-0357-CV-W-ODS) and asked for judicial confirmation of the Award.  Judgment was entered on May 18, 2007.  On June 25, 2008, Plaintiff filed a Motion for Relief From Judgment predicated on documents Monitor provided in May 2008 pursuant to the injunction's commands.  The Motion was granted in December 2008; the judgment was vacated insofar as the monetary award was confirmed and the parties were directed to reconvene the arbitration proceeding.

Meanwhile, Plaintiff filed the instant suit in November 2008.  The original Complaint (in 188 paragraphs) and the Amended Complaint (in 284 paragraphs) generally allege the events described above.  The Amended Complaint – Plaintiff's operative pleading – also alleges Defendants engaged in various actions before and after the arbitration to hide the fact and extent of (1) Monitor's violation of the confidentiality agreement, (2) Clipper's use of the confidential information, and (3) the extensive coordination and planning between Clipper and Monitor with respect to the misuse of Plaintiff's confidential information.  The Defendants in this case are:

- Clipper
- Fund II
- Doctoroff
- RPG Investment Holdings, LLC
- Charles Yoon
- William Young
- Mark Thomas
- The law firm of Sullivan & Worcester, LLP
- Laura Steinberg (an attorney at Sullivan & Worcester)

The motion under consideration was filed jointly by Sullivan & Worcester ("S&W") and Steinberg, so the Court will focus on the counts asserted against them.  Those counts are: Count I, which asserts all Defendants violated and conspired to violate RICO, and

3

Count IV, which asserts all Defendants conspired to misappropriate Plaintiff's trade secrets.

## B. The Amended Complaint

The Amended Complaint ("AC") alleges an enterprise consisting of Monitor and Clipper "together with certain of their present and former partners and employees" designed to misappropriate and use trade secrets and confidential information obtained from Monitor's clients. AC, ¶ 17. Monitor's consulting business requires it to have access to clients' proprietary information, which it falsely promises will remain confidential. Monitor allegedly shares this information freely with Clipper so that Clipper can make investment and other business decisions. E.g., AC, ¶¶ 18-27. Plaintiff identifies four other acquisitions of Clipper's that were in industries in which Monitor allegedly previously performed consulting work for others in those industries. AC, ¶¶ 91-107. Monitor's clients are not identified, and there are no allegations regarding the content of any agreements between Monitor and its clients. There is also no allegation that any confidential information obtained by Monitor was used by Clipper, much less any specific identification of such information.

As for S&W and Steinberg, Plaintiff alleges they – acting as legal counsel for Monitor – "have acted in concert with the enterprise and directed the efforts of the enterprise to conceal and cover-up its unlawful activities." AC, ¶ 31. Generally, these activities consisted of (1) providing Plaintiff with false assurances that Monitor had not misappropriated trade secrets, (2) misleading Plaintiff and the Arbitrator by withholding evidence and permitting destruction of evidence, and (3) withholding information and misleading Plaintiff about Monitor's compliance with the injunction. AC, ¶¶ 31, 135, 136. Beyond generally alleging that S&W and Steinberg "directed" or "controlled" the enterprise's actions, Plaintiff's provide the following specific allegations:

- Before the arbitration these defendants "purported to investigate Hallmark's concerns" and wrote a letter to Plaintiff denying Monitor was involved in Clipper's acquisition of RPG. AC, ¶¶ 140-41, 143

4

- In January 2006 Steinberg represented that she had collected all of Plaintiff's proprietary information from her client and returned it to Plaintiff. This representation was allegedly false. AC, ¶ 145.
- Thereafter, counsel continued to provide assurances that Monitor had not violated the confidentiality agreement and played no part in Clipper's acquisition of RPG. AC, ¶ 147.
- These defendants continued these denials and representations throughout the arbitration. AC, ¶¶ 150-53; see also AC, ¶¶ 158-59. Some of these denials and representations were made to the arbitrator. AC, ¶¶ 157, 162.
- These defendants failed to instruct Monitor to hold all documents that might be relevant to the dispute, which resulted in the destruction of potential evidence. AC, ¶¶ 154-55.
- In August/September 2006, Steinberg "attempted to prevent Hallmark from deposing [a witness] by falsely representing" the witness' involvement in the dispute was minimal and filed documents designed to prevent Hallmark from deposing witnesses. AC, ¶¶ 170-72.
- In October 2006, Steinberg represented that "Emily" Kahn had reviewed a piece of Plaintiff's confidential information without also disclosing that "Emily" was also known as "Megan" Kahn. AC, ¶ 175.
- Various witnesses provided testimony that Plaintiff describes as "false."
- S&W urged the Arbitrator to issue rulings based on representations Plaintiff characterizes as "false" or otherwise unsupported by the record before the Arbitrator. AC, ¶ 186.
- After the Arbitrator issued his decision, these defendants continued to refrain from "initiat[ing] a 'litigation hold'" which resulted in the loss of information that was to be supplied to Plaintiff. AC, ¶¶ 192, 194.
- These defendants negotiated with Plaintiff for search terms that would preclude discovery of relevant documents. AC, ¶ 197.

- These defendants represented that responsive documents had been produced when they had not and failed to promptly advise Plaintiff when documents were unearthed. AC, ¶¶ 200-01, 203-04, 207-11.

Within Count I, Plaintiff alleges S&W and Steinberg engaged in "schemes to defraud Hallmark, the Arbitrator, and the Court" by using mail and wire communications to suppress information and communicate "fraudulent representations," all of which were designed to hide other frauds and the misuse of Plaintiff's confidential information. AC, ¶ 249. In Count IV, Plaintiff alleges S&W and Steinberg "joined the conspiracy [to misappropriate trade secrets] for the purpose of concealing the conspiracy and defendants' conduct from Hallmark . . . so that defendants' use, disclosure and other misappropriation of Hallmark's trade secrets could continue." AC, ¶ 272.

## II. DISCUSSION

The liberal pleading standard created by the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Fed. R. Civ. P. 8(a)(2)). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Id. (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In ruling on a motion to dismiss, the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the Plaintiff[ ]." Stodghill v. Wellston School Dist., 512 F.3d 472, 476 (8th Cir. 2008).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

6

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); see also Cole v. Homier Distrib. Co., 599 F.3d 856, 861 (8th Cir. 2010) (quotation omitted) ("Where we can infer from those factual allegations no more than a mere possibility of misconduct, the complaint must be dismissed.").

While a complaint is to be construed in a plaintiff's favor, there is an important caveat: "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Iqbal, 129 S. Ct. at 1949. No deference is due to "legal conclusions or 'formulaic recitation[s] of the elements of a cause of action.'" Lustgraaf v. Behrens, 619 F.3d 867, 873 (8th Cir. 2010).

Overlayed on these general principles of pleading are some additional issues implicated by (1) the fact that Plaintiff's claims arise from S&W's and Steinberg's actions as legal counsel for a client and (2) one of the claims asserted arises under RICO. In addition to general pleading inadequacies, the Amended Complaint fails to allege certain elements required to maintain a RICO claim. As discussed in greater detail below, each of these issues provides an independent ground for dismissing Plaintiff's claims against these defendants.

### A. Civil Conspiracy

#### 1. State Law Privilege[1]

Count IV arises under state law. "Missouri recognizes an absolute privilege for communications related to judicial and quasi-judicial proceedings." Alternate Fuels, Inc. v. Cabanas, 435 F.3d 855, 859 (8th Cir. 2006). Moreover, "[b]ecause an attorney is an alter ego of his or her client, a conspiracy between the attorney and client usually is not

---

[1] Defendants contend there is also a federal privilege that protects them from the RICO claim. They may be right, but the Court notes many of the cases they rely upon are couched in terms of whether a claim against an attorney can be made under various Civil Rights statutes. The Court's uncertainty, combined with the fact that Defendants will prevail for other reasons, suggests the best course is to express no opinion on this issue.

possible." Roth v. La Societe Anonyme Turbomeca France, 120 S.W.3d 764, 778 (Mo. Ct. App. 2003). These principles deprive Count IV of any viability. Communications made by S&W and Steinberg designed to advance their clients' interests cannot form the basis for a conspiracy. If they could, every attorney representing a tortfeasor or wrongdoer could become a conspirator simply by advancing his or her clients' interests in communications to other parties or before an adjudicatory body.

Plaintiff contends liability is based on conduct, not representations and statements. This contention is contradicted by the Amended Complaint, where the only acts attributed to these defendants involved statements made (or not made) to their clients, to Plaintiff, or to the Arbitrator. There is no allegation that S&W or Steinberg used, possessed, or destroyed anything. There is not even an allegation that they advised their clients to use, possess, or destroy Plaintiff's trade secrets or evidence relating to this case.

Plaintiff also invokes the "exceptional circumstances" exception, which dictates "that an attorney may be liable to a third person for acts arising out of the attorney's representation of a client, if the attorney is guilty of 'fraud, collusion, or a malicious or tortious act.'" Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co., 931 S.W.2d 166, 177 (Mo. Ct. App. 1996) (quoting Donahue v. Shughart, Thomson & Kilroy, P.C., 900 S.W.2d 624, 627 (Mo. 1995) (en banc)). Plaintiff attaches the label "fraud" to a great many of Defendants' statements and contends they were made "to further the conspiracies to violate RICO," but (1) the legal-label of "fraud" is not entitled to deference and (2) the only actions Plaintiff has identified consist of statements made while representing clients. Accepting these representations as fraud would, as stated earlier, expose every attorney to liability – which is why the privilege prohibits such claims.

Count IV is also foreclosed to the extent Plaintiff relies upon alleged misconduct during the arbitration. Transgressions in the context of a proceeding – including claims of improper conduct during the discovery process – do not qualify as exceptional circumstances, so there can be no liability. E.g., Phipps v. Union Elec. Co., 25 S.W.3d 679, 682 (Mo. Ct. App. 2000).

## 2. Civil Conspiracy's Elements

Plaintiff extolls its extremely long and detailed Amended Complaint as prima facie proof that it has alleged enough facts to satisfy the pleading requirements. Careful reading of the Amended Complaint reveals, however, that the allegations are insufficient as to the civil conspiracy claim against S&W and Steinberg.

"A civil conspiracy is an agreement or understanding between two or more persons to do an unlawful act or use unlawful means to do an otherwise lawful act." Trimble v. Pracna, 51 S.W.3d 481, 500 (Mo. Ct. App. 2001). It is not a cause of action unto itself, but rather a means of extending liability to parties who may have aided others in committing a tort without committing all of the elements of the tort themselves. Id. at 501. "A claim of conspiracy must establish: (1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and, (5) the plaintiff was thereby damaged." Rice v. Hodapp, 919 S.W.2d 240, 245 (Mo. 1996) (en banc).

As stated earlier, "[t]here can be no conspiracy between an agent and a principal." Mika v. Central Bank of Kansas City, 112 S.W.3d 82, 94 (Mo. Ct. App. 2003). An exception exists if the agent has an independent stake in achieving the objects of the conspiracy, id., but such is not the case here. Moreover, the "meeting of the minds" must be plead with sufficient facts to support the elements: not only because Missouri law requires it, Lyn-Flex West, Inc. v. Dieckhaus, 24 S.W.3d 693, 700 (Mo. Ct. App. 1999), but because Iqbal and Twombly require Plaintiff to plead facts sufficient to show more than the mere possibility that there was a meeting of the minds to misappropriate Plaintiff's trade secrets. Plaintiff has failed in this regard. The Amended Complaint might suggest the possibility there was a meeting of the minds to perpetuate and obscure misappropriations of trade secrets, but there are no allegations suggesting anything more.

9

B. RICO

RICO establishes both criminal penalties and a private right of action for those injured by "a pattern of racketeering activity." More specifically, a private right of action is bestowed upon "[a]ny person injured in his business or property by reason of a violation of" RICO. 18 U.S.C. § 1964(c). RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." Id. § 1962(c). RICO also makes it unlawful for anyone to conspire to violate its provisions. Id. § 1962(d). Count I alleges all Defendants (including S&W and Steinberg) violated RICO and conspired to violate RICO. Some of Defendants' arguments relate to the substantive RICO claim, while others relate to Plaintiff's allegations of conspiracy to commit RICO violations. The applicable context(s) will be identified in the discussion.

*1. Conducting or Participating in the Enterprise's Affairs*

In 1993, the Supreme Court discussed what was meant by phrase "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." The Court construed both verbs – "conduct" and "participate" – as relating to the concept of control over the enterprise. "To conduct" the enterprise's affairs means to lead, manage, or run. Reves v. Ernst & Young, 507 U.S. 170, 177-78 (1993). The Court then held that "to participate" in the affairs also required "some part in directing those affairs." Id. at 179. The Court ultimately endorsed a test that requires the defendant to participate in the enterprise's operation or management. Id. at 179, 183-85.

The Court then applied the standard to the case before it: a claim asserting accountants who audited a co-op participated in the co-op's operation or management through a pattern of racketeering activity (primarily securities fraud). The Reves majority rejected the contention that the accountants participated in the co-op's operation or management by negligently preparing the financial statements, explaining

that professional standards "do not define what constitutes management of an enterprise for the purposes of" RICO. Id. at 186.

The Eighth Circuit described Reves as "a fairly uncomplicated application of the operation or management test . . . built upon recognition that Congress did not mean for § 1962(c) to penalize all who are employed by or associated with a RICO enterprise, but only those who, by virtue of their association or employment, play a part in directing the enterprise's affairs." Handeen v. Lemaire, 112 F.3d 1339, 1348 (8th Cir. 1997). Provision of professional services will not expose someone to liability, even if the services are provided to a RICO enterprise. Id. It does not matter if those services are substandard because "RICO is not a surrogate for professional malpractice actions." Id. (citations omitted).

Of course, this rule is not "an absolute edict that an attorney who associates with an enterprise can never be liable under RICO." Id. at 1349. Parroting the language from Handeen, Plaintiff insists that it has plead S&W and Steinberg "crosse[d] the line between traditional rendition of legal services and active participation in directing the enterprise." The Amended Complaint makes these allegations in substantially similar words – however, this is a legal conclusion to which no deference is due. The actions, inactions, and statements described in the Amended Complaint do not demonstrate participation in the enterprise's operation or management. The mere fact that the actions described were consistent with the enterprise's objectives and allegedly constituted violations of professional standards does not substitute for facts demonstrating S&W or Steinberg directed the enterprise's actions.

*2. Pattern of Racketeering Activity*

A pattern of racketeering activity "requires at least two acts of racketeering activity" within a specified time-frame. 18 U.S.C. § 1961(5).[2] "Racketeering activity"

---

[2]There are additional requirements to establish a "pattern," e.g., H.J. Inc. v. Northwestern Bell Tele. Co., 492 U.S. 229 (1989), but those requirements are not at issue in this discussion.

consists of the commission of various specified crimes.  Id. § 1962(1).  The Amended Complaint does not adequately allege S&W or Steinberg engaged in racketeering activity.[3]

The first predicate acts alleged are violations of the mail fraud and wire fraud statutes.  18 U.S.C. §§ 1341, 1343.  Generally speaking, these statutes prohibit the use of mail or wire to perpetrate a fraud.  Plaintiff alleges Sullivan and S&W used the mail and wire communications "to send and receive Hallmark Confidential Information in furtherance of the scheme to defraud Hallmark . . . ."  AC, ¶ 249(a)(1).  Plaintiff also alleges these defendants mailed and wired communications to make fraudulent misrepresentations to Plaintiff, the Arbitrator, and the Court in order to hide other frauds committed by other defendants in the case so as "[t]o avoid the consequences of the theft of trade secrets . . . ."  AC, ¶ 249(a)(2).  With respect to the first allegation, the Amended Complaint does not allege Sullivan or S&W received any of Plaintiff's proprietary information.  The Amended Complaint alleges these defendants used the mail to return proprietary information to Plaintiff, but the Amended Complaint does not suggest such conduct was fraudulent.  The Amended Complaint also intimates S&W and Steinberg failed to return some of the proprietary information – but this does not constitute using the mail to receive or send anything.  The second allegation of mail/wire fraud runs afoul of problems similar to those discussed earlier with respect to the litigation privilege recognized under state law.  "A number of courts have considered whether serving litigation documents by mail can constitute mail fraud, and all have rejected that possibility."  United States v. Pendergraft, 297 F.3d 1198, 1208 (11th Cir. 2002) (citing cases); see also St. Germain v. Howard, 556 F.3d 261, 263 & n.1 (5th Cir. 2009).[4]

---

[3]Plaintiff has abandoned some of its allegations of racketeering activity.  Plaintiff's Suggestions in Opposition (Doc. # 130) at 24 n.21.  The abandoned allegations will not be addressed.

[4]The Amended Complaint characterizes a great many of Steinberg's statements to be "false."  The Amended Complaint does not allege that Steinberg knew all of these statements were false, which is critical requirement of the fraud claims.

12

The remaining predicate acts are based on 18 U.S.C. § 1512. Plaintiff alleges S&W and Steinberg violated sections 1512(c)(1) and 1512(c)(2). The former provision makes it unlawful to corruptly alter, destroy, mutilate, or conceal a record, document, or other object "with the intent to impair the object's integrity or availability for use in an official proceeding." The latter provision makes it a crime to corruptly obstruct, influence or impede "any official proceeding." The term "official proceeding" is a statutorily defined term and consists of proceedings (1) in a federal court, (2) before an agency of the federal government, (3) before Congress, or (4) involving the business of insurance. Id. § 1515(a). Neither Hallmark's investigation nor the arbitration was an "official proceeding." The only "official proceeding" was the action before this Court to confirm the arbitration award – but Plaintiff does not allege S&W or Steinberg violated section 1512(c)(2) in the context of that proceeding. In fact, as the Court has noted previously, neither S&W nor Steinberg were attorneys of record in that proceeding.

The Court concludes the Amended Complaint fails to allege S&W or Steinberg committed this racketeering act. Therefore, the Amended Complaint fails to allege these defendants engaged in a pattern of racketeering activity.

### 3. Allegations of Conspiracy

As mentioned earlier in the context of the civil conspiracy claim, Plaintiff relies on its detailed Amended Complaint to suggest it has demonstrated a "tacit understanding" between the criminal enterprise and its lawyers. In truth, Plaintiff only alleges agreements and exchanges of the sort expected between lawyers and their clients. What Plaintiff fails to allege is any agreement to engage in illegal conduct. Handeen, 112 F.3d at 1354 (RICO conspiracy established by showing violation of statute by some party and "additional evidence that the defendant entered into an agreement to breach the statute."); see also Salinas v. United States, 522 U.S. 52, 63-64 (1997) ("The partners in the criminal plan must agree to pursue the same criminal objective . . . ."); American Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1293-94 (11th Cir. 2010). At

best, the Amended Complaint alleges nothing more than facts that are consistent with liability; it does not cross the line to plausibility as required by Iqbal and Twombly.

### III.  CONCLUSION

For these reasons, the Court concludes the Amended Complaint fails to state a claim against Sullivan & Worcester LLP and Laura Steinberg.  The claims against them are dismissed in their entirety.

IT IS SO ORDERED.

DATE: November 22, 2010

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT