IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| HALLMARK CARDS, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 08-0840-CV-W-ODS |
| | ) | |
| MONITOR CLIPPER PARTNERS, LLC, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND OPINION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

Pending is a motion to dismiss filed by:

- Monitor Clipper Partners, LLC ("Clipper")
- Monitor Clipper Equity Partners II, LP ("Fund II")
- RPG Investment Holdings, LLC ("RPG Holdings")
- Adam Doctoroff
- Charles Yoon
- William Young
- Mark Thomas

Collectively, these defendants will be referred to as "the Clipper Defendants."

The motion seeks dismissal for a variety of reasons. The Court expresses no opinion on any arguments other than those discussed herein. For the following reasons, the motion (Doc. # 111) is granted in part and denied in part.

## I. BACKGROUND

### A. General

Plaintiff is a privately-held manufacturer of greeting cards. In 2001, Plaintiff and Monitor Company Group Limited Partnership ("Monitor") entered a contract whereby

Monitor provided Plaintiff with certain consulting services. The contract required Monitor to maintain the confidentiality of information provided to it by Plaintiff.

Clipper is a private equity investment firm. Most of Clipper's managing directors are also Monitor's limited partners, the entities are headquartered in the same building, and they share support systems and administrative functions. Monitor maintains a standing "case team" to assist Clipper in its business, and the entities publicly promote their working relationship. In November 2005, the media reported Clipper's interest in acquiring Recycled Paper Greetings, Inc. ("RPG"), one of Plaintiff's competitors. Plaintiff contacted Monitor and sought assurances that the confidentiality provisions of their contract had been followed and that none of its proprietary information had been provided to Clipper. Clipper's efforts with regard to the RPG matter were directed by Adam Doctoroff, a principal at Clipper. Clipper eventually formed Fund II to acquire RPG; Fund II, in turn, created a holding company called RPG Holdings as a vehicle for purchasing RPG. The acquisition was completed in December 2005. Meanwhile, Plaintiff, Monitor and Clipper continued communicating about Plaintiff's concerns until January 23, 2006, at which time Plaintiff became dissatisfied with Monitor's and Clipper's responses and initiated an arbitration proceeding.

On March 21, 2007, the Arbitrator issued his decision finding Monitor breached the confidentiality provisions in a myriad of ways, not all of which involved Clipper. Nonetheless, the Arbitrator found Monitor made Plaintiff's confidential information available to Clipper. "Even after Hallmark wrote to Monitor on November 22, 2005, expressing its concerns about Monitor's potential misuse of Hallmark's confidential information, Monitor continued to improperly disseminate Hallmark's information." Award, ¶ 43. In addition, Movant maintained the information on databases that were accessible by people who were not supposed to have access; "[m]any of those documents were also available to Monitor Clipper, even while it was contemplating and consummating the acquisition of" RPG. Award, ¶ 44. Clipper specifically sought the information in question: "To analyze the potential acquisition [of RPG], Monitor Clipper promptly contacted Monitor personnel who had worked on the Hallmark project because they had 'relevant experience' in the greeting card industry. Monitor assisted in this

process by identifying and referring Monitor Clipper to the Monitor consultants who had, through their consulting experience with Hallmark, specific expertise in the areas of concern to Monitor Clipper." Award, ¶ 58. Clipper contacted at least five of those consultants, who then provided advice to Clipper based on the confidential information or, in some instances, provided the information itself. Award, ¶¶ 59-79.

In March 2007, the Arbitrator issued a ruling in Plaintiff's favor (although it did not find in Plaintiff's favor on all of the claims asserted) and granted Plaintiff monetary and injunctive relief. In May 2007, Plaintiff and Monitor jointly filed an action in this Court (*Hallmark Cards, Inc. v. Monitor Company Group Limited Partnership*, No. 07-0357-CV-W-ODS) and asked for judicial confirmation of the Award. Judgment was entered on May 18, 2007. On June 25, 2008, Plaintiff filed a Motion for Relief From Judgment predicated on documents Monitor provided in May 2008 pursuant to the injunction's commands. The Motion was granted in December 2008; the judgment was vacated insofar as the monetary award was confirmed and the parties were directed to reconvene the arbitration proceeding.

Meanwhile, Plaintiff filed the instant suit in November 2008. In addition Clippper, Fund II, and Doctoroff, the original Complaint asserted claims against Monitor and principals, officers, or agents of Monitor. In March 2009 the Court held, *inter alia*, that the claims against the "Monitor Defendants" had to be arbitrated. In June 2010, Plaintiff filed an Amended Complaint that eliminated the Monitor Defendants. The Amended Complaint remains Plaintiff's operative pleading: it added the remaining Clipper Defendants and asserts the following claims:

Count I      violations of RICO and conspiracy to violate RICO
Count II      unjust enrichment
Count III      misappropriation of trade secrets
Count IV      conspiracy to misappropriate trade secrets
Count V      conversion
Count VI      fraud in the inducement

Count V is asserted against Clipper, Fund II, and RPG Holdings, and Count VI is asserted against Clipper. The remaining counts are asserted against all of the Clipper Defendants.

### B. Specific Allegations

The Amended Complaint ("AC") alleges an enterprise consisting of Monitor and Clipper "together with certain of their present and former partners and employees" designed to misappropriate and use trade secrets and confidential information obtained from Monitor's clients. AC, ¶ 17. Monitor's consulting business requires it to have access to clients' proprietary information, which it falsely promises will remain confidential. Monitor allegedly shares this information freely with Clipper so that Clipper can make investment and other business decisions. E.g., AC, ¶¶ 18-28. Plaintiff identifies four other acquisitions of Clipper's that were in industries in which Monitor allegedly previously performed consulting work for others in those industries. AC, ¶¶ 91-107.

Clipper, Doctoroff, Young, Yoon, and Thomas are alleged to have conspired with Monitor "to mine Hallmark Confidential Information and Monitor's knowledge of [the] greeting card industry, which Monitor had learned through its confidential work for Hallmark." AC, ¶ 35. The are alleged to have then used that information to make decisions about acquiring and operating RPG. AC, ¶¶ 35, 42. Doctoroff is alleged to have spearheaded the evaluation of RPG on behalf of Clipper, while Yoon and Young were "responsible for the RPG acquisition and were [Clipper's] primary contacts with RPG both during and after the acquisition." AC, ¶ 44. Thomas is simply described as being among those who "decided to pursue the acquisition of RPG." AC, ¶ 45. Other paragraphs detail some of the individuals' actions during the course of the evaluation and acquisition process, none of which are alleged to have occurred in Missouri.

Plaintiff alleges that when it began directing inquiries to Monitor about misuse of its confidential information, Monitor and the Clipper Defendants "engaged in a scheme and conspiracy to hide evidence of such use as well as evidence of such use in the

4

operation of RPG after the acquisition." AC, ¶ 136. Clipper, through counsel, is alleged to have communicated to Hallmark via telephone that it had none of Plaintiff's proprietary information. These representations are alleged to be false. AC, ¶¶ 146-48. The aforementioned arbitration commenced in January 2006 and involved Plaintiff and Monitor: the Clipper Defendants were not parties. In August 2006 Plaintiff sought to depose Clipper; through counsel, Clipper sent an e-mail to Plaintiff's counsel attempting to limit the deposition's scope because Clipper purportedly possessed only limited summaries of portions of Plaintiff's information. AC, ¶ 167. Doctoroff testified on behalf of Clipper, and testified that Clipper obtained no financial or other information about Plaintiff from Monitor, and had none of Plaintiff's documents. This testimony is alleged to be false. AC, ¶¶ 168-69.

Part of the Award was injunctive in nature, and required Monitor to search and account for physical and electronic copies of Plaintiff's information. During the course of this effort Monitor is alleged to have uncovered documents revealing a much more significant exchange of documents and information between Monitor and Clipper than had previously been revealed. Some of that information had been revealed directly to Doctoroff. AC, ¶ 212. These revelations were discussed in a meeting of principals from Monitor and Clipper, including Young and Thomas. AC, ¶ 202.

After the Award was issued Plaintiff also continued requesting information from Clipper. AC, ¶ 213. In June 2007, Clipper (through counsel) responded to a letter sent by Plaintiff representing that Clipper did not request or receive any of Plaintiff's confidential information. AC, ¶¶ 191. Additional representations to this effect were made in the ensuing months. AC, ¶¶ 215, 217-19. Nonetheless, Plaintiff and Clipper negotiated a Confidential Agreement; one of the provisions called for Clipper to search its physical and electronic files for Plaintiff's confidential information. Clipper negotiated for search terms that were designed to avoid discovery of such information. AC, ¶¶ 225-28.

## II. DISCUSSION

### A. Personal Jurisdiction

#### *1.*

Initially, the Court must address Plaintiff's argument that the issue of personal jurisdiction has already been resolved. The issue has been discussed, and while the Court ruled in Plaintiff's favor that ruling was not intended to be a final resolution of the matter. A ruling declining to dismiss for lack of personal jurisdiction is, by its nature, interlocutory in nature. See Dakota Indus. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991). Moreover, the Court specifically warned that its March 16, 2009, decision should not be construed as the final word on the matter when it said "this determination is preliminary. It is based solely on the uncontested information in the Clipper Defendants' affidavits and the uncontested allegations in the Complaint, all construed in the light most favorable to Plaintiff. Further development of the Record may require a different result when the case is actually tried."

The case has not been tried, but the Record has been developed further. First, the Amended Complaint – which eliminated the Monitor Defendants and contained more allegations than the original Complaint – provides the Court with information it did not have previously. Second, RPG Holdings, Yoon, Young and Thomas were not defendants when the Court issued its March 2009 Order, so that Order could not have evaluated their Due Process claims. Finally, the parties have provided additional affidavits and arguments bearing on the issue of personal jurisdiction, and these arguments deserve consideration.

2.

There are two broad categories of personal jurisdiction.[1] "Specific jurisdiction refers to jurisdiction over causes of action that 'arise out of' or 'relate to' a defendant's activities within a state." Lakin v. Prudential Securities, Inc., 348 F.3d 704, 707 (8th Cir. 2003) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). "General jurisdiction, on the other hand, refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose." Id. (quotation omitted). Plaintiff does not contend Defendants are subject to general jurisdiction in this state, and therefore relies on their specific contacts with the state to justify suing them here. This requires a showing that

> [t]he nonresident defendant's conduct and connection with the forum state . . . be such that [it] should reasonably anticipate being haled into court there, and it is essential that there be some act by which the defendant purposefully avails [it]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. Purposeful availment means that the defendant's contacts with the forum state must not be random, fortuitous, attenuated, or the result of unilateral activity of a third person or another party.

Guiness Import Co. v. Mark VII Distributors, Inc., 153 F.3d 607, 614 (8th Cir. 1998) (internal citations omitted); see also Dever v. Hentzen Coatings Inc., 380 F.3d 1070, 1073-74 (8th Cir. 2004). The "minimum contacts" analysis required by the Fourteenth

---

[1] The Court has bypassed consideration of Missouri's long-arm statute because "[i]t is well settled that the Missouri long arm statute authorizes the exercise of jurisdiction over non-residents 'to the extent permissible under the due process clause.'" Porter v. Berrall, 293 F.3d 1073, 1075 (8th Cir. 2002) (quoting FDIC v. Malmo, 939 F.2d 535, 537 (8th Cir. 1987)). Therefore, the entire analysis dovetails, except (perhaps) for one issue. While many cases establish that a party can be liable for a co-conspirator's actions, it does not appear that Missouri law imposes personal jurisdiction on a party based solely on a co-conspirator's actions. State ex rel. Sperandio v. Clymer, 581 S.W.2d 377, 383-84 (Mo. 1979) (en banc); see also State ex rel. Pain, Anesthesia & Critical Care Sevices, P.A. v. Ryan, 728 S.W.2d 598, 602-04 (Mo. Ct. App. 1987) (discussing Clymer).

7

Amendment calls for consideration of the following factors: "(1) the nature and quality of contacts with the forum state; (2) the quantity of these contacts; (3) the relationship between the contacts and the cause of action; (4) the interest of the forum state; and (5) the convenience of the parties."  Wines v. Lake Havasu Boat Mfg., 846 F.2d40, 42 (8th Cir. 1988).  The first three factors are of primary importance.  E.g., Austad Co. v. Pennie & Edmonds, 823 F.2d 223, 226 (8th Cir. 1987).  "The existence of personal jurisdiction . . . depends upon . . . a sufficient connection between the defendant the forum state to make it fair to require defense of the action in the forum."  Kulko v. Superior Court of Cal., 436 U.S. 84, 91 (1978).

      None of the Clipper Defendants have regular or consistent contact with Missouri such that general jurisdiction exists.  They do not conduct business, own property, or maintain an office or other form of contact in the state.  The two entities are not registered to do business in Missouri, and none of the individuals have a driver's licence, professional license, property, or other tie to the state.  This leaves the possibility that the Clipper Defendants are subject to jurisdiction because of their actions giving rise to Plaintiff's claims.  Each defendant's contacts must be considered separately.  Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781 n.13 (1984).  In addition, the agreement between Plaintiff and Clipper contained the following clause:

> Hallmark and Hallmark Counsel also agree that [Clipper's] entering into this Confidential Agreement and/or performance of its obligations under this Confidential Agreement will not be used as support for an argument that [Clipper] is subject to personal jurisdiction, service or process or venue in Missouri Courts.

Therefore, Plaintiff cannot predicate personal jurisdiction on any acts taken to fulfill obligations imposed by the agreement.

      Yoon, Young, and Thomas are not alleged to have had any contact, much less the necessary minimum contacts, with this forum.  Similarly, nothing is mentioned about any contacts by Fund II or RPG Holdings.  These defendants must be dismissed.

      Doctoroff presents a closer question.  He submitted to a deposition in Massachusetts for use in the arbitration in Missouri, and allegedly knew that was the

8

purpose of the deposition.  Doctoroff is alleged to have intentionally provided false testimony in that deposition, knowing it would be relied upon by the parties and, potentially, the Arbitrator.  This does not appear to be a fortuitous contact with Missouri.  It is not clear whether this contact was voluntary such that it can be characterized as "purposely directed" into Missouri.  E.g., Steinbuch v. Cutler, 518 F.3d 580, 586 (8th Cir. 2008).  This may be a thin reed upon which to rest jurisdiction, and the Court may ultimately conclude that jurisdiction over Doctoroff is lacking.  At the present, the Court's obligation to construe matters in Plaintiff's favor compels concluding that Doctoroff should not be dismissed.

Clipper's contacts were greater than Doctoroff's in that they consisted of communications responding to Plaintiff's inquiries.  Clipper was not obligated to respond: its decision to do so resulted in activity purposefully directed into Missouri.  Its responses are alleged to have either (1) harmed Plaintiff or (2) furthered the conspiracy that harmed Plaintiff.  The Court concludes, based on the current Record, that it has jurisdiction over Clipper.

### 3.

The only remaining issue to be addressed is Plaintiff's contention that its allegations of a conspiracy permit the Court to impose jurisdiction over Fund II, RPG Holdings, Yoon, Young, and Thomas.  RICO contains a nationwide service provision declaring that if a court has personal jurisdiction over one or more RICO defendants, the court may exert jurisdiction over other parties if required to promote the ends of justice.  18 U.S.C. § 1965(b).  The Eighth Circuit has not addressed this provision.  The Court concludes the ends of justice do not justify exerting jurisdiction over Yoon, Young, and Thomas.

Some courts hold the "ends of justice" provision is triggered only if there is no district where all defendants are amenable to jurisdiction.  E.g., FC Inv. Group LC v. IFX Markets, Ltd., 529 F.3d 1087, 1100 (D.C. Cir. 2008); PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 71 n.5 (2d Cir. 1998); Butcher's Union Local No. 498 v. SDC

9

Investment, Inc., 788 F.2d 535, 539 (9th Cir. 1986). Here, all of the Clipper Defendants – indeed, all of the defendants who are in or have been named in this suit – are amenable to suit in the District of Massachusetts. Under this rule, then, the ends of justice do not permit the Court to exert jurisdiction over these defendants.

Plaintiff invokes the Tenth Circuit's view, which holds that section 1965(b)'s "'ends of justice' analysis is not controlled by the fact that all defendants may be amenable to suit in one forum." Cory v. Aztec Steel Bldg., Inc., 468 F.3d 1226, 1232 (10th Cir. 2006). The Tenth Circuit declined to "offer a competing definition, as the 'ends of justice' is a flexible concept uniquely tailored to the facts of each case." Id. However, the concept is not so flexible that it can be satisfied solely with allegations that the plaintiff has suffered damage in a particular forum, id. at 1232-33, and this is all Plaintiff offers to support invocation of the "ends of justice." Therefore, regardless of which interpretation is employed, RICO does not permit the Court to exert jurisdiction over Fund II, RPG Holdings, Yoon, Young, or Thomas.

## B. RICO Claims

RICO establishes both criminal penalties and a private right of action for those injured by "a pattern of racketeering activity." More specifically, a private right of action is bestowed upon "[a]ny person injured in his business or property by reason of a violation of" RICO. 18 U.S.C. § 1964(c). RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." Id. § 1962(c). RICO also makes it unlawful for anyone to conspire to violate its provisions. Id. § 1962(d). Count I alleges all defendants (including Clipper and Doctoroff) violated RICO and conspired to violate RICO. A pattern of racketeering activity "requires at least two acts

10

of racketeering activity" within a specified time-frame. 18 U.S.C. § 1961(5).[2] "Racketeering activity" consists of the commission of various specified crimes. Id. § 1961(1). The Amended Complaint does not adequately allege Clipper or Doctoroff engaged in racketeering activity.[3]

The first predicate acts alleged are violations of the mail fraud and wire fraud statutes. 18 U.S.C. §§ 1341, 1343. Generally speaking, these statutes prohibit the use of mail or wire to perpetrate a fraud. Plaintiff alleges Defendants used the mail and wire communications "to send and receive Hallmark Confidential Information in furtherance of the scheme to defraud Hallmark . . . ." AC, ¶ 249(a)(1). Plaintiff also alleges Defendants mailed and wired communications to make fraudulent misrepresentations to Plaintiff, the Arbitrator, and the Court in order to hide other frauds committed by other defendants in the case so as "[t]o avoid the consequences of the theft of trade secrets . . . ." AC, ¶ 249(a)(2). The problem is: Plaintiff fails to describe the alleged fraud. Misappropriation of trade secrets is not fraud; it may be tortious, but it does not support a claim for wire and mail fraud. The existence of a RICO enterprise is not, in and of itself, a fraud; thus, Plaintiff's allegations about Clipper Defendants' efforts to obscure the existence of the conspiracy or the RICO enterprise do not constitute frauds. "A number of courts have considered whether serving litigation documents by mail can constitute mail fraud, and all have rejected that possibility." United States v. Pendergraft, 297 F.3d 1198, 1208 (11th Cir. 2002) (citing cases); see also St. Germain v. Howard, 556 F.3d 261, 263 & n.1 (5th Cir. 2009). This extends to statements by counsel expressing the position of the client: if such communications could constitute fraud, "every dispute in which the parties' counsel exchanged letters could give rise to

---

[2]There are additional requirements to establish a "pattern," e.g., H.J. Inc. v. Northwestern Bell Tele. Co., 492 U.S. 229 (1989), but given the absence of any viable racketeering acts, there is no need to decide whether those acts qualify as a pattern of racketeering activity.

[3]Plaintiff has abandoned some of its allegations of racketeering activity. Plaintiff's Suggestions in Opposition (Doc. # 129) at 16 n.14. The abandoned allegations will not be addressed.

RICO litigation. Such activity simply is not fraudulent." Paul S. Mullin & Assocs. v. Bassett, 632 F. Supp. 432, 540 (D. Del. 1986); see also Nolan v. Galaxy Scientific Corp., 269 F. Supp. 2d 635, 643 (E.D. Pa. 2003). As for Doctoroff, there is no allegation that he used the mail or wire to do anything in particular. Plaintiff essentially presents a multitude of allegedly false statements and allegations of improper actions and characterizes the combination as a fraud. The Court concludes that, as to these two Defendants, the Amended Complaint does not adequately allege acts of mail or wire fraud.

      The second and third predicate acts alleged are based on 18 U.S.C. § 1512, specifically sections 1512(c)(1) and 1512(c)(2). The former provision makes it unlawful to corruptly alter, destroy, mutilate, or conceal a record, document, or other object "with the intent to impair the object's integrity or availability for use in an official proceeding." The latter provision makes it a crime to corruptly obstruct, influence or impede "any official proceeding." The term "official proceeding" is a statutorily defined term and consists of proceedings (1) in a federal court, (2) before an agency of the federal government, (3) before Congress, or (4) involving the business of insurance. Id. § 1515(a). Neither Hallmark's investigation nor the arbitration was an "official proceeding." The only "official proceeding" was the action before this Court to confirm the arbitration award. Plaintiff nonetheless insists it has alleged Clipper and Doctoroff have committed these predicate acts because their destruction and concealment of documents and their and obstruction of Plaintiff's investigation affected this lawsuit, the Court's monitoring of the injunction, and the related contempt proceedings. Plaintiff directs the Court's attention to many allegations in the Amended Complaint, but they do not satisfactorily allege wrongdoing of the type required by the statute. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); see also Cole v. Homier Distrib. Co., 599 F.3d 856, 861 (8th Cir. 2010). None of the actions described occurred while an official proceeding was pending. As a practical matter, it is not possible to interfere with an official proceeding that does not exist absent some basis for believing that proceeding will exist. Simple denials of culpability cannot be deemed to interfere with official proceedings: if they could, then all would-be litigants who do not immediately confess to

12

wrongdoing would be criminally liable. Some of the actions were not taken by Clipper or Doctoroff. Finally, the Amended Complaint does not even allege Clipper or Doctoroff intended to interfere with an official proceeding.

The last racketeering act posited alleges the interstate transfer or receipt of stolen goods in violation of sections 2314 and 2315. The weight of authority establishes that these provisions apply to tangible property, not intellectual (or other intangible) property. E.g., United States v. Stafford, 136 F.3d 1109, 1114-15 (7th Cir. 1998); United States v. Brown, 925 F.2d 1301, 1307-09 (10th Cir. 1991). Applying these statutes to a "theft of trade secrets" claim is rendered more inappropriate by the fact that another statute already criminalizes such activity. 18 U.S.C. § 1832. Unfortunately for Plaintiff, section 1832 is not a racketeering act.

Plaintiff relies on cases (and amendments to the statutes) involving transmission of money, but these cases are distinguishable. The issue addressed by these authorities involves transfers of money that take the form of electronic credits and debits – intangible representations of tangible goods. See, e.g., United States v. Kroh, 915 F.2d 326, 328 (8th Cir. 1990) (adopting United States v. Kroh, 896 F.2d 1524, 1528-29 (8th Cir. 1990)). These cases are inapplicable.

### C. Unjust Enrichment and Conversion

Count II asserts a claim for unjust enrichment against the Clipper Defendants. Count V asserts a claim for conversion against Clipper.[4] The Clipper Defendants argue these claims are preempted by the Uniform Trade Secret Act as adopted by Missouri. Section 417.463.1 of the Missouri Statutes provides that the Trade Secret Act "displace[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret."

---

[4]Count V also asserts a conversion claim against Fund II and RPG Holdings, but they have already been dismissed.

Plaintiff contends the tort claims are valid if the information at issue is not determined to be a trade secret, but agrees that if its proprietary information is a trade secret then the tort claims are preempted. Therefore, unless and until (1) Defendants concede or (2) the Court determines the information at issue constitutes trade secrets, all three claims are viable. The Clipper Defendants disagree, relying primarily[5] on a decision of the Hawaii Supreme Court interpreting that state's Trade Secret Act and holding that it "preempts non-contract, civil claims based on the improper acquisition, disclosure or use of confidential and/or commercially viable information that does not rise to the level of a statutorily-defined trade secret." BlueEarth Biofuels, LLC v. Hawaiian Elec. Co., Inc., 235 P.3d 310, 327 (Ha. 2010). The Court does not believe the Missouri Supreme Court would adopt this interpretation of its statute.

The Missouri Supreme Court has not addressed this issue, so it is incumbent upon the Court to predict how that court would resolve the issue. E.g., Campbell v. Davol, Inc., 620 F.3d 887, 893 (8th Cir. 2010). There are no decisions from the Missouri Court of Appeals to aid in this endeavor. The Court thus starts with the statute's language. Section 417.463.1 preempts alternative claims that might "provid[e] civil remedies for misappropriation of a trade secret." If the object in question were not a tangible object (e.g., a television), there would be no viable argument that a claim for conversion is preempted. Why? Because the remedy sought does not involve "misappropriation of a trade secret." For preemption to be triggered, the property that has been stolen/misappropriated must be a trade secret: otherwise, the Trade Secret Act has no application. Defendants' (and the Hawaii Supreme Court's) interpretation effectively rewrites the statute to preempt claims for misappropriation/theft of "information," which is not what the statute says.

If the information Plaintiff has described as proprietary qualifies as a trade secret, then Plaintiff's only remedy lies under the Trade Secret Act. In that case, if Plaintiff cannot demonstrate that the trade secret was misappropriated, Plaintiff will be left with

---

[5]The Clipper Defendants cite other cases, but other than this decision none suggest that the Trade Secret Act preempts claims involving the loss/theft/misappropriation of non-trade secrets.

14

no remedy. However, if the information does not qualify as a trade secret, then the Trade Secret Act has no application. Until that determination is made, the Court cannot conclude whether Counts II and V are preempted.[6]

### D. Trade Secrets

In Count V, Plaintiff alleges the Clipper Defendants (1) misappropriated or (2) conspired to misappropriate trade secrets. A trade secret is

> information, including but not limited to, technical or nontechnical data, a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> • derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use;
>
> • is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mo. Rev. Stat. § 417.453(4). The Clipper Defendants contend the Amended Complaint does not adequately describe the trade secrets. The Court disagrees; while the information is occasionally described as a "trade secret," the Amended Complaint provides details about the character and nature of the information that is sufficient to suggest the information qualifies as a trade secret. See, e.g., AC, ¶¶ 34, 38, 259-61. The Clipper Defendants' other arguments involve factual inquiries that should not be evaluated under Rule 12(b)(6).

The Clipper Defendants also contend Plaintiff's claim of conspiracy (Count IV) is preempted by the Trade Secret Act. The Court disagrees because, despite its name and connotations, a civil conspiracy is not a cause of action. "Civil conspiracy is not a cause of action in and of itself; rather, it extends liability based on an underlying

---

[6]In a footnote, the Clipper Defendants contend Count II should also be dismissed because Plaintiff has not adequately alleged that a benefit was conferred on them. The Court disagrees. See, e.g., AC, ¶¶ 73, 76, 80-81, 84, 125-28, 255.

15

wrongful act." Mark VII, Inc. v. Barthol, 926 S.W.2d 128, 131 (Mo. Ct. App. 1996) (citing Royster v. Baker, 365 S.W.2d 496, 499 (Mo.1963)). "[T]he doctrine of civil conspiracy extends liability for tort to persons other than the actual wrongdoer but it is the acts causing damage to the plaintiff that give rise to liability for damages, not the conspiracy itself." Farmland Industries v. Frazier-Parrott Commodities, Inc., 871 F.2d 1402, 1409 (8th Cir. 1989) (internal quotations and ellipses omitted); see also Gott v. First Midwest Bank of Dexter, 963 S.W.2d 432, 437-38 (Mo. Ct. App. 1998). It is a theory of vicarious liability, allowing a plaintiff to sue a defendant who did not actually commit an actionable wrong so long as the defendant agreed to help – and actually did help – the one who actually committed the wrong. The Court also holds that the Amended Complaint adequately alleges the existence of an agreement to misappropriate Plaintiff's information, as well as independent acts of misappropriation by the two remaining defendants.

### E. Fraud

Count VI asserts a fraud claim against Clipper only. This count focuses on the negotiations that led to the Confidential Agreement and Release. Plaintiff alleges Clipper misrepresented the extent of its use and possession of Plaintiff's information or failed to disclose material information about those topics. Plaintiff alleges that if it had "known that there was direct evidence that Hallmark Confidential Information had been provided to Monitor Clipper, it would not have agreed to the Confidential Agreement which delayed legal process against Monitor Clipper and appropriate relief for Hallmark." AC, ¶ 282.

Plaintiff's claim suffers from problems with the elements of reliance and damage, both of which are required for fraud claims. E.g., Huttegger v. Davis, 599 S.W.2d 506, 511-12 (Mo. 1980) (en banc). The Confidential Agreement Plaintiff alleges it was fraudulently induced to enter required Clipper to search for confidential information. AC, ¶¶ 222-24. This specific allegation defeats Plaintiff's general assertion that it relied on Clipper's representations when it entered the Confidential Agreement: if Plaintiff had

16

truly relied on Clipper's representations, Plaintiff would not have negotiated for a search of Clipper's physical and electronic files. Moreover, The Confidential Agreement with Clipper was negotiated *after* the arbitration with Monitor was completed: by that time, Plaintiff had argued – and the Arbitrator found – that Clipper had used Plaintiff's information. Plaintiff's allegations belie reliance.

Similarly, given that Clipper's alleged efforts to mislead Plaintiff failed, it is difficult to see how Plaintiff was damaged. Plaintiff suggests it could have filed suit against Clipper sooner, but this is not "damage" that the law recognizes. Plaintiff points to its allegations that Clipper Defendants destroyed evidence, but there is no allegation suggesting that this destruction was caused by Plaintiff's purported filing of suit.[7]

### III. CONCLUSION

Defendants Monitor Clipper Equity Partners II, LP, RPG Investment Holdings, LLC, Charles Yoon, William Young, and Mark Thomas are dismissed without prejudice for lack of personal jurisdiction. Counts I and VI are dismissed for failure to state a claim.

IT IS SO ORDERED.

DATE: December 2, 2010

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT

---

[7]The Court rejects the Clipper Defendants' invocation of the economic loss doctrine, which "bars recovery of purely pecuniary losses in tort where the injury results from a breach of a contractual duty." Dubinsky v. Mermart, LLC, 595 F.3d 812, 819 (8th Cir. 2010). Plaintiff's claim does not arise from a contractual duty: at the time of the alleged misrepresentations and omissions there was no contract and, hence, no contractual duty. Elsewhere, Plaintiff describes Clipper's failure(s) to comply with the Confidential Agreement, but Count VI does not rest upon these, post-contract acts/statements.