IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

HALLMARK CARDS, INCORPORATED, )
)
Plaintiff, )
)
vs. ) Case No. 08-0840-CV-W-ODS
)
MONITOR CLIPPER PARTNERS, LLC, et al., )
)
Defendants. )

ORDER AND OPINION DENYING PLAINTIFF'S MOTION FOR SANCTIONS AND GRANTING ALTERNATIVE REQUEST FOR JURY INSTRUCTION REGARDING DESTRUCTION OF EVIDENCE

Pending is Plaintiff's Motion for Sanctions (Doc. # 336), which is based on Plaintiff's contention that Defendants destroyed documents relevant to this lawsuit. The motion asks the Court to strike Defendants' pleadings and enter judgment for Plaintiff or, alternatively, declare that Plaintiff is entitled to a jury instruction permitting the jury to draw inferences against Defendants. The Court declines to strike Defendants' pleadings or enter judgment based on Defendants' destruction of, or failure to preserve, documents. The Court expresses its intent to read an adverse inference instruction to the jury.

## I. PROLOGUE

The Court begins by addressing Defendants' procedural defenses. They first contend Plaintiff failed to follow Local Rule 56.1's requirement that individual facts be set forth in separate paragraphs. The obvious flaw in this argument is that this motion is not a motion for summary judgment, so Local Rule 56.1 does not apply. While the Court's Scheduling and Trial Order set forth requirements for "dispositive motions," it is not so clear that these requirements applied to anything other than motions under Rule 12 or Rule 56. The Court would have preferred those standards be followed, but the

Court cannot say Plaintiff should have known it was required to follow the dictates applicable to dispositive motions – and the Court is unwilling to reject the motion out of hand on this basis.

Defendants next contend the motion is untimely. The Court disagrees. The motion is predicated on the destruction of evidence. It seems entirely appropriate to wait until discovery is completed – and all evidence is discovered – to file the motion. The Court also notes that it did not establish a deadline for a motion of this sort: given its dispositive nature, Plaintiff's reliance on the deadline for dispositive motions is reasonable.

## II. FACTUAL BACKGROUND

The parties have provided significant documentary material regarding Plaintiff's claims. The Court will attempt to address each of the factual issues separately. Inasmuch as the Court is the factfinder with regard to sanctions, the Court's rendition will include factual conclusions based on the materials submitted.

### A. Litigation Hold

Plaintiff first faults Defendant Monitor Clipper ("Clipper") for failing to institute a litigation hold on documents in January 2006, when it first acted on the potential for litigation. As has been discussed in the past, the genesis of the parties' dispute arose out of a dispute between Plaintiff and a company related to Monitor Clipper called Monitor Company Group Limited Partnership ("Monitor"). In 2001, Plaintiff and Monitor entered a contract whereby Monitor provided Plaintiff with certain consulting services. The contract required Monitor to maintain the confidentiality of information provided to it by Plaintiff. In November 2005, the media reported Clipper's interest in acquiring Recycled Paper Greetings, Inc. ("RPG"), one of Plaintiff's competitors. On November 22, Plaintiff contacted Monitor and sought assurances that the confidentiality provisions of their contract had been followed and that none of its proprietary information had been

provided to Clipper. The concern was well-founded; as the Court has found in the past, most of Clipper's managing directors are also Monitor's limited partners, the entities are (or, at least, were) headquartered in the same building, and they share support systems and administrative functions. Monitor maintains a standing "case team" to assist Clipper in its business, and the entities publicly promote their working relationship. Thus, Plaintiff's concern that Monitor may have been helping Clipper in its acquisition of RPG was justified.

Attorney Larua Steinberg represented Monitor, and she began gathering information to prepare a response to Plaintiff's letter. Concerned that it might become involved in litigation on this matter, Clipper retained attorneys Patrick O'Toole and James Westra in January 2006. The decision proved prescient, as Plaintiff initiated arbitration against Monitor and Clipper became involved in that proceeding – not as a full-fledged party, but rather as a target from whom information was sought. That same month, Westra engaged in conversations with Plaintiff's counsel about Plaintiff's concerns. In addition, conversations between members of Monitor's and Clipper's "legal teams" ensued, and other individuals (for instance, Bill Young) were involved in their dual capacities as officers/employees of both Monitor and Clipper. These (and other facts) previously led the Court to conclude that Monitor and Clipper possess a "common interest" or "joint defense" extending the attorney/client privilege to communications between them. See, e.g., Order dated January 18, 2012 (Doc. # 247).

Plaintiff and Monitor proceeded to arbitration (pursuant to an arbitration provision in the consulting agreement); prior to arbitration the parties were permitted to engage in a certain amount of discovery. The arbitrator issued his ruling on March 21, 2007; included in his findings was the conclusion that Monitor provided confidential information to Clipper, and actually continued doing so *after* Plaintiff initially expressed concerns in November 2005. The arbitrator also found that during the RPG acquisition, Clipper personnel freely contacted Monitor personal who were working on behalf of Hallmark. The arbitrator awarded Plaintiff $4.1 million and injunctive relief. At the parties' request, the award was confirmed on May 18, 2007.

Meanwhile, by January 2006 (and possibly earlier), Clipper received a copy of Plaintiff's November 2005 letter to Monitor. In that letter, Plaintiff demanded that Monitor "maintain all documents in whatsoever form including electrnoic (whether in the custody or control of [Monitor] or any of its operating companies including [Clipper]" related to a a variety of topics including Monitor's dissemination of Hallmark's information, Clipper's receipt of Hallmark's information, and the RPG transaction. However, Clipper did not take any immediate action to preserve documents. Young testified that no such instruction was circulated to Clipper employees until late 2006 or 2007. Young Dep. at 186. Michael Thomas testified to not knowing if a hold was ever issued. Thomas Dep. at 171. The privilege log submitted in this case indicates a litigation hold was implemented in May 2007 – *after* the arbitrator issued his ruling.[1]

B. Peter Kim

Peter Kim was a Clipper employee from August 2005 to July 2006; during his tenure he worked on Clipper's acquisition of RPG. Clipper contends that all of Kim's work was placed in a shared directory and the contents of the shared directory were preserved and produced to Plaintiff. However, when Kim left Clipper, his computer was "recycled" as part of Clipper's "routine exiting practice," resulting in the deletion of all data. Any data or files that had not been transferred to the shared directory were irretrievably lost – including, at issue in this proceeding, any of his e-mails. In addition, certain papers were destroyed when Kim left Clipper; because they were destroyed, there is no way to determine if they were simply copies of items that were on the shared directory.

Plaintiff argues that without Kim's computer there is no way to determine that "all" relevant documents were placed on the shared directory. Plaintiff also points out that

[1]Defendants proffer Laura Steinberg's deposition, but it is unhelpful. First, Steinberg was Monitor's lawyer, not Clipper's. Second, she is asked if a litigation hold was communicated to Monitor's employees, not Clipper's. Third, her answer does not clearly establish that any effort to retain documents was made by either entity.

Kim testified – consistent with the previous observations about Clipper's lack of effort to preserve documents – that he was never told to preserve items related to Hallmark or RPG. Plaintiff also points out that because not all of Kim's e-mails have been (or can be) produced, there is no way for Plaintiff to fully track the extent to which its confidential information was disseminated – particularly since other employees' e-mails were also destroyed. Plaintiff also cannot ascertain if (or the extent to which) Kim supplied information to those outside Clipper and Monitor, including particularly Credit Suisse First Boston ("CSFB"). CSFB prepared information for investors that was allegedly derived from information supplied by Clipper that was itself based on Hallmark's confidential information provided by Monitor. Defendants suggest there is no proof that Kim contributed to CSFB information – but of course, the lack of proof may be due to Clipper's failure to preserve Kim's e-mails.

C. Monitor's Standing Case Team

In January 2005, a memorandum was prepared to describe Monitor's "ongoing efforts" to support Clipper's acquisition business. According to the memorandum (Exhibit T to Plaintiff's motion), Monitor was to "staff a case team to exclusively serve [Clipper] for the 2005 calendar year. This project is more akin to a retainer relationship, by which the Monitor team is dedicated 100% to [Clipper]." Case Team members were stationed in Clipper's office space and, for all intents and purposes, were effectively working directly and solely for Clipper for that year. Some members of the Case Team – including particularly Grant Brown and Jeffrey Pauker – assisted Clipper's efforts regarding RPG. Indeed, the Case Team's existence, origin, and access to Hallmark information was mentioned in presentations to RPG's management. However, none of their computers was preserved.

Defendants dismiss any responsibility for preserving the Case Team members' computers or documents, contending they were employed by Monitor. The Court is not impressed with Defendants' argument for two reasons. First, as previously noted in this and other Orders, Monitor and Clipper were closely related entities whose business

operations were intertwined. Second, and more importantly, Clipper controlled the activities of the Case Team and its claim that it lacked sufficient authority or responsibility to direct that they preserve evidence is unacceptable – particularly given the background to this dispute and Clipper's knowledge about the possibility of litigation.

The Court notes Defendants do not contend Grant's and Pauker's files were placed on the shared directory (as was the case with Kim). Defendants contend that it is unlikely that there are any e-mails that were not produced because all e-mails that exist were obtainable from other people's computers. However, if Grant or Pauker sent e-mails between themselves, Kim, and others whose e-mails were not retained, those e-mails have been lost forever. Defendants hint at such a possibility, but suggest there is no proof – but there is no proof only because Defendants failed to preserve it.

D. Paul Maxwell and Jan Murley

Maxwell was a Clipper employee who worked on the RPG acquisition as early as October 2005. He continued work in connection with RPG after the acquisition.

Jan Murley was a former executive with Plaintiff who was allegedly recruited by Clipper for the purpose of working for RPG. Maxwell was Murley's initial and primary contact.

In January 2007, Plaintiff expressed concerns about Murley's employment with RPG. Plaintiff alleges that in response to those concerns "Maxwell worked with Murley . . . to execute a revised version of her consulting agreement with RPG" that falsely represented that Murley had not and would not provide or use any material obtained from Plaintiff. Clipper also retained an outside vendor to image computers (including Maxwell's), apparently to preserve evidence of who did and did not receive confidential/proprietary information from Murley. The confidential information was to be deleted after the computers were imaged. However, the day before Maxwell's computer was to be imaged, a previously-installed program called "Shredder" was opened.

As its name suggests, Shredder is designed to eliminate files and programs so they cannot be accessed (as opposed to a simple deletion of the files and programs,

which will permit those files and programs to be "resurrected" and accessed). It is at this point that a battle of experts ensues. Plaintiff's expert concedes he cannot tell whether Shredder was actually executed or whether it was merely opened – thus, he cannot state for sure that any documents were actually destroyed, much less what their content would have been. Defendants' expert echoes these conclusions.[2]

E. "Indirect Evidence of Spoliation"

Under this heading, Plaintiff describes several instances in which, essentially, it expected to find documents – and from this sequence of events invites the Court to infer that the documents were destroyed. Specifically,

- A witness testified that Murley distributed documents bearing Plaintiff's logo – whether it was the distinctive "crown" logo or merely the distinctive "H" from Plaintiff's name is not specified (and Plaintiff's statement that the witness positively referenced the crown logo is simply wrong). However, no such documents were produced during discovery.
- Robert Calhoun's computer contained no documents or e-mails, although other people's computers reflected e-mails sent to and received from Calhoun.

[2]Defendants' expert explained that a program such as Shredder "can be configured to overwrite data with random information up to 15 times . . . mak[ing] the data difficult to recover." However, in a seemingly contradictory statement, Defendants' expert also suggests that one "could have conducted a search for a wiping pattern used by the Shredder application" and no such pattern was evident on Maxwell's computer. The latter statement is the subject of a Motion to Strike, and the Court has ruled the statement may not be offered at trial. For purposes of this motion, the Court's inability to reconcile (1) the statement that Shredder replaces data with random information with (2) the statement that Shredder replaces data with information in a pattern that can be discovered is made more difficult by the lack of an explanation. The Court finds the former statement more credible because it is supported by more explanation and because it is consistent with Plaintiff's expert's testimony. In short, the Court accepts what the experts agree upon: that there is no way to tell whether Shredder was used to destroy any data.

- CSFB prepared a "talking points document titled 'RPG Investor Questions.'" One of the answers addressed Clipper's reason for paying "such a high multiple" for RPG by explaining Clipper believed "that through their consulting arm's unparalleled experience in the greeting cards industry including the work they have done with Hallmark, they can derive growth and produce high cash flow from RPG that others cannot." The CSFB employee who prepared the document indicated he obtained the information for the answers from Clipper. However, none of Clipper's employees admit to recognizing the document, even though there are communications between Kim and CSFB for other answers – but not this one. Plaintiff insinuates Kim provided information for this answer as well and decries the lack of documents to support this theory (or, at least, to explain the origins of the information).
- Plaintiff alleges Defendant Adam Doctoroff has testified inconsistently as to whether he or Clipper received any of Plaintiff's confidential information.

The Court makes no findings one way or the other as to whether these facts suggest additional documents have been destroyed or withheld. The evidence creates inferences, but the Court has not been presented with sufficient information to make a conclusive determination. A conclusive determination is not necessary because the Court's ultimate decision would not change regardless of how the factual dispute is resolved.

## III. DISCUSSION

The Court's legal conclusions are shaped by its view of the facts.[3] The Court rejects Defendants' argument that at worst they were negligent in allowing documents to be destroyed. They rely heavily on the presence of their general policy to erase

[3]The Court rejects Plaintiff's invitation to rely on Lewy v. Remington Arms Co., 836 F.2d 1104 (8th Cir. 1988) because the Eighth Circuit has since has described its discussion on the subject as dicta and has described it as an incorrect statement of law. See Morris v. Union Pacific R.R., 373 F.3d 896, 901 (8th Cir. 2004).

computers of departing employees as well as the absence of any evidence demonstrating their nefarious intent.

The absence of a "smoking gun" or other clear evidence of Clipper's intent is not dispositive. Circumstantial evidence is frequently relied upon to ascertain an actor's intent. It is true that some documents were destroyed pursuant to previously-existing, generally applicable documentation policies – but the facts suggest Clipper purposely decided not to "rescue" critical documents/information/computer hardware from these general policies or otherwise insure they were preserved. Clipper knew in as early as January 2006 that it faced possible litigation in connection with the RPG acquisition. It strove mightily to ascertain the extent to which Clipper acquired or used information supplied by RPG; in so doing, it examined the computers and files of those working on the project. The destroyed material was not incidental to the matter: it was material directly relating to the transaction at issue, and was possessed by individuals specifically responsible for that transaction. There is no indication of any effort to save the material; instead, Clipper allowed it to be destroyed when those individuals left the company.

Defendants also point to the abundant evidence Plaintiff has been able to garner. The presence of such evidence does not demonstrate Clipper's actions were merely negligent. The presence of such evidence, however, persuades the Court that the more serious sanctions suggested – striking Defendants' pleadings or granting judgment for Plaintiff are not justified. While Plaintiff has been prejudiced, it has not been prejudiced to the degree that justifies such draconian relief. However, the intentional destruction of evidence that would have helped Plaintiff demonstrate the existence and extent of Defendant's misconduct justifies reading the jury an adverse inference instruction. E.g., Stevenson v. Union Pac. R. Co., 354 F.3d 739, 748-49 (8th Cir. 2004). While the precise contents of the documents are unknown, the individuals' roles coupled with the information that is known demonstrates the missing documents would have advanced Plaintiff's cause.

In Stevenson, the Court of Appeals reversed the use of an adverse inference instruction where the destroyed documents related to an accident years before litigation

was commenced. Id. at 747-49. In contrast, Clipper knew litigation was threatened, knew litigation against Monitor had already been instituted, and acted in all ways as if litigation was in the offing – except to actually preserve relevant evidence. Moreover, Plaintiff asked Clipper to retain the information specifically for this purpose. The present situation is comparable to the portion of Stevenson affirming different adverse instruction based on the Defendant's destruction of documents after the lawsuit was initiated. A party cannot blithely destroy documents until the date of filing if it knows litigation is in the offing, has acted to prepare for litigation, and has taken all the other steps in anticipation of litigation that Clipper took in advance of the filing of this case. Clipper intentionally destroyed documents for the purpose of suppressing the truth. Cf. Morris, 373 F.3d at 901.

The Court presently intends to read the following instruction to the jury, which is derived from 3 Fed. Jury Prac. & Instr. § 104.27 (6th ed. 2000):

> If you should find that a party willfully destroyed evidence in order to prevent its being presented in this trial, you may consider such destruction in determining what inferences to draw from the evidence or facts in the case. You may, but are not required to, assume that the contents of the files destroyed would have been adverse or detrimental to the party you find destroyed the evidence.

The Court is not inclined to specify the destroyed evidence in the instruction, preferring to leave that as an issue for the jury's consideration. This instruction purposely fails to identify the "wrongdoer" so that it does not convey to the jury that the Court has made a decision of its own in that regard. Finally, the instruction allows the jury to draw an adverse interest against the party it finds responsible for destroying the evidence, which will allow it to treat the defendants differently if it finds it appropriate to do so.

## III. CONCLUSION

The Court finds Clipper purposely allowed evidence to be destroyed for the purpose of making it unavailable to Plaintiff in the looming litigation. The Court declines

to enter judgment for Plaintiff or strike Defendants' pleadings, but intends to instruct the jury as set forth above.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT

DATE: July 25, 2012