IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| HALLMARK CARDS, INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 08-0840-CV-W-ODS |
| | ) | |
| MONITOR CLIPPER PARTNERS, LLC, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

<u>ORDER AND OPINION GRANTING IN PART AND DENYING IN PART
PARTIES MOTIONS TO STRIKE EXPERT TESTIMONY</u>

Pending are three motions to strike expert testimony filed by Plaintiff and one filed by Defendants. For the following reasons, the motions are granted in part and denied in part.

<u>I. GOVERNING LAW</u>

Pursuant to Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training or education" may offer an opinion if

    a.    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    b.    the testimony is based on sufficient facts or data;

    c.    the testimony is the product of reliable principles and method; and

    d.    the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 was adopted following the Supreme Court's decision in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), and requires the Court to act as a gatekeeper to insure that expert testimony is relevant and reliable. <u>See</u>, <u>e.g.</u>, <u>Vasquez v. Colores</u>,

648 F.3d 648, 653 (8th Cir. 2011). "In deciding whether expert evidence should be admitted, a district court must determine whether the expert's methodology is reliable and can be reasonably applied to the facts of the case." Eckelkamp v. Beste, 315 F.3d 863, 868 (8th Cir. 2002).

## II. RICH HOFFMAN

Rich Hoffman is a computer forensic expert. He has seventeen years of computer experience, the last six years of which have been focused on computer forensic examination. He is currently (and has been since retained by Defendants) Assistant Vice President of Forensics and lead computer forensic examiner for UnitedLex Forensics ("UnitedLex"). His experience and qualifications are quite extensive and need not be repeated here. It is sufficient to note that (1) Plaintiff does not dispute Hoffman's qualifications and (2) the Court finds Hoffman satisfies the requirements of Rule 702(a).

Hoffman has prepared a fifty page report containing a variety of expert opinions. Plaintiff contends three of those opinions lack a sufficient basis in fact or data or are not the product of reliable principles or methods as required by Rule 702(b) and Rule 702(c).

### A. Robert Calhoun's Computer

Among the opinions regarding Robert Calhoun's computer, Hoffman states that the forensic image size of Calhoun's computer "is reasonable given his job function and his data storage practices."[1] Plaintiff contends Hoffman was not provided sufficient

---

[1] The Court rejects Plaintiff's argument that the opinion is beyond Hoffman's expertise. The Court believes that, if provided with sufficient facts about a person's practices and computer usage, Hoffman would be qualified to offer an opinion about what the forensic image size should look like. The Court also rejects Plaintiff's argument that Hoffman's opinion is somehow testimony about Calhoun's intent – it is actually testimony about what a computer would look like under specified conditions.

2

information to reach such a conclusion. In his deposition, Hoffman testified he relied on Defendants' attorney's representation about Calhoun's position and computer usage and, based on those representations, the amount of data on Calhoun's computer was reasonable.

The Court does not believe Hoffman's opinion – that the computer's condition was consistent with usage levels described by counsel – is particularly helpful to the jury *unless* the jury is somehow informed about Calhoun's actual usage practices.[2] In that case, Hoffman could testify in the form of a hypothetical question that the computer image was consistent with Calhoun's testimony about his computer usage practices.

All of this assumes, of course, that the opinion is somehow relevant. Defendants advise that Hoffman's opinion will only be used to counter Plaintiff's expert opinion that Calhoun's computer has less data than one would expect – which causes the Court to wonder why Plaintiff believes its expert's opinion has a better basis or is more admissible under Rule 702 than Hoffman's. In any event, Defendant advises that it intends to file a Motion in Limine arguing Plaintiff's expert's opinions is irrelevant, and if the motion is granted then Hoffman will not speak on this issue. The Court offers no opinion on this issue. All the Court holds is as follows: Hoffman cannot testify that Calhoun's computer storage was consistent with counsel's representations regarding Calhoun's computer usage. If a proper foundation for a hypothetical question is created during trial based on Calhoun's testimony, Rule 702 will permit Hoffman to offer an opinion as to whether Calhoun's computer image was consistent with the usage

---

[2]The Court is also concerned that allowing Hoffman to testify based solely on what counsel told him (even if counsel's information came from Calhoun) would impermissibly create the impression that what Hoffman describes about Calhoun's computer usage is correct. This concern is heightened by Hoffman's admission that he has no knowledge of these facts other than what has been told to him by others. The factual basis for any such opinion should be presented to the jury for its consideration so it can decide, for instance, whether it believes Calhoun's testimony in this regard. The Court also finds it somewhat distasteful that Defendants can (1) ask experts to rely on information communicated by counsel (2) argue that it does not have relay that information to the opposing party because it was a communication from counsel, then (3) invite the jury to rely solely on the expert's regurgitation of the information supplied by counsel.

3

described by Calhoun.  Whether Rule 403 permits the inquiry is a matter for another day.

## B.  The Shredder Program and the "Eyeball Review"

A program called "Shredder" was accessed on Paul Maxwell's computer.  As its name suggests, Shredder destroys documents and files so they cannot retrieved.  The experts have offered varying opinions as to whether Shredder actually destroyed any documents.  Hoffman's report describes Shredder as "overwrit[ing] data with random information up to 15 times" and indicates that while there is no doubt the program was accessed, "it is not possible . . . to conclude that any files were actually wiped when Shredder was opened . . . ."  The report also offers opinions as to how Shredder may have been accessed without actually destroying documents.  However, in a seemingly contradictory statement, during his deposition Hoffman suggests that one "could have conducted a search for a wiping pattern used by the Shredder application" and no such pattern was evident on Maxwell's computer.

Plaintiff seeks to exclude Hoffman's deposition testimony about Shredder creating a discoverable pattern because (1) it is not contained in his report and (2) it is inconsistent with his opinion that Shredder replaces data with "random" information.  Not only does Hoffman fail to explain this seeming discrepancy, but Defendants fail to do so as well.  Instead, Defendants contend Hoffman does not intend to offer this opinion at trial.  Nonetheless, Plaintiff insists this issue "remains before the Court" because Defendants mentioned this opinion in their response to Plaintiff's Motion for Sanctions.

As noted in footnote 2 of the Order on Plaintiff's Motion for Sanctions (and as intimated above), the Court cannot reconcile the contradiction between statements declaring (1) Shredder replaces data with random information and (2) Shredder replaces data with a discoverable pattern of information.  Defendants do not endeavor to do so and disclaim any intent to offer the second opinion at trial.  The Court formalizes Defendants' intent and, for the reasons stated, declares Hoffman cannot

4

offer this opinion at trial. This is all that needs to be said with respect to the issue in the context of the Motion to Strike

### C. Production Statistics

Hoffman purports to describe the number of documents UnitedLex searched, imaged and produced. He also purports to describe, by various categories, the number of documents produced or involving Peter Kim. Plaintiff endeavors to describe this information as "facts" or "facts supplied by Defendants." The Court disagrees. The Court understands the information to be an explanation of what Hoffman/UnitedLex did, reviewed, discovered, or prepared during the course of its expert analysis. The label of "facts" is irrelevant: it is just as a much of a "fact" as, for instance, a DNA expert describing the steps taken to analyze a sample of human tissue – and is just as admissible. This is not a case of Hoffman describing something that Defendants did that he has no knowledge of; for instance, he does not purport to describe the thoroughness with which Defendants gathered information before providing it to him.[3] The Court discerns nothing improper in permitting a forensic computer expert to describe the types, sources, and amount of information that he received from his client or that he generated from his analysis.

Plaintiff also complains these "facts" were not disclosed. This argument is confusing: Plaintiff is making this argument precisely because this information was disclosed in Hoffman's expert report. Moreover, much of it appears to be a summary of information that was produced to Plaintiff. For instance, Hoffman indicates he produced 946 documents authored by Peter Kim – and Plaintiff received the 946 documents. Defendants suggest Plaintiff can readily verify the information; Plaintiff labels this suggestion "ridiculous," but the Court agrees with Defendants. Hoffman will be permitted to testify on these matters, subject to the caveat expressed in footnote 3.

---

[3]If this were the case, the Court's decision would be different.

## III. DR. COLIN BLAYDON

Dr. Blaydon is a Professor of Management at Dartmouth College, and former Dean of Dartmouth's Tuck School of Business. Defendants retained him to testify about Plaintiff's damages and industry practices. Plaintiff does not challenge Dr. Blaydon's qualifications to address these topics, but contends some of his specific opinions fall outside these boundaries or are otherwise inadmissible.

Much of Dr. Blaydon's proffered testimony relates to the issue of damages. Before addressing the parties' arguments about that testimony, the Court must define the damages that are available to Plaintiff. The Court embarks on this endeavor largely on its own: while the parties have discussed damages they have done so only obliquely.

A plaintiff may recover "*both* the actual loss caused by misappropriation *and* the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." Mo. Rev. Stat. § 417.457.1 (emphasis supplied). However, "in lieu of damages measured" by these methods, a plaintiff may recover "a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." Id. In this context, the unjust enrichment obtained by the defendant is comprised of two possible components: any gains or profits earned from the use of the trade secret and any cost savings achieved through use of the trade secret. "The misappropriator's profits are the financial gain derived from selling products or services embodying the trade secrets or using the trade secrets. The misappropriator's savings is the financial gain realized from not having to develop the trade secrets obtained unlawfully." Epstein on Intellectual Property, ¶ 3.02[B] (2009). As far as the Court is aware, Plaintiff is not endeavoring to recover anything for its actual loss (such as lost sales). Therefore, if Plaintiff does not elect to recover the royalty value of its trade secrets, it can recover (1) Defendant's financial gain or[4] (2) any cost savings achieved by the misappropriation.

---

[4]Most of the authorities cited indicate that the defendant's cost savings may be used to value gain instead of, and not as well as, profits earned from the misappropriation. This is undoubtedly based on the need to avoid double counting of gains. Cf. Salsbury Laboratories, 908 F.2d at 714-15.

6

E.g., ConFold Pacific, Inc. v. Polaris Indus., 433 F.3d 942, 957 (7th Cir. 2006) (Illinois law); Mid-Michigan Computer Sys. Inc. v. Mark Glassman, Inc., 416 F.3d 505, 510 (6th Cir. 2005) (Ohio law); Salsbury Laboratories, Inc. v. Meriux Laboratories, Inc., 908 F.2d 706, 714 (11th Cir. 1990) (Georgia law); CardioVention, Inc. v. Medtronic, Inc., 483 F. Supp. 2d 830, 845 (D. Minn. 2007) (Minnesota law).[5]

With this understanding in place, the Court can examine Plaintiff's objections to Dr. Blaydon's testimony. In doing so, the Court is mindful that some issues cannot be fully resolved because they depend on choices Plaintiff will have to make in pursuing its damages.

### A. Legal Opinions

Plaintiff first takes issue with what it describes as legal opinions. The parties agree that expert testimony on legal matters is inadmissible. E.g., Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003), but this is an overly broad statement. The evil to be avoided is having the expert offer legal conclusions on issues that will be the subject of the Court's instructions to the jury. See United States v. Klaphake, 64 F.3d 435, 438-39 (8th Cir. 1995); United States v. Wells, 83 F.3d 745, 753 (8th Cir. 1995), reversed on other grounds, 519 U.S. 482 (1997). However, an expert sometimes offers opinions on legal issues or bases an opinion on legal matters. The key inquiry is, as Rule 702 suggests, whether the expert's proffered testimony will aid the jury. See United States v. Van Dyke, 14 F.3d 415, 422-23 (8th Cir. 1994) (trial judge should have permitted expert testimony about the contents and requirements of a banking regulation). Expert testimony that instructs the jury as to the legal principles governing the case is not helpful because it invades the Court's

---

[5] Missouri courts have declared that decisions from other jurisdictions interpreting their versions of the Uniform Trade Secrets Act may be relied upon to understand and interpret Missouri's codification. E.g., Lyn-Flex West, Inc. v. Dieckhaus, 24 S.W.3d 693, 697-98 (Mo. Ct. App. 1999).

7

responsibility to instruct the jury on such issues; however, not all opinions touching on the law are automatically prohibited.

The Court has reviewed paragraphs 85-142, which includes the portions Plaintiff describes as "legal opinions" and encompasses Dr. Blaydon's opinions on topics related to those addressed in the statements challenged by Plaintiff. Having done so, and having considered the parties' arguments, the Court rules as follows:

1. Dr. Blaydon may not offer opinions/criticisms related to the failure of Dr. Kenneth Serwin (Plaintiff's damages expert) to apportion damages between the two defendants. Such testimony implies to the jury that damages should have been apportioned. Neither party has asked the Court to rule on this issue, and expert testimony should not be used to imply that the law requires apportionment. Thus, the opinions contained in paragraphs 93, 105, and 141 should not be offered.

2. Defendants may argue that they had a limited role in the RPG acquisition as this relates directly to ascertaining the benefit Defendants obtained. Plaintiff argues this testimony would be misleading, alleging that Clipper is jointly and severally liable with Monitor Clipper Equity Partners II, LP ("Fund II") and RPG. The Court will permit Dr. Blaydon to testify about the benefits actually received by Defendants, but the benefits received by, or harm inflicted by, non-parties is irrelevant in this proceeding. The benefits Clipper actually earned from the transaction enabled by Plaintiff's trade secrets are relevant to the issue of damages. Those benefits include any profits Clipper was able to obtain by using Plaintiff's trade secrets. Dr. Blaydon will be permitted to offer opinions about Clipper's economic interest in the RPG transaction,[6] and the fact that he does not consider benefits earned by non-parties does not preclude his testimony.

---

[6]Of course, even if Defendants' gains were zero they would still be liable for either (1) the cost savings enjoyed by using Plaintiff's trade secrets or (2) the royalty value of the trade secrets. Plaintiff could also eschew any effort to recover unjust enrichment and seek only a reasonable royalty – which would render Dr. Blaydon's analysis of Defendants' gains/profits irrelevant.

8

Plaintiff alleges Defendants are jointly and severally liable with RPG and Fund II, but neither RPG nor Fund II are parties to this litigation. Plaintiff's assertion of joint and several liability or a theory of civil conspiracy does not permit it to recover for the gains incurred by non-parties: both theories are simply means of extending liability from one party to another, but they do not permit extending liability from a party to a non-party. For the Court to impose joint and several liability, the Court would have to determine that RPG and Fund II are liable and have been unjustly enriched – but the Court cannot do this. It is appropriate to allow Plaintiff to seek from Defendants the benefits they received, but it is inappropriate to allow Plaintiff to seek from Defendants the benefits received by non-parties whose interests cannot be litigated – and whose liability cannot be evaluated – in this proceeding. Ironically, Plaintiff's view could lead to it being unjustly enriched. Its position implicitly suggests Clipper should seek contribution from RPG and Fund II. Suppose Clipper does this, but loses. This means that, in a contested proceeding, Fund II and RPG would have convinced a jury that it did not misappropriate Plaintiff's trade secrets – yet Clipper will have been forced to pay Plaintiff for Fund II's and RPG's supposed unjust enrichment. In such a scenario, it is Plaintiff that would be unjustly enriched at Clipper's expense.[7]

3. Dr. Blaydon bases some of his calculations about the benefits obtained by Defendants on certain contracts. The Court deems this to be appropriate, particularly given the subject matter and Dr. Blaydon's expertise. Indeed, it can be argued that failing to consider the contracts presents a distorted view of the benefits received by Defendants. As an expert in the field of mergers and

---

[7]Beyond insisting that it has asserted claims for civil conspiracy and joint and several liability, Plaintiff does nothing to support its extraordinary theory. This is not a case where a party sues a single defendant for all the damages it incurred, leaving it to that defendant to seek recourse against the other tortfeasors. Plaintiff instead seeks to make Defendants disgorge the benefits allegedly received by non-parties based on the non-parties' wrongdoing, obviating the need to prove the non-parties' wrongdoing or the extent of the non-parties ill-gotten gains. The Court's independent research failed to unearth a reported case permitting a plaintiff to hold a defendant liable for a non-party's unjust enrichment.

9

acquisitions, Dr. Blaydon is permitted to offer opinions about the parameters of such transactions and the particulars of Clipper's acquisition of RPG.

## B.  Defendants' Limited Financial Gain

Plaintiff argues Dr. Blaydon should not be permitted to testify about Defendants' limited financial gain from the RPG transaction because even if they gained nothing they could still be liable for damages.  Plaintiff is correct in arguing that Defendants could still be liable for damages.  However, as discussed in Part III(A)(2), above, one of the components of those damages is – at least theoretically – the gains Defendants achieved.  So long as Plaintiff wishes to seek damages based on Defendants' gains, then Dr. Blaydon's testimony on the matter must be permitted.  If Plaintiff does not seek damages based on Defendants' gains (as opposed to cost savings achieved or royalties), then Dr. Blaydon's testimony would probably be irrelevant.

The Court's holding should not be construed as suggesting that Defendants' losses on the RPG endeavor serve as a "credit" against any other measure of damages. For instance, if Defendants lost $1 million on the transaction but saved $2 million by using Plaintiff's trade secrets and not developing the information on their own, the damages would be $2 million.  Similarly, if Plaintiff seeks a reasonably royalty instead of Defendants' unjust enrichment, any losses on the RPG matter would be irrelevant.

## C.  Opinions Predicated on Allegedly Undisclosed Information

### 1.

Plaintiff alleges that certain of Dr. Blaydon's opinions are predicated on information supplied to him by Defendants' counsel, but the information was not supplied to Plaintiff as required by Orders of the Court and Rules of Civil Procedure. Defendants' argument is two-fold: first they argue that Plaintiff's expert suffered from the same failings, then they argue they produced everything they had to produce.

10

The Court rejects Defendants' arguments. They have not presented sufficient information to permit the Court to ascertain what it is they believe Plaintiff's expert should have provided. Moreover, the Court rejects Defendants' argument that Dr. Blaydon could rely on facts supplied by counsel and that Defendants do not have to provide Plaintiff with the underlying factual information. The Scheduling and Trial Order required as part of the expert disclosures "a complete statement of . . . the data or other information considered by the witness in forming the opinions . . . ." Defendants' failure to provide the information deprives Plaintiff of the opportunity to test the factual underpinnings for Dr. Blaydon's testimony, as well as the opportunity to present the factual basis for his opinions to the jury for its consideration. Defendants did not have to supply the information to Plaintiff, but having failed to do so they cannot launder these facts through its expert's testimony. Defendants asserts that oral communications from counsel to the expert need not be disclosed, but the Court rejects this position when the expert's sole basis for factual matters relied upon comes from those communications.

Having reached this decision, the Court does not know exactly what is excluded. Dr. Blaydon's deposition confirms that the factual information contained in various paragraphs came from Defendants' counsel, and Dr. Blaydon cannot testify that this information is "fact." Dr. Blaydon also cannot testify about any opinions predicated on these facts – but Plaintiff does not identify, and the Court does not know, what opinions those are. It may also be that the Court's decisions about damages and related testimony elsewhere in this Order obviates the need to resolve this issue.

### 2.

Plaintiff also contends Defendants did not sufficiently provide information related to Dr. Blaydon's EBITDA analysis. The Court believes Defendants' disclosure was sufficient.

### D. Royalties

The royalty measure of damages depends on ascertaining the negotiated price the parties would have agreed to had they negotiated a price. E.g., Secure Energy, Inc. v. Coal Syntehtics, LLC, 708 F. Supp. 2d 923, 931 (E.D. Mo. 2010). It may be that the parties before the court would not have been willing to negotiate a contract for the payment of royalties, but the factfinder's job is to hypothesize their willingness. Eg., MGE UPS Systems, Inc. v. GE Consumer and Indus., 622 F.3d 361, 367 n.2 (5th Cir. 2010); Mid-Michigan Computer Sys., 416 F.3d at 510-11; Vermont Microstystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 151 (2d Cir. 1996); LinkCo, Inc. v. Fujitsu Ltd., 232 F. Supp. 2d 182, 186 (S.D.N.Y. 2002). Dr. Blaydon's report faults Plaintiff's expert's analysis because he assumes Clipper would have negotiated a license. Whether Clipper would actually have negotiated a license is irrelevant: the law demands that its willingness be assumed, so Dr. Blaydon cannot offer the opinions contained in paragraphs 107 or 108 of his report. However, the opinions contained in paragraphs 109-11 relate to Clipper's motivations to pay and, hence, to the amount Clipper would have been willing to pay. These opinions are admissible.

Plaintiff also seeks to strike all of Dr. Blaydon's testimony regarding the royalty measure of damages because he is not an expert on royalties. Dr. Blaydon is qualified to discuss Clipper's role in the RPG transaction and offer opinions as to what Clipper would have been willing to pay. Plaintiff's arguments affect the weight, not the admissibility, of his opinion.

### E. Facts Disguised as Opinions

Plaintiff correctly argues that experts cannot offer opinions regarding historical facts or matters of intent, motivation, or other thought processes. However, it is difficult to ascertain that Dr. Blaydon is offering such "opinions." The Court declines to take action at this time, preferring instead to evaluate these objections in context during the trial. Plaintiff will have to make contemporaneous objections when it believes Dr. Blaydon is offering inadmissible testimony.

12

## IV. FRANK O'CONNELL

### A. Lack of Expertise

Plaintiff alleges O'Connell is not qualified to offer an opinion regarding royalties. Most of Plaintiff's arguments relate to the content of his opinion and not to his qualifications. The Court will not detail O'Connell's qualifications; having reviewed his qualifications, the Court concludes he has the necessary education or experience to offer expert opinions (subject to the Court's other rulings).

### B. Royalties

Plaintiff generally alleges O'Connell cannot testify about the royalty value of trade secrets because he does not fully understand the law regarding the measure of damages. The Court does not believe an expert needs to understand the law in order to offer an admissible opinion. O'Connell possesses admissible opinions about various considerations that play a part in ascertaining the reasonable royalties. As with Dr. Blaydon, O'Connell cannot opine that the royalty damages are zero because Defendants would not have been willing to license Plaintiff's trade secrets. Thus, he cannot offer the opinion contained in the first sentence of paragraph 13 of his report. However, also as with Dr. Blaydon, O'Connell can testify about factors that would be relevant in ascertaining how much Defendants would have been willing to pay if they wanted to obtain a license for the trade secrets.

### C. Invading the Jury's Province

The Court agrees that O'Connell cannot offer expert testimony purporting to establish that Plaintiff's confidential information is not a trade secret. A trade secret is legally defined by statute. Mo. Rev. Stat. § 417.453(4). "Though the existence of a trade secret is a fact-intensive inquiry, it is ultimately a question of law determined by

13

the court." AvidAir, 663 F.3d at 971. If there are disputed historical facts that will affect the Court's determination, then those can be decided by the jury – but much of O'Connell's testimony will not aid the jury or the Court in determining whether the information qualifies under the law as a trade secret. Accordingly, O'Connell cannot offer any expert opinions (1) suggesting the information is not a trade secret or (2) purporting to opine as to whether purely historical facts occurred or did not occur (i.e., Did Defendants use information? Did Plaintiff try to keep the information a secret?) in an effort to tell the jury whether the information is, in his estimation, a trade secret, or that it was not misappropriated. Specifically, O'Connell cannot offer the opinions contained in paragraphs 11, 29, 30, 34, 35, and 36; this list is not necessarily exhaustive, and does not preclude Plaintiff from making additional contemporaneous objections. In contrast, O'Connell may offer the testimony indicated in paragraph 31, because expert testimony about the types of information that are generally and freely available in the industry will help the factfinder determine whether Plaintiff's information had "independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use." Mo. Rev. Stat. § 417.453(4)(a).

## V.  DR. KENNETH SERWIN

### A.  Lack of Experience in the Greeting Card Industry

Dr. Serwin has a Ph.D in economics and specializes in the fields of industrial organization and finance. Defendants contend he is unqualified to offer opinions in this case because he does not have expertise in the greeting card industry. The Court holds that this argument may be presented to the jury for its consideration of the weight to be accorded Dr. Serwin's testimony. The argument does not affect the admissibility of his opinions.

### B. Failure to Differentiate Damages Among Various Entities

Defendants contend Dr. Serwin evaluated the damages caused by non-parties to this lawsuit. As stated elsewhere (in this and other Orders), the Court holds Plaintiff cannot recover from these defendants the unjust enrichment received from non-parties. Dr. Serwin will be permitted to testify as to the benefits received by Defendants as a result of Defendants' misappropriation, but not as to the benefits received by others.

### C. Failure to Account for Certain Facts

Defendants generally marshal facts it contends Dr. Serwin failed to consider in reaching his conclusions. The Court deems these to be issues affecting the weight of his testimony and should be considered by the jury. Dr. Serwin can explain why the facts in question did not affect his analysis, and the jury can decide whether to believe his testimony. These arguments do not affect the admissibility of his testimony.

### D. Failure to Investigate

In a related argument, Defendants fault Dr. Serwin for failing to investigate facts supplied to him by Plaintiff. They do not contend that the factual bases for his opinions was not disclosed; they contend he failed to independently verify the information. Again, this relates to the weight, not the admissibility, of his testimony.

### E. Remaining Arguments

Defendant's remaining arguments seem to quarrel with Dr. Serwin's conclusions solely because they are contrary to Defendants' view of events. Of course, this is no basis for excluding his testimony. It is true that he has engaged in hypothesis – but this

15

is true of all experts. After all, they are offering opinions. This is particularly true with respect to the issue of royalties, where the law already recognizes that a certain amount of informed speculation is required. Ultimately, the Court discerns no reason to exclude Dr. Serwin's opinions.

## VI. CONCLUSION

The parties' motions discuss snippets and excerpts from the experts' opinions, then rely on those small samples to target the opinions broadly and in generalized terms. Some of their arguments are credited herein, but the effect is far more limited than the parties suggest and serve to exclude only portions of the experts' testimony. Unfortunately, the Court cannot definitively identify all of the impermissible testimony.

The parties' motions are granted in part and denied in part as discussed herein.

IT IS SO ORDERED.

                                                                /s/ Ortrie D. Smith
                                                                 ORTRIE D. SMITH, SENIOR JUDGE
DATE: July 25, 2012                                 UNITED STATES DISTRICT COURT