IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| HALLMARK CARDS, INCORPORATED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 08-0840-CV-W-ODS |
| ) | |
| MONITOR CLIPPER PARTNERS, LLC, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

## ORDER AND OPINION DENYING DEFENDANT MONITOR CLIPPER PARTNERS MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR NEW TRIAL

Following a jury trial and entry of an adverse judgment, Defendant Monitor Clipper Partners, LLC ("Clipper") has filed a Motion for Judgment as a Matter of Law or, in the Alternative, for New Trial. For the following reasons, the motion (Doc. # 540) is denied in its entirety.

## I. BACKGROUND

Plaintiff is a privately-held manufacturer of greeting cards. In 2001, Plaintiff and Monitor Company Group Limited Partnership ("Monitor") entered a contract whereby Monitor provided Plaintiff with certain consulting services. The contract required Monitor to maintain the confidentiality of information provided to it by Plaintiff.

Clipper is a private equity investment firm. There was a close working relationship between Clipper and Monitor. The Court need not mention all aspects of their relationship, but it will mention two of the most important; namely, Monitor's creation of "case teams" to assist Clipper with its endeavors and Monitor's and Clipper's public extolling of their working relationship.

In November 2005, the media reported Clipper's interest in acquiring Recycled Paper Greetings, Inc. ("RPG"), one of Plaintiff's competitors. Plaintiff contacted Monitor and sought assurances that the confidentiality provisions of their contract had been followed and that none of its proprietary information had been provided to Clipper. Clipper's efforts with regard to the RPG matter were directed by Adam Doctoroff, a principal at Clipper. Clipper's acquisition was completed in December 2005. Meanwhile, Plaintiff, Monitor and Clipper continued communicating about Plaintiff's concerns until January 23, 2006, at which time Plaintiff became dissatisfied with Monitor's and Clipper's responses and initiated an arbitration proceeding against Monitor.

On March 21, 2007, the Arbitrator issued his decision finding Monitor breached the confidentiality provisions in a myriad of ways, not all of which involved Clipper. Nonetheless, the Arbitrator found Monitor made Plaintiff's confidential information available to Clipper. Award, ¶¶ 43-44. In addition, the Arbitrator found Clipper specifically sought the information in question: "To analyze the potential acquisition [of RPG], Monitor Clipper promptly contacted Monitor personnel who had worked on the Hallmark project because they had 'relevant experience' in the greeting card industry. Monitor assisted in this process by identifying and referring Monitor Clipper to the Monitor consultants who had, through their consulting experience with Hallmark, specific expertise in the areas of concern to Monitor Clipper." Award, ¶ 58. Clipper contacted at least five of those consultants, who then provided advice to Clipper based on the confidential information or, in some instances, provided the information itself. Award, ¶¶ 59-79.

In March 2007, the Arbitrator issued a ruling in Plaintiff's favor (although it did not find in Plaintiff's favor on all of the claims asserted) and granted Plaintiff monetary and injunctive relief. In May 2007, Plaintiff and Monitor jointly filed an action in this Court (*Hallmark Cards, Inc. v. Monitor Company Group Limited Partnership*, No. 07-0357-CV-W-ODS) and asked for judicial confirmation of the Award. Judgment was entered on May 18, 2007. On June 25, 2008, Plaintiff filed a Motion for Relief from Judgment predicated on documents Monitor

provided in May 2008 pursuant to the injunction's commands. The Motion was granted in December 2008; the judgment was vacated insofar as the monetary award was confirmed and the parties were directed to reconvene the arbitration proceeding. Meanwhile, Plaintiff filed the instant suit in November 2008 against Clipper, Doctoroff, and others.

## II. DISCUSSION

### A. Judgment as a Matter of Law

When considering a motion for judgment as a matter of law, all factual issues are construed in the light most favorable to the verdict. Marez v. Saint-Gobain Containers, Inc., 688 F.3d 958, 963 (8th Cir. 2012). The motion should then be granted only if there was no legally sufficient basis for the verdict. E.g., Luckert v. Dodge County, 684 F.3d 808, 817 (8th Cir. 2012) (citing Fed. R. Civ. P. 50).

#### *1. Effect of the Prior Arbitrations*

Clipper argues the judgment against it cannot stand because Plaintiff has already received compensation from Monitor for the misappropriation of its trade secrets. This argument relies heavily on the Eighth Circuit's decision in *Kforce, Incorporated v. Surrex-Solutions Corporation.* The Court disagrees with Clipper's interpretation and application of *Kforce*.

The parties in *Kforce* were competitors, both of which provided personnel staffing solutions in the information technology industry. Kforce's account manager, Richard Albert, resigned and took a position with Surrex in violation of a non-compete clause in his employment contract with Kforce. 436 F.3d 981, 983 (8th Cir. 2006). Kforce sued Albert in state court and the parties later settled their dispute. Kforce then filed suit against Surrex in federal court, alleging tortious interference with contract, conspiracy to breach contract, and violations

3

of the Missouri Uniform Trade Secrets Act ("MUTSA"). The district court dismissed Kforce's claims because (1) the second suit sought a double recovery and (2) the second suit was barred by res judicata. Id.

In affirming the dismissal, the Court of Appeals observed that a party cannot be compensated for the same injury twice. Critical to the court's inquiry was the fact that while Albert and Surrex acted independently and committed separate and distinct legal wrongs, there was only one injury alleged and the actual and compensatory damages sought in the two cases was the same. Id. at 984. The court did not hold that those who commit separate and distinct, but related, wrongs always create a single injury, or that in all such cases the damages sought will be the same. All the court held was that in the case then pending (1) both suits sought compensation for the same injury, and (2) two lawsuits cannot seek recovery for the same injury.

Clipper's arguments depend on its characterization of the arbitration proceedings against Monitor as seeking the exact same damages that were sought in this lawsuit. Clipper assumes the accuracy of this characterization, arguing that the characterization is legally compelled. Therein lies the flaw in Clipper's argument: as discussed in the Court's prior orders addressing this issue, the arbitrator did not award damages for *this* misappropriation of trade secrets.

The Award was issued on March 21, 2007. The first nine pages (through paragraph 41) detail the contractual relationship between Plaintiff and Monitor, including the contract's terms and the parties' performance. There follows a section entitled "Monitor Has Improperly Disseminated Hallmark Confidential Information," but the discussion details Monitor's breach of the contract by disseminating Plaintiff's confidential information *within* Monitor. For instance, the Arbitrator found that "[d]espite its contractual obligations to give Hallmark's confidential information only to consultants who needed it for Hallmark's project, Monitor improperly shared Hallmark information widely within Monitor." Award, ¶ 42. The ensuing paragraphs describe Monitor's internal use of Plaintiff's information for training and similar purposes.

4

The Award's next section describes the relationship between Monitor and Clipper, and also addresses Clipper's acquisition of RPG. The Arbitrator found Clipper "contacted Monitor personnel who had worked on the Hallmark project because they had 'relevant experience' in the greeting card industry." Award, ¶ 58. Later, the Arbitrator describes instances in which Clipper accessed Plaintiff's confidential information.

The Arbitrator found Monitor breached its contract with Plaintiff in four ways:

1. Disseminating Plaintiff's confidential information "within and outside Monitor,"
2. Using Plaintiff's confidential information for its own benefit,
3. Providing access to the confidential information, "including to [Clipper],"
4. Failing to notify Plaintiff of these disseminations of information.

Award, ¶ 87. In assessing damages, the Arbitrator endeavored to calculate the value of the contract's confidentiality provision. Award, ¶ 89. This figure was $3.2 million. Award, ¶ 98. The Arbitrator then expressed "concern[ ] that the integrity of those trade secrets with respect to the greeting cards industry may have been placed at risk as a result of Monitor's breach of contract." Award, ¶ 99. He then found that "except in the greetings arena, any risk to the value of Hallmark's trade secrets is de minimis. That minimal risk is fully compensated by the inclusion of certain gifts information in Hallmark's $3.9 million development costs calculation." Award, ¶ 100. The Arbitrator reduced that sum "since limited harm was proven" and awarded "an additional $900,000 . . . to compensate for the losses incurred from money expended for 'cost of creation.'" Award, ¶ 101.

The Arbitrator later considered Plaintiff's separate claim for misappropriation of trade secrets. However, the Arbitrator's discussion makes it clear that the claim focused on Monitor's internal use of the information, not Monitor's dissemination to Clipper. Indeed, this is why the Arbitrator ultimately rejected this claim: with the claim limited in this manner, Plaintiff was unable to demonstrate Monitor used Plaintiff's confidential information for commercial advantage, which is a required element under New York Law. Award, ¶ 107-08.

5

The Court confirmed the Award on the parties' joint request in May 2007.[1] In December 2008, the Court granted Plaintiff's motion to vacate its judgment confirming the award and remanded the matter to the Arbitrator for any further proceedings he deemed appropriate. This decision was prompted by information (obtained, ironically, as a result of the Award's prospective relief) suggesting Monitor withheld information from the Arbitrator. This new information purportedly further demonstrated Monitor misappropriation of trade secrets. In remanding the matter to the Arbitrator, the Court acknowledged there were reasons to believe the new information would not affect the Award but held it was for the Arbitrator to decide these issues.

Clipper seizes upon a passage from this discussion to support its view that the damages granted in the Arbitration are duplicative; the Court said "[t]he new information confirms Monitor Clipper's use of the information, which would have diminished the information's value – but the Arbitrator already awarded damages for this injury." Regardless, closer examination of the Award leaves it is unclear whether the $900,000 was for the lost value due to Clipper's use of the information or for Monitor's use of the information. In addition, it is not clear *which* trade secrets were considered in arriving at the $900,000. The Award focuses more on the provision of Monitor personnel to assist Clipper than it does on any particular trade secrets.

Finally, and most importantly, after the matter was remanded Plaintiff and Monitor settled their dispute. The Arbitrator ended up awarding nothing, and his original decision was a nullity. The Court has reviewed the March 18, 2010 settlement between Plaintiff and Monitor, and it does not establish Monitor paid any amount of money to Plaintiff because Monitor provided trade secrets to Clipper. The Court has also reviewed all rulings made by the Arbitrator prior to the settlement, and nothing therein presents the issue of Clipper's misappropriation. Thus, in the end, nothing indicates Plaintiff recovered

---

[1] Case Number 07-0357-CV-W-ODS. Courts may take judicial notice of their own records, as well as records from other court proceedings that relate to the matters at issue. E.g., Great Plains Trust Co. v. Union Pac. R. Co., 492 F.3d 986, 996-97 (8th Cir. 2007).

damages from Monitor for the same the same injuries at issue in this case. The Court concedes this is a close issue, but it continues to believe the Record fails to establish Plaintiff has previously been compensated for Clipper's misappropriation of trade secrets. Clipper's argument is rejected.

### 2. *Sufficiency of the Evidence*

Clipper contends it is entitled to judgment as a matter of law because (1) Plaintiff failed to adequately identify the trade secrets at issue and (2) the information was already public, was stale, or was no longer the subject of reasonable efforts to maintain secrecy. These issues were addressed before trial. Now that the trial is over, and the Court is obligated to construe the Record in the light most favorable to the verdict, the Court's rejection of these arguments stands.

MUTSA defines a trade secret as

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mo. Rev. Stat. § 417.453(4). Clipper's first argument assumes Plaintiff was obligated to point to "the secret portion" of each and every document, which simply is not required to establish that something is a trade secret. Such an approach eviscerates the definition, particularly its provision that a compilation of information can be a secret. This is true even if the compilation consists mostly (or even entirely) of publicly available information; the critical inquiry is whether the possessor derives value from the secrecy of the combination or arrangement. "Compilations are specifically contemplated in the UTSA definition of a trade secret, and the fact that some or even most of the information was publicly

7

Case 4:08-cv-00840-ODS   Document 585   Filed 03/20/13   Page 7 of 19

available is not dispositive . . . . Compilations of non-secret and secret information can be valuable so long as the combination affords a competitive advantage and is not readily ascertainable." AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp., 663 F.3d 966, 972 (8th Cir. 2011).

Before trial, Plaintiff disclosed the information that it contended was a trade secret. Plaintiff also identified the documents, presentations, and other materials produced by Clipper that allegedly included information obtained from those trade secrets. The trade secrets at issue were sufficiently identified.

The remaining issues are factual in nature, and all such issues were submitted to the jury for its consideration. See Jury Instruction 19. In returning a verdict for Plaintiff – which required a finding that the documents were trade secrets – the jury must have found that the documents were not generally known or readily ascertainable, derived economic value from not being generally known, and were the subject of efforts that were reasonable under the circumstances to maintain secrecy. Clipper tried to convince the jury the alleged trade secrets were generally known or readily ascertainable, did not derive economic value from being a secret, and were not the subject of reasonable efforts to maintain their secrecy. The jury rejected these arguments. While there was evidence to support Clipper's position, there was also evidence to the contrary – and a legitimate factual dispute should not be resolved as a matter of law. E.g., Billingsley v. City of Omaha, 277 F.3d 990, 993 (8th Cir. 2002).

### 3. Compensatory Damages

Clipper contends Plaintiff's damages expert, Dr. Kenneth Serwin, violated the Court's August 20, 2012 Order (Doc. # 417) and the Court's July 25, 2012 Order (Doc. # 384) when he calculated damages. Clipper also contends this testimony violated the applicable legal standards for ascertaining damages.

In the first Order, the Court held "Plaintiff cannot recover from these defendants the unjust enrichment received from non-parties. Dr. Serwin will be permitted to testify as to the benefits received by Defendants as a result of

Defendants' misappropriation, but not as to the benefits received by others."
Doc. # 384 at 15. The second Order applied this principle to the calculation of
royalties, and expanded on the Court's explanation of what was and was not
permitted:

> The Court will not permit Plaintiff to recover reasonable
> royalties that would have been paid by non-parties. That said, this
> does not mean that evidence regarding the value of the trade
> secrets to non-parties is irrelevant. To some extent, anything that
> benefits non-parties (notably, RPG) benefitted Defendants. Such
> benefits are a factor that may affect the unjust enrichment
> Defendants realized or the reasonable royalty Defendants would
> have paid.
> The Court intends to focus the jury on the unjust enrichment
> enjoyed by Defendants and on the reasonable royalty Defendants
> would have paid. The jury cannot award Plaintiff (1) the reasonable
> royalty Defendants would have paid, added to (2) the reasonable
> royalty RPG would have paid, added to (3) the reasonable royalty
> Fund II would have paid, etc.. It can award only the reasonable
> royalty Defendants would have paid. *However, the jury can
> consider the benefits to non-parties in ascertaining that figure
> because the benefits (real or expected) to non-parties may have
> increased the reasonable royalty Defendants would have paid.* The
> distinction may be subtle, but it is clear, and the Court expects the
> parties to adhere to these distinctions both in their arguments and
> in the presentation of evidence.

Doc. # 417 at 5-6 (emphasis supplied).

At the outset, the Court notes that pretrial evidentiary orders are
interlocutory in nature; indeed, the second paragraph of the Court's August 20
Order reminded the parties of this fact. Second, the Court's consideration of this
issue is hampered by Clipper's tendency to present its argument in generalities,
without specifying portions of Dr. Serwin's testimony that allegedly violated the
Court's prior orders. The Court is not inclined to read through all of Dr. Serwin's
testimony and (1) compare and contrast it to the Court's pretrial orders or (2)
independently evaluate its admissibility. Nonetheless, the Court has reviewed
Dr. Serwin's testimony, paying particular attention to the portions specified by
Clipper. Having done so, the Court adheres to its ruling that Dr. Serwin's
testimony was admissible. First, the evidence offered is consistent with the

9

Court's pretrial orders. Second, as noted by the Court previously, evidence was presented that would permit the jury to find Clipper "structured the RPG transaction so that its benefits and costs were divided among other entities, controlling where money went and how expenses were incurred." Doc. # 523 at 4. The jury was entitled to consider Clipper's "governing role" when deciding what Clipper expected out of the transaction and what Clipper would have paid.

Clipper also argues this view is an incorrect statement of law. The flaw in Clipper's argument is that it presupposes a multitude of unrelated and separately-interested entities. The Record in this case contains evidence suggesting Clipper decided how expenses and gains were to be allocated, so if it was not directly responsible for a particular expense it was only because Clipper elected to make someone else nominally responsible – but, the ultimate responsibility for everything rested with Clipper. Clipper understandably protests that this portrayal of the facts is incorrect, but it is the jury's job to evaluate the facts. Clipper also argues Dr. Serwin's trial testimony is somehow different from his deposition testimony. As indicated during trial, this is a matter for impeachment. More importantly, the Court is not persuaded that Dr. Serwin's trial testimony was markedly different from his deposition testimony.

Finally, Clipper argues the damage award cannot stand because Dr. Serwin did not establish Clipper had the ability to pay the reasonable royalty and Clipper presented uncontroverted testimony that it could not. As to the first contention, the Court finds no basis in law for concluding damages can be awarded only if the misappropriator can pay them. Second, the Court does not agree that the uncontroverted evidence established Clipper could not pay the royalty. The fact that it could not borrow more than $500,000 for office renovations does not conclusively establish Clipper could not have arranged for financing for Plaintiff's confidential information as part of the acquisition. The contexts are different. Moreover, self-interested testimony from Clipper itself is not of such a conclusive nature that the Court (or the jury) is legally compelled to accept it as true.

10

## *4. Punitive Damages*

Clipper contends the award of punitive damages is unconstitutional. To place matters in context, the jury awarded compensatory damages of $21.3 million and punitive damages of $10 million. The constitutionality of a punitive damage award requires consideration of (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio between punitive damages and compensatory damages, and (3) the difference between the punitive damages awarded and the civil penalties authorized in similar cases. E.g., Trickey v. Kaman Indus. Tech. Corp., 705 F.3d 788, 802 (8th Cir. 2013). The most important factor is the degree of reprehensibility. Id. (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)). Reprehensibility requires consideration of factors such as whether the harm was physical or economic, whether the defendant acted with indifference to or reckless disregard of the health or safety of others, the plaintiff's financial vulnerability, whether the conduct was isolated or repeated, and whether the harm was the result of intentional actions, deceitful conduct, or accident. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003).

Clipper contends no amount of punitive damages can be justified because it caused purely economic harm, Plaintiff was not financially vulnerable, and this was a singular event. The Court disagrees. First, the Eighth Circuit has held that acting with evil motive or reckless indifference indicates reprehensibility even if health or safety is not at risk. E.g., Trickey, 705 F.3d at 803; JCB, Inc. v. Union Planters Bank, NA, 539 F.3d 862, 875-76 (8th Cir. 2008); Craig Outdoor Advertising, Inc. v. Viacom Outdoor, Inc., 528 F.3d 1001, 1021 & n.9 (8th Cir. 2008). Here, the jury found Clipper "acted outrageously because of . . . its evil motive or reckless indifference to the rights of others," Instruction No. 25, and after hearing the evidence the Court tends to agree Clipper acted at least with reckless disregard to the fact that it was seeking out and using someone else's trade secrets.

To be sure, the reprehensibility is not as high as might exist in other cases. However, reprehensibility is just one factor to consider. The ratio of

11

actual damages to punitive damages is 0.5 to one – a multiplier of less than a single digit – and augurs in favor of the jury's assessment. Considering the Gore factors, the Court concludes the jury's award of punitive damages does not shock the conscience or indicate passion or prejudice on the jury's part. Cf. Trickey, 705 F.3d at 802 (citing Gore, 517 U.S. at 568).

Clipper next argues that it cannot be assessed punitive damages based on Monitor's conduct. The problem is that Clipper does not explain how it was assessed punitive damages based on Monitor's conduct. To the extent Clipper believes this is an instructional error, see Clipper's Suggestions at 49, it has not identified any erroneous instructions or any instructions it proposed that address this point. The Jury Instructions repeatedly referred to the defendants and did not invite the jury to consider the conduct of non-parties in determining the amount of punitive damages.

Finally, Clipper contends it "had an absolute defense to punitive damages in that it relied on the advice of counsel." Clipper's Suggestions at 42. Clipper not only fails to present any legal authority for this proposition, but it identifies no evidence suggesting it acted on the advice of counsel when it decided to seek out and use Plaintiff's confidential information.

## B. New Trial

A new trial may be granted when the first trial results in a miscarriage of justice, either because (1) the verdict is against the weight of the evidence, (2) the damage award is excessive, or (3) legal errors occurred during the trial. E.g., Trickey, 705 F.3d at 807. For legal error to justify a new trial, the error must prejudicially affect the outcome. E.g., id.; First Nat'l Bank in Sioux Falls v. First Nat'l Bank South Dakota, 679 F.3d 763, 768-69 (8th Cir. 2012). When considering whether a new trial is justified because the first result is against the weight of the evidence, the Court may rely on its own interpretation of the evidence but cannot set aside the jury's verdict simply because the jury could have reached a different result or because the Court believes other outcomes are

12

more appropriate. Harris v. Secretary, U.S. Dep't of Army, 119 F.3d 1313, 1318 (8th Cir. 1997).

### 1. Dr. Serwin's Testimony and Damage Calculations

Clipper's argument here is similar to the one presented in Section II(A)(3), above. The Court's ruling is also the same. The Court discerns no evidentiary error or miscarriage of justice.

### 2. Evidence of Actions by Jan Murley, nxtMove, and RPG

Clipper contends the evidence involving Jan Murley, nxtMove, and RPG was irrelevant and should not have been admitted. Clipper relies heavily on the Court's pretrial, interlocutory ruling regarding the evidence. However, as acknowledged by Clipper, the Court allowed the evidence in for limited purposes. While the documents used by Murley and nxtMove were not the same documents Plaintiff contended were misappropriated, they contained the same information as the misappropriated documents. The fact that Murley and nxtMove (1) sought out and (2) used these documents demonstrated the information they contained (and, thus, the information in the misappropriated documents) was useful – which countered Clipper's contention that the documents were stale, valueless, or useless.

Instruction No. 22 limited the use of this evidence in a manner consistent with the Court's oral explanation as to how the evidence could be used. Clipper speculates the limiting instruction was ineffective, and supports this claim by pointing to other cases where the limiting instruction was found to be ineffective. The comparisons prove nothing: ineffectiveness in one case does not equal ineffectiveness in all cases, and there is nothing comparable between this case and those Clipper cites. To the contrary, the jury was specifically told what the alleged trade secrets were, see Instruction No. 19, and were required to specify which of the alleged trade secrets (if any) were misappropriated. See Verdict

13

Form A.  The jury was not confused into thinking that liability could arise from the "misappropriation" of anything other than the five documents specified in the Jury Instructions.

### 3.  Laura Steinberg

Clipper contends Steinberg's testimony was inadmissible.  The Court disagrees for the reasons previously expressed, and there is no reason to add anything to the Court's ruling made during trial.

### 4.  Instructional Error

(a)  Comparative Fault

Clipper contends the jury should have been instructed to consider Plaintiff's comparative fault.  The Court ruled comparative fault applies to negligence claims.  MUTSA does not establish a negligence standard.  Clipper cites cases counseling that the nature of the injury does not dictate whether comparative fault applies, but this does not establish that it should be given in all cases.  The cause of action dictates whether comparative fault is available, and there is nothing to support Clipper's position that it is available here.  As intimated during trial, the Court finds no reason to believe the Missouri Supreme Court would apply comparative fault to a claim under MUTSA.  Therefore, the instruction should not have been given.

Moreover, Clipper wanted the jury to consider Plaintiff's "fault" in failing to take reasonable steps to protect its trade secrets.  Under MUTSA, the requirement of taking reasonable steps is a requirement for the trade secret to exist: if the jury believed Plaintiff failed to take reasonable steps, then there was no trade secret and Clipper was entitled to an outright verdict.  Clipper essentially wanted the jury to consider the same issue twice.  This also demonstrates the lack of prejudice: if the jury thought Plaintiff failed to make "efforts that were

14

reasonable under the circumstances to maintain" the secrecy of its information, it would have found the information was not a secret and would have ruled for Clipper. The fact that the jury did not rule for Clipper means the jury must have found Plaintiff made reasonable efforts – so the lack of another instruction asking the jury to consider the same issue did not prejudice Clipper.

(b) Instruction No. 19

Instruction No. 19 told the jury what it had to find in order for it to conclude a trade secret existed. Clipper contends the instruction was erroneous, but its argument does not identify a misstatement of law. Instead, Clipper has presented an argument as to why Plaintiff's confidential information did not qualify as a trade secret – which is a factual argument that does not demonstrate an infirmity in the instruction.

Clipper's argument seems to be that Plaintiff disseminated most or all of the information in the documents, thereby terminating its status as a trade secret. This argument could have been (and was) made to the jury under Instruction No. 19 by, for instance, contending the information was generally known or was not the subject of efforts to maintain its secrecy. The jury rejected this fact-based argument, and there is no basis for trying the issue again.

(c) Instruction No. 17

Instruction No. 17, which is a modified version of Eighth Circuit Model Instruction 5.23, told the jury that a limited liability company (such as Clipper) acts only through its agents and employees – a true statement, given that all entities can act only through the actions of human agents. The Court added a sentence declaring that "[t]he agent or employee may, but does not have to be, a defendant in this case." This language was added so the jury would not think co-Defendant Adam Doctoroff was the only agent whose actions could be

15

attributable to Clipper, as there were a multitude of other agents (Peter Kim, to name just one) whose actions were attributable to Clipper.

Clipper does not argue the instruction is incorrect as matter of law; instead, it argues the instruction could have been used to make Clipper liable for the conduct of others. First, the Court's review of the Transcript reveals no objection to this instruction. Tr. at 1368-91.[2] The closest mention is when counsel contended there was "a fatal omission in the instructions which is failure to instruct the jury on whose conduct can be considered for the imposition of liability." Tr. at 1388. However, this statement was not made in regard to this particular instruction – and it should be noted Clipper did not propose a different instruction that specified all the employees/agents for whose conduct it was responsible.

Apart from Clipper's failure to object, it does not now argue the instruction is incorrect – it just suggests the jury may have used the instruction for unintended purposes. The Court disagrees, and does not discern any prejudice or miscarriage of justice stemming from Instruction No. 17.

(d) Instruction No. 14

Instruction No. 14 was an instruction on spoliation. See Order dated July 25, 2012 (Doc. # 381). Clipper preserves its arguments regarding this instruction, and there is no need for further discussion of those issues.

While conceding the "instruction on its face did not allow the jury to draw an adverse inference based on the conduct of nonparties," Clipper argues there was "so much evidence of non-party spoliation conduct" that the instruction became a nullity. Clipper theorizes the jury must have held Clipper accountable for spoliation by nonparties. The Court does not share Clipper's view of the evidence.

---

[2]Some of the instruction numbers changed following the instruction conference. However, evaluating the substance of counsel's remarks reveals no objection to the instruction that was finally numbered as Instruction No. 17.

16

Clipper also contends that its destruction of documents was based on the advice of counsel. The Court addressed this specific issue during trial in the context of Plaintiff's motion to preclude evidence regarding the advice of counsel. After suggesting that silence from counsel did not constitute "advice," Tr. at 1263, the Court denied Plaintiff's motion in limine, stating "[i]t depends on how that advice of counsel evidence comes in as to whether I think that's an appropriate objection or not. So we'll see how it goes and you make your objection at the appropriate time." Tr. at 1265. Thereafter, there was no evidence indicating counsel advised Clipper that it was acceptable to destroy documents, computer records, or other potential evidence. As intimated during trial, the Court holds that Clipper is not entitled to a new trial based on its defense of "advice of counsel" when counsel did not provide any advice.

### 5. *Submission of Fraudulent Inducement Defense to Clipper's Counterclaim*

On October 2007, Plaintiff and Clipper executed an agreement whereby Clipper agreed to take certain actions and Plaintiff agreed to release all claims against Clipper except for those based on intentional misconduct (such as, for instance, misappropriation of trade secrets). The agreement expressed certain representations, including a representation that Clipper did not have any of Plaintiff's trade secrets.

Originally, Plaintiff alleged Clipper's representation that it did not have any trade secrets was fraudulent and asserted a claim for fraud. The Court granted summary judgment on this claim primarily because there was no damage, but also because there was no basis for Plaintiff's reliance.

Clipper asserted a counterclaim for breach of contract. Plaintiff defended by arguing it was entitled to judgment because its claim for misappropriation of trade secrets was valid and thus was not barred by the agreement. Plaintiff also asserted an affirmative defense predicated on Clipper's representation that it did not have any of Plaintiff's trade secrets. The jury returned a verdict for Plaintiff.

Clipper contends submission of the affirmative defense was improper,

17

based largely on the Court's grant of summary judgment on Plaintiff's substantive claim. Without specifically saying so, Clipper essentially contends the Court should have granted summary judgment on the affirmative defense and not submitted the issue for the jury's consideration. A denial of summary judgment is not reviewable after a jury renders a verdict because it makes no sense to ignore the resolution of facts following a complete development of the Record. Clipper essentially invites the Court to ignore the full trial and focus only on what was known before trial. This approach is not to be followed. E.g., Studnicka v. Pinheiro, 618 F.3d 799, 801 (8th Cir. 2010); Eaddy v. Yancey, 317 F.3d 914, 916 (8th Cir. 2003). In any event, the Court adheres to its view that the claim for fraud and the defense of fraud are different. See Order dated July 25, 2012 (Doc. # 383) at 7-8.

Finally, there was no prejudice because Plaintiff prevailed on its claim for misappropriation of trade secrets. Prior to trial, the Court held Massachusetts law would not permit Defendant to recover its attorney fees from defending this suit, leaving only Defendant's claim for specific performance. The value of this remedy was dubious, but the Court allowed the claim to remain, stating:

> The Court is not sure what value this relief would have. As noted earlier, Clipper cannot prevail if Plaintiff convinces a jury that Clipper misappropriated trade secrets – and if Plaintiff does not convince a jury that Clipper misappropriated trade secrets, then Clipper will have "won the war" and this intermediate battle will be meaningless. Because (1) specific performance is an equitable remedy to be ordered by the Court and (2) the Court suspects it lacks full and complete information, the Court will deny Plaintiff's request for judgment on this remedy. The issue can be revisited, if necessary, at the end of trial.

Order dated July 25, 2012 (Doc. # 382) at 3. Plaintiff's victory on its misappropriation claim automatically defeated Clipper's counterclaim, regardless of the affirmative defense.

### *6. Punitive Damages*

Clipper contends a new trial on the issue of punitive damages is necessary because there was extensive evidence about the conduct of third parties. The Court rejects this argument for the reasons stated. The Court further finds the jury's findings regarding punitive damages (including the amount awarded) represent a reasonable and well-supported interpretation of the facts, and no injustice is evident.

### III. CONCLUSION

Clipper's Motion for Judgment as a Matter of Law or, in the Alternative, for New Trial, is denied.

IT IS SO ORDERED.

DATE: March 20, 2013

/s/ Ortrie D. Smith  
ORTRIE D. SMITH, SENIOR JUDGE  
UNITED STATES DISTRICT COURT