```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF MISSOURI
 2                      WESTERN DIVISION

 3

 4   HALLMARK CARDS, INC.,            )
                                     )
 5                     Plaintiff,)
                                     )
 6        vs.                        )Case No.08-00840-CV-W-ODS
                                     )
 7   MONITOR CLIPPER PARTNERS, LLC.,  )
                          et al.)November 5, 2012
 8                              )Kansas City, Missouri
                        Defendants.)
 9

10           TRANSCRIPT OF JURY TRIAL PROCEEDINGS
             BEFORE THE HONORABLE ORTRIE D. SMITH
11            UNITED STATES SENIOR DISTRICT JUDGE

12                    VOLUME 1 OF 10

13   APPEARANCES:
     FOR THE PLAINTIFF:          Mr. Charles W. German
14                               Mr. Daniel E. Blegen
                                 Rouse Hendricks German May PC
15                               1201 Walnut, 20th Floor
                                 Kansas City, Missouri 64106
16
                                 Mr. John C. Aisenbrey
17                               Stinson Morrison Hecker LLP
                                 1201 Walnut Street, Suite 2800
18                               Kansas City, Missouri

19         (APPEARANCES CONTINUED ON NEXT PAGE)

20

21   COURT REPORTER:            Ms. Cynthia M. Johnson, RMR
                                U.S. Court Reporter
22                              400 East 9th Street, Room 8552
                                Kansas City, Missouri 64106
23                              (816)512-5657

24

25   Proceedings reported by computer stenography; transcript
     produced by computer.
```

(APPEARANCES CONTINUED ON NEXT PAGE)

```
 1                    (APPEARANCES CONTINUED)

 2   FOR THE DEFENDANTS:          Mr. David F. Oliver
                                  Ms. Stacey R. Gilman
 3                                Berkowitz Oliver Williams Shaw
                                  2600 Grand Blvd. Ste. 1200
 4                                Kansas City, Missouri 64108

 5

 6                                Mr. Steven L. Manchel
                                  Mr. Michael G. Donovan
 7                                Manchel & Brennan, PC
                                  199 Wells Avenue, Ste. 301
 8                                Newton, MA 02459

 9                         *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2
                                                        Page No.
 3
      NOVEMBER 5, 2012 - DAY 1
 4
      RECORD..............................................    2
 5
      INSTRUCTIONS NOS. 1 - 6 READ........................   34
 6
      OPENING STATEMENT BY MR. AISENBREY..................   34
 7
      OPENING STATEMENT BY MR. MANCHEL....................   53
 8
                        PLAINTIFF'S EVIDENCE
 9
      WITNESSES:
10
           DON HALL, JR.
11         Direct Examination by Mr. Aisenbrey............   72
           Cross-Examination by Mr. Manchel...............   99
12         Redirect Examination by Mr. Aisenbrey..........  148
           Recross-Examination by Mr. Manchel.............  161
13
           WAYNE STRICKLAND
14         Direct Examination by Mr. German...............  168
           Continued Direct Examination by Mr. German.....  227
15         Cross-Examination by Mr. Donovan...............  234

16    NOVEMBER 6, 2012 - DAY 2

17    WITNESSES:

18         WAYNE STRICKLAND - RESUMED
           Continued Cross-Examination by Mr. Donovan.....  283
19         Redirect Examination by Mr. German.............  322
           Recross-Examination by Mr. Donovan.............  334
20
      RECORD.............................................  338
21
      VIDEO DEPOSITION OF MARK THOMAS....................  347
22
      WITNESSES:
23
           ADAM DOCTOROFF
24         Direct Examination by Mr. Aisenbrey............  347
           Continued Direct Examination by Mr. Aisenbrey...  387
25
```

```
1                            INDEX (Continued)

2                                                            Page No.

3   VIDEO DEPOSITION OF BILL YOUNG.......................    400

4   VIDEO DEPOSITION OF PETER KIM........................    401

5   RECORD...............................................    401

6   CONTINUING VIDEO DEPOSITION OF PETER KIM.............    410

7   VIDEO DEPOSITION OF CHARLES YOON.....................    411

8   RECORD...............................................    411

9   NOVEMBER 7, 2012 – DAY 3

10  RECORD...............................................    413

11  VIDEO DEPOSITION OF SEAN GARDNER.....................    429

12  WITNESSES:

13      JOHN MAYNARD
        Direct Examination by Mr. Blegen.................    430
14      Continued Direct Examination by Mr. Blegen......    482
        Cross-Examination by Mr. Donovan................    482
15      Redirect Examination by Mr. Blegen..............    527

16  RECORD...............................................    531

17  VIDEO DEPOSITION OF GRANT BROWN......................    532

18  VIDEO DEPOSITION OF JEFFREY PAUKER...................    533

19  RECORD...............................................    533

20  CONTINUING VIDEO DEPOSITION OF JEFFREY PAUKER........    534

21  RECORD...............................................    534

22  NOVEMBER 8, 2012 – DAY 4

23  RECORD...............................................    536

24

25
```

```
 1                    INDEX (Continued)

 2                                                      Page No.

 3   WITNESS:

 4        DR. KENNETH SERWIN
          Direct Examination by Mr. German................   548
 5        Continued Direct Examination by Mr. German......   599
          Cross-Examination by Mr. Manchel................   627
 6
     RECORD...........................................   675
 7
     WITNESS:
 8
          DR. KENNETH SERWIN - RESUMED
 9        Continued Cross-Examination by Mr. Manchel......   680
          Continued Cross-Examination by Mr. Manchel......   746
10        Redirect Examination by Mr. German.............   784
          Recross-Examination by Mr. Manchel.............   801
11
     RECORD...........................................   806
12
     NOVEMBER 9, 2012 - DAY 5
13
     RECORD...........................................   814
14
     VIDEO DEPOSITION OF STEVE LEVIN.....................   824
15
     VIDEO DEPOSITION OF MARK POCHARSKI..................   826
16
     RECORD...........................................   826
17
     CONTINUING VIDEO DEPOSITION OF MARK POCHARSKI........   835
18
     VIDEO DEPOSITION OF LARRY EARLEY....................   836
19
     VIDEO DEPOSITION OF JAN MURLEY......................   840
20
     RECORD...........................................   842
21
     WITNESS:
22
          PAUL MAXWELL
23        Direct Examination by Mr. Blegen...............   848
          Continued Direct Examination by Mr. Blegen......   861
24        Cross-Examination by Mr. Donovan...............   889

25
```

```
 1                          INDEX (Continued)

 2                                                          Page No.

 3    NOVEMBER 13, 2012 - DAY 6

 4    WITNESSES:
```

```
 5         PAUL MAXWELL - RESUMED
           Continued Cross-Examination by Mr. Donovan......    905
 6         Redirect Examination by Mr. Blegen..............    928

 7    VIDEO DEPOSITION OF LAURA STEINBERG.................    937

 8    VIDEO DEPOSITION OF PATRICK O'TOOLE.................    938
```

```
 9    WITNESSES:
```

```
10         JOHN MALLERY
           Direct Examination by Mr. Blegen................    941
11         Cross-Examination by Mr. Oliver................    980

12    RECORD.............................................    992
```

```
13    WITNESSES:
```

```
14         BRIAN GARDNER
           Direct Examination by Mr. Aisenbrey.............    994
15         Cross-Examination by Mr. Manchel................   1034
           Continued Cross-Examination by Mr. Manchel......   1067
16
```

```
      NOVEMBER 14, 2012 - DAY 7
17
```

```
      RECORD.............................................   1121
18
```

```
      WITNESS:
19
```

```
20         BRIAN GARDNER - RESUMED
           Continued Cross-Examination by Mr. Manchel......   1122
           Redirect Examination by Mr. Aisenbrey...........   1160
21         Recross-Examination by Mr. Manchel..............   1186

22    RECORD.............................................   1193
```

```
23    PLAINTIFF RESTS

24                        DEFENDANTS' EVIDENCE

25
```

```
 1                        INDEX (Continued)

 2                                                          Page No.

 3   WITNESSES:

 4        ADAM DOCTOROFF – RECALLED
          Direct Examination by Mr. Donovan...............    1194
 5
     MOTIONS..............................................    1251
 6
     COURT'S RULING.......................................    1264
 7
     WITNESS:
 8
          ADAM DOCTOROFF – RESUMED
 9        Continued Direct Examination by Mr. Donovan.....    1267
          Cross-Examination by Mr. Aisenbrey.............     1322
10        Redirect Examination by Mr. Donovan............     1364

11   NOVEMBER 15, 2012 – DAY 8

12   INSTRUCTION CONFERENCE...............................    1368

13   RECORD...............................................    1391

14   VIDEO DEPOSITION OF MARK WILLIAMSON..................    1394

15   WITNESS:

16        APRIL EVANS
          Direct Examination by Mr. Donovan...............    1396
17        Cross-Examination by Mr. German................     1421

18   RECORD...............................................    1469

19   WITNESSES:

20        APRIL EVANS – RESUMED
          Continued Cross-Examination by Mr. German.......    1471
21
          JAY DITTMAN
22        Direct Examination by Mr. Donovan...............    1518

23   OFFER OF PROOF.......................................    1530

24

25
```

```
 1                        INDEX (Continued)

 2                                                        Page No.

 3   WITNESSES:

 4       JAY DITTMAN – RESUMED
         Continued Direct Examination by Mr. Donovan.....   1532
 5       Cross-Examination by Mr. Blegen.................   1538

 6       DR. COLIN BLAYDON
         Direct Examination by Mr. Manchel...............   1541
 7
 8   RECORD...........................................   1572

     NOVEMBER 16, 2012 – DAY 9
 9
     RECORD...........................................   1574
10
11   WITNESS:

         DR. COLIN BLAYDON – RESUMED
12       Continued Direct Examination by Mr. Manchel.....   1576
         Cross-Examination by Mr. German.................   1602
13
14   RECORD...........................................   1636

15   WITNESS:

         DR. COLIN BLAYDON – RESUMED
16       Continued Cross-Examination by Mr. German.......   1639
         Redirect Examination by Mr. Manchel.............   1649
17
18   RECORD...........................................   1652

19   MOTIONS..........................................   1653

20   COURT'S RULINGS..................................   1654

21   DEFENDANTS REST

22   INSTRUCTIONS NOS. 9 – 29 READ....................   1655

23   CLOSING ARGUMENTS BY MR. GERMAN..................   1657

24   CLOSING ARGUMENTS BY MR. MANCHEL.................   1692

25   CLOSING ARGUMENTS BY MR. GERMAN..................   1722

     JURY RETIRED.....................................   1728
```

```
 1                    INDEX (Continued)

 2                                                    Page No.

 3    NOTE FROM JURY......................................    1729

 4    NOTE FROM JURY......................................    1731

 5    NOTE FROM JURY......................................    1733

 6    NOVEMBER 19, 2012 – DAY 10

 7    NOTE FROM JURY......................................    1734

 8    RECORD..............................................    1734

 9    NOTE FROM JURY......................................    1735

10    RECORD..............................................    1736

11    NOTE FROM JURY......................................    1739

12    VERDICT.............................................    1740

13    JURY POLLED.........................................    1742

14    RECORD..............................................    1743

15    CERTIFICATE OF REPORTER.............................    1745

16                        *    *    *

17                    INDEX OF EXHIBITS

18    PLAINTIFF'S EXHIBITS              OFFERED    RECEIVED

19    No. 40 (e-mail)                  341 in part 343

20    No. 49 (e-mail)                  1345        1345

21    No. 55 (Q & A sheet)             343         345

22    No. 62 (e-mail)                  403         403

23    No. 115 (e-mail)                 868         868

24    No. 122 (Strategy & Action plan) 819         823

25    No. 125 (e-mail)                 923         923
```

```
 1                    INDEX OF EXHIBITS (Continued)

 2   PLAINTIFF'S EXHIBITS                    OFFERED      RECEIVED

 3   No. 128 (e-mail)                          814          818

 4   No. 128A (e-mail)                         814          818

 5   No. 150 (e-mail)                          423        425cond.

 6   No. 173 (affidavit)                       403        404 rej.

 7   No. 186 (metadata)                        404        406 rej.

 8   No. 202 (e-mail)                          407          407

 9   No. 203 (e-mail)                          407          407

10   No. 204 (e-mail)                          423          425
     cond.
11   No. 217 (e-mail)                          408          409

12   No. 241 (e-mail)                          870          870

13   No. 246 (contact report)                  819          823

14   No. 266 (e-mail)                          428          429

15   No. 270S (letter)                        1046         1046

16   No. 281 (e-mail)                          346          346

17   No. 306 (e-mail)                          871          871

18   No. 307 (contact report)                  819          823

19   No. 313 (consulting agreement)            882          882

20   No. 319 (consulting agreement)            814          818

21   No. 334 (e-mail)                          814          818

22   No. 342 (e-mail)                         1460         1460

23   No. 346 (e-mail)                          819          823

24   No. 349 (letter)                         1009         1009

25   No. 360 (letter)                          814          818
```

```
                        INDEX OF EXHIBITS (Continued)

PLAINTIFF'S EXHIBITS                          OFFERED     RECEIVED

No. 361 (letter)                                814         818

No. 363 (letter)                                814         818

No. 364 (e-mail)                                814         818

No. 370 (e-mail)                                814         818

No. 371 (consulting agreement)                  814         818

No. 375 (letter)                                836         839

No. 376 (contact report)                        819         823

No. 383A (BKD report)                           964         965

No. 386 (Shredder random overwrite)            974         974

No. 422 (letter)                                785         786

No. 429 (brochure)                             1440        1440

No. 430D (Shredder pop-up window)              976         976

No. 430E (Shredder pop-up window)              976         976

No. 440 (report)                               979         979

No. 442 (directory listing)                    978         978

No. 443A (detailed report)                     967         967

No. 443B (link file report)                    961         961

No. 443C (log)                                 966         966

No. 449 (e-mail)                               1467        1467

No. 475 (e-mail)                                887         887

No. 487 (e-mail)                                 83          83

No. 488 (e-mail)                                 84          84

No. 489 (spreadsheet)                           453         453
```

INDEX OF EXHIBITS (Continued)

| PLAINTIFF'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| No. 546A (resume) | 550 | 550 |
| No. 547A (schedule) | 575 | 575 |
| No. 547C (schedule) | 570 | 570 |
| No. 547D (schedule) | 223 | 570 |
| No. 547E (schedule) | 572 | 572 |
| No. 547G (summary) | 581 | 581 |
| No. 547H (list of invoices) | 580 | 580 |
| No. 547K (schedule) | 623 | 623 |
| No. 547L (diagram) | 615 | 615 |
| No. 547N (schedule) | 603 | 603 |
| No. 649 (photo) | 848 | 848 |
| No. 651 (financial statement) | 1530 | 1531 |
| No. 652 (financial statement) | 1530 | 1531 |
| No. 653 (financial statement) | 1530 | 1531 |
| No. 654 (financial statement) | 1530 | 1531 |
| No. 655 (financial statement) | 1530 | 1531 |
| No. 656 (financial statement) | 1530 | 1531 |
| No. 658 (spreadsheet) | 463 | 463 |
| No. 659 (e-mail) | 1453 | 1453 |
| No. 660 – 673 (transcripts) | 1638 | 1638 |
| No. 674 (schedule) | 1675 | 1676 |
| No. 674A (schedule) | 1675 | 1676 |
| No. 676A & 676B (videos) | 1638 | 1638 |

```
1                    INDEX OF EXHIBITS (Continued)

2    PLAINTIFF'S EXHIBITS                  OFFERED      RECEIVED

3    No. 1505 (e-mail)                      1183         1183

4                            *     *     *

5    DEFENDANT'S EXHIBITS                  OFFERED      RECEIVED

6    No. 327 (Giftbeat Magazine)            1246         1246

7    No. 412A (data room info)              1282         1282

8    No. 1016A (e-mail)                      894          894

9    No. 1022 (e-mail)                       426          427

10   No. 1255A (transcript – Mark           1655         1655
                     Williamson)
11
     No. 1275D (DVD – Williamson depo.)     1655         1655
12

13                           *     *     *

14

15

16

17

18

19

20

21

22

23

24

25
```

1   NOVEMBER 5, 2012 – DAY 1

2          (The following proceedings were had OUT OF THE

3   PRESENCE AND HEARING OF THE JURY:)

4          THE COURT:  Good morning.  Welcome back.

5          I take it everyone had a nice weekend with their

6   families.

7          Okay.  Be seated.

8          The parties requested some time to take up some

9   issues, I think, relative to exhibits and perhaps opinions.  I

10  have been through the trial briefs over the weekend and I have

11  reviewed the previous orders that have been issued throughout

12  the life of the case.

13         I'll begin by observing that some of the orders have

14  been I think misinterpreted or misapplied by the parties.  It

15  is difficult, always difficult to rule objections to evidence

16  in the abstract.  It is far better for me to hear the context

17  and understand the context of the exhibit before I rule the

18  objection.  That said, I will allow the parties to make

19  whatever arguments they want to make this morning and to the

20  extent that I'm comfortable doing it, I will rule those

21  objections.  To the extent that I'm not comfortable not doing

22  it, I'll simply defer the objection until the exhibit is

23  actually offered.  So who would like to go?

24         MR. BLEGEN:  Your Honor, we have four issues to

25  address this morning.  Three relate to deposition designations,

1    housekeeping we need to clean up now so we can complete them.

2    And I have one relating to the opening statement of the

3    defendants that actually ties back to the trial brief.  Would

4    you prefer the deposition issues?

5           THE COURT:  You take them in whatever order you like.

6           MR. BLEGEN:  All right.  I'll start with deposition

7    issues.  There is a dispute over a small amount of testimony in

8    the deposition of Mark Thomas.  You have sustained an objection

9    to some testimony.  I have a copy of the transcript if you want

10   to see it.

11          THE COURT:  I do.

12          MR. BLEGEN:  The testimony highlighted in yellow on

13   page 191 to 192, you had sustained an objection lodged by the

14   defendants that related to, I believe, speculation, personal

15   knowledge because --

16          THE COURT:  Just a second.

17          All right.  I'm sorry.

18          MR. BLEGEN:  No problem, Your Honor.

19          THE COURT:  Back up to the beginning.

20          MR. BLEGEN:  Okay.  You have in front of you a

21   snippet of the testimony of Mark Thomas.  There is a section

22   designated, highlighted in yellow that was designated by the

23   plaintiffs on 191 and 192.  It has to do with Exhibit 40.  And

24   the testimony was objected to as being beyond his knowledge.

25   And as you read it through he does not recognize the document

1    he's asked questions about.  At the time of that designation,

2    the defendants designated the following testimony in blue which

3    is continuing on speculating about that same document.  Well,

4    you sustained the objection as to 191 and 192, the plaintiff

5    had, to the plaintiff's designation.  The defendants now want

6    to keep their testimony which, frankly, falls under the same

7    objectionable issue and want to add in the testimony that is

8    highlighted in blue to the right on 191.

9          Our issue with that is that based upon your ruling

10   all of the testimony on those three pages should be excluded in

11   our view.  At the very least you've told us we're not allowed

12   to play that section of testimony and they want us now to add

13   it back in to the designation.

14         THE COURT:  Stacey?

15         MS. GILMAN:  Your Honor, Dan and I had an e-mail

16   exchange on this over the weekend which I'd like to provide to

17   the Court.

18         I think this issue is much simpler than it may seem

19   at first glance.  The plaintiff never objected to the testimony

20   on pages 192 and 193 that were designated by the defendant.

21   And they agreed in our e-mail exchange to include that

22   testimony.  The only testimony that I understand they're

23   objecting to adding back in at this point is the testimony on

24   page 191 which is one Q and A, paren, question and answer

25   paren, that simply asks the witness to look at the exhibit and

1    acknowledge that he had it.  That is necessary to provide

2    context to 192 and 193.  We're aware that you've made it clear,

3    and we agree with you, these videos should be presented in a

4    manner that will not be confusing to jury.  That question and

5    answer paren is necessary, we believe, in order to let the jury

6    know what exhibit is being discussed in the following testimony

7    whichever one you agree we can play for the jury.

8         THE COURT:  Anything further?

9         MR. BLEGEN:  Just to note that we didn't object to

10   their testimony because we didn't object to our testimony.  We

11   think that entire part from 191 to 193 should be played.  But

12   you sustained their objection and the testimony they want to

13   play is objectionable for the same reason.  So for consistency

14   we ask it be stricken.

15        THE COURT:  By striking the testimony offered by

16   plaintiff, I don't think that really added or detracted from

17   the case.  Thomas doesn't know anything about the exhibit

18   portion designated by defendants, says he doesn't know anything

19   about the diary survey.  I think that stands on its own.  So I

20   will allow the defendants to play lines 10 through 15 on page

21   191 and then lines 20 through 24 on page 192 and 1 through 8 on

22   page 193.

23        MR. BLEGEN:  Thank you, Your Honor.

24        The second issue on deposition designations has to do

25   with Bill Young.  Mr. Young, we understood was going to be a

1    live witness when we designated his testimony in a belt and

2    suspenders fashion.  He is not now a live witness.  There is

3    about two minutes of testimony that we have requested to add

4    that just really puts into evidence two exhibits that have

5    already been stipulated as to admissibility but, they're

6    letters he wrote, they're the two offer letters, one from July,

7    one from September.  I have a copy of the testimony we propose

8    to add that I can provide you.

9         You know, the history of the Bill Young deposition,

10   both sides designated and counter designated back in September

11   of the deadlines the Court set.  After we were first told Bill

12   Young was likely not coming when the witness list was first

13   provided to the Court, the counter designations by the

14   defendants were significantly increased.  They added a bunch of

15   testimony after the deadline for designated testimony.  We did

16   not object to that in the interest of everybody not getting

17   along, not having a fight about it.  We're not asking at this

18   point and I understand it was in the week before the trial

19   started to add a couple of minutes to merely put in two

20   exhibits that are coming in evidence any way.  We just wish to

21   put them in by the person who signed them rather than putting

22   them in through somebody else and it may be confusing.  We just

23   ask the Court's permission to add the testimony designated in

24   yellow.

25        There is some blue testimony that I highlighted.

1    That was their actual they already designated that.  That is

2    coming in.  Just to show that there is already testimony on

3    those topics that are coming into evidence.

4              THE COURT:  Stacey?

5              MS. GILMAN:  We advised the plaintiffs some weeks ago

6    that Mr. Young was not coming.  And, in fact, it was always

7    known by the plaintiffs it was a question mark whether he would

8    be here.  That's why we did designate testimony from him in the

9    course of the schedule that was set by the Court for deadline

10   for designation.

11             I'm not sure what testimony Mr. Blegen is referring

12   to that he is claiming that we added in.  I don't believe we

13   have added in any other than in cooperation with plaintiffs, I

14   think he just said they don't have any objection to anything we

15   added.  This is added testimony on the eve of trial that they

16   have no excuse for not having identified earlier.  It is far

17   too late and we object to it being added.

18             I will note for the Court that is the added testimony

19   that we found in the designations going back through them.

20   I've asked Mr. Blegen whether there is more in the e-mail

21   exchange.  I never heard back.  I don't even know if that's the

22   only added testimony.  But just as Your Honor said on Friday,

23   nothing new should be thrown out at trial.  We believe that the

24   designation has been hashed out ad nauseam and should not be

25   added to at this late date.

1          MR. BLEGEN:  Your Honor, this was transmitted last

2   Tuesday in the cover e-mail.  I noted to Ms. Gilman that, in

3   fact, we did add some testimony.  The pleading that was

4   provided was red lined to show exactly what we added.  So this

5   idea that we're hiding additional testimony is inappropriate

6   but there is no prejudice here.  They've had it for a week.

7   We've asked them for any response.  If they wished to counter

8   designate something for context, they're welcome to do so.

9   We'd like to be able just to put those two exhibits in through

10  them.

11          THE COURT:  I'll allow it.

12          MR. BLEGEN:  Thank you, Your Honor.

13          Do you mind if I take these back so my paralegal

14  knows what we're doing?

15          The final deposition related issue, evidentiary

16  related issue relates to Jan Murley.  First, I want to start

17  off by apologizing to the Court.  Upon receiving the order

18  related to Jan Murley last week I went back and reviewed our

19  jury instructions and we did, in fact, create confusion that

20  was unintended in defining trade secrets to include the Murley

21  materials.  Which then as I re-read it carries through to the

22  verdict director that makes it appear that we're asking the

23  jury to award damages as defined with regard to the Murley

24  materials.  That was not our intent.  Those are not part of the

25  damage claim.  We have been and are only seeking damages as to

1    the five presentations that make up what has been referred to

2    as Exhibit 20.  So I apologize to the Court for the confusion

3    that has caused.

4         With that said, the evidence that we have designated

5    in depositions and intend to put on at trial related to Murley

6    goes to many, many issues in the case, most of which are

7    necessitated by the defendant's arguments and the evidence they

8    intend to put on about Hallmark's trade secrets.  What we need

9    to address is what impact, if any, the Court's order on the

10   claim regarding Jan Murley would have on the testimony in the

11   case.  The Court indicated it may, in the order, but we want to

12   clarify and have an opportunity to address that because we

13   don't believe it should, because none of the evidence was

14   intended to support a claim for damages with regard to Jan

15   Murley.

16        In fact, the evidence related to the 2006 to 2007

17   time period, the hiring of Jan Murley, the hiring of nxtMove,

18   the chain of events that occurred during there goes to a

19   variety of issues.  The defendants argue that they never used

20   any Hallmark trade secrets, never would have used any Hallmark

21   trade secrets.  Well, what Jan Murley brought to the table was

22   largely, it was derived completely from, almost completely from

23   the Exhibit 20 trade secrets.  And we'll prove at trial, in

24   fact, the information she's providing in 2006 for use by RPG is

25   the same information stolen in 2005.  So it goes to the issue

1    of whether it was used and useful.  They argue it's not useful.

2    They argue it's old and stale.  They argue this has no

3    relevance to RPG.  Well, in fact, a year after the acquisition

4    they're continuing to use that same information.

5            The individual from nxtMove will testify that that

6    information provided by Jan Murley was the base line on the

7    industry that nxtMove is able to use in 2006 to move forward

8    and do research on just the humor segment that RPG was using.

9    So this is very useful, very interesting information.  It was,

10   in fact, transmitted directly from Monitor Clipper to RPG.  She

11   provided it to Monitor Clipper.  They forwarded it on to RPG,

12   which is a direct violation of the confidential agreement that

13   they're claiming that bars us from bringing this action.

14           Just like to note, too, that Jan Murley, her role, we

15   learned about that in early 2009 after the original complaint.

16   At that point in time, if you'll recall, the case was stayed

17   for a period of a year.  When we filed the first amended

18   complaint we discussed in detail the very evidence we're

19   intending to put on at trial about Jan Murley and her role in

20   the process.  It has been a subject of discovery.  The

21   depositions you refer to in the order as having occurred before

22   the April 23 hearing were only taken because of the very Jan

23   Murley evidence that we're talking about.  So this isn't new

24   information.

25           Now the damage claim on Murley is another situation

1   but we're not seeking that.  But there are a variety of other

2   reasons.  It goes to the counterclaim.  It goes to the cover

3   up.  Spoliation.  Much of the spoliation evidence is relevant

4   or is in context because of the events with Jan Murley.  Paul

5   Maxwell, who ran Shredder, was the primary contact with Jan

6   Murley and nxtMove.  So that evidence is extraordinarily

7   relevant to all the other issues in the case.  So with that and

8   with our apologies for our jury instructions which were

9   confusing and that is our fault, I apologize for that, we'd ask

10  that the Court allow us to put on the evidence related to Jan

11  Murley, related to nxtMove, which you've already reviewed in

12  the course of the deposition objections.  And we made the

13  argument in the trial brief as to the relevance of it.  We

14  would ask we be allowed to put that evidence on, knowing that

15  we're not actually seeking a claim with regard to the Murley

16  evidence.

17          MS. GILMAN:  Your Honor, what Mr. Blegen has just

18  asked the Court is essentially to reconsider its order.  In the

19  e-mail that I handed to you a moment ago, if you look at page 4

20  Mr. Blegen told us on Friday that they were not going to make

21  any amendments to their deposition designations,

22  notwithstanding your order because they were still evaluating

23  it and, in fact, needed clarification from this Court about

24  what the order meant.

25          We asked Mr. Blegen to explain what clarification he

1    believed was necessary.  The plaintiff declined to tell us what

2    their position was on the order.  So this is the first we're

3    hearing of a request to start from scratch and reconsider your

4    order.

5         With that said, as we think the Court's order

6    correctly reflects, these supposed trade secrets that relate to

7    Ms. Murley much later are entirely distinct from the trade

8    secrets that are claimed at issue in this case with respect to

9    these defendants.  And all of plaintiff's filings up to this

10   point have claims that these acts of alleged spoliation, the

11   supposed image and purge of the computer, Mr. Maxwell's running

12   a shredder, that all of those actions related to Ms. Murley's

13   use of the trade secrets that you've said are not at issue in

14   this case.  In fact, in their motion for sanctions, they

15   specifically made the argument that Monitor Clipper's counsel,

16   Weil, became involved in issues related to Murley in January of

17   2007 after RPG's Chief Financial Officer Ed Stassen raised

18   concerns to Maxwell and other Monitor Clipper employees about

19   Murley sharing confidential Hallmark information with Monitor

20   Clipper and RPG.  As a result of sharing confidential Hallmark

21   information, Monitor Clipper took two steps relevant to the

22   present motion.  The first that they identified was the

23   renegotiating of the nxtMove contract which Your Honor has

24   already expressly said in the order relates to all this new

25   information that is not relevant to this suit.  The second was

1  they claimed that Clipper hired a computer forensics firm to

2  make images of the computers used by the persons who received

3  Murley's dissemination at Hallmark.  It goes on the same way.

4       Their claim has always been that that conduct was

5  designed to conceal the use and dissemination by Murley of

6  those later trade secrets which she was supposedly retained

7  from Hallmark.  There is no connection in the evidence in this

8  case between the trade secrets that they're claiming these

9  defendants misappropriated as those later trade secrets.

10       Similarly, with respect to Mr. Maxwell in the

11  response brief that they filed just recently regarding our

12  objections to deposition designations they said at page 3, the

13  evidence that Paul Maxwell, a Clipper employee, was actively

14  engaged with Murley and nxtMove, ran the Shredder program in

15  January of 2007 to destroy evidence on his computer the day

16  before it was to be imaged also provides strong evidence that

17  the defendants knew their acquisition and use of Murley

18  material was improper.  All of this goes to the Murley material

19  that Your Honor has correctly said are not the trade secrets

20  that are at issue in this case.  It's highly prejudicial for

21  this all to come in.  And also, frankly, prejudicial for them

22  to come in this morning and seek reconsideration after refusing

23  to even tell us what their position was on this.

24       MR. BLEGEN:  Your Honor, first off, if you choose to

25  read the e-mail string, I don't have it in front of me, I can't

1  remember exactly what was said.  We had conversations in the

2  courtroom after you left Friday.  We had e-mail exchanges.

3  Clearly their position is your order means nothing from 2006

4  and 2007 ever comes in the case.  They told us they believe

5  your order impacts every deposition designation in the case.

6  We believe that as we explained earlier there has been

7  confusion caused by us in that the information, in fact, the

8  very nxtMove and Murley contract negotiation that you noted in

9  your order was being kind of thrown in as an issue that was

10  potentially not coming in because of confusion caused by our

11  jury instructions.

12          Now, that information, as I said earlier, the

13  information Jan Murley transmitted to Monitor Clipper, Monitor

14  Clipper transmitted to RPG was from Hallmark materials.  It was

15  the same Hallmark material that they stole in 2005.  It was, so

16  it is, it's not a completely separate set of information but

17  we're not seeking damages on that.  It does show that the

18  information stolen from us in 2005 was still relevant and

19  useful.  And, in fact, used by them.

20          As far as the destruction of evidence, they stole

21  trade secrets.  Hallmark sent a letter saying to Monitor and

22  Monitor Clipper received it saying, I certainly hope you're not

23  using our information that you had from the BMR.  They then set

24  upon trying to use Monitor, so Monitor finds nxtMove.  Monitor

25  Clipper works with nxtMove to do the same thing for Hallmark.

1   They bring in Jan Murley to do what they, what Hallmark said

2   you better not be doing.  It goes to their intent.  It goes to

3   the bad acts.  And all of that culminated after there was a

4   complaint by RPG's CFO where he looked at the documents and

5   said, these should sure look like they're from Hallmark.  They

6   did the image and purge.  They were trying to make sure none of

7   that remained at RPG and so they imaged the computers.  The

8   problem is right before they did that, Paul Maxwell, the

9   Monitor Clipper employee, ran Shredder on his computer.  We

10  have no idea what all was lost.  Jan Murley deleted documents

11  from her computer right before it was imaged.  All of that goes

12  to the bad acts of Monitor Clipper and their attempts to cover

13  up what they had done.

14          The contract was renegotiated.  I believe Ms. Gilman

15  said it was the nxtMove contract.  In fact, it was Jan Murley's

16  contract where clauses were inserted by Paul Maxwell, that make

17  specific false representations about whether she had had

18  materials from the former employer in her consulting with RPG

19  work.  That is the kind of evidence that is coming in.  We're

20  not seeking damages with regard to what Murley brought in 2007.

21  In fact, we will be able to tie the very information in there

22  to the same information as at issue in the case just to show

23  that, in fact, it was the same information used in 2006.

24          As far as surprise, all of this was coming in until

25  everyone received your order.  In your deposition objection

1   order all of this was approved to come in and their objections

2   were overruled.  So it's really a question on Thursday we

3   received the order.  On Friday both sides had an idea of what

4   that may impact and neither side was particularly forthcoming

5   with exactly what the impact -- Their request was, well, what

6   are you going to voluntarily delete from your designations

7   today because of the order?  Our position was, well, I'm not

8   sure what the scope of the order is so we need to take it up

9   with the Court.  We thought we might do it Friday but you

10  indicated you would rather do it this morning.  We're here this

11  morning.  And there is no prejudice.  There is no surprise.  We

12  just need clarification because as you can tell the sides do

13  not agree on the scope and impact of your order.

14          THE COURT:  Let me -- Go ahead.

15          MS. GILMAN:  Your Honor, this argument that these

16  Murley materials tie back to the trade secret presentations

17  that are at issue in this case is entirely new and has never

18  before been advanced by the plaintiff in this case.  And there

19  is absolutely no connection between the Power Points and the

20  Murley materials or the information contained in those.

21          I guess I don't want to repeat everything that I've

22  already said because I think the Court is well aware but all of

23  the alleged concealment, spoliation, that all goes to what

24  Ms. Murley and others did with respect to the Murley materials.

25  And what might have been destroyed to cover up that conduct,

1    not the conduct at issue with the trade secrets that are at

2    issue in this case.

3            MR. BLEGEN:  Not to be belabor the point but on that

4    final point, Your Honor, we have no idea what Paul Maxwell

5    deleted.  He arrived on the scene in September of 2005 in the

6    middle of due diligence, was involved in the acquisition.  In

7    January 2007, knowing his computer is going to be imaged, he

8    ran a document wiping tool that erased all evidence of what was

9    there.  The only time he ran it is the day before his computer

10   is going to be imaged.  It may have been the Murley materials.

11   It may have been things he was keeping in his possession from

12   the original contract.  Mr. Maxwell will be here to explain if

13   he can what he was erasing.  But that evidence clearly goes

14   beyond any question --

15           THE COURT:  It has been my practice and I'm sure the

16   parties are aware of it, that I try to make rulings that allow

17   both sides to fairly present their theory of the case to the

18   jury.  In indicating that I would not submit a damage

19   instruction for trade secrets misappropriated by Murley it was

20   not my intention to exclude any testimony or evidence related

21   to Murley.

22           To the extent that Murley's activities can be linked

23   to the five presentations which were shown in Exhibit, I think

24   it's 40, might have been Exhibit 20 at the April hearing.  But

25   in any event, to the extent that her activities involved use of

1    those materials, I think pretty clearly that testimony, that

2    evidence would be admissible.

3         To the extent that the plaintiff intends to offer

4    evidence of new trade secrets or misappropriation of trade

5    secrets that are not a part of those five presentations, that's

6    excluded.  So I don't think there is any way you can try this

7    case without some reference to Jan Murley.  As long as the

8    defendant denies that the presentations derived independent

9    economic value, I think their use at a later date tends to

10   refute that and is therefore relevant.  To the extent that it's

11   plaintiff's position that the defendant destroyed evidence

12   carries the day, I think evidence of that destruction is

13   necessary and should be admitted.

14        I hope that gives the parties some guidance.  Again,

15   it's difficult to rule these things in the abstract.  I have to

16   know what the context of the evidence is and what the context

17   of the exhibits are before I can make those rulings definitive

18   but I hope that gives you the direction you need.

19        MR. BLEGEN:  Thank you, Your Honor.

20        The one final issue the defendants have today, you

21   indicated you had read the trial briefs so you may have seen

22   this yourself.  There is an argument for, in the trial brief

23   submitted by the defendants that they intend to argue that the,

24   argue the fact of lost profits as having an impact, the fact of

25   not having lost profits having an impact on the trade secrets

1  on the damages on your evidence.  Respectfully we raised this

2  exact issue pretty much.  You gave a very clear and distinct

3  order that no evidence regarding Hallmark's lost profits or

4  lack of lost profits was going to be admissible because it's

5  not going to be given with the case and could confuse the jury.

6  In defiance of that the defendants indicate they intend to make

7  that very exact argument that you excluded in their opening

8  statement here this morning.  We would ask that you make clear

9  that your order stands and that they're not allowed to make

10  those arguments in their opening statement.

11          MR. MANCHEL:  Good morning, Your Honor.

12          THE COURT:  Good morning.

13          MR. MANCHEL:  The reason that we presented this issue

14  to the Court in advance is so there would be no surprise and no

15  confusion.  And it touches on what the Court just spoke to

16  which is the independent value supposedly of the presentation

17  trade secrets at issue.

18          We anticipate that Hallmark will say that they were

19  valuable.  We anticipate that Hallmark will say the value is

20  lost if made secret.

21          THE COURT:  Made public?

22          MR. MANCHEL:  Made public.  I'm sorry.  We're not

23  going to present to the jury the notion that there was no claim

24  for lost profits.  But we believe we should be entitled to

25  present to the jury that Hallmark claims they're valuable

1  because they're secret. Hallmark's claims they were taken by

2  the defendants and used by the defendants and as a result are

3  no longer secret. And we have testimony from Hallmark's

4  30(b)(6) witness and from Dr. Serwin in his expert capacity

5  that there is no dollar value that Hallmark has ascribed to

6  these trade secrets and there is no diminution in value and

7  that he is aware of no lost profits. Our argument to the jury

8  both through witnesses and ultimately in closing will be

9  Hallmark's claim is impossible if the value comes from the

10 secrecy. If the value's supposedly lost because it was

11 disclosed by the defendants, how is it possible that, according

12 to their damages expert and their 30(b)(6) witness on damages,

13 there's been no diminution in value. They've never calculated

14 the dollar value of these trade secrets. And there's been no

15 lost value or lost profits that they're aware of in any way,

16 shape or form. The fact that they chose not to bring a lost

17 profit claim cut us off from taking discovery on the issue of

18 whether, in fact, there were lost profits. But we have sworn

19 testimony from their 30(b)(6) witness and their expert saying

20 they're aware of no losses, no lost profits arising out of the

21 use by the defendants of these trade secrets. Thank you, Your

22 Honor.

23         MR. BLEGEN: Your Honor, that argument is exactly

24 what was made in opposition to the motion in limine and it was

25 rejected. You cited the American Family Mutual Insurance case

1  in which the product was never even brought to market.  There

2  was no evidence, couldn't have been lost profits because there

3  had been no use in the market place and that lack of lost

4  profits was deemed irrelevant and excluded in that case.

5        You specifically indicate that they are precluded

6  from presenting evidence or arguments to the effect that we did

7  not suffer lost profits.  They argue that there is no evidence

8  we did lose but there's also no evidence that we did not have

9  lost profits.  In fact, if this is allowed to proceed I'm sure

10 Mr. Hall, this morning, would be happy to explain to the jury

11 the ways in which we could certainly have lost profits by their

12 use.  But that is our understanding that evidence is not in the

13 case.  It was very explicitly excluded in the motions in limine

14 process on the very usage of that evidence that is being

15 proposed for the opening statement today.

16       THE COURT:  The order in limine says that the Court

17 rejects defendant's argument that the lack of lost profits is

18 relevant to the issue of whether the information is a trade

19 secret.  Although value to a business is a factor in

20 determining whether information is a trade secret, this does

21 not mean the information must be specifically relatable to

22 measurable profits to be a trade secret.  I cite the American

23 Family case and say that it does not hold the absence of lost

24 profits means the information lacks value.  To the contrary,

25 the absence of such evidence could mean many things, most of

1    which have nothing to do with the information's value.

2    Plaintiffs request to bar this line of evidence and argument is

3    granted.  I adhere to that ruling and the defendant will be

4    prohibited from mentioning it in opening statement.

5            MR. DONOVAN:  Your Honor, I just want clarification

6    on that.

7            THE COURT:  Okay.  Let me clarify something.  When

8    one attorney speaks to an issue that attorney carries the day

9    on that issue.  I don't want you jumping up and down and double

10   teaming me up here.  I have enough trouble with one lawyer at a

11   time.

12           MR. MANCHEL:  May I, Your Honor?

13           THE COURT:  Yes.

14           MR. MANCHEL:  We anticipate that a witness this

15   morning for Hallmark, Wayne Strickland, will be testifying

16   about the value of the trade secrets of Hallmark to a potential

17   competitor.  Now, again, I really am looking at this from a

18   different issue than the whether it is a trade secret.  I

19   understand the Court's ruling.  I'm not speaking to that.  If

20   they speak about the value to competitors, the issue he's going

21   to present is the value is lost if it's presented to a

22   competitor.  We ought to be able to cross-examine

23   Mr. Strickland and show that, in fact, there was no value lost

24   even though they claim this was shown to a competitor.  So it

25   doesn't really go to the existence of the trade secret and

1  whether it's a trade secret, we're conceding that issue.  It

2  goes to whether the value of a trade secret was destroyed which

3  is their claim.  The claim is if this is shown to a competitor

4  it would have value to the competitor and the value to Hallmark

5  would be lost.  And that's the issue that we're anticipating to

6  be able to cross-examine this witness on.

7       MR. BLEGEN:  Well, at this point in time I can't

8  speak definitively as to what Mr. Strickland will testify to

9  today.  But I will say that is a different issue than lost

10 profits and to cross-examine him on whether or not Hallmark

11 lost profits, having to do with whether the trade secrets have

12 value to Hallmark, what had value to RPG.  I'm confident that

13 the plaintiffs in the American Family case believed that their

14 trade secrets had value and would lose value if they were used

15 by the competitor who stole them, even though that competitor

16 never effectively used them and there were no profits lost.  So

17 and that Court very clearly had said the issue of lost profits

18 would not come in.  So I'm not sure at this point in time

19 whether that issue is going to come up, how it's going to come

20 up, what the impact of lost profits would be.  But I don't

21 believe the issue of whether or not Hallmark lost profits would

22 be relevant to that line of questioning if it were to occur.

23       THE COURT:  I'm not sure that I understand what the

24 intended cross-examination of Mr. Strickland will be.  What I'm

25 saying is that questions concerning whether Hallmark lost

 1    profits as a result of the alleged misappropriation of trade

 2    secrets is not an issue in the case.

 3            Now, I don't know how you want to parse that.  I

 4    don't know how that applies to Strickland.  Do your

 5    cross-examination.  If you think it's objectionable, object,

 6    and I'll rule it in context.

 7            MR. BLEGEN:  Thank you.  That's all that we have to

 8    raise this morning.

 9            MS. GILMAN:  Your Honor, pursuant to the Court's

10    scheduling order the parties have been exchanging demonstrative

11    exhibits that are planned to be used in opening, by and large,

12    by agreement.  However there are two exhibits that plaintiff

13    proposes to use as demonstrative in their opening argument.

14            THE COURT:  Opening statement?

15            MS. GILMAN:  I'm sorry.  Opening statement.  Thank

16    you.  Well, I'm anticipating what it might be.

17            THE COURT:  I'm sure it won't be.

18            MS. GILMAN:  I'm sure you are right.  Thank you.

19            And issues have arisen with respect to these two

20    demonstratives and I will provide copies to the Court of the

21    two that were provided to us.

22            First on the time line that I've provided to the

23    Court, in January on that time line there are two bullet items

24    Clipper coordinated computer sweep and Maxwell runs Shredder.

25    We originally had one objection to use of the term computer

1   sweep. They have agreed to change that to image and purge, I

2   believe. But the remaining issue is the one that we've just

3   discussed with the Court with respect to the Murley materials.

4   And I respect the Court's order on that. And I understand the

5   plaintiff's position now is that those Murley materials in some

6   fashion later derived from Exhibit 20 however we do not believe

7   that the evidence will show that any evidence will come in in

8   this case to support a connection between Exhibit 20 and the

9   Murley materials. And therefore with the -- this is an

10   improper topic to be covered and displayed to the jury in the

11   opening statement. If the Court is going to allow them to put

12   in evidence, that needs to come in through the case. Again,

13   they've never made the argument before today that those Murley

14   materials are tied in some way to the presentation of the trade

15   secrets that are at issue here. And therefore we object to

16   that item being included on the time line and we ask that it be

17   removed.

18         THE COURT: The second exhibit?

19         MS. GILMAN: The second exhibit purports to represent

20   I suppose the structure of the companies and we objected to

21   this as misleading. Among other reasons because it suggests

22   that Monitor Clipper Partners was the owner of Recycled Paper

23   Greetings which was simply not the case. At best Monitor

24   Clipper Partners was one of more than 90 entities that held

25   indirect ownership in effect having 1.4 percent stake at that

1    level.  And this notion that Monitor Clipper was the entity

2    that acquired RPG, again, that's a brand new argument in the

3    case.  In fact, this Court will recall that the plaintiff has

4    been arguing for joint and several liability all along which

5    would be inconsistent.  If they're the owner, you don't need to

6    make those arguments.  And we think this misrepresents what the

7    structure was and would be improper to show to the jury.

8         I'm cognizant of your admonition that only one

9    counsel should speak to each issue.  This relates to some other

10   overarching issues that we think are likely to come up in the

11   opening that Mr. Manchel has planned to speak to.  I don't know

12   whether the Court will hear from him on that.

13        THE COURT:  Let's start out the right way.  Go ahead

14   and finish the argument.

15        MS. GILMAN:  So therefore which have objected to the

16   use of this slide.  In addition to the problem of the ownership

17   between Monitor Clipper and RPG, which is contrary to the

18   evidence in this case, it also shows this line from Monitor

19   Group going into Fund II, which we, frankly, don't even

20   understand why that is there.  There is no evidence that would

21   show that connection and we think this would be a

22   misrepresentation not supported by the evidence and should not

23   be shown to the jury.

24        MR. AISENBREY:  Good morning, Your Honor.  Turning to

25   the time line first.  This is a time line we want to use, what

1    we expect the evidence to show.  As I understood Your Honor's

2    order on Friday that if we expect the evidence to show

3    something and it doesn't show it, the jury will make us pay for

4    that at closing.  I think we will be able to put in the

5    evidence of the image and purge.  I think the Shredder evidence

6    is something to talk about.  So I think it's fair game.

7         With respect to the structure, I don't know how this

8    implies that Monitor Clipper owns Recycled Paper.  In fact, I

9    propose to use this to explain the complex of the companies

10   that were created so the jury will have an understanding of

11   what fits where.  I think they're going to have one somewhat

12   similar.  It stops at Fund II and goes down.  It doesn't have

13   what is above Fund II.  It doesn't have the fact that Fund II's

14   general partner is abbreviation Clipper 2 Limited Partners

15   whose general partner is Clipper general partners who, in fact,

16   are all the Clipper people.

17        So I think this helps me explain it to the jury just

18   so they get an idea who the players are.  I don't think it

19   misstates anything.  It certainly doesn't show that Monitor

20   Clipper owns Recycled Paper.  It does indicate that they had a

21   corporate services agreement with Recycled Paper which I think

22   was worth several million dollars to Monitor Clipper Partners.

23        THE COURT:  What is the interest in Monitor Group and

24   Fund II?

25        MR. AISENBREY:  I was about to tell you that, Your

1    Honor.  I think Monitor Group has an interest in Fund II.  They
2    are among the investors.  I think they do it through a trust
3    but, in fact, Monitor Group, I believe the evidence will be
4    owns part of Fund II.  They're one of the investors.
5                THE COURT:  Do you have evidence?
6                MR. AISENBREY:  I believe we do.
7                THE COURT:  I'll allow the plaintiffs to use both
8    those exhibits in opening statement.
9                MR. MANCHEL:  Thank you, Your Honor.
10               I thought I would take a shot and see if we can
11   resolve some issues that I'm concerned are going to come up in
12   opening argument.
13               THE COURT:  Statement?
14               MR. MANCHEL:  Opening statement.
15               MR. AISENBREY:  I'm worried about how the defense
16   thinks this.
17               MR. MANCHEL:  From our perspective, Your Honor, I'd
18   like to avoid two things.  I really don't like to interrupt
19   opposing counsel's discussion.  I think there are several
20   issues that I'm almost virtually certain will be raised.  I
21   think they go directly to the warning that Your Honor gave on
22   Friday in terms of both, nothing being new and warning the
23   plaintiff about the possibility of a mistrial.  I don't know if
24   it's something Your Honor would like to address now.  I don't
25   know if we can agree whether or to what extent they're coming

1    in but I thought I'd raise these issues.

2         The first set of issues at this moment given the

3    Court's rulings, I would ask for a continuing objection during

4    discovery, I'm sorry, during opening statement, having to do

5    with Maxwell's Shredder, the Murley materials and nxtMove.  I

6    understand the Court's ruling but just so the record is clear,

7    the Maxwell Shredder testimony has been offered and argued

8    solely and exclusively as regards Exhibit 20A through E,

9    period.  And Your Honor has made it clear that if that is going

10   to be offered for the purpose of showing some use of Exhibit 20

11   which are trade secrets at issue in this case, it may come in.

12        I want to state for the record I will not object

13   during the opening but I want the record to be very clear that

14   as regards Murley, nxtMove and Maxwell, all evidence that will

15   be presented, all argument that has been made goes solely and

16   exclusively to the supposed use of Exhibits 20A through E, the

17   destruction supposedly of Exhibits 20A through E, and the

18   imaging of computers as a result Exhibits 20A through E, so I

19   ask please to have a continuing objection during opening

20   statements.

21        THE COURT:  That is certainly my intention.  I'll

22   show your objection as continuing.

23        MR. MANCHEL:  Thank you, Your Honor.

24        There are three damage numbers that we anticipate

25   will be raised during opening by the plaintiffs.  The unjust

1   enrichment in terms of financial gains, the unjust enrichment

2   in terms of avoided cost, and the two reasonable royalty

3   figures.  We object, to be clear, and Your Honor I'll make the

4   objection during opening, we object to the jury being told the

5   number and we object to the jury being told any basis for the

6   number.

7          The objection will be that the number and the basis

8   will be based on information that this Court has ruled as

9   inadmissible.  It will be a statement made in opening that

10  cannot as a matter of law be proven during trial given this

11  Court's rulings.  It will be based on information that is not

12  relevant.  And as regards Dr. Serwin, he will be offering the

13  expert opinion and that's the basis for the opening remarks.

14  It will violate Federal Rules of Evidence 703 and 705 insofar

15  as it will be based on an opinion that is not supported by any

16  facts in the case.

17         I want to be very clear about this because we just

18  touched on it.  This notion that came up last week, literally,

19  that Clipper owned or controlled RPG is new.  I believe it's

20  being raised at this point to deal with the Court's rulings on

21  the joint and several liability issue because during discovery,

22  during expert opinion exchanges and all depositions, the sole

23  and exclusive reason offered by the plaintiff for both the

24  number and the basis for the number is the sole reason that

25  this Court knocked out which is these figures would be paid by

1   the beneficial owners of the profit and revenue stream.

2          As regards avoided costs, the testimony which has

3   been struck by this Court is it didn't matter who avoided the

4   costs.  Anybody along any of these legal entities that avoided

5   the costs, the defendants are liable.

6          As regard the revenue, the exact same argument was

7   made.  Any revenue that was realized by any legal entity along

8   any of this ownership structure is owned by the defendants.

9          The reasonable royalty numbers that came flat out and

10  said this is what others would pay.  Period.

11         So we're in a position now that if they say during

12  opening to the jury the reason you should award these figures

13  to the plaintiff is because Clipper really owned RPG, or some

14  type of argument that you just heard touched on that is going

15  to try to collapse the entities, not only is that a brand new

16  argument, not only does it run counter to the stipulations that

17  were presented to this Court in connection with the summary

18  judgment motion but for us, substantively, it is literally

19  brand new.  There will be no witness that they can put forward,

20  not Dr. Serwin in his expert capacity and not Dr. Serwin in his

21  30(b)(6) witness capacity that has or will testify along those

22  lines.  We think it would be inappropriate and prejudicial.

23  And if it was offered during opening, I would have to object.

24  I understand I don't know exactly what will be said but I want

25  the Court to know I would have to object and that I would move

1   for a mistrial because of how prejudicial it is.

2          It is a clean sweep away as Stacey just said.  Think

3   about it for a moment intellectually.  All we've ever heard is

4   joint and several.  If they had an alternate argument that my

5   client should pay damages because my client really owned

6   Clipper, that should have been presented last March or last

7   April.  Thank you, Your Honor.

8          MR. AISENBREY:  Your Honor, I think I can be brief on

9   this.  We disagree with Mr. Manchel's points just made but the

10  fact is in opening statement I intend to refer to millions of

11  dollars, nothing more.  That's it.  No explanation of why or

12  how or who owns what or unjust enrichment or reasonable royalty

13  or Dr. Serwin or anything else.  So I think this is really

14  moot.

15         I do believe we will go into, as I said, the complex

16  organizational structure.  I think the evidence will show that

17  Clipper benefited to the tune, the kind of money we asked for

18  in this case.

19         THE COURT:  All right.  I'll show the defendant's

20  objection as continuing through the opening statement.

21         For the record, if the objection were made during the

22  opening statement, I would overrule.  And if a motion for

23  mistrial is made at that stage, I would overrule a motion for

24  mistrial.

25         Let's take, oh, about 5 minutes to get comfortable.

1    Actually that clock is a little slow.  Let's take about 5

2    minutes.  It's fast.

3            MR. BLEGEN:  Your Honor, very, very briefly.  I meant

4    to do this earlier.  I actually have an alternative instruction

5    on the trade secrets to provide to the Court.

6            THE COURT:  Just give it to Steve, please.

7            MR. AISENBREY:  Your Honor, could we have our

8    assistants set up the computer to use?

9            THE COURT:  Yes.  And I was looking at the clock on

10   the back wall.  It is actually about 19 minutes after the hour.

11   We'll start at 8:30, as soon as all the jury is here.  We'll be

12   in recess.

13           Just for your information we are missing one juror.

14   Eva is checking to see if the juror left a message.  Traffic

15   was snarled in the Northland this morning.

16           There was a message from juror, I think it's number

17   3, who had indicated she had gotten turned around but is nearby

18   so we should be ready in a moment.

19           (The following proceedings were had IN THE PRESENCE

20   AND HEARING OF THE JURY:)

21           THE COURT:  Please be seated.  Welcome back, ladies

22   and gentleman.

23           I am going to begin by reading a series of general

24   instructions to you.  Following that you will hear the opening

25   statements by the attorneys.  And after that the plaintiff will

1    commence its presentation of evidence.

2              (Instructions Nos. 1 through 6 were read by the

3    Court.)

4              THE COURT:  Is the plaintiff ready to present opening

5    statement?

6              MR. AISENBREY:  We are, Your Honor.

7              May it please the Court?

8              THE COURT:  Go ahead.

9              MR. AISENBREY:  Good morning, ladies and gentleman.

10             As you learned on Friday, my name is John Aisenbrey.

11   And together with Charlie German and Dan Blegen we represent

12   Hallmark Cards.

13             The case we're here about is a case about stealing

14   property.  The property in question is trade secrets, which are

15   information a business uses to its advantage, how it proceeds

16   and works in the market place.

17             The defendant, Monitor Clipper, manages a fund you'll

18   hear called Fund II.  And with the money from that Fund II it

19   buys and sells companies.  What this case is about is in 2005

20   Fund II, with Monitor Clipper managing it, saw an opportunity

21   to purchase Recycled Paper Greetings, which was then the third

22   largest greeting card company in the United States.

23             And Monitor Clipper, people you'll meet, knew that a

24   consulting firm called Monitoring Consulting or Monitor Group

25   had done extensive work a few years before for Hallmark Cards.

So they were interested in the issue of potentially buying
Recycled Paper. And, in fact, what they did was, you will
hear, is go about methodically trying to get whatever
information the consulting firm had about Hallmark to evaluate
and manage Recycled Paper.

This case is about how they succeeded in doing that,
then how they bragged about it internally and even to lenders
that they approached to help buy the company.

And when Hallmark questioned the purchase of Recycled
Paper by a group Monitor Clipper was involved with, they lied
about it and tried to cover it up by destroying evidence. So
when the case is over, we'll be asking you for a substantial
amount of damages.

What I want to talk to you about this morning is how
they did it, how they stole the trade secrets and how they
covered them up.

The people involved, I'll use the Power Point here a
little bit to give you some -- so you don't have to look at me
all the time. Just a welcome relief, I'm sure. Monitor
Clipper Partners, there are four people whose names will come
up. One of them is present in the courtroom. Adam Doctoroff
is a defendant, Peter Kim, Paul Maxwell and Charles Yoon.
We'll be talking about them. At the time they were all
principals or employees of Monitor Clipper.

Now, I told you that Monitor Clipper looks for

1   companies where they can use the expertise of Monitor

2   Consulting.  And Monitor Consulting, you'll hear the names and

3   hear some testimony from Steve Levin, Mark Pocharski, Stacey

4   Raiche and Juanita Moore.

5          Now, these two companies are affiliated with one

6   another through common governance.  Mark Thomas, Bill Young and

7   a man named Bob Calhoun were all on the governing committees of

8   Monitor Clipper Partners and the governing committees of

9   Monitor Consulting.

10          Finally, the last set of players, something called

11   the Monitor standing case team.  These are employees of Monitor

12   who are dedicated 100 percent to work for Monitor Clipper.  In

13   fact, you'll see the contract that says the case team to

14   exclusively serve Monitor Clipper Partners for the 2005

15   calendar year by which Monitor team is dedicated 100 percent to

16   Monitor Clipper.  The team is to be considered flexible

17   resource that Monitor can put to the use wherever it sees fit.

18   So those three fellows, Grant Brown, Jeffrey Pauker and Megan

19   Kahn, while they're employed by Monitor Group, in fact, in 2005

20   they worked exclusively under the contract and in this case for

21   our purposes here, for Adam Doctoroff.

22          Now the events we're going to be talking about began

23   in the summer of 2005.  In 2005, in July, the owners of

24   Recycled Paper decided to sell the company.  And they did it

25   through a method that's frequently used with companies called

1    an auction process.  They went to a investment banker, you'll

2    hear the name William Blair and Company, and they offered their

3    company up for sale.  And William Blair put out what is called

4    a teaser.  Among the companies that got that teaser was Monitor

5    Clipper.  And the man that you saw the picture of, Bill Young,

6    got it and he forwarded it to Steve Levin and Mark Pocharski.

7    Remember, those are the guys who are back over at Monitor

8    Consulting.  He had a special reason to do that.  He knew that

9    they had been the senior leaders working for Hallmark on the

10   project a few years before.

11          Now, a little bit about that project.  In 2001 and

12   early 2002 Hallmark Cards undertook a top to bottom review or

13   fresh look of business model redesign.  You'll hear it referred

14   to as the BMR.  And they used a consulting company to do it,

15   Monitor Group.  They did it under a contract.  And under that

16   contract Hallmark disclosed to Monitor Group virtually

17   everything it had about the greeting card industry.  Its

18   financial statements.  Its financial projections.  Its

19   extensive research in market research, consumer research,

20   product research, channel research, retailer research,

21   marketing strategies, customer terms, contracts with various

22   customers, everything.  And the people from Hallmark and the

23   people from Monitor Consulting, Mark Pocharski, Steve Levin,

24   Stacey Raiche, worked together to build a business model

25   redesign which was presented in a series of presentations which

1    you'll see.

2            All this was confidential.  It was to help Hallmark

3    look at the challenges going forward.  The contract provided

4    that everything Hallmark gave to Monitor Group belonged to

5    Hallmark.  Everything Monitor Group created as part of that

6    work belonged to Hallmark.  And none of it could be used by

7    Monitor Group for any reason except the Hallmark project.

8            After Mr. Young asked Mr. Levin and Mr. Pocharski for

9    their thoughts, he sent an initial offer letter.  On July 29 he

10   sent a letter to William Blair in which he stated, Monitor

11   Clipper Partners L.L.C, then the abbreviation you'll see from

12   time to time MCP, is pleased to make the following proposal to

13   acquire Recycled Paper Greetings.  He went on in that letter to

14   say that MCP's strong interest in the company stems from a

15   significant amount of resident knowledge about this sector in

16   which RPG competes, which provides us with particular

17   enthusiasm, etc.

18           The significant amount of resident knowledge to which

19   he refers was Monitor Group's knowledge.  All of which belonged

20   to Hallmark.

21           After Mr. Young sent this letter he assigned

22   Mr. Doctoroff, who is sitting here, to work on the project, be

23   the man who was the quarterback, I think he'll call himself,

24   the spearhead.  And he worked with that standing case team,

25   Mr. Brown, Mr. Pauker and Ms. Kahn, to do due diligence.  Dig

1    in to the company.  See if we really want to buy it.  And if we
2    do, what price would we pay?

3              And one of the first things that Mr. Doctoroff did
4    was he contacted Mark Pocharski because he wanted to know about
5    the work from Hallmark.  And Pocharski told him, you'll see the
6    document, I don't know that I can share anything.  The work we
7    did was Hallmark specific.  That didn't slow Mr. Doctoroff
8    down.

9              By the way, I want to make one thing clear.  Hallmark
10   does not contend that Monitor Group could not work with Monitor
11   Clipper on Recycled Paper.  There was no non-compete in
12   existence in 2005.  They were free to work with them.  But what
13   they were not free to do was use anything that belonged to
14   Hallmark.  That's the problem for Monitor Clipper using the
15   Group stuff because everything Monitor Group knew about the
16   greeting card industry came from Hallmark and their work for
17   Hallmark.  They had never worked for any other greeting card
18   company.  It was all Hallmark.

19             A little while later Mr. Kim, Peter Kim was one of
20   the people from the Clipper side, reports back to
21   Mr. Doctoroff.  We're not finding much about the greeting card
22   industry.  The information is sparse.  That's not surprising
23   because Hallmark is a private company you'll hear.  The only
24   public company in the area is American Greetings and you can
25   get public information in their S.E.C. filings but not very

1    much detail.  And then the rest of the companies like RPG are

2    private and small companies.  But Mr. Doctoroff kept pressing.

3    He told the case team and the people he was contacting, I'd

4    like to know above evolution of channels.  I'd like to know

5    about the impact of the Internet.  I'd like to know about

6    demographic information, competitive analysis, competitors

7    profiles, pricing trends.  He really wanted to know a lot, all

8    of which Monitor Group knew because they had learned it from

9    Hallmark.

10          And, finally, he probed, he pressed, he went out and

11   talked to Stacey Raiche.  He even went to Toronto where Juanita

12   Moore was.  He didn't meet up with her up there but he was up

13   there and hoped to meet with her, trying to find out stuff

14   about the work they had done for Hallmark.

15          Now, every time you see an e-mail from Adam Doctoroff

16   you will see that after he asks for information, he always

17   says, obviously, I don't want anything confidential from

18   Hallmark.  You'll see that every time.  But he had been told by

19   Mark Pocharski way back on August 4, everything we have is

20   Hallmark specific.  We don't know anything except what came

21   from Hallmark.

22          And, finally, on August 25 his efforts paid off.  He

23   received an e-mail, as you know, you read e-mails from the

24   bottom, a man named Steve Levin, who I mentioned who was a

25   Monitor Group person, sent to Jeffrey Pauker an e-mail and

1    said, subject, greetings.  Nothing else.

2         Up above Jeffrey Pauker on August 25 takes that

3    document and says, sends it on to Adam Doctoroff, Grant Brown,

4    Megan Kahn and Peter Kim, the other two members of the case

5    team and Mr. Doctoroff and Kim from Clipper.  And he says,

6    documents from Levin's work on Hallmark attached below.  I will

7    go through these this morning and pull out the most salient

8    information.  Wanted to get the raw documents to you sooner

9    rather than later.

10         One document he attached was actually a public

11   document from 1999.  The other three we'll talk about for a

12   minute.  This is the Greetings Business Model Discussion, OEC

13   meeting.  The OEC at Hallmark was the highest level executive

14   group that made decisions during the business model redesign.

15   These are the senior executives of the company.  This is a

16   report that is, I think this one is about 68 pages long.  You

17   will see it details lots of information about Hallmark's work.

18         The second one is a December 2001 version of the

19   report.  This one is 110 pages long.

20         These documents lay out Hallmark's growth strategy,

21   its interpretation of the research of the market, where it

22   thinks things are going, how it thinks it can deal with the

23   issues and problems in the market, how it deals with the

24   Internet.

25         And the third thing is the item that was called the

1     Gold Crown Channel Analysis Status Update.

2              Now, during the trial you'll see each of these.  I'm

3     not going to go into them now.  This one was 55 pages long.

4     They are full of Hallmark's information.  This one is

5     especially interesting because I think most people are familiar

6     with Gold Crown Stores.  They're not owned by Hallmark,

7     largely.  Hallmark owns a few but most of them are independent

8     businesses.  And those independent businesses in 2005 could and

9     did in many cases buy from Recycled Paper.  In fact, Recycled

10    Paper listed them as one of their top channels of distribution.

11    So you can see why Mr. Doctoroff and Mr. Levin were interested

12    in this report.

13             These were highly confidential presentations.  You'll

14    hear that even within Hallmark they're not disclosed every

15    where.

16             Now, as you see them you will notice that some of the

17    pages in them contain public information.  I think one of them

18    has a census report in it which, obviously, anyone can get that

19    from the federal government.  But as a compilation of, entire

20    compilation, taking public information combined with Hallmark's

21    proprietary research to draw conclusions, these are Hallmark's

22    trade secrets.

23             Now, the information in these was from 2001 and even

24    before, some of the research back in the 90s.  But you'll hear

25    testimony explaining that that research was still viable, still

1  used in 2005.  These strategies were still in use in 2005.  In

2  fact, many of them still are today.  So Mr. Doctoroff's

3  repeated requests for this information finally paid off.

4          Now, you will also hear that Mr. Doctoroff relied on

5  the Monitor people to decide what they could share.  You'll

6  have to decide how you interpret that.  But Clipper had an

7  incentive in place to help encourage Monitor Group people to

8  help them.  Mr. Levin, for example, was scheduled to receive an

9  award of over a quarter of a million dollars for his assistance

10  to Monitor Clipper on this project.

11          So what did Mr. Doctoroff do when he got these?  That

12  is the subject of some dispute.  In 2006, testifying in an

13  arbitration, Mr. Doctoroff testified he did not receive them.

14  In 2012, almost seven years after the event, in this case

15  testifying in a deposition, he had an epiphany.  Confronted

16  with the fact that he had actually received these documents

17  with the evidence in the e-mails, he now remembers that he was

18  in a meeting and he got a Blackberry message.  He couldn't read

19  it on his Blackberry in the meeting so he waited until he went

20  to his office.  When he got to his office he opened them up and

21  he started to look at them and he realized that they might be

22  Hallmark confidential information.  So he says he closed them

23  and deleted them and he told Mr. Kim to delete them.  All of

24  this he remembers in 2012 but in 2006 he denied it.  You'll

25  have to decide what you believe.

 1          But what he did not tell Mr. Pauker to do, and this

 2   is very significant, he did not tell Mr. Pauker you can't use

 3   them.  He said, don't send them to me.  I don't want them in my

 4   inbox.  And Mr. Pauker and the standing case team, who worked

 5   100 percent for Clipper on this project, used them and you will

 6   see how they did.  They were the people charged with drafting

 7   the investment overview that the big guys at Clipper would

 8   finally read and review to decide to buy Recycled Paper.

 9          A few hours later that day Jeffrey Pauker sends to

10   Grant Brown and Megan Kahn, Levin decks condensed.  Decks are

11   these Power Points, the term they used, they call them a deck.

12   It's just one page after another from a Power Point.  That's

13   the three things we just looked at.  He's condensed them.

14   Megan and I went through the documents from Levin.  I tried to

15   condense the most salient information into the following

16   30-slide deck.  Note, MCP staff are not included in this

17   e-mail.  So, obviously, the message was received.  Don't send

18   these to me, Mr. Doctoroff, or Mr. Kim.  You guys can use them.

19   Don't send them to me.

20          In fact, that same day, and there will be some

21   dispute about the timing of this but it really doesn't make any

22   difference.  Mr. Brown sends a message to Mr. Pocharski.  Mark,

23   Steve mentioned, Steve would be Steve Levin, that the three OEC

24   meeting presentations from September, October and November 2001

25   might prove helpful to the RPG effort.  Do you happen to have

these?  Obviously, we would want to scrub any Hallmark specific
data.

Ladies and gentleman, the first one that he already
got was August and he got December.  Levin apparently didn't
have October, November, September.  He's saying you might look
at those too but you should scrub -- and Brown says, we'll
scrub any Hallmark specific data.

You'll see those OEC reports.  You can flip through
them and decide.  If you scrub the Hallmark data out, I submit
you'll be left with census data and a lot of blank pages.

A week later on September 7 Monitor's standing case
team got more Hallmark confidential information.  Mr. Brown
received and sent out to Mr. Pauker and Ms. Kahn, again, more
TMG documents in the subject line.  TMG stands for The Monitor
Group.  One of them is Small Competitors and Deep Discount
Space.  This, too, is a Hallmark document.  Hallmark and the
Greeting Card Industry, Understanding Industry Trends.  This,
too, is a Hallmark document.  Remember what Mr. Levin said he
wanted?  He wanted evolution of channels, demographic
information, competitive analysis, pricing trends, competitor
profiles.  These two documents are rifle shots for that kind of
information.  Together with the three OEC documents I just
talked about or the two OEC documents and the Gold Crown
document.  These are the five presentations that Clipper stole.

As a result on September 19, a second round bid was

1   sent in and on behalf of, they will tell you on behalf of the

2   Fund II and we'll talk about that in a minute, Clipper sent in

3   a bid for $305 million.  The next bid from another bidder was

4   218 million.  Kelso is another company, somewhat like Clipper.

5   They didn't have any Hallmark information.

6       Now, in the initial bid on July 29 Clipper had initially

7   suggested they would bid between 290 and 305 million.  That

8   was after they knew they had Monitor Group's information

9   maybe, but now that they've seen it, they went to the high

10  end of the bid, $305 million.  But they weren't done.  First,

11  we'll look at the actual bid letter.  This is the letter they

12  wrote bidding 305 million.  In the second paragraph they

13  point out, again, our strong interest in the company stems

14  from a significant amount of resident knowledge about the

15  greeting card sector.  Furthermore, we have engaged

16  significant resources from MCP and Monitor Consulting Group.

17  The significant resources they've engaged were Hallmark's

18  five presentations.

19      Now, I expect you'll hear evidence that these

20  presentations were 3 years old so they were old and they were

21  stale.  You'll have to decide whether they were old and stale

22  in the light of how they were used.  You'll be told we didn't

23  use them.  You'll have to decide from the evidence whether

24  they were used.  Then you'll be told, oh, they were all

25  public information anyway.  You'll have to decide whether if

1    you have a bunch of public information you lie about it.

2         But they went a little high.  A few days later Mark

3    Thomas wrote to Bill Young, these are the three guys from the

4    top of the chart I showed you before.  You know, I'd go

5    higher on this one.  I'm probably 320 to 325 guy.  This deal

6    is center of the bull's eye.  And, in fact, a few days after

7    that the final bid was accepted at 317 and a half million

8    dollars for Recycled Paper.

9         Now, Clipper and Fund II weren't going to put up the

10   whole 317 and a half million.  They were going to borrow a

11   bunch of it.  This is where they went to the lenders.  They

12   had to go out to the lenders to borrow almost $200 million.

13   In doing that they made presentations.  The Recycled Paper

14   people and the Clipper people and Credit Swiss, which is the

15   bank that was putting together the lending organization, made

16   presentations to various bankers about why you should lend

17   money to this organization.

18        And Mr. Yoon, Charles Yoon, who by now had replaced Adam

19   Doctoroff on the team as the quarterback, drafted talking

20   points of what he would say in a conference call.  In

21   discovery in this case we were able to learn, as they were

22   working on the financing, the teleconference script he wrote

23   for himself.  And he says, as you know MCP does not make any

24   investment unless we feel we have a real competitive

25   advantage.  RPG is in the sweet spot of our investment

1    strategy.  We know more about the greeting card industry than

2    anyone else.  Monitor has done numerous consulting work for

3    Hallmark.  They're bragging about it.  We know more about

4    greeting cards because we've got Monitor.  And the only thing

5    they know is what they learned from Hallmark and that all

6    belongs to Hallmark.

7         Now, once the deal was announced, Hallmark saw it in the

8    trade papers.  And Hallmark's general counsel wrote a letter

9    to Monitor.  He said, hey, we want our documents back.  We

10   want an assurance from you that you haven't traded or shared

11   anything with Clipper and we want you to put in place what is

12   called a litigation hold.  We want you to preserve all the

13   documents, don't be deleting any e-mails, keep everything.

14   You'll hear what a litigation hold is.  We'll come to that,

15   where that leads in a minute.  But after they negotiate the

16   transaction, they finally buy the company in December of

17   2005.

18        And they send a memo to their internal partners.  And

19   this, internally, this is what they're saying inside.  MCP

20   emerged as the winner of a competitive auction based on

21   management's preference, the value we're able to bring to

22   bear and Monitor Group's deep knowledge of the greeting card

23   industry.  All of which belongs to Hallmark.

24        Few sentences later, Monitor had historically worked for

25   one of the major greeting card manufacturers and MCP was able

1    to glean industry insights from Monitor Group.  Those

2    industry insights were Hallmark's insights.

3        Now when they bought the company they created a series

4    of other companies.  And you'll hear a lot about this but I

5    just want to give you the names so you'll understand where

6    they fit in the picture.  At the top you have Monitor Clipper

7    Partners.  Charles Yoon, who had taken over for Mr. Doctoroff

8    and Bill Young are the principal players in the RPG

9    transaction.  RPG at the bottom was bought and owned by a

10   company called RPG Holdings.  RPG Holdings was owned by RPGI

11   or RPG, Inc. and that was owned by Fund II that I've talked

12   about.

13       Fund II is a group of funds, couple of funds with lots

14   of investors.  It's a limited partnership.  And a limited

15   partnership you'll hear can only act through its general

16   partner.  And the general partner of Fund II is an entity

17   called, this is a shorthand because it has a longer name,

18   Clipper 2 Limited Partnership.  It's the general partner of

19   Fund II.  Then Clipper Group GP is the general partner of

20   Clipper 2 LP.  And the one up there at the top there, Clipper

21   GP, if I may, this one here, the governing board of that

22   entity are all Monitor Clipper Partners.  Partners from

23   Monitor Clipper.  Mr. Yoon and Mr. Young are from Monitor

24   Clipper.  Mr. Yoon and Mr. Young are president and secretary,

25   treasurer of RPGI.  They're on the board of RPG Holdings.

1    And they're on the board of Recycled Paper.

2        I submit the evidence will be that Clipper managed and

3    ran RPG.  And what they did was they used Paul Maxwell, the

4    other name that you saw on the list, who worked with the

5    people at RPG over time.  Time does not permit me to go into

6    all the details there but you'll hear that testimony as well.

7        Now, I'd like to turn briefly to the cover up.  Remember

8    Mr. Gardner at Hallmark, who you will hear, sent a notice to

9    Clipper, excuse me, to Monitor Group to retain your

10   documents.  And he also asked that Monitor Clipper retain

11   their documents.  And Mr. Young got a copy of that letter.

12   He knew about it.  But in January of 2006, as of then Clipper

13   had put in place no litigation hold.  They had done nothing

14   about preserving documents.  Through their counsel they deny

15   that they ever received any confidential information.

16       In March and April two members of that Monitor's

17   standing case team, Mr. Brown and Mr. Pauker, left the

18   company.  These are the guys that worked 100 percent for

19   Monitor Clipper, dedicated to them, they left the company and

20   their computers were erased.

21       In July of 2006, Mr. Kim left Clipper and his computer

22   was erased.  Still no litigation hold.

23           In August, as I told you, Mr. Doctoroff denied under

24   oath that he had received any Hallmark information.  In fact,

25   what he said in answer to the question was, I don't believe so,

no.  Again, we weren't asked specifically not to receive it.
So I don't believe so, no.

In January of 2007, Clipper coordinated an effort to
image the computers and purge Hallmark information from a
series of people at RPG and at Clipper.  One of the people
whose computer was to be imaged was Paul Maxwell, the man
from Clipper who working with RPG.  He had a program on his
computer that you'll hear about called Shredder.  He ran it
the day before they made an image of his computer.

In March Monitor Consulting undertook an exhaustive
search within the consulting group for Hallmark's documents.
At this point the cover-up began to unravel.  The last member
of the standing case team, Megan Kahn, left Monitor in June.
They were able to capture some of her e-mails.

In July Monitor's counsel found that e-mail that I
showed you earlier from August of 2005 that transmitted those
Hallmark confidential documents to Mr. Doctoroff.  She found
it.  She reported it to Clipper, to their management so that
they understood what had happened.  She didn't tell Hallmark.
And Clipper didn't tell Hallmark either.  Hallmark was kept
in the dark.  In fact, during this time Clipper and Hallmark
were in a negotiation of what you'll hear is called a
confidential agreement.  It was an effort to avoid this case.

Clipper agreed to search its computer systems and if it
found no Hallmark information, other than incidental things

1   that would not prove to be intentional misconduct, Hallmark

2   would not sue them.  But in May of 2008, almost a year later,

3   the Monitor Group lawyer had to disclose to Hallmark what she

4   found the previous year.  And she told Hallmark that Clipper

5   had received Hallmark confidential documents way back in

6   August of 2005.

7        I submit to you, ladies and gentlemen, that's evidence

8   of intentional misconduct which is sufficient to allow

9   Hallmark to bring this case and it brings us here today.

10  Once we brought the case we found a lot more evidence of

11  deceit.

12       You'll hear four witnesses for Hallmark.  Don Hall will

13  testify here today.  He's the president and CEO of the

14  company.  Wayne Strickland, who is president for Hallmark for

15  its Wal-Mart business.  He's actually a Hallmark employee.

16  He's not a Wal-Mart employee but he manages the Wal-Mart

17  business.  John Maynard will testify later this week.  He has

18  worked in Hallmark's research department for many years.

19  And, finally, Brian Gardner, the general counsel of Hallmark,

20  to talk to you about the cover-up.

21       Unfortunately, many of the witnesses from Clipper, Mr.

22  Young, Mr. Yoon, Mr. Thomas will not be here.  But we have

23  videotape depositions of them.  The parties will be showing

24  you videos of the witnesses who do not come in person.  We

25  both worked together to make them as short as we can but I'll

1    be the first to tell you it's not the most exiting television

2    you'll ever see.  We appreciate your patience as you watch

3    it.

4        At the conclusion of the case Hallmark will be asking

5    you for a verdict for Hallmark in the amount of millions of

6    dollars.  Thank you for your time.

7                THE COURT:  Defendants?

8                MR. MANCHEL:  Yes, Your Honor.

9                THE COURT:  Mr. Manchel.

10               MR. MANCHEL:  May it please the Court.

11               THE COURT:  Go right ahead.

12               MR. MANCHEL:  Good morning.

13               My name is Steven Manchel and along with my

14   co-counsel I represent the defendants in this case, Adam

15   Doctoroff and Monitor Clipper Partners.

16               What you just heard was designed to lead you to

17   believe that the information at issue in this case goes to the

18   heart and soul of Hallmark and that's what this case is about.

19   But you will learn that that is not what this case is really

20   about.  You will learn, and I think you've seen it already,

21   that this case is really about Hallmark being upset at the

22   company that it hired to be its consultant, Monitor Group.

23   Monitor Group is not a defendant in this action.

24               The evidence will show that in 2001 Hallmark hired a

25   consulting company named Monitor Group.  The information that

1    you saw up on the screen, those presentations, was created by

2    Monitor Group in 2001 and 2002.  The evidence will show that

3    Monitor Group and Hallmark signed a contract.  The contract

4    between Monitor and Hallmark had nothing to do with my clients.

5    You will see that the contract provided specifically that 30

6    days after the close of Monitor's work, if Hallmark thought

7    that Monitor had confidential information belonging to

8    Hallmark, and you just heard the argument that everything

9    belonged to Hallmark, if Hallmark believed that the contract

10   provided specifically that within 30 days Hallmark could

11   request that its information be returned.

12          The evidence will show Monitor's work ended in 2002.

13   But when the work ended the evidence will show that Hallmark

14   left the presentations at issue in this case behind.  And you

15   will see that Hallmark is upset now with what it claims Monitor

16   did with those presentations.  But you will not see anything

17   that Hallmark's claims, and you didn't hear it today, about

18   what Clipper supposedly did with the presentations.

19          We were discussing, you heard from plaintiff's

20   counsel the demand letter.

21          Trial Exhibit 1268, please.

22          This is the letter that you were just shown.  You see

23   the date on the letter?  The date on the letter is November 22

24   of 2005.  It is a demand for the return of all Hallmark related

25   documents.  That's three years after the work ended.

1          Let's look at the first sentence of the letter.  We

2     were shocked to learn that you are entering into direct

3     competition with Hallmark Cards after you obtained Hallmark's

4     most confidential core business trade secrets through an

5     intimate consulting relationship under which Hallmark paid you

6     millions of dollars.  You will learn in the course of this case

7     that Clipper had no idea, no idea that Hallmark would have any

8     problem with Monitor working with Clipper.  And you will learn,

9     in fact, that the ability of Monitor to work on the RPG deal,

10    this direct competition, Monitor was not only allowed, the

11    contract that Hallmark signed with Monitor, you will see,

12    specifically allowed for RPG.

13         Let's take a look, please, at consultants agreement

14    1264.

15         This is the contract you will see between Hallmark

16    and Monitor.  You can see up there.  The Monitor Company Group,

17    Hallmark Cards, Inc.  The evidence will show that this was the

18    deal between Hallmark and Monitor that governed the work that

19    Monitor did for Hallmark.

20         Please go to page 7.

21         Take a look, please, and please remember this when

22    you see this agreement during the course of the case, paragraph

23    number 18.  Monitor agrees that for the later of the period of

24    this agreement or the last day Monitor performs work pursuant

25    to this agreement and for 24 consecutive months thereafter it

 1   will not directly or indirectly compete.  Two years.  That's

 2   it.

 3          Then if you turn to the next page, you'll see that in

 4   this contract, in the very agreement that governed the

 5   relationship, Monitor got to work with Recycled Paper products.

 6          The letter that was sent to Monitor, not to Clipper,

 7   was sent over one year after the two-year period expired.  The

 8   evidence will show that in the fall of 2005 RPG had become the

 9   number 2 competitor to Hallmark in the country.  And the

10   evidence will show that in the fall of 2005 RPG threatened to

11   significantly impact Hallmark's revenue at its two top vendor

12   sources, Walgreens and Wal-Mart.  In fact, you'll learn, having

13   nothing to do with Clipper and having nothing to do with

14   Monitor, that before RPG was put up for sale Walgreens

15   conducted a test between RPG and Hallmark.  And Walgreens

16   concluded that RPG's humor cards were so good they should be

17   put into 1200 Walgreen Stores and replace Hallmark Shoe Box

18   cards.  That's why you will see the price at RPG continued to

19   rise.  Then the evidence will show that Wal-Mart called RPG,

20   unsolicited, to see if RPG would like to put its cards into

21   Wal-Mart.

22          Now, Hallmark found out that one of the top

23   consulting companies in the country, the company that Hallmark

24   thought was so good Hallmark hired, was going to work with RPG

25   and the letter was sent.

1              I wonder if you're curious about one thing at this

2     moment.  I haven't mentioned Clipper or Adam Doctoroff other

3     than to introduce them to you.  The evidence will show that all

4     the things that we've discussed, all the things you heard,

5     mostly all the things you heard from Hallmark, had nothing to

6     do with Clipper or Adam Doctoroff.  You'll learn, for example,

7     that Clipper heard about RPG through a voice mail left on its

8     general mailbox.  That's how Clipper heard that RPG was up for

9     sale.  And you'll learn that after the call was brought in to

10    Bill Young, they started to take a look at this project.

11             But I want to be clear about something because you're

12    going to hear lots of names, lots of companies, lots of

13    corporate structure issue.  Clipper did not buy RPG.  Clipper

14    did not own RPG.  The evidence will be absolutely clear that it

15    was owned by others.

16             This is the ownership structure of RPG.  The company

17    you see on the bottom, RPG, Inc., that's the company that sells

18    the cards.  It was owned by RPG Holdings.  That was owned by

19    RPG Investment.  The little box that you see to the left, those

20    are the companies that were set up by the former owners of RPG

21    who believed so much, the evidence will show, in RPG's future

22    that they invested their own money.  And then, finally, you see

23    at the top, Fund II.

24             Let's be very clear about Fund II.  Fund II has over

25    90 limited partners.  Clipper is what you see there on the

1    bottom.  That's the piece that Clipper owned indirectly of RPG.

2            The name of the fund is Fund II.  And you will see

3    that Fund II hired Clipper to go out and find companies that

4    Fund II might be interested in investing in.  The way it works

5    and you'll see in this case it worked not only for RPG but it's

6    the way it works in the industry is Clipper goes out and raises

7    money.  Gets all sorts of very large, very sophisticated

8    institutional clients to pool their money and then Clipper

9    researches the market to see what companies Fund II might be

10   interested in buying.  And that's exactly what happened in this

11   case.  You will see all sorts of financial analyses and reports

12   and accountants and attorneys and analysts pouring over

13   information to decide whether RPG is something Fund II should

14   buy.

15           But I'm going to ask you, please, as you listen to

16   the conversation, the evidence that is going to be presented

17   that you remember that figure.  That 1.4 percent figure.  What

18   ever number you hear used, what ever ownership you hear

19   claimed, that's the fact that will be shown to you through the

20   evidence.  1.4 percent of whatever it is that you hear.

21           You also heard about the bids during the opening

22   remarks of Hallmark.  You heard about how the bid for RPG had

23   to reflect the use by Clipper of the confidential information

24   that is at issue in this case.  Let me show you the bids.  See

25   the first bid?  The range is 290 to 305 million.  That bid, the

1    evidence will show, Hallmark admits Clipper couldn't possibly

2    have had access to any confidential trade secret information.

3    That's the first bid.

4           The second bid is exactly in that range.  And it's

5    the second bid that Hallmark says, well, now, Clipper has

6    access to the confidential information.

7           The price that was ultimately paid for RPG was

8    $317 million.  But you will learn that that money wasn't paid,

9    first of all, at all by Clipper.  Clipper is not the owner.

10   And you'll also learn that the money wasn't, in fact, paid by

11   Fund II in large measure.  The evidence will show that a bank,

12   a bank not in this case, a bank that is not a defendant, loaned

13   over half of the money spent on the RPG deal.  The evidence

14   will show that one of the largest banks in the country, Credit

15   Swiss, reviewed the RPG deal on its own, thought the price that

16   was being paid was correct and determined that it would lend

17   twice the amount of money that Fund II was putting in.  And

18   there is no claim and you will not hear any claim that this

19   bank, too, had access to Hallmark trade secret information.

20          Hallmark claims that Clipper used Monitor to get an

21   advantage.  I want to be very clear about this.  They did.

22   Hallmark, Clipper absolutely used Monitor to get an advantage.

23   Clipper did seek Monitor's help, absolutely.  You will see a

24   videotape of Bill Young, a videotape that was made when

25   Hallmark took his deposition.  Bill was a founder of Monitor

1   and then became a founder of Clipper.  You will see that Bill

2   Young was the person at Clipper who got the phone call about

3   RPG being up for sale.  And you will see that Bill Young

4   reached out for people at Monitor.  In fact, the evidence will

5   show that Bill Young reached out for people at Monitor that he

6   thought had worked on the Hallmark project.  My client, Adam

7   Doctoroff, also reached out for people at Monitor that he

8   thought had worked on the Hallmark project.  And I want to be

9   very clear about this with you because the evidence will show

10  exactly this, I promise.  When they reached out for those

11  people, they knew they had worked on Hallmark and they knew

12  that Monitor likely had confidential information.  That's why

13  every time they spoke to Monitor, every time they spoke to

14  someone from Monitor, they made it very clear, we do not want

15  confidential information.  We expect you to honor your

16  confidentiality policies.  You will learn that they made it

17  absolutely clear that they did not want any Hallmark

18  confidential information.

19          You will see that they knew when they called that

20  Monitor has a confidentiality policy and that they expect

21  Monitor to honor the confidentiality policy.  You will hear

22  from Adam Doctoroff and almost every Clipper witness who was

23  asked this question, did they think when people sign an

24  agreement and when people agree to keep things confidential

25  they expect it to be kept confidential and they rely on Monitor

1    to police itself.  This was Monitor information from a Monitor

2    client.  And you will hear evidence that there were occasions

3    in the past on other deals where Monitor said, no, I'm sorry.

4    We can't help you with this project because for us to do it

5    would require us to disclose confidential information.

6         You heard in opening remarks that Clipper bragged

7    about Monitor.  It did.  Clipper believed that Monitor was one

8    of, if not the top consulting companies in the United States.

9    And the evidence will show and I don't know what other proof to

10   give you is that Monitor was hired by Hallmark.  And what you

11   will see is Monitor was hired by Hallmark at a point in time

12   when Monitor had very little, if any, greeting card experience.

13   So there is no company that knows better than Hallmark that

14   Monitor and Clipper don't need any confidential information in

15   order to help turn a greeting card company around.

16         You will also see there's nothing unique or different

17   about the way Clipper and Monitor work on a project.  You will

18   hear testimony from witnesses and from an expert who will show

19   you that the structure between Monitor and Clipper, a private

20   equity firm needing a consultant and working with a consultant,

21   is not unusual.

22         Let's talk about the information itself.  You're

23   going to hear all sorts of evidence about all sorts of

24   information.  You heard some of it already.  Hallmark gave

25   Monitor everything.  Hallmark shared everything with Monitor.

1    Monitor worked on all sorts of things for Hallmark.  You will

2    learn that this case though is about the attachments to three

3    e-mails.  That's it.  The information that Hallmark claims was

4    taken was attached to three e-mails.

5         The first e-mail will be Trial Exhibit 487.  This is

6    an e-mail in August of 2005 from a Monitor employee.  Not my

7    client, not the defendant in this case.  A Monitor employee.

8    That is sent unsolicited, never asked for, to Adam Doctoroff.

9    Mr. Doctoroff saw the e-mail.  The evidence will show that he

10   decided the information might be confidential, might be

11   confidential and immediately deleted it.  And the evidence will

12   show, ladies and gentlemen, this is the only e-mail that ever

13   touched Clipper.  This is the only e-mail that ever touched

14   Adam Doctoroff.

15        Now, the opening, we talked, you heard all sorts of

16   conversation about Adam Doctoroff.  Did you notice there was no

17   representation to you because I'll represent that none exists,

18   about Mr. Doctoroff reading this information.  You were brought

19   through the attachments that were attached to the e-mail.  They

20   were.  But the evidence will show that the e-mail was deleted

21   when Mr. Doctoroff received it.  And now he's being sued

22   personally.

23        The evidence will show that the reason he's being

24   sued personally is because he volunteered to give a deposition

25   in another case.  And in response to the question, did you or

1    Clipper receive confidential information, you heard, he said I

2    don't believe so.  I don't think we did.

3              The evidence will show that Adam Doctoroff at the

4    moment Fund II was deciding whether to buy RPG wasn't even at

5    Clipper.  He was in a hospital with his wife having a child.

6    And the deposition that you just heard referenced, the evidence

7    will show, occurred almost one year later after that event.

8    And he said I don't believe I got it because he did not

9    remember that he received one e-mail in the context of the

10   entire transaction that he then deleted.  But now he's here

11   personally.

12             The second e-mail we'll show you, this is the second

13   e-mail that's at issue in this case.  Please remember this.

14   This is an e-mail written by a Monitor employee to a Monitor

15   employee.  There is no Clipper person on this e-mail.  We did

16   not even know this e-mail existed.  The evidence will show the

17   defendants did not know this existed before the lawsuit began

18   because it's at Monitor.  And you will learn that this e-mail

19   was intentionally kept from Clipper.  If you take a look at the

20   body of the e-mail which you'll see over and over.  Megan and

21   I, those are Monitor employees, went through documents from

22   Levin.  He's a Monitor employee.  And I have tried to condense

23   the most salient information into the following 30-deck slide.

24   Note, MCP staff are not included in this e-mail.  That's

25   Clipper.

1           This is an e-mail that goes to what you just heard

2    it's called the Monitor standing case team.  They are Monitor

3    employees.  They are hired, they are trained, they are paid,

4    they are disciplined, they are promoted and they are demoted by

5    Monitor.  You will learn that Clipper never heard of this

6    e-mail and never saw this e-mail.

7           And then there is the third e-mail that's at issue in

8    this case.  This again, everybody on that screen are Monitor

9    employees.  These are Monitor employees communicating with

10   Monitor.  And you will learn that Adam Doctoroff and Clipper

11   never knew about this e-mail and never knew what was going on.

12          But there is a reason why Monitor never shared this

13   with Clipper.  You heard the reason was because Adam Doctoroff

14   walked down the hall and said, I don't want to see it but you

15   use it.  The reason it wasn't shared, the evidence will show,

16   is if Clipper and Adam ever wanted confidential information, it

17   would never be this.  Ever.

18          You will see that it's very important for you to

19   understand what Hallmark is asking you to do in this case.

20   Hallmark is asking you to do, I think the evidence will show

21   you, Hallmark is asking you to do four things.  First, Hallmark

22   is asking you to make my clients pay damages because of what

23   other people did.  Second, Hallmark will be, the evidence will

24   show and you will see, that Hallmark will be asking you to pay

25   damages because other people got benefits.  Third, the evidence

1    will show you and you will see that Hallmark is asking you to

2    award damages because Hallmark claims that the information in

3    2005 was worth exactly what it was in 2001.  But most

4    importantly, the fourth reason, and that's the reason for the

5    e-mail never being shown to Clipper.  Hallmark, the evidence

6    will show, is asking you to award damages because it thought

7    that Clipper or it argues that Clipper wanted 100 percent of

8    what was in the attachments.

9            Hallmark will present one witness on this issue.  His

10   name is Dr. Serwin.  He's their expert witness.  And you will

11   see that Dr. Serwin will say that my clients should pay money

12   beyond anything they ever made in connection with RPG because

13   100 percent of what is in those e-mails was wanted by my

14   client, was worth exactly what it was before, was secret still

15   and was valued.  I want you to remember, please, as you listen

16   to the evidence 100 percent.

17           You will learn that the damages that Hallmark asks

18   you to award fail if it's not 100 percent.  And I promise you,

19   I promise you that the evidence will show it is impossible to

20   say but you'll decide, that my clients wanted 100 percent.  We

21   will show you evidence of facts that the attachments weren't

22   secret.  In fact, we'll show you evidence of Hallmark

23   disclosing the information to its competitors, to Hallmark

24   employees throughout the building, in a newsletter that anybody

25   could walk into the building and take with them.  We'll show

1    you evidence of Hallmark disclosing this information to what is

2    called the Greeting Card Association, which is a trade

3    association that competitors participate in.  So the evidence

4    will show you very clearly that this information wasn't secret

5    and the evidence will show you very clearly that this

6    information was, in fact, stale.

7           But most importantly the evidence will show you that

8    Clipper couldn't possibly have wanted it.  You will see

9    evidence and Hallmark didn't take you through the presentations

10   but we will as the case goes on.  You will see evidence in the

11   presentation of research on disposable dinnerware, stationery,

12   balloons, invitations.  All of those things might have

13   something to do with Hallmark but none of those things, the

14   evidence will show, have anything to do with RPG.  RPG only

15   sold cards and only sold humor cards at that.

16          You heard about Peter Kim and the fact that Peter

17   Kim's computer was erased.  It was.  Peter Kim's computer was

18   erased.  Hallmark says it was erased to make sure that nothing

19   could ever be found.  Once again, you'll see that Hallmark was

20   upset with the wrong people.  Clipper, you will learn is very

21   upset that Peter Kim's computer was erased.  You'll learn it is

22   upset about the erasure of the computer because Clipper didn't

23   know it had been erased.  You saw the demand letter that was

24   put up on the screen for both us and for Hallmark.  The demand

25   letter went to Monitor, not to Clipper.  But the evidence will

show that Clipper got so concerned about Hallmark's threat that
Clipper went out, hired its own attorney.  One of the largest
law firms in the country to give it advice on how it should
deal with Hallmark's letter and with what might follow.

And the evidence will show and you heard it mentioned
by Hallmark in their opening, that there is this thing called a
litigation hold.  And it is.  It's a real thing called a
litigation hold.  And what it means in plain English is that
when the attorney determines that information needs to be
preserved, the attorney tells the client and the client sends
out what is called a litigation hold.  It is a letter or memo
to the whole firm saying, if you had anything to do with this
matter, you must preserve your paper information and your
electronic information.  And you will see that as soon as the
letter came in, Clipper went out and hired a law firm.  And you
will see that the law firm did not tell Clipper to put a
litigation hold in for 18 months.  And the minute the law firm
told Clipper to put the litigation hold in, Clipper put it in.

But what happened, you will see, is Peter Kim who is
the second most junior person on the entire RPG project quit to
take another job in New York.  His departure had nothing to do
with this case you'll see.  His taking another job had nothing
to do with this case.  And you'll see that he turned his laptop
in in the ordinary course of business.  You'll see that Clipper
processed the laptop because it's used by other junior people

1    and that is the entire story of the erasure.

2           You also heard about two computers being erased at

3    Monitor.  I want to ask you to do one thing for me when the

4    testimony comes up about those two computers being erased.  I

5    want you to try and find in this case the person who said they

6    were erased.  It's going to be one person.  You're going to

7    hear all sorts of things from all sort of people about all

8    sorts of computers.  But I want you, please, to find the one

9    person who says the computer is erased.  That person is going

10   to be someone named Laura Steinberg.  I ask you to please

11   remember the name Laura Steinberg.  The reason I ask you to

12   remember that is the evidence will show that was Monitor's

13   lawyer.  Monitor's lawyer will testify that two Monitor

14   employees and the evidence will show in the midst of Hallmark

15   and Monitor fighting with each other, two Monitor employees

16   computers were erased.  That's who will speak in this case to

17   the computers.  They're not our employees.  They weren't our

18   computers.  We had no idea that Monitor would allow the

19   computers to be erased.

20          There is another contract in this case, another

21   important contract that we're going to ask at the end of the

22   case you folks tell Hallmark to honor.  The name of the

23   contract is the confidential agreement.  Clipper had its own

24   contract with Hallmark.

25          Now, this contract, you heard in opening and I think

1   you're going to hear it throughout the case, all sorts of

2   suggestions or comments about how Clipper and Monitor are the

3   same, the Monitor standing case team works only for Clipper.

4   This is what Hallmark represented to Clipper before this

5   lawsuit was brought.  Whereas MCP and Monitor are separate

6   entities.  That's Hallmark's words, the evidence will show, in

7   Hallmark's contract with Clipper.  And that's before this

8   lawsuit was ever filed.  MCP and Monitor are separate entities.

9           And the evidence will show that the purpose of this

10  agreement was that we wouldn't be here today.  The purpose of

11  this agreement was to avoid litigation.  And the deal was

12  pretty simple.  The deal was as the evidence will show, if

13  Clipper agreed because Hallmark believed that Clipper had

14  confidential information.  If Clipper agreed to let Hallmark

15  through search terms go through Clipper's computers, then

16  Hallmark, when the search was done, wouldn't sue.

17          Now you just heard about the letter that was found,

18  the e-mail that was found a year before this deal.  But you

19  will see, the evidence you will see is in the middle of working

20  on this agreement, in the middle of working on this agreement,

21  Hallmark was told that Adam Doctoroff had received that e-mail

22  with the attachments.  And you will see that Hallmark didn't

23  scream out, deals off.  You'll see that Hallmark didn't yell,

24  you duped us.  You'll see none of that.  What you'll see is the

25  next step in the agreement which is the searching of the terms.

1    And then you will see right when Clipper was in the middle of

2    searching for the information that Hallmark asked us to search

3    for, Hallmark filed suit.

4            This agreement has a paragraph in it.  The paragraph

5    in it says if the parties do steps 1 through 6 which we'll show

6    you what was being done in the course of this case, if they do

7    steps 1 through 6, look four lines from the bottom.  Hallmark

8    will release from escrow the confidential mutual release.  Or

9    2, file a lawsuit.  The evidence will show that Hallmark did

10   not file a lawsuit when it was suppose to.  That the time had

11   passed.  And that it jumped the gun.  And the evidence will

12   show that if it had honored this agreement, right there, number

13   1, release from escrow the confidential mutual release, I want

14   you folks to understand the evidence will show there is

15   actually a general release, a piece of paper being held by

16   Hallmark that was suppose to be released, suppose to cover my

17   clients and we would not be here.  So at the end of this trial

18   I'm going to ask you to please make sure that Hallmark honors

19   its agreement.

20           At the end of the day I think that the information

21   will show, and the evidence will show, that Hallmark's very

22   upset with Monitor.  And at the end of the day what I'll ask

23   you as you review the evidence is to please make this case just

24   about my clients.  They're the ones who have been sued.  And

25   for the reasons that I've articulated, as well as the evidence

1    you'll see, at the end of the case I'll ask you to, please, to

2    rule, No. 1, that release should be in force and effect.  And,

3    No. 2, that no damages should be awarded against my clients.

4            I thank you in advance for your time, your courtesy

5    and your attention.

6            THE COURT:  We would ordinarily go to about 10:30 but

7    this seems a propitious time to take a break.  So let's take 15

8    minutes.  Please remember not to discuss the case among

9    yourselves.  Keep an open mind until you've heard the evidence

10   in the case and discussed it with your fellow jurors.  We'll

11   see you back here in 15 minutes.  We'll be in recess.

12                            (Recess)

13           (The following proceedings were had OUT OF THE

14   PRESENCE AND HEARING OF THE JURY:)

15           THE COURT:  I didn't want to embarrass our late juror

16   this morning so I said nothing to her during court.  Eva has

17   spoken with her and let her know that we expect her to be on

18   time in the future.

19           Okay.  Are we ready?

20           MR. AISENBREY:  Yes, sir.

21           THE COURT:  Okay.  Eva.

22           Whose first, Mr. Aisenbrey?

23           MR. AISENBREY:  Don Hall.

24           (The following proceedings were had IN THE PRESENCE

25   AND HEARING OF THE JURY:)

1          THE COURT:  Please be seated.

2          Mr. Aisenbrey.

3          MR. AISENBREY:  Thank you, Your Honor.

4          Plaintiff calls Don Hall.

5            DON HALL, PLAINTIFF'S WITNESS, SWORN

6          MR. AISENBREY:  May I proceed, Your Honor?

7          THE COURT:  Go ahead.

8                         DIRECT EXAMINATION

9   BY MR. AISENBREY:

10  Q    Mr. Hall, would you introduce yourself to the jury and

11  tell them what your position is?

12  A    I'm Don Hall, Junior.  I'm CEO and president of Hallmark

13  Cards.

14  Q    Briefly, Mr. Hall, would you give the jury your

15  educational background?

16  A    Yes.  I have a bachelor of arts from Claremont McKenna and

17  an M.B.A. from the University of Kansas.

18  Q    And also, briefly, can you give them, give us an overview

19  of the positions that you've held in Hallmark over the years?

20  A    I've been with Hallmark a little over 30 years.  My first

21  position was a section leader in our manufacturing facility.  I

22  was a packaging section leader.  Did that for a couple of

23  years.  Then I moved into a graphic arts area where I was

24  department manager of art photo film finishing area which would

25  create the plates that were used for the lithography.  After a

1  couple years in graphic arts I then became a line planer in

2  stationery, writing instruments.  Later became in charge of the

3  marketing and new business responsibilities for our Keepsake

4  Ornament line.  Then later became the head of creative,

5  overseeing all of the creative functions and the artists and

6  writers of the company.  Then went on to head up our product

7  development activities for the Hallmark brand.  And then became

8  the head of corporate strategy and development and then from

9  that position I was named the CEO.

10  Q    It may well be pretty obvious but just to clear it, your

11  grandfather started the company, is that right?

12  A    Yes, it is.

13  Q    You worked, basically, up through all the positions you

14  just discussed?

15  A    Yes.

16  Q    I'd like to turn your attention to the time frame of 2001

17  and 2002 and a project called the Business Model Redesign.  Are

18  you familiar with that?

19  A    Yes, I am.

20  Q    Can you describe for the jury what this was?

21  A    This was a very extensive evaluation of our business.  We

22  wanted to sit back and look at the business with fresh eyes and

23  try to look at all of the research that we had, look at the

24  consumer trends that were taking place in order to develop a

25  more effective strategy for the future that would guide our

1 decision making for many years to come.

2 Q    Did you use a consulting firm for that?

3 A    Yes, we did.

4 Q    Who was that?

5 A    Monitor.

6 Q    Called Monitor Group or something?

7 A    Monitor Group, yeah.

8         MR. AISENBREY:  Your Honor, may I approach?

9         THE COURT:  You may.

10 BY MR. AISENBREY:

11 Q    Mr. Hall, I'm handing you what has been marked as Exhibit

12 D227.  Can you identify that, please?

13 A    Yes.  This is the consultant services agreement.  This is

14 the contract that we entered into, the consulting agreement

15 with Monitor Group.

16         MR. AISENBREY:  Your Honor, I offer D227.  I think

17 it's been stipulated to.

18         THE COURT:  Without objection D227 --

19         MR. AISENBREY:  Yes, sir.

20         THE COURT:  -- is admitted.

21 BY MR. AISENBREY:

22 Q    Mr. Hall, it's on the screen up there but if you want to

23 use the paper copy, whichever might be easiest for you to see.

24         If we could turn, first, Cindy, can you pull up that

25 first paragraph?

1          This is a contract that was signed December 5 of

2   2001, is that right?

3   A    Yes, it is.

4   Q    I think we just saw it a little bit in opening.  This is

5   the contract between Hallmark and Monitor Consulting for

6   consulting services, is that correct?

7   A    Yes.

8   Q    If we could go to page 5, paragraph 9.

9          This paragraph 9 here describes the client furnished

10  data.  In the first sentence, I'm going to read it and then ask

11  you to explain to me what that entailed.  All data and

12  information submitted to Monitor by Hallmark in connection with

13  the deliverables and all output data and information generated

14  by Monitor pursuant to the statement of work on this project

15  which is then defined as the Hallmark data, belonged to

16  Hallmark.

17         First of all, Mr. Hall, what sort of data was

18  provided to Monitor?

19  A    We gave Monitor very extensive information about our

20  business.  We shared with them really virtually all of our

21  consumer data which would entail research about consumer

22  trends, purchasing behavior, knowledge that we had about the

23  use of greeting cards in the industry.  We shared with them a

24  very extensive view of our financial data showing our

25  profitability, showing sales by various segments of the

1   business, terms that we would charge customers.  So they had

2   complete visibility of what different customers were paying by

3   different channels.  And we looked at all this information over

4   time periods to try to assess where our business was.

5   Q    You used the phrase terms.  Can you explain more clearly

6   what you mean by that?

7   A    Yes.  When we negotiate with a customer we agree to do

8   certain things for them.  We agree to certain prices for the

9   product or different kinds of rebates.  We agree to how we

10  would handle returns of product if product didn't sell in a

11  season or if it wasn't successful, we would agree to how we

12  would bring that product back and buy it back.  We would agree

13  to things like obsolescence which means how frequently we would

14  go and remove lower selling product or product that wasn't as

15  fresh.  It would speak to how we would handle merchandising

16  costs, who would pay for signing, how often it would be reset,

17  who would pay for the fixturing that's in the store.  It would

18  cover things like services.  In many cases we will actually

19  send our employees into the stores to supply the product and to

20  set up displays.  But each of these elements of our business

21  would be carefully discussed and negotiated with each customer

22  individually.  And those were comprised with the terms or the

23  cost of doing business with them with a specific customer.

24  Q    You also used the phrase different channels of

25  distribution.  What is a channel of distribution?

1    A    Well, there are different types of retailers that we work

2    with.  It would be things like Gold Crown Stores which would

3    be primarily independently owned card shops.  They would be

4    chain drug stores like a Walgreens or CVS.  It would be grocery

5    stores like Safeway.  It would be chains like discount channels

6    like Wal-Mart.  But those would be different channels of trade

7    and those customer strategies are different so we would

8    approach them differently based on the product offered.

9    Q    You described the financial information and the customer

10   terms and research and stuff.  Does Hallmark make that publicly

11   available?

12   A    No, we do not.

13   Q    Is it confidential?

14   A    Yes.  Absolutely.  It's very confidential.

15   Q    How is it handled within Hallmark?

16   A    We handle it very confidentially.  We treat all that

17   information very carefully.  We are a private company.  We

18   realize that that information is something that needs to be

19   protected because it could do real harm to us if it got out.

20   We have an ethic of creating confidence and reminding people

21   about the confidentiality throughout their careers.

22   Q    If we could highlight the second sentence in paragraph 9.

23   It goes on to state in the contract with Monitor, that Hallmark

24   data shall be deemed confidential and will not be used by

25   Monitor, other than in connection with providing deliverables,

1    disclosed, sold, assigned by Monitor or commercially exploited

2    by or on behalf of Monitor or its employees or agents.

3              What was your purpose in defining it in that way,

4    what they could do with the data?

5    A    Well, we were very clear at the very beginning that the

6    information that we provided to them or the information that

7    they would help us construct as we were involved in this

8    consulting agreement was all our information.  The work

9    product, the deliverables, all of the things that came out of

10   that were deemed to be confidential.  So anything we provided

11   to them about our business and anything that they shared back

12   in terms of conclusions, all of that work product was something

13   that we protected as being confidential information that we

14   possessed.

15   Q    Now, when you hired, when you engaged Monitor did you do

16   that because they had a lot of experience in the greeting card

17   industry?

18   A    No, no.  We hired them because we felt like they could

19   help work with us to assimilate some of the information that we

20   had.

21   Q    And so did Hallmark people work with them or did you just

22   turn this over to them and they came back later, here's what we

23   have?

24   A    No.  It was a very extensive consulting effort.  They

25   brought a lot of consultative expertise but we paired that up

1    with our best, most knowledgeable people in Hallmark to work

2    side by side in developing this, this knowledge of what our

3    future strategy would be.

4    Q    Would it fair to say that you educated them about your

5    business?

6    A    Yes.

7    Q    Now, you may have mentioned this but I want to be clear.

8    Are the terms with customers, the contracts with customers is

9    that like a price list?  Would somebody call up Hallmark and

10   say, what's the general terms for a drug store?

11   A    No.  No.  The terms are very confidential.

12   Q    Now, you mentioned Hallmark research.  What is that?

13   A    We conduct a great deal of research.  We try to understand

14   what kinds of trends there are with the consumer.  We want to

15   understand how consumers connecting activities are changing

16   over time.  We track that, monitor it very carefully.  We

17   develop a great deal of information about what they're

18   purchasing, what they desire, what they are purchasing in terms

19   of our product.  We have a great deal of information about our

20   customers, about the industry and track that information over

21   time.

22   Q    Do you have a budget for research?

23   A    Yes.  We spend about $14 million a year in collecting

24   information.

25   Q    Did you provide any of your research to Monitor Group?

1   A    We provided all of it.  We gave them access to all of our

2   research.

3   Q    Was this Business Model Redesign, is that sometimes called

4   the BMR?

5   A    Yes.

6   Q    Was the BMR an unusual project for Hallmark or is this

7   something you do from time to time?

8   A    It's very unusual.  We have never undertaken an evaluation

9   of our strategy like this before and we've not done one since.

10  Q    Is it fair to say it was a big project for Hallmark?

11  A    It was a very big project.  It was one that we intended to

12  have reform our thinking about how we were going to compete and

13  win in the market place over time.  And our intention was to

14  create a strategy that would guide our business for many years

15  to come.

16  Q    So you mentioned Hallmark people worked with Monitor

17  people.  Was this a consulting project that extended over a

18  period of time?

19  A    Yes.  It extended for many months and it was the

20  predominant focus of some of our best and brightest people.

21  Q    Now, the project itself was about, a little over ten years

22  ago.  What was your position at that time at Hallmark?

23  A    At that time I was the, I was in charge of corporate

24  development and strategy.

25  Q    Did you attend the Business Model Redesign meetings or

1    presentations?

2    A    Yes.

3    Q    Before we leave Exhibit D227, could -- We'll come back to

4    that?

5            Could I have Exhibit P487.  And page 25.

6            Mr. Hall, do you recognize what is up on the screen

7    here?

8    A    Yes.  This was one of the reports that was provided by

9    the, by Monitor that summarized some of the progress during

10   that period of time.

11   Q    What is that OEC?

12   A    Well, the OEC stood for Organizational Effectiveness

13   Committee.  It was a group of some of our most senior leaders

14   in the company.  They would receive periodic updates on

15   progress on this report and some of the key conclusions that

16   were coming out of the work product.

17   Q    Now, could we also have P487 and page 93?

18           Mr. Hall, can you tell us what this is?

19   A    This is another presentation that was shared with the OEC

20   outlining some of the conclusions that were being reached by

21   the Monitor Group and our leaders about the future strategy.

22   Q    And this was prepared by Monitor?

23   A    Yes, it was prepared by Monitor.  They put these decks

24   together but it was the work product of our extensive effort in

25   outlining our future strategy.

1   Q     You say our, you mean Hallmark's and Monitor's together?

2   A     Yes.

3   Q     Could we have Exhibit 487, page 203?

4         Could you tell us what this is?

5   A     This is a report on the Gold Crown channel, looking very

6   specifically at that channel of distribution.  This would

7   include all of the independent card shops around the country

8   and an important channel of distribution, part of the process

9   was to look very closely at that channel of distribution.

10  Q     You say independent card shops are these shops that are

11  not owned by Hallmark?

12  A     Yes.  There are about 3,000 independent stores.  Hallmark

13  owns a very, very small portion of those.  Most of them are

14  owned by independent business operators.

15  Q     Okay.  We'll see these particular presentations in detail

16  later today.  But, generally, from your perspective, what do

17  they contain?

18  A     Well, these contain the most important conclusions about

19  our business strategy for the future.  This was the culmination

20  of the extensive work we did to try to understand how, what we

21  needed to do as a business to be successful in the future,

22  where those growth opportunities would be and how we could

23  effectively meet consumers needs and customers expectations.

24  This was the compilation of all of that information.  It

25  identified the most important issues that underpinned our

1   strategy.  It outlined conclusions and why we reached it and

2   outlined what we were going to do in the future to operate our

3   business.

4   Q   Were they confidential?

5   A   Highly confidential.

6   Q   Were they widely distributed within Hallmark?

7   A   No.  No.  There would be only a very small group of people

8   at Hallmark that would have access to these compilations.  Not

9   even all, not even our officers would have all seen this, even

10  a subset of our corporate officers would have had access to

11  this.

12          MR. AISENBREY:  Your Honor, I offer Exhibit 487.

13          THE COURT:  Without objection, 487 will be admitted.

14  BY MR. AISENBREY:

15  Q   Mr. Hall, I'd like to turn to Exhibit 488, page 2.  Can

16  you tell the jury what this is?  It says Hallmark --

17  A   This is a report about the Hallmark and greeting card

18  industry and outlining the industry trends.  I believe it was a

19  very extensive review of trends that we were seeing in the

20  industry and things that we thought were particularly relevant

21  to forming our strategy going forward.

22  Q   Are trends important to you in doing your work at

23  Hallmark?

24  A   Very much so.  This is a business that doesn't change

25  dramatically overnight.  It changes slowly and gradually and

1    usually in the same direction.  What we were doing was looking

2    very carefully at the information that we had about the

3    consumers, about customers and about those trends.  And trying

4    to understand where the industry was going so that we could

5    develop strategy of moving in that direction.  This outlined

6    what some of those trends were and how we would build our

7    strategy.

8    Q    Was this also a presentation from the BMR?

9    A    Yes.

10   Q    Could we have Exhibit 488.  This is Small Competitors in

11   the Deep Discount Space.  Can you tell us what this is, Mr.

12   Hall?

13   A    This is a part of the BMR work where we focused very

14   specifically at the changes that were occurring within the

15   smaller competitors, within the deep discount space.  This is

16   kind of an evolving place of business with the emergence of

17   deep discount card stores like Family Dollar and Dollar

18   General.  We were trying to understand how that would change

19   the landscape of retail but also specifically what that would

20   mean in terms of what our strategy should be.

21   Q    I'd like to turn to the issue of confidentiality at

22   Hallmark.  Start out with this question.  Is confidentiality

23   important to Hallmark?

24   A    Yes, it's very important.

25   Q    I'd like to --

1          Judge, I forgot to offer Exhibit 488.

2          THE COURT:  Without objection 488 is admitted.

3   BY MR. AISENBREY:

4   Q    We were talking about confidentiality.  Is that important

5   at Hallmark?

6   A    Yes, confidentiality is very important.

7   Q    How is it instilled in the employees?

8   A    We build a culture where we appreciate the importance of

9   maintaining the confidentiality of important information.  It

10  begins really on somebody's first day at work.  We, every

11  employee signs a confidentiality agreement when they begin at

12  Hallmark.  It underscores the importance of maintaining

13  confidentiality expectations.  We frequently discuss this and

14  remind people about the importance of confidentiality.  We have

15  policies to that effect.  Our policy 124 outlines the

16  importance of maintaining confidentiality.  It's available to

17  all employees on our intranet but we insist that managers

18  review it and read it again annually and sign off they have

19  read it and are reminded about the importance of

20  confidentiality.

21  Q    How is confidential information specifically handled at

22  Hallmark?

23  A    We maintain the confidentiality based on the need to know.

24  If somebody is in possession of confidential information they

25  know that they are.  And they know that they share that

1    information only with people who have a need to know it.  It's

2    not sufficient if they want it.  They need to have the

3    information.  And it means the person that has it needs to

4    insure that the person receiving it is authorized and has a

5    need for that information.

6    Q    What about things like research reports that you discussed

7    and the financial information or contract terms, is that just

8    standard confidential information?

9    A    All that information is highly confidential and it would

10   have been deemed that way.  Its dissemination would be very

11   restricted.  We would know who should receive certain levels of

12   that information and are very careful in terms of how we share

13   that information within our business.

14   Q    Now, Mr. Hall, I think most of us in the room have read

15   about, heard about Hallmark.  We read about it in the paper.

16   Hallmark discloses some information publicly, doesn't it?

17   A    Yes.  We choose to share some information from time to

18   time.  It's always when we know it's to our benefit.  When we

19   do share it, it's for a business purpose.  It's thoughtfully

20   considered.  We make sure that we feel comfortable in sharing

21   it and it's typically a very broad, very directional and

22   nothing that would be specifically compromising in terms of a

23   competitive position.  So we evaluate it very carefully before

24   we use it in that way.  But we from time to time do make some

25   information available.  We think it helps advantage the

1  business.

2  Q    So, for example, in a presentation like one of the ones we

3  just saw, do you ever turn this over, as I'm holding it here in

4  my hand, to anybody?

5  A    No.  We never would do that.  That is a compilation of the

6  most important facts about our business.  It's really our

7  secret sauce and we would not make that available.

8  Q    Would any information from that report or that may be

9  contained in that report ever be disclosed?

10  A    There may be some from time to time where we might choose

11  to take little bits and pieces, little nuggets that we might

12  feel would be important to share with different groups for

13  specific reasons but it would be very carefully considered.

14  Q    Is all confidential information at Hallmark marked with a

15  confidential stamp?

16  A    Most of it is.  But everybody knows when they have

17  confidential information and they know how it should be

18  treated.  We remind people of that frequently.  I talk about it

19  often in our all employee meetings and with different

20  activities but this is something we continually remind and

21  stress.

22  Q    So was the BMR work among the confidential materials you

23  talked about?

24  A    Yes.  It's probably our most confidential information.

25  Q    Was there, was it all Hallmarkers working on it or how did

1    you staff it from the Hallmark side?

2    A    No.  We staffed the project with some of our most talented

3    marketing leaders.  It was a very small subset of people and

4    they worked on it.  Some worked on only portions of it.  A much

5    smaller group would have seen the entire compilation.

6    Q    I'd like to talk briefly about competition.  Start with

7    the question, is the greeting card business competitive?

8    A    Very competitive.

9    Q    You are familiar with a company called Recycled Paper

10   Greetings?

11   A    Yes, I am.

12   Q    Sometimes referred to as RPG, is that right?

13   A    Yes.

14   Q    In 2005 what was Recycled Paper's position as a competitor

15   of Hallmark?

16   A    Recycled was our second largest competitor.

17   Q    I think we've talked about Gold Crown Stores a little bit?

18   A    Yes.

19   Q    Were they able to sell RPG products?

20   A    Yes.

21   Q    In 2005?

22   A    Yes.

23   Q    We heard in opening statement that Walgreens was a

24   customer of Hallmark, is that right?

25   A    Yes.

1    Q    And they were selling RPG products as well?

2    A    Yes, they were.

3    Q    Now, you told us that the customer terms that you had with

4    various channels of distribution or customers like Walgreens or

5    whatever are confidential and tightly controlled.  Why does

6    that have to be confidential?  Why is it a secret, what the

7    terms are with Walgreens?

8    A    Well, this is a very competitive industry and every time

9    you're working with a customer, you're working with them

10   individually and they're trying to decide whether to choose

11   your offering or somebody else's.  And so it's a competitive

12   bidding process.  And the terms that we offer are a very

13   important consideration as they choose which customer they want

14   to work with.

15   Q    So how could a competitor use your information, if they

16   knew it?

17   A    Well, a competitor if they had this information would

18   understand the kinds of things that we were offering.  They

19   would understand what kinds of things they needed to offer in

20   our position.  They would understand our cost structure behind

21   some of those different elements like service or fixturing or

22   signing.  They would understand what they might need to do to

23   counter at that.  And if they let a customer know any of that

24   information then that would be very powerful for a customer in

25   terms of understanding what they should demand of a contract

1    and how they should negotiate those pieces.  I'm not a poker

2    player but I do know that if you were to try to play poker with

3    somebody and you had all your cards on the table and everybody

4    knew what you had in your hand but you didn't know what they

5    had in their hand, you would lose.  And that's a lot like the

6    bidding process when you go through a contract renewal with a

7    customer.

8    Q    Now, we're concerned here with the events that occurred in

9    2005 and 2006.  I guess the question I have is wouldn't

10   information in these BMR reports that we've seen, which was

11   from 2001 and early 2002, wouldn't that be out of date by 2005?

12   A    No.  It would not be out of date in 2005 and it's not out

13   of date today.  In 2005 there were still contracts in existence

14   that would have been part of that BMR so the specific terms of

15   those current contracts would have been visible.  But as I

16   mentioned earlier the trends in this industry don't change

17   quickly.  So directionally this would give people a great deal

18   of information then.  And even today it would be descriptive of

19   some of the costs of our model.  It would talk about the trends

20   and importantly it would describe the strategy that we're still

21   using today.

22   Q    What about the research though, the research that was in

23   there was from the 95 to 2000 time frame.  Would that still be

24   useful in 2005?

25   A    Absolutely.  This information is information that we would

1    have known about the industry, we have a great deal of

2    information about it.  And it would have been very useful to

3    others who wouldn't have had that information.

4    Q    Were you satisfied with the results of the BMR?

5    A    Yes.  Yes.  It was very important work.

6    Q    If we could go back to Exhibit D227 for a minute.  If we

7    could go to page 7 paragraph 18.

8              Mr. Hall, do you have that in front of you?

9    A    Yes.

10   Q    This is a paragraph we saw in opening.  It deals with,

11   says, conflict of interest.  But it deals with the, what I

12   think is called a non-compete.  Are you familiar with that?

13   A    I'm sorry.  I thought I had the right page.

14   Q    It's page 7.  I'm sorry if I said --

15   A    No.  Page 7.  Okay.

16   Q    Are you familiar with the concept of a non-compete?

17   A    Yes.

18   Q    And we see here that in this contract Monitor agreed that

19   it would not work for a series of other companies that are

20   listed for 24 months after the conclusion of the work on the

21   BMR, is that right?

22   A    Yes.

23   Q    So one of the companies, in fact, that is listed is on the

24   next page is Recycled Paper Greetings.  It's a full series of

25   greeting card companies there?

1  A    Yes.

2  Q    Now, since you have turned over all of this confidential

3  information to Monitor, were you, are you saying that you don't

4  believe they should have been permitted to work with Recycled

5  Paper or Monitor Clipper in 2005 after that expired?

6  A    We were perfectly fine with them being a consultant.  This

7  paragraph envisions the fact that after that period of time

8  they were free to consult with competitors.  But we were very

9  insistent that the confidentiality of our work, the information

10 that we shared about the industry, the information that they

11 helped pull together, all of that information was deemed to be

12 confidential and would not be used in that setting.  So they

13 were free to consult but they were not free to share our

14 information with others.

15 Q    Or their conclusions?

16 A    Or their conclusions or any of the work that we

17 collectively did with the BMR, they were not free to use that

18 information.

19 Q    So turning to the fall of 2005 did it come to your

20 attention that Monitor Clipper was involved in the acquisition

21 of Recycled Paper?

22 A    Yes.

23 Q    Were you concerned?

24 A    Very concerned.

25 Q    Why?

1    A    We were concerned because we had done a great deal of work

2    with Monitor and we were concerned about the confidentiality of

3    our information falling into the hands of a competitor.

4    Q    Did you do anything about it?

5    A    Yes, we did.

6    Q    What did you do?

7    A    Our general counsel Brian Gardner wrote a letter to

8    Monitor and he asked them to give him assurances that our

9    information would not and has not been shared with Monitor

10   Clipper.  He also asked them to return all of the work product

11   and the information they had back to us.  And he asked Monitor

12   to retain the information so that it would not be lost and he

13   instructed them to let Monitor Clipper know that they should

14   also retain the information.

15   Q    Now, if they were going to return all the information to

16   Hallmark what would they retain?  You mean like e-mails and

17   things like that?

18   A    Yes.

19   Q    Is that last thing you referred to, I think was referred

20   to in opening by Mr. Manchel as a litigation hold?

21   A    Yes.

22   Q    Are you familiar with that term?

23   A    Yes, we are.

24   Q    When Mr. Gardner sent this letter out did Hallmark

25   initiate a litigation hold?

1   A     Yes, we did.

2   Q     Did you get Monitor to return all Hallmark's materials?

3   A     They were very slow to respond.

4   Q     What was the basis for you asking them to return all the

5   materials?

6   A     Well, the contract was very clear in terms of the fact

7   that it was our information and that we could ask for it to be

8   returned.

9   Q     Could we go to page 5, Exhibit D227, please, and paragraph

10  9.

11          We looked at this earlier.  The third sentence, we

12  looked at the first two.  Then the third sentence says, all

13  Hallmark data shall be returned within 30 days of the exit

14  interview with Hallmark project manager if requested.  Do you

15  see that?

16  A     Yes.

17  Q     Did you request that they return everything within 30 days

18  of the end of the project in 2002?

19  A     No, we didn't.

20  Q     Why not?

21  A     We knew it was confidential.  We knew it was protected.

22  We -- it's typical that you would after an extensive evaluation

23  like that may continue to have a consulting relationship in the

24  future.  But we did not have any concerns that that information

25  would be jeopardized because we had a very clear understanding

1  about the confidentiality of the information that they

2  possessed.

3  Q    Did you trust Monitor?

4  A    We absolutely did.

5  Q    So when you did not receive the documents and materials

6  back, as you put it, promptly enough or quickly enough what did

7  Hallmark do?

8  A    We filed an arbitration to compel them to give us back our

9  information.

10 Q    That was in January of 2006?

11 A    Yes, I believe so.

12 Q    Did you also file a claim against Monitor Clipper at that

13 time?

14 A    No, we didn't.

15 Q    Why not?

16 A    We had a contractual arrangement with Monitor that clearly

17 specified their information and we had no reason to believe

18 that Monitor Clipper at that point had any of that information.

19 We had been told that Monitor Clipper did not receive any of

20 that information and our action was against Monitor Consulting,

21 Monitor Group because of the clarity of our contract.

22 Q    When you say you've been told Monitor Clipper did not

23 receive any, are you referring to a statement by Monitor

24 Clipper's lawyer?

25 A    Yes.  Monitor Clipper gave us that statement and we relied

1    on it.

2    Q    And the arbitration concluded in March of 2007.  As a

3    result of that did Hallmark get all of its materials returned?

4    A    Eventually, I think.

5    Q    Monitor was required to search for and return most of it?

6    A    They had to go through an extensive search over a period

7    of time to produce that information and send it back to us.

8    Q    Now, when the arbitration concluded did Hallmark have

9    further contact with Clipper?

10   A    Yes.  We continued to insist that our Hallmark information

11   was confidential and that they should neither receive it or

12   have access to it.

13   Q    I'm sorry.  With Clipper, did you ask them to see if they

14   had received any?

15   A    Yes, we asked them.  And they affirmed that they did not

16   have any information.

17   Q    Now, Hallmark claims in this case that in August of 2005

18   while investigating whether to purchase Recycled Paper,

19   Mr. Doctoroff and Clipper and their team received these five

20   confidential BMR reports that you just discussed.  When did you

21   become aware that Clipper had received these documents in

22   August of 2005?

23   A    Well, shortly after that.

24   Q    I'm sorry.  Shortly after August of 2005?

25   A    No.  No.  We learned of it when the search process --

1    Q    At Monitor?

2    A    -- was completed at Monitor Group, we learned that some of

3    those documents had been shared with Monitor Clipper.

4    Q    That would be some time in the summer of 2008?

5    A    Yes.

6    Q    And when was the lawsuit filed?

7    A    Just shortly thereafter, a couple months after we learned

8    that those documents had been shared with Monitor Clipper.

9    Q    Now, did you authorize the lawsuit?

10   A    Yes, I did.

11   Q    Why did you authorize Hallmark to sue Monitor Clipper?

12   A    Well, as soon as we learned that the information from our

13   BMR was shared with Monitor Clipper, we filed the lawsuit.

14   Q    Now, I'd like to turn briefly, before we conclude, to the

15   issue of injury.  Okay?

16   A    Yes.

17   Q    How would Hallmark be injured in 2005 if these

18   compilations, these five compilations that we've been

19   discussing fell into the hands of a competitor?

20   A    Well, these compilation in our BMR were the distillation

21   of all of our knowledge about the consumer, the market place,

22   the customers.  And it was the most important things that we

23   thought that would guide our strategy for the future.  So it

24   contained information about the customer and consumer and our

25   costs and, importantly, the strategy that we used going

1  forward.  And if that were in the hands of a competitor it

2  would give them a great deal of insight into our business and a

3  great deal of insight as to how to be more competitive with us.

4  If they shared it with a customer, it could jeopardize our

5  ability to do business with them and be effective.  So it had

6  great importance to us.  In 2005 it was still a very important

7  body of work.  It was still the underpinning of our strategy

8  for the future just as it is today.

9  Q    First two sentences.  The end of the first sentence is,

10 with all the project work Hallmark data belongs to Hallmark.

11 Do you see that?

12 A    Yes.

13 Q    Has Hallmark ever considered licensing this stuff to

14 another party?

15 A    No.

16 Q    Granting the right to use it?

17 A    No, we have not.

18 Q    Would you ever do that?

19 A    Absolutely not.

20 Q    Now, we've also heard some statements about Hallmark

21 sharing this information.  Can you tell us what the Greeting

22 Card Association is?

23 A    The Greeting Card Association is a group of some of the

24 manufacturers of greeting cards.  We have a trade association

25 where we get together and talk about things that are of common

1  interest to us, things like postal issues and things like that

2  that are common for the entire industry.  And we try to develop

3  an industry-wide perspective to encourage the use of greeting

4  cards or to help the citizen mailer.

5  Q    Have you ever considered sharing these compilations in

6  their entirety with the Greeting Card Association?

7  A    No.  We would not share the compilations from our BMR with

8  an outside group, much less a trade group.

9  Q    Do you share some information with the Greeting Card

10  Association?

11  A    There are some bits and pieces from our research and from

12  this that we have deemed to be useful to us as we think about

13  growing our business.  And we have from time to time shared

14  those little bits and pieces.  But when it really advantages us

15  and only after we consciously make that decision that we want

16  to share it.

17  Q    So, Mr. Hall, finally, has Hallmark ever shared these five

18  compilations with anybody outside of Hallmark?

19  A    No.  No.

20        MR. AISENBREY:  That's all I have, Your Honor.

21        THE COURT:  Cross-examination?

22        MR. MANCHEL:  Your Honor.

23        THE COURT:  Go ahead.

24                    CROSS-EXAMINATION

25

1    BY MR. MANCHEL:

2    Q    Good morning, Mr. Hall.  My name is Steve Manchel.  I

3    represent the defendants in this case.  Before I step into some

4    of my prepared questions I'd like to spend a few minutes

5    talking about some of the things you just discussed with your

6    counsel.  You talked about the level of information that

7    Hallmark shared with Monitor during the BMR, correct?

8    A    Yes.

9    Q    And you talked at length about in particular the

10   information about customer terms that Hallmark had, retailers

11   and vendors and the like, correct?

12   A    Yes.

13   Q    And your testimony was that that is information that you

14   believe is very confidential and you wouldn't want it known

15   outside of Hallmark, correct?

16   A    Yes.

17   Q    Isn't it true, sir, that there's absolutely no evidence

18   that Hallmark has that any customer terms or terms of sale was

19   ever disclosed to Clipper or RPG?

20   A    I don't know.  I don't know what has happened to them, the

21   information from BMR.

22   Q    You don't know what has happened?

23   A    I don't know what Monitor Clipper has done with that

24   information, who they've shared it with, who has that

25   information or what they've done with it.

1  Q    Let me be clear, sir.  Isn't it true that there's no

2  evidence in this case that Clipper ever received any terms of

3  sale between Hallmark and its retail clients?

4  A    I don't know the specific documents and pieces that were

5  shared but I do know that elements of the BMR were shared with

6  Monitor Clipper and that information is confidential.

7  Q    So you are the individual who authorized the lawsuit,

8  correct?

9  A    Yes.

10 Q    Your view is that you believe there were elements of the

11 presentations that were shared with Clipper, correct?

12 A    Well, there were components, important components out of

13 the BMR that were shared and when we discovered that, that's

14 when I authorized the lawsuit to protect our information.

15 Q    And one of the components of the BMR that you discussed

16 with the jury on direct was the terms of sale that Hallmark has

17 with its customers, correct?

18 A    That would have been one of the pieces of information,

19 that's correct.

20 Q    And, in fact, that was never shared with Clipper, isn't

21 that right?

22 A    I don't know.

23 Q    I just handed you, sir, Defendant's Exhibit 1270.  These

24 are the responses that Hallmark gave to my clients about, among

25 other things, what is at issue in this case.  And I would ask

1    you, please, first of all, do you know that Hallmark provided

2    my clients with these answers, sir, these interrogatory

3    responses?

4    A    I know that once I heard that our BMR was compromised and

5    that Monitor Clipper had in their possession some of our

6    information from the BMR, I authorized us to proceed to protect

7    that information.  I was not involved in the development of the

8    legal actions that took place.  I've not seen this document.  I

9    left that up to our lawyers to develop the argument and to

10   pursue our rights.

11   Q    Sir, would you do me a favor and turn to page 24 of

12   Defendant's Exhibit 1270.  If you look at the first two lines,

13   this is the question that was asked of Hallmark.

14          If you contend that the Clipper defendants used,

15   disclosed, converted or misappropriated any of Hallmark's terms

16   of sale with any retailer then we ask you to answer a bunch of

17   question.

18          If you turn to page 25.  This was Hallmark's answer.

19          Highlight the top portion, please.

20          Subject to and without waiving these objections and

21   its general objections Hallmark's states that while Monitor had

22   access to Hallmark's terms of sale, Hallmark has no evidence at

23   this time that Clipper received any of Hallmark's terms of sale

24   with Hallmark's customers.  Do you see that, sir?

25   A    Yes.

1    Q    Do you believe that to be a true statement?

2    A    I'm sure at the time that that's, reviewing the documents

3    that would be a true statement.

4    Q    Sir, this is from March of this year.  Do you believe it's

5    a true statement?

6    A    Yes.

7    Q    So all of the testimony that you gave the jury on your

8    direct about all of the terms of sale and the customers and the

9    poker analogy, none of that has anything to do with this claim,

10   isn't that right?

11   A    No.  The information that we used in developing our

12   strategy, the BMR, contained all of the information that we had

13   about every aspect of our business.  We completely laid open

14   all of the information in our business and then from that

15   determined what our strategy would be going forward.  The BMR

16   is a reflection of our strategy taking into account all of that

17   information.  We were very concerned about losing the

18   compilation of all of the information and the description of

19   our going forward strategy.

20   Q    Would you put up Plaintiff's Exhibit 487, please?

21        This is one of the presentations at issue in this

22   case, isn't it, sir?

23   A    Yes, it is.

24   Q    And this is the OEC presentation, correct?

25   A    Yes.

1    Q    And the OEC presentations for the BMR project were

2    prepared by Monitor, correct?

3    A    Yes, they were.

4    Q    This is one of scores of presentations prepared by

5    Monitor, isn't that right?

6    A    Yes.

7    Q    So my question to you, sir, is, I appreciate the fact that

8    Hallmark shared a lot of information with Monitor.  But in this

9    case with Clipper, the issue is, is Hallmark asserting that

10   Clipper misappropriated and took terms of retail sales?

11   A    You're asking about a particular legal point in a legal

12   document.  If I may, I would like to just point out what my

13   concerns are.  My concerns are that the BMR was the compilation

14   of our entire strategy.  It was the knowledge that we had about

15   the business.  It was everything we knew that's important to

16   our future.  We laid that out in the BMR documents and this was

17   a very significant one.  This would have been 75 to 100 pages

18   long.  It was outlining some of the summary conclusions that we

19   were reaching about the critical strategy that we had going

20   forward.  And none of that information should have been in the

21   hands of Monitor Clipper.

22              MR. MANCHEL:  Your Honor, move to strike.

23              THE COURT:  It's non-responsive.  I'll sustain.

24              MR. MANCHEL:  Thank you, Your Honor.

25

1    BY MR. MANCHEL:

2    Q    Now, sir, how many presentations are actually at issue in

3    this case?

4    A    Well, in terms of number of presentations I know that

5    these, you mentioned there were scores.  There would have been

6    four or five very, very significant summary descriptions of our

7    business.  And this would have been one of those handful of

8    presentations that would have been the compilation of our

9    strategy.

10   Q    Sir, can you tell this jury how many presentations

11   Hallmark is claiming was misappropriated by my clients?

12   A    I don't know.

13   Q    Can you tell this jury specifically what was in the

14   presentations that Hallmark claims were misappropriated by my

15   clients?

16   A    I don't know the specific documents that Monitor Clipper

17   had in its possession.

18   Q    You also said at one point in response to your counsel's

19   questioning that you viewed whatever was taken as the secret

20   sauce of Hallmark.  Those are the words you used, correct?

21   A    Yes.

22   Q    Then you said you were asked in response to a question but

23   Hallmark left the secret sauce behind at Monitor, isn't that

24   right?

25   A    Yes.

1    Q    And you said, your words were, it's typical for Hallmark

2    or for a company that hires a consultant to leave confidential

3    information behind, is that right?

4    A    Yes.  It's not unusual.

5    Q    So Hallmark left, well, let me ask you this.  How do you

6    know, sir, it's not unusual if this is the first such project

7    Hallmark did with a consultant such as Monitor, how do you know

8    that's usual?

9    A    I don't know.

10   Q    So you don't know it's usual, correct?

11   A    Well, I know that often you develop long term

12   relationships with consultants.  But none of that mattered

13   because we had confidence based on the contractual outline that

14   that was going to be, that confidentiality would be maintained.

15   Q    So let's be clear.  You don't know if it's usual for a

16   company to leave behind its secret sauce with a consultant when

17   the work is done, is that correct?

18   A    I don't know if it's usual.  I know it's not unusual.

19   Q    And your company decided to leave this secret sauce behind

20   with an entity, Monitor, that your company had given permission

21   to work with competitors after two years, correct?

22   A    Yes.

23   Q    Did you have any concerns at all?

24   A    No.

25   Q    Well, then let me ask you, sir, if Hallmark didn't have

1    any concerns about information being left behind, why did

2    Hallmark in its contract with Monitor insist that Hallmark be

3    able to take back within 30 days all Hallmark related material?

4    A    We wanted to make sure that we had access and clear claims

5    over that material.

6    Q    Well, it wasn't claims or access, sir.  The contractual

7    provision was you would take it back and there would be nothing

8    in the hands of Monitor, isn't that right?

9    A    Yes.

10    Q    In fact, let's take a look now at Defendant's Trial

11    Exhibit 1264, please.  This is the contract as we just looked

12    at it that was signed between Hallmark and Monitor, correct?

13    A    Yes.

14    Q    And this is dated as of December 5, 2001, correct?

15    A    Yes.  I assume it's the same as D227.

16    Q    Yes.  If you turn, please, to page 5, paragraph 9.

17    A    Yes.

18    Q    Your attorney took you through this paragraph.  Do you

19    recall that, sir?

20    A    Yes.

21    Q    You looked at the first sentence about all data and

22    information submitted to Monitor, do you see that language?

23    A    Yes, sir.

24    Q    That sentence I believe you said with your counsel on

25    direct that sentence, in fact, covers the presentations that

1  are at issue in this case, correct?

2  A    Yes.

3  Q    Then if you drop down a few sentences toward the bottom,

4  it says within 30 days.  The sentence begins, all Hallmark

5  data.

6           If you would highlight that sentence, please, Jeff.

7           This reads all Hallmark data and all copies supplied

8  shall be returned within 30 days of the exit interview with

9  Hallmark project manager, if requested.  Correct?

10 A    Yes.

11 Q    And there was never a request by Hallmark for the return,

12 was there, sir?

13 A    No, there wasn't.

14 Q    Would you, please, put up, Jeff, Defendant's Trial Exhibit

15 578.

16           This, sir, is Monitor's final recommendation,

17 correct?

18 A    I believe so.

19 Q    And the date of it is June 2002, correct?

20 A    Yes.

21 Q    This is the culmination of the BMR work, correct?

22 A    Yes.

23 Q    So three years after the BMR work ended, Hallmark had

24 still not asked back for any of its supposedly confidential

25 information, correct?

1  A    No.

2  Q    No, I'm wrong or no, it had not?

3  A    I'm sorry.  No, it had not.  We had not asked for that

4  information back.

5  Q    Would you put up, please, Jeff, Defendant's Exhibit 1268.

6          Now, this is the letter that Hallmark sent demanding

7  back the return of all Hallmark related information, correct?

8  A    Yes.

9  Q    And it was sent in November of 2005, correct?

10 A    Yes.

11 Q    And it was sent to Monitor, correct?

12 A    Yes.

13 Q    You understand Monitor is not --

14 A    Monitor Group.

15 Q    Monitor is not the defendant in this case, correct?

16 A    It was sent to Monitor group, the consulting arm.

17 Q    Well, consulting arm, sir, or consulting company?

18 A    Consulting company.

19 Q    You understand they're two legally different entities,

20 don't you, sir?

21 A    Yes.

22 Q    Now, in this demand letter that's sent by the general

23 counsel of the company, Brian Gardner, if you look at the top,

24 is that right?

25 A    Yes, it is.

1  Q    And the letter as we see right at the top is a demand for

2  the return of all Hallmark related documents, correct?

3  A    Yes.

4  Q    Let's take a look at the first sentence.

5        First sentence reads, we were shocked to learn that

6  you are entering into direct competition with Hallmark Cards

7  after you obtained Hallmark's most confidential core business

8  trade secrets through an intimate consulting relationship under

9  which Hallmark paid you millions of dollars.

10       Do you see that language, sir?

11 A    Yes.

12 Q    And the direct competition that Monitor was entering into

13 concerned RPG, correct?

14 A    Yes.

15 Q    And the reason that Hallmark sent this letter, sir, is

16 because of the intimate consulting relationship that Monitor

17 had had with Hallmark, correct?

18 A    Yes.

19 Q    Hallmark was shocked that Monitor would even do business

20 with RPG, isn't that right?

21 A    We were very concerned that we were shocked, yes, but we

22 were very concerned about losing the information that was

23 developed in the BMR.

24 Q    Well, you don't say that in the first sentence, do you,

25 sir?

1    A    No, it's not listed there.

2    Q    All it says is you're shocked to learn that Monitor would

3    even do business with RPG after having had an intimate

4    relationship, correct?

5    A    That's what that sentence says, yes.

6    Q    Was it true?

7    A    We were shocked to hear that the acquisition was going

8    forward and we were very concerned about the confidentiality,

9    maintaining the confidentiality of our information.

10   Q    But Hallmark had a deal with Monitor that after two years,

11   even though Monitor had an intimate consulting relationship

12   with Hallmark, Monitor could work with competitors, right?

13   A    That's correct.

14   Q    Let's go back to Defendant's Exhibit 1264, please, Jeff.

15        Go to page 7, please.  If you highlight the conflict

16   paragraph, please.

17        This was the deal that Hallmark struck with Monitor

18   about when Monitor could work with competitors, correct?

19   A    Yes.

20   Q    The deal was that despite the fact, even though Monitor

21   had an intimate consulting relationship with Hallmark, Monitor

22   could, in fact, go out and help Hallmark competitors after two

23   years, correct?

24   A    That's correct.

25   Q    And, in fact, Hallmark agreed further that Monitor could

1    do that specifically with RPG, isn't that right?

2    A    Yes.

3    Q    Take a look at page 8, please, we see the language.    That

4    identifies specifically RPG.

5            Can we go back, please, Jeff, to the demand letter,

6    Defendant's Trial Exhibit 1268.

7            In the fall of 2005, and I believe you said this in

8    response to your counsel's questioning, RPG was a chief

9    competitor of Hallmark, isn't that right?

10   A    That's correct.

11   Q    In fact, it was one of the leading competitors in the

12   market place, Hallmark's second most important competitor,

13   correct?

14   A    That's correct.

15   Q    And in 2005 Walgreens was one of Hallmark's top customers,

16   isn't that right?

17   A    Yes.

18   Q    And at Walgreens RPG was Hallmark's primary competition,

19   isn't that right?

20   A    Yes.

21   Q    In fact, isn't it true, sir, that in the summer of 2005

22   Hallmark learned before this letter was sent, Hallmark learned

23   that Walgreens had decided to give RPG floor space in over 1200

24   of its stores?

25   A    Yes.

1    Q    And that floor space was going to be used to replace Shoe

2    Box, isn't that right?

3    A    I believe so.

4    Q    Show Box is Hallmark's humor card, correct?

5    A    Yes.

6    Q    So before this letter was sent, Hallmark found out, by the

7    way the replacement at Walgreens by RPG had nothing to do with

8    Monitor or Clipper, correct?

9    A    I'm sorry.  Could you repeat the question?

10   Q    Walgreens' decision to replace Shoe Box at 1200 stores had

11   nothing to do with Monitor or Clipper, correct?

12   A    Yes.

13   Q    Now, you were copied on this letter, weren't you, sir?

14   A    Yes.

15   Q    And if you go to the signature page, please, Jeff.

16   Highlight the folks who were copied.

17             That's you on the top, right?

18   A    Yes.

19   Q    The next individual, David Hall, that's your brother?

20   A    Yes.

21   Q    What position did your brother hold in 2005, do you

22   remember?

23   A    I'm trying to remember.  It was about in that time I think

24   he was in charge, at that point he was the president of North

25   America.

1  Q    And this year, sir, what position does he hold?

2  A    Pardon me?

3  Q    What position does David Hall hold at this time?

4  A    He's the president of North America.

5  Q    Did either of you -- well, strike that.  Did you read this

6  letter before it was sent out?

7  A    No.  I don't think so.

8  Q    You didn't see this letter at all?

9  A    I don't recall seeing it before it went out.  I was very

10  well aware of our concerns about losing information to a

11  competitor.

12  Q    Did you see this letter some time, obviously, after it

13  went out?

14  A    Oh, yes.

15  Q    Do you recall when you first saw it?

16  A    I don't.

17  Q    Go back to the first sentence, please, Jeff.

18        When you read this letter for the first time did you

19  say to anybody hold on a minute.  Monitor is allowed to work

20  with Clipper.  This sentence reads that Monitor can't work with

21  RPG, that's not right.  We're only concerned about confidential

22  information.  Did you say anything along those lines?

23  A    I'm sorry.  The question again?

24  Q    When you read this, this opening sentence of demand?

25  A    Uh-huh.

1    Q    Did you say, well, excuse me, Mr. Gardner, we can't tell

2    them we're shocked to learn, just that they're working with the

3    competitor because that's the deal.  We need to tell them we're

4    concerned about confidential information.  Did you say that or

5    words to that effect?

6    A    That was our focus was making sure that the information

7    that was contained in the BMR did not fall into the hands of --

8    Q    Why doesn't it say that there then?

9    A    I didn't write the letter.

10   Q    Well, sir, in fact, the focus was to stop Monitor, period,

11   from working with RPG, isn't that right?  That's what Hallmark

12   wanted to stop, wasn't it?

13   A    We wanted to make sure that the information that was

14   contained in the BMR was protected because we understood how

15   damaging the loss of our trade secrets would be if it went to a

16   competitor.

17   Q    Would you turn now, Jeff, please, to page 2 of this

18   letter?  Would you highlight the portion for the jury, please,

19   that goes from pages 2 to 3?

20            This reads, most disturbing of all is information

21   revealed on Monitor Clipper dot com including but not limted to

22   the following.  Monitor Clipper leverages its close

23   relationship with Monitor with respect to day-to-day operating

24   issues as well as long term company strategic positions.

25   Monitor Clipper's tight strategic relationship with Monitor's

industry experts allows it to quickly understand and analyze a

wide variety of industries and that Monitor Clipper actually

identifies a substantial number of potential investments

through Monitor's business relationships and through

initiatives to target industries where Monitor has significant

knowledge and expertise.

Do you see that language, sir?

A    Yes.

Q    That's what the general counsel of Hallmark wrote to

Monitor in November 2005, correct?

A    Yes.

Q    This was what was most disturbing for Hallmark, correct?

A    Yes.

Q    But Hallmark knew before this letter was ever written

exactly what the relationship was between Monitor and Clipper,

isn't that right, sir?

A    No, we didn't.

Q    Well, sir, Hallmark has a unit called Party Express, isn't

that right?

A    Yes.  We did, yes.

Q    In 2005 you did, didn't you, sir?

A    Yes.

Q    And earlier?

A    Yes.

Q    And Party Express was a supplier of party products,

1    correct?

2    A    Yes.

3    Q    Some time around the year 2000 Hallmark was approached by

4    a company called Am Scam, isn't that right?

5    A    Yes.

6    Q    Am Scam was a designer and distributor of decorative party

7    goods, correct?

8    A    Yes.

9    Q    When that happened, when Am Scam approached Wal-Mart, I'm

10   sorry, approached Hallmark, it approached Hallmark about the

11   possibility of the companies doing a finance deal together,

12   isn't that right?

13   A    Yes.

14   Q    When that happened what Hallmark did was it reached out to

15   get Clipper involved, didn't it?

16   A    I don't know.

17   Q    You don't know, sir?

18   A    I don't.

19   Q    And during all the time that Hallmark worked with Monitor,

20   this intimate consulting relationship with Monitor over two

21   years, is it your testimony, sir, that Hallmark had no idea who

22   Clipper was or what Clipper did or how Clipper was in any way

23   doing business with Monitor?

24   A    The sentence did give us some concerns because it

25   referenced that Monitor Clipper aligns with businesses in which

1  Monitor has significant knowledge and expertise.  Our concern

2  was the fact that Monitor Group developed their significant

3  expertise because we provided it to them.  Because we shared

4  all of the information about the industry that they didn't know

5  before the engagement and that we shared with them very openly

6  all of our information.  We were concerned that that expertise

7  that was shared in confidence with Monitor Group would be

8  shared with its partner, Monitor Clipper.  That was the basis

9  of our concern.  I'm sorry.

10  Q    Which is it, sir?  Is it information or expertise?

11  A    Well, it's the work product that was developed for the

12  BMR.  It would be our strategy.  It would be the information

13  that we would uniquely have.  It would be our trade secrets.

14  It would be the knowledge that we uniquely possess.

15  Q    But the expertise that Monitor developed, that Monitor

16  would be free to share, right?  I mean people get better and

17  smarter and they learn stuff when they work on a particular

18  project, right?

19  A    Yes.

20  Q    And Monitor, obviously, must have learned a great deal

21  about the card industry and about Hallmark when working with

22  Hallmark in the BMR, right?

23  A    They could consult but they could not share our

24  information.

25  Q    That wasn't my question, sir.  My question to you was,

1   Hallmark hired Monitor at a point in time when Hallmark knew

2   Monitor had almost no experience in the greeting card business,

3   correct?

4   A    Yes.

5   Q    But that didn't matter to Hallmark because Hallmark knew

6   that Monitor was good enough to take Hallmark to the next level

7   without any greeting card information at all, correct?

8   A    Yes.

9   Q    And without any greeting card experience at all, correct?

10  A    Yes.

11  Q    And without any greeting card expertise, correct?

12  A    Yes.  If bound with the work that we would provide in

13  terms of the sharing the data and providing the data analytics.

14  Q    And a consultant, like anybody else who works with a

15  client for the first time in a new industry, learns things

16  about the industry and gets better and smarter about the

17  industry, right?

18  A    Yes.

19  Q    And that consultant, Monitor in this case, is absolutely

20  free to share its expertise and its learnings with RPG as long

21  as it doesn't constitute Hallmark confidential information,

22  correct?

23  A    Yes.

24  Q    But you were asked, sir, on direct by your counsel, I

25  tried to write it down.  I think your words were everything

1   that Monitor came to be was owned by Hallmark or words to that

2   effect, is that right?

3   A    I don't remember my exact words.

4   Q    Is that the gist of it?

5   A    The contract provision that the information that we shared

6   with Monitor, the proprietary trade secret information that we

7   shared as part of that development of our BMR, that that

8   information would be maintained as confidential.  It also said

9   that any of the work product that was created with Monitor

10  consultants and Hallmark marketing people, that that work

11  product would be maintained as confidential work product.

12  Those were the deliverables.  Those were the things that were

13  contained in the BMR and that we wanted to make sure would be

14  maintained as confidential information.

15  Q    And you use the word, I want to be really clear here.

16  These are folks being sued.  You used the word deliverables.

17  That's the stuff, that's the presentation, correct?

18  A    Yes.

19  Q    But the expertise, the we're better and we're smarter and

20  we know more about the greeting card, that Monitor is free to

21  share, right?

22  A    Free to share consulting expertise, not free to share our

23  information.

24  Q    That Hallmark doesn't own, right, the expertise, Hallmark

25  doesn't own, right?

1   A     No.

2   Q     Now, in fact, you testified, your attorney asked you a

3   question about the Greeting Card Association.  Remember that?

4   A     Yes.

5   Q     It's called in the industry the GCA?

6   A     Yes.

7   Q     And you said there are times when Hallmark, I tried to

8   write this down.  If I don't say it correctly, please let me

9   know.  There are times when Hallmark chooses to share with the

10  GCA little nuggets and give the GCA pieces of information,

11  correct?

12  A     Yes.

13  Q     But, sir, you testified before today that Hallmark never

14  shares information with the GCA, isn't that right?

15  A     I don't remember what you're referring to.  I think what

16  I've tried to delineate here is that we consciously will share

17  some bits and pieces of research information with the GCA.  But

18  it's very consciously decided upon.  We do not share the

19  compilation of our strategy, the deep market research, that

20  competitive information contained in the BMR.  We do not share

21  that kind of information but we will talk about how many

22  birthdays there are in the country and talk about greeting card

23  sending and things like that in ways that we would hope would

24  be self promotional and informative to driving the business

25  forward.

1  Q    Sir, you gave testimony in the arbitration that was

2  between Hallmark and Monitor, didn't you?

3  A    Yes.

4  Q    And in your testimony under oath in that arbitration did

5  you say, sir, that Hallmark does not contribute information to

6  the GCA?

7  A    We do not contribute confidential information to the GCA.

8  Q    Would you pull up, please, Jeff, January 8, 2007

9  arbitration transcript, page 183.  Highlight, please, lines 3

10 through 10.

11       That's your testimony, sir, under oath.  It reads, we

12 do not contribute our information to their sources.

13       Do you see that?  Is that, in fact, what you said,

14 sir?

15 A    Yes.

16 Q    But today you say that you do contribute nuggets of

17 information to the GCA, is that right?

18 A    This is, yes, it is.

19 Q    And, in fact, sir, Hallmark contributed all sorts of

20 information from these presentations to the GCA, isn't that

21 right?

22 A    No.  We didn't distribute all sorts of information from

23 the BMR.  We may have shared bits and pieces from it with the

24 GCA but we would not share the highly definitive strategic

25 information from the BMR.

1    Q    Well, sir, you keep wanting to talk about information from

2    the BMR.  I'm trying to talk about the information in just the

3    presentations at issue in this case.  My question to you, isn't

4    it true, let's take a step back.  Your testimony to your

5    counsel was the information in the presentations in this case

6    was not only confidential in 2005, it is still confidential

7    today, correct?

8    A    That's correct.

9    Q    My question to you, sir, is, isn't it true that Hallmark

10   shared information in the presentations at issue in this case

11   with the GCA?

12   A    It is true that we would have shared parts of the

13   information contained in the BMR with the GCA.  It would have

14   been information that we consciously decided was appropriate to

15   share in a public environment like that.  But it was not the

16   compilation of the information in the BMR, we would not share

17   that with the GCA.

18   Q    When you say consciously made decision, what you mean is

19   Hallmark just decided that some stuff wasn't confidential any

20   more so it would share, correct?

21   A    We would determine what was confidential, what would be

22   advantageous for us to share.  We would determine what would be

23   disadvantageous for us to share.  And we would only share those

24   pieces that would be of interest in hoping to elevate the usage

25   of greeting cards.  So we will from time to time share how many

1   birthdays there are in the United States because that always

2   generates some human interest stories and those kinds of things

3   help remind people about the benefits of sending cards.

4   Q    Isn't it true, sir, that Hallmark decided before my

5   clients supposedly ever misappropriated these presentations,

6   Hallmark decided that it was in Hallmark's interest to share

7   information from the presentations with the GCA, isn't that

8   right?

9   A    We did share some of the information with the GCA.

10  Q    And the GCA is a trade organization that Hallmark's

11  competitors belong to, correct?

12  A    Yes.

13  Q    And, in fact, Hallmark shared information from the

14  presentations that are at issue in this case in a presentation

15  to the GCA at which American Greetings attended, isn't that

16  right?

17  A    Yes.

18  Q    Would you put up, please, Defendant's Trial Exhibit 589?

19       Mr. Hall, I'll represent to you this was the document

20  that was produced to us by the GCA.  Do you see the little

21  numbers on the bottom?

22  A    Yes.

23  Q    So this is a document that the GCA had, not that we had,

24  that was produced to us.  Okay?

25  A    Yes.

1    Q    Now, if you turn, the top of this document, the cover page

2    right here, that's the Hallmark symbol, correct, Hallmark

3    Crown?

4    A    Yes, it is.

5    Q    It's entitled Category Growth Initiative, Greeting Card

6    Association, correct?

7    A    Yes.

8    Q    Turn to the second page, please.  Business problem.  Some

9    segments of consumers are choosing alternate forms of

10   communication particularly among women 45 and older.  Do you

11   see that?

12   A    Yes.

13   Q    That is exactly the conclusion that was in one of the

14   presentations supposedly at issue in this case, isn't it?

15   A    Yes.

16   Q    That's one of the core conclusions supposedly of the BMR

17   worth in the presentations in this case, correct?

18   A    It was information, yes, it is but it's information that

19   was central to a strategy that we had to try to reach the age

20   women --

21   Q    We'll talk about the strategy in this minute.  Let's stick

22   with the information.  So this jury understands, when this

23   presentation was made to the Greeting Card Association that

24   information came from what you claim is still secret as of

25   today, isn't that right?

1  A    It came from the BMR.  It was part of the research that

2  was developed and the BMR is still very important today.

3  Q    I understand it's important but this part of the BMR is no

4  longer secret, is it, sir?

5  A    No.

6  Q    Now, would you turn to page 3?  This comes right out of

7  the presentations at issue in this case, too, doesn't it, sir?

8  A    Yes.

9  Q    So consumers have many communication choices.  That's a

10 conclusion you claim is in the presentations that's still

11 secret today, right?

12 A    Yes.

13 Q    How can it be secret, sir?  It's been given to the

14 Greeting Card Association.  How is it secret?

15 A    It's, the work around the BMR was to develop a strategy

16 that we could act on.  It was not to develop a beautiful

17 presentation report that would go on a shelf.  It was to form

18 our actions.  One of the things that we thought was very

19 important was that women over 45 needed to be re-engaged.  We

20 thought it would be helpful for us as an industry group to be

21 able to put more emphasis around women over 45.  Because

22 getting women over 45 more engaged in the greeting card sending

23 was to our advantage.  We would have gone very carefully

24 through the BMR and extracted those couple nuggets and shared

25 them consciously with the trade association because we thought

1    it was to our advantage.  That's the reason we spent those many

2    months with that much effort and that much cost to develop

3    something that we could act on.  It was something that we could

4    actually do and help drive participation in greeting cards.  We

5    thought this was important for the association, all of us,

6    collectively, to have a better understanding.  We did not go

7    underneath this and describe a lot of the actions that are very

8    proprietary to us or the information that led us to these

9    conclusions.  We skimmed along the surface and only touched on

10   those things that we thought could engage them in a productive

11   way to drive the consumption of greeting cards.

12   Q    Sir, you even revealed to the GCA the strategies that came

13   from these issues, didn't you?  Didn't you?

14   A    Yes.  We revealed some of the things that we wanted them

15   to act on, that we thought would be beneficial to us and to the

16   industry.

17   Q    Go to the next slide, please.  You even told your

18   competitors about the research that supposedly is at issue in

19   this case, isn't that right?

20   A    We told them, yes, we told them what we wanted them to

21   know.

22   Q    So conducted research in late 2001.  The research that

23   Hallmark does is the diary study, correct?

24   A    Yes.

25   Q    So you're revealing to your competitors the results of

1  diary study research, isn't that right?

2  A    Yes, on a very summary and purposeful level.

3  Q    It's not -- the second bullet point, they don't believe

4  they are substituting new forms of communication for cards.

5  That comes from the diary study, doesn't it?

6  A    Yes.

7  Q    Then the next bullet point.  When pressed, they admitted

8  to occasionally forgetting.  That comes from the diary study

9  research, right?

10  A    Yes.

11  Q    Next bullet.  Asked us to remind them of the benefits.

12  That comes from it, right?

13  A    Yes.

14  Q    Now, as I said before, Hallmark even revealed the

15  strategy, if you go to the next slide.  Look at the second

16  bullet point, sir.  You told, Hallmark told its competitors

17  that it needed to create an advertising campaign that the

18  emotional benefits of sending a card, only a greeting card can

19  deliver the emotional impact.  Do you see that?

20  A    Yes.

21  Q    That's the heart of the BMR work, isn't it, sir?

22  A    It's a small part of the BMR.

23  Q    A small part?

24  A    We were trying to encourage our competitors in the

25  industry to lean into the benefits of card sending and to lean

1  into the reminders for people to send cards.  We didn't feel

2  that the others were doing as much to remind people and to

3  remind people of the benefits or remind people of the emotional

4  qualities and we wanted them to do that.  We outlined the fact

5  that we were doing our part to try to give people reasons to

6  send greeting cards.  We were very careful not to describe our

7  strategy around that campaign because in addition to getting

8  people to want to send more cards, we, of course, want people

9  to send more Hallmark Cards.  So our strategy that's contained

10 in the BMR would be very precise and much more descriptive of

11 how we were going to approach this in ways that was beneficial

12 to us.  But we also realize that it's healthy for the entire

13 industry, if people were to re-engage the card enthusiasts over

14 the 45-year age group.

15 Q    Sir, you didn't decide that.  Hallmark was told that by

16 Monitor as part of the central conclusions of the BMR, isn't

17 that right?

18 A    That was, the BMR was the compilation of our best thinking

19 and Monitor's best consulting.

20 Q    Monitor's advice to you, sir, at the heart of the BMR was

21 to go out and get everybody to sell more cards, don't go out

22 and just tell them to buy Hallmark, isn't that right?

23 A    That was, that was a central theme but that's not --

24 Q    And that's why and that's why Hallmark was making this

25 presentation at the GCA because Monitor told you don't create

1    advertising that just talks about Hallmark, create advertising
2    that will lift the whole category, isn't that right?
3    A    That was part of the conclusions that we reached.
4    Q    And those conclusions were the conclusions that were in
5    the presentations at issue in this case, isn't that right?
6    A    Yes.  That was part of it.
7    Q    And those conclusions weren't secret.  They were public,
8    long before 2005 came along, isn't that right?
9    A    No.  The conclusions of the BMR were not made public.
10   Q    The conclusion of the BMR was, you, Hallmark, should have
11   advertising that floats the whole category, not Hallmark,
12   correct?
13   A    That was one of the points.
14   Q    That's it, right there, isn't it?
15   A    Yes.
16   Q    Can we go to the next slide, please?
17        Then you told them, your competitors, the songs that
18   you were going to use at Hallmark to raise the category, isn't
19   that right, to deal with emotion, right?
20   A    Yes.  We were previewing a campaign that we were about to
21   launch.
22   Q    And the campaign was the Remembering Campaign, correct?
23   A    Yes.
24   Q    Go to the next slide, please.
25        And that Remembering Campaign was the direct result,

1   as you were just shown, of Monitor concluding for Hallmark that

2   Hallmark needed to focus on emotions and women over 45 needed

3   to be targeted and the whole category needs to be lifted,

4   correct?

5   A    Yes.

6   Q    Those are the some of the central conclusions contained in

7   the BMR, isn't that right?

8   A    Yes.

9   Q    Defendant's Trial Exhibit 270, please, Jeff.

10        Sir, this was the agenda for the presentations.  This

11   is another document that was given to us by the Greeting Card

12   Association.

13        Jeff, would you turn, please, to page 3.

14        Your Honor, while he's doing that, may I raise an

15   issue?  I'm not moving each time for introduction of these

16   exhibits because they're all stipulated to and I believe we

17   deem them to be admitted.  But if the Court wants me to I'll

18   say it each time but I think we've crossed that bridge.

19        THE COURT:  I'm comfortable with that.

20        MR. MANCHEL:  Thank you, Your Honor.

21   BY MR. MANCHEL:

22   Q    Would you look, please, at the entry for 11 am to 11:45.

23   Jim Welch at the time was a senior officer at Hallmark,

24   correct?

25   A    Yes, he was.

1   Q    And his presentation to the GCA was, "What do we know

2  about today's consumer?" Correct?

3  A    Yes.

4   Q    This is just months after the BMR project finished, isn't

5  that right?

6  A    Yes.  Right.  What was the date?

7   Q    Go to the first page, please, Jeff.  Highlight the date,

8  please.

9          It's a little hard to read.

10  A    October of 2002.

11   Q    So October of -- the BMR ended in 2002, correct?

12  A    The final report was issued in June of 2002.

13   Q    Would you pull up, please, Jeff.  Strike that.

14          Would you pull up Plaintiff's Trial Exhibit 487, page

15  93.  This is one of the presentations at issue in this case,

16  isn't it, sir?

17  A    Yes, it is.

18   Q    It's part of what Hallmark claims was still secret in

19  2005?

20  A    Yes.

21   Q    The information in it?

22  A    Yes.  The compilation of all of that information.

23   Q    I want to be clear, sir.  Your claim is, Hallmark's claim

24  is the information in this that's still secret, right?

25  A    Yes.  I'm saying that the compilation of that information

1  is our secret sauce.  There are pieces of it that are public.

2  There are pieces of it that we've chosen to share.  But it's

3  the compilation that constitutes our strategy.

4  Q    Well, sir, you keep saying compilation.  Have you actually

5  read these presentations recently?

6  A    No.  I've looked at them but I haven't read through them

7  recently.

8  Q    So do you know that, in fact, there are sections, like

9  there is a section on dinnerware and there is a section on

10  stationery.  There is a section on women over the age of 45

11  being targeted.  Did you see those things?  Do you remember

12  that?

13  A    Yes.

14  Q    So when you say compilation, it's kind of like chapters in

15  a book.  Is that fair?

16  A    It's the entire book.

17  Q    I understand.  So if I went into the library I wouldn't

18  find this on a shelf, correct?  That's the book, right?

19  A    Yes.

20  Q    But there are plenty of places I could find the chapters

21  in stores, isn't that right?

22  A    No.

23  Q    Well, let's take a look.  Let's turn, please, Jeff, if you

24  turn to page 99.  Highlight the language under the bar, please.

25            That's just what we saw at the Greeting Card

1    Association, isn't it?

2    A    Yes.

3    Q    So this chapter has been disclosed, right?

4    A    That's a sentence in a paragraph of a chapter.  It's not

5    the chapter.

6    Q    Okay.  We'll look at more.  Would you turn to slide 19,

7    please, Jeff, which I believe is 111.  If you highlight the

8    language on the top, please.

9         That's the message that you have to go out and market

10   fairness and emotion and the like, correct?

11   A    Yes.

12   Q    Equity heavy messaging, right?  So that's been released,

13   too, right?

14   A    Not to that degree.

15   Q    Not to that degree.

16        Would you turn to slide 22, please, page 114.

17        This was also revealed to the Greeting Card

18   Association that we just saw, isn't that right, sir?

19   A    I'm having trouble reading it.

20   Q    Can you highlight it, please, Jeff?

21        Next 24 months is to stabilize the market.  Right?

22   Marketing efforts are targeting women older than 45, right?

23   Equity advertising.  These are all the things we just discussed

24   in the GCA, correct?

25   A    No.  It's not all of them.  We would not have shared the

1     advertising budget.  We wouldn't have shown some of that level

2     of detail.  The headline might have been what we were trying to

3     encourage the other Greeting Card Association members to do

4     because we know it's healthy for the industry to have

5     information pushing, pushing to the consumer to encourage them

6     to send cards.  But we would not tell what our annual

7     advertising budget would be or some of the specific actions.

8     So while the headline may be something we acted on, the rest of

9     it, underneath the headlines, would have been proprietary and

10    we would have been very careful about.

11    Q    Sir, you're calling them headlines.  Those are the

12    conclusions, right?

13    A    Yeah, some of the summary conclusions.  But much of what

14    is contained in the BMR would contain a precision of

15    information that we would not want our competitors to know

16    about.

17    Q    Well, in fact, sir, you disclosed, Hallmark disclosed

18    precise information from these presentations in newsletters

19    that are available to anybody that walks into the Hallmark

20    building, isn't that right?

21    A    We have shared bits and pieces from the BMR to customers,

22    to the industry, to consumers, when we have felt that those

23    pieces of information would be helpful on us acting on our

24    strategy.

25    Q    Let me ask you a question.  As of 2005 what percentage of

1   bits and pieces of the five presentations at issue have been

2   disclosed?  Do you know?

3   A    I don't know.  But I do know that --

4   Q    But we do know, sir, that as of 2005 as we've just seen

5   and we're going to go look at the newsletters, a hundred

6   percent of the presentations at issue in this case weren't

7   secret, isn't that right?

8   A    That's correct.

9   Q    Now, if you take a look, please, at Defendant's Exhibit

10   267.  This is Hallmark's daily news information sheet, correct?

11   A    Yes.

12   Q    Newsletter?

13   A    Yes.

14   Q    Called the Noon News?

15   A    Yes.

16   Q    Thousands and thousands of copies of these are generated

17   and placed around all buildings occupied by Hallmark employees,

18   correct?

19   A    Yes.

20   Q    In this Noon News letter, folks are being told about the

21   BMR project, correct?

22   A    Yes.

23   Q    Jeff, just highlight the date for the jury, please, so

24   they can see.

25          This is July 12, 2002, correct?

1    A    Yes.

2    Q    That's one month after the BMR concluded, correct?

3    A    Yes.

4    Q    And in this newsletter.

5          Jeff, can you go to about the middle of the column in

6    the center?

7          In this newsletter everyone is being told that

8    there's been a Business Model Redesign work ongoing at

9    Hallmark, correct?

10   A    Yes.

11   Q    So that's not a secret, right?

12   A    No.  No.

13   Q    And if you turn to, just to the right of that, Jeff.

14         You see, sir, the language, folks were also told the

15   decisions that had been made in the BMR, isn't that right?

16   A    They were being told about a change in organizational

17   structure as we were acting on our strategy.

18   Q    Well, if you take a look --

19         Jeff, if you would highlight, please, the language

20   that reads summary of decisions to date.  Right about there.

21         Women 45 and older who have no children at home will

22   be our target consumers because we've seen a significant drop

23   off in card sending within this group.  Do you see that

24   language, sir?

25   A    Yes.

1  Q    Pretty specific, isn't it?

2  A    It's directional.  We wanted everybody, all Hallmarkers to

3  work hard against our goal of trying to re-engage the women

4  card senders over 45.  That was our primary --

5  Q    Sir, Hallmark is revealing a central conclusion contained

6  in the presentations in this case to anyone that walks into

7  Hallmark, isn't that right?

8  A    We're revealing an important directional move that we're

9  taking.  We don't describe the basis that was contained in the

10 BMR.  This is a very high level view which we thought was very

11 important for Hallmarkers working in the business to understand

12 how we were going to shift our area of attention.  We wanted

13 artists and writers and product line planners in be clear about

14 what we were trying to do.

15 Q    And what you were trying to do came from a conclusion from

16 the presentations that are at issue in this case, correct?

17 A    That's correct.

18 Q    And let's be specific, women 45 and older.  That was one

19 conclusion, right?

20 A    Yes.

21 Q    Who have no children at home.  That's another conclusion,

22 correct?

23 A    Yes.

24 Q    Will be the target consumers.  That's another conclusion,

25 correct?

1    A    Yes.

2    Q    Because the research, some of the research at issue in

3    this case have shown a significant drop off in card sending in

4    that group, correct?

5    A    Yes.

6    Q    Clipper and Monitor needed nothing to know stuff like

7    this, isn't that right?

8    A    They were part of developing the strategy that helped

9    develop those choices.  But below this level of detail or below

10   this conclusion is a lot of detail that is very confidential.

11   But we chose to make this available to all of our employees so

12   that they knew how we were going to try to re-engage the

13   consumer.

14   Q    The Noon News isn't confidential, is it, sir?

15   A    No.  We make it available to all Hallmarkers.

16   Q    Well, in fact --

17   A    We want everybody to know.

18   Q    Anybody who walks into the building can take this out,

19   correct?

20   A    Yes.

21   Q    Now, you were deposed in this case, sir, weren't you?

22   A    Yes.

23   Q    And when you were asked the question in this case under

24   oath if the Noon News was confidential, you testified that the

25   Noon News was confidential, didn't you, sir?

1    A    I don't remember that but I'll take your word for it.

2    Q    No.  It's important, sir, because I want to make it clear

3    to the jury that under oath you said, first it is confidential

4    and then today you're saying it's not confidential.  So just

5    give me one second, please, and I'll get you the cite.

6              Just give me one moment, Your Honor.  Sorry.

7              MR. MANCHEL:  Would you go, please, Jeff, to

8    Defendant's Trial Exhibit 269?

9    BY MR. MANCHEL:

10   Q    This is another Noon News letter, correct, sir?

11   A    Yes.

12   Q    And you were asked a question --

13             If you go, please, Jeff, to Mr. Hall's May 11, 2012

14   transcript, lines 8 to 11.  Page 208, I'm sorry.  Lines 8

15   through 11.

16             "QUESTION:  Do you consider this information

17   confidential Hallmark information that's contained in the CEO

18   perspectives?

19             "ANSWER:  Yes."

20             Do you see that language, sir?

21   A    Yes.

22   Q    It's not confidential, is it, sir?

23             MR. AISENBREY:  Your Honor, he needs to read the

24   whole answer.

25             THE COURT:  Yes.  We'll hear the answer.

1    BY MR. MANCHEL:

2    Q    Yes.  It, the -- the -- the intent of the information

3    isn't to go public.  I've not written these columns to go into

4    *The Kansas City Star*.  Do you see that?

5    A    Yes.

6    Q    In fact, sir, that information is not confidential, isn't

7    that right?

8    A    No.  Well, no, it's not the confidential information of

9    the BMR.  We made a conscience decision to engage Hallmark

10   employees by sharing some bits and pieces of the information

11   that was part of the BMR because we thought it was important to

12   have them understand where we're going.  And I think when we

13   publish it, we know that there are a lot of copies of that so

14   when we approach it, we know that could fall into other

15   people's hands.  So when we decide what goes in there we decide

16   what is appropriate putting in a publication that goes to

17   literally thousands of Hallmarkers who we feel have to have

18   that information to be able to move us along in our strategy.

19   Q    Sir, it's a very simple question.  Is the Noon News

20   confidential?

21   A    It's intended for Hallmark employees but I think we know

22   it's more public than the way we treat other confidential

23   information so.

24   Q    Does that mean it is confidential or it isn't

25   confidential?

1  A    We consciously make a decision to make that more public by

2  sharing it with Hallmarkers.

3  Q    Does that mean it's not confidential?

4  A    That sentence is not confidential.

5  Q    I'm asking about the Noon News, the document.  The Noon

6  News isn't confidential, is it, sir?

7  A    No.

8  Q    And Hallmark put in the Noon News conclusions and

9  information from the presentations at issue in this case, isn't

10  that right?

11  A    We put information in there about some of the conclusions

12  at a very high and conscience level.

13  Q    So as a result of the GCA and these Noon News, is it fair

14  to say, sir, that 100 percent of the presentations at issue in

15  this case as of 2005 weren't still confidential?

16  A    No.  The BMR was still highly confidential.

17  Q    Now, you also testified, sir, that, I'm trying to remember

18  this correctly.  It was in substance I believe you said that

19  Hallmark didn't want to sue Clipper and relied on Clipper

20  talking to Hallmark about information Clipper might have had

21  and that was the reason why Hallmark entered into the

22  confidential agreement with Clipper, right?  Words to that

23  effect?

24  A    Yes.  We wanted to make sure that our information that was

25  developed with Monitor Group was protected.

1  Q    Well, in fact, that's what the deal was all about between

2  Hallmark and Clipper, correct, the confidential agreement?

3  A    Yes.

4  Q    And Hallmark was really concerned that Clipper might have

5  information, correct?

6  A    Yes, we were.

7  Q    And so Hallmark struck a deal with Clipper where Hallmark

8  said, in essence, if you let us search for the information, we

9  won't sue you, isn't that right?

10 A    Yes.

11 Q    And you said in response to a question from your attorney,

12 you said something like when we found out that Clipper had

13 received one of these e-mails, we sued.  Do you remember saying

14 that?  An e-mail that contained one of the presentations?

15 A    Yes.

16 Q    That's not when Hallmark sued though, is it, sir?

17 A    When we learned that information had been in the receipt

18 of Monitor Clipper we realized then that we had been lied to

19 and that Monitor Clipper had information that was confidential

20 and that's when we decided to sue.

21 Q    Sir, do you remember the month this lawsuit was filed in?

22 A    I don't.

23 Q    If I suggested to you November, would that sound about

24 right?

25 A    I'll take your word for it.

1  Q    Do you remember when Hallmark learned that Clipper had

2  received one of the e-mails with the information attached to

3  it?  Do you remember when that happened?

4  A    It was shortly before, a couple months before that.

5  Q    Could it have been in June or July, sir?

6  A    It was some time in the summer but I can't tell you

7  specifically when it was.

8  Q    Do you remember what Hallmark did right after it found out

9  that Clipper had received that single e-mail?  Do you remember

10 what action Hallmark took?

11 A    I don't.

12 Q    The action Hallmark took was to agree to a set of search

13 terms with Clipper and have Clipper start looking, isn't that

14 right?

15 A    Uh-huh.

16 Q    I'm sorry, sir.  Yes?  You have to say yes?

17 A    Yes.

18 Q    So Hallmark didn't sue right away when it found out about

19 the e-mail, did it, sir?

20 A    No.

21 Q    In fact, Hallmark got Clipper to start the search, isn't

22 that right?

23 A    Yes.

24 Q    And Clipper was in the process of searching after Hallmark

25 knew that Clipper had received this information, right?

1   A     I don't know the exact sequence.

2   Q     It was months though, wasn't it, sir?

3   A     Before we sued, we knew that Monitor Clipper had in its

4   possession the information from our BMR despite the fact that

5   they had attested for years that they did not.

6   Q     I want to be clear about that.  Hallmark, in your words,

7   knew, quote, unquote, that it had been lied to supposedly by

8   Clipper, correct?

9   A     Yes.

10  Q     And didn't sue, isn't that right?

11  A     We sued shortly afterward.  I can't remember how long it

12  was.

13  Q     Well, Hallmark realized it had been lied to and then

14  turned around and agreed on search terms, isn't that right?

15  A     I don't know the exact sequence.

16  Q     But the search terms were after this, right?

17  A     I don't know the sequence but I know we were engaging --

18  Q     I'm sorry.  Then what happened was in the fall, out of the

19  blue, without any warning, Hallmark just went ahead and sued

20  Clipper, correct?

21  A     Well, I don't think -- we did sue.  I don't think it was

22  out of the blue.  It was founded on the fact that we found that

23  Monitor Clipper did have documents in its possession.

24  Q     But Hallmark knew that already.  Hallmark knew that months

25  earlier, right?

1  A    Again, I don't know the exact sequence of when we found

2  the documents but we did have a very strong basis and what was

3  reviewed with me was that we had information that led us to the

4  conclusion that Monitor Clipper had in its possession

5  information from our BMR that it should not have had.

6  Q    And Hallmark knew that if the review, Clipper's review and

7  Clipper turned over what it had to Hallmark, then Hallmark

8  would have to give Clipper the general release that had been

9  signed, isn't that right?

10 A    No.  We had the right to sue for misconduct.  And there's

11 no question that we had been lied to in terms of the

12 conclusions that Monitor Clipper had given us, that they didn't

13 have that material in its possession.  When we found they did

14 we had the right to sue for improper misconduct.

15 Q    Hallmark had the right to sue but didn't, correct?

16 A    We did.  We did sue Monitor Clipper.

17 Q    From the moment that Hallmark realized it was lied to, to

18 the moment that the lawsuit arrived, are you aware of a single

19 e-mail from Hallmark to Clipper, a single communication from

20 Hallmark to Clipper where Hallmark says, Clipper, you're taking

21 too much time on this search, you lied to us, this deal is

22 broken, we're suing?

23 A    Well, the concern, again, was not the amount of time on

24 the search, the concern was the fact that our information was

25 in the hands of Monitor Clipper.

1    Q    So the concern wasn't how long the search was taking?

2    A    Well, I was mostly concerned about the information because

3    these represent our trade secrets.

4    Q    So I'm going to ask you --

5    A    -- details in the BMR and those documents could be very

6    devastating to our business if they were inappropriately shared

7    with competitors or customers.

8    Q    I'll ask you again, sir.  Between the time that Clipper,

9    I'm sorry, between the time that Hallmark decided it had been

10   lied to and the time the lawsuit was filed, those months, while

11   Clipper was performing the searches called for under the

12   agreement, are you aware, sir, of an e-mail or a phone call

13   that went from Hallmark to Clipper where Hallmark said, deal is

14   off.  You lied to us.  We're suing.

15   A    I don't know the details, the sequence of the timing or

16   the back and forth.  Those are the details I don't know.

17            MR. MANCHEL:  No further questions, Your Honor.

18            THE COURT:  Let's break for lunch.  We'll plan on

19   returning to the courtroom about 1:15.  That's a little less

20   than an hour but we got kind of a late start.  So I'd like to

21   try to makeup for it if we can.

22            Please remember Instruction No. 7.  Don't discuss the

23   case with anyone, keep an open mind until you've heard all the

24   evidence and the views of your fellow jurors.  We'll see you

25   back here at 1:15.  We're in recess.

1          (Witness temporarily excused.)

2               (Noon Recess)

3          (The following proceedings were had OUT OF THE

4     PRESENCE AND HEARING OF THE JURY:)

5          THE COURT:  All right.  If the jury is ready, let's

6     bring them in, please.

7          (The following proceedings were had IN THE PRESENCE

8     AND HEARING OF THE JURY:)

9          THE COURT:  Welcome back.  Please be seated.

10          Mr. Aisenbrey, your redirect examination.

11          MR. AISENBREY:  Thank you, Your Honor.

12                    REDIRECT EXAMINATION

13     BY MR. AISENBREY:

14     Q    Mr. Hall, Mr. Manchel was asking you some questions about

15     Exhibit, I think he used D1268 but we were using D227.  Either

16     way it's the letter that Mr. Gardner wrote.

17          Do we have 227?  I'm wrong.  It's not 227.  It's

18     1268.

19          Do you remember this letter that you were shown this

20     morning?

21     A    Yes.

22     Q    And I think you said that you had not read it before it

23     went out, right?

24     A    Right.

25     Q    But you were aware of it and you were asked a lot of

1    questions about it.  Do you remember that?

2    A    Right.

3    Q    Do you remember the questions you were asked about it?

4    A    Yes.

5    Q    Could you blow up that first paragraph?

6         Mr. Manchel only blew up the first sentence.  This is

7    written by Brian Gardner, is that right?

8    A    Yes.

9    Q    He wrote, we were shocked to learn that you're entering

10   into direct competition with Hallmark Cards after you obtained

11   Hallmark's most confidential core business trade secrets

12   through an intimate consulting relationship under which

13   Hallmark paid you millions of dollars.

14        Do you remember he read that you?

15   A    Yes.

16   Q    He didn't enlarge the rest of that paragraph.  It goes on

17   and says, according to media published reports, Monitor Clipper

18   Partners, a subsidiary of Monitor Company Group, plans to

19   invest in Recycled Paper Greetings.

20        Now, at the time this was written did you understand

21   the detail, who owns what between Monitor Clipper and Monitor

22   Group?

23   A    No.

24   Q    Did you know that Monitor Group that, excuse me, that the

25   seven of the eight managing directors of Monitor Clipper were

1    also partners of Monitor Group?

2    A    Yes.

3    Q    Now, when you understood that Monitor was free to consult

4    with another greeting card company, did you think they were

5    free to go ahead and buy one with one of their, what you

6    believed to be a subsidiary?

7    A    No.

8    Q    Could we turn to the next pages, please?  To the next to

9    the last paragraph?

10            Mr. Gardner notes that he, he was looking on the

11    Monitor dot com website, reveals that Monitor Clipper has

12    privileged access to proprietary resources of the Monitor Group

13    and the close proximity of the group companies within the

14    Cambridge office allows for ready collaboration?

15            Was that a matter of concern to you?

16    A    Yes, absolutely.

17    Q    Is this the same thing to you as consulting with another

18    greeting card company when one of them buys it and they are in

19    the same building?

20    A    No.  Not when they have that same kind of relationship.

21    Q    The bottom paragraph on that page he notes that Monitor

22    Clipper leverages its close relationship to Monitor with

23    respect to and he's quoting from the website, day-to-day

24    operating issues as well as long term company strategic

25    positioning.  Monitor Clipper's tight strategic relationship

1  with Monitor's industry experts allows it to quickly understand

2  and analyze a variety of industries that Monitor Clipper

3  actually identifies a substantial number of potential

4  investments through Monitor's business relationships and

5  through initiatives to target industries where Monitor has

6  significant knowledge and expertise?

7         Did that concern you?

8  A    Yes.  We were very concerned about the loss of our BMR.

9  Q    Now, Mr. Manchel asked you about the BMR presentations and

10 he asked you about a question from an interrogatory answer

11 where the question were asked.  The answer was Hallmark has no

12 evidence at this time that Clipper received any of Hallmark's

13 terms of sale with Hallmark's customers.  Do you remember that?

14 A    Yes.

15 Q    Terms of sales with the customer are what?

16 A    Well, terms of sale would be things like returns,

17 obsolescence, merchandising costs, margin.

18 Q    They would be revealed in the contract?

19 A    They would be revealed in the contract.

20 Q    Are you aware of any information that Monitor Clipper had

21 any actual contracts with Hallmark's customers?

22 A    No.

23 Q    Go to Exhibit 487, please.  And would you turn to the Gold

24 Crown document on, just a second I'll give you the page.

25         That's -- this is the one that was a Gold Crown

1    update.  Do you remember that?

2    A     Yes.

3    Q     Could you turn to Exhibit 487 at 208?  Maybe it's 209.

4          It's page 46 of the document, if you can read those

5    numbers.

6          Your Honor, may I approach the document for a moment?

7          THE COURT:  Yes.

8          MR. AISENBREY:  You've got to go up to about 46.

9    BY MR. AISENBREY:

10   Q     Mr. Hall, what is this?

11   A     This is a summary of line item comparisons of each of our

12   major channels of trade.  And it shows what our gross shipments

13   are to that channel.  It identifies precisely what our returns,

14   obsolescence and terms costs are.  It describes what the direct

15   margin is and then it describes the casual labor that we would

16   apply to the service of the business.  And then the cost that

17   we spent on fixturing, merchandising in the store.  So it's a

18   summary of the important terms of our contracts.  And this is

19   the kind of thing that we absolutely would not want a

20   competitor or a customer to know about.

21   Q     The four lines there, Gold Crown, Hallmark Mass, EFH

22   Ambassador Mass and Wal-Mart.  Are those different channels?

23   A     Yes, those are different channels.

24   Q     Does this reveal the specifics of a contract with any one

25   of those?

1    A    No.   These summarize the terms but it does not reveal the

2    specific contract.

3    Q    Now, Mr. Manchel asked you some questions, he showed you

4    some pages in these documents and asked you if they were public

5    information.  Do you remember that?

6    A    Yes.

7    Q    Could you go to the second OEC presentation, page 8 of

8    that, December 12.

9         You talked about this a little bit.  This is an

10   example of one of the pages in there.  This is census data,

11   isn't it?

12   A    Yes.  The bottom left-hand, it's noted that that

13   summarizes U.S. Census information.

14   Q    Does Hallmark contend that U.S. Census information is

15   confidential?

16   A    No.  It's public information.

17   Q    But is that information there put together with other

18   information in the compilation to drive the conclusions?

19   A    We use that public information paired with our unique

20   information to build conclusions about the trends and

21   opportunities in the industry.

22   Q    Could we have Exhibit D589?

23        Mr. Manchel spent some time with you on this document

24   here.  Do you remember this?

25   A    Yes.

1    Q    Now, this was a presentation.  He showed another document.

2            Just briefly, if we could have D270.

3            This is the agenda, this was the agenda for a

4    Greeting Card Association meeting.  Do you remember that?

5    A    Yes.

6    Q    And I think it's very hard to read.

7            If I could approach, Your Honor?

8            THE COURT:  You may.

9    BY MR. AISENBREY:

10   Q    It's very hard to read but it says that this is

11   October 2002.  You want to read it on the regular page?  You

12   can't read it on the screen.  The date of that October 2002?

13   A    Yes.

14   Q    Thank you.  So Mr. Welch did this presentation in October

15   of 2002?

16   A    Yes.

17   Q    Could you tell me when Mother's Day is in 2002?

18   A    First Sunday in May.

19   Q    Every year?

20   A    Every year.

21   Q    In your line you probably know that.

22            In fact, if we could go back to D589.

23            Mr. Welch was presenting information about Hallmark's

24   Remembering Campaign, wasn't he?

25   A    Yes.

1    Q    As he points out --

2            If you go to the next to the last page, the third to

3    the last page I guess.

4            This campaign was launched Mother's Day of 2002,

5    right?

6    A    Yes.

7    Q    So when do you start doing advertising for Mother's Day?

8    A    It would be several months before.

9    Q    So in March?

10   A    It would be early, well, probably before March, probably

11   January or February.

12   Q    So in October Mr. Welch told people about an ad campaign

13   that Hallmark had been running for almost ten months?

14   A    Yes.

15   Q    And in that --

16           If we could go to the second page, Cindy.

17           These are ads that had been on the air for almost ten

18   months.  And he points out, we're trying to get people over 45,

19   women over 45 to buy more cards?

20   A    Yes.

21   Q    Now, if that was told at the Greeting Card Association to

22   an American Greetings person, as Mr. Manchel pointed out they

23   were present, exactly how would they use that piece of

24   information against Hallmark?

25   A    Well, they would have already seen the ads from on

1    television and we didn't show them the specifics underneath it.

2    We just talked about the campaign available to everybody.

3    Q    The next page.

4            First bullet.  Consumers have many choices.  Cell

5    phones, computers.  Was that a startling revelation to anybody

6    in October of 2002?

7    A    No.

8    Q    Mr. Welch wasn't telling anybody any big secret, was he?

9    A    No.

10   Q    Greeting cards are not the easiest to use.  The

11   illustration there appears to be you have to mail it?

12   A    Yes.

13   Q    Pretty much have to mail a greeting card, don't you?

14   Unless it's an e-greeting?

15   A    Yes.

16   Q    Or the need to convince them why greeting cards are worth

17   the effort.  Now, is that something that's important?

18   A    No.  It's important but not new.

19   Q    Not a big surprise.

20   A    Yes.

21   Q    How about they have other choices and they may just

22   forget?

23   A    No.

24   Q    I think you said that your purpose in this was to get the

25   other manufacturers to join Hallmark in trying to get people to

1    buy more cards?

2    A    Yes.

3    Q    Is there anything in this thing that's a threat to

4    Hallmark?

5    A    No.  We purposely chose the information from our strategy

6    that we thought could encourage others in the industry to

7    encourage people to use greeting cards more often.  We were

8    careful not to reveal any information underneath this but we

9    did want others in the industry to promote the use of greeting

10   cards and we wanted to encourage that behavior because it's

11   good for the entire industry to be able to do that.

12   Q    You got some questions about the Noon News.  Do you

13   remember that?

14   A    Yes.

15   Q    And could I have Exhibit D267, please?

16           This is one in which --

17           Column on the right, Cindy, just the middle of the

18   column on the right.  No.  Actually it's Q and A below that.

19   Thank you.

20           This is talking about the Remembering Campaign also,

21   isn't it?

22   A    Yes.

23   Q    It's dated, I don't know if you can see it now but I'll

24   tell you the date is July 12, 2002.  So the Remembering ads

25   have been on the air for 5 months or so, is that right?

1    A    Yes.

2    Q    And, again, you're telling Hallmarkers information about

3    what we're doing.  Why would you tell Hallmarkers about it?

4    A    We wanted them to be excited about the business and focus

5    on the things that we needed to do to be more successful.  And

6    it was important for them to know that we had a strategy, they

7    knew where we were going and kind of what was expected.  But we

8    shared a very high level.  But it was really with the intent of

9    engaging more people, letting everybody that worked for the

10   company understand what we were focusing on.

11   Q    Now, if you could go back to Mr. Hall's deposition.

12          You were asked some questions about whether you

13   regarded the Noon News as confidential?  Do you remember that?

14   A    Yes.

15   Q    He showed you a page from, part of a page, 208, lines 8 to

16   11 is what he called it.  And do you consider this information

17   confidential Hallmark information that is contained in the CEO

18   prospectus and they showed, yes.  It, the -- the -- the intent.

19   But the rest of the answer goes on.

20          I'd like you to enlarge the rest of the page.  Just

21   take it from line 8 to the end of the page.

22          You went on to say, the intent isn't to go public.  I

23   don't write these columns to go into *The Kansas City Star*.

24   I've written them for Hallmarkers, for their use and about our

25   business.

1          Do you consider it confidential Hallmark information?

2          I'm careful not to disclose information that, you can

3   see that it's a very high level.

4          Well, what I'm trying to get at is, get an

5   understanding of, you don't seem to want to answer whether it

6   is, do you or don't you construe it to be Hallmark confidential

7   information?

8   Go over to the next page.

9          We construe this to be non public information shared

10  with employees but we're also careful not to provide any

11  details of our, you know, any of the details that might be

12  detrimental if they fall into the wrong hands.

13         Those were your answers, weren't they?

14  A    Yes.

15  Q    Earlier in the deposition, a few pages earlier --

16         If you could go to page 190, Cindy.

17         You were asked the question at line 25 starts and

18  then you have to go to the next page.  But nothing in the Noon

19  News is considered confidential by Hallmark, is that right?

20         We would think, we would think of it as being

21  appropriate information for a very broad audience of Hallmark

22  employees.

23         Okay.

24         Not intended to be made public or put on the Internet

25  but it would be, it would be built with a careful lens to the

1   fact that it's a very broad group of Hallmark employees and we

2   still try to provide, but they need to know, what's the

3   appropriate level of detail they would need to know to be able

4   to do their jobs.

5           But there's no restriction on someone taking the Noon

6   News out of Hallmark, correct?

7           No.  They can take it home.

8           They could take it home?

9           Yes.

10          They could show it to their family members?  They

11  could show it to their friends, correct?

12          We try to encourage it for communication purposes but

13  yes, I'm sure there are Hallmarkers that share it with their

14  family.

15          There, there's no restriction on someone's use or

16  disclosure of the Hallmark news?

17          Well, we certainly wouldn't want to encourage people

18  to share that with our competitors or more broadly but it's

19  information that we think is interesting, it is information to

20  them and their work here.  It's important for them to

21  understand what we're doing.  But we realize it's a very broad

22  distribution and a very large audience.

23          So the Noon News is, basically, the news that goes

24  out to Hallmarkers to do their job, is that right?

25  A    That's correct.

1  Q    Now, the last thing I want to ask you about.  You were

2  asked some questions about Exhibit 215.  We don't need to see

3  it.  It's the confidential agreement that Mr. Manchel asked you

4  about?

5  A    Yes.

6  Q    He had a lot of questions about can you point to this

7  e-mail or that letter.  Are you familiar with all the

8  communications that went back and forth between Hallmark legal

9  and Clipper's lawyers in the summer of 2008?

10 A    No.

11 Q    Or even the summer of 2007 for that matter?

12 A    No.  There was a lot.

13 Q    Who would be the right person to ask those questions of?

14 A    Brian Gardner, who is our general counsel.

15 Q    He will be here later this week.  Perhaps Mr. Manchel will

16 have questions for him.

17              Your Honor, that's all I have of this witness.

18              THE COURT:  Recross.

19                      RECROSS-EXAMINATION

20 BY MR. MANCHEL:

21 Q    Sir, you were asked a question from your counsel just now,

22 in essence, the same question I asked you.  Do you consider the

23 Noon News confidential?  He read a couple of pages worth of

24 testimony to you.  I'm going to ask you the question and ask if

25 you can maybe give me a yes or no.  Is the Noon News

1   confidential?

2   A    I'm sorry.  I want to be responsive to the question.  It's

3   an audience that we know is very broad.  It's a communication

4   vehicle that's accessible by the public.  It's an audience that

5   we know needs to understand and have context.  But we provide

6   information in there that is of something that we know could

7   fall into the hands of a competitor or could fall into the

8   hands of a customer so we're very careful about what we put in

9   the Noon News.  We don't intend for that to be a press release

10  to *The Kansas City Star*.  We don't intend to put it out for our

11  competitors.  But we do try to provide context for our

12  employees.  But it's very carefully considered knowing that

13  it's a very broad distribution and that people are likely to

14  talk about it, share it or maybe for it to fall in others

15  hands.  So we're very careful not to put confidential

16  information in the Noon News that would be to our detriment.

17  I'm sorry.  I'm trying to answer it the best I can.

18  Q    David Hall is the president of Hallmark?

19  A    Yes, he is.

20  Q    He's your brother?

21  A    Yes.

22  Q    Would you put up, please, David Hall's testimony, April 6,

23  2011, page 101, lines 6 through 10, please?

24          MR. AISENBREY:  Your Honor, is this impeachment?

25          THE COURT:  Step up, please.

1          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

2     PROCEEDINGS WERE HAD:)

3          MR. MANCHEL:  David Hall came out and said this was

4     not confidential.  He's an officer of Hallmark.  And under Rule

5     30, 32A3 I can use that testimony for any purpose in the case,

6     deposition testimony.

7          MR. AISENBREY:  He hasn't really denied it's not

8     confidential but that's, I mean, if we're going to keep going.

9          MR. MANCHEL:  I'll show the jury.  It's very simple.

10    He just comes out and says it's not even a Hallmark document.

11         (THE PROCEEDINGS RETURNED TO OPEN COURT.)

12    BY MR. MANCHEL:

13    Q    Would you show the jury, please, would you highlight for

14    the jury lines 6 through 10?

15         "ANSWER: I don't think that I would see the Noon News

16    as a Hallmark document.  It is a publication to try to share

17    some communication with our employees audience.

18         "QUESTION:  So you don't view that as a Hallmark

19    document?

20         "ANSWER:  As a confidential document, no, that's

21    correct.

22         Is that a correct statement from your brother, sir?

23    A    I think that's a good answer.  It's not a communication.

24    It's a publication that we try to share communication with our

25    employee audience.

```
1    Q    Then there is the second part of the answer, isn't there
2    sir?
3    A    Yes.
4    Q    As a confidential document, no, correct?  It's not
5    confidential?
6    A    Yes.
7    Q    Now, would you pull up on the screen, please, Defendant's
8    Exhibit 1268.
9         You were shown this letter, again, weren't you, sir?
10   A    Yes.
11   Q    I tried to write it down as best I could.  But your answer
12   was it was okay for Monitor to work as a consultant with a
13   competitor like RPG but it wasn't okay for Monitor to own RPG,
14   right?  Is that the gist of the testimony that you gave?
15   A    Well, if I can, I'd like to clarify the kind of concern.
16   Q    I'm sorry.  I'm just trying to establish here the
17   testimony that you gave to your lawyer was, I wrote down, it
18   was okay for them to be a consultant but they weren't free to
19   buy one.  That's what you said, right?
20   A    Yes.
21   Q    Well, first of all, they were absolutely free to buy
22   anything they wanted, isn't that right?  After two years?
23   A    We were, you're asking a legal point.  I don't know.  The
24   arrangement that we had was to allow them to consult but it was
25   not to allow them to have our confidential information.  When
```

1  we read the press release and when we saw the website, it was

2  indistinguishable to us that the group that we were working

3  with was different than the new competitor that we were going

4  to be competing with.  And we were very concerned about

5  documents from the BMR being shared with a direct competitor.

6  Q    So let me see if I can break this down for you, sir.

7  First question.  Was there anything in the Hallmark Monitor

8  agreement that says after two years Monitor Group can't go out

9  and buy a competitor?

10 A    No.

11 Q    In fact, you know, sir, Monitor Group didn't buy RPG,

12 isn't that right?  You know that, don't you?

13 A    I do now.

14 Q    And you know that Clipper didn't buy RPG, isn't that

15 right?

16 A    That Clipper?

17 Q    Correct.

18 A    Didn't buy RPG?

19 Q    Correct.

20 A    I don't know that.

21 Q    Do you even know who the owner of RPG is, sir?  Hallmark

22 brought this lawsuit.  Do you know who owns RPG or who owned

23 it?

24 A    The press release said that Monitor Group, Monitor Clipper

25 Group acquired RPG.  That was the information that we had that

1   gave us the concerns that all of our confidential information
2   might become jeopardized.
3   Q    Did any of your in-house lawyers or anyone just go to the
4   Secretary of State's office and see who the owner of RPG was?
5   A    I don't know what they did after reading the press release
6   but we were very concerned about protecting our information.
7   Q    I understand your concern.  You say you acted on a press
8   release.  Did anybody just go look up in the public records who
9   owned RPG, in fact?
10  A    I don't know what the lawyers did to research it.  I do
11  know that the website was very disturbing as I pointed out
12  earlier because it was very clear in terms of implying that
13  information was shared and that was one of the advantages for
14  Monitor Clipper is that they had access to information.  When
15  we saw that we were concerned about having access to our
16  information.
17  Q    Your attorney took you to a Gold Crown presentation, first
18  you were taken back to the interrogatories where Hallmark said
19  we don't have any claim for retail terms then you went to look
20  at one of the presentations, correct?
21  A    Yes.
22  Q    What was the date of the presentation your attorney showed
23  you?
24  A    For the Gold Crown?
25  Q    Yes.

1  A    I think it was January but I don't recall.

2  Q    That's right.  January 2002.

3  A    Yes.

4  Q    What was the date of the interrogatories I took you

5  through?  Do you remember?

6  A    I don't.

7  Q    March of 2012.  So someone at Hallmark decided that what

8  was there in 2002 was not worth reporting in the

9  interrogatories in 2012, right?  Twelve years, ten years later?

10 A    You're asking me about a level of detail in terms of a

11 legal document, the interrogatory, which I was not involved in

12 constructing.  I have great confidence in our legal staff and

13 the basis on which they put that information together.  They

14 were acting to protect our confidential information which we

15 began to be very concerned about as soon as we heard that

16 Monitor Clipper might have access to it.

17 Q    Your attorney also took you through a couple of questions

18 where he got you to say that the Remembering Campaign had been

19 out, we think, for about ten months before the GCA

20 presentation, correct?

21 A    Yes.

22 Q    If you look at a Remembering Campaign commercial, does it

23 say anywhere in there that the point of the commercial is to

24 target women over 45 to buy cards?

25 A    It doesn't say that, no.  I think for a marketer, they

1    could look at the creative execution and determine that.

2    Q    Well, it can certainly look at it and say you're going for

3    emotion.  That's right, isn't it?

4    A    Yeah.  We could go for emotion.

5    Q    But there's nowhere in there that says, hello, women over

6    the age of 45.  We're targeting you to buys cards.  Right?

7    That was a BMR conclusion, wasn't it?

8    A    Yes.

9              MR. MANCHEL:  No further questions.

10             THE COURT:  Thank you, Mr. Hall.  You may step down.

11                                      (Witness excused.)

12             THE COURT:  Plaintiff may call its next witness.

13             MR. GERMAN:  Your Honor, Charlie German for Hallmark

14   at this time.  And our next witness is Wayne Strickland who I

15   believe is in the hall.

16        WAYNE STRICKLAND, PLAINTIFF'S WITNESS, SWORN

17                      DIRECT EXAMINATION

18   BY MR. GERMAN:

19   Q    Good afternoon, Mr. Strickland.  Welcome to federal court.

20   Would you, please, introduce yourself to the Court and jury?

21   A    My name is Wayne Strickland.

22   Q    And you're employed at Hallmark?

23   A    My 33rd year at Hallmark Cards.

24   Q    Tell the Court and jury, please, what your job entails

25   today that you're doing today?

1    A      Today I'm general manager of the Wal-Mart Customer Team.

2    I have about, little less than a hundred full-time employees

3    who live in Kansas City or northwest Arkansas or around the

4    country.  About 5,000 part-time employees that help us run the

5    Wal-Mart business.

6    Q      What does it mean, Mr. Strickland, to run the Wal-Mart

7    business for Hallmark?  What is it you do?

8    A      Wal-Mart is our single largest customer.  We do about

9    $900 million with Wal-Mart in retail.  I'm responsible for the

10   strategy development for how we market with Wal-Mart.  I'm

11   responsible for making sure Hallmark Cards understands what

12   Wal-Mart expects of Hallmark.  We have product development

13   responsibility, execution responsibilities.  It's a different

14   kind of category, management functions, both here and in

15   Bentonville.  So it's my responsibility to make sure that we

16   allow resources to meet the needs of Wal-Mart and Hallmark so

17   they're making the profits that they want to make and Hallmark

18   is making the profits that we want to make.

19   Q      Why do you have 5,000 employees around the country for

20   this one customer?

21   A      The agreement we have with Wal-Mart in our pricing

22   strategy, our terms strategy is that we've agreed to service

23   the store.  So, for example, Halloween was over last week so

24   Halloween cards that didn't sell had to come off the rack.  So

25   somebody has to do that work.  Our people do that work.

1   Thanksgivings cards have to go back on the fixtures.  We also

2   set some Christmas merchandise.  I'm sure there is lots of

3   Christmas merchandise in the stores here in Kansas City.  So

4   we, basically, act as the back end operation for Wal-Mart.

5   When the product comes in the back room, we take it.  We store

6   it.  We put it on display.  We take it down when it doesn't

7   sell.  So we've got people in our Wal-Mart stores on a daily

8   basis all across the country.

9   Q    Thank you.  Are you as the general manager of the Wal-Mart

10  business, let's back up a second.  Take us, so you've been 33

11  years, explain to the jury your tenure at Hallmark, what

12  various jobs you've held leading to the one you have now?

13  A    Thirty-three years.  Started out at Fort Smith, Arkansas,

14  as a sales representative.  1980.  Basically, little piece of

15  geography from North Arkansas down to Hooks, Texas.  I was

16  responsible for calling on the Hallmark stores in that part of

17  the country that we did business with.  Did that for 3 years, 3

18  years, 4 months.

19          Moved down to Dallas, Texas.  Actually, Arlington,

20  Texas.  Had a little bit bigger sales responsibility.  Had part

21  of Fort Worth and Dallas, out to west Texas a little bit.

22          Then I was promoted to what we call market

23  development manager where I was responsible for finding people

24  who wanted to own Hallmark stores and putting them in stores,

25  helping to negotiate the leases with people who had stores,

1    wanted to sell stores.  Find people that wanted to buy the

2    stores.  So a couple years of that.  Remodeling the store.

3    Maybe somebody had a store and they wanted to move to a bigger

4    location.  So did that for a couple of years.

5            Then I came to Kansas City.  I was a market

6    development, product marketing manager for greeting cards which

7    meant I was representing kind of the field that the retailers

8    wanted to do for the every day greeting cards for the Hallmark

9    brand.  Then did that for a couple years.

10           I went out as a regional manager in Atlanta, Georgia.

11   Back then we called it our special markets business.  It was

12   department stores, bookstores, military bases.  Had everything

13   from Washington DC to Miami to New Orleans.  I had people that

14   worked for me scattered across those 12 or 13 states.  Then I

15   came in -- did that for a couple years.

16           Came in.  I was the sales vice president for that

17   group.  So I had all that group report up to me.

18           Then after that I became channel programs director

19   for the Hallmark brand.  Which meant I was trying to represent

20   all the needs of all the different customers for the Hallmark

21   brand back to a product areas.  Did that for a couple years.

22           Then I became marketing director for the Gold Crown

23   Stores.  So I was responsible for marketing for Gold Crown

24   which was back to marketing and merchandising.  And I think IT

25   might have even been under my leadership for part of that.  So

1   did that for about three and a half years.

2           Then I became, we called it Expressions from Hallmark

3   slash Ambassador sales team which is basically supermarkets.  I

4   think we had Target, K-Mart, but mainly supermarkets and a

5   couple of discount stores.

6   Q     You were the head of that?

7   A     I was the team leader for that.

8   Q     About what year was that?

9   A     It was January of 2000 I started.

10  Q     Just trying to get a sense of where we are in this,

11  career-wise.

12  A     It's confusing.  So January of 2000, I did that for about

13  4 years.

14          Then I became director, Vice President of Customer

15  Strategy and Planning.  I did that for two or three years.

16          And became the Vice President of Category Management.

17          Then I was team leader of the Walgreens team.

18          Then I was team leader of the Drug Store team.

19          Then team leader of Wal-Mart team.

20  Q     Where you are now.  You've been around all sides of the

21  Hallmark operation?

22  A     Marketing and product development and sales and team

23  leader and carried a bag, did all of that.

24  Q     You have testified in this case as an official company

25  representative to express the company's position on certain

1     aspects of the damages claim?

2     A     Yes.

3     Q     And you testified in the earlier arbitration proceedings

4     against the consulting firm, Monitor?

5     A     Yes.

6     Q     Now, let's focus for a moment on your current position as

7     the team leader of the Wal-Mart business.  Let me ask you, is

8     the financial relationship between Hallmark and its customer,

9     biggest customer, Wal-Mart, confidential information?

10     A     Absolutely.

11     Q     Why is that kept confidential?

12     A     We do not want our customers, other customers, especially

13     our competitors, to know our terms of sale or pricing or

14     strategy for this customer or any customers.  It's very

15     important that it's confidential.

16     Q     Are the costs that Hallmark takes on to service that

17     Wal-Mart business, your 5,000 employees, the work that is done

18     in all of those stores, that cost structure for Hallmark, is

19     that considered confidential information?

20     A     Yes, it is.

21     Q     Are the profit margins that Hallmark earns when it sells

22     products to Wal-Mart considered confidential information?

23     A     Extremely.

24     Q     Why is all of that so secret?

25     A     We don't need all of our customers or competitors to know

1    our pricing for different customers and profits or margins we

2    make for different customers.  It's different for each

3    customer.  You wouldn't want your competitor or your existing

4    customers to know what you're selling to this customer or that

5    customer down the street.  That information is confidential.

6    Q    And that's considered confidential within Hallmark?

7    A    Very confidential.

8    Q    How many people within Hallmark know the financial

9    relationship between Hallmark and Wal-Mart?

10   A    Hard to say.  Ten or 12, 15.

11   Q    Out of how many thousands of people?

12   A    Thousands.

13   Q    So it's fairly close to the vest?

14   A    Very close to the vest.

15   Q    Could we have Exhibit 487 back up, please?  I'd like to go

16   to that.

17         You know what Exhibit 487 is, Mr. Strickland?  It's

18   been admitted in evidence.  We have talked about it throughout

19   this case.  Do you recognize the e-mail and the attachments to

20   it?

21   A    I did.

22   Q    And you understand from your role as the official company

23   representative testifying in this case on certain aspects of

24   the damages claim, you have an understanding why Hallmark has

25   sued Monitor Clipper and Adam Doctoroff?

1   A    I do.

2   Q    What is your understanding of the reason for this case?

3   A    The reason for the lawsuit is we've had a lot of material,

4   particularly file presentations that were stolen from us, that

5   held confidential information about our strategy for our

6   purposes.  In 2001 we consulted with Monitor Company to begin

7   what we call the Business Model Redesign Process.  The business

8   model work was the most extensive, comprehensive analysis and

9   evaluation of our greetings business -- I guess back there I

10  had been around 21, 22 years -- we had ever done.  And it's the

11  most extensive work we've done since.  If you remember back --

12  Q    Excuse me just a minute.  And I am going to come to the

13  BMR.  But the purpose for the lawsuit is because the five

14  presentations that you mentioned came out of that BMR project,

15  true?

16  A    Yes.  Yes.

17  Q    And in Exhibit 487 here, the e-mail, do you see the, I

18  have a hard copy here if you prefer to look at that?

19  A    No, I've got it.

20  Q    Do you recognize the names at the top of the e-mail string

21  of Adam Doctoroff?

22  A    I do.

23  Q    He is this fellow over here, defendant, one of the

24  defendants in this case?

25  A    Yes.

1   Q    And the attachments to Exhibit 487, the presentations that

2   we talked about, those are part of the BMR project that you

3   described?

4   A    Yes.

5   Q    Let's go to the Gold Crown page.  Do you recognize,

6   Mr. Strickland, that this is one of the five presentations?

7   A    I do.

8   Q    And it's attached to the e-mail that was sent to

9   Mr. Doctoroff?

10  A    Yes.

11  Q    You mentioned part of your career tenure at Hallmark

12  involved the management capacity for the Gold Crown Stores.

13  Would you explain to the Court and jury, please, the

14  relationship between Hallmark and the Gold Crown Stores that

15  you see in the shopping centers?

16  A    The Gold Crown Stores are, at the time this work was done

17  was roughly 4800, 5,000 stores represented by about 18, 1900

18  individual owners that are individual owners that own and

19  operate their stores.  We had about three or four hundred

20  company owned stores that we run but for the most part these

21  are independently run stores by people like in this courtroom

22  that want to have a business, want to run their own business.

23  Q    And this work that was part of the BMR project that we see

24  reflected in the Gold Crown channel focused on Hallmark's

25  relationship with those stores?

1  A    Yes.  The Gold Crown channel analysis, we took a very deep

2  dive on the Gold Crown channel because we needed to understand

3  what we thought the future was going to be for that channel as

4  well as what investments Hallmark needed to make to keep that

5  channel growing.  For the greetings business model work we

6  wanted to have a clear understanding of was that channel going

7  to grow, was it going to have more stores, less stores, more

8  owners, less owners.  And what role did Gold Crown Stores play

9  in the greetings business going forward.

10 Q    Why would that kind of information be of any interest to a

11 private equity company considering an investment in the

12 greeting card market?

13 A    Well, this analysis had confidential information about our

14 terms, about our go to market strategy.  It told us what owners

15 were the most profitable, what locations were the most

16 profitable, what size store was the most profitable.  Whether

17 we owned a strip center in a mall, if it was more profitable or

18 not.  It broke down our Gold Crown channel every way we could

19 think of to tell us what the future looked like.

20 Q    Mr. Strickland, this is part of the Gold Crown channel

21 analysis document that we're looking at in Exhibit 487 the Gold

22 Crown presentation.  Mr. Hall touched on this briefly during

23 his testimony a few minutes ago but give us your perspective

24 what we're seeing on this slide.

25 A    This is a highly confidential -- this slide contains

1   highly confidential information about our gross shipments and

2   our terms or pricing we pay toward each group or customers or

3   customer.  For example, the top one is gross shipments as of

4   2001.  The term R-O-T, ROT, stands for returns, obsolescence

5   and terms.  Returns would be things like, go back to our

6   Halloween example, Halloween cards that didn't sell last week

7   at Wal-Mart.  We pick those up.  Those are called returns.  So

8   we manage that with Wal-Mart.

9           By the way we don't do that at Gold Crown.  We don't

10  return that product to Gold Crown.  They keep it.

11          Obsolescence would be product that we've had on the

12  shelf for a period of time that is not selling.  It's in our

13  best interest or the retailers best interest to take that

14  product back.

15          Terms would be additional items that we agree to pay

16  to that retailer.  It might be, for Wal-Mart, we give them the

17  fixtures.  We own all of the inventory.  Wal-Mart doesn't own

18  any inventory.  We own it all.  It's called paper scan or scan

19  base trade.  It might include opening orders for some retailers

20  we give them a free opening order.  For some retailers we have

21  placement fees.  For some retailers we have marketing fees.

22  What you'll see as you go across there you'll see, I'll use

23  Wal-Mart for example, 457 gross shipments.  142 million in ROT.

24  And if you go, so ROT is all the way across.  You've got Gold

25  Crown Nine and Hallmark Mass which is back then it was

1  Walgreens, CVS, Kohl's, I think some military accounts.  They
2  carried the Hallmark brand but they weren't Gold Crown.  EFH
3  and Bass -- it's 538 million with 55 percent ROT and then
4  you've got Wal-Mart with 457 with 142 million in ROT.  Then it
5  talks about team direct cost so that's the cost of the team.
6  So actually the people on the team the full-time account and
7  all of that.
8          Casual labor.  Casual labor is a term where we go in
9  and reset a store.  Wal-Mart calls it resetting the module.  We
10 pay for that meeting time to go in and change out the gift wrap
11 or reset greeting cards.  We have fixture amortization.
12 Mr. German you can see from this chart those terms, the cost to
13 serve is different by customer.
14 Q    By channel, right?
15 A    By channel.  Thank you, yes.
16 Q    And this information you pointed out was compiled as of, I
17 think it says 2001 second forecast.  I think that's later in
18 the year 2001.  Does that kind of information change, 2002, 3,
19 4, 5?
20 A    The numbers change a little bit but the relationship stays
21 the same.  Gross shipment is going to change.  Your ROT will
22 change based on your gross shipments but the relationship
23 doesn't change that much.
24 Q    So if we're looking at the Wal-Mart column there at the
25 far right, the gross shipments of $457 million.  And returns,

1   obsolesces, terms being 142 million of that, those numbers

2   could change slightly over the period of years but the

3   31 percent would remain about the same?

4   A    About the same.

5   Q    In 2005 when the events that bring us to this lawsuit took

6   place, was that information current and relevant that you see

7   on the screen?

8   A    Absolutely.  As it is today.  It was then, it was in 2005

9   and it's relevant today.

10  Q    How would that information that we see, financial

11  information on Hallmark's four main distribution channels,

12  benefit a private equity company that is thinking about

13  investing fund money in a greeting card company?

14  A    If you were wanting to invest in a greeting card company

15  this information would be critical.  Because it tells you which

16  channels and customers have the most volume and which ones are

17  the most profitable.

18       When we did this work, there were many headlines,

19  many things that came out of the business model work.  One of

20  those was around how profitable we are with some of our largest

21  mass channel customers like Wal-Mart and Walgreens and CVS.  I

22  believe most suppliers that do business with Wal-Mart, let me

23  back up.  I don't think Wal-Mart is the most profitable

24  customer for most suppliers.  They might be the largest but

25  they might not be one of the most profitable because Wal-Mart

1    is pretty good at getting a pretty good price.

2              This information is also critical because most large

3    suppliers, I'm talking about Proctor and Gamble or Unilever,

4    Coke, people who do business in mass channels, Wal-Mart would

5    be their highest volume most likely.  Then comes Target and

6    then you would have K-Mart.  Then you start with the big

7    supermarkets like Kroger or Safeway and Publix.  It's pretty

8    predictable where the volume would come from if you were a

9    company like Proctor, Unilever or Coke or something like that.

10             What is very unique for Hallmark is that Walgreens

11   and CVS are two of the largest called Hallmark mass customers.

12   They are number 2 and number 3 for Hallmark in terms of volume

13   because those two customers have committed quite a bit of space

14   in their store to be a destination for greeting cards.  And

15   they are very high volume for us and very high margin.

16   Q    By margin you mean?

17   A    Profit.

18   Q    Profits?

19   A    Excuse me.  I say margin I mean profit most of the time.

20   Q    Is that information, information that a private equity

21   company gleans from this single slide you see here?

22   A    Absolutely.  You can look right there and tell, the lower

23   your ROT number is the more profitable you're going to be for

24   that customer unless there is something different in your gross

25   shipments number or something like that and this is not.  This

1  is by greeting cards.

2  Q    And you're familiar, I take it, because of your position

3  in the market end of the business with the company known as

4  Recycled Paper in 2005?

5  A    I'm sorry.  Asked me again.

6  Q    I take it you were familiar with the Recycled Paper

7  company in 2005?

8  A    Yes.

9  Q    Did Recycled Paper products, greeting products sell its

10 cards in the Gold Crown channel?

11 A    Yes, they did.

12 Q    Now, we started talking a moment ago that this is a piece

13 of the work that came out of the BMR.  Why don't you explain

14 for the Court and jury, please, your role, Wayne Strickland's

15 role in the business model?

16 A    I was asked in 2001, I was leading the EFH Ambassador team

17 at the time, if I would work on the Business Model Redesign to

18 primarily represent the customer team.  I sat in on some of the

19 consumer team work but mainly my work was to develop the

20 strategies for the customers.  So I was working full-time as a

21 customer team leader and also working almost full-time as the

22 representative on the business model work for the greetings

23 business focused on the customers.

24 Q    Now, Mr. Hall has described the BMR in some detail for us

25 but why from your perspective on the ground running the EFH

1    Ambassador mass channel, why was the BMR needed?

2    A    Back in 2001 we had a lot of questions around the future

3    of the greeting card business.  If you can remember in 2001 I

4    bet most people in this room got e-mails with e-greetings on

5    them.  You click on it, be a little greeting card come to life.

6    It had silly stuff on it and different things.  You might

7    remember if you went to some stores you might see a greeting

8    card kiosk.  You go in and call them touch screen greetings,

9    called them a lot of things.  But there were a lot of ways to

10   make a greeting.  And then there was a rapid expansion of the

11   Dollar Stores, Dollar General, Family Dollar, those kinds of

12   things that we knew in Canada that part of the business was

13   growing really rapidly.  We also knew in the UK that part of

14   the business was growing rapidly and was a very competitive

15   market in the UK.

16           Many times what happens in the UK will come to the

17   U.S. eventually.  What happens in Canada, some of that will

18   flow down to us eventually.  So we had some really tough

19   questions around what is the role of greeting cards in the

20   future?  Is it going to be a viable relevant category or will

21   e-greetings be the way people want to communicate.  If it's

22   going to be a viable relative category, who is the consumer

23   target?  Who do we need to target all of our efforts against,

24   whether it's marketing the product, writing the product,

25   designing the product.

1          And then once you get to that you say what customers

2     do you want to sit on?  Might be some that say you want to go

3     to Dollar Store?  Let's take our product to Dollar Stores.

4     There might be others that say be all about e-greetings or

5     greeting card kiosk or greeting card vending machines.  All

6     kinds of crazy ideas about how to put cards in the hands of the

7     consumer.  In which case do you continue to invest in Gold

8     Crown.

9          When you're back in the Gold Crown do you get more

10    aggressive with Wal-Mart?  Are there customers out there that

11    we don't do any business with today that we need to be more

12    aggressive with?  So this was a very important part of our

13    history that we had to decide was the greeting card business

14    going to be the business we needed to continue to grow and if

15    so how?  With who?  And how do you do it?  How do you spend and

16    what do you want to spend in the future?  It's critical.

17    Q    Did the BMR itself involve analysis of more than just the

18    greeting card business at Hallmark?

19    A    By that we did an analysis of who buys greeting cards and

20    when they buy them, what triggers a purchase.

21    Q    I probably didn't ask the question very well.  Did you

22    look at the gift's business, for example?

23    A    Yes, we looked at the gifts business.  We looked at the

24    party business.  We looked at different things, yes.

25    Q    But what we're talking about in this case is the greetings

1    part of the BMR, right?

2    A    Right.

3    Q    There are more modules of the BMR than just greetings?

4    A    Yes.

5    Q    Okay.  Now, who at Monitor were the primary consultants

6    working on the greetings business?

7    A    I worked with a lady named Elise Martin.  Might have been

8    Elise Bates at the time.  Elise Martin.  Romney Resney, Stacey

9    Raiche, Mark Pocharski, Bob Lurie from time to time.  He wasn't

10   a daily participate.  But the other names we worked with them

11   almost every day including weekends.

12   Q    Did you ever meet a Juanita Moore?

13   A    I did.

14   Q    What was her role?

15   A    I think she was a finance analyst.  I didn't spend a lot

16   of time with Juanita.

17   Q    You mentioned the name Mark Pocharski, was he one of the

18   senior consultants?

19   A    He was.

20   Q    Did you work closely with him?

21   A    I worked with him.  He worked more closely with the guy,

22   John Beeder.

23   Q    Who was the head of greetings at the time, at Hallmark?

24   A    John Beeder was running the greetings business at

25   Hallmark.

1  Q    Now, Mr. Hall described that there were dozens or scores

2  of Power Point presentations that were generated over the

3  course of the BMR.  Is that accurate in your experience?

4  A    Yes.

5  Q    What is it, you've looked at the five presentations that

6  are at issue in this case, true?

7  A    Yes.

8  Q    What is it about those five presentations that

9  distinguishes them from all of those others, if any?

10 A    The five presentations were the summary of dozens, I might

11 even say hundreds but dozens and dozens of smaller pieces of

12 work that summarized our work.  For example, on the customer

13 side, you know, I went out with Elise Martin.  We went to

14 customer sites on location and asked them questions for an hour

15 and a half or two hours.  That entire process might lead to one

16 page in the slide.  And that page might lead to one bullet

17 point in the next slide.  So there were hours and hours and

18 days and days of work that led up to the summary presentations

19 that together when you add them altogether they represented

20 what our work was.

21 Q    What period of time are we talking about from beginning of

22 the consulting work with Monitor to the completion of the work

23 on the greetings part of the BMR?

24 A    We started work in early 2001.  We completed the greeting

25 card strategy work in December of 01.

1    Q    Now, we looked at and one of the presentations that we're

2    going to examine here today is the December 2001 OEC, right?

3    A    Yes.

4    Q    You've seen that?

5    A    Yes.

6    Q    Is that the culmination of the greetings work?

7    A    December OEC was the completion of the greeting card

8    strategy work.  We were done.

9    Q    We saw during Mr. Hall's testimony a Power Point

10   presentation that was dated June 2002?

11   A    Yes.

12   Q    To roughly the same group of people.  What was going on

13   between year end 2001 and June 2002 on the greetings BMR?

14   A    We were in implementation mode.  I personally took

15   additional assignment when that work was done and we were now

16   into staffing and understanding how we best go to market and

17   implement the greeting card strategy.  There was other work

18   being done but it was -- the greetings business was all about

19   implementation of the strategy.

20   Q    Now, the five presentations then that embodied the

21   business strategy were in your hands.  I think the latest one

22   we saw was January of 2002 on the Gold Crown?

23   A    Yes.

24   Q    Were those presentations kept confidential within

25   Hallmark?

1    A    Absolutely.

2    Q    We've seen through Mr. Hall's testimony and then some of

3    the examples he gave that a piece of information or a piece of

4    research or a top level conclusion from the BMR might be shared

5    from time to time.  But my question is, those five

6    presentations themselves, are you aware of any instance in

7    which any one of them was disclosed publicly?

8    A    No.

9    Q    Was the information that we see in the five and that the

10   jury will see in the five presentations still confidential in

11   2005?

12   A    Yes.

13   Q    Was that information confidential at the time it was

14   attached to that e-mail and sent to Mr. Doctoroff at Monitor

15   Clipper?

16   A    Absolutely.

17   Q    Was it still relevant at that time?

18   A    Yes.

19   Q    Why doesn't information on Hallmark's business strategy

20   become less and less relevant as time goes on as you begin to

21   implement it and you have ad campaigns and marketing

22   promotions?  Why doesn't the information lose its value as time

23   marchs on?

24   A    The greeting card business, if you look at a lot of trend

25   lines of business, it's not that volatile.  It's a pretty

steady trend in terms of units in the industry. We're in a

little bit of decline right now but it's not volatile. And our

terms with customers, our pricing with customers is pretty

steady. We, for the mass channel business, Walgreens, CVS,

Kroger, Safeway, all of those, they're under contract. We

negotiate some times 5 years, some times a little longer, some

times a little shorter, contracts with these customers so we

could have had contracts, did have contracts in 2001, 2002 that

would have been extended beyond 2005. And the relative scale

of the terms, percentages, then in 2005 as I testified a few

minutes ago is basically the same as it is today.

Q    Thank you. Let's put Exhibit 487 back up on the screen.

Let's just go to the first page. Put the e-mail up.

Mr. Strickland, one of your jobs in this case has

been to, as a company representative in the case, has been to

look at these five presentations and to testify, translate what

we're seeing there, true?

A    Yes.

Q    So I'd like, I don't want to go page by page because

there's hundreds of pages but I'd like to give the Court and

jury some sense of what we're seeing through those five

presentations. So let's go to the first one. August OEC.

Next page. Okay. Describe for us, please, then what the

August OEC presentation involved?

A    August OEC 2001 was a summary of the work for the

1    greetings business model year to date.

2    Q    Okay.  And the OEC was what?

3    A    I think it stood for Organizational Effectiveness

4    Committee.  It contained the president of our North American

5    business, Don Fletcher, a handful, say 10 or 12 of the officers

6    and 15 or 20 senior leaders that their role was to listen to

7    this information, ask questions, make sure we're on course,

8    make sure that we weren't missing anything, to basically vet

9    the information as we went forward.  So it was some of our

10   senior experienced people in the business that were there.

11            The reason it's such a large group, Mr. German, is,

12   as I said, this was the most extensive work we've ever done in

13   the business.  We had some real tough questions to ask and

14   answer.  So this group we met with and we said, here's what

15   we're finding, here's what we're learning.  What questions

16   should we be asking?  How do you feel about this information?

17   Do you support us going forward?

18   Q    Who was the most senior head of marketing for greeting

19   cards at that time on the OEC?

20   A    It was a lady by the name of Jan Murley.

21   Q    And you mentioned the name John Beeder earlier.  He was

22   head of greetings?

23   A    He was head of the greeting card business.

24   Q    The president of the organization, Mr. Fletcher at that

25   time?

1   A    Don Fletcher.

2   Q    And then you had a gifts person and a few others?

3   A    Gifts person, operations person, technology person, cross

4   functional representation of the company.  HR people.

5   Q    Okay.  Now, we're going to look at a few of the slides

6   here in detail but this is August of 2001.  And you told us the

7   work was completed in December of 2001?

8   A    Yes.

9   Q    Why, having studied this for this case and representing

10  the company on these issues, why is the information that we see

11  in the August presentation of any interest in 2005 to a private

12  equity company thinking about investing in the greeting card

13  company?

14  A    Because the information is still relevant.  Our pricing,

15  terms, our strategy for how we're going to activate the

16  shopper.  Who our consumer target is.  Why she buys.  In the

17  buying process when do you talk to her.

18  Q    And how in your view as a marketing person, a business

19  person does knowing what Hallmark is doing in those areas help

20  somebody like a Monitor Clipper who's thinking about buying a

21  competing company or investing in a competing company.

22          MR. DONOVAN:  Objection, speculation.

23          THE COURT:  I'll allow him to answer if he knows.

24          THE WITNESS:  If someone was wanting to buy a

25  greeting card company and they knew what the biggest player in

1    the category was going to do and how to spend their money, it

2    would inform them all the choices they could make.  For

3    example, what one of the choices we made as a result of this

4    work is that we are going to have a greeting card category

5    campaign, a Remembering Campaign.  Because in our analysis, we

6    had decided greeting cards are still very relevant.  It's a

7    very big category.  Consumers, our best consumers actually

8    thought they were still buying more cards but they were

9    actually buying a little less.  But they wanted to buy more,

10   they just forgot.  In their busy hectic lives, working moms,

11   working dads, big families and everything, they just kind of

12   just, a few cards kind of dropped through the cracks during the

13   year and they forgot to send them.

14           So we put together a category campaign.  A category

15   campaign is trying to show the benefits of a greeting card

16   category regardless of what brand, regardless of what customer,

17   regardless of what channel.  It's typically what a category

18   leader would do or brand leader would do.  Some people would --

19   we use the example of Coke a lot.  Coke used to advertise Coke.

20   You never saw any Pepsi commercials because what they were

21   actually doing was advertising soft drinks.  If people thought

22   of soft drinks, they just remembered to buy the brand they

23   preferred.

24           So we made a huge investment and change of strategy

25   to invest in a category campaign.  So if I knew that and I

1  wanted to go buy a greeting card company, I would say that's

2  terrific because Hallmark is going to advertise the category.

3  I don't have to do any of that.  I can take all of my money and

4  spend it where I want to spend it.  And by having all this

5  information, all the work, all the analysis, all the summary

6  already done, you can make a lot of choices how you want to

7  spend your money because we've done all the work.

8  Q    In 2005 was Hallmark's strategy of investing in the

9  category as opposed to the Hallmark brand a secret?

10 A    No.  We ran category campaign advertising.  So you could

11 watch TV and you knew we were going to advertise the category

12 but you didn't know what else we were doing.

13 Q    Let's go to page 18 in this deck and just blow that up if

14 you would.

15      This slide, Mr. Strickland, why don't you explain to

16 the jury very generally what we see in the grid but more

17 particularly those numbers along the right-hand side?

18 A    This grid represents a buying process.  Most products that

19 you buy, we buy, there's some kind of process you're following

20 the triggers of purchase for a greeting card, you know, there's

21 going to be, figure out which one to read.  When there is a

22 trigger, we call it up here, inner circle relationship which

23 might be your mom, dad, your wife, an outer circle

24 relationship, that might be a co-worker, that kind of thing.

25 There is an event that happens that triggers a choice.  And

1    then you can see here there's a lot of different choices for

2    that relationship.  You could send a card and you buy a gift

3    and make a phone call.  You could take them to dinner.  It goes

4    on and on and on.  So there is a set of choices that a person

5    goes through when they're deciding to buy a greeting card.  So

6    a lot of people, most marketers understand that there is

7    choices.  But the big aha, the big take away for us from this

8    work is we were spending $153.6 million way down in the buying

9    process when a person has already kind of made the choice.

10   Q    Down there third from the bottom?

11   A    Third from the bottom you see $153.6 million, we were

12   spending money, a person has already made the choice.  They've

13   already gone through I'm going to do this, boom.  So what we

14   said is we need to shift that.  We need to spend more money

15   higher up in the buying process to influence her that it needs

16   to be a greeting card.  Love for it to be a Hallmark greeting

17   card but certainly needs to be a greeting card.  That's a

18   significant change in how we're spending money and a great

19   amount of money.

20   Q    Let's go on forward to, two pages forward.  Blow this one

21   up.

22        Tell us what we see in this study here,

23   Mr. Strickland.  And first tell us, look at the footnote down

24   at the bottom left.  What are the sources of information that

25   we see in this analysis?

1  A     This was some of our internal research.  The footnotes at

2  the bottom just kind of how our research came up with this

3  information.

4  Q     What are we seeing here on the two bar graphs?

5  A     What we're seeing on the far left there is green bars.

6  Number 1, it talks about total household participation.  So

7  over 90 percent of households participate in the greeting card

8  category.

9  Q     Was that news to you?

10  A     90 percent was new.  I don't know if it was news but it

11  was very validating especially when you consider very few

12  things have more household participation.  I'm not even sure

13  tooth paste and toilet paper are much higher than that.  It's a

14  little scary but that's true.  What that tells you is that most

15  households in the United States participate in this category.

16  So if you're looking --

17  Q     By that you mean, participate in the category, you mean

18  buy cards?

19  A     They buy cards.  Somewhere along the way 90 percent of the

20  households in United States buy greeting cards.  Then it goes

21  on to tell you what greeting card occasions or seasons they

22  buy.  The greeting card business is really made up of two kinds

23  of business.  There is the seasonal business like Valentine's

24  Day, Easter Day, Graduation, Bosses Day, Halloween, Christmas

25  and Thanksgiving.  And every day cards, birthday cards,

1  thinking of you cards, sympathy cards, wedding cards,

2  anniversary cards, all that.  This tells you the biggest chunk

3  of the business or biggest chunk of participation is in

4  birthday all the way down to Easter would be the lowest.

5          Then on the right-hand side there is a 5-year change

6  of household participation.  So it tells you over the last 5

7  years which of those occasions or seasons was declining the

8  most or the least.  This was new information.

9  Q    This was new information?

10  A    Right.

11  Q    Let's go to page 22.  Called quantification of buying

12  process opportunities?

13  A    Okay.

14  Q    Picking up where you left off before about household

15  participation, what does this analysis tell us?

16  A    This is another one of those aha moments in the business

17  process redesign for greeting cards as relates to what

18  consumers we need to target.  And what this is doing is

19  breaking it down to more expected occasions and less expected

20  occasions.  Inner circle, outer circle, more expected occasions

21  would be things that tells you here, Christmas, birthday,

22  Valentine's Day, Mother's Day, Father's Day, anniversary,

23  wedding, those kinds of things.  Those are what we call

24  expected occasions.  You're not going to miss your husband's

25  birthday or your mother's birthday most likely.

1        Less expected occasions were New Year's, Easter,

2   Thanksgiving, Halloween, smaller occasions and less expected.

3        Inner circle would be those relationships in your

4   inner circle and then outer circle would be, might be co-worker

5   or friend of a friend or neighbor or something like that.

6   Inner Circle, outer circle both have the same meaning whether

7   it's less expected or most expected.

8        So this begins to zero in on, for us, where you need

9   to focus your marketing, your product development, your

10  merchandising, your signing.  And we decided you had the most

11  sales for most expected occasions with your inner circle

12  relationships.  If you drill down here you can look at the

13  numbers and it tells you, if you want to move a little of the,

14  I forgot about it to I remembered that is pretty good for us.

15  Lot more people buy greeting cards.

16  Q    Let's go to the next slide, please, Cindy.

17       This one is entitled potential consumer leverage

18  points.  What does that mean?

19  A    This slide is saying where you should focus.  It's saying

20  for the more expected occasions, inner circle and outer circle

21  are the number 1 and 2 leverage points.  The third leverage

22  point would be less expected occasions but still inner circle.

23       The reason this is important is there's a lot of

24  choices you can make in the greeting card business.  You could

25  say, gosh, we need to get more people to remember Easter.

1    Let's go after Easter.  Well, if you do this analysis, it's a

2    less expected occasion and you could spend a lot of money but

3    it's our analysis that you're not going to change a lot of

4    people that's going to go buy more Easter cards for this

5    category, part of the category is in decline.  But if you can

6    take the most expected occasions with your inner circle

7    relationships, get them just to buy a few more cards, we can

8    grow.

9    Q    And that was news to Hallmark in 2001?

10   A    Yes, it was news.  And it gave us a path to say if we do

11   those things we can grow this business.  Because, again, big

12   category that is relevant.  They're forgetting.  They're just

13   forgetting to buy the cards.  And if we can intervene higher in

14   the buying process, especially those people more expected

15   occasions, inner circle relationships, go buy more cards.

16   Q    Let's look at slide 28.  Acquisition of new accounts.  How

17   does this analysis work relate to that inner circle, outer

18   circle, more and less expected?  What does this tell us?

19   A    This is an analysis that we did to say where would you go

20   after new accounts?  In the top you see it says, cards more

21   core to the business or it says, cards not core to the

22   business.  That was our evaluation of those retailers that make

23   greeting cards core part of the business, was that business

24   important to them?  Walgreens, CVS, they were non deep

25   discounter, core to the business, high financial stability.

1   And we have people like Rite Aid and Eckerd, they were non

2   discounted cards core to the business but they were a little

3   shaky financially.  So this was our way of trying to coordinate

4   and target what retailers you should spend more money on.  Is

5   it core to their business?  Are they financially stable?  And

6   is this a big opportunity?

7   Q     So if you put this analysis of the customers together with

8   the analysis of the consumers, people who buy cards, and the

9   financial relationship information we looked at earlier, what

10  does that tell an investor, a private equity firm thinking

11  about buying a greeting card company?

12  A     If they were thinking about buying a greeting card company

13  it would tell them it's profitable.  It's viable.  It's the

14  biggest company in the -- really the only brand in the business

15  is going to invest in a category and here's who they're going

16  to go market.  Gives them a lot of choices.  How to spend their

17  money and where to go spend it.  The work has already been

18  done.  They don't have to speculate on where to go or what to

19  do.  The work has been done.

20  Q     Is that kind of information on the consumers, on the

21  accounts who buy your cards, the financial relationships

22  available publicly anywhere?

23  A     Not that I know of.

24  Q     Let's look at slide 33.  What does this analysis tell us,

25  Mr. Strickland?

1    A    Again, this is one of the aha moments for us in the

2    analysis.  This tells us that our top 12 greeting card

3    customers represented 85 percent of our revenue.  We also

4    learned that they represented over 100 percent of our profit.

5    So --

6    Q    How could it be over a hundred percent?

7    A    Because we're not making some money on some other

8    customers.  The terms we're paying, there are some high terms

9    customers.  We're not making profit on those customers.  The

10   reason that this was important, I kind of touched on it

11   earlier, if you didn't know the business, if you didn't have

12   all the analysis and the information you can only get if you

13   really learn the business day-to-day, I think people would

14   think, well, Wal-Mart, probably not making a lot of money

15   there.  Because Gold Crown is a speciality store chain that

16   most consumer private product goods companies don't deal

17   with -- the Proctors and the Cokes, they don't deal with Gold

18   Crown.  They're off the radar.  Then Walgreens and CVS, they're

19   probably No. 12, 13 or 14 for most other companies.  But this

20   would tell you hallmark makes a lot of money at Wal-Mart.  They

21   make a lot of money at Gold Crown.  Here's the nooks and

22   crannies and the idiosyncrasies of the Gold Crown channel.  And

23   then they go out and get Walgreens and CVS.  I'll be darned.

24   Q    Cindy, go to page 39, please.

25        In this part of the analysis we see a study called AG

1  Competitor Analysis.  AG is American Greetings?

2  A    Yes.

3  Q    What does this tell Hallmark?

4  A    We did some work to try to determine if American Greetings

5  had a huge cost advantage to us in terms of making a greeting

6  card.  So in this Business Model Redesign work, as I said

7  earlier, we're trying to look at A to Z, everything about the

8  business.  And one of those we looked at American Greetings and

9  said, now, from a seasonal card basis we're about the same and

10  from every day card business, there is a slight difference.  So

11  we did a lot of work on trying to figure out how our

12  competitors operate.

13  Q    Now, American Greetings is a public company so this kind

14  of information about cost structures and so forth you could get

15  from their government filings and public reports?

16  A    Right.

17  Q    Does information like that regarding Hallmark's operation

18  and Hallmark's costs appear in any public filing?

19  A    No.

20  Q    So this kind of analysis that takes American Greetings,

21  putting it together with Hallmark, is a unique piece of

22  information?

23  A    Absolutely.

24  Q    Confidential within Hallmark?

25  A    Extremely.

1  Q    Let's go to page 56.

2          Mr. Strickland, the next two or three pages --

3          Cindy, why don't we go forward quickly to pages 56,

4  57.

5          Is the growth, no growth model scenario one and the

6  next page no growth model scenario 2 following the industry

7  decline.  The jury will have these to look at at their leisure

8  but tell us what we see in those two scenarios regarding a no

9  growth model.  What does that mean?

10  A    Could we go back to the first one?  Go back to the first

11  slide.

12  Q    Okay.

13  A    What we were looking at in this slide two scenarios, gross

14  share following industry decline.  So we're looking at the

15  financial implications of, okay, you don't do anything and you

16  just follow the industry trend down.  Or you try to grow share

17  by what we ended up doing is advertising, going to market a

18  category campaign.  So if someone had this information they

19  don't need to do this work because we've already done the work

20  for them.

21  Q    Let's go now, to the December OEC presentation.  The next

22  presentation attached to the e-mail.  You've told us the

23  greeting card work was done in December?

24  A    Yes, sir.

25  Q    What does this presentation then represent?  It's several,

1    a couple hundred pages long, 100 some odd pages long.  We're

2    not going to do it page by page but tell us in general what

3    this presentation embodied when it was presented to the OEC at

4    Hallmark?

5    A    This is a summary of the greeting card business strategy

6    work.  This is all the months work that we did.  This is the

7    summary, we're into the greetings business model strategy work.

8    It says what we're going to go do.

9    Q    If somebody thinking about getting into the greeting card

10   business or investing in that category, has this document in

11   their hand, do they know Hallmark's playbook?

12   A    Absolutely.  They know our playbook.  They know our secret

13   sauce.  It would be like going to the football game and the

14   defense knows the play you're going to call every time you go

15   to the line of scrimmage.

16   Q    Just a couple of general questions.  If you can generalize

17   for us, with this growth strategy in hand at the end of 2001,

18   what was Hallmark's business strategy going forward?  What

19   changed?  How did Hallmark alter its behavior as a result of

20   this work in the BMR?

21   A    Well, we identified a new consumer target, women 45 plus.

22   We went after that target.  We were going to advertise the

23   category.  Launch the Remembering Campaign.  We grouped our

24   customers into, the top 15 customers into what, we called them

25   suites at the time.  And we put more focus on our top customers

1  to grow them more quickly because that's where we made all our

2  profits and that's where north of, I think the slide said

3  85 percent of our revenue.  So it gave us real clearly a focus

4  about the consumer target we should go after, how to activate

5  her at a different point in the buying process and which

6  customers to go after and also what not to do.  We didn't go

7  after more electronic greetings and kiosk and chasing Dollar

8  Stores and going after other potentially unprofitable business.

9  We said, greeting card category is relevant.  We want to grow

10 it.  Here's how we're going to grow it.  Here's who will buy

11 it.  And here's the customer we're going to get most aggressive

12 with because that's where we can make the most money.

13 Q    Was that strategy still in place at Hallmark in the fall

14 of 2005?

15 A    Yes.

16 Q    Was the information in this Power Point presentation, this

17 business strategy presentation from December of 2001 still

18 relevant in the fall of 2005?

19 A    Yes.

20 Q    Was it confidential?

21 A    Yes.

22 Q    In the fall of 2005?

23 A    Yes.

24 Q    Between December 2001 when this work was delivered and

25 approved and adopted by Hallmark and the fall of 2005 when it

1    got attached to that e-mail, had that compilation, that

2    greetings business model OEC discussion December 12, 2001

3    presentation ever been publicly disclosed?

4    A     No.

5    Q     Let's look at page 3 of the presentation, please.  There

6    you go.  Blow that up.

7              Early on in this presentation, Mr. Strickland, there

8    is this time line of various jobs that people at Hallmark and

9    people at Monitor are working on to do this analysis.  And you

10   can see that the jobs over to the right appear to fall during

11   the calendar year of 2002.  Do you see that?

12   A     Yes.

13   Q     How do you explain that time line that we see in this

14   presentation with your statement earlier that the work was done

15   at year end 2001?

16   A     We accelerated the work.  And we completed the greeting

17   card strategy work in December of 01.

18   Q     Were some of the things that we see over on the far right

19   that were at least initially slotted to occur in 2002, not

20   done?

21   A     Most of that work was not done or it was done earlier.

22   Q     Down at the very bottom of that time line we see something

23   called white space?

24   A     Yes.

25   Q     What was that?

1  A      White space is a term we used to say what else might be

2  out there.  You know white space opportunities might be should

3  we do kind of a dream space, thinking the deck or examples of

4  kind of white space stuff that might happen.  I don't think we

5  ever saw text messaging and all that stuff coming alive like it

6  did.  We did a lot of that work very early on and the work

7  before we got to customers and channels and all that, we vetted

8  that pretty hard early which led us to we need to stick with

9  our best customers where we make all of our money and where

10 most of the revenue is and we didn't do any more white space

11 work after the December OEC presentation.  We were done with

12 it.

13 Q      Let's go to page 7, please.

14          Now, Mr. Strickland, down at the very bottom left the

15 source of this is called Hallmark diary study.  Do you see

16 that?

17 A      I do.

18 Q      That is a proprietary Hallmark research?

19 A      Yes.

20 Q      What do we see on the chart here?

21 A      On this chart we're breaking down category trends in units

22 by lifestyle from 1996 to 2000.  Lifestyle meaning young

23 couple, young singles, parents with kids at home, and couples

24 and singles 45 plus without kids in home.  You can see on the

25 left there is the axis of millions and bottom is the years.

1          And what you can see starting in 1999 is a

2   significant drop off in units for couples and singles 45 plus

3   without kids in the household.  That's where a large part of

4   the unit decline was happening.  In fact, looks like

5   180 million units.

6   Q    Okay.  And what does this tell somebody thinking about

7   getting into the card business?

8   A    Well, it can tell you a lot of things.  It could say I

9   believe I have a lot of cards that could go after young and

10  middle singles.  They seem to be growing.  I can make a lot of

11  cards all about parents and kids.  That part is growing.  I

12  could go after young couples, maybe there's nobody else in that

13  market place.  Or I could go after couples and singles 45 plus

14  without kids in the household because that's in decline and I

15  understand what it would take to get them to buying cards

16  again.  In other words it gives a lot of information that

17  somebody can make a lot of choices.  They don't have to do the

18  work.  The work has been done.

19  Q    Kind of informed decision making on where to invest in

20  your customers, where to invest in marketing, promotion,

21  advertising?

22  A    Marketing, product, customers, what kind of product, size

23  of product, price of product, how you go to market.  It would

24  help inform those choices.

25  Q    Let's go to slide 13.

1          Mr. Strickland, this one is called exploring target

2    decline and tell the Court and jury, please, what this analysis

3    is telling us?

4    A    Well, it might be a little boring, I apologize.  But

5    greeting cards on the surface may look like a simple business

6    but it's a very complicated business because, again, there is a

7    seasonal business, Valentine's, Mother's Day, Father's Day, all

8    that and then there is the every day business.  And each of

9    those seasons and each of the occasions, birthday, anniversary,

10   wedding, thinking of you, baby, wedding, all that, it's all

11   about the relationship one person has with another person.  And

12   let's take Mother's Day, for example.  Some people have great

13   relationships with their moms.  Some people have average

14   relationships with their mom.  Some people don't have a good

15   relationship with their mom.  The kind of cards you send, the

16   kind of card you like, the price of those cards, it's different

17   based on that person and the person who is going to get the

18   card and what the card says, what it's about.  So there is all

19   these different relationships and you play it over, again, all

20   these different seasons, all the different occasions, all these

21   different relationships.

22          What we did, we broke down 110 possible recipient and

23   occasion relationships.  All those things I just talked to you

24   about.  And of all of those we said there's 15 largely more

25   expected occasions responsible for nearly all of the decline

1    between 97 and 2000 with friend birthday alone accounting for a
2    third of the decline.
3                So, again, billions of units of greeting cards sold
4    in a year.  We did all this work.  We said it comes down to
5    friend birthday is a third of the unit of decline then here's
6    the other different pieces of it.
7    Q    So what does that tell Hallmark, how does that inform
8    Hallmark's strategy going forward to try to focus on that
9    occasion, friend's birthday?
10   A    That led to the Remembering Campaign that said we know
11   birthdays are important, we know people want to send cards.
12   We'd done the research and people said we love the category.
13   We want to send more cards.  They forget.  So the Remembering
14   Campaign was about reminding people that a birthday is coming
15   up or an occasion is coming up and remind them to send a card.
16               So we're trying to be good stewards of the category,
17   the category of advertising because we believe if you can get
18   friend birthday just to go up a little bit, this category is
19   going to be a good category to be in.
20   Q    Was that information even after the Remembering Campaign
21   had been launched and out there on television still relevant in
22   the fall of 2005?
23   A    Absolutely.
24   Q    In your position at that time, as one of the team leaders
25   and chief business people at Hallmark, Mr. Strickland, was it

1   part of your job to observe what the competition is doing out

2   there in your market space?

3   A    Yes.

4   Q    Were you aware of Recycled Paper Greetings in 2005 and

5   2006?

6   A    Yes.

7   Q    Can you describe for the Court and jury any changes in

8   Recycled Paper's behavior that you were able to observe from

9   2005 to 2006 after the transaction involved in this case?

10  A    Recycled Paper made a significant change in their line

11  meaning their greeting cards.  Recycled Paper had got into the

12  business and made some in-roads with our retailers with

13  primarily all humor, risque, slightly off color humor that at

14  the time we didn't do.  We didn't do.  So the retailers who

15  bought Recycled could say we bought that line because that's

16  something Hallmark doesn't do.  We wouldn't do risque stuff and

17  I won't talk to you about what it looked like but it's some

18  stuff we didn't do at the time.

19          But in 2005 and beyond, the line changed.  The line

20  changed from that humor, risque line to kind of a general line

21  of greeting cards.  You had birthday cards.  You had thank you

22  cards.  It looked like a scaled down line of our cards.  It was

23  now a truly acceptable line of greeting cards.  Had a lot of

24  friends birthday cards in it.  It wasn't all the risque, people

25  would say offensive product.

1  Q    Let's go to slide 29, please.  What is this analysis

2  telling Hallmark, Mr. Strickland?

3  A    We did some work to say if the target is 45 plus with no

4  kids, if that's our target, do they shop where we have

5  customers?  Will they, did our top customers have these

6  consumers and they do.  You can see over to the right.  The

7  left here is Gold Crown and here is 45 plus, no kids in the

8  home, the numbers that go with it.  On the right it's talking

9  about where are these 45 plus consumers, that's the blue bar.

10  You can see Gold Crown, Wal-Mart, Walgreens, CVS, Safeway, very

11  high bars.  So that's where our core consumer is shopping.

12        It would have been a disaster for us if it said

13  that's our core consumer, that's who we want to go after but

14  she doesn't shop in the stores that we sell to.  So, again, it

15  was a reinforcement of we want to do business with these

16  customers and be more aggressive with those customers.

17  Q    What does this tell a private equity company looking or

18  thinking about investing some of its funds, money in the

19  greeting card business?

20  A    It gives them choices.  It tells them that Hallmark is

21  going to be advertising, going to be doing this campaign.

22  They're going after 45 plus.  You can ride that.  You can go in

23  behind them if you wanted to be a part of that and here's where

24  those customers are shopping.  Or you could say I want to do

25  something different if you wanted to.  But it tells you where

1    the biggest brand in the company is going to do.  Tells you why

2    they're going to do it.  Tells you the consumer target they're

3    going after.  And it tells you where they're shopping.

4    Q    If you have that kind of information you see on this slide

5    together with the financial relationship information we looked

6    at at the beginning of your testimony, how does that give you,

7    as a potential entrant to the market, some insight?

8    A    It gives you choices.  It tells you what Hallmark is going

9    to do.  Then you get to decide, again it's like a playbook.

10   It's like a football team going to the line of scrimmage and

11   the defense knows what play you're going to run every time you

12   run it.  It's our secret sauce.  You could say run your play,

13   we're going to defend you.  You saying we're going to do

14   something very different and we're going to take this terms

15   package to this customer.  Or we know you don't service these

16   stores so we're going to offer service packets to these stores.

17   We know you don't get returns on these customers so we're going

18   to get returns on them.  They get to choose.

19   Q    Go to page 38.

20         Mr. Strickland, this seems to be giving information

21   about Hallmark's top customers.  What does this tell a

22   potential competitor?

23   A    Well, what this slide showed us was we won't repeat

24   everything I said so far but we said, hey, these top customers,

25   they're a lot of revenue for us and we make a lot of profit on

1   them.  What this chart showed us and they're also growing

2   faster than all other customer.  So it's not like you've got a

3   customer that, hey, we're making a lot of profit today but

4   they're in decline.  We don't think they'll be in business in a

5   few months.  These customers are continuing to grow and we

6   think they're going to continue to grow.  So it's a validation

7   of the choices that we were making.

8   Q    I think we could keep going but let's skip back down

9   towards the end, Cindy.  Go to page 100.

10        You spoke earlier, Mr. Strickland, about the white

11  space that you actually, instead of doing it in 2001, 2002 did

12  it very early on in the BMR process.  And you see up at the top

13  left of this slide it refers to the white space opportunities?

14  A    Right.

15  Q    Let's go to the next page.

16        Tell us quickly, still hard to see, but if you can,

17  Mr. Strickland, just tell the Court and jury how this white

18  space or high tech potential segment of the market was

19  evaluated by Hallmark at the time of the BMR?

20  A    It's a very busy chart but this chart reflects all the

21  work we did coming up to the December OEC presentation of what

22  Hallmark had done in electronic greetings and technology and

23  resources in pre, not 88, all the way up to 2001.  I think

24  there were some people that believed falsely that we hadn't

25  been in that business before.  We hadn't been trying to do

1    kiosk or touch screen greetings or e-greetings and all that

2    stuff and we didn't know what to do.  Actually we had been

3    doing a lot of work in that before.  So we did the analysis.

4    We did not think that all of that white space opportunity

5    represented much of an opportunity for us.  We looked at it,

6    put this kind of information together, we vetted it, we talked

7    about it, debated it because, again, some people thought that

8    electronic greetings was going to be the wave of the future and

9    greeting cards were going to be like the buggy whip.  People

10   just didn't need them any more.  We didn't think that was true

11   for greeting cards.  And so we said we're done with white

12   space.  We're moving on to implementing the greeting card

13   strategy.

14   Q    So Hallmark made a conscience decision coming out of the

15   BMR not to focus resources on electronic greetings?

16   A    Not to focus any of our work on white space.

17   Q    Texting?

18   A    Whatever texting was then but whatever it might be.

19   Q    Were there other greeting card companies who chose

20   differently?

21   A    Absolutely.

22   Q    Like?

23   A    Mr. German, I don't think we need the names of the

24   companies but some companies went after more electronic

25   greetings and kiosk greetings and greetings online and all of

1    those kinds of things, thinking that was going to be the growth

2    engine for the greeting card business.  We chose not to.

3    Q    How about a company called Gibson Greetings?

4    A    Yes.  Gibson Greetings made a different choice.  They went

5    out of business.

6    Q    How about Recycled Paper Greetings?

7    A    I'm not aware of any online activities Recycled went

8    after.

9    Q    In other words, kind of like Hallmark did?

10   A    Yes.

11   Q    I want to go back for just 30 seconds to that Gold Crown

12   channel.  It's the next deck.  We spoke earlier and you said

13   that you thought that Recycled Paper Greetings sold its product

14   through the Gold Crown channel stores?

15   A    They did.

16   Q    I'd like to just show the jury while we're on this point.

17            Your Honor, this is a stipulated exhibit but it kind

18   of fits in here.

19            Mr. Strickland, what you see here is the offering

20   memorandum from William Blair and Company that was sent out to

21   Monitor Clipper and other potential private equity firms

22   interested in Recycled Paper Greetings.  It's Exhibit 1023 from

23   July of 2005.  And the parties have agreed that this is

24   admissible in this case.  I just want to display it to the

25   jury.

1          Could we go to page 3, please?  Keep going.  Blow up

2    the top paragraph, please.

3          In the description of the business of Recycled Paper,

4    the company, the investment bank noted that the company,

5    Recycled Paper, had significant experience in selling in best

6    of class retailers and they list off a few of them.  Some of

7    those are your customers as well, right?  Walgreens?

8    A    Yes.

9    Q    And then there is the Hallmark Gold Crown Stores.  Do you

10   see that?

11   A    Yes.

12   Q    Was the Hallmark channel a significant distribution

13   channel for Recycled Paper?  Do you know?

14   A    I don't know how big it was.  They sold in some of the

15   Gold Crown Stores.  I don't remember.

16   Q    Recycled Paper had about $91 million of revenue in 2005.

17   Does that jog --

18   A    Sounds about right, yes.

19   Q    Any idea how much of that $91 million revenue would be

20   from Gold Crown?

21   A    I do not.

22   Q    Let's go to Exhibit 488.  We've looked at the three

23   presentations that were attached to the August 25 e-mail.

24   That's Exhibit 487.  I want to touch briefly on the two short

25   presentations that were attached to the second e-mail which is

1    Exhibit 488.  You've seen this e-mail before Mr. Strickland?

2    A    Yes.

3    Q    Do you understand that the from and to people here are the

4    Monitor standing case team that worked on the Recycled Paper

5    deal?

6    A    Yes.

7    Q    Let's go to the first Power Point attachment.

8                Understanding industry trends, August 2001.  Do you

9    recall this study?

10   A    I do.

11   Q    Let's go to page 3, please.

12               AG is American Greetings?

13   A    Yes.

14   Q    Tell the jury what you're seeing here regarding the study

15   of American Greetings decline?

16   A    We were attributing the AG decline to their channel

17   strategy.  We believe that the drug stores and supermarkets

18   they had acquired were not the healthiest of those in the

19   channel.

20   Q    Next page.  AG plus Gibson.  Do you see that?

21   A    Yes, I do.

22   Q    What does that refer to?

23   A    Pardon me?

24   Q    What does that refer to?

25   A    The combined share of American Greetings and Gibson

1    together.

2    Q    And what is this analysis telling us about Hallmark's

3    performance compared to American Greetings and Gibson?

4    A    It's showing that share remained pretty stable through the

5    early 90s then '97, '98, started getting some distance between

6    the two of us where Hallmark was growing its share of the

7    business and AG and Gibson were declining.

8    Q    Next page.  Now, in the small competitors deck, explain

9    why this study was done?

10   A    Well, again, we're trying to do the most thorough analysis

11   we could do of our business including other competitors.  So we

12   looked at, I think there are seven competitors in this analysis

13   as well as the deep discount channel.  So we wanted to know who

14   was there?  What were their strengths?  Who was the best

15   competitors?  Do we think the channel is going to grow?  Can we

16   make money in the channel?  Those kinds of things.

17   Q    Cindy, if you would, turn over to page 2.

18        Who were the small competitors that Hallmark studied

19   through this process?

20   A    Well, we looked at two groups of competitors.  There is

21   the non-discounted competitors which is Paramount and Recycled

22   Paper.  Then we looked at a group of discount competitors,

23   Gallant, Tantus, Image Craft, Freedom, Novo Card.  So we were

24   looking at, again, there are different ones that sell to non

25   deep discount and those who sell to discount.

1   Q    So you actually, part of the BMR actually involved

2   Hallmark's study of Recycled Paper?

3   A    Yes.

4   Q    Next slide, please.

5        What does this analysis tell the reader about

6   Recycled Paper compared to other small card manufacturers?

7   A    Recycled Paper is a strong player in the non-discounted

8   part of the business relative to all the others.  If you look

9   at the seven, Recycled Paper, look at the chart a little more

10  carefully here, gives industry size, market share, its average

11  retail pricing and what channels of trade it's sold in.

12  Q    Is this information on all of these competitor companies

13  confidential within Hallmark?

14  A    Yes.

15  Q    Do you know whether RPG, itself, had this kind of

16  information on itself?

17  A    No.

18  Q    Any of these other companies?

19  A    No.

20  Q    How did you collect that information?

21  A    It says the source is the Hallmark profiler database.

22  Must have been a research division collecting information.

23  Q    Let's look at the next slide.  Product offerings.  That

24  what I was looking for.

25       What does this analysis tell the reader about

1    Recycled Paper Greetings, Mr. Strickland?

2    A    This was our evaluation of the five deep discount or

3    discounter greeting card companies and the two non-discount

4    greeting card companies, Recycled Paper and Paramount.  It

5    gives the average price.  It gives the unit volume.  Then the

6    dots across here, themes and quality, is our evaluation of all

7    those companies where we evaluated Recycled Paper higher than

8    Paramount Greetings in terms of being competitive.

9    Q    Does this tell somebody like a private equity company

10   evaluating a potential investment that if you're going to buy a

11   greeting card company, Recycled Paper is the number one choice?

12            MR. DONOVAN:  Objection, Your Honor, putting in

13   speculation of somebody else.

14            THE COURT:  Again, if he knows, I'll allow him to

15   answer.  He shouldn't speculate or guess.

16   BY MR. GERMAN:

17   Q    If you know, what does this tell somebody looking to make

18   a potential investment in the greeting card industry?

19   A    It says Hallmark's evaluating those competitors and it

20   places Recycled Paper pretty high in the pecking order.

21   Q    Number 1?

22   A    Number 1.

23   Q    I'm going to change the subject, Mr. Strickland.  Going to

24   try to head towards the finish line here.  You were the

25   corporate representative who analyzed one aspect of the damages

1  claim in this case.  True?

2  A     Yes.

3  Q     Explain to the jury what it was that you oversaw in the

4  compilation of information about the damages being claimed in

5  this case?

6  A     It was my job to look at the work done by Monitor Company

7  as relates to the greetings business model.  How much work was

8  done and how much we paid for it and what that information

9  contained and how much was confidential and how it might be

10  used by someone else outside of Hallmark.

11  Q     Have you been, did you oversee the collection of

12  information that attempted to put a dollar value of the fees

13  paid to Monitor for those five presentations we just went

14  through?

15  A     Yes.

16  Q     And you're prepared to share that with the Court and jury

17  here today?

18  A     Yes.

19  Q     Now, you worked at some point with an economist that

20  Hallmark retained for the case, Dr. Serwin?

21  A     Yes.

22  Q     Describe that process for the jury.

23  A     I met with Dr. Serwin at least two times.  I took him

24  through these five presentations and explained what, the

25  content of the presentations and what it meant.  And we spent

1   hours together going through all of these slides and charts and

2   graphs and all that for me to explain what the information

3   meant.  Also explained to him how much money we paid to have

4   that work done for us.

5   Q     Okay.  Now, Dr. Serwin prepared certain charts that

6   displayed the financial information that you provided to him?

7   A     Yes.

8   Q     Did you have a chance to review and verify the accuracy of

9   those numbers before they were presented?

10  A     Yes.

11  Q     I'm going to hand you --

12        Don't put it up yet.

13        I'm going to hand the witness Exhibit 547D.  Ask you

14  if you can identify that for the Court, please?

15  A     Title says Hallmark versus Monitor Clipper, unjust

16  enrichment BMR project cost.  It has pricing codes on the

17  left-hand side.  It has a Business Model Redesign Project

18  description of five initiatives.  And on the right-hand side it

19  talks about the cost of those initiatives.

20  Q     All right.  Where did the financial information on Exhibit

21  547D come from?

22  A     It came from our finance group.

23  Q     Who heads that department?

24  A     At the time it was Mark Woodward.

25  Q     Mark Woodward.  Was he involved in the BMR?

1    A    He was our day-to-day point person across all the work

2    that Monitor was doing at Hallmark whether it was gifts or some

3    other work that went on.  So Mark was the point person who was

4    making sure that we were paying the bills.

5    Q    He paid the bills?

6    A    Or authorized the bills to be paid.

7    Q    And did Mr. Woodward compile the financial information

8    that you see on this exhibit at your request?

9    A    Yes.

10   Q    And you gave that information to Dr. Serwin?

11   A    Yes.

12   Q    Does this exhibit then, 547D, fairly summarize the

13   financial information that the Hallmark finance department

14   compiled at your request on the fees paid for these five

15   presentation for the BMR?

16   A    Yes.

17         MR. DONOVAN:  Objection.  The last question was fees

18   paid for the five presentations.  He already testified this is

19   fees paid for the whole BMR project.

20         MR. GERMAN:  That's correct.  So let me ask the

21   question again.

22   BY MR. GERMAN:

23   Q    Does Exhibit 547D fairly summarize the information from

24   the Hallmark finance department for the fees paid for the

25   entire Business Model Redesign project?

1    A    Yes.

2              MR. GERMAN:  With that, Your Honor, I offer 547D.

3              MR. DONOVAN:  Objection.

4              THE COURT:  I'll tell you what.  Let's take our last

5    break today.

6              Why don't we see you back here at 3:30 and then we'll

7    run until 5:00.  We'll be in recess.  Don't talk about the

8    case.

9                                  (Witness temporarily excused.)

10             (The following proceedings were had OUT OF THE

11   PRESENCE AND HEARING OF THE JURY:)

12             THE COURT:  Before we get to the objection, Charlie,

13   I don't see this exhibit identified on your exhibit list.

14             MR. GERMAN:  Your Honor, it is one page out of

15   Exhibit 547.  547 were all of the schedules, what are called

16   the updated and revised schedules.  And that's the entire,

17   like, expert report quantification analysis.

18             THE COURT:  Okay.

19             MR. GERMAN:  The portions of those schedules that

20   represent the fees on the BMR project was Mr. Strickland's

21   project.  The portion of those schedules that represent the

22   research costs, that was Mr. Maynard, another Hallmark witness,

23   that was his project.  So what we were going to do since they

24   provided that information was just take those three exhibits

25   for him and two for Mr. Maynard and have them authenticate the

1 information that went to Dr. Serwin so that when Dr. Serwin

2 testifies, that information that he got from Hallmark, was

3 provided by Hallmark is already in.  That's what we were

4 already doing.

5       MR. DONOVAN:  Objection is, first on the top of that,

6 highly confidential source, protective order.  So that

7 shouldn't be on the document.

8       Two, it's a hearsay document.  It's part of an expert

9 report.  It's double hearsay, actually.  He's saying somebody

10 else prepared it.  He got it.  He provided it to Dr. Serwin.

11 That's fine using it.  It's fine for Dr. Serwin to get up and

12 testify that this is what he received but it's not evidence.

13       THE COURT:  If Mr. Woodard -- Woodward, is he going

14 to testify?

15       MR. GERMAN:  He's not.

16       THE COURT:  Well, I think for the moment I'm going to

17 reject the exhibit.  As such that doesn't mean that Dr. Serwin

18 can't testify that he relied upon the exhibit or the amounts

19 involved in the exhibit but I'll sustain the objection.

20       MR. GERMAN:  Okay.  Then what I think I'll do, Your

21 Honor, is just ask Mr. Strickland to give us the gross numbers

22 without offering the document.  Because he did, that

23 information did come from him.  He doesn't even have to look at

24 the document.

25       MR. DONOVAN:  Your Honor, may I be heard?

1          THE COURT:  Sure.

2          MR. DONOVAN:  I don't see how that changes that it's

3     still hearsay.  It's verbal hearsay instead of written hearsay

4     at that point.  I don't know, he can say that he provided

5     information to Dr. Serwin but for him to say that he got

6     information of numbers from somebody else and then passed that

7     along to someone else, again, it's just hearsay.  It's double

8     hearsay.

9          THE COURT:  I understood that he compiled the numbers

10    and gave them to Woodward and that Woodward recorded them and

11    gave them back.  Is that not correct?

12         MR. GERMAN:  We were asked to provide a 30(b)(6)

13    witness on a portion of the damages that represented avoided

14    consulting fees.  He was the witness.  He compiled, as a

15    30(b)(6) witness, the information that Hallmark paid to

16    Monitor, brought it down to the five presentation that we're

17    here about.  It's $12 million for the whole BMR project.

18    $5 million for the work fed into these five presentations.  He

19    then appeared as the corporate rep, gave a deposition on all

20    those issues, the underlying billings and invoices that lead

21    into there.  That's what I'm going to ask him to say.

22         MR. DONOVAN:  I'm fine with him asking those

23    questions but at the deposition he said that he didn't prepare

24    it.  That Mr. Woodward prepared it and provided him the

25    numbers.

1    THE COURT:  If he was Hallmark's 30(b)(6) witness to

2  testify as to those damages, I'll allow him to give the number.

3  Overruled.

4    See you back here in 10 minutes.

5    (Recess)

6    (The following proceedings were had OUT OF THE

7  PRESENCE AND HEARING OF THE JURY:)

8    MR. GERMAN:  Your Honor, I just informed the counsel

9  there was a newspaper reporter in for about the last three

10  minutes of Mr. Strickland's exam, nothing about the

11  presentations.  We've explained the rule in effect and he left.

12    THE COURT:  Okay.  You'll have to let us know that

13  because we have no idea who is reporting, who is just

14  spectating.

15    MR. GERMAN:  I just turned and saw him.

16    (The following proceedings were had IN THE PRESENCE

17  AND HEARING OF THE JURY:)

18    WAYNE STRICKLAND, RESUMED

19    THE COURT:  Please be seated.

20    Mr. German, you may continue.

21    MR. GERMAN:  Thank you, Your Honor.

22    CONTINUED DIRECT EXAMINATION

23  BY MR. GERMAN:

24  Q    Mr. Strickland, how much did Hallmark pay to Monitor for

25  the entire Business Model Redesign project?

1    A    $12 million.

2    Q    I'm sorry?

3    A    $12 million.

4    Q    Of that $12 million, how much of that represents the work

5    done on the greetings business that we've examined here today?

6    A    $5 million.

7    Q    Does that $5 million for the greetings project represent

8    all the costs incurred on that project?

9    A    The $5 million represents what we paid to get the work

10   done.  It didn't represent the hundreds and hundreds of hours

11   of people at Hallmark that worked on this project for all this

12   time in addition to their full-time jobs and all the work that

13   didn't get done because we were doing this for all that period

14   of time.  So it's a fair and reasonable estimate of the money

15   we paid for the work that got done for the greetings business

16   model.

17   Q    And is it your testimony that the $5 million is the cost

18   that Hallmark paid for the five presentations that we've looked

19   at here today?

20   A    $5 million is what we paid for those five presentations.

21   Q    And the work that flowed into them?

22   A    And the work that flowed into them.

23   Q    What does that $5 million represent in this case?

24   A    $5 million is what Monitor Clipper avoided --

25        MR. DONOVAN:  Judge, may we approach?

1          THE COURT:  Yes, approach.

2          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

3     PROCEEDINGS WERE HAD:)

4          MR. DONOVAN:  Your Honor, this is what we were

5     talking about earlier.  They have a damages expert.  Their

6     interrogatories said the damages expert was Dr. Serwin.  He

7     would be the one talking about the quantification of

8     calculation of their unjust enrichment damages.  He has an

9     expert report on the issue.  We took his deposition on the

10    issue.  We filed a brief with Your Honor before the hearing

11    before, I think it was last week, for trial on the damages

12    issue where we laid out clearly what his report says and what

13    his deposition testimony says.  And there does not say that the

14    defendant in this case, Clipper, avoided those costs when --

15    what it says is a group of companies which includes RPG, RPG

16    Holdings, RPG Investments and Fund II, that that grouping

17    avoided the cost.  And that they're stuck with that.

18         If today he testifies that Clipper avoided the cost,

19    that is a new theory to this case that we have -- has not been

20    part of this case before nor have we been able to conduct

21    discovery on that new theory.  That's what we have filed with

22    Your Honor, I think a little bit earlier.

23         MR. GERMAN:  First of all, that's just not correct.

24    Dr. Serwin's report didn't -- made no such statement.  This

25    issue of joint and several liability, Serwin's report never

1   uses that term joint and several liability was -- our response

2   to the defendant saying, well, it wasn't really Clipper, it was

3   this company or this company or that company, we said it

4   doesn't matter.  That's really not what we're talking about

5   here with this witness.  That will be for Dr. Serwin.  That was

6   the argument made on the motion for summary judgment and they

7   said we had no damages.  The Court rejected that.  That was the

8   argument they made in the Daubert motion against Serwin's

9   testimony.  The Court rejected that.  That was the argument

10  they made in the motions in limine saying that as a matter of

11  law he couldn't testify.  The Court rejected that.

12          Now you have said that we have to limit our evidence

13  of avoided costs to Clipper and Doctoroff.  We're prepared to

14  do that.  At the time of the due diligence process Clipper and

15  Doctoroff were the only ones there at the time these costs

16  would have been incurred to hire the consultants.  They're the

17  only ones there.  These RPG entities didn't exist then.  It's

18  not a new theory.

19          They asked us to provide a 30(b)(6) witness on this

20  very issue, on the question of avoided costs and fees, we've

21  appointed him.  That's what he said.  Serwin says the same

22  thing.

23          THE COURT:  I think what we're going to do is defer

24  this discussion for a later day.  I'm going to sustain the

25  objection to this witness that Clipper avoided those costs.  If

1    Serwin wants to testify to it, I'll reconsider it at that time.

2    Objection sustained.

3                (THE PROCEEDINGS RETURNED TO OPEN COURT.)

4                THE COURT:  The jury will disregard the witness's

5    answer that Monitor Clipper avoided 5 million dollars in costs.

6    BY MR. GERMAN:

7    Q    So the $5 million, Mr. Strickland, is the money that

8    Hallmark paid to Monitor for those five presentations we just

9    went through?

10   A    Yes.

11               MR. GERMAN:  That's all.

12               THE COURT:  Cross-examination?

13               MR. DONOVAN:  Your Honor, I have one issue I would

14   like to approach the bench about based on the testimony.

15               THE COURT:  Step up.

16               (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

17   PROCEEDINGS WERE HAD:)

18               MR. DONOVAN:  His testimony, he had just testified to

19   two issues.  Interrogatory response No. 5 and No. 7 were

20   questions put to him.  If you claim defendants use of any

21   Hallmark trade secret impacted in any way Hallmark's revenue or

22   profitability of business relations with any retailer.  And

23   they say, I mean, Hallmark does not assert a claim that the

24   defendant's use of any Hallmark trade secret information

25   impacted retailer.  He just testified their relations with

1    terms with the retailers, the fact they could be harmed by the

2    fact some competitor now has that information.  This put this

3    to bed.  When the interrogatory answers, what are the claims in

4    this case?  What are the issues we need to conduct discovery

5    on?  The claims, we're not asserting any claim for that.

6              Likewise with No. 7.  They say Hallmark has no

7    evidence at this time that Clipper received any of Hallmark's

8    terms of sales with Hallmark's customers.  Now he's just

9    testified that, in fact, they received terms of sale with

10   Wal-Mart.  He's up here saying he's in charge of the Wal-Mart

11   account.  He had that slide that said Wal-Mart on it.  Now he's

12   testifying about the terms of sale with Wal-Mart which is a

13   retailer, one of their customers.  They've now interjected

14   these into the case.  I mean there's only two options here.

15   One we move to strike it or, two, if Your Honor is not inclined

16   to do so, we have to be able to question him on these issues.

17   He's now saying they had their terms of sale.  They could be

18   harmful to them.  But I don't want to do that with the

19   discussion we had this morning.  Obviously, I want to raise the

20   issue with Your Honor.

21             MR. GERMAN:  He didn't say they had been impacted.

22   He said a potential competitor might be able to.  He did not

23   say that we have lost sales.  He did not say we've lost

24   profits.  Purposely stayed away from that because of this very

25   discussion.

1          The interrogatory answers, they questioned Don Hall

2    about it.  They can question him about it.  Specific contract,

3    Walgreen contract, CVS contract, Wal-Mart contract.  The slide

4    they've had since 2005 shows channel information, gross costs,

5    the obsolescence and the returns, the discounts, the fixtures,

6    the labor costs.  It's not our deal.  It's not our deal with

7    Wal-Mart.  It's our cost to serve and the margins we make based

8    on the revenues.  It's financial information to be sure but

9    it's not our contract with Wal-Mart or any of those customers.

10   And that Gold Crown channel analysis has been, that's one of

11   what we call the smoking gun e-mails.  It's in the case from

12   the very beginning.  Certainly no surprise to them.  We have

13   not made a claim for lost profits.  We're not making a claim

14   for lost profits.  He did not say we lost profits.  Did not say

15   we lost sales.  He just said a company thinking about an

16   investment in the space with this kind of information would

17   have insights not publicly available and could make decisions.

18          MR. DONOVAN:  What he said, it could be harmful to

19   Hallmark to have competitors have that information in their

20   possession.  They could use it against Hallmark.  True.  Doing

21   a little semantics.  True.  Didn't use the word profit.  But

22   the interrogatory doesn't say that.  It says impacted.  Assert

23   a claim that use of any of the trade secrets impacted revenue

24   profitability.  What they're trying to say, yes, if a

25   competitor had this, that would be harmful to us.  Could impact

1  us.  They didn't take the next step and say that happened.

2          THE COURT:  Well, I don't think the door has been

3  opened, Michael, so my ruling remains the same.  Stay away from

4  the issue of lost profits.

5          MR. DONOVAN:  What about impact?

6          THE COURT:  You can ask him what impact there was, if

7  you want to.

8          MR. DONOVAN:  Thank you.

9          MR. GERMAN:  Impact.  Okay.

10          Just so we don't get ourselves in trouble, impact, I

11  think to be fair, to ask Mr. Strickland about potential impact

12  and how somebody with this information which is what he said

13  might have insight.

14          THE COURT:  Have a competitive advantage.

15          MR. GERMAN:  We have not claimed impact.  This

16  information is on the unjust enrichment side.  This would be

17  information you have to go out and try to acquire somewhere

18  else and pay the cost.

19          THE COURT:  I'm going to allow the defendant to

20  inquire whether this witness can testify there was not a

21  financial impact at Hallmark.  His answer is going to be no but

22  I'll allow the question.

23          MR. GERMAN:  Okay.

24          (THE PROCEEDINGS RETURNED TO OPEN COURT.)

25                        CROSS-EXAMINATION

1      THE COURT:  When you're ready, Mr. Donovan.

2   BY MR. DONOVAN:

3   Q    Good afternoon, Mr. Strickland.  How are you?

4   A    Good.  Good afternoon.

5   Q    I want to go over some of the questions and answers that,

6   that's gone on this afternoon.  And I want to start with you

7   went through a lot of these slides from these five

8   presentations.  And then Mr. German asked you kind of the

9   Seminole question which was, well, what was the results of the

10  BMR?  And what I believe you said was, it was the growth

11  strategy, is that right?

12  A    Yes.

13  Q    And he said that that was, in fact, the business strategy

14  coming out of the BMR, going forward for Hallmark, correct?

15  A    Yes, sir.

16  Q    And you identified four aspects to that.  The first that

17  the target consumer was 45 and older women with no kids,

18  correct?

19  A    Yes.

20  Q    And the second was that you were going to advertise the

21  category as opposed to advertising the brand, correct?

22  A    Yes.

23  Q    And the third was that you were going to group customers

24  into suites and you were going to focus on the top 15

25  customers?

1   A    Yes.

2   Q    In fact, there was a slide showing from the customers that

3   the top twelve were 85 percent of the revenue for Hallmark,

4   correct?

5   A    Yes.

6   Q    Then the fourth one you said was to focus on those top

7   customers?

8   A    Yes.

9   Q    That business strategy, that growth strategy was not

10  confidential after the BMR was completed, isn't that correct?

11  A    I thought the growth strategy was confidential after the

12  BMR, yes.

13  Q    You thought it was?

14  A    Yes.

15  Q    But didn't, in fact, to make the growth strategy work

16  didn't Hallmark go out and advertise what that growth strategy

17  was?

18  A    Hallmark advertised, if they placed ads in the Remembering

19  Campaign that is part of our advertising strategy, yes.

20  Q    And, in fact, they went out and they publicized in the

21  Noon News, didn't they?

22  A    Yes.

23  Q    So if we could look at Defendant's Exhibit 269.

24       First page there, you see it says business model

25  decisions will change how we work.  Then there is an article

1    about the results of the BMR, correct?

2    A    Yes.

3    Q    And then the second page.  CEO perspectives over there on

4    the left.

5            If we could blow that up.  Keep going down.

6            Okay.  There it says, North America has identified

7    and begun focusing on four priorities, greetings, gifts, party

8    and Hallmark Gold Crown, the preliminary step in creating four

9    business model initiatives in turning around our business

10   performance.  This is the comments on what is coming out of the

11   BMR, correct?

12   A    Yes.

13   Q    And the next in bold there it says what we learned.  That

14   means what we learned from the BMR, correct?

15   A    Yes.

16   Q    Then the data says, during this period, that meaning the

17   period of the BMR process, we learned much about what works and

18   what doesn't.  Then it gives bullet points.

19           If you can pull that up a little bit, Jeff.

20           Then it says, we learned that our $12 billion goal

21   and array of new business ventures were distracting us from

22   pressing short term concerns.  Right?  That was what you were

23   describing earlier, decided not to go forward with the white

24   space issues?

25   A    What I was talking about was the greetings business model.

1   I think this is reflective of all of the work that was done.

2   Q    Okay.  The next bullet down, we learned that we can't take

3   our eyes off the heart of our business, specifically greeting

4   cards, the Hallmark Gold Crown network and the women of 45 and

5   older who have been our most loyal buyers of greeting cards.

6   So that's the target consumer that came out of the BMR process,

7   correct?

8   A    Yes.

9   Q    Then the next bullet, we learned that we must advertise

10  the emotional benefits of sending and receiving greeting cards.

11  Right?  That was part of the BMR as well, right, the equity

12  advertising?

13  A    Yes.

14  Q    And then if we can go over to the right there is a box up

15  there that said, businesses to implement unique strategies.

16  Again, that would focus just on the greetings because the five

17  presentations you testified were just part of the greetings

18  module of the BMR, right?

19  A    Yes.

20  Q    And there were other modules of the BMR, is that correct?

21  A    Yes.

22  Q    Do you recall what some of those were?

23  A    Gold Crown, gifts, party, I can't remember.

24  Q    And there under the greetings it has four bullet points.

25  First one, target consumer is women age 45 and older with no

1    children at home.  That's the first bullet point you gave us as

2    the business strategy coming out of the BMR, right?

3    A    Yes.

4    Q    This is exactly what you just testified to.  This is the

5    road map of where Hallmark is going to go based off the results

6    of the BMR?

7    A    Yes.

8    Q    This is not confidential, is it?

9    A    It is.

10   Q    This is confidential?

11   A    Yes.

12   Q    The Noon News?

13   A    Yes.

14   Q    It's a confidential document?

15   A    Yes.

16   Q    That's your personal opinion?

17   A    It's the company's opinion.

18   Q    I'm at just a little bit of a loss because we had the CEO

19   here before you who had a different opinion.  That's why I'm

20   trying to understand whether it's the company's opinion or your

21   personal opinion?

22   A    I've also felt the Noon News is confidential information.

23   Q    So that's your personal opinion?

24   A    That's my opinion.

25   Q    Okay.  But the Noon News, we had a deposition of you,

1  correct, Mr. Strickland?

2  A    Yes.

3  Q    And you agreed with us that the Noon News is mailed out to

4  former employees, correct?

5  A    I think so, yes.

6  Q    And so those employees aren't under any confidentiality

7  obligation to Hallmark after they've left Hallmark, correct?

8  A    No.

9  Q    And the Noon News is put out around Hallmark offices and

10 any visitor can come in and get a copy of the Noon News,

11 correct?

12 A    Yes.

13 Q    But even though there are those facts you still construe

14 the Noon News as a being a confidential document?

15 A    I do, yes.

16 Q    Are employees allowed to take it out of Hallmark's

17 offices?

18 A    Yes.

19 Q    Is there any restriction on them sharing it with their

20 family members?

21 A    I don't think that would be using good judgment.

22 Q    Is there any actual company policy that they're not

23 allowed to?

24 A    Not that I'm aware of, no.

25 Q    Is there any company policy they're not allowed to share

1  with non family members?

2  A    No.  Other than you have an employment agreement and you

3  go to work saying that you can't share confidential

4  information.

5  Q    Correct.  And then your personal view is that the

6  information that's put in the Noon News is confidential?

7  A    Yes.

8  Q    And is that, I'm trying to get the scope of it, is that

9  every piece of information that's in the Noon News or only some

10 information that's in the Noon News is confidential?

11 A    It would be some.  I don't think employee's birthdays and

12 anniversaries would be confidential.

13 Q    So the document itself overall is not confidential.

14 You're just saying that you believe that there is information

15 within the document that is confidential?

16 A    Yes.

17 Q    And in this case this document, let's turn to the third

18 page.  Is the information on that page confidential?

19 A    Actually all the information in the Noon News is

20 confidential.  I don't share it with anyone outside of

21 Hallmark.  That's my view of it.

22 Q    But I'm trying to ask whether you construe all the

23 information on the third page as being confidential?

24 A    I believe it's confidential.  I wouldn't share it outside

25 of Hallmark.

1   Q    Okay.  So back to the second page, that box under

2   greetings.  The second bullet down, category growth strategy.

3   Remembering advertising is being used to increase

4   participation.  That's another thing that came out of the

5   Remembering Campaign as a result of the BMR process, correct?

6   A    Yes.

7   Q    And at this time, which is September of 2002, that

8   Remembering Campaign has already been going on?

9   A    Right.

10  Q    That's been communicated out to the market place, isn't

11  that right?

12  A    Yes.

13  Q    The next bullet, suites are aligning the business plans

14  with five key strategies for our top retailers.  That's what

15  you mentioned as being one of the strategies that came out of

16  the BMR, correct?

17  A    Yes.

18  Q    So this document is setting forth what the actual

19  strategies were coming out of the BMR, right?

20  A    Yes.

21  Q    Okay.  Then if we could pull up Defendant's Exhibit 267.

22  And if we could blow up down at the bottom it says what

23  decisions have been made?  Last question and answer, yes.

24       Now, this is a question and answer.  It says what

25  decisions have been made?  And the answer -- paragraph.  Then

1  it says greetings. Women 45 and older who have no children at

2  home will be our target consumers, right? That's the BMR

3  again?

4  A    Yes.

5  Q    Then it says because we've seen a significant drop off in

6  card sending within this group. That's what you pointed out in

7  one of the other slides, right? There was a bar, there was a

8  graph there that showed the lines and it showed drop off in the

9  last 2 years in that particular group, 45 and older women,

10 correct?

11 A    Yes.

12 Q    So this now is disclosing what the results were of the

13 research that had been done about what was the trend that was

14 going on with certain demographics within people that buy

15 greeting cards, correct?

16 A    Yes.

17 Q    And that drop off was back between, putting a time frame

18 on it was '99, 2000, correct?

19 A    Yes.

20 Q    Before that, if I remember the chart correctly '97, '98

21 was pretty flat?

22 A    Yes.

23 Q    And the issue here, the presentations that Hallmark

24 alleges were taken was in the summer of 2005, correct?

25 A    Yes.

1    Q    So that's 5 years later, right?

2    A    Yes.

3    Q    So there's no data here that says anything about what is

4    going on or what the drop off is between 2000 and 2005?

5    A    No.

6    Q    And there was no such data in the presentations, was

7    there?

8    A    No.

9    Q    And the chart that we looked at, went from '97 to 2000 so

10   it showed a four-year period.  Do you recall that?

11   A    Yes.

12   Q    And was that four-year period significant?  In other

13   words, were you involved?  Why did they pick four years?

14   A    I don't remember why we picked four years.

15   Q    Then it says we will spend more marketing dollars to

16   remind consumers to send cards.  That's a direct result of the

17   BMR, right?

18   A    Yes.

19   Q    I mean, these all are.  These are decisions that came out

20   of the BMR, right?

21   A    Yes.

22   Q    And that's marketing dollars, that's the chart we showed

23   before that talked about the marketing dollars, right?  You

24   talked about where do we want to spend those marketing dollars,

25   right?

1    A    Yes.

2    Q    Now, this is saying we want to spend them to remind

3    consumers to send cards, right?

4    A    Yes.

5    Q    That's send cards.  Just any old card?  Right?  It's not

6    reminding them they need to buy a Hallmark card versus an

7    American Greetings card?

8    A    Well, we would certainly prefer they buy a Hallmark card,

9    yes.

10   Q    Yes.  But the theory was, wasn't it, Mr. Strickland, that

11   if you rise the full category what was Hallmark's market share

12   at that point?

13   A    In the 50 some, guessing.

14   Q    So if you rise it to two more cards get bought, then

15   Hallmark is using the odds to say at least one of them will be

16   a Hallmark card that gets bought, right?

17   A    Yes.

18   Q    So this whole theory, I think what you said before was in

19   fact what came out was just to rise the whole category.  Let's

20   just get people to buy cards.  Let's not worry about what card

21   they buy.  Correct?

22   A    We did worry about what card they buy.  We'd prefer them

23   to buy a Hallmark card but, yes, we wanted to grow the

24   category.

25   Q    And by growing the category that would sell more Hallmark

1  cards?

2  A     Yes.

3  Q     So it was a win win?

4  A     Yes.

5  Q     And so now this is saying that to do that we're going to

6  remind consumers to send the cards and then we have based the

7  Remembering ad campaign on this decision.  So the Remembering

8  ad campaign was going to implement what the BMR results were,

9  correct?

10  A     Right.

11  Q     Then the last one there says we will focus most of our

12  efforts on our top retailers, those who provide above

13  90 percent of our revenues in our designing suites, product

14  service and marketing groups to support these retailers and

15  strategies.  And that was the last bullet you were given,

16  right?  That you were going to focus on those 15 accounts?

17  A     Yes.

18  Q     So, again, this is articulating, it's all out in the Noon

19  News, that's being put out, being mailed out to former

20  employees, being distributed and put out where anyone can pick

21  it up at any of Hallmark's offices, correct?

22  A     Yes.

23  Q     Are you familiar with the Greeting Card Association?

24  A     I know what it is.

25  Q     Can you tell us what it is?  What's your understanding of

1  what it is?

2  A    I've never been to the Greeting Card Association.  I've

3  known people who have gone to the Greeting Card Association.  I

4  think it's a group of suppliers that make greeting cards,

5  trying to make decisions in the best interest of the greeting

6  card business.

7  Q    And could you put up Defendant's Exhibit 589, please?

8        Have you seen this document before, Mr. Strickland?

9  A    I don't think so.

10  Q    I've placed that in front of you so you can take a look at

11  that, if you don't recognize the cover.  So it's a Power Point

12  and the title page says category growth initiative and it says

13  prepared by Hallmark.  Do you see that?

14  A    Yes.

15  Q    Category growth initiative, again, is the same phrase

16  we've been using as what came out of the BMR at Hallmark,

17  correct?

18  A    Yes.

19  Q    Turn to the second page.

20  A    Okay.

21  Q    That was a business problem that was faced and was tackled

22  by engaging in the BMR, correct?

23  A    Yes.

24  Q    And the women 45 and older we've talked about, correct?

25  A    Yes.

1    Q    Then the next page, these are some of the issues that came

2    up in the BMR, some of the findings, right, the third line in

3    particular, need to convince them why greeting cards are worth

4    the effort?

5    A    Yes.

6    Q    Next page.  This one is titled what consumers told us.

7    Conducted research in late 2001 to find why consumers are using

8    substitutes.  That was what was done in the greetings part

9    module of the BMR, correct?

10   A    Yes.

11   Q    And in the next bullet, they don't believe they're

12   substituting new forms of communications for cards.

13            Next bullet, when pressed they admitted to

14   occasionally forgetting.  Do you see that?

15   A    I do.

16   Q    Then the last one, asked us to remind them of benefits.

17   That was what the research said came out of the BMR, correct?

18   A    Yes.

19   Q    And that last bullet, asked us to remind them of benefits,

20   is in fact what Hallmark decided that was going to be their

21   strategy, correct?

22   A    Yes.

23   Q    That's the next page, the opportunity.  Remind consumers

24   of the emotional benefits of sending a card.

25            Second bullet, create an advertising campaign that

1  the emotional benefits of sending a card, only a greeting card

2  can deliver the emotional impact.  That was the Remembering

3  Campaign?

4  A    Yes.

5  Q    And this was all being disclosed to the GCA, correct?

6  A    I wasn't there.

7  Q    Okay.  And the GCA is made up of suppliers in the industry

8  meaning other companies that are manufacturing and selling

9  greeting cards?

10  A    Correct.

11  Q    So now the competition knows what the category growth

12  initiative is and what is being done by Hallmark, correct?

13  A    I think they know what our advertising strategy looks like

14  or advertising campaign looks like.

15  Q    And the reasons why, right?

16  A    Yes.

17  Q    Plaintiff's Exhibit 44.

18        I've placed in front of you what's marked as

19  Plaintiff's Exhibit 44.  Have you seen this document,

20  Mr. Strickland?

21  A    I have.

22  Q    In what context have you seen this document?

23  A    In preparing for this testimony.

24  Q    And what is your understanding of what this document is?

25  A    This is a document that Monitor sent to Monitor Clipper.

1   Q    No.  If you look at the names --

2         Blow it up a little bit more.

3         It's Mr. Pauker?

4   A    Mr. Pauker.

5   Q    Part of Monitor?

6   A    Yes.

7   Q    Mr. Brown and Ms. Kahn are also part of Monitor?

8   A    Okay.  Excuse me.

9   Q    And if we go down to the text, Jeff.

10        Now, you talked about these five presentations today

11  and have gone through those presentations.  This e-mail here

12  says, Megan and I went through the documents from Levin and I

13  have tried to condense the most salient info into the following

14  30-slide deck.  Note, MCP staff are not included in this

15  e-mail.

16        So this is Monitor saying what is the most salient

17  information from those presentations down to a 30-slide deck.

18  So from all the pages that we looked at before, Monitor has now

19  taken it and said, there's only 30 of them that we feel are

20  salient.  Have you looked through this document?  You said

21  you've gone through this document before, correct?

22  A    I believe so, yes.

23  Q    And did you notice that there is no information in here

24  from the Gold Crown presentation at all?

25  A    Let me look at it.  Actually there are a couple of slides

1   from Gold Crown.

2   Q    Couple slides what?

3   A    That mention Gold Crown.

4   Q    No, I didn't say it mentioned Gold Crown.  But that came

5   from the Gold Crown presentation?

6   A    Excuse me.  No, there's not.

7   Q    And therefore Monitor concluded that those weren't salient

8   slides for their purposes?

9          MR. GERMAN:  Objection.

10         THE COURT:  If he knows he can answer.  If he doesn't

11   know he can say so.

12         THE WITNESS:  I just know what is contained in this

13   e-mail.  I don't know their assessment of their slides.

14   BY MR. DONOVAN:

15   Q    The Remembering Campaign started, we've had testimony,

16   before Mother's Day of 2002.  Does that sound right to you?

17   A    Yes.

18   Q    How long did that go on?

19   A    I don't remember, nine or ten months.

20   Q    And did it work?

21   A    I thought it worked, yes.

22   Q    In what way?

23   A    Well, we had a lot of measures that we were keeping track

24   of.  And I thought the campaign was working but I can't recite

25   all those measures and--

1    Q    Was one of the goals to stop the decline in the 45 and

2    older women with no kids?

3    A    Yes.

4    Q    Did they track whether that, in fact, occurred?

5    A    I believe so but I don't remember what the results were.

6    Q    And why was it stopped after nine or ten months?

7    A    My understanding was we had to re-deploy those resources

8    toward the Gold Crown channel. That we needed more focus on

9    Gold Crown because I believe the Christmas of 2002 they did not

10    have a very good Christmas season. They under-performed. And

11    we chose to take money from the greetings advertising campaign

12    and direct it toward the Gold Crown channel. That's my

13    understanding.

14    Q    That was the end of the Remembering Campaign?

15    A    Yes.

16    Q    So the money that had been set aside for that was then

17    diverted into Gold Crown, is that right?

18    A    Yes.

19    Q    Now, if we could go to Plaintiff's Exhibit 485, page 114.

20    And if we could blow up down at the bottom. Actually if you

21    could blow the whole thing up, please.

22          So, again, I don't want to belabor the point. This

23    is the OEC presentation. This is the page that has the

24    decisions of the greetings module of BMR, correct?

25    A    I'll take your word for it, it came out of the OEC

1  presentation.  I don't remember exactly but these look like

2  those decisions, yes.

3  Q    The first one says, goal for the next 24 months is

4  category stabilization, not market share growth.  That's what

5  we talked about rising the whole category, correct?

6  A    Yes.

7  Q    Not focusing on Hallmark's brand, correct?

8  A    Just growing the category, yes.

9  Q    In place of, I mean there are other ways to have strategy,

10  strategy could be to have people change buying other cards to

11  change to buying Hallmark Cards.  That would be a brand

12  strategy, correct?

13  A    We chose to grow the category.  That was the Remembering

14  Campaign strategy was to grow the category.  We did other

15  things, too, but that was the focus of our advertising efforts.

16  Q    And there it says that was the goal for the next 24

17  months.  Do you see that?

18  A    Yes.

19  Q    So that the BMR was setting forth what the strategy was

20  going to be for two years, is that right?

21  A    This part of the decision for the next 24 months, yes.

22  Q    Then down at the very bottom there --

23          If you could blow that up a little bit.

24          Says second phase marketing plans may be needed post

25  24 months to reach emerging consumers, women less than 45.  Do

1  you see that?

2  A    Yes.

3  Q    So, again, this is telling us that the results of this BMR

4  and the course that Hallmark is going to go on is a 24-month

5  course.  Then at that point we're going to need the next phase

6  of whatever we're going to do.  Isn't that fair to say?

7  A    For the advertising campaign, yes.

8  Q    Is that, in fact, what ended up happening, Mr. Strickland?

9  A    No.  The Remembering Campaign didn't last that long.  We

10  re-deployed the money.

11  Q    It lasted less than 24 months?

12  A    Yes.

13  Q    Now, Mr. Strickland, you talked a lot when Mr. German was

14  asking you questions about what could be done with information

15  in the presentations by a competitor, is that right?

16  A    Yes.

17  Q    You have no knowledge that anything was actually ever done

18  by Clipper with any information, correct?

19  A    They bought Recycled Paper.

20  Q    Anything else?

21  A    Recycled Paper got more aggressive in the market place.

22  Q    Anything else?

23  A    No.

24  Q    Now, after the BMR there continued to be consultants

25  brought in to Hallmark, isn't that right?

1    A    Yes.

2    Q    And as we saw it was going to be a short life for the

3    advertising campaign coming out of the BMR.  There was going to

4    have to be some new marketing that was going to be developed

5    for the greetings area, correct?

6    A    Yes.

7    Q    So -- in an effort to expand upon that BMR and brought in

8    further consultants, correct?

9    A    Ask the question again, please?

10   Q    Sure.  It expanded upon what ever was done in the BMR and

11   it brought in further consultants to do more consulting work

12   for Hallmark?

13   A    Yes.

14   Q    One of those was called a Business Transformation Project,

15   correct?

16   A    Yes.

17   Q    That's different from the BMR, Business Model Redesign,

18   right?

19   A    Right.

20   Q    It sounded awfully similar.  And in that project that was

21   started shortly after the BMR, is that right?

22   A    I think Business Transformation started years after BMR.

23   Q    But before 2005?

24   A    I don't remember the start date.

25   Q    And that was a major project, wasn't it?

1   A    Yes.

2   Q    It was a big undertaking for Hallmark?

3   A    Yes.

4   Q    And they hired MacKenzie and Company to do that with them,

5  correct?

6   A    Yes.

7   Q    How long did that project take?

8   A    I don't remember.

9   Q    What was the cost of that project?

10   A    I don't know.

11   Q    Were you involved in that project?

12   A    Yes.

13   Q    What was it that project did?

14   A    I'm sorry?

15   Q    What was it that that Business Transformation Project did?

16   A    I worked on the customer side of the industry.

17   Q    Because generally you're always working on the customer

18  side versus the consumer side, right?

19   A    Generally speaking, yes.

20   Q    And then another one that came up was called the Category

21  Management Project, correct?

22   A    Yes.

23   Q    And if I remember correctly back when you were listing

24  some of your prior positions, one of them was vice president of

25  category management?

1  A    Yes.

2  Q    Was it during that time that this project was put

3  together?

4  A    I don't have my time lines quite right.  I can't remember

5  if I was vice president of customer strategy or the vice

6  president of category management.  I don't remember when it

7  started, what I was doing at the time.

8  Q    Okay.  Maybe I have some documents that may help.

9  A    Sure.

10  Q    Put up Defendant's 541.  And could we go to page 8?

11        Can you read that all right, Mr. Strickland?

12  A    Can you bring it up a little bit.  Okay.  I got that.

13  Q    So that this is part of a lead-in here, I guess.  To do

14  this project Hallmark went out and interviewed various

15  consultants, correct?

16  A    Which project is that?

17  Q    Category management?

18  A    Yes.

19  Q    And included in that was the Partnering Group?

20  A    Yes.

21  Q    And the New England Consulting Group?

22  A    Yes.

23  Q    I think it was Boston Consulting Group was another one?

24  A    Yes.

25  Q    Were there any others you recall?

1    A    I thought there was a Meridian.

2    Q    And were you involved in this selection of who was going

3    to do this project for Hallmark?

4    A    Yes.

5    Q    And who else was involved in that?

6    A    A man by the name of Faneel Jackatonny.

7    Q    And who decided that they were going to have this project,

8    category management?

9    A    Who chose the consultant or --

10   Q    No.  Who decided there was going to be a project and we

11   were going to bring consultants in?  Was that you?

12   A    No, it wasn't me.  It was, I got a call from Don Fletcher

13   one day.  He had been to a board meeting.  We had a man on the

14   board named Bill Perez.  Bill was the CEO of SC Johnson at the

15   time.  And Bill thought we weren't doing strong enough category

16   management work.  So at the board meeting he told Don and Don,

17   that's Don Fletcher and Don Hall, that we needed to step up our

18   game in category management.  They assigned me and

19   Mr. Jackatonny to research some outside consultants that could

20   come help us develop those practices for category management.

21   Q    Can you explain what you mean when you use the phrase

22   category management?

23   A    Category management is a process that suppliers go through

24   that tries to understand what is going to be the key triggers

25   that help the consumer shop and buy your category more

1   frequently or put more in the basket.  There's a series of
2   steps you follow to develop a strategy for your category.
3   Q    And so this letter here, September 8, is from the New
4   England Consulting Group, David Stone to you saying, it was
5   great to speak to you again and have an opportunity to catch up
6   with each other.  So had you known Mr. Stone previously?
7   A    I have.
8   Q    In what way?
9   A    Dave Stone and his partner Gary, I can't remember his last
10  name.
11  Q    Stiple?
12  A    It's close.  They helped us with a branding decision back
13  in '97, '98 when we decided to launch another brand of greeting
14  cards called Expressions from Hallmark to Wal-Mart.  So we had
15  worked with Gary and Dave during that process and had a good
16  working relationship with Dave.  So I called him up, asked him
17  if he would be interested in talking to us about it and he was.
18  And he met with us.  This is the letter he sent me in return.
19  Q    So this letter is being sent after you have the meeting
20  with him?
21  A    Yep.  Well, can I read the rest of the letter.  I can't
22  remember if it's before he came or after he came.  I thought it
23  was after he had already been with me.
24  Q    Okay.  So the second paragraph says, if you can blow that
25  up, Jeff, 541, page 8.

1      From your brief overview it appears you all have made

2  good progress recently in building momentum in market share

3  however despite this performance you also made it very clear

4  you and management are dissatisfied with the overall health and

5  growth of the category and are currently in the process of

6  rethinking your customer management and go to market

7  organization processes to accelerate long term profitable

8  growth.  Do you see that?

9  A    I do.

10  Q    That's what came out of your discussions with him to

11  engage in this new consulting arrangement, correct?

12  A    No.  That's the letter Dave wrote me.  That's not the

13  conversation we had.

14  Q    So he misunderstood the conversation?

15  A    Yes.  He was, Dave is like a lot of consultants.  He comes

16  in and hears one thing and tries to talk you into doing a lot

17  of other stuff.

18  Q    So let's look at the next page, page 9.  Before we get to

19  that.  Let me ask you, had you just had that one consulting

20  arrangement with him in 1997 or had he worked with Hallmark

21  more than that?

22  A    I only worked with Dave and Gary during that assignment.

23  Q    Do you know whether they worked with Hallmark, with other

24  people within Hallmark other than yourself?

25  A    I don't think so but I don't know.

1   Q     Where it says, understanding the project.  Bring up the

2   last 2 bullets there.

3            It says, conversely new competitive channels as the

4   Dollar Stores have emerged and grown complicating the

5   traditional competitive frame and consumer value propositions.

6   Do you see that?

7   A     Yes.

8   Q     That's what you were describing earlier, right, the Dollar

9   Stores were growing in the UK and in Canada and you saw it as a

10  precursor to coming down to the United States, correct?

11  A     Yes.

12  Q     And now he's saying in this conversation with you that has

13  now started to emerge and it's complicating the traditional

14  competitive frame work, correct?

15  A     It's Dave's assessment of it.

16  Q     Okay.  And Dave is a consultant with a consulting group

17  that Hallmark has used previously, right?

18  A     He's a partner up there.

19  Q     The last bullet says, further while Hallmark has

20  maintained solid relationships with its customers the company

21  believes that it is now essential to re-energize and

22  re-structure these relationships to provide a new and broader

23  platform for future category customer and brand growth?  Do you

24  see that?

25  A     Yes.

1   Q    Do you see that's what the company's needs were in

2   September of 2004?

3   A    No.  That's what Dave wrote in his letter.

4   Q    So he misunderstood his conversation with you?

5   A    He missed the mark and Dave didn't get the assignment.

6   And I called Dave up and said, Dave, I'm asking for help with

7   the category management.  You're trying to do something very

8   different here.  And we didn't hire Dave.

9   Q    Okay.  And then under objectives in the next bullet down.

10  It says, the overall objective of the project will be to build

11  next generation category management skills and processes to

12  drive long term category growth and to increase share of

13  category sales and profits for Hallmark retailers.  Did he

14  misunderstand that as well or is that what the objective was?

15  A    That would not have been what I would have written but he

16  was trying to get there with this statement.

17  Q    And then down in the next bullet --

18            Blow that up, Jeff.  Second single line.

19            That one says, improve the alignment of marketing and

20  retail customers business strategies to increase brand Hallmark

21  relevance.  Do you see that?

22  A    I do.

23  Q    That's a very different concept than raising a whole

24  category, isn't it?

25  A    Yes.

1    Q    Was that part of the objectives that Hallmark had at that

2    point?

3    A    No.

4    Q    So he misunderstood that as well?

5    A    Yes.

6    Q    Then if we could go to the last bullet on that page.  It

7    says, development and testing of break out directions and

8    strategies to drive total category growth.  What about that?

9    Did he get that right or did he misunderstand that?

10   A    Dave wasn't an expert in category management.  Dave's a

11   very good consultant but I could tell from this letter and

12   follow-up conversation with Dave, even though he was there he

13   wasn't the right person for this work.  He did not understand

14   category management.  I felt like this letter and Dave's

15   approach was to come in, get involved in the business and pitch

16   the things they're good at doing.  And these are things that

17   Dave and his team are good at doing.  But it wasn't the work I

18   needed done and I didn't hire him.

19   Q    And he's good at doing, this is what he does.  He's a

20   consultant in the marketing area, right?

21   A    I think Dave and Gary are consultants in anything you'll

22   pay them to do.

23   Q    If you look at the next page.  Under experience, first

24   sentence under experience there, it says, background NECGS has

25   previously conducted several successfully assignments with the

1    Hallmark organization and the following summarizes the scope of

2    our capabilities.  Goes on to talk about their experiences.  So

3    they had worked on several projects with Hallmark?

4    A    Not that I'm aware of.  I'm only aware of one.

5    Q    Were you aware that they had worked on projects for

6    American Greetings?

7    A    I don't remember.  I wasn't aware or I've forgotten.

8    Q    Did you ever ask the consulting group if they had done

9    work for American Greetings?

10   A    I would have had to ask but I don't remember.

11   Q    Why would you have had to ask?

12   A    It would be just kind of a first question you ask, have

13   you worked with our number 1 competitor before?

14   Q    And the answer?

15   A    If they worked with our number 1 competitor, they wouldn't

16   have been at the top of my list.

17   Q    But, in fact, you wouldn't have ruled them out, would you?

18   A    I wouldn't have ruled them out but they would not have

19   been at the top of my list.  There would have been other people

20   with similar or better capabilities that I didn't have to worry

21   about that.

22   Q    But Hallmark, in fact, had hired them at one point, you

23   said back in 1997.  Do you know then whether they had worked

24   for American Greetings?

25   A    No, I do not.

1    Q    Did you ask them?

2    A    I don't remember.

3    Q    It's common, isn't it, that consultants are going to work

4    for competitors in industries?

5    A    I think it's common for some competitors, not for others.

6              MR. DONOVAN:  Can we pull up D1016?

7              THE COURT:  What is the number again, Mr. Donovan?

8              MR. DONOVAN:  1016.

9    BY MR. DONOVAN:

10   Q    I placed a hard copy there for you, if you could flip

11   through that and let me know, I don't think you've seen this,

12   but does that look like the type of Power Point that you or

13   someone that hires or vets consultants gets from consulting

14   companies?

15   A    I'm sorry.  Ask the question again?

16   Q    Sure.  The title page says this is a document of New

17   England Consulting Group making a pitch to RPG in July of 2006.

18   A    Okay.

19              MR. GERMAN:  Your Honor?

20   BY MR. DONOVAN:

21   Q    Are you familiar with this type of document?

22              MR. GERMAN:  This is not a stipulated exhibit.  It

23   should not be displayed until --

24              THE COURT:  Take the exhibit down, please.

25

BY MR. DONOVAN:

Q    Were you aware that the New England Consultant Group is
pitching RPG in 2006?

A    I was not.

Q    You weren't aware whether they had done work for American
Greetings or not previously?

A    No.

Q    When you, were you involved in signing the contracts with
the consultants?

A    Yes.

Q    Such as the Partnering Group?

A    Yes.

Q    When you do that there is a limited non-compete that's
part of that?

A    I forget exactly what the phrasing says.  There is some
kind of non-compete, yes.

Q    It's limited to some specific time period, correct?

A    I think so.  I'd have to look at the agreement to be
certain.

Q    After that time period they're free to go out and work
with any competitors of Hallmark in the market place?

A    But they cannot share confidential information.

Q    Excuse me?

A    But they cannot share confidential information.

Q    Correct.  But they're free to go out --

1   A     Sure.

2   Q     If you hire a consultant that's worked for a competitor in

3   the industry, is that an issue for you?

4   A     Ask that again.

5   Q     Sure.  If you're interviewing someone who is a consultant

6   that's done work in the greeting card industry for other

7   greeting card companies, is that a problem for you or for

8   Hallmark?

9   A     I would not put them at the top of my list.  I would try

10  to find somebody who had not worked in the industry before.

11  Q     Why is that?

12  A     I would just rather have someone I didn't have to deal

13  with any confidentiality issues or anything of that.  Just hire

14  somebody who is fresh in the business.

15  Q     Were you involved in hiring, in the hiring of Monitor for

16  the BMR project?

17  A     No.

18  Q     But you indicated earlier that you worked extensively with

19  a series of Monitor employees, correct?

20  A     Yes.

21  Q     Elise Martin, Romney Resney, Stacy Raiche, Mark Pocharski.

22  And you had indicated that you worked with them almost every

23  day, is that right?

24  A     Yes.

25  Q     I think you said including weekends?

1  A    Yes.

2  Q    It was busy?

3  A    Yes.

4  Q    When you say you worked with them they were here in Kansas

5  City?

6  A    Yes.

7  Q    Monitor is based back east, correct?

8  A    Yes.

9  Q    So were they set up in offices within Hallmark's offices?

10 A    Yes.

11 Q    Was that in the area that you were in, physically, I'm

12 saying?

13 A    We spent so much time in the conference rooms together,

14 I've kind of forgot where their officers were because most of

15 day we were sitting in the conference rooms with the laptops

16 out and Power Points and all that kind of stuff but they had

17 offices at Hallmark.

18 Q    And so when you say you worked with them every day you're

19 talking about person to person, not over the telephone?

20 A    Most weeks they were here three or four days a week.

21 Q    In the offices within Hallmark?

22 A    Yes.

23 Q    And were they working, to your understanding, exclusively

24 on the BMR project at that point?

25 A    Yes.

1   Q    So they didn't have other projects for other clients of

2   Monitor?

3   A    I don't know that.  They probably had other clients but

4   while they were here they were working on Hallmark.

5   Q    They were here you're saying almost every day including

6   weekends, right?

7   A    No.  They were here usually Monday through Thursday and

8   then when they were back in Boston I talked to them on Fridays.

9   I talked to them on Saturdays.  I talked to them on Sundays.

10  Had to put a fax machine in my home so I could get the decks on

11  the weekend so we could look at them over the weekend and be

12  ready for meetings on Monday morning.

13  Q    What meetings?

14  A    It was the work, moving all the work that you saw in the

15  OEC presentation, it was all the work that led up to those

16  summary presentations.

17  Q    Well, I've seen OECs, right?  We've seen some OEC

18  presentations?

19  A    Yes.

20  Q    I've seen other ones called NAMT?

21  A    Yes.

22  Q    That's North American Management Team.  Is that what that

23  is?

24  A    Yes.

25  Q    And so there was a series of meetings of that group that

1  had to do with the BMR, correct?

2  A    I don't know.  That sounds right but I don't know.

3  Q    And what about what I've seen referred to as 10th Floor

4  Meetings.  Does that sound familiar to you?

5  A    That's a location where they would meet.

6  Q    Who is, is there a certain level of individuals that are

7  on the 10th floor?  Why it's called a 10th floor meeting or is

8  it just there is a conference room on the 10th floor?

9  A    The 10th floor is a more casual atmosphere.  Sometimes the

10  NAMT would meet on the 10th floor.

11  Q    And the five presentations that we talked about here today

12  and those are all solely within the greetings module within the

13  BMR, correct?

14  A    Yes.

15  Q    Defendant's Exhibit 1251, Jeff.  If you could blow that

16  up.

17          Now, this is a document 2001, 2002 Business Modeling

18  project.  Project documents.  Hallmark Greetings.  Do you see

19  that?

20  A    Yes sir.

21  Q    This represents a lot of the presentations that were done

22  by Monitor as part of the greetings module within the BMR,

23  correct?

24  A    I don't know who was doing the presentations.  It doesn't

25  say.  It's a schedule.

1    Q    Have you seen this document before?

2    A    I've seen a lot of documents, looks familiar.  I don't

3    know if I've seen this exact document or not.

4    Q    Defendant's Exhibit 262.  Place that on there.  See if

5    that looks familiar to you.  Let me ask the question first,

6    were you part of the OEC?

7    A    I presented to the OEC.  I wasn't a member of the OEC.

8    Q    You presented to the OEC.  Was Monitor part of those

9    presentations to the OEC?

10   A    I think they were there for some of them.  I don't know if

11   they were there for all of them.

12   Q    This document has at the bottom there Hallmark and Monitor

13   Group, June 2002.  Do you see that?

14   A    I do.

15   Q    And if you look at the second page.  Now, this lists OEC

16   meeting documents.  It lists five dates of OEC meetings.  Do

17   you see that?

18   A    I do.

19   Q    And they'd be August 30th and December 12th were two of

20   the five presentations, correct?

21   A    Yes.

22   Q    And then there was also a meeting on October 11, 2001.  A

23   meeting on February 6, 2002.  And a meeting on March 6, 2002.

24   Do you see that?

25   A    I do.

1    Q    Were you aware of any other meetings of the OEC with

2    respect to the greetings portion of the BMR?

3    A    I'm not.

4    Q    Did you participate in all five of these meetings?

5    A    No.

6    Q    Do you know which ones you did?

7    A    August and December.

8    Q    You didn't participate in any of the others?

9    A    I don't think so.  It's ten years ago.

10    Q    Actually, Jeff, if you could go to page 197.

11         That's the February 6, 2002 cover page.  These are

12    sizable presentations, correct?  But I'm not going to go

13    through it but that's the February 6 one and that shows Monitor

14    Group preparing it, OEC meeting and these were actual physical

15    meetings at Hallmark, correct?

16    A    The slide says Monitor Group, yes.

17    Q    The date of the meeting, that's when the meeting is held?

18    A    Looks like it, yes.

19    Q    Then, Jeff, if you could go to page 243.

20         Again, now, this is the Business Model Initiative

21    update.  It's within this package of the OEC documents, and

22    it's March 6, 2002, document with the Monitor Group legend on

23    it.  You didn't attend that meeting, did you?

24    A    No.

25    Q    I've placed in front of you what has been marked

1    Defendant's 264.  This is the NAMT, North American Management

2    Team, that we mentioned earlier, right?

3    A    Yes.

4    Q    You said you were involved in some presentations to that

5    group.  I'm sorry, was that OEC?

6    A    OEC.

7    Q    Okay.  NAMT, were you involved in any presentations to

8    them?

9    A    I don't remember.

10   Q    Okay.

11   A    We had, just to clarify, at the time we were doing the

12   Business Model Redesign work we were also running the business.

13   So you're asking me did I ever go to the NAMT and make

14   presentations, yes, but it was about other topics.

15   Q    I'm sorry if I wasn't clear.  I'm talking about this

16   package right here says Hallmark Greetings Business Model

17   Project, NAMT documents.  You understand this to be a work

18   product from the BMR project, correct?

19   A    It has information from the BMR project, yes.

20   Q    And the second page lists out there the dates of the

21   meetings spanning from October 2001 to May 31, 2002.  Right?

22   A    Yes.

23   Q    Can you identify any meetings there that you participated

24   in?

25   A    I cannot.

1    Q    Was Monitor involved in preparation of the materials for

2    these various meetings?

3    A    I don't know.

4    Q    Jeff, if you could pull up Exhibit 264, pull up page 19.

5              And, again, this has a cover page prepared by Monitor

6    Group, correct?

7    A    It has a Monitor cover page.

8    Q    Monitor Group, right?

9    A    Right.

10   Q    If you go to the next page, Jeff.  Blow up the footer

11   there.

12             Did you know that Monitor coded its documents?

13   A    I do.

14   Q    Do you recognize WYC as meaning Hallmark?

15   A    I did.

16   Q    If you blow up the footer on the right.

17             That is showing that it's copyrighted Monitor Company

18   Group, right?

19   A    Yes.

20   Q    Do you have any reason to believe that's not true?

21   A    No.

22   Q    Pull up page 38.

23             Now, this is a February 22, 2002 one.

24             Go to the next page.

25             And, again, down at the bottom the footer has the

1   Monitor coding and the Monitor copyright.  Do you have any
2   reason to believe this wasn't prepared by Monitor?
3   A    I don't know who prepared the document.  These are the
4   footers that identify Monitor documents.  But many times we
5   would take pages from previous presentations and drop them in
6   the next presentations.  So I don't know who prepared it but I
7   can read what the document footer says.
8   Q    Actually before we get to that, Jeff, will you pull up
9   Defendant's Exhibit 253?  Blow up the top of that?
10           This is a memo from Mark Pocharski.  He's one of the
11  individuals that you worked with on the greetings BMR project,
12  right?
13  A    Yes.
14  Q    And he's sending that to these other individuals there who
15  are identified, Elise Martin, Romney Resney, Stacy Mann.  Do
16  you see that?
17  A    I do.
18  Q    And it's dated Monday, May 13, 2002.  It says, regarding
19  NAMT meeting notes.  See that?
20  A    I do.
21  Q    Have you ever seen this document?
22  A    I don't remember.
23  Q    Okay.  Jeff, can you blow up the paragraph after that.
24           There it says, here's a quick summary and suggested
25  to-dos coming out of Friday's meeting.  I'm happy to discuss

1    any questions or comments.  As I mentioned in my voice mail the

2    meeting was generally positive with a few notable exceptions.

3    I'll summarize by key active participant.  It certainly appears

4    that he participated in a meeting in May of 2002 of the NAMT.

5    Is that fair to say?

6    A    He was there or he had a conversation with someone about

7    it.  I don't know if he was there.

8    Q    Then blow up the first page below that.

9         Is Don Fletcher part of the NAMT?

10   A    He is.

11   Q    He says clearly trying to keep things moving, declared

12   right level discussion on both suites, in greetings, gift

13   integration, no need to return to the NAMT.  It goes on and on.

14   It's a summary of the meeting.  Do you see that?

15   A    Yes.

16   Q    Now, let's take Defendant's 265.  Actually, I'm sorry, go

17   to the second page of that same document before we move on.

18   About halfway down the middle there, blow that up.

19        To-dos, Mark, Steve and Sammer.  Those are three of

20   the recipients of this memo.  Follow-up with John, Lisa

21   regarding Pauker and decision rights around creative working

22   with Steve Levin and Sammer.  Want to insure equitable

23   treatment.  These are two new items for Monitor people,

24   correct?

25   A    Yes.

1  Q    Then blow up the last two.

2          Here's two to-do items for Sammer, right?  Did you

3  ever work with Sammer?

4  A    No.

5  Q    And then pull up the next page, Jeff.

6          Those are the rest of the ones for Sammer.  The next

7  person.  Now, Elise and Romney, those are two people you worked

8  with, right?

9  A    Yes.

10 Q    These are two items for them to do in May of 2002?

11 A    Looks like it, yes.

12 Q    Next one down.  Stacey, you worked with Stacy Raiche,

13 right?

14 A    Right.

15 Q    On the greetings module?

16 A    Yes.

17 Q    These are to-do items for her in May of 2002 from Mark

18 Pocharski, correct?

19 A    Yes.

20 Q    Mark Pocharski was someone that would distribute work to

21 these people, right?

22 A    Yes.

23 Q    The Elises and the Staceys?

24 A    Yes.

25 Q    That's what this memo is doing, correct?

1    A    Yes.

2    Q    That's in May of 2002?

3    A    Yes.

4    Q    Take a look now at Defendant's Exhibit 265.  Now, this one

5    looks like the same cover page, right?  Hallmark Greetings,

6    Business Model Project.  Tenth floor documents.  That's what we

7    talked about the 10th floor?

8    A    Yes.

9    Q    And then the second page there has 1, 2, 3, 4, 5 meetings.

10   Did you participate in any of those meetings?

11   A    I don't remember if I did or not.

12   Q    Flip to the 4th page.  January 2002.  The next page.

13        So now here, again, we have the same footer.  It's

14   Monitor.  We have the decisions before us, consumers,

15   customers, configuration.  Invest to grow the category.  That's

16   what we've been talking about, right?

17   A    Yes.

18   Q    45 and older activate the target equity program.  These

19   are all talking about the business model, right?

20   A    Yes.

21   Q    These documents went through May of 2002, isn't that

22   right?

23   A    Yes.

24   Q    It was June when we looked earlier at --

25        Actually, Jeff, pull up 578.

1     That was the one we looked at the consumers, that was

2   one of the final documents for the BMR, right, on the greetings

3   section?

4   A    Ask the question, again, please.

5   Q    Sure.  That document, looked at it earlier on direct with

6   Mr. German.  This document here?

7   A    I didn't look at it.

8   Q    So let's take a look at it then.  Actually going to give

9   you-- actually placed before you two documents 578 and 579.

10            So let's take 579 first.

11            Pull that up, Jeff, 579.

12            This one, again, Hallmark Greetings.  Business model

13   project.  Then it has configuration on it.  That was part of

14   the greetings module, correct?

15  A    Yes.

16  Q    This has a date of June 2002.  Look at page 2.  That's

17   saying there, final recommendations then exhibits to that final

18   recommendations.  Is that your memory that concluded on or

19   about June 2002?

20  A    I wasn't there for this presentation.

21  Q    Okay.  Then let's take the other one, Defendant's Exhibit

22   578.  And that one says Hallmark Greetings, business model

23   project.  Consumers and customers.  See that one?

24  A    I do.

25  Q    Do you recall this document?

1   A    No.

2   Q    Look at the next page.  That has final recommendation.

3   Then consumer exhibits and customer exhibits.  Were you at this

4   meeting?

5   A    No.

6   Q    Had you pulled off of the BMR project at some point

7   time-wise in the 2001-2002 time period?

8   A    No.  When the strategy work was done in December we had

9   wrapped up what we wanted to do.  We went into the

10   implementation phase.  So I started an assignment that was part

11   of the implementation of the business model process.

12   Q    Along with your regular duties that you were doing?

13   A    No.  I started a new assignment.

14   Q    I'm sorry?

15   A    I started a new assignment.

16   Q    Okay.  When was that?

17   A    First part of 2002.

18   Q    First part of 2002.  What was the new assignment?

19   A    Vice president of customer strategy and planning.

20   Q    And did you continue to work with the Monitor consultants,

21   Ms. Martin and Ms. Raiche and Mr. Pocharski and so on?

22   A    I worked with mainly Elise Martin.  But it wasn't on the

23   strategy work.  It was on implementation work.  It was going

24   back and asking Elise some clarification questions as we got

25   into staffing, actually putting the business model in practice.

1    It was clarification questions and that kind of stuff.  Thirty

2    minutes here and there early part of 2002.

3    Q    I'm moving to a new section.

4            THE COURT:  Let's stop.

5            Ladies and gentleman, I'm going to read Instruction

6    No. 7 to you again.  During this recess and every other recess

7    do not discuss this case among yourselves or with anyone else

8    including your family and friends.  Do not allow anyone to

9    discuss the case with you or within your hearing.  Do not

10   discuss also means do not e-mail, send text messages, blog or

11   engage in any other form of written, oral or electronic

12   communication as I instructed you before.  Do not read any

13   newspapers or other written account, watch any televised

14   account or listen to any radio news program on the subject of

15   this trial.  Do not conduct any independent Internet research

16   or consult with any other sources about this case, people

17   involved in the case or its general subject matter.  You must

18   keep your mind open and free of outside information.  Only in

19   this way will be you be able to decide the case fairly based

20   solely on the evidence and my instructions on the law.  If you

21   decide this case on anything else you will have done an

22   injustice.  It is very important that you follow these

23   instructions.  And, again, I may not repeat this instruction

24   before every recess but please keep it in mind throughout the

25   trial.

1          We'll ask that you be in the jury room at 8:30

2    tomorrow morning and ready to return for your second day of

3    work.  Thank you for your time and service today.

4          (The following proceedings were had OUT OF THE

5    PRESENCE AND HEARING OF THE JURY:)

6          THE COURT:  I will be here at 8 tomorrow morning.  If

7    you need me just send a message and I'll come out.

8          Good night.

9                              (Witness temporarily excused.)

10                        *    *    *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25