```
 1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF MISSOURI
 2                     WESTERN DIVISION


 3

 4   HALLMARK CARDS, INC.,            )
                                      )
 5                    Plaintiff,)
                                      )
 6         vs.                        )Case No. 08-00840-CV-W-ODS
                                      )
 7   MONITOR CLIPPER PARTNERS, LLC.,  )
                          et al.)  November 7, 2012
 8                                    )  Kansas City, Missouri
                       Defendants.)
 9

10             TRANSCRIPT OF JURY TRIAL PROCEEDINGS
              BEFORE THE HONORABLE ORTRIE D. SMITH
11             UNITED STATES SENIOR DISTRICT JUDGE

12                     VOLUME 3 OF 10

13   APPEARANCES:
     FOR THE PLAINTIFF:         Mr. Charles W. German
14                              Mr. Daniel E. Blegen
                                Rouse Hendricks German May PC
15                              1201 Walnut, 20th Floor
                                Kansas City, Missouri 64106
16
                                Mr. John C. Aisenbrey
17                              Stinson Morrison Hecker LLP
                                1201 Walnut Street, Suite 2800
18                              Kansas City, Missouri

19         (APPEARANCES CONTINUED ON NEXT PAGE)

20

21   COURT REPORTER:           Ms. Cynthia M. Johnson, RMR
                               U.S. Court Reporter
22                             400 East 9th Street, Room 8552
                               Kansas City, Missouri 64106
23                             (816)512-5657

24

     Proceedings reported by computer stenography; transcript
25   produced by computer.
```

```
 1                    (APPEARANCES CONTINUED)

 2    FOR THE DEFENDANTS:           Mr. David F. Oliver
                                    Ms. Stacey R. Gilman
 3                                  Berkowitz Oliver Williams Shaw
                                    2600 Grand Blvd. Ste. 1200
 4                                  Kansas City, Missouri 64108

 5

 6                                  Mr. Steven L. Manchel
                                    Mr. Michael G. Donovan
 7                                  Manchel & Brennan, PC
                                    199 Wells Avenue, Ste. 301
 8                                  Newton, MA 02459

 9                              *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2
                                                         Page No.
 3
     NOVEMBER 5, 2012 - DAY 1
 4
```

```
     RECORD............................................    2
 5
     INSTRUCTIONS NOS. 1 - 6 READ........................   34
 6
     OPENING STATEMENT BY MR. AISENBREY..................   34
 7
     OPENING STATEMENT BY MR. MANCHEL....................   53
 8
                          PLAINTIFF'S EVIDENCE
 9
     WITNESSES:
10
             DON HALL, JR.
11           Direct Examination by Mr. Aisenbrey............   72
             Cross-Examination by Mr. Manchel...............   99
12           Redirect Examination by Mr. Aisenbrey..........  148
             Recross-Examination by Mr. Manchel.............  161
13
             WAYNE STRICKLAND
14           Direct Examination by Mr. German...............  168
             Continued Direct Examination by Mr. German.....  227
15           Cross-Examination by Mr. Donovan...............  234

16   NOVEMBER 6, 2012 - DAY 2

17   WITNESSES:

18           WAYNE STRICKLAND - RESUMED
             Continued Cross-Examination by Mr. Donovan.....  283
19           Redirect Examination by Mr. German.............  322
             Recross-Examination by Mr. Donovan.............  334
20
     RECORD............................................  338
21
     VIDEO DEPOSITION OF MARK THOMAS....................  347
22
     WITNESSES:
23
             ADAM DOCTOROFF
24           Direct Examination by Mr. Aisenbrey............  347
             Continued Direct Examination by Mr. Aisenbrey...  387
25
```

INDEX (Continued)

Page No.

VIDEO DEPOSITION OF BILL YOUNG....................... 400

VIDEO DEPOSITION OF PETER KIM........................ 401

RECORD.............................................. 401

CONTINUING VIDEO DEPOSITION OF PETER KIM............. 410

VIDEO DEPOSITION OF CHARLES YOON..................... 411

RECORD.............................................. 411

NOVEMBER 7, 2012 – DAY 3

RECORD.............................................. 413

VIDEO DEPOSITION OF SEAN GARDNER.................... 429

WITNESSES:

    JOHN MAYNARD
    Direct Examination by Mr. Blegen................ 430
    Continued Direct Examination by Mr. Blegen...... 482
    Cross-Examination by Mr. Donovan................ 482
    Redirect Examination by Mr. Blegen............. 527

RECORD.............................................. 531

VIDEO DEPOSITION OF GRANT BROWN..................... 532

VIDEO DEPOSITION OF JEFFREY PAUKER.................. 533

RECORD.............................................. 533

CONTINUING VIDEO DEPOSITION OF JEFFREY PAUKER........ 534

RECORD.............................................. 534

NOVEMBER 8, 2012 – DAY 4

RECORD.............................................. 536

                        INDEX (Continued)

                                                    Page No.

WITNESS:

      DR. KENNETH SERWIN
      Direct Examination by Mr. German................  548
      Continued Direct Examination by Mr. German......  599
      Cross-Examination by Mr. Manchel................  627

RECORD............................................  675

WITNESS:

      DR. KENNETH SERWIN - RESUMED
      Continued Cross-Examination by Mr. Manchel......  680
      Continued Cross-Examination by Mr. Manchel......  746
      Redirect Examination by Mr. German..............  784
      Recross-Examination by Mr. Manchel..............  801

RECORD............................................  806

NOVEMBER 9, 2012 - DAY 5

RECORD............................................  814

VIDEO DEPOSITION OF STEVE LEVIN.....................  824

VIDEO DEPOSITION OF MARK POCHARSKI..................  826

RECORD............................................  826

CONTINUING VIDEO DEPOSITION OF MARK POCHARSKI........  835

VIDEO DEPOSITION OF LARRY EARLEY....................  836

VIDEO DEPOSITION OF JAN MURLEY......................  840

RECORD............................................  842

WITNESS:

      PAUL MAXWELL
      Direct Examination by Mr. Blegen................  848
      Continued Direct Examination by Mr. Blegen......  861
      Cross-Examination by Mr. Donovan................  889

```
 1                          INDEX (Continued)

 2                                                        Page No.

 3   NOVEMBER 13, 2012 - DAY 6

 4   WITNESSES:

 5        PAUL MAXWELL - RESUMED
          Continued Cross-Examination by Mr. Donovan......    905
 6        Redirect Examination by Mr. Blegen..............    928

 7   VIDEO DEPOSITION OF LAURA STEINBERG.................    937

 8   VIDEO DEPOSITION OF PATRICK O'TOOLE.................    938

 9   WITNESSES:

10        JOHN MALLERY
          Direct Examination by Mr. Blegen................    941
11        Cross-Examination by Mr. Oliver................    980

12   RECORD..............................................    992

13   WITNESSES:

14        BRIAN GARDNER
          Direct Examination by Mr. Aisenbrey.............    994
15        Cross-Examination by Mr. Manchel................   1034
          Continued Cross-Examination by Mr. Manchel......   1067
16
     NOVEMBER 14, 2012 - DAY 7
17
     RECORD..............................................   1121
18
     WITNESS:
19
          BRIAN GARDNER - RESUMED
20        Continued Cross-Examination by Mr. Manchel......   1122
          Redirect Examination by Mr. Aisenbrey...........   1160
21        Recross-Examination by Mr. Manchel..............   1186

22   RECORD..............................................   1193

23   PLAINTIFF RESTS

24                          DEFENDANTS' EVIDENCE

25
```

```
 1                           INDEX (Continued)

 2                                                           Page No.

 3    WITNESSES:
```

```
 4        ADAM DOCTOROFF – RECALLED
          Direct Examination by Mr. Donovan...............   1194
 5
      MOTIONS..........................................   1251
 6
      COURT'S RULING...................................   1264
 7
```

```
      WITNESS:
 8
```

```
          ADAM DOCTOROFF – RESUMED
 9        Continued Direct Examination by Mr. Donovan.....   1267
          Cross-Examination by Mr. Aisenbrey..............   1322
10        Redirect Examination by Mr. Donovan.............   1364
```

```
11    NOVEMBER 15, 2012 – DAY 8
```

```
12    INSTRUCTION CONFERENCE...............................   1368

13    RECORD............................................   1391

14    VIDEO DEPOSITION OF MARK WILLIAMSON.................   1394
```

```
15    WITNESS:
```

```
16        APRIL EVANS
          Direct Examination by Mr. Donovan...............   1396
17        Cross-Examination by Mr. German.................   1421

18    RECORD............................................   1469
```

```
19    WITNESSES:
```

```
20        APRIL EVANS – RESUMED
          Continued Cross-Examination by Mr. German.......   1471
21
          JAY DITTMAN
22        Direct Examination by Mr. Donovan...............   1518

23    OFFER OF PROOF....................................   1530
```

```
24

25
```

```
1                       INDEX (Continued)

2                                                      Page No.

3    WITNESSES:

4        JAY DITTMAN – RESUMED
         Continued Direct Examination by Mr. Donovan.....   1532
5        Cross-Examination by Mr. Blegen.................   1538

6        DR. COLIN BLAYDON
         Direct Examination by Mr. Manchel...............   1541
7
     RECORD.............................................   1572
8
     NOVEMBER 16, 2012 – DAY 9
9
     RECORD.............................................   1574
10
     WITNESS:
11
         DR. COLIN BLAYDON – RESUMED
12       Continued Direct Examination by Mr. Manchel.....   1576
         Cross-Examination by Mr. German.................   1602
13
     RECORD.............................................   1636
14
     WITNESS:
15
         DR. COLIN BLAYDON – RESUMED
16       Continued Cross-Examination by Mr. German.......   1639
         Redirect Examination by Mr. Manchel.............   1649
17
     RECORD.............................................   1652
18
     MOTIONS............................................   1653
19
     COURT'S RULINGS....................................   1654
20
     DEFENDANTS REST
21
     INSTRUCTIONS NOS. 9 – 29 READ......................   1655
22
     CLOSING ARGUMENTS BY MR. GERMAN....................   1657
23
     CLOSING ARGUMENTS BY MR. MANCHEL...................   1692
24
     CLOSING ARGUMENTS BY MR. GERMAN....................   1722
25
     JURY RETIRED.......................................   1728
```

INDEX (Continued)

Page No.

NOTE FROM JURY........................................ 1729

NOTE FROM JURY........................................ 1731

NOTE FROM JURY........................................ 1733

NOVEMBER 19, 2012 – DAY 10

NOTE FROM JURY........................................ 1734

RECORD............................................... 1734

NOTE FROM JURY........................................ 1735

RECORD............................................... 1736

NOTE FROM JURY........................................ 1739

VERDICT.............................................. 1740

JURY POLLED.......................................... 1742

RECORD............................................... 1743

CERTIFICATE OF REPORTER.............................. 1745

*   *   *

INDEX OF EXHIBITS

| PLAINTIFF'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| No. 40 (e-mail) | 341 in part | 343 |
| No. 49 (e-mail) | 1345 | 1345 |
| No. 55 (Q & A sheet) | 343 | 345 |
| No. 62 (e-mail) | 403 | 403 |
| No. 115 (e-mail) | 868 | 868 |
| No. 122 (Strategy & Action plan) | 819 | 823 |
| No. 125 (e-mail) | 923 | 923 |

```
 1                    INDEX OF EXHIBITS (Continued)

 2    PLAINTIFF'S EXHIBITS                OFFERED      RECEIVED

 3    No. 128 (e-mail)                     814        818

 4    No. 128A (e-mail)                    814        818

 5    No. 150 (e-mail)                     423        425 cond.

 6    No. 173 (affidavit)                  403        404 rej.

 7    No. 186 (metadata)                   404        406 rej.

 8    No. 202 (e-mail)                     407        407

 9    No. 203 (e-mail)                     407        407

10    No. 204 (e-mail)                     423        425 cond.

11    No. 217 (e-mail)                     408        409

12    No. 241 (e-mail)                     870        870

13    No. 246 (contact report)            819        823

14    No. 266 (e-mail)                     428        429

15    No. 270S (letter)                   1046        1046

16    No. 281 (e-mail)                     346        346

17    No. 306 (e-mail)                     871        871

18    No. 307 (contact report)            819        823

19    No. 313 (consulting agreement)      882        882

20    No. 319 (consulting agreement)      814        818

21    No. 334 (e-mail)                     814        818

22    No. 342 (e-mail)                    1460        1460

23    No. 346 (e-mail)                     819        823

24    No. 349 (letter)                    1009        1009

25    No. 360 (letter)                     814        818
```

INDEX OF EXHIBITS (Continued)

| PLAINTIFF'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| No. 361 (letter) | 814 | 818 |
| No. 363 (letter) | 814 | 818 |
| No. 364 (e-mail) | 814 | 818 |
| No. 370 (e-mail) | 814 | 818 |
| No. 371 (consulting agreement) | 814 | 818 |
| No. 375 (letter) | 836 | 839 |
| No. 376 (contact report) | 819 | 823 |
| No. 383A (BKD report) | 964 | 965 |
| No. 386 (Shredder random overwrite) | 974 | 974 |
| No. 422 (letter) | 785 | 786 |
| No. 429 (brochure) | 1440 | 1440 |
| No. 430D (Shredder pop-up window) | 976 | 976 |
| No. 430E (Shredder pop-up window) | 976 | 976 |
| No. 440 (report) | 979 | 979 |
| No. 442 (directory listing) | 978 | 978 |
| No. 443A (detailed report) | 967 | 967 |
| No. 443B (link file report) | 961 | 961 |
| No. 443C (log) | 966 | 966 |
| No. 449 (e-mail) | 1467 | 1467 |
| No. 475 (e-mail) | 887 | 887 |
| No. 487 (e-mail) | 83 | 83 |
| No. 488 (e-mail) | 84 | 84 |
| No. 489 (spreadsheet) | 453 | 453 |

```
 1                    INDEX OF EXHIBITS (Continued)

 2    PLAINTIFF'S EXHIBITS                   OFFERED     RECEIVED

 3    No. 546A (resume)                        550        550

 4    No. 547A (schedule)                      575        575

 5    No. 547C (schedule)                      570        570

 6    No. 547D (schedule)                      223        570

 7    No. 547E (schedule)                      572        572

 8    No. 547G (summary)                       581        581

 9    No. 547H (list of invoices)              580        580

10    No. 547K (schedule)                      623        623

11    No. 547L (diagram)                       615        615

12    No. 547N (schedule)                      603        603

13    No. 649 (photo)                          848        848

14    No. 651 (financial statement)           1530       1531

15    No. 652 (financial statement)           1530       1531

16    No. 653 (financial statement)           1530       1531

17    No. 654 (financial statement)           1530       1531

18    No. 655 (financial statement)           1530       1531

19    No. 656 (financial statement)           1530       1531

20    No. 658 (spreadsheet)                    463        463

21    No. 659 (e-mail)                        1453       1453

22    No. 660 - 673 (transcripts)             1638       1638

23    No. 674 (schedule)                      1675       1676

24    No. 674A (schedule)                     1675       1676

25    No. 676A & 676B (videos)                1638       1638
```

```
 1                    INDEX OF EXHIBITS (Continued)

 2   PLAINTIFF'S EXHIBITS                OFFERED    RECEIVED

 3   No. 1505 (e-mail)                    1183      1183

 4                            *    *    *

 5   DEFENDANT'S EXHIBITS                OFFERED    RECEIVED

 6   No. 327 (Giftbeat Magazine)          1246      1246

 7   No. 412A (data room info)            1282      1282

 8   No. 1016A (e-mail)                    894       894

 9   No. 1022 (e-mail)                     426       427

10   No. 1255A (transcript – Mark         1655      1655
                    Williamson)
11
     No. 1275D (DVD – Williamson depo.)   1655      1655
12

13                            *    *    *

14

15

16

17

18

19

20

21

22

23

24

25
```

1    NOVEMBER 7, 2012 - DAY 3

2              (The following proceedings were had OUT OF THE

3    PRESENCE AND HEARING OF THE JURY:)

4              MR. BLEGEN:  At the very beginning I want to

5    apologize, again, for yesterday.  They worked late into the

6    evening, this morning tested.  We believe all of the software

7    bugs that were causing it to crash are resolved and we will not

8    have an issue today.  We're terribly sorry and embarrassed it

9    happened yesterday.

10              THE COURT:  Okay.  Before we get to business, where

11   are we now in the presentation of the plaintiff's case?

12              MR. GERMAN:  Your Honor, I think that we will have

13   several videos today that are shorter.  We have one live

14   witness from Hallmark.  We will, we intend to put our expert

15   witness on tomorrow.  And I think if we are lucky, in the

16   plaintiff's case, we'll probably be done, I'm thinking Monday

17   morning.

18              John?

19              MR. AISENBREY:  I think so, Judge.  Although a lot

20   depends on the cross-examination of the expert.  It could end

21   Friday afternoon depending on how long that goes.

22              MR. GERMAN:  Our original plan was to rest on Friday

23   afternoon.  I think, realistically, it may go to Monday

24   morning.  We're on the clock.  We're keeping track.

25              THE COURT:  Okay.  Well, I was hoping that it might

1   not be necessary to work on Monday for a lot of different

2   reasons.  I hate to impose on the jury on a holiday and I don't

3   know that any of them are veterans but I'm sure they have high

4   regards for veterans and their contributions to the country.

5           Secondly, it is complicated.  I realize the parties

6   have offered to pay the cost but the Court can't accept the

7   money from you because we can't mingle that with the

8   appropriated funds.

9           Another option would be to have you donate it to the

10  historical society but I'm really not inclined to do that

11  because I think you might feel pressured to give a donation you

12  would not otherwise give.  So there are a lot of reasons why it

13  becomes complicated for me to ask you to pay for it.  So I

14  guess we'll go ahead and work Monday but at this stage I'm not

15  inclined to accept any money from the parties as reimbursement.

16          MR. MANCHEL:  I have a suggestion for Monday that

17  might help a little.  If we're going to finish Monday morning

18  we might be able to release the jury quickly because obviously

19  we're going to move for judgment and it's going to be pretty

20  comprehensive arguing.  And I think if we do that I'll still

21  have plenty of time to finish my case including closings by

22  Friday.  I don't know if I could do that if we started on

23  Tuesday and then broke.  So I'm a little hesitant.  I almost

24  feel as if we could go without Monday but then we would run the

25  risk of leading into the Thanksgiving week which I know Your

1    Honor has open but I'm not going to look like such a great guy.

2    I just throw that out, better we work less on Monday and

3    relieve them and give them most of their holiday.  Like I said,

4    I'll know better Friday.  But I might be able to do it so we

5    just start Tuesday and have a shot at finishing Friday.  So

6    I'll work either way.

7         THE COURT:  Well, why don't we all just keep it, you

8    know, at the top of our mind and I'll try to make a decision

9    today because I want the jury to be able to plan for their

10   either 2 or 3 day weekend.  So let's think about it some more

11   today and maybe by the end of the day we'll have a better

12   handle.

13        MR. GERMAN:  From the plaintiff's point of view we

14   have no objection to taking Monday off.  I'm sensitive to

15   counsel's comments about not wanting to have the evidence and

16   arguments extend in to the holiday week.  I think if we argued

17   the case Monday morning I think the jury would have plenty of

18   time to decide if the Court wants to take Monday, Veteran's

19   Day, off for them or --

20        MR. MANCHEL:  I agree that's your call.

21        THE COURT:  All right.  We'll just keep thinking

22   about it.

23        MR. MANCHEL:  Your Honor, thank you.  I was not going

24   to say two words at 5:03 last night so I'm asking the Court's

25   indulgence to raise this this morning.  We'd like to move to

1   strike a portion of the Yoon deposition that dealt with Murley.

2   And I also think it gives the Court the context that the Court

3   has been asking for in terms of framing up how to police what

4   I'm going to call the Murley order.

5           If Your Honor recalls the last ten minutes or so of

6   the deposition went as follows.  No. 1, the head hunter, the

7   resume, the Hallmark executive, the CEO position, the

8   consultant position, those items are actually covered expressly

9   by Your Honor's order.  The negotiations that led up to her

10  position and they were in the deposition.  That deposition was

11  shown to the jury.  Then they went into the sweep and purge and

12  Patrick O'Toole segment.  Then at the end of all of that which

13  is the point we've been making to the Court, we thought it had

14  been resolved in the order, at the end of all that they said to

15  Mr. Yoon have you seen the presentation that is at issue in

16  this case and his answer was no.  So they know that witness had

17  absolutely no connection to the presentations at issue in this

18  case but the jury still heard what I think is confusing and

19  prejudicial information and it's covered by the letter and I

20  think the spirit of the order about now RPG's hired a Hallmark

21  executive.  Now there is lawyers going out to purge computers.

22  When all of that had to do with 20A through E, the package that

23  was handed up to you during the hearing on Murley.

24          So I'm concerned that this is going to play out over

25  the course of a lot of depositions moving forward, these video

1    depositions.  And I think as I said it provides the Court with

2    a context that you were looking for which is, if you take a

3    step back what point did any of that have to do with the case

4    that has been framed by the Court.  And they knew in advance

5    with this witness, there is no connection with Charlie Yoon

6    whatsoever to the presentations at issue in this case.

7              THE COURT:  What I still do not know is what the

8    overlap is between the five presentations and Exhibits 20A

9    through E.

10             MR. MANCHEL:  I think what you'll see, Your Honor, at

11   most is that there are parts of Exhibit, what you're calling

12   Exhibit 20 that if you take, let me take a step back.  What I

13   think is indisputable and will not be disputed at this moment

14   is, No. 1, they are different documents.  Remember the issue

15   presented by Hallmark in this case is it's 100 percent of what

16   is in those presentations.  And I remember Your Honor's words,

17   so be it.  So, No. 1, as a compilation which is the position

18   they've taken in this case, they are different compilations

19   period.

20             No. 2, they're from different times.

21             No. 3, they come from Hallmark taken by Jan Murley.

22   And Jan Murley does what she does with them.

23             So I think those are, if you will, foundational posts

24   of the analysis.  I believe that what you will see at some

25   point is there are pieces, there are pieces of information from

1    Exhibit 20 that either are the same or very close to what is in

2    20A through E.

3           My point is, I don't see that they can have it both

4    ways.  We're either talking about the 100 percent compilation

5    which they're not or we're talking about, which I think we are,

6    we're talking about the trade secrets that are supposedly

7    embodied in these documents.  And if we are, I'm okay with

8    that.  I'm okay with the notion that they're going to make a

9    case that there are some things in 20A through E that are in 20

10   and therefore those things have value as opposed to compilation

11   versus compilation.  And that's where I think the evidence will

12   end up, Your Honor.

13          THE COURT:  Okay.

14          MR. BLEGEN:  Your Honor, this actually touches on

15   something that I was going to bring up with regard to exhibits

16   this morning.  But Mr. Yoon's limited testimony is going to be

17   inconsistent with testimony that's coming up on the exact

18   process of hiring Jan Murley, who did it.  It is clear from

19   later witnesses that the RPG board, Mr. Yoon testified, hired

20   the search firm to get Jan Murley is not at all what happened.

21   It was actually the Monitor Clipper people who, whether the

22   search firm or not, identified Jan Murley and presented her to

23   the RPG executives.  So they were directing up the hiring.

24          As far as the issue on Exhibits 20A through E, the

25   slides in one of those exhibits, actually marked as Exhibit

1    150, are straight out of the BMR.  Now it's not the entire 487,

2    488, but it is straight out of there as well as another e-mail

3    which is marked as Exhibit 204 that Jan Murley sends in advance

4    of her consulting, sends to Clipper in advance of her

5    consulting with RPG where she pulls information out of that BMR

6    presentation as the baseline for RPG's research going forward

7    with NxtMove.  That shows that, contrary to their position, it

8    was useful.  It was used.  It was not old and stale.  It

9    continued to be the baseline upon which RPG was able to conduct

10   additional research without having to go through the baseline

11   research in 2006 and 2007.  So goes directly to their defenses

12   in this case.

13         Now, we're not arguing, as we discussed previously,

14   that Jan Murley bringing that information is an independent

15   damage claim in this case.  We're not making that argument.

16   Perhaps we could have but we're not making that argument at

17   this point.  We're talking about the original one.  But this

18   goes to continued use and it goes to the intent of Clipper, did

19   they really just innocently get Exhibit 20 or did they really

20   want that information?  They bragged about the information.

21   They said they were going to use Monitor's information.  They

22   received Hallmark's letter.  They realized maybe they can't use

23   exactly what they got from Monitor so what do they do?  They

24   hired Jan Murley to bring the same information to them because

25   they knew how important and useful it was.

1          Then that also goes to the fact that when they

2     realize in 2006 and 2007 that it's going to come out

3     eventually, potentially, that they have this, they went through

4     the image and purge process which also involved Paul Maxwell

5     shredding unknown documents off his computer from the Jan

6     Murley time period and perhaps before because he had been

7     involved since September of 2005.  It involves the cover up.

8     It goes directly to their confidential agreement claim because

9     that was a material fact that was misrepresented to us and was

10    not disclosed to us during the course of the negotiation of the

11    confidential agreement.

12         As you observed previously Jan Murley is in some way,

13    shape or form in the case because it's a material event.  It's

14    a material fact.  We're not submitting a damage claim.

15         THE COURT:  All right.  I'm going to overrule the

16    motion to strike at this time.  There needs to be some

17    connection between the five presentations and Exhibits 20A

18    through E.  And if that doesn't develop, then you may renew

19    your motion to strike.

20         MR. MANCHEL:  Your Honor, not even -- what I'm

21    struggling with as an issue.  I keep hearing the use of some of

22    the things from some of the Murley documents she had from

23    Hallmark show that we thought Exhibit 20 was valuable.  And

24    what I'm struggling with is, is this a compilation claim or is

25    this, as we think it is, a trade secrets in the compilation?

1    They could have a book that has trade secrets embodied in
2    discrete chapters, if you will.  I think it's very difficult to
3    have to deal with it both ways.  If the question is, did
4    Clipper believe the compilation was valuable, these are not the
5    compilations.  If the question is, did Clipper think that there
6    were things within the so-called compilation that were
7    valuable, then, No. 1, we were precluded from taking discovery
8    on that because we asked them to identify, what did you think
9    was valuable in these things and their answer was everything.
10   We had a hearing on that where they said they would not
11   identify what they thought in it was a trade secret and what
12   was valuable.  So I'm just really struggling with the notion
13   how they can say this piece of information shows, I think it
14   shows the most that that piece of information was valuable to
15   Jan Murley.  But how that goes to the value of the compilation
16   when we asked specifically show us the pieces of information in
17   the compilation that you say we think are valuable, these are
18   trade secrets and their answer was no.  So that is just the
19   frame work.  It's not just for me the connection between the
20   two it's the connection of the compilation.  What is the
21   relevance of one piece of information from 20A through E
22   they're going to show Jan Murley touched.  How does that show
23   the value of the compilation?  And if it's used to show the
24   value of the compilation, why weren't we permitted to have them
25   say, here are the pieces in the compilation that we think are

1    valuable.

2          MR. BLEGEN:  And, Your Honor, we've been over that.

3    That's a bit of a red herring argument.  They stole the

4    compilation.  They stole those five trade secrets.  They're

5    claiming these five trade secrets are completely irrelevant.

6    They're of no use.  These trade secrets are old and stale.

7    These trade secrets were never used, this compilation.  A

8    rebuttal of that argument is the fact that when they needed to

9    do marketing, they needed to analyze the industry to grow RPG,

10   they went right back to the compilations.

11         Now, it's true, Jan Murley did not send 250 pages of

12   Power Points to them.  She picked out the data points she

13   thought were most salient to the questions asked of her.  She

14   submitted the slides from the Power Point she thought were most

15   relevant to the issues she was addressing with RPG.  That shows

16   that the data, the learnings, the information of the BMR is not

17   publicly disclosed, old and stale, and of no use and never used

18   by RPG.  That's different from the issue of is there something,

19   is there one page in this 250 pages we're claiming is a trade

20   secret.  That's never-- they stole the compilation.  They're

21   claiming the compilations are irrelevant.  This shows that that

22   is simply not true.  They knew they were relevant.  They

23   understood they were relevant and they were used in 2006.

24         THE COURT:  Just so we're all on the same page, it's

25   been my understanding for many months now that the trade

1    secrets in this case are the compilations, that there are no

2    individual aspects of the presentations that you claim are

3    trade secrets.  It's the compilation itself.  And based on that

4    understanding I'm expecting that there will be some evidence

5    that some of those presentations were used by Murley and RPG.

6    If that doesn't show up then I will re-entertain the motion to

7    strike.  But that's my expectation.

8            MR. BLEGEN:  If counsel is finished, we'll actually

9    address that right now.

10           THE COURT:  Well, do we have deposition issues

11   because I'm starting at 8:30.

12           MR. BLEGEN:  There are, this is an exhibit issue for

13   today.  It's a live witness today but rather than waste the

14   time of the jury, we wanted to try to bring it up before it

15   actually happens.

16           Your Honor, I'm going to hand you two exhibits at

17   issue, Exhibit 150 and 204.  These are exhibits to answer the

18   precise question that Your Honor said we needed to answer on

19   Monday when this issue was addressed.  Exhibit 150 is the Power

20   Point Jan Murley e-mailed.  There is another exhibit with the

21   transmittal e-mail.  Exhibit 204 is a separate e-mail she sent,

22   kind of giving a background on the industry and the research

23   and to prepare RPG, Clipper and nxtMove to do their research.

24   These exhibits are specifically identified and discussed in the

25   depositions of Jan Murley, in the depositions of Ed Stassen.

1  They will likely be addressed with Paul Maxwell who is a live

2  witness later in the week.  Mr. Maynard has, who will testify

3  today, has reviewed these previously, has testified about them

4  previously.  I would like to have him testify today to show

5  precisely where the information in 150 and the information in

6  204 comes out of this compilation.  They're stipulated as to

7  foundation but not admissibility.  I would ask the Court to

8  provisionally admit these and allow us to display them to the

9  jury so he can make that explanation in expectation that they

10 will be formally admitted in the depositions of Jan Murley, Ed

11 Stassen and the testimony of Mr. Maxwell.

12          THE COURT:  Stacey?

13          MS. GILMAN:  Good morning, Your Honor.  If they're

14 using them exclusively for the purpose of taking pieces of them

15 and showing the Court and the jury where 20A through E, which

16 is what that exhibit is and the other one relates to, how that

17 is the compilation where the connection is, then for the

18 provisional purpose of admission, we're not opposing that.  But

19 Mr. Maynard is their 30(b)(6) witness on damages.  And clearly

20 in the scope of that we do have objection to him testifying

21 pursuant to the Court's order, 20A through E should not be used

22 for damages in the case.

23          MR. BLEGEN:  Your Honor, that's actually not our

24 plan.  He will testify on damages but not in regard to what has

25 been referred to as 20A through E.

1          THE COURT:  All right.  Plaintiff's Exhibits 150 and

2     204 will be conditionally admitted.

3          MS. GILMAN:  May I continue, Your Honor?

4          THE COURT:  Yes.

5          MS. GILMAN:  It's our understanding from counsel that

6     the depositions that may be played today are those of Sean

7     Gardner, Pocharski, Brown, Levin and Ms. Shaw.  Mr. Gardner's

8     deposition was dealt with yesterday.  Across several of these

9     Exhibit 40 is referenced.  That is the incomplete copy of the

10    e-mail with some but not all of the attachments.  The Court has

11    already ruled that it should not come in.  Although pieces of

12    it may be shown because they are the same.  He had not decided

13    as of last night what their position would be so I don't know

14    if there is opposition or if they're moving for admission of

15    Exhibit 40.

16         MR. BLEGEN:  Your Honor, the first deposition in

17    which this will come up is Grant Brown.  In Grant Brown I mark

18    for the first time Exhibit 40, which was the three

19    presentations at issue in the case, an additional public

20    document that I omitted from that exhibit for use in deposition

21    and a cover letter.  In that same deposition defendants marked

22    Exhibit 1022, which is that missing piece, and have put it in

23    testimony through Mr. Brown that that was a fourth presentation

24    that was also transmitted on e-mail.  So I believe the concern

25    about completeness and confusion with Exhibit 40 is, in fact,

1    resolved by the defendants' own designations in the deposition

2    we're going to play.  So at that point I believe 40 and 1022

3    should be admitted into evidence so they are formally admitted.

4    We will largely be referring only to 487 and 488 in front of

5    the jury, however because it's the color version that's easier

6    to read.

7            MS. GILMAN:  Your Honor, there's no additional

8    probative value to introducing 40 into evidence and it can only

9    serve to confuse and prejudice and I don't believe --

10           THE COURT:  Stacey, where is the harm if in the

11   presentation of Brown's deposition all four pieces of the

12   exhibit are shown to the jury?

13           MS. GILMAN:  Because, in fact, they will be shown

14   piecemeal and it may not be evident particularly if that

15   exhibit goes back to the jury room during deliberations, that

16   those were connected.  The jury may well forget the testimony

17   about the two of them.  As he said they have ample copies with

18   everything attached.

19           THE COURT:  Juries don't forget.  I don't see the

20   harm.  If the jury asks for Exhibit 40, we'll have a

21   conversation about whether we send back just the three pieces

22   or all four pieces.  My inclination would be to send Exhibit 40

23   and 122 at that time with a note telling them that those two

24   exhibits comprise all of the presentation.

25           MR. BLEGEN:  Your Honor, we are absolutely fine with

1    that and would agree.  Just to clarify, it's 1022.

2              THE COURT:  I'm sorry?

3              MR. BLEGEN:  It's 1022, not 122.  It's actually under

4    that number.  It's plaintiff's.  I'm not sure what the

5    defendant's number is but it's Deposition Exhibit 1022.

6              THE COURT:  While we are on that subject.  Is 1022 a

7    Defendant's Exhibit or Plaintiff's Exhibit?

8              MR. BLEGEN:  It is a Defendant's Exhibit but I don't

9    know the trial exhibit number because it doesn't correspond to

10   the deposition.

11             THE COURT:  There was reference made to deposition

12   exhibits in the depositions yesterday and I was unable to match

13   up to the trial exhibit numbers.  So you'll need to be aware of

14   that and my list may not show an exhibit that was referred to

15   and the parties have agreed would be admitted simply because I

16   didn't have the correct number.

17             MR. BLEGEN:  And if it was in a portion of the

18   designations made by the plaintiff it will directly correspond

19   to our trial exhibit list.  If it was made in the portion of

20   the deposition designated by the defendants, they have a

21   different numbering system at trial so I can't answer your

22   question.

23             THE COURT:  We'll deal with it if it comes up.

24             MS. GILMAN:  We were able to reach agreement on a

25   couple exhibits.  They're not moving admission of Exhibit 65 in

1    Brown and have also agreed that Exhibit 263 in Mr. Pocharski's

2    deposition will not come in, no need to refresh his

3    recollection.  There is one disputed exhibit remaining in

4    Pocharski's deposition.  It's Exhibit 266.  This is an e-mail

5    from Mr. Pocharski to Bill Young suggesting Chris Casey at MCP

6    support RPG in January of 2006.  It relates to the actions of

7    non-party Monitor.  We believe it should be excluded under the

8    Court's ruling that non-party conduct is irrelevant for

9    damages.  And we are objecting to it on that basis and as well

10   as prejudicial.

11           THE COURT:  I'm just going to observe, Stacey, that

12   most of the evidence offered by the plaintiff is going to be

13   prejudicial to the defendant and most of the evidence offered

14   by the defendant will be prejudicial to the plaintiff.  It's

15   undue prejudice that we're concerned about.

16           MS. GILMAN:  Thank you, Your Honor.  And I apologize

17   for not making that clarification.  We would not be objecting

18   if it were simply prejudicial in the permissible way.  We do

19   believe it is unduly prejudicial.

20           MR. BLEGEN:  Your Honor, this is a step in the chain.

21   Monitor assisted Monitor Clipper in acquiring a company.

22   Monitor Clipper intended to use Monitor to work for RPG.  Chris

23   Casey was the step in which they did that.  Chris Casey then

24   knowing that Monitor can't be hired, goes out and finds nxtMove

25   and is going to work behind the scenes with nxtMove.  Then

1   turns nxtMove over to Paul Maxwell, Monitor Clipper.  The

2   testimony is coming in, the objections have been overruled.

3   This exhibit is discussed and it is a link in that chain with

4   regard to Chris Casey and the overall scheme and plan of the

5   defendants to use the Hallmark trade secrets.

6           MS. GILMAN:  Your Honor, we believe it is related to

7   20A through E and all of the subsequent conduct of the

8   non-parties in this case.

9           THE COURT:  Defendant's objection is overruled.  266

10  will be admitted.

11          Let's take about 3 minutes and get started.

12                     (Recess)

13          (The following proceedings were had IN THE PRESENCE

14  AND HEARING OF THE JURY:)

15          THE COURT:  Good morning.  I like to see who's

16  frowning and who is smiling.

17          Please be seated.

18          Mr. Aisenbrey.

19          MR. AISENBREY:  Thank you, Your Honor.

20          Plaintiff calls Sean Gardner from Credit Swiss by

21  videotape.

22          (The video deposition of Sean Gardner was played for

23  the jury.)

24          MR. AISENBREY:  Your Honor, that concludes the

25  deposition of Sean Gardner.

1          THE COURT:  Mr. Aisenbrey, and would you and someone

2     representing the defendant step up, please?

3          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

4     PROCEEDINGS WERE HAD:)

5          THE COURT:  The deposition is less than desirable,

6     John.  One of the ideas is to take out the objections in the

7     deposition so the video runs smoothly.  So going forward, let's

8     try to get the objections out of the record so the jury doesn't

9     have to listen to those.

10          MR. AISENBREY:  I think they tried to do that.  What

11     happened was the word objection came in, then the beginning, it

12     was poorly done.  I agree.  We'll look at that.

13          (THE PROCEEDINGS RETURNED TO OPEN COURT.)

14          THE COURT:  Next?

15          MR. BLEGEN:  Your Honor, plaintiff's call John

16     Maynard.

17          JOHN MAYNARD, PLAINTIFF'S WITNESS, SWORN

18                  DIRECT EXAMINATION

19          MR. BLEGEN:  Your Honor.

20     BY MR. BLEGEN:

21     Q    Morning, Mr. Maynard.  Would you introduce yourself to the

22     jury, please?

23     A    Good morning.  I'm John Maynard.  I'm with Hallmark Cards.

24     Q    You said you're current employment is Hallmark Cards?

25     A    Right.

1  Q    Where are you from?

2  A    I'm from Kansas City originally.  Grew up here.  Went to,

3  right across the river, North Kansas City High School.

4  Q    What is your educational background?

5  A    Went to the University of Missouri Columbia for awhile

6  then finished up at University of Missouri Kansas City.

7  Q    And what was your degree in?

8  A    At the University of Missouri Kansas City, it was

9  mathematics and modern physics.

10 Q    Where did you go after you received that degree.

11 A    I went to work for Boeing in Wichita, Kansas.  While I was

12 there I also went to graduate school.

13 Q    At Wichita State?

14 A    I did.

15 Q    What was your degree from Wichita State?

16 A    It was in engineering management science.

17 Q    And how did you end up working for Hallmark after Boeing?

18 A    Well, I was in graduate school and my father, who knew I

19 was looking for a job, he saw an ad in the Wall Street Journal

20 for Hallmark and he sent it my way.  Said looks like this is

21 what you wanted to do.  I answered the ad, interviewed and got

22 the job.

23 Q    And where did you start working at Hallmark?

24 A    I was in the research group.

25 Q    And what is the research group?

1  A     Research group is about 60, 70 folks that do analysis of

2  consumer research, trying to understand the market place and

3  consumer attitudes and behavior.

4  Q     And what was your progression in positions?

5  A     I started out as an analyst and then they had a promotion

6  progression to kind of senior analyst then moved into

7  management roles after that.

8  Q     What is your current position?

9  A     I'm currently a marketing initiatives director.

10  Q     What does that position do?

11  A     Essentially it's special projects and leading initiatives

12  for the marketing division.

13  Q     Let's spend a brief bit of time explaining the research

14  department to the jury.  Where is the Hallmark research

15  department located?

16  A     It's at the corporate headquarters in downtown Kansas

17  City.

18  Q     What was the structure of the research department in the

19  2000, 2002 time period when the BMR was occurring?

20  A     We had, the organization had a number of individual teams

21  that supported different parts of the business.  I was

22  responsible for working with the greeting card part of the

23  business.

24  Q     And what is the purpose of the research department at

25  Hallmark?

1    A    Our job is to help understand what the consumer is trying

2    to reflect in the market place in terms of greeting cards

3    attitudes and behaviors and just understanding their needs that

4    they have so that the company can better meet those needs and

5    understand the trends in the market place so they can

6    understand how to develop strategies to make our money that we

7    need to make.

8    Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

12   xxxxxxxx

13   Q    Just in case the terminology gets confusing at some point

14   you mentioned consumer, what is a consumer in Hallmark's words?

15   A    The consumer is the person, the individual who at the

16   shelf at the store will make the final purchase.

17   Q    And what is a customer?

18   A    We think of our customers as the stores or chains of

19   stores that would distribute those products, for example,

20   Wal-Mart or Walgreens would be examples.

21   Q    And what kinds of research are conducted by the research

22   department?

23   A    We do a wide range of things.  We do qualitative work,

24   which is focus groups.  We'll get a bunch of people in the

25   room, just have a discussion.  We'll do quantitive studies,

1   surveys, those kinds of things.  And we also analyze other data

2   we collect through other mechanisms, like our point of sale

3   data, the purchase diary, other attitude studies that we

4   conduct.

5   Q    One of the things that's been discussed in the case is a

6   diary panel, purchase diary.  Can you explain what a purchase

7   diary panel is?

8   A    The purchase diary is a panel of households across the

9   United States that keep track of their greeting card purchases

10  and other purchases of products that Hallmark sells and anyone

11  sells.  So it's not just for Hallmark products.  It's any

12  greeting card they buy they would record that purchase in a

13  diary.  And they would include many pieces of information that

14  go with it, like where they bought it, the price, the brand,

15  the relationship they're buying it for, the occasion, etc.

16  Q    So in addition to finding out the purchasing habits on

17  Hallmark Cards you're also finding out how many American

18  Greetings cards, how many Recycled Paper greeting cards, etc

19  were purchased?

20  A    Yeah.  We want them to record any purchase of any card or

21  any product that Hallmark is tracking regardless of the company

22  brand, anything they purchase.

23  Q    Can't Hallmark get that information just from their sales

24  data?

25  A    The only sales information that Hallmark receives is

1  Hallmark related information.  We do not receive anything from

2  our competitor companies or other companies that sell greeting

3  cards.

4  Q   How long has Hallmark been doing this diary?

5  A   Well, actually precedes my time.  It's the early 80s that

6  I know we've been tracking, collecting data.

7  Q   And how many people at any given time are on one of these

8  diary panels?

9  A   It does vary a bit but it's 2 to 5,000, depending on kind

10 of the analysis and strategy we're pursuing at the time.

11 Q   How are the panels selected?

12 A   We actually hire a company that does it for us in a period

13 of time.  So they will, their job is to recruit the households

14 that participate and to send out the diary device or the piece

15 of paper that they keep track of and to then receive that

16 information back and tabulate it and send us the data.

17 Q   Do the members of this panel know that it's Hallmark doing

18 the research?

19 A   No, they do not know it's Hallmark.  We don't want to let

20 them know that so they don't have a bias in how they answer the

21 questions.

22 Q   How often does Hallmark receive this data?

23 A   We tend to do it in waves that are timed around certain

24 important parts of the year, seasonal parts of the year.  So,

25 for example, we might have a wave in the fall that would extend

1    from sometime in August to the end of like October to capture

2    Halloween.

3    Q    So shortly the research department will be receiving a

4    wave of data about this fall's purchases?

5    A    I would hope so.

6    Q    Now, could the diary panel participants just make things

7    up, fill it out, get it done?

8    A    Of course, that is possible.  But we try to do things to

9    guide them to not do that.  For example, we ask them, this is

10   why we do it at the time of the purchase so it's immediate

11   information as well as we ask them to use the receipts to

12   record the information.

13   Q    What information off the receipt would they record?

14   A    Well, it's important to get, there is a price on the card

15   itself but also the price they paid for it.  We want to know

16   both of those pieces of information.  The receipt would have

17   the price they paid.

18   Q    Is there something particular about what is on the receipt

19   that would tell you more about the card?

20   A    In addition to that we ask them to record the UPC code on

21   the cards they buy and that then allows us to get other

22   information like the brand, and the price and sometimes they

23   just allow us to correct misrecorded brands because the UPC has

24   the correct brand on it.

25   Q    Or the UPC corresponds with a toaster, you know it's not a

1  greeting card?

2  A    That is true, too.

3  Q    Does Hallmark use that UPC information for any part of the

4  research other than verifying it's actually a greeting card?

5  A    That's all we use it for.

6  Q    And how long does the purchase diary data continue to be

7  used?  You'll get the fall here in a week or so.  Is that

8  thrown out by the end of the year?

9  A    No.  We use the data ongoing because we build ongoing

10  trend lines with it and do other analysis that looks over time.

11  Q    Within Hallmark, who has access to this, the raw data?

12  A    It's a very small group within the research group that

13  have access and expertise in how to analyze it.

14  Q    You, personally, if you wanted to go in and look at the

15  raw data, could you do it?

16  A    I'm not equipped to do it nor do I have access to it.

17  Q    Now, you talked about gathering this data.  Explain to the

18  jury once it's gathered what Hallmark does with all of the

19  purchase diary information?

20  A    So the data is gathered and since it's a sample of

21  households in the United States we need to do some work to

22  project it to kind of, we do estimates of what we're trying to

23  project and predict and to be the national level of

24  participation and size of the market.  So we have to apply

25  other data to it.  So it's an estimate process or it's an

1  analysis process, not just a reporting out process to create

2  these estimates.  For example, we will create the size of the

3  market place and Hallmark's share, competitor share, channel

4  share, do pricing analysis with it.  But we also have to take

5  into consideration the representation of the households on the

6  panel and we do some weighting of the data so that it does

7  reflect what we believe to be what is going on nationally.

8  Q    And you've mentioned reports, what kind of reports does

9  this data flow out of?

10  A    There is a report that we produce called, it's an acronym,

11  GCIO, which is the Greeting Card Industry Outlook.  That is the

12  first trend annual analysis report that produces a trend line

13  of the size of the market and dollars in units.  We then also

14  trend line, the share, channel and dollar share, excuse me,

15  brand share, bulk and dollars in units.  We do trends of

16  average price paid for cards, average price sold for cards,

17  other trend lines.  We also do other analysis, for example,

18  talked about Halloween.  We would do a specific Halloween

19  analysis that would drill into what is happening with the

20  current occasion of Halloween.

21  Q    You were talking a minute ago about the greeting card

22  industry.  Is it just diary panel data in there or what else?

23  A    Quite a bit goes into it.  It starts with the diary

24  information but that's not sufficient to do our analysis.  We

25  also integrate our wholesale sales information and we currently

1    are integrating point of sale information into it.  So that we

2    can use that to help calibrate the estimates to best determine

3    what is the size of the market place and what those values,

4    kind of the attributes of the market place really are.

5    Q    You mentioned earlier trend line.  What is a trend line?

6    A    Just you could, over time it would be, for example, the

7    size of the market, so how it changed over time in terms of

8    growth or decline.  Could also be a trend line for price so

9    could be a trend line of how the prices have increased or

10   decreased over time.

11   Q    And this GCIO, is that document available generally at

12   Hallmark?

13   A    No.  It's fairly restricted access.

14   Q    Who has access?

15   A    The people that are managing or running the greeting card

16   business and our senior executives.

17   Q    Is the GCIO considered confidential within Hallmark?

18   A    Yes, it is.

19   Q    You talked a little bit about research and the jury has

20   heard about this process in 2001, 2002 called BMR and about the

21   2005 events, August of 2005.  I want to briefly discuss

22   refinements that may have occurred during that time period.  I

23   want to hand you Exhibit 1451.

24            I believe this one is stipulated, Your Honor.

25

1           And just to ask you, Mr. Maynard, what is that

2     document, 1451?

3     A    This is the 2002 greeting card GCIO report that was

4     published in 2003.

5     Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6     A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9     xxxxx

10    Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11    xxxxxxxxxxxxx

12    A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24    Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
 1   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 2   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxx
 3   A      xxxxxxxxxxxxxxxx
 4   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 5   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 6   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 7   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 8   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 9   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21   xxxxxxxxxxxx
22   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23   xxxxxxxxxxxxxxxx
24   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

1  Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3  A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

5  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6  Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8  A       xxxxxxxxxxxxxxxx

9  Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10 A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11 xxxxxxxxxxxx

12 Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13 A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18 Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20 A       xxxxxxxxxxxxxxxxx

21 Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22 xxxxxxxxxxx

23 A       xxxxxxxxxxxx

24 Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

1   xxxx

2   A   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4   Q   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

5   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6   A   xxx

7            MR. DONOVAN:  Objection.

8            THE COURT:  Your objection is?

9            MR. DONOVAN:  There's been no testimony --

10           (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

11   PROCEEDINGS WERE HAD:)

12           MR. DONOVAN:  Hallmark has taken the position in this

13   case it did not value the trade secrets.  We ask in

14   interrogatory answers about that.

15           MR. BLEGEN:  I will rephrase to ask the value to

16   Hallmark and how they used it so it's clear.  I apologize for

17   any confusion the question may have caused.  We don't intend to

18   get into the overall --

19           MR. DONOVAN:  I think that's still what they're

20   trying to do.  They're trying to say he can place a valuation

21   on the research.

22           MR. BLEGEN:  I'll use a different word.

23           THE COURT:  Rephrase.  Feel free to object again if

24   he doesn't.

25               (THE PROCEEDINGS RETURNED TO OPEN COURT.)

1    BY MR. BLEGEN:

2    Q    Let me ask that a different way.  Did this methodological

3    change that was implemented in 2003, change in any way the use

4    being made of the research and results of the BMR?

5    A    No, it did not.

6    Q    One other thing I'd like to cover briefly because I think

7    the term has come up before.  Are you familiar with Mintel?

8    A    I am.

9    Q    What is Mintel?

10   A    Mintel is a company that does studies on categories,

11   greeting cards being a category, books would be a category, for

12   example, jewelry could be a category.  They just do things,

13   primarily, they scan all of the information that is available

14   in the public domain or Internet or newspapers, etc. and

15   summarize that.  Could be press releases.  And they also

16   typically in the greeting card case, they would conduct a

17   survey of people and ask them questions about their greeting

18   card sending behavior.

19   Q    So they're not a greeting card industry research company?

20   A    Not specifically, no.

21   Q    Are you familiar with their reports on the greeting card

22   industry?

23   A    Yes, I've seen one.  I actually purchased one in 2005.

24   Q    Why did you purchase one?

25   A    Well, their model is to conduct these studies and then try

1    to sell it to, in this case, greeting card companies.  So

2    they're always calling you on the phone to try to sell it.

3    They try to sell to all the companies.  They kept calling me to

4    sell me a copy.  And they published a table of contents and I

5    was just intrigued to see what they had in it to see how it

6    compared to our information.  And was able to negotiate a price

7    that was much cheaper than they wanted to sell on the street

8    and decided to buy one.

9    Q    And what was your reaction to that?

10   A    I felt that it was very high level information that we

11   already knew for the most part.  The other thing I found is I

12   better understood their methodology of how they conducted it

13   which felt to me that wasn't very credible.  For example, they

14   would call on the phone a thousand people one time in a year

15   and ask them about their annual greeting card purchases and say

16   can you tell me about how many cards you bought this year and

17   tell me about all of them.  So it's highly recall rating which

18   we know in our experience people cannot remember their cards

19   and they make up what they record.  Or report back.  And so I

20   didn't feel it was credible at all.

21   Q    So unlike Hallmark's approach where they record very

22   specific information when they buy, Mintel was asking people

23   about it later?

24   A    You could recall the whole year.  Hallmark's is more the

25   moment.  This was, could be 365 days from the occasion you

1    purchased.

2    Q    And so after you purchased it and reviewed it, what did

3    you do with that Mintel report?

4    A    So not to create confusion and to cause disruption given

5    the assessment that it was less reliable than what we had, I

6    chose to put it in the file cabinet, lock it up and we did not

7    distribute it at all.

8    Q    You're the only one within Hallmark that saw that Mintel

9    report?

10   A    Yes.

11   Q    Are you familiar with the Business Model Redesign?

12   A    I am.

13   Q    What was your role in the, well, let's back up.  What was

14   research's role in the Business Model Redesign?

15   A    So one of the teams on the Business Model Redesign was

16   called the consumer team.  Since we were involved in the

17   consumer research aspect we played heavily in the consumer

18   aspect and assumed part of the work.

19   Q    And did you, what was your interaction, the research

20   group's interaction with the Monitor Consulting Company group?

21   A    So between July 2001 and the end of the year 2001 the

22   research team was heavily engaged with the on-the-ground

23   Monitor people in the building, consulting with them, providing

24   research reports, participating with them in meetings.  Just,

25   we were given the direct to, you know, give them anything they

1    wanted and asked for to help them with this analysis and

2    project.

3    Q    And were you personally involved in that?

4    A    I was very much so.

5    Q    What was your position at the time?

6    A    I was a research manager.

7    Q    And what types of research, just briefly, we'll cover this

8    in more detail later, what types of research was provided to

9    the Monitor Consulting Group?

10   A    Rather extensive.  We provided them with the many past

11   research reports we conducted, wide range of strategic studies

12   and tactical studies that range from very specific seasonal

13   analysis to overall greeting card analysis.  We provided them

14   with purchase diary reports and even data.  They had access to

15   any of the reports that we had produced plus anything that we

16   were currently working on, they had access to.

17   Q    And did any new conclusions, at least new that you're

18   aware of come out of that BMR process?

19   A    Yes.

20   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
 1   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 2   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 3   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 4   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 5   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 6   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 7   A     xxxxxxxxxxxxxxxxxxxxxx
 8   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 9   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12   xxxxxxxxxxxxxxxxxxxx
13   A     xxxxxxxx
14   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16   xxxxxxxx
17   A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

1  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2  A    xxxxxxxxxx

3  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

5  A    xxxxxxxxxxxxxxxxxxx

6  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10  xxxxxxxxx

11  A    xxx

12  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18  xxxxxxxxxxxxxxxxxxx

19  A    xxxxxxxxxxxxxxx

20  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22  xxxxxxxxxxxxx

23  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
 1    Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 2    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 3    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 4    xxxxxxxxxxxxxxxx
 5    A      xxxxx
 6    Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 7    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 8             xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 9    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10             xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14    A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15    Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17    A      xxxx
18    Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20             xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21    A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23    Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
1   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
2   xxxxxxxxxxxxxxxxxxx
3   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
4   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
5   A    xxxx
6   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
7   xxxxxxxxxxxxxxx
8             xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
9   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12  xxxxxxxx
13  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14  xxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15            xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

A    xxxxxxxxxxxxxxxxxxxxx

Q    I'm not going to go through all the examples.  I want to

focus now, Mr. Maynard, on the issue of damages regarding

Hallmark.  I want to place in front of you Exhibit 489.  Can

you tell us what Exhibit 489 is?

A    489 is a listing of all of the research that we shared

with Monitor during their engagement in 2001.

Q    And what does it say about it?

A    It lists the project or the analysis.  It lists the year

it was produced.  It also captures the cost of creating that

research.

Q    And what was your role in the creation of Exhibit 489?

A    I directed the development of this document.  I asked

someone to pull this information together in this form and

capture the cost of research.

Q    Did you direct them as to what research they were to find

the cost documents on?

A    Yes.  We asked them to find the research, we actually

provided a list of the research, we kept track of it, that we

had given Monitor.  In addition to that we found references in

terms of some footnotes in documents and we used that as a

1  source to find the specific research studies that we needed to

2  capture in this document.

3  Q    Did you, once someone had entered all of the data in the

4  spreadsheet, did you review that spreadsheet?

5  A    I did review the spreadsheet.

6          MR. BLEGEN:  Your Honor, we offer 489.

7          MR. DONOVAN:  No objection.

8          THE COURT:  489 is admitted.

9  BY MR. BLEGEN:

10 Q    Okay.  Now, enlarge the top so it's easier for everyone to

11 see.

12         Now you indicated cost side information being

13 gathered.  What was the source document that was used to

14 generate the cost side?

15 A    The primary source document was a document called the

16 project agreement form.  It would capture the amount paid to

17 the vendor, the amount, additional expense reports from

18 Hallmark employees who worked on it, as well as their internal

19 time in terms of the payroll costs.

20 Q    Are those records of Hallmark's that you are familiar with

21 and work with?

22 A    Yes.

23 Q    There is a category which can be seen there under the

24 vendor column for this first study called internal payroll

25 costs.  Do you see that?

1    A    Yes.

2    Q    And how was that number developed at Hallmark?

3    A    That number is developed by the analysts or employees that

4    are working on the project.  They would estimate the time in

5    terms of hours that they would be working on this project and

6    we would apply an hourly rate to that time to calculate that

7    number.

8    Q    And why is that estimated and not actual time?

9    A    We do our best job of estimating our time.  It's really

10   all we need to do is get close for internal budgeting purposes

11   so we did not agonize over trying to get down to the nearest

12   minute.

13   Q    And do Hallmark research employees track their time on an

14   hourly basis?

15   A    We do not track our time.

16   Q    Now, this estimate we're talking about of payroll costs,

17   was that something that was done for purposes of creating

18   Exhibit 489?

19   A    No.  Those are captured on the project agreement form at

20   the time the project is conducted.

21   Q    And have you done those types of payroll estimates?

22   A    Me, personally?

23   Q    Yes.

24   A    Yes, I've done them personally.

25   Q    Are those numbers 100 percent accurate of exactly how much

1  payroll cost there was associated with each of these documents?

2  A   Accuracy, no.  They are often, in many cases understated.

3  There's probably more time put in on the project or the

4  analysis.

5  Q   These are, I think you indicated, estimates looking

6  forward at a project, correct?

7  A   There was, actually the process was you would estimate

8  going in how much time you would spend on it.  And the intent

9  was to capture kind of what they did at the end but either it

10  wasn't that important for us to really capture that because we

11  did it another way.  But also it just varied on the analyst

12  whether they did it or not.  It wasn't that important to us at

13  that time for our internal purposes.

14  Q   Is that just for overall budgets for the departments at

15  Hallmark?

16  A   Yes.  It was how we managed budgets and the way we did it

17  was sufficient for what we needed to do internally.

18  Q   So it wasn't being tracked for purposes of billing.  It

19  was just budgeting, correct?

20  A   Budgeting.  That's correct.

21  Q   So this 489, I think you indicated, tries to capture the

22  specific costs of doing various research projects at the time,

23  is that correct?

24  A   That's correct.

25  Q   Had those research projects been performed in 2005, would

1    it have cost that amount exactly?

2            MR. DONOVAN:  Objection.

3            THE COURT:  If he knows I'll allow him to answer.  If

4    he doesn't know, he can say he doesn't know.

5            THE WITNESS:  It would cost at least this amount.

6    BY MR. BLEGEN:

7    Q    Could this research have been performed and created in

8    August of 2005?

9    A    No.  Because some of it actually goes back in time.  So,

10   for example, you cannot recreate 1993 purchase diary in 2005.

11   Q    And Exhibit 489, let's walk through the columns briefly

12   just so we all understand what is reflected in it.  The first

13   column is entitled project number.  What does that mean?

14   A    That is essentially an internal code we assign to a

15   project so in this case that was, the 97 represents the year,

16   for example.

17   Q    And the second column is title.  What is in that.

18   A    Every study had a name.  This would be the name for the

19   study in this case so it was card deprivation and inundation

20   study.

21   Q    And the third column is year.  That's just the year in

22   which the study was performed?

23   A    Yes.

24   Q    There is a column total cost.  What is reflected there?

25   A    That should be the sum of the values that are, labeled

1    vendor amount column.  That's the total cost of adding up those

2    components for the project.

3    Q    And then the next column, vendor amount.  What is

4    reflected, take the next two together?

5    A    Okay.  So 332,000 would be the amount we paid in this case

6    one of the vendors in the project, NFO Research.  18771 and 90

7    cents would be the vendor Adams and Associates.  They were an

8    outside firm that helped us with this.  We paid them that

9    amount.  And then the 23394 is essentially an expense report.

10   Expense reports are the expenses that an employee would incur

11   participating in the project.  For example, their travel, you

12   know, to the project.  And then at the bottom is the, what we

13   talked about previously, the estimated $3,000 internal payroll

14   cost.

15   Q    The subtotal in the next column?

16   A    The subtotal then would be the capturing in this case,

17   same number, the total cost of vendor expense report for that.

18   Q    The final column is titled source research for documents

19   known to be in MCP's and or case team's possession.  Do you see

20   that column?

21   A    Yes.

22   Q    What is reflected in that column?

23   A    The subtotal is all the research that we, like I said, we

24   shared with them.  So it's actually more than what has been

25   identified in this document.  So that is a subset, the final

1  column is a subset of the subtotal cost.

2  Q    Okay.  So it's instead of what was provided to Monitor in

3  the BMR it's what you were able to track into the five

4  presentations that this case is about?

5  A    That is correct.

6  Q    I want to move down to the large section at the bottom of

7  that page entitled purchase diary.  I think it may spill on to

8  the next page.  For now we'll talk about this page.  We

9  discussed this purchase diary earlier and I believe you

10 indicated that that is the collection and aggregation of data

11 about consumer usage, right?

12 A    That's correct.

13 Q    And there are, in this instance, NFO Research shows up

14 quite a few times.  That's the vendor that was used at that

15 time to do purchase diaries, is that true?

16 A    That's correct.

17 Q    Now, that diary study, I think you indicated, gathers

18 information about other products Hallmark sells beyond greeting

19 cards, is that right?

20 A    It does.

21 Q    When you receive it, the price list, like the first one,

22 102,100, is that off of the invoice from NFO Research?  Is that

23 the source of that?

24 A    Yes.

25 Q    From that invoice, does the vendor tell you how much of

1    that total cost is attributable to greeting cards versus gifts

2    or wrapping paper?

3    A    The cost of conducting the diary is the cost of the whole

4    diary.

5    Q    So by looking at the invoice can you separate out how much

6    it would have cost to just do the greeting card research versus

7    some other type of research?

8    A    By looking at the invoice?

9    Q    Yes.

10   A    No, we cannot tell by looking at the invoice.

11   Q    Is that cost at Hallmark ever separated for any purposes?

12   A    Well, like I said, for budgeting purposes we had to come

13   up with a mechanism to allocate the cost to the businesses we

14   were working with.  And an easy way and way that worked for us

15   for internal purposes was to allocate them based upon wholesale

16   sales of those businesses.

17   Q    So wholesale sales of how much money in greeting cards

18   Hallmark sold versus some other?

19   A    The size of the greeting card business versus the size of

20   the wrapping.

21   Q    How much in the budgeting at Hallmark is allocated to the

22   greeting card business?

23   A    Typically it was 80 percent and above.

24   Q    Now, if you were to have done that research and said we

25   only want to do the purchase diary or the greeting card, would

1  it have cost 20 percent less to do the research that is

2  reflected here?

3  A    No.

4  Q    This starts at 1993.  Is all of the purchase diary work

5  that was provided to Monitor and reflected in the five Power

6  Points included on this exhibit?

7  A    No.  One of the charts we just looked at prior to this

8  which was the trend line from 1990 to 2000 for the greeting

9  card industry included 3 years that aren't included, 1990,

10 1991, and 1992.

11 Q    Why is that information not included on this?

12 A    So when we went back to identify documentation of the

13 expenses reported in the diary we could not find the 1990, 91

14 and 92 to produce this document.

15 Q    So the overall cost of the purchase diary as reflected in

16 489, is that lower than what it actually cost to create what

17 was provided to Monitor?

18 A    Yes.  This is lower than the overall cost of producing the

19 data that went in to using the chart.

20 Q    This is a seven-page document.  We're not going to go

21 through every entry.  But are the rest of the entries on the

22 document organized in the same manner as the two we've looked

23 at?

24 A    Yes, they are.

25 Q    Now, I'd like to go to the last page, page 7.  The bottom

1  5 or 6 lines.  Here we are at the bottom of the exhibit.  There
2  is a bar that is titled totals.  Do you see that?
3  A    Yes.
4  Q    When you carry that across to the column entitled total,
5  what is the number again?
6  A    Very far one right corner?
7  Q    No, second to last column?
8  A    10,330,471 and 40 cents.
9  Q    And that's the total cost which I believe you said was
10 understated to perform all of the research that was provided to
11 Monitor, correct?
12 A    Yes, that's correct.  This is for this document all the
13 research data we shared with Monitor, that is the total cost of
14 conducting those studies.
15 Q    And the next column over, what is that number?
16 A    6,256,442 and 21 cents.
17 Q    What is reflected in that number?
18 A    That is reflecting, that's, those are the costs of just
19 the research studies that showed up in reference and were used
20 to produce the five documents in the BMR.
21 Q    And now I'm going to hand you Exhibit 547A.  And ask you
22 if you recognize that document?
23 A    I've seen this document, yes.
24 Q    That's a document that, that version of it is what was
25 generated by Hallmark's expert in this case, Dr. Serwin, right?

1    A     That's my understanding, yes.

2    Q     Now, is 489 your exhibit we just talked about, is it

3    reflected in 547A?

4    A     Yes.  It's the whole thing is included in here and what

5    was done is looks like there were five additional columns added

6    that actually broke out then attributed the costs associated in

7    to which of the five BMR documents it was present in.

8    Q     But other than those five columns on the far right on

9    Exhibit 547A, is everything else, the remainder of the columns

10   essentially what you provided in 489?

11   A     Yes.

12   Q     Thank you.  You can set that aside.  Okay.  Another chart.

13   Handing you what is marked as Exhibit 658.  Can you identify

14   that document for me, please?

15   A     Yes.  This is a document I helped create which was taking

16   the five studies we just talked about and then explicitly

17   documenting what research information was in those studies and

18   then what page it was on.

19   Q     And what was your role in the creation of Exhibit 658?

20   A     I asked that this, for help in putting this together and

21   indicated I wanted all of the five documents, kind of in the

22   rows, then also capture the research studies.  And then I went

23   through after it was created, I went through and reviewed it

24   and corrected where we had mislabeled a page or added pages.

25   So we investigated every single one of the cells here to make

1    sure it was accurate.

2             MR. BLEGEN:  Your Honor, I would offer Exhibit 658.

3             MR. DONOVAN:  No objection.

4             THE COURT:  658 is admitted without objection.

5             MR. BLEGEN:  Your Honor, this is a new one added--

6    BY MR. BLEGEN:

7    Q    So what I've now shown on the screen is Exhibit 658,

8    correct?

9    A    Yes.

10   Q    And what documents were used to create the chart that

11   we're seeing here?  Let's start with this one.  On the

12   right-hand side there is a column that says, I'm sorry,

13   left-hand side there is a column that says Bates number and a

14   column that says document name.  Do you see that?

15   A    I do.

16   Q    What is reflected in that, those columns?

17   A    These were the five BMR documents that are in question in

18   the case that are listed here individually with their title.

19   Q    So these are the five presentations from the August

20   September 2005 time period that are the subject of the claims

21   against Monitor Clipper, correct?

22   A    Yes.

23   Q    And the next column over is titled relevant BMR category.

24   Do you see that?

25   A    Yes.

1    Q    What is that column referring to?

2    A    So the project was broken in different categories and we

3    talked about those, the greetings one.  So the GRT was the code

4    for the greetings portions of the work.  And at the very bottom

5    the CHN was the code for channel.  So there were different

6    parts of the work these were aligned with.

7    Q    And there is one, the second one down is called small

8    competitors in the deep discount space.  The BMR category on

9    this document that was generated has I-N-T?

10   A    Yes.

11   Q    First off, what is I-N-T?

12   A    I-N-T was the integration piece of the work.

13   Q    Is that correct that that small competitors document was

14   INT?

15   A    No.  After this was produced we recognized that should

16   have been in the greetings portion of the, should have been

17   coded as GRT.  And the reason it was mislabeled here, that's

18   what it was on the document.  We recognized after the fact that

19   was just a mislabeling.

20   Q    So whatever label was put on the document that happened

21   to, that is at issue here was not the portion of the BMR

22   process in which that document was created?

23   A    It should have been part of the greetings.

24   Q    And so the rest of the column headers, can you just walk

25   us through those?  First one is sources of category of decline,

1    what is that?

2    A    So in general the column headers are either references to

3    an analysis or a study.  And the first one is an analysis that

4    was from the purchase diary that showed kind of where the

5    sources of decline were in the chart.

6    Q    And is that a specific research report that is reflected

7    on 489?

8    A    It was an analysis.

9    Q    The next one, U.S. Industry Dollar and Unit Volume.  What

10   does that refer to?

11   A    That would refer to the trend lines associated with our

12   GCO process to generate the United States Industry Dollar and

13   Unit Volume trend lines.

14   Q    Is that a specific research report or a category of

15   research from multiple sources?

16   A    It's a category of research.

17   Q    And if you go to the top left, there are, there are notes

18   here in the top left of the chart.  What are those notes?

19   A    I refer to some of these were analysis from multiple

20   research studies or a reference to an analysis and so these are

21   the notes that reference that.  So, for example, the buying

22   process that we saw earlier, very top one, that was developed

23   from a number of research projects.  This lists them out.  For

24   example, we looked up before the card deprivation and

25   inundation study listed here and another study called, it's an

1    acronym, Coda, that had multiple phases that was used to

2    develop that. So we just decided to document them in this case

3    through this noting.

4    Q    And so in the buying process, that was the chart that has

5    all the boxes that shows the steps people go through to make

6    greeting cards purchases?

7    A    Yes.

8    Q    What you've done here, you identified, you were involved

9    in the research and the BMR work that developed the documents,

10    is that true?

11    A    I was involved in that and I was also involved in the

12    studies.

13    Q    So what you've done is made that a category and you've

14    identified on these notes all of the various research reports

15    listed on 489 that go into that category?

16    A    That is correct.

17    Q    And the one we just talked about U.S. Industry and Dollar

18    Unit Volume, that's on that list, too, correct?

19    A    Yes.

20    Q    Where does that one come from according to your notes?

21    A    That comes from purchase diary for 1990, 2000 and our GCIO

22    process which is that analysis that uses the purchase diary.

23    Q    And across the top of 658 are a series of column headers

24    and then under those column headers are, well, let's ask it

25    this way. The column headers across the top, are those all, we

1    talked about a few specific ones, were they all put together

2    using the same process?

3    A    I'm not sure I understand the question.

4    Q    Each one of those is either a specific report or it's a

5    category.  You put the category contents in the note at the

6    top, right?

7    A    Yes.  So if it was a category, there was a grouping of

8    work that had a footnote.  If it wasn't a category, it was a

9    particular study that we just the reference was called out, so

10   stand alone.

11   Q    So in the body of the chart we talked about the column

12   with the Power Point presentations at issue in the case and

13   talks about the column headers.  What did you put in the body

14   of this chart?

15   A    So the body or the cell that has values in it are the

16   Bates numbers to the page numbers in the particular report that

17   utilize that information.

18   Q    So those are pages where there is a specific source or you

19   knew from looking at it that that's where the analysis came

20   from?

21   A    Yeah.  In some cases the sources were indicated in the

22   footnote and in other cases, for example, the buying process, I

23   was involved in that.  I knew that those studies were used in

24   the development so we just captured the list of them.

25   Q    And how did this Exhibit 658 then relate back to Exhibit

1   489?

2   A   So if you recall that the prior Exhibit 489 had all of the

3   research we shared with Monitor Clipper during the engagement.

4   This just captures, this is how we were able to sort that

5   subset and so it led to the subset of the total on the prior

6   exhibit.

7   Q   And you indicated you were involved in preparing this.

8   Did you check all these entries to make sure they were correct?

9   A   I did.  In fact, we checked, we actually found we had some

10  that were incorrectly captured and we took them off.

11          MR. BLEGEN:  Your Honor, I'm about to move to another

12  category.  I'd like a minute of your time before we do that.

13  We could either take a break now or --

14          THE COURT:  You folks okay?  Can you go another 20

15  minutes or so?  Okay.  Step up.

16          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

17  PROCEEDINGS WERE HAD:)

18          MR. BLEGEN:  Before -- this is where I'm going into

19  the information that Murley provided.  Before I go into that

20  brisk residual -- down the road different, people heard your

21  order this morning slightly differently in the courtroom.  I

22  want to make sure we're clear.  The materials we're going to go

23  through with Murley are ones that come straight out of the

24  slightly different titles, same analysis in the Power Points at

25  issue in the case so we're going to show that was used at the

1    later date.

2           There is some question because we don't know whether

3    the exact Power Points that she used to create that were the

4    two exact Power Points.  In fact, there is reason to believe

5    some of them were older, had been updated by the time the trade

6    secrets they had became an issue.  I mean there are documents,

7    spoliation questions where that stuff came from she turned

8    around and used with RPG.  What we're concerned about knowing

9    that whether your concern that may later cause us to have that

10   excluded from the case is the question of whether she actually

11   physically possessed those or just whether we can tie the

12   analysis presented in her materials as being the same pieces of

13   the same analysis of the big documents that are our compilation

14   documents.

15          MR. DONOVAN:  And this is where the rubber meets the

16   road, frankly.  We've been saying this.  Ms. Murley worked at

17   Hallmark many years.  She was in all these meetings.  You heard

18   she was part of the BMR process.  She retained those documents.

19   She was sued by Hallmark.  That's what the finding of the judge

20   was in that case.  And now they're trying to bring those

21   documents to this case without any showing whatsoever there was

22   any connection with the defendants in this case and her.  She

23   brought the materials there with her when she came to be a

24   consultant with RPG.  Yet the defendants are the ones now that

25   are trying to defend Murley from what her actions are.  Rather

1   than defending the defendants documents they had which could

2   have been there for the couple days, five presentations.

3   There's been a lot of material.  One that went to Clipper

4   didn't go to the standing case team.  There are five

5   presentations at issue.

6           Now, what they're trying to interject in addition to

7   that Ms. Murley, herself, had some materials, we want to throw

8   those into the case as well.  I think that was what Your

9   Honor's order last week was getting at when saying those were

10  separate issues against Ms. Murley.  There has been litigation.

11          THE COURT:  What I have been trying to say, maybe I

12  haven't said it very effectively, is that to the extent Murley

13  used any of the five presentations, then I think that shows

14  that Clipper thought they had some value.  But what ever it is

15  that Murley had, and I don't know what it was, but whatever she

16  had, it needs to tie directly back to the Exhibit 487.

17          MR. BLEGEN:  And that's the clarification because

18  there's a chart, there's a bunch of charts, there are charts

19  that are identical or mostly identical, there may be some typos

20  in them, to charts that exist in 478 showing that information

21  was still useful and relevant to them in 2006.

22          Whether it was exactly out of the December OEC, we

23  don't have the source document that she used to create her

24  document.  It doesn't exist any longer.  So we can't say it

25  came, that it was like a page pulled out of the Power Point but

1  the chart and the buying process, that is exactly the same in

2  what Murley used to what they're claiming was no use and

3  irrelevant in 2006.

4        THE COURT:  I think there needs to be no question at

5  all about the source of the information that Murley used.  I

6  think it has to be tied directly and if not precisely at least

7  overlaps a portion of the five presentations.  If it doesn't,

8  don't use it.  If it does, then I think that shows that Clipper

9  thought it had value in 2005.

10        MR. BLEGEN:  I think we're good on that.  It does

11  overlap.  But, you know, there may have been revisions, earlier

12  versions of that OEC that are worded slightly different but

13  it's the exact same analysis she had in her possession that she

14  used.  But it's the same, I mean the chart is the same, maybe

15  titled differently.  She may have changed the title to prepare

16  it to present to them but the chart is the same.

17        MR. DONOVAN:  I don't know what particular chart

18  they're going to show.  I don't know what it is they're saying

19  but I think what you're hearing is, yeah, there's a lot of the

20  same information.  This was a long process so, obviously, that

21  had an evolution to it when the charts were updated and moved

22  forward.  So on argument you're hearing today was it a June

23  document or was it a December document?  It says June on it.

24  It says December.  There is a lot of different versions of

25  these agreements, Your Honor.  I can't speak specifically

1  because I don't know specifically what it is they're going to

2  put up.

3          What I do know is she brought the documents on board

4  and what those are, had some of the same information on it.

5  Probably does have some of the same information.  I suspect

6  some of the same information.  It does because she was on the

7  BMR process and had access to a lot more information than what

8  is in the five presentations.  She probably does have some

9  information from the five presentations.  But so I can't speak

10  to it specifically what they have but it's going to be somewhat

11  different than the five presentations.

12          And the other thing, Your Honor, you know, it's

13  overriding in this case, I think you can see it the first two

14  days, is the plaintiff's questions are not is the information

15  in this presentation trade secrets.  It's is this document

16  together, this binder clip on it.  Can you pull it off the

17  shelf in the library?  That's their case.  It's only been two

18  days.  It's pretty clear that a lot of information in there is

19  not a trade secret.  And their case is it doesn't matter as

20  long as we have one or two trade secrets in our package, that's

21  enough.  And that really raises this question now.  If they're

22  going to say we can go out and take out a bit and a piece, say

23  okay, that bit and piece, don't look behind the curtain.  The

24  next 4 pages may be all non trade secrets.  We may have

25  disclosed them or whatever.  But this binder wasn't disclosed.

1    And that's the only thing that matters.

2              THE COURT:  The other side of it, Michael, you seem

3    to say because it's a compilation you can take bits and pieces

4    out of it, use it and not violate their trade secrets.  I don't

5    think that's the law.

6              MR. DONOVAN:  We believe it's not a trade secret.

7    You have a --

8              THE COURT:  You can take what you need, as long as

9    you don't take the whole thing?  Is that your position?

10             MR. DONOVAN:  My position is it -- compilation loses

11   trade secret by having a binder with pieces.

12             THE COURT:  If that's the law you're going to get a

13   new trial because I don't think you can take out bits and

14   pieces and use it then contend you haven't violated the trade

15   secret that the compilation is.

16             Back to the original issue why are you using this

17   witness to talk about Murley stuff?

18             I thought this was a damage witness.

19             MR. BLEGEN:  He's research.  And he has the

20   background.  He worked on the BMR.  He has factual knowledge of

21   it.  He can do the comparison knowing they're identical.  I

22   could -- it ties back up when Murley testifies.  Frankly, what

23   we've done, Murley does it on a page by page basis.  It would

24   have been two hours playable.  We're trying to cut out as much

25   as we could Murley talking about it.  We could potentially do

1    it.  Mr. Maynard already testified about as we went through

2    their June 2002 document and compared to the OECs, many of the

3    same slides that appear in the --

4            THE COURT:  Here is my final word.  To the extent

5    that Murley used secrets from the five presentations, I'm going

6    to allow you to use those.  Now if they've been re-titled but

7    the chart itself is identical, then I think that probably is

8    enough for the jury to decide that it was taken from the five

9    presentations.  If it's different, if it's a new trade secret,

10   if it's a different trade secret, then we're going to be

11   starting this thing all over again.

12           MR. BLEGEN:  It's not.  We'll be very clear.  It's

13   not a separate misappropriate act.

14           THE COURT:  You need to be very, very careful in this

15   area.  Okay?

16           MR. BLEGEN:  Okay.

17           MR. DONOVAN:  One thing, just to make sure I heard

18   when you say taken from five trade secrets, you don't mean in

19   the possession of Clipper.  You just mean the material, the

20   same material in the five presentations.  Thank you.

21           MR. BLEGEN:  Yes.

22           (THE PROCEEDINGS RETURNED TO OPEN COURT.)

23           THE COURT:  Proceed.

24   BY MR. BLEGEN:

25   Q    I apologize for that delay in the proceedings.

1          Mr. Maynard, I'm going to hand you what's been marked

2     as Plaintiff's Exhibit 150.  I will try to turn this back over

3     to Cindy without breaking anything.  Okay.

4          You have in front of you, Mr. Maynard, a document

5     marked Plaintiff's Exhibit 150, which will be the subject of

6     additional testimony later but I want to look at a couple of

7     pieces of this exhibit.  First is on page 4 of Exhibit 150,

8     which I believe at this point may be recognizable to the jury.

9     Do you recall earlier today we discussed this chart showing

10    this trend from 1990 to 2000.  Do you remember that?

11    A    I do.

12    Q    If you'll bring up 487, just split screen, page 29.

13         And just to back up and clarify, I'll represent to

14    you that Exhibit 150 is from October 31, 2006 and involved, the

15    jury will hear shortly, a meeting between Jan Murley and RPG

16    and nxtMove and Monitor Clipper in 2006.  So the chart on the

17    right there is Exhibit 150 from 2006 and the chart on the left

18    is 487, it's a page out of the August OEC presentation.  It's

19    part of Exhibit 487.  Are you familiar with that chart that's

20    reflected on those pages?

21    A    I am.

22    Q    And you were involved in the preparation of this material,

23    right?

24    A    I was.

25    Q    Is the material in Exhibit 150 the same chart that was

1  part of the August OEC presentation in 2001?

2  A    The chart is identical.

3  Q    And, in fact, the only difference is there is a title

4  taken off the top and the Hallmark logo has been removed from

5  the slide in Exhibit 150, is that correct?

6  A    That's correct but the data and chart itself are the exact

7  same chart.

8  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

12 A    xxxxxxxxxxxxx

13 Q    xxxx

14 A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18 xxxxxxxxxxxxxxxxxx

19 Q    And so was this, was this some research information and

20 learnings out of the BMR you were involved in preparing?

21 A    Yes, it was.

22 Q    Now, are these trend lines like we discussed previously?

23 A    Yes, they are.

24 Q    Would this trend line here, reflected on this page, have

25 been impacted by the 2003 refinement of the research analysis?

1    A    It would not have, for the most part.  Because these are

2    industry level trend lines and the things that were affected

3    after that were at the Hallmark level.

4    Q    So when it was included in 2006 in Exhibit 150 it was

5    still accurate as represented on that page?

6    A    Yes.

7    Q    And once again there are some changes in the titling at

8    the top and the Hallmark logo is no longer on Exhibit 150, is

9    that correct?

10   A    That's correct.

11   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

12   xxxxxxxxxxxxxxxxxxxxxxxx

13          xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14   xxxxxx

15   A    xxxxx

16   Q    xxxxxxxxxxxxxxxxxxxxxxxxx

17   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23          xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
1  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
2  xxxxxxxxxxxxxxxxxxxxxxxxxxxx
3  Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
4  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
5  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
6  A     xxxxxxxxxxxxxxxx
7  Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
8            xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
9  xxxxxxxxxxxxxxxx
10 A     xxxxxxxxx
11 Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12 A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17 xxxxxxxxxxxxx
18 Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19 A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23 Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
1    xxxxxxxx

2    A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3    Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

5    A      xxxxxxxxxxxxxxxxxxxxxxxxx

6    Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7    xxxxxxxxxxxxxx

8              xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9    xxxxxxxxxxxxxxxxxxxxxxxxxxxx

10   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11   xxxxxxxxxxxxxxxxxxxxxx

12   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25   xxxxxxxxxxxxxxxxx
```

```
 1   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 2   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 3   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 4   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 5   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 6   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 7   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 8   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 9   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   xxxxxxxxxxxxxxxxx
11   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17   xxxxxxxxxxxxxxxxxxxxx
18   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20           xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21   xxxxxx
22   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
1   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4   A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

5   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9   xxxxx
```

Q     And once again here the only difference between August 2001 as part of the Power Points at issue in this case and the use of the slide in October of 2006 is that the Hallmark logo has been removed from the top, correct?

A     Yes.

            THE COURT:  Let's stop and take our mid morning break.

            Please don't talk about the case.  We'll see you back here in 15 minutes.  We're in recess.

                              (Witness temporarily excused.)

                    (Recess)

            (The following proceedings were had OUT OF THE PRESENCE AND HEARING OF THE JURY:)

            THE COURT:  Eva, see if we have a jury, please.

            (The following proceedings were had IN THE PRESENCE AND HEARING OF THE JURY:)

1      THE COURT:  Please be seated.

2      Mr. Blegen.

3                  JOHN MAYNARD, RESUMED

4              CONTINUED DIRECT EXAMINATION

5  BY MR. BLEGEN:

6  Q    Mr. Maynard, I have one last question for you.  It has to

7  do with 489, the chart with the costs on it.  Do you recall

8  that exhibit?

9  A    Yes.

10 Q    And just to put together the chart of the costs and the

11 chart with the various presentations on it, as part of that

12 analysis what you've done is traced the research into the five

13 presentations at issue in this case and you came up with a

14 total cost of that research for those that flowed into those

15 five presentations of about 6.3 million, is that correct?

16 A    That is correct.

17 Q    Thank you.

18           We'll pass the witness, Your Honor.

19                    CROSS-EXAMINATION

20 BY MR. DONOVAN:

21 Q    Good morning, Mr. Maynard.  How are you?

22 A    Good.  Thank you.

23 Q    Nice to see you again.

24 A    You, too.

25 Q    Why don't we start with where we just ended up there.  You

1    came up with a chart with figures of 6.3 million.

2              Why don't we put that up, Jeff?  489, the last, back

3    page there.

4              That's the number that you're referring to?

5    A    The one in the lower right corner.

6    Q    The lower right corner, 6.2 million?

7    A    Yes.

8    Q    That was a hundred percent of the costs for the research

9    that was done, correct?

10   A    It was the cost of conducting the research that was

11   included, just the research that was included in the five

12   documents.

13   Q    Right.  So we saw the mapping where you said if I found

14   that there was some information from a piece of research in one

15   of the five presentations, then I said, okay, that research is

16   going to go on to my chart, correct?

17   A    That's correct.

18   Q    And that research had a cost, let's call it a hundred

19   dollars.  On your chart went a hundred dollars, correct?

20   A    The cost of the research went on the chart.

21   Q    Right.  So if the cost of the research was a hundred

22   dollars, the hundred dollars would go on to your chart?

23   A    Yes.

24   Q    Now, if the research, the research came out with a report,

25   right?  It could be 5 pages, could be 20 pages, could be 25

1  pages, right?

2  A    There were many ways of documenting the results.  It could

3  be what ever it took to document the results.

4  Q    And the results could be a few numbers, could be lots of

5  numbers, could be a lot of data points, could be a few data

6  points, correct?

7  A    The results told a story of what we found in the research.

8  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11  xxxxxxxxxxxxxxxxxxxxxx

12  A    xxxx

13  Q    And you did that.  You said, okay, was there other

14  research as part of that where that came from?  In other words,

15  that piece of information came from some research, correct?

16  A    It came from, that case it came from the purchase diary

17  then all the associated analysis and people's time to kind of

18  produce that result.

19  Q    Okay.  And there was more results than just that one

20  result, correct?

21  A    There are many.  We do many analyses from the purchase

22  diary.

23  Q    But in that chart there was just that analysis that was on

24  that particular chart, correct?

25  A    I'm not sure I understand.

1    Q    What I'm trying to get at is the research has a cost.  One

2    cost you're saying for the whole research.  But what you found

3    in a presentation may have only been one small part of that

4    research or could have been half of that research or could have

5    been three-quarters of that research, correct?

6    A    The research was reflected in the report.  We did not put

7    all the slides and all the information from that report or that

8    analysis in the document.  Often times that occurs.

9    Q    You just said if I could find anything from this piece of

10   research on this page then that, we checked that block and that

11   research is going on to my chart, correct?

12   A    Correct.

13   Q    There was no assessment of how much of that research do I

14   find in the five presentations?

15   A    There is no way to assess the overall value of that.  It

16   could be much greater value, that piece of information than the

17   research study.  So the cost, that's the best estimate we have

18   of that information is the cost of doing the research.

19   Q    There is the cost of doing the full research?

20   A    The full research.

21   Q    And you talked about confidentiality.  You said that, I

22   don't want to put words in your mouth, my notes if I get it

23   down right.  It was highly confidential.  Did not share with

24   anyone.  Did I get that right?

25   A    What I mean by that, well, we shared with people in the

1    company.  I mean, that's an overstatement I suppose.  We share

2    with people that needed to know the information to do their

3    jobs and we have permission to share with.

4    Q     Okay.  And when we talk about sharing, are you talking

5    about when the research is done?  So if the research was done

6    in 1998 you're talking about in 1998 that it's only shared with

7    people who need to know that information?

8    A     We keep research and continue to use it.  And if new

9    people enter our jobs, for example, after the research is

10   conducted and they're part of that business and have a need to

11   know and it helps them do their job then we would share it with

12   them.

13   Q     What about sharing outside of Hallmark?  Your statement

14   seemed pretty broad saying it was highly confidential and you

15   did not share it with anyone?

16   A     I never personally shared anything outside of Hallmark

17   unless I had permission to share.

18   Q     And who would you get permission from?

19   A     I would work with people who were at approval levels to do

20   it and typically a corporate officer, if they asked us to share

21   it or if they wanted us to share we would work with them on

22   what to share.

23   Q     Was there a formal policy or process by which you could

24   share confidential information outside of Hallmark?

25   A     The process I worked under was to, typically, I never did

1    actively but was asked to do it and then whatever content was

2    shared was under their approval.

3    Q    When you say their approval, who are you referring to?

4    A    The corporate officers that I worked with.  In particular

5    in this case many times that I worked with at the time was John

6    Beeder.

7    Q    And did John Beeder authorize you to share information

8    outside of Hallmark?

9    A    I did not share information outside of Hallmark.  I gave

10   it to him and others who shared it outside of Hallmark.  They

11   asked me to provide the information and then others would share

12   it.

13   Q    So you knew when you were sharing information with them

14   the intent was that they would then share it outside of

15   Hallmark?

16   A    Yes.

17   Q    And then my question I guess is, the research that's on

18   your report there, the Plaintiff's Exhibit 489, how do you know

19   what research on here is still confidential to Hallmark and

20   what research is not any longer confidential to Hallmark?

21   A    We consider all of the research confidential.  We choose,

22   like many companies, to release pieces of their knowledge to

23   the market place or to others but the totality of the research

24   is considered confidential.

25   Q    And those pieces that you release, those pieces are no

1  longer confidential, right?

2  A    That tidbit or factoid, once released would not be

3  considered a confidential factoid.

4  Q    And so in that trend line that we saw, that 4-year trend

5  line, if that information has been released then the

6  information is no longer confidential, right?

7  A    That chart has not been released.

8  Q    What about the information within the chart?

9  A    There's been, I'm aware of some tidbits of that chart,

10  like the decline in 45 plus that we shared with some people

11  that happened externally but that chart in totality of that

12  information has not been released.

13  Q    But as you sit here today, you don't know all of the

14  information that's been released from Hallmark.  Is that fair

15  to say?

16  A    I would not have knowledge of all the information from

17  Hallmark, no.

18  Q    So you're not in position to be able to say what research

19  has or has not been released from Hallmark, are you?

20  A    I'm in position to say that chart we're talking about has

21  not been released from Hallmark.

22  Q    We'll get to that chart in a minute.  My question was

23  broader.  My question was, you have a chart here that's seven

24  pages.  So I guess I'm trying to understand, is it your

25  position that every piece of research here on this 7-page chart

1    has been maintained as confidential information within

2    Hallmark?

3    A    The study itself is confidential on all, the whole

4    reflected here, the analysis and study reflected in the chart.

5    Like I said, we would release pieces of that periodically to,

6    small piece of that to indicate our understanding of what is

7    going on or for reasons to help further our business.

8    Q    And so there was bits and pieces of this information that

9    you found in the five presentations, correct?

10   A    I would not describe it as bits and pieces.  I would

11   provide that these were referenced and were significant

12   portions of these studies in the five presentations.

13   Q    Well, I thought, I'm confused.  I thought you said a

14   moment ago that you couldn't quantify it so that you said that

15   if the research, you found it in the presentations then it was

16   an all or nothing thing because you couldn't break up the cost?

17   A    That's what I said about the costs.  But I would not

18   describe the pieces in the research as bits and pieces.  There

19   were significant portions of the findings and results from this

20   research that are reviewed and reflected in those reports.

21   Q    And what I'm asking is, as you sit here, you, yourself,

22   personally, don't know whether all of those findings or any of

23   those findings were released outside of Hallmark.  Isn't that

24   fair to say?  You, personally?

25   A    I, personally, know that very little, small pieces have

1    not been released outside of Hallmark, small pieces but there

2    have been significant pieces that have not been released.

3    Q    All right.  Well, let's take a look at an example, I

4    guess.  Can we pull up Plaintiff's 487.  And can we go to page

5    99?

6              And this was the example we were just kind of

7    speaking about, correct?

8    A    The chart, yes.

9    Q    And this is from 1996 to 2000?

10   A    Yes.

11   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

12   xxxxxxxx

13   A    xxxx

14   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16   xxxxxxxxxxxxxxxxxxxxxxxx

17   A    xxxxx

18   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22   A    xxxxxxxx

23   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25   A    xxxxxxxxxxxxxxxxx

1    Q    And if we could pull up Defendant's Trial Exhibit 589.

2         Before we do that.  I apologize.  The last one was

3    487.  So just blow up the bottom left corner there.

4         Says, Source, Hallmark Diary Study.  Do you see that,

5    sir?

6    A    Yes, I do.

7    Q    That was what you talked about here today, the diary

8    study, right?

9    A    Yes.

10   Q    So the information that's on that chart came from that

11   study, right?

12   A    Came from the data from that and the analysis to produce

13   those numbers, yes.

14   Q    And then if we could pull up 589.  Page 2 of that.

15        Actually, I'm sorry.  Go back to page 1 of 589.

16        This is a document that's familiar to the jury,

17   Exhibit 589, Category Growth Initiative Greeting Card

18   Association.  The Hallmark logo.  Are you familiar with this

19   document?

20   A    I don't have it in front of me so I can't, I don't recall

21   seeing it.

22   Q    So are you familiar with that document?

23   A    I am not.

24   Q    So if we could go to page 2.

25        There it says, industry issue, business problem, some

1    segments of consumers are choosing alternative forms of

2    communication particularly among women 45 and older.  Do you

3    see that?

4    A    Yes.

5    Q    That's the same information about the drop in women 45 and

6    older.  Do you see the comparison there?

7    A    I do.

8    Q    And isn't it, in fact, the BMR, what came out of that was

9    a category growth initiative?

10   A    Yes.

11   Q    And so this is disclosing information that originated from

12   the work that had been done in the diary study, isn't that

13   right?

14   A    This is disclosing a very small piece of the information

15   from the BMR work.  But there was a lot of other analysis that

16   we've seen in other charts that was part of BMR work that led

17   to the why, the whats and hows of implementing the strategy.

18   And that's not included here.  This is just like a small piece

19   of that and it's not the depth of analysis that went into the

20   BMR.

21   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22   xxxxxx

23             xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

A    xxxx

Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

A    xxxx

Q    What was the name of that research?

A    This was, I don't recall the exact name.  It was a
perception analyzer we did.

Q    So we can blow up, down at the very bottom to the left
there, Jeff.

         I think it has a source listed, Mr. Maynard.  Do you
see that?

A    I do.

Q    Is that where it came from?

A    Yes.

Q    And you were involved in that?

A    I was.

Q    And then we can go to the other chart on page 4.

         Now, this says, what consumers told us.  Conducted
research in late 2001 to find why consumers are using
substitutes.  See that?

A    Yes.

Q    Do you recognize that as being the same study that we were
just talking about, November of 2001, category growth

1   perception analyzer?

2   A    It's not the same study.

3   Q    It's not?  What study is that study?

4   A    This is another high level findings from additional

5   studies.

6   Q    What studies were those?

7   A    This was some of the qualitative work we did through the

8   BMR.

9   Q    Then it says, they don't believe they are substituting new

10  forms of communications for cards.  Do you see that?

11  A    Yes.

12  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19  xxxxxxxxxxxxxxxxxxxxx

20  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
1    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
2    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
3    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
4    Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
5    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
6    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
7    A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
8    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
9    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17   xxxxxxxxxxxxxxxxxx
18   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   xxxxxxxxxxxxxx
20           xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21   xxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxx
23   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24
25           xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
1    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
2    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
3    A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
4    Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
5    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
6    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
7    A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
8    Q    xxxxxxxxxx
9    A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11             xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15   A    xxxx
16   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   A    xxxxxxxxxxxx
20   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21             xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24   A    xxxxxxxxxxxx
25   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
1   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4   A   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

5   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11  xxxxxxxxxx

12  Q   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13  xxxxxxxxxxxxxxxxxx

14          xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19  xxxxxxxxxxxxxxxxxx

20  A   xxxxxxxxxxx

21  Q   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22  A   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
1    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
2    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
3    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
4    xxxxxxxxxxxxx
5    Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
6             xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
7    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
8    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
9    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11   xxxxxxxxxxxxxxxxxxxxxxxx
12   A    xxxx
13   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14   xxxxxxxxxxxxxxxxxxxxxxxxx
15   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23   Q    You had no knowledge that this had been disclosed until I
24   showed it to you today, right?
25   A    I had not seen all of this high level but I was familiar
```

1  with some of the screens disclosed at a high level.  Not to
2  this audience.
3  Q    That's not unusual because as you said, you're not the
4  person that discloses it, correct?
5  A    That's correct.
6  Q    And Mr. Beeder, he had the ability, I think you said, make
7  sure, he had the ability himself to decide if he would disclose
8  something outside of Hallmark?
9  A    My understanding is as a corporate officer they could
10  choose to and they periodically did, for business purposes,
11  disclose high level information.
12  Q    And were you aware that there were departments within
13  Hallmark that would share information outside of Hallmark and
14  that was part of their regular duties?
15  A    We have a public affairs department that shares high level
16  information and I've known that they do that, yes.
17  Q    And who do you work with there in those areas?  Public
18  affairs?
19  A    Some have changed.  Steve Doyal leads it and Linda Odell
20  in the past, I worked with her.
21  Q    And who did you get approval from if they want that
22  information?
23  A    Well, Steve is a corporate officer.  He would work with
24  John Beeder.  I know they worked together on what they chose to
25  release to various audiences.

1    Q    Could we put up Defendant's 499?  Blow up the top there.

2              Do you know a Dean Rodenbough?

3    A    Yes, I do know Dean.

4    Q    I'll give you a copy of this.  And where does

5    Mr. Rodenbough work?

6    A    He's in our public affairs department.

7    Q    And have you seen this e-mail before?

8    A    I don't recall seeing this e-mail before.

9    Q    If you look on the second page, there it's titled,

10   Greeting Card Industry and Season Facts, January 2006?

11   A    I see that.

12   Q    You see that?  Then it lists out various statistics about

13   the greeting card industry, doesn't it?

14   A    Uh-huh.

15   Q    Also lists out Hallmark's market share, correct?

16   A    I see that, yes.

17   Q    Number of cards Hallmark makes in a year?

18   A    Yes.

19   Q    Then it lists out different occasions, figures there as

20   well, correct?

21   A    I see that, yes.

22   Q    Is any of that information confidential?

23   A    I don't know where they've sent this.  We shared it with

24   them.  I would consider, if we released this in the public

25   under the definition it would no longer be confidential.  But

1   these are just high level information that come from our

2   analysis.

3   Q    So want to be clear, let's talk about before it's

4   released.  I'm just asking, you're a manager of a research

5   department, correct?

6   A    Yes.

7   Q    So this information would have come from the research

8   department?

9   A    It did.

10  Q    It would have been sent by you or somebody else off to

11  Mr. Rodenbough?

12  A    Yes.

13  Q    And so prior to you sending it out, are you saying that

14  Hallmark, that you consider this to be confidential

15  information?

16  A    We consider the purchase diary information, this comes

17  from, is confidential information.  It's very detailed.  Has a

18  lot to do with it.  There are high level statistics that come

19  from it that we utilize in a public sense or in a sense outside

20  of the company for business purposes.  And this would be one of

21  those purposes.  These are very high level statistics on the

22  greeting card category.

23  Q    So prior to its release, is it or is it not considered

24  confidential by you?

25  A    Prior to release, it's, excuse me.  It is confidential.

1   Whatever we have not released is confidential.

2   Q    So all the data that you generate, that Hallmark generates

3   as part of the diaries, you're saying every piece of that you

4   consider to be confidential?

5   A    I would consider the diary study itself to be a

6   confidential piece of information.  We choose to release pieces

7   of the analysis.  If we have released those, those pieces,

8   small pieces are no longer confidential.

9   Q    And can we look at the second page?  Blow that up.

10          So then the first bullet, in units, the greeting card

11  industry is twice the size of personal soap.

12          Second bullet, participating U.S. households purchase

13  an average of 34 individual cards per year.  Total average

14  including non-participating household is 25.  Where does that

15  information come from?

16  A    That would be a calculation from our analysis from the

17  purchase diary.

18  Q    And have you been aware that that's been released outside

19  of Hallmark?

20  A    I'm aware that our public affairs group has it and they've

21  done something with it based upon this document.

22  Q    Well, I'm asking you, were you aware you provided that at

23  some point to someone, knowing it was going to get released

24  outside of Hallmark?

25  A    We provide statistics that are at a high level.  They

1    would release them, yes.

2    Q    And the next bullet down talks about Americans purchase 20

3    paper greeting cards for every one e-card sent.  Do you see

4    that?

5    A    Yes.

6    Q    Familiar with that statistic?

7    A    I am now.  I mean, I don't recall the specific statistics.

8    Q    Again, that's coming from the purchase diary?

9    A    That would come from our analysis of the purchase diary

10   and other information.

11   Q    The next one, average price of a greeting card $1.86.

12   Where does that come from?

13   A    I'm going to assume it's from, I think, I'm guessing

14   that's from the purchase diary but it could be other sources

15   too.

16   Q    The next one, the average American household sends and

17   receives 20 Christmas holiday cards per year.  Is that from the

18   purchase diary?

19   A    I don't believe so.

20   Q    Do you know what study that is from?

21   A    That would not be from the purchase diary.  We do lots of

22   added studies.  I would say that was from an attitude and usage

23   study done on Christmas.

24   Q    And then the last one there says, eliminate reference to

25   nearly 90 percent of the American households use greeting

1    cards.  Current estimate is 74 percent of the households

2    purchased individual cards in 2004.  Considerable decline.  Do

3    you see that?

4    A    Yes.

5    Q    Do you recall that?

6    A    Recall what?

7    Q    Do you recall that statistic that there was a significant

8    decline in 2004?

9    A    We've been observing in our analysis the decline of

10   participation.  I don't recall the exact statistics.  I'm

11   familiar that there would be a decline in household

12   participation.

13   Q    Where did that data come from?

14   A    The participation analysis would come from the purchase

15   diary.

16   Q    And were you aware of a considerable decline prior to

17   2004?

18   A    I'm not sure I understand.  Was I aware?

19   Q    It says there was a considerable decline in 2004.

20   Estimate is 74 percent of households purchase individual cards

21   in 2004.  A considerable decline.

22   A    I think that's an interpretation of a chart that was

23   probably produced at the time that would have a decline in it.

24   Q    But it's referencing 2004, right?

25   A    Yes.

1    Q    So the new statistic is 74 percent in 2004 or thereafter?

2    A    That would be our, that would be, I'm assuming this is

3    from the BMR assessment of the first study of participation in

4    2004.

5    Q    And were you aware that before that it was viewed as

6    nearly 90 percent participation?

7    A    We have had, yes, we've had numbers of 90 percent

8    participation in prior years, yes.

9    Q    That's true of a lot of the research data, isn't it, that

10   it changes over time?

11   A    The trend lines, our trend lines that we produce that we

12   look at, I wouldn't call it changes.  It's a trend.

13   Q    And there is also a Hallmark press room, isn't there?

14   A    I'm familiar that we have on our website a press room,

15   yes.

16   Q    And does the research department provide information to

17   that department to put up on the website?

18   A    I don't recall what is out there right now.

19   Q    I'm not asking you specifically.  I'm asking you a

20   process.  Is there a process by which the research department

21   provides research results to whatever department puts content

22   on to the Hallmark website?

23   A    I'm aware that we have statistics around, high level

24   statistics around greeting card occasions or situations or

25   around the category or the greeting card sending that are

1   probably on the site.  I'm not familiar with all the sources

2   for those.  There are some that probably come from our internal

3   information, like the number of cards we produce.  And some of

4   it is possible it comes from the research group.

5   Q    Want to talk about the purchase diary.  You had indicated

6   that this is something done through a vendor, correct?

7   A    Correct.

8   Q    The vendor is the one that goes out and recruits the

9   panel.  The vendor is one that does the actual studies,

10  correct?

11  A    That's correct.

12  Q    And there is an actual form that is used, isn't there?

13  A    Yes.

14  Q    For how it's done?  And I believe you said we track the

15  products.  The question I guess is, what is it that you track?

16  What products?

17  A    We track in the purchase diary products of the key

18  categories that Hallmark produces like greeting cards, gift

19  wrap, party goods and ornaments.

20  Q    Defendant's 572.  This is from a company called Centipede.

21  Do you see, recognize this as being a purchase diary form?

22  A    Yes, I do.

23  Q    This one has listed on the second page, that's ornaments

24  so that's tracking purchasing behaviors with regard to

25  ornaments, correct?

1    A    That's correct.

2    Q    And then the third page is one that has greeting cards,

3    correct?

4    A    Yes.

5    Q    And then the fifth page has gift wrap?

6    A    Yes.

7    Q    And it also has party goods, balloons, invitations?

8    A    Yes.

9    Q    And the next page has disposable dinnerware?

10   A    Yes.

11   Q    So Hallmark is tracking all of those different products?

12   A    Yes.

13   Q    And this form is put together in collaboration between

14   Hallmark and the vendor, in this case, Centipede?

15   A    Yes.

16   Q    What happens, let's move back in time to the 2000 time

17   frame.  These forms would be sent out to individuals that were

18   participating, correct?

19   A    These would go to the households that have agreed to

20   participate in the purchase diaries.

21   Q    I believe you said there was anywhere from 2,000 to 5,000?

22   A    It did vary.

23   Q    Then those participating households would fill this form

24   out, send it back into a third party vendor, right?

25   A    Yes.

1    Q    The third party vendor would enter in all the information

2    to create some kind of database, correct?

3    A    That's correct.

4    Q    Isn't it true that the cost to do it, one of the drivers

5    of that cost is the fact that how many questions you have on

6    here, how many products do you have?

7    A    Actually the biggest driver of the cost is the recruitment

8    and maintenance of the households.  The incremental costs of

9    adding categories and pages is small.  That's why we did it

10   altogether as opposed to separate diaries.  Because you have

11   to, there is significant mailing costs.  There's significant

12   household maintenance costs in terms of getting new households

13   and rewarding those households to participate.

14   Q    But, sir, one of the cost drivers is the length of the

15   form, is it not?

16   A    There is cost related to length of form but it's minor

17   compared to the cost of maintaining the households.

18   Q    But you can't quantify what that cost is, can you, sir?

19   A    I can't personally but we can at Hallmark and we did and

20   that's why we chose to go with one diary, across all categories

21   versus individual diaries for other categories, because we knew

22   the cost driver was the number of households.

23   Q    Sir, you entered into a contract with the vendor, correct?

24   A    We had, yes.  I don't know contract but we had an

25   agreement for how to conduct the diary.

1  Q    And you had negotiated a price to conduct the diary,

2  correct?

3  A    Yes.

4  Q    And would that be, that was a set price for the, for a

5  year or two years, correct?

6  A    Yes.

7  Q    It wasn't done for each individual wave, was it?

8  A    It was not.

9  Q    And you weren't involved in those negotiations, were you?

10 A    I was not.

11 Q    So there was a dollar figure that was arrived at and

12 that's what it's going to cost to conduct a diary survey that

13 has this type of questions on it, right?

14 A    Correct.

15 Q    As you sit here today you don't know what it would cost if

16 instead of having ornaments and party goods and gift wrap and

17 dinnerware, it didn't have any of that, it just had greetings,

18 you don't know what the cost of that diary would be, do you?

19 A    It would be close to the cost of doing this diary.  Like I

20 said, the cost driver, the biggest cost driver to the purchase

21 diary was the households.  Not the individual pages.

22 Q    Well, sir, if someone has to enter in ten pages worth of

23 information or two pages worth of information, it would take a

24 lot less time to enter in two pages, wouldn't it?

25 A    It would take some.  Like I said the cost of conducting

1   the diary is not driven by data entry.  It's driven by the

2   number of households.  That's just a fact.  That's why we did

3   it this way.  That's why it's altogether.

4   Q    Now, talk about the allocation of the costs.  I believe

5   you testified that at Hallmark they did decide that we're going

6   to have some allocation of the costs of the purchase diaries to

7   different departments within Hallmark, is that right?

8   A    Correct.

9   Q    And at Hallmark the way that they did it, if I got this

10   right was they used the wholesale sales figures, is that right?

11   A    Correct.

12   Q    So didn't have any relation to what the actual cost was

13   for ornaments or for dinnerware, correct?

14   A    The cost of the purchase diary is the cost of the purchase

15   diary.  In fact, each of those areas was getting a great deal

16   on a purchase diary.  Ornaments cannot afford their own

17   purchase diary.  They had to have a corporate diary to conduct

18   this kind of work.  The cost of a purchase diary is expensive.

19   It takes a lot of time to work with those households and

20   mailing costs, recruiting those households we use, ornament

21   business alone could not have its own diary.  So, in essence,

22   all of those businesses were benefiting from a single diary.

23   Q    Correct.  I understand that.  But I'm saying there was a

24   choice made by Hallmark to set it up based off of wholesale

25   sales.  It had no relation to the actual cost of putting

1    together the diary, correct?

2    A    There was a choice made by Hallmark for budgeting purposes

3    for, just for P and L business management purposes to

4    re-allocate the cost of the purchase diary back to those

5    businesses based upon wholesale shipments.

6    Q    And you met with Dr. Serwin, the plaintiff's expert, in

7    this case, correct?

8    A    Yes.

9    Q    And you provided him with Plaintiff's Exhibit 489?

10    A    I have.

11    Q    Did you have discussions with him?

12    A    Yes.

13    Q    And did you tell him that the purchase diary had tracking

14    for products other than greeting cards?

15    A    I don't recall that specific conversation.

16    Q    Did you tell him that Hallmark internally allocated the

17    costs of the purchase diary to the different product areas?

18    A    I don't recall if we had that conversation.

19    Q    Well, you knew he was preparing damages for this case, an

20    analysis of what Hallmark claims were damages in this case,

21    correct?

22    A    Correct.

23    Q    And you knew the damages in this case related to greeting

24    cards, correct?

25    A    I knew the damages in this case were a corporate issue

1    under the BMR.  I don't know exactly what, how to think about

2    that in terms of damages.  I'm not a damages expert.  I was

3    just answering the questions I was asked.

4    Q    Well, were you informed that the five presentations came

5    from the greetings module within the BMR?

6    A    Yes.  But my view is that it was a greetings module but it

7    was a corporate initiative.

8    Q    But it was within the greetings module, sir, right?

9    A    It was within the greeting module but BMR was a corporate

10   initiative.

11   Q    Okay.  So you just don't recall addressing that issue at

12   all with Mr. Serwin, is that right?

13   A    I don't recall.

14   Q    Now, you talked about internal payroll costs, correct?

15   A    Yes.

16   Q    Let me back up one last question.  The costs of the

17   purchase diary, what you're showing on here, I see it listed as

18   NFO Research?

19   A    Yes.

20   Q    Exhibit 49?

21   A    Yes.

22   Q    Is that the vendor that actually did these diaries?

23   A    That's correct.

24   Q    What did you do, did you get the invoices to prepare the

25   sheet?  How did you get these numbers?

```
1    A    The numbers came from a project agreement form which
2    included the invoice amount on them.
3    Q    You didn't actually see the invoice, yourself?
4    A    I've seen invoices.  I don't know if I saw all these
5    invoices but I have seen invoices.
6    Q    And then the internal payroll costs come from that same
7    budget agreement form?
8    A    Correct.
9    Q    If I heard the testimony right, it's an estimate, right?
10   A    It is.
11   Q    And that estimate is made at the beginning before the work
12   is done?
13   A    We were required to do an estimate at the beginning of the
14   work for all of the, all these costs, invoice amount or cost,
15   researching cost and payroll cost, yes.
16   Q    And it is not, if I heard you right, again, you did not
17   keep track of time?
18   A    We do not.
19   Q    So it ends up being an estimate?
20   A    It's a good estimate.
21   Q    That is submitted.
22   A    Correct.
23   Q    On the project agreement?
24   A    Yes.  It's an estimate based upon our experience of
25   conducting similar types of work on that project, yes.
```

1   Q    And so the figures on 489, when ever it says internal

2   payroll costs, is an estimate, right?

3   A    Not necessarily.  In some cases it could be an analyst

4   going back and providing an after the project estimate.  I'm

5   just not clear which ones are prior and which ones are after

6   the project.  There is a mix here, I believe.

7   Q    But even if it's after the project, it's still an

8   estimated time?

9   A    Yes.  Estimated based upon our experience in conducting

10  similar types of work.

11  Q    Did you inform Dr. Serwin of that, that it was estimates

12  for internal payroll costs?

13  A    I don't recall specifically conversation around that.

14  Q    Did you tell him that they were actual costs that were

15  tracked?

16  A    I couldn't tell him that.  We didn't track actual costs.

17  Q    Now, sir, if we could look at 489.  Put up 489.

18       Purchase diary starts in 1993, 94, 95, 96, all the

19  way up through 2000, correct?

20  A    Yes.

21  Q    Well, isn't it true, sir, that Hallmark had filed

22  litigation against Monitor, back some years ago?

23  A    I don't recall.  I know of the litigation.  I don't recall

24  the date.

25  Q    I didn't ask the date.  Wasn't it true at that time that

1    you had submitted the chart and it didn't have the 93, 94, 95,

2    96 data of the purchase diary?

3    A    I think that's the case, yes.

4    Q    And now in this case you are, in fact, putting those years

5    on there?

6    A    Yes.

7    Q    Let's take a look at the mapping for 1993, 94, 95 and 96.

8    So if we can look at Plaintiff's Exhibit 658.  In the column,

9    Jeff, above the column diary, purchase diary in the middle.

10   1993 and 96.

11            See that, Mr. Maynard?

12   A    Yes.

13   Q    That column?  I don't want to go through them.  You

14   established how you put this chart together, correct?

15   A    I'm sorry?

16   Q    You established how you put this chart together?

17   A    Yes.

18   Q    What it represents.  And that, I want to focus on that

19   column there where it says purchase diary 1993 to 1996, not in

20   Exhibit 75.  And that represents the 93 through 96 that wasn't

21   in the case against Monitor, correct?

22   A    I believe that's it, yes.

23   Q    So I want to take a look at those.  I think there are 8

24   pages there you say, okay, those pages have purchase diary

25   information from 1993 to 1996.  That's the reason why you say

1   now you added them into this case, right?

2   A    No.  Actually I think we didn't add.  It was actually an

3   oversight earlier that they should have actually been in the

4   case.  There is a chart that we looked at prior to this that

5   includes 1990 to 2000 information.  That is purchase diary.  We

6   just didn't make the connection that that should have been

7   included.

8   Q    Sir, can you look at, what I've given you is two

9   documents.  One is the August OEC presentation and one is the

10  December OEC presentation.  Do you recognize those documents,

11  sir?

12  A    I've seen these before, yes.

13  Q    These are the documents you went through to put together

14  this chart?

15  A    Yes.

16  Q    Jeff, can you put up Plaintiff's 487?

17           So what I'd like to do is take a look at what you

18  charted out there for this column.  For the purchase diary you

19  have page HM-MCG9769.  So you see that Bates number, sir?

20  That's what you were referring to in your chart, right?

21  A    Yeah.

22  Q    So that one said acquisition opportunity by target

23  segments, correct?

24  A    Yes.

25  Q    Sir, that doesn't have any information from 1993 to 1996,

1    does it?

2    A    Does not.  Looks like there is, it should have been in the

3    column next to it on the left, the profiler database.

4    Q    Okay.  And that's down at the bottom, source there says

5    Hallmark Customer Profile 2000, correct?

6    A    Correct.

7    Q    So that was just a mistake?

8    A    Looks like a mistake, yes.

9    Q    So let's go on to the next one then, which is in the other

10   packet, the December packet.  And that one is, the first Bates

11   number there is HMNCG9815?

12   A    Yes.

13   Q    Page 99.  This is one we looked at already today, right?

14   A    Yes.

15   Q    This one comes from the purchase diary.  This one has,

16   does start with one piece of information in 1996, correct?  Do

17   you see that?

18   A    I see that, yes.

19   Q    So that one is correctly in that column?

20   A    Yes.  For 1996, yes.

21   Q    And then we go to Bates number 9818.  Page 102.

22   A    Yes.

23   Q    That one doesn't list a source.  When I look at it it says

24   category decline from 97 to 2000 in each of the boxes?

25   A    Yes.

1   Q     That data is not from 93, 94, 95, 96, is it?

2   A     It's referencing a chart that was created from 96 to 2000

3   but just talking about those 3 years.

4   Q     So is it your position that trends from 97 to 2000 were in

5   the, a purchase diary from 1993 or 94, 95 or 96?

6   A     No, they were not.  That information probably should be

7   captured under a different column.  Should have been under the

8   GCIO column.

9   Q     Okay.  If you go to, Jeff, page 105 and Bates number 9821.

10         This one here, the source says Hallmark diary study,

11  right?

12  A     Yes.

13  Q     But this is data from up above it says decline between 97

14  and 2000.  Do you see that?

15  A     Yes.

16  Q     So that should be in a different column as well, right?

17  A     Can I revise my answers?  I'm remembering now what

18  happened here.  And the column is purchase diary but we're just

19  indicating that the 93 to 96 information is not in Exhibit 75.

20  Or was not in, yeah, not in Exhibit 75.  So that whole column

21  is suppose to be purchase diary.

22  Q     It is, right?  It's suppose to be purchase diary, right?

23  A     Yeah.

24  Q     That's data from 93 to 96?

25  A     No.  That's not what I'm saying.  I'm just saying that

1  Exhibit 75 did not have, as a note, so it's not saying that

2  this is not excluding those years.  It's just the column should

3  be purchase diary period regardless of what year.  And then

4  separately there is a note that says that those years, like we

5  observed, are not in Exhibit 75.

6  Q    So that column is just a purchase diary column?

7  A    Yes.

8  Q    Okay.  So let's go to the 9824.  Page 108.

9        So here now, on the source we have Hallmark diary

10 study?

11 A    Yes.

12 Q    So that's in the right column?

13 A    Correct.

14 Q    But the data in there now, it's 97 and 2000 data, right?

15 A    In this slide it's 97, 2000.  Like I said, that whole

16 column is representative of purchase diary from 1990 plus.

17 Q    And then if we go to 9837, page 121, Jeff.

18       Now, this one says what?  2000 purchase diary?

19 A    Yes.

20 Q    And so that's in the right column, purchase diary.  And

21 the data from this one happens to be for the year 2000?

22 A    That's correct.

23 Q    And then the next one is 9839.  Page 123.

24       Now, this one is profiler report 2000?

25 A    Yes.

1   Q    Is that something that comes from the purchase diary?

2   A    Yes, it does.  It looks like we've accounted for both

3   places, under the profiler database, it's in the column to the

4   left, as well as in the purchase diary.

5   Q    This one has 2000 data, right?

6   A    That's correct.

7   Q    So this isn't indicating 93 to 96?

8   A    Correct.  But that whole column of purchase diary was

9   purchase diary regardless of the year.

10  Q    Okay.  Then the last one is 9859, page 143, Jeff.

11           And that has purchase diary so that's in the right

12  column.  And now your explanation of this is all purchase

13  diary, that's why it's in that column even though it's only the

14  year 2000, is that right?

15  A    Yes.  This shows a detailed analysis of the targets we've

16  seen before, just for Gold Crown, so can see kind of the detail

17  that is underneath some of our analysis.

18  Q    Okay.  We can pull those down.  I believe this is what you

19  referred to earlier a coda.  Is that what you were referring to

20  when you mentioned coda earlier?

21  A    Yes.

22  Q    And this is a study conducted by the research department?

23  A    Yes.

24  Q    And what year was this conducted?

25  A    1995.

```
1   Q    And this is on your chart of data you believe was drawn

2   from in one of the presentations, correct?

3   A    Yes.

4   Q    Turn to page 6.  So this was 1996 data and 1995 data,

5   right?

6   A    No.  This is actually data from a purchase diary from

7   1986.

8   Q    Okay.

9   A    Shows we've actually had purchase diary information in the

10  80s and there's actually other charts here that go back to the

11  mid 80s from the purchase diaries.  Coda is a study but we

12  include data from other sources including the purchase diary.

13  And we still continue to use coda and we continue to use this

14  information.

15  Q    Defendant's Exhibit 141.  Are you familiar with this

16  document, sir?

17  A    I am.

18  Q    This was something else prepared by Wirthlin Worldwide.

19  Are those vendors you hired or Hallmark hired, sir?

20  A    Yes, for the study.  Yes.

21  Q    Were you involved in this study?

22  A    I was.

23  Q    What is Wirthlin?  Are they just a consulting firm?

24  A    No.  They were a research firm that we hired to conduct

25  the study.
```

```
1   Q    Now, this was a study June 12 of 2000, right?

2   A    Correct.

3   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

5   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9   xxxxxxxxxxxxxxxxxx

10  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11  xxxxxxx

12  A    xxxx

13  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15  A    xxxx

16  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17  A    xxxx

18  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21  xxxx

22  A    xxxxx

23  Q    xxxxxxxxxxxxxxxxxxxxxxxxx

24  A    xxx

25  Q    xxxxxxxxxxxxx
```

```
 1   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 2   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 3   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 4   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 5   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 6   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 7   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 8   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 9   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13   xxxxxxxxxx
14   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   xxxxxxxxxxxxxxxxxxxxxxx
20   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
1    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3    xxxxxxxxxxx

4    Q    Sir, I'd like to reference back to what you talked about

5    on examination with your counsel, Plaintiff's Exhibit 1451.  Go

6    to the third page.

7             Now, this --

8    A    Can you give me a moment?

9    Q    Sure.

10   A    Thank you.

11   Q    So this lays out the estimation process as of year end

12   2001, right?

13   A    Yes.  This indicates that we used purchase diary

14   information in combination with other information to create our

15   estimate.  That's why you cannot just use the raw data.  You

16   have to have the other information.  You can use the raw data

17   but you have to use it in concert with other information to

18   produce the estimates.

19   Q    And then this is the document, sir, is it not, that the

20   next page, describing old process and then the next page

21   describing July 2003 estimation process.

22   A    Yes.

23   Q    Next page.  Industry estimate process.  And it's

24   describing new, this is the new process is what it describes,

25   correct?
```

1   A      This is updated revised process, yes.

2   Q      And because it's restated they went back in time and

3   restated the numbers, correct?

4   A      We revised the numbers to indicate new levels of trend

5   lines in some cases but the shape of those curves remained the

6   same.  And those did not affect then the strategies that we had

7   put in place.

8   Q      But if someone had the data from 99 or 2000, sir, that

9   data wasn't being used and restated in 2003, correct?

10  A      The data, the trend lines is what we used.  So we used the

11  trend to, we looked at a trend line that showed a decline.

12  That decline was still occurring.  So the conclusion would be

13  the same.  That there would still be a decline and still needed

14  to intervene.

15  Q      I'm not asking about the conclusion, sir.  I'm asking

16  specifically about the numbers.  The numbers would have changed

17  after the restatement?

18  A      The numbers in some cases changed to a different level in

19  terms of a trend but the reason we do our work is not for

20  academic purposes to create a trend line.  We do our work to

21  form our strategy as a company so the strategies did not

22  change.

23  Q      I'm not asking about the strategy.  I'm asking, literally,

24  the number for, say, the year 2003.  If it was 60 percent, that

25  number would be restated under the new process so it could

1  track with the new number in 2003?

2  A    We established new levels of trend lines but the shape of

3  the trend remained the same.

4  Q    You say established new levels of trend lines, meaning the

5  number for the year 2000 changed from what it was previously?

6  A    We shifted trend lines that were trending say at a level,

7  call it 10, 12, 13.  Those might have shifted down to 5, 6, 7

8  but the shape in terms of an increase or decrease, that slope,

9  that stayed the same.  That is what is important to us in terms

10  of understanding how to think about the strategy.

11  Q    Correct.  I understand that, sir.  But in 2000 if it was,

12  use your example, it was 5 and then in 2003 when using a new

13  process, so now it goes to 12.  But the 2000 would have been 7.

14  You would have to move that up to 7 to keep that same trend

15  line, correct?

16  A    That's correct.  We did that because we didn't want to

17  mislead the company in terms of new estimates.  We wanted to

18  make sure they were working with the real information they

19  needed to make the decisions.  We didn't want to mislead them

20  from a change that really wasn't a change in the market place

21  but was due to the methodology of the report.

22  Q    So if you didn't raise that 5 up to 7 and you left it at

23  5, now, in 2003 it was 12, that would show a different trend,

24  wouldn't it?

25  A    It would not even be a trend.  It would be apples to

1  oranges comparison.

2  Q    You mentioned that the Mintel report, and you said that

3  you weren't comfortable using the numbers from the Mintel

4  report.  You didn't believe in them, is that correct?

5  A    Correct.

6  Q    Are there quite a few differences between the Mintel

7  report and Hallmark's research?

8  A    There were differences.

9  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11  A    xxxxx

12  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17  xxxxxxxxxxxxxxxxx

18  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19          MR. DONOVAN:  That's all I have, Your Honor.

20          THE COURT:  Redirect?

21          MR. BLEGEN:  Very briefly, Your Honor.

22                      REDIRECT EXAMINATION

23  BY MR. BLEGEN:

24  Q    Let's start at the very end and we will be brief,

25  Mr. Maynard.

```
1              xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
2    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
3    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
4    A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
5    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
6    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
7    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
8    xxxx
9    Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   xxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12   Q    But the idea of consumer activation, the idea of who the
13   target market is, the idea that we've talked about here in
14   Exhibit 487 and 488, are those numbers changed thus that it
15   impacts the results of this BMR process?
16   A    Those trend lines would maintain that same shape and the
17   conclusions would be the same.
18   Q    You were asked about Exhibit, Defendant's Exhibit 149,
19   page 2.  This is the greetings motivational segmentation
20   research.
21   A    I have it.
22   Q    Are you with me?
23   A    Yes.
24   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
 1   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 2   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 3   A    xxxxxxxxxxxxxxxxxxxxx
 4   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 5   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 6   xxxxxxxx
 7   A    xxxx
 8   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 9   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22   xxxxxxxx
23   A    xxxxxxxxxxxxxxx
24   Q    You were asked at the beginning of your cross-examination
25   about Defendant's Exhibit 499.  It's the Dean Rodenbough e-mail
```

1  to Barb Miller.  Did you see that?  Do you know what the GCA

2  did with what ever was provided to them by Mr. Rodenbough in

3  2006?

4  A     I do not know.

5  Q     Do you know whether the GCA shared it with other members

6  like American Greetings or RPG?

7  A     I don't know what they did with it.

8  Q     If the GCA kept that confidential and didn't share it,

9  used it aggregate with other information to kind of come up

10  with an industry overview, in your opinion would that have

11  caused this information contained in 499 to lose its

12  confidential status?

13  A     No.  If it was combined with other information and these

14  numbers were not released, then I would say that they're still

15  confidential.

16  Q     And even if it had been released, does the information

17  that is contained in Exhibit D499, is disclosing that high

18  level industry information, does it make 487 and 488, the five

19  presentations at issue here, does it cause within your opinion,

20  does it mean the information in the BMR is no longer

21  confidential?

22  A     No.  The BMR is still confidential.

23  Q     Finally, you were asked about the 489, your chart on the

24  costs that came up with $6.3 million worth of research having

25  been incorporated into that BMR process.  Could the five

1  presentations, the compilations 487, 488, as they are presented

2  here, could they have been arrived at without the research that

3  you have identified, the $6.3 million in research you

4  identified as having been provided to Monitor and incorporated

5  in those?

6  A    No.  Research permeates throughout that, across all the

7  studies in terms of the analysis and in the work and I don't

8  think those documents could have been produced to the same

9  degree without the research.

10  Q    That's all I have.

11            THE COURT:  Recross?

12            MR. DONOVAN:  I have nothing.

13            THE COURT:  Thank you, Mr. Maynard.  You may step

14  down.

15                                    (Witness excused.)

16            THE COURT:  You don't have a 12-minute witness, do

17  you?

18            MR. BLEGEN:  Unfortunately, no.

19            THE COURT:  Wishful thinking on my part.

20            All right.  Let's break for lunch.  Please don't talk

21  about the case.  We'll try to have it just a little bit warmer

22  when you come back in after lunch.  But if you start falling

23  asleep, I'm going to turn the cold back up again.

24            We'll see you at 1:20.

25            (The following proceedings were had OUT OF THE

1  PRESENCE AND HEARING OF THE JURY:)

2          THE COURT:  See you back here in an hour.

3                    (Noon recess)

4          (The following proceedings were had OUT OF THE

5  PRESENCE AND HEARING OF THE JURY:)

6          THE COURT:  Who is next?

7          MR. BLEGEN:  Grant Brown by video.

8          Just, you had mentioned this morning the objections.

9  They've been editing them out.  We have tried to edit out as

10 best we can.  There will be times though where the objection is

11 actually stated over the top of the answers.  You'll hear

12 objections occasionally where the witnesses answered-- but

13 there's nothing we can do about that.

14         THE COURT:  Okay.  Eva, if the jury is ready, bring

15 them in.

16         (The following proceedings were had IN THE PRESENCE

17 AND HEARING OF THE JURY:)

18         THE COURT:  Please be seated.

19         Mr. Blegen.

20         MR. BLEGEN:  Your Honor, the plaintiff's called Grant

21 Brown by video deposition.

22         THE COURT:  Again, folks, I'm not going to re-read

23 the instruction on video depositions but keep it in mind,

24 please.

25         (The video deposition is being played for the jury.)

1          MR. BLEGEN:  Your Honor, that completes the testimony

2     of Grant Brown.

3          THE COURT:  You folks okay?  Let's move on.

4          MR. AISENBREY:  Your Honor, we have another exciting

5     video, Mr. Jeff Pauker testifying.

6          Your Honor, this is going to go for a long time.  Do

7     we just break it at 3:30?

8          THE COURT:  3:15.

9          MR. AISENBREY:  Okay.  We'll just stop.

10          (The video deposition is being played for the jury.)

11          THE COURT:  We'll see you back here in about 15

12     minutes.  We'll be in recess.

13                         (Recess)

14          (The following proceedings were had OUT OF THE

15     PRESENCE AND HEARING OF THE JURY:)

16          THE COURT:  On Veteran's Day, my thought now is that

17     we won't work on Veteran's Day whether the plaintiff finishes

18     the case Friday or not.  I'll entertain whatever motions you

19     want to make at the end of the day Friday.  I'm not going to

20     rule them at the end of the day.  I will read whatever written

21     submissions you provide me over the weekend.  And if you don't

22     finish Friday, you can finish up Tuesday morning and then we'll

23     move to the defendant's case, assuming that is the appropriate

24     action to take at that time.  And then we will release the jury

25     on Monday.  They won't be expected to be here and I'll release

1  the courthouse personnel.  Okay.

2              (THE PROCEEDINGS RETURNED TO OPEN COURT.)

3              THE COURT:  Please be seated.

4              Mr. Aisenbrey, you may resume.

5              (The video deposition of Jeffrey Pauker continued.)

6              MR. AISENBREY:  Your Honor, that concludes the

7  deposition of Jeffrey Pauker.

8              THE COURT:  Who will be your next witness,

9  Mr. Aisenbrey?

10             MR. AISENBREY:  Your Honor, we have one more video

11 and tomorrow we have a live witness, Dr. Serwin.  The video, I

12 think is 53 minutes long.  We could put that after Dr. Serwin

13 or we could start the video now.

14             THE COURT:  What would you folks like to do?  Would

15 you like to take off early today?

16             All right.  You've earned it.  A couple of

17 announcements.  I have decided not to call you back on Monday,

18 Labor Day or Veteran's Day.  We will take Veteran's Day off and

19 we'll see you on Tuesday morning of next week.  That may mean

20 that we carry over until the first part of the week of

21 Thanksgiving.  I want to warn you about that in advance.  But I

22 think we ought to honor the veterans if we can and we do that

23 by not working on Monday.

24             Secondly, you may have noticed the barricade across

25 the second floor in what we call the Bell Room.  The Bell Room

1   is being converted into a historical exhibit of the American

2   justice system in the Western District of Missouri.  Among the

3   needs for that are pictures of juries in action.  And so the

4   clerk's office has asked permission to come in and take

5   pictures of you during the course of the trial.  I won't, I

6   won't include anyone who doesn't want to be included.  What

7   we'll do is photo shop your face out of the picture if you

8   don't want it in there.  But at some point this week, most

9   likely this week, there may be someone prowling around the

10  courtroom with a camera.  I want you to know what it's for.

11  And if you would rather not be included, let me know that and

12  I'll make certain that we blot you out in some fashion or

13  another.

14          That concludes our business for today.  I'm not going

15  to reread Instruction 7 to you.  You know now you should not

16  discuss the case with anyone and you should keep an open mind

17  until all the evidence is in.

18          We'll see you tomorrow morning at 8:30.  Good night.

19          (The following proceedings were had OUT OF THE

20  PRESENCE AND HEARING OF THE JURY:)

21          THE COURT:  Do we have anything else we need to take

22  up this evening, folks?  If not, I will be here at 8 in the

23  morning.  Let me know if you need me.  Good night.

24                          *    *    *

25