1      IN THE UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF MISSOURI
2                WESTERN DIVISION

3

4   HALLMARK CARDS, INC.,              )
                                      )
5                       Plaintiff,)
                                      )
6           vs.                       )Case No. 08-00840-CV-W-ODS
                                      )
7   MONITOR CLIPPER PARTNERS, LLC.,   )
                          et al.)November 8, 2012
8                          )Kansas City, Missouri
                    Defendants.)
9

10          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
            BEFORE THE HONORABLE ORTRIE D. SMITH
11           UNITED STATES SENIOR DISTRICT JUDGE

12                    VOLUME 4 OF 10

13  APPEARANCES:
    FOR THE PLAINTIFF:        Mr. Charles W. German
14                            Mr. Daniel E. Blegen
                              Rouse Hendricks German May PC
15                            1201 Walnut, 20th Floor
                              Kansas City, Missouri 64106
16
                              Mr. John C. Aisenbrey
17                            Stinson Morrison Hecker LLP
                              1201 Walnut Street, Suite 2800
18                            Kansas City, Missouri

19         (APPEARANCES CONTINUED ON NEXT PAGE)

20

21  COURT REPORTER:           Ms. Cynthia M. Johnson, RMR
                              U.S. Court Reporter
22                            400 East 9th Street, Room 8552
                              Kansas City, Missouri 64106
23                            (816)512-5657

24

    Proceedings reported by computer stenography; transcript
25  produced by computer.

1    (APPEARANCES CONTINUED)

2  FOR THE DEFENDANTS:              Mr. David F. Oliver
                                   Ms. Stacey R. Gilman
3                                  Berkowitz Oliver Williams Shaw
                                   2600 Grand Blvd. Ste. 1200
4                                  Kansas City, Missouri 64108

5

6                                  Mr. Steven L. Manchel
                                   Mr. Michael G. Donovan
7                                  Manchel & Brennan, PC
                                   199 Wells Avenue, Ste. 301
8                                  Newton, MA 02459

9                    *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2
                                                          Page No.
3
     NOVEMBER 5, 2012 - DAY 1
4
     RECORD.............................................   2
5
     INSTRUCTIONS NOS. 1 - 6 READ.......................  34
6
     OPENING STATEMENT BY MR. AISENBREY.................  34
7
     OPENING STATEMENT BY MR. MANCHEL...................  53
8
                        PLAINTIFF'S EVIDENCE
9
     WITNESSES:
10
             DON HALL, JR.
11           Direct Examination by Mr. Aisenbrey.............  72
             Cross-Examination by Mr. Manchel...............  99
12           Redirect Examination by Mr. Aisenbrey..........  148
             Recross-Examination by Mr. Manchel.............  161
13
             WAYNE STRICKLAND
14           Direct Examination by Mr. German...............  168
             Continued Direct Examination by Mr. German......  227
15           Cross-Examination by Mr. Donovan...............  234

16   NOVEMBER 6, 2012 - DAY 2

17   WITNESSES:

18           WAYNE STRICKLAND - RESUMED
             Continued Cross-Examination by Mr. Donovan......  283
19           Redirect Examination by Mr. German.............  322
             Recross-Examination by Mr. Donovan.............  334
20
     RECORD.............................................  338
21
     VIDEO DEPOSITION OF MARK THOMAS....................  347
22
     WITNESSES:
23
             ADAM DOCTOROFF
24           Direct Examination by Mr. Aisenbrey............  347
             Continued Direct Examination by Mr. Aisenbrey...  387
25

                         INDEX (Continued)

                                                    Page No.

VIDEO DEPOSITION OF BILL YOUNG...................... 400

VIDEO DEPOSITION OF PETER KIM....................... 401

RECORD............................................. 401

CONTINUING VIDEO DEPOSITION OF PETER KIM............ 410

VIDEO DEPOSITION OF CHARLES YOON.................... 411

RECORD............................................. 411

NOVEMBER 7, 2012 - DAY 3

RECORD............................................. 413

VIDEO DEPOSITION OF SEAN GARDNER................... 429

WITNESSES:

    JOHN MAYNARD
    Direct Examination by Mr. Blegen................ 430
    Continued Direct Examination by Mr. Blegen...... 482
    Cross-Examination by Mr. Donovan................ 482
    Redirect Examination by Mr. Blegen.............. 527

RECORD............................................. 531

VIDEO DEPOSITION OF GRANT BROWN..................... 532

VIDEO DEPOSITION OF JEFFREY PAUKER.................. 533

RECORD............................................. 533

CONTINUING VIDEO DEPOSITION OF JEFFREY PAUKER........ 534

RECORD............................................. 534

NOVEMBER 8, 2012 - DAY 4

RECORD............................................. 536

INDEX (Continued)

Page No.

WITNESS:

    DR. KENNETH SERWIN
    Direct Examination by Mr. German................   548
    Continued Direct Examination by Mr. German......   599
    Cross-Examination by Mr. Manchel................   627

RECORD..........................................   675

WITNESS:

    DR. KENNETH SERWIN - RESUMED
    Continued Cross-Examination by Mr. Manchel......   680
    Continued Cross-Examination by Mr. Manchel......   746
    Redirect Examination by Mr. German..............   784
    Recross-Examination by Mr. Manchel..............   801

RECORD..........................................   806

NOVEMBER 9, 2012 - DAY 5

RECORD..........................................   814

VIDEO DEPOSITION OF STEVE LEVIN.....................   824

VIDEO DEPOSITION OF MARK POCHARSKI..................   826

RECORD..........................................   826

CONTINUING VIDEO DEPOSITION OF MARK POCHARSKI........   835

VIDEO DEPOSITION OF LARRY EARLEY....................   836

VIDEO DEPOSITION OF JAN MURLEY......................   840

RECORD..........................................   842

WITNESS:

    PAUL MAXWELL
    Direct Examination by Mr. Blegen................   848
    Continued Direct Examination by Mr. Blegen......   861
    Cross-Examination by Mr. Donovan................   889

1                        INDEX (Continued)

2                                                          Page No.

3    NOVEMBER 13, 2012 - DAY 6

4    WITNESSES:

5         PAUL MAXWELL - RESUMED
          Continued Cross-Examination by Mr. Donovan......    905
6         Redirect Examination by Mr. Blegen..............    928

7    VIDEO DEPOSITION OF LAURA STEINBERG.................    937

8    VIDEO DEPOSITION OF PATRICK O'TOOLE.................    938

9    WITNESSES:

10        JOHN MALLERY
          Direct Examination by Mr. Blegen................    941
11        Cross-Examination by Mr. Oliver.................    980

12   RECORD.............................................    992

13   WITNESSES:

14        BRIAN GARDNER
          Direct Examination by Mr. Aisenbrey.............    994
15        Cross-Examination by Mr. Manchel................   1034
          Continued Cross-Examination by Mr. Manchel......   1067
16
     NOVEMBER 14, 2012 - DAY 7
17
     RECORD.............................................   1121
18
     WITNESS:
19
          BRIAN GARDNER - RESUMED
20        Continued Cross-Examination by Mr. Manchel......   1122
          Redirect Examination by Mr. Aisenbrey...........   1160
21        Recross-Examination by Mr. Manchel..............   1186

22   RECORD.............................................   1193

23   PLAINTIFF RESTS

24                        DEFENDANTS' EVIDENCE

25

INDEX (Continued)

Page No.

WITNESSES:

     ADAM DOCTOROFF – RECALLED
     Direct Examination by Mr. Donovan...............  1194

MOTIONS..........................................  1251

COURT'S RULING...................................  1264

WITNESS:

     ADAM DOCTOROFF – RESUMED
     Continued Direct Examination by Mr. Donovan.....  1267
     Cross-Examination by Mr. Aisenbrey..............  1322
     Redirect Examination by Mr. Donovan.............  1364

NOVEMBER 15, 2012 – DAY 8

INSTRUCTION CONFERENCE............................  1368

RECORD...........................................  1391

VIDEO DEPOSITION OF MARK WILLIAMSON..................  1394

WITNESS:

     APRIL EVANS
     Direct Examination by Mr. Donovan...............  1396
     Cross-Examination by Mr. German.................  1421

RECORD...........................................  1469

WITNESSES:

     APRIL EVANS – RESUMED
     Continued Cross-Examination by Mr. German.......  1471

     JAY DITTMAN
     Direct Examination by Mr. Donovan...............  1518

OFFER OF PROOF...................................  1530

1

INDEX (Continued)

2

Page No.

3

WITNESSES:

4

    JAY DITTMAN – RESUMED
    Continued Direct Examination by Mr. Donovan..... 1532
5

    Cross-Examination by Mr. Blegen................. 1538

6

    DR. COLIN BLAYDON
    Direct Examination by Mr. Manchel............... 1541
7

RECORD............................................ 1572
8

NOVEMBER 16, 2012 – DAY 9
9

RECORD............................................ 1574
10

WITNESS:
11

    DR. COLIN BLAYDON – RESUMED
12

    Continued Direct Examination by Mr. Manchel..... 1576
    Cross-Examination by Mr. German................. 1602
13

RECORD............................................ 1636
14

WITNESS:
15

    DR. COLIN BLAYDON – RESUMED
16

    Continued Cross-Examination by Mr. German....... 1639
    Redirect Examination by Mr. Manchel............. 1649
17

RECORD............................................ 1652
18

MOTIONS........................................... 1653
19

COURT'S RULINGS................................... 1654
20

DEFENDANTS REST
21

INSTRUCTIONS NOS. 9 – 29 READ..................... 1655
22

CLOSING ARGUMENTS BY MR. GERMAN................... 1657
23

CLOSING ARGUMENTS BY MR. MANCHEL.................. 1692
24

CLOSING ARGUMENTS BY MR. GERMAN................... 1722
25

JURY RETIRED...................................... 1728

```
 1                    INDEX (Continued)

 2                                                    Page No.
```

```
 3    NOTE FROM JURY....................................    1729

 4    NOTE FROM JURY....................................    1731

 5    NOTE FROM JURY....................................    1733

 6    NOVEMBER 19, 2012 – DAY 10

 7    NOTE FROM JURY....................................    1734

 8    RECORD............................................    1734

 9    NOTE FROM JURY....................................    1735

10    RECORD............................................    1736

11    NOTE FROM JURY....................................    1739

12    VERDICT...........................................    1740

13    JURY POLLED.......................................    1742

14    RECORD............................................    1743

15    CERTIFICATE OF REPORTER...........................    1745
```

```
16                      *    *    *

17                  INDEX OF EXHIBITS
```

```
18    PLAINTIFF'S EXHIBITS              OFFERED    RECEIVED

19    No. 40 (e-mail)                 341 in part 343

20    No. 49 (e-mail)                   1345        1345

21    No. 55 (Q & A sheet)              343         345

22    No. 62 (e-mail)                   403         403

23    No. 115 (e-mail)                  868         868

24    No. 122 (Strategy & Action plan)  819         823

25    No. 125 (e-mail)                  923         923
```

INDEX OF EXHIBITS (Continued)

| PLAINTIFF'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| No. 128 (e-mail) | 814 | 818 |
| No. 128A (e-mail) | 814 | 818 |
| No. 150 (e-mail) | 423 | 425 cond. |
| No. 173 (affidavit) | 403 | 404 rej. |
| No. 186 (metadata) | 404 | 406 rej. |
| No. 202 (e-mail) | 407 | 407 |
| No. 203 (e-mail) | 407 | 407 |
| No. 204 (e-mail) | 423 | 425 cond. |
| No. 217 (e-mail) | 408 | 409 |
| No. 241 (e-mail) | 870 | 870 |
| No. 246 (contact report) | 819 | 823 |
| No. 266 (e-mail) | 428 | 429 |
| No. 270S (letter) | 1046 | 1046 |
| No. 281 (e-mail) | 346 | 346 |
| No. 306 (e-mail) | 871 | 871 |
| No. 307 (contact report) | 819 | 823 |
| No. 313 (consulting agreement) | 882 | 882 |
| No. 319 (consulting agreement) | 814 | 818 |
| No. 334 (e-mail) | 814 | 818 |
| No. 342 (e-mail) | 1460 | 1460 |
| No. 346 (e-mail) | 819 | 823 |
| No. 349 (letter) | 1009 | 1009 |
| No. 360 (letter) | 814 | 818 |

                    INDEX OF EXHIBITS (Continued)

PLAINTIFF'S EXHIBITS                        OFFERED      RECEIVED

No. 361 (letter)                              814          818

No. 363 (letter)                              814          818

No. 364 (e-mail)                              814          818

No. 370 (e-mail)                              814          818

No. 371 (consulting agreement)                814          818

No. 375 (letter)                              836          839

No. 376 (contact report)                      819          823

No. 383A (BKD report)                         964          965

No. 386 (Shredder random overwrite)           974          974

No. 422 (letter)                              785          786

No. 429 (brochure)                           1440         1440

No. 430D (Shredder pop-up window)             976          976

No. 430E (Shredder pop-up window)             976          976

No. 440 (report)                              979          979

No. 442 (directory listing)                   978          978

No. 443A (detailed report)                    967          967

No. 443B (link file report)                   961          961

No. 443C (log)                                966          966

No. 449 (e-mail)                             1467         1467

No. 475 (e-mail)                              887          887

No. 487 (e-mail)                               83           83

No. 488 (e-mail)                               84           84

No. 489 (spreadsheet)                         453          453

INDEX OF EXHIBITS (Continued)

| PLAINTIFF'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| No. 546A (resume) | 550 | 550 |
| No. 547A (schedule) | 575 | 575 |
| No. 547C (schedule) | 570 | 570 |
| No. 547D (schedule) | 223 | 570 |
| No. 547E (schedule) | 572 | 572 |
| No. 547G (summary) | 581 | 581 |
| No. 547H (list of invoices) | 580 | 580 |
| No. 547K (schedule) | 623 | 623 |
| No. 547L (diagram) | 615 | 615 |
| No. 547N (schedule) | 603 | 603 |
| No. 649 (photo) | 848 | 848 |
| No. 651 (financial statement) | 1530 | 1531 |
| No. 652 (financial statement) | 1530 | 1531 |
| No. 653 (financial statement) | 1530 | 1531 |
| No. 654 (financial statement) | 1530 | 1531 |
| No. 655 (financial statement) | 1530 | 1531 |
| No. 656 (financial statement) | 1530 | 1531 |
| No. 658 (spreadsheet) | 463 | 463 |
| No. 659 (e-mail) | 1453 | 1453 |
| No. 660 - 673 (transcripts) | 1638 | 1638 |
| No. 674 (schedule) | 1675 | 1676 |
| No. 674A (schedule) | 1675 | 1676 |
| No. 676A & 676B (videos) | 1638 | 1638 |

INDEX OF EXHIBITS (Continued)

| PLAINTIFF'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| No. 1505 (e-mail) | 1183 | 1183 |

\*     \*     \*

| DEFENDANT'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| No. 327 (Giftbeat Magazine) | 1246 | 1246 |
| No. 412A (data room info) | 1282 | 1282 |
| No. 1016A (e-mail) | 894 | 894 |
| No. 1022 (e-mail) | 426 | 427 |
| No. 1255A (transcript – Mark Williamson) | 1655 | 1655 |
| No. 1275D (DVD – Williamson depo.) | 1655 | 1655 |

\*     \*     \*

1  NOVEMBER 8, 2012 - DAY 4

2         (The following proceedings were had OUT OF THE

3  PRESENCE AND HEARING OF THE JURY:)

4         THE COURT:  Good morning.  How can I help you?

5         MR. AISENBREY:  Yes, Your Honor.  We have one short

6  matter.  In the O'Toole deposition which we will probably get

7  to tomorrow, there was objections to a number of things and a

8  number of them were sustained.  But there's one short part that

9  we would like to ask you to reconsider.  It has to do with an

10  Exhibit 516 which is the confidential agreement that is the

11  subject of the counterclaim.  I have a copy of that for you if

12  you want to see it.

13         And the testimony that is at issue I have highlighted

14  here but, basically, it is Mr. O'Toole identifying the exhibits

15  that he sent to Mr. German and me as part of the compliance

16  with that agreement.  Under the agreement Clipper was required

17  to send a redacted copy of the overview, investment overview

18  for attorneys eyes only to Mr. German and to me.  This is the

19  transmittal letters doing that.  And part of our defense to the

20  confidential agreement is, in fact, they redacted material they

21  were not suppose to redact and therefore they breached the

22  agreement.  All I want to do here is put the letters into

23  evidence.  That's the issue.  I have a copy --

24         THE COURT:  Let me see it.

25         MR. AISENBREY:  This is the agreement and the

1  transcript pages I'm talking about highlighted.

2          THE COURT:  Thank you.

3          Stacey?

4          MS. GILMAN:  Your Honor, we believe, first of all,

5  the designations are coming too late.  There was a protocol for

6  doing this.  There may have been portions of depositions that

7  we would have asked to be added back in which have already been

8  played but it was our understanding the schedule was done for

9  that.

10         The objections to these portions to the extent they

11  were even designated before have all been sustained.  And what

12  I hear him say now is these are really in the nature of

13  defenses to our counterclaim.  You know, if we open the door to

14  that when we put on our case in chief, so be it.  But at this

15  point in time there is no justification for putting them in

16  other than to try to make it appear there was some fraudulent

17  behavior and misrepresentation which Your Honor has already

18  said should not be proved by attorney communications of this

19  nature.

20         MR. AISENBREY:  Briefly, Your Honor, these were

21  designated originally and they were part of a motion, a lot of

22  other things in the deposition.

23         With respect to the counterclaim, part of their

24  counterclaim is that they complied with the confidential

25  agreement.  Part of the confidential agreement requires them to

1    send these materials to us.  Just putting into evidence the

2    fact they sent them, our evidence will be that what they sent,

3    not fraudulently, just did not comply with the agreement and

4    the agreement requires that there would be no breaches of the

5    agreement.  If there are, Hallmark can bring a lawsuit.

6           THE COURT:  The orders in limine or orders with

7    respect to depositions have in my view always been sort of

8    interlocutory in nature, however, I don't see any reason at

9    this point to revisit this issue.  If the defendants put on

10   evidence about the agreement, which they undoubtedly will, I

11   will be open to reconsider under rebuttal but it seems

12   inappropriate to put it in, in your case in chief.

13          MR. AISENBREY:  That's fine, Your Honor.  We were

14   just trying to anticipate and not have to worry about rebuttal.

15   We'll take it up later.

16          THE COURT:  Okay.

17          MR. GERMAN:  Your Honor, while we have your

18   attention, yesterday, our witness this morning is Dr. Serwin on

19   the damages case.  Yesterday I gave Mr. Manchel a CD of 14, 15,

20   17 slides, demonstrative slides we intend to use.  I'm told

21   there are some objections.

22          MR. MANCHEL:  There are unfortunately 20 slides so

23   I'll try to go through them as quickly as I can.  If it's okay

24   with Your Honor, I'll put them up on the screen.

25          Jeff, slide 2, please.

1          The issue with this, Your Honor, is five

2   presentations found in possession of Clipper and standing case

3   team.  There is no delineation between the two.  The evidence

4   in the case was there was one e-mail with Adam Doctoroff and

5   the other two or three e-mails at issue in this case were

6   solely with the standing case team.  So we object to the

7   implication that they were in Clipper's possession.  In fact,

8   Dr. Serwin's testimony will be he understands that one went

9   directly to Mr. Doctoroff, the others went to the standing case

10  team.

11          MR. GERMAN:  That's true.  That's why we said Clipper

12  and the standing case team.  The testimony will be that the

13  three, the two OEC presentations and the Gold Crown, which are

14  part of Exhibit 487 went directly to Doctoroff and Kim and the

15  Exhibit 488 with the other two went to the standing case team.

16  That's what he intends to say.

17          MR. MANCHEL:  Your Honor, I think it's just extremely

18  important to defendants that this be kept clear with the jury

19  and not confusing.

20          THE COURT:  Well, you're parsing words very finely

21  here.  If the slide said presentations in possession of,

22  instead of found in possession of, then I think it would be

23  unobjectionable because there's no question Mr. Doctoroff did

24  possess the slides, some of the information at one time and

25  there's no issue that the standing case team did.  Do you agree

1  with that?

2          MR. MANCHEL:  I do, Your Honor.

3          THE COURT:  I think I'll leave you to point that out

4  in cross-examination, Mr. Manchel.  That objection is

5  overruled.

6          MR. MANCHEL:  Slide 3, please.

7          Your Honor, this goes to, there is a series of slides

8  that go to the issues that we have briefed for the Court in our

9  Serwin pretrial bench brief.  These numbers were delivered in

10 discovery solely and exclusively based on the, what we call

11 colloquially the joint and several liability theory.  There is

12 absolutely no admissible basis in the record, nor could there

13 be, for the use of these numbers.  And so we object to them.

14 They are based on theories.  We were given no alternate

15 theories, no alternate bases.  So if these numbers are put in

16 front of the jury, the next question will have to be the basis

17 for them.  The basis that's been offered has been ruled in

18 inadmissible by the Court and no other basis has ever been

19 offered to us in discovery.

20         The Court ordered specifically that no theories and

21 no argument may be pursued through the expert.  And I don't

22 think the Court ruled specifically on the 30(b)(6) witness but

23 that would be the law governing the 30(b)(6) witness at trial

24 so we object to this being put in front of the jury.

25         THE COURT:  I'm curious how you're going to do this,

1    Charlie.

2              MR. GERMAN:  Well, this is the fourth time this issue

3    has been raised.  In the motion for summary judgment they said

4    we couldn't use the numbers because there were no damages.

5    That was overruled on the grounds it was a question of fact for

6    the jury.  In the Daubert motion, it was argued that the

7    methodology by which the numbers were derived was unreliable.

8    That was rejected.  The Court held it was for the jury.  And

9    the motions in limine, it was argued that the numbers violated

10   the Court's joint and several order.  That was overruled and

11   held that it was a question of fact for the jury and not basis

12   for exclusion of the testimony.

13             So we had a preview of this the other day.  The

14   report from Dr. Serwin, the original report, the updated report

15   with these numbers, never mentions joint and several.  That's

16   not the basis on which he proceeded.  During the course of the

17   deposition, he was cross-examined as he'll be cross-examined

18   here today that, well, of the unjust enrichment, did you

19   consider that Clipper might have gotten itself reimbursed from

20   RPG or from investors?  And his answer would be no.  I looked

21   at the appointed costs and the fees.  The fees were paid

22   directly to Clipper.  And that's my analysis.  I have not

23   considered reimbursement.  And he's free to cross-examine on

24   that.

25             With respect to the royalty, the testimony will be

1    that the royalty is a matter of economics and law, as you tell

2    them, is calculated at the time of the misappropriation in

3    September 1, 2005.  The argument has been, well, that royalty

4    is probably going to be for the benefit of RPG and other

5    entities and therefore, Dr. Serwin, aren't you ascribing to

6    Clipper the royalties that would be paid by other parties?

7    And, of course, no, you cannot do that.  Only a royalty that

8    would be paid by Clipper.

9            So what the report says and what Dr. Serwin will say

10   today is that at the time of the negotiation the only entity at

11   the table, the hypothetical table with Hallmark is Clipper.

12   September 1, 2005, there is no deal.  RPG is off in the future

13   somewhere, still independently owned.  There is no acquisition

14   entity.  There is no equity commitment.  There is no final debt

15   financing.  There is no contractual relationship of any kind

16   between Clipper or its investors and RPG and its sellers or the

17   banks or the investors.  But at the time of the hypothetical

18   negotiation, what would Clipper take into account in

19   negotiating a royalty with Hallmark?  And as the Court has held

20   in limine order, pages 5 and 6, the testimony will be that

21   Clipper would consider the total economic benefits for the deal

22   it hopes to make but has not made at the time of the

23   negotiation.  It would consider all of the benefits that it

24   believes are inherent in possession of the presentations trade

25   secrets.

1          THE COURT:  I'm more concerned about the royalty

2    argument than I am about the unjust enrichment.  It seems to me

3    that all of Hallmark's losses need to be attributable to either

4    Clipper or Doctoroff.  And to the extent that that number

5    includes benefits to entities other than those two, it

6    shouldn't be, it will be not admitted and shouldn't be

7    reflected on the slide.

8          MR. GERMAN:  Well, the unjust enrichment is comprised

9    of two components, the avoided costs and the fees.  And the

10   avoided cost are costs that would have been incurred in the due

11   diligence process.  Either to procure research or to hire

12   consultants to produce data or information equivalent to what

13   we see in the presentation trade secrets.  During that due

14   diligence process, July and August and September, into

15   September, early September 2005, the entity doing the due

16   diligence is Clipper.  It would be Clipper and only Clipper and

17   Mr. Doctoroff who would have had to, had they not had the trade

18   secrets, hire consultants or procure research to try to

19   replicate what they had in the presentation trade secrets.

20          So what the testimony will be is at that time during

21   the due diligence process the only entity out there, since RPG

22   is still independently owned and the investors are not

23   committed, there is no deal, the entity doing the due

24   diligence, thinking about still, considering whether to make a

25   final bid on the deal is Clipper.  Clipper would incur those

1  costs.

2       Now, post deal they will argue Clipper would seek

3  reimbursement under its contracts, both with RPG and that

4  contract doesn't come into existence until November, or from

5  Fund II, the investment, which at the time of the due diligence

6  has not committed to the deal because there is no deal.  They

7  haven't even submitted the final bid yet.  It doesn't get

8  submitted until later in September.

9       So whether Clipper would be entitled to reimbursement

10  of those costs is, I think, a question of fact.  They rely on

11  certain contracts.  We're going to show through their witnesses

12  and the documents themselves that there is considerable

13  ambiguity as to whether those reimbursement rights are real or

14  imagined.

15       And with respect to the presentation trade secrets

16  themselves, I think it's just common sense that if we're

17  talking about those costs, you don't get reimbursed for theft

18  or paying off consultants to divulge confidential information.

19  If we're talking about a third party vendor or like a Deloitte

20  or MacKenzie or some research firm, and Clipper was doing this

21  legitimately, Clipper would be writing the checks to procure

22  that information.  Clipper would be incurring those costs.

23  Whether they get reimbursed in the future is nothing that

24  Dr. Serwin has considered and they're going to cross-examine

25  him about that.

1      MR. MANCHEL:  Your Honor, what you just heard at the

2  tail-end, that they're going to put in the contract arguments

3  through our witnesses, that's the issue.  I asked Dr. Serwin

4  point blank, what he thought about the contracts that bore on

5  the issue of expenses.  His answer was, I didn't read them.  I

6  didn't consider them.

7      I want to be very, very clear, Your Honor.  This is

8  obviously of critical importance to the defendants.  Dr. Serwin

9  testified unequivocally that at the commencement of his work,

10  before he did a single thing he had been instructed to make no

11  distinction between any of the legal entities at issue in this

12  case.  That was his instruction at the opening.

13      It's hard for me to phrase this for Your Honor but

14  we've given the Court I believe Dr. Serwin's deposition and his

15  report and cited for each category the exact evidence that he

16  gave.  What you just heard from Attorney German is absolutely

17  brand new, 100 percent brand new.  And I've never heard it from

18  Dr. Serwin's mouth.  I've never heard it from a witness in this

19  case.  There's never been an argument that the reason for the

20  unjust, never, there's been no evidentiary argument in 30(b)(6)

21  or an expert that the reason why the cost should be reimbursed

22  is because on September 1 there wasn't a deal.  And the

23  contracts around September 1 would not have -- never has there

24  been a single witness in this case that presented it.  I asked

25  and I hope Your Honor has a chance to read the deposition.  I

1    asked every which way I could, do you have any alternate

2    theories?  Anything else on which you base this?  Have you

3    looked at the contracts?  I asked him, did you even conclude

4    that Clipper avoided costs?  And his answer was I didn't.  I

5    didn't, it was that base level.  I never got to because he

6    never offered anything and I asked him on what basis.  On the

7    reasonable royalty that goes to really, Your Honor, to the

8    heart of the Court's order.  Your Honor said in your order you

9    may not obtain a reasonable royalty based on what others would

10   have paid.  That is the precise language that Dr. Serwin used

11   when I asked him the basis.  I'm seeking $29 million because it

12   would have been paid by the beneficial owners of the income

13   stream.

14          Then, Your Honor, in the same motion suggested that

15   they could come up with a theory on reasonable royalty such as

16   there is, in essence, an indirect benefit that Clipper would

17   appreciate.  The notion that Clipper would have been happy, if

18   you will, that Fund II got something so it would have paid

19   more.  They invented their report 3 times.  They never asked

20   for another report after that order.  They never offered up

21   anything else.  The very first time that we heard these

22   arguments was last week in connection with the materials we

23   presented to the Court.  That's it.  In fact, I asked

24   Dr. Serwin straight out, did you assume for purposes of your

25   analysis that RPG was owned by Clipper.  Answer, no.

1        I looked at every single theory that he put in the

2   report and every theory that he advanced in the deposition,

3   Your Honor.  And we really painstakingly laid that out for the

4   Court in the Serwin brief.  But this is, for us this goes

5   beyond undue prejudice.  For us at this moment after 3 years to

6   have them put a witness on the stand and say the things that

7   have just been represented are being said, I would ask the

8   Court to please, if you're at all inclined to allow this to go

9   forward, just please take a look at the deposition testimony,

10  again, because I give you my word, Judge, you'll not find this

11  in the report and you'll not find it in the deposition.  And

12  Your Honor was very, very strict with us and very, very strict

13  with them.

14        I want to say at one point you said you do this at

15  your peril.  If you don't disclose it and you don't put it out

16  there, then you can't use it.  So I've got two fundamental

17  issues.  The stated basis for those two numbers, period, end of

18  story.  That others would have paid.  Period.  That is, that's

19  indisputable.  And I didn't hear the dispute here.  The reasons

20  today for those numbers are completely new.  And I didn't hear

21  Attorney German say they're not.  I heard him say, this is what

22  Dr. Serwin will say.  But if he's going to make this type of

23  presentation through Dr. Serwin, I would ask him to show me

24  where in the deposition and report this appeared because, Your

25  Honor, it really doesn't.

1          THE COURT:  Okay.  We're short of time.  I'm going to

2     allow this slide in.  Other objections will have to be

3     presented during the course of the deposition.

4          We'll take two or three minutes and we'll get

5     started.

6                         (Recess)

7          (The following proceedings were had IN THE PRESENCE

8     AND HEARING OF THE JURY:)

9          THE COURT:  Good morning.  Welcome back.

10          Mr. German.

11          MR. GERMAN:  Your Honor.

12          Good morning everybody.

13          Plaintiff calls Dr. Kenneth Serwin.

14     DR. KENNETH SERWIN, PLAINTIFF'S WITNESS, SWORN

15                    DIRECT EXAMINATION

16     BY MR. GERMAN:

17     Q    Good morning, Dr. Serwin.  Would you introduce yourself to

18     the jury and to the Court?

19     A    My name is Kenneth Serwin.

20     Q    And you are the economist in this case for the damages

21     analysis for Hallmark?

22     A    That's correct.

23     Q    So tell the Court and jury, please, a little bit about

24     your background.  What brings you to this case?

25     A    Yes.  I'm a PhD in economics.  I work as a director at

1    Berkeley Research Group.  It's an international economics and

2    management consulting firm.  I have been doing this type of

3    work for approximately 15 years since I received my PhD in

4    economics.

5    Q    What year did you receive your PhD, sir?

6    A    1997.

7    Q    From what school?

8    A    University of California, Los Angeles.

9    Q    UCLA?

10   A    Yes.

11   Q    And any degrees prior to the PhD?

12   A    Yes.  I have an undergraduate degree in economics and I

13   also have a master degree in international relations.

14   Q    From what institution?

15   A    The undergraduate degree is from the University of

16   California at Berkeley and the master degree is from the London

17   School of Economics.

18   Q    Have you specialized in your work, in your economics

19   practice in any particular area of discipline?

20   A    Over my career as a practicing consulting economist I have

21   done a large amount of work dealing with intellectual property

22   evaluation and estimation of damages in commercial litigation.

23   I've also done damages in commercial litigation in other types

24   of disputes other than intellectual property but a large part

25   of my time revolves around intellectual property.  Also I do

1    quite a bit of public policy work in terms of questions of

2    macro economic issues.

3    Q    When you say, Dr. Serwin, when you say intellectual

4    properties, specifically what type of property are you

5    referring to?

6    A    Intellectual property, usually there are many types but

7    patents, trade secrets, copyrights, trademarks are the main

8    types of intellectual property.  I've done work in all of

9    those.

10   Q    And have you, specifically with respect to trade secrets

11   which is what this case is about, have you over the course of

12   your career analyzed damages claims involving misappropriation

13   of trade secrets?

14   A    Yes, I have, on a number of occasions.

15   Q    I'd like to hand you, if I could, please, Exhibit 546A and

16   ask you to identify that for the Court, please?

17   A    Yes.  This is my curriculum vitae or resume.

18   Q    And is it accurate and up-to-date?

19   A    I believe it doesn't include the testimony in the Hallmark

20   matter that I've given.

21   Q    Before this case?

22   A    Yes.

23             MR. GERMAN:  We'd offer 546A, please?

24             THE COURT:  Without objection 546A will be admitted.

25             MR. GERMAN:  Thank you.

1    Q    Now, Dr. Serwin tell the Court and jury, please, what it

2    is that you were asked to do in this case?

3    A    In this matter I was asked to evaluate and estimate

4    damages suffered by Hallmark due to the alleged

5    misappropriation of the presentation trade secrets.

6    Q    And you completed that work?

7    A    Yes, I have.

8    Q    Now, just as a matter of housekeeping, I assume you're

9    being paid?

10   A    Yes, I am.

11   Q    What are you charging Hallmark for your work?

12   A    My time, I charge $600 an hour.

13   Q    And there's additional charges from your firm?

14   A    Yes.  I have had a staff that has assisted me on this case

15   over the period I've been engaged.

16   Q    When were you first retained?

17   A    I believe at the end of 2009.

18   Q    So you've been working on the case almost three years?

19   A    That's correct.

20   Q    And you have prepared certain reports for the case?

21   A    Yes, I have.

22   Q    Those have been shared with the defense?

23   A    Yes, they have.

24   Q    And you've appeared for a deposition in the case?

25   A    Yes, I have.

1    Q    Taken by defense counsel?

2    A    Yes.

3    Q    That was earlier this year?

4    A    That was in May of this year, yes.

5    Q    So from the end of 2009 through today, roughly, what has

6    your firm been paid by Hallmark?

7    A    Somewhat over a million dollars.

8    Q    Now, in connection with your work on the damages aspect of

9    the case, have you been asked to express any opinions at all on

10   liability issues?

11   A    No, I have not.  I don't have any opinions on liability

12   issues.

13   Q    So the question of whether there were, in fact, trade

14   secrets or whether they were misappropriated is not something

15   you've considered?

16   A    Well, I have taken that as an assumption that these are

17   valid trade secrets and as an assumption that they have been

18   misappropriated.

19   Q    So on those assumptions then, you performed a damages

20   case?

21   A    That's correct.

22   Q    So what are the trade secrets then that you have evaluated

23   in analyzing the damages issues?

24   A    In this matter there are five distinct, what I'll call

25   Power Point presentations.  And those five distinct Power Point

1  presentations are what I evaluated.

2  Q    Could we have Exhibit 487, please?

3         Dr. Serwin, Exhibit 487 has been spoken about

4  throughout the course of this week.  Can you see it on the

5  screen there?

6  A    I do.

7  Q    Do you recognize the e-mail?

8  A    I do.

9  Q    Can we see the next page, please?  Next page.  The

10  attachments.

11         Dr. Serwin, this is an attachment to the Exhibit 487

12  OEC meeting from August of 2001.  Is this one of the five

13  presentations?

14  A    Yes, it is.

15  Q    And the next one.

16         Similarly, the December OEC discussion,

17  December 2001.  Is this one of the five presentations?

18  A    Yes, it is.

19  Q    And then thirdly, the Gold Crown Channel Analysis, January

20  2002.  Is this one of the five presentations you considered?

21  A    Yes, it is.

22  Q    Then Exhibit 488, please.

23         Exhibit 488 has been discussed previously.  Do you

24  recognize the e-mail?

25  A    Yes, I do.

Q    Let's go to the first attachment now.

        This attachment to Exhibit 488 is called Hallmark Greeting Card Industry, Understanding Industry Trends.  Is this one of the five presentations?

A    Yes.

Q    And the second one.

        Then, finally, Small Competitors and the Deep Discount Space.  Is that the fifth of the five presentations?

A    Yes, it is.

Q    Slide 2, please.

        Now, Dr. Serwin, you've prepared a number of slides here to help talk through your testimony this morning?

A    That's correct.

Q    On this slide we see the five presentations you've just described.  Tell us what is being depicted on slide 2?

A    Well, as you see there is a larger black circle.  What that represents is the totality of the information that potentially was available to Clipper from the Hallmark engagement with Monitor Consulting and the input and outputs of that engagement.  So that is all information that potentially was out there that were Hallmark trade secrets.

        Of that totality of potential information the five presentations are a subset.  And this is just reflecting that. My analysis is based on that small subset of five presentations and not everything.

1  Q    And so what you've assumed is that the five presentations,

2  each one of the five presentations constitutes a Hallmark trade

3  secret?

4  A    That was the assumption I was asked to make, yes.

5  Q    Have you gone through the presentations, page by page, to

6  try to isolate or identify particular trade secrets within each

7  of the presentations?

8  A    I reviewed the presentations but I've not done any work to

9  isolate individual specific slides as trade secrets separable

10 from the presentation as a compilation.

11 Q    In your field of work in analyzing trade secret damage is

12 that a standard methodology that people in your profession

13 follow?

14 A    In the analysis of economic damages it is taken as an

15 assumption.  I ask the question what is the trade secret that

16 I'm looking to assess damages on.  And as I understand the

17 trade secret, it is a compilation.  That is standard to ask

18 that question and base the damages on that.

19 Q    So describe for the Court and jury, please, Dr. Serwin,

20 the process that you went through, the work that you did, just

21 physically, what did you do to gather information and arrive at

22 the conclusions you're going to present this morning?

23 A    The overall process is one where collecting and evaluating

24 the documents and production that was in this case so to a

25 large amount of pages upon pages upon pages of e-mails, other

1  documents of financial analyses, the legal filings in the case

2  to get a general broad understanding of the case.  Having

3  interviews with relevant individuals to ask necessary questions

4  in order to understand and take assumptions with respect to

5  things that are outside the scope of my analysis to use as

6  input to the economic damage analysis.

7  Q    You mentioned interviews.  One of the Hallmark people who

8  testified in this case earlier this week was Wayne Strickland.

9  Did you interview him?

10 A    Yes, I did.

11 Q    Did you talk to him about consulting fees that Hallmark

12 paid Monitor?

13 A    I did.

14 Q    Another individual who has testified was John Maynard.

15 Did you interview Mr. Maynard?

16 A    I have spoken with Mr. Maynard, yes.

17 Q    What was the topic of that interview?

18 A    To understand the calculation of the cost of underlying

19 research that is synthesized or summarized within the five

20 presentations.

21 Q    Now, you told us that you had prepared a report, a written

22 report in this case?

23 A    Yes, I did.

24 Q    And that was provided to defense counsel and the Court?

25 A    Yes.

1    Q    And then you did an updated report a couple of months

2    later?

3    A    Yes, I did.

4    Q    That was also provided to the defense and the Court?

5    A    Yes.

6    Q    And those reports were prepared and submitted before you

7    testified in the deposition you gave in this case?

8    A    Yes, they were.

9    Q    We're not going to mark and offer the reports into

10   evidence because you're here to testify live but I'm going to

11   set the reports up there so that if you need to refer to them

12   or defense counsel wants to refer to them, they'll be available

13   to you?

14   A    Okay.

15   Q    For the record these are Exhibits 546 and 1347.

16          I'm going to set them on the ledge by the witness,

17   Your Honor.

18          Now, Dr. Serwin, let's start by asking you to

19   describe for the Court and jury the kinds, I'm not sure that's

20   the right word but the types of damages calculations that

21   you've made in this case?

22   A    Yes.  As I understand the potential remedies in this

23   matter, one potential remedy is what is termed unjust

24   enrichment or gains or costs that were avoided by the

25   defendants by virtue of the alleged misappropriation of the

1    trade secrets.  So that is one aspect of the damages that I

2    calculated.

3    Q    Okay.  Stopping there for just a moment.

4              MR. MANCHEL:  Your Honor, he's going to stop.  Move

5    to strike, please.

6              THE COURT:  Overruled.

7              MR. MANCHEL:  May I approach.

8              THE COURT:  Yes.

9              (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

10   PROCEEDINGS WERE HAD:)

11             MR. MANCHEL:  Thank you, Your Honor.  There's no

12   evidence in the case there's been any -- no opinion -- avoided

13   by the defendant.  I asked him specifically if they determined

14   that anything had been avoided by the defendants and his

15   response back to me, I did not.  I did not assume the

16   defendants avoided any costs.  I assumed simply there was joint

17   and several liability among the defendants.  That was his

18   direct testimony on this specific point.  And Your Honor struck

19   the one witness before him.

20             THE COURT:  If you believe there is not joint and

21   several liability between Doctoroff and Monitor Clipper, you

22   said there was no direct joint and several liability.

23             MR. MANCHEL:  No.  No sir.  I'm sorry.

24             THE COURT:  I know what you mean but that's what you

25   said.

1          MR. MANCHEL: I'm sorry. I said his testimony was, I

2   asked him specifically did you assume or conclude in your

3   analysis that the defendant avoided costs? His answer was, no,

4   I did not assume that. His answer was, his answer was, I was

5   instructed to assume joint and several liability among the

6   non-parties and that's what I based my testimony on. The one

7   witness who raised the issue here, which I believe was

8   Mr. Maynard, he went on to say that the defendants avoided the

9   costs and Your Honor granted the motion to strike and did not

10  allow the testimony in. So there is no statement in this case

11  that these defendants avoided costs even as a threshold matter,

12  let alone the basis for it.

13         MR. GERMAN: Same argument, Your Honor. The report

14  says very clearly that Clipper and Doctoroff avoided costs.

15  That's, we're not going to joint and several liability.

16  Mr. Manchel is free to cross-examine him on who avoided the

17  costs. His testimony is that the defendants avoided the costs

18  and that's what the report says.

19         MR. MANCHEL: Your Honor, I can't cross-examine him.

20  I don't have any, I cross-examine him on what he offered. I

21  literally don't have a basis on which to cross-examine what

22  this gentleman is going to say on avoided costs.

23         THE COURT: If he said in his deposition that he

24  didn't delineate between the parties, that's a basis for

25  cross-examination.

1    MR. MANCHEL:  But then they see these huge numbers

2  where there is no basis.  This isn't a matter of impeachment or

3  cross-examination.  This is your specific --

4    THE COURT:  This case once we get past liability is

5  always going to be a battle of experts.  I've allowed both

6  experts to offer their opinions.  I'm going to allow this

7  expert to offer his opinion subject to cross-examination and

8  argument.

9    MR. MANCHEL:  But will you allow him to offer his

10  opinion that is based on things that you have ruled out or will

11  you allow him --

12    THE COURT:  I don't know what his opinion is going to

13  be until I hear it.

14    MR. MANCHEL:  All right.  Then I'll come back when

15  the opinion is offered and move to strike on the same motions.

16    THE COURT:  Motion to strike now is overruled.

17        (THE PROCEEDINGS RETURNED TO OPEN COURT.)

18  BY MR. GERMAN:

19  Q    Okay.  Let's try again.  With respect to unjust

20  enrichment, the measure of damages you analyzed, what are the

21  components of it that you are stating in this case?

22  A    The components of that are costs that otherwise would have

23  been incurred by Clipper in generating comparable research to

24  arrive at the same results of research that are incorporated in

25  the five presentations.  And the cost that would have been

incurred by Clipper to generate the same results or comparable

results, not the same but comparable results to the

recommendations and conclusions that were incorporated in the

five presentations.

Q    And is there another component to the unjust enrichment

analysis?

A    There is another component which is fees that were

received by Clipper as a direct result of completing the

transaction to acquire the company RPG and management fees

received by Clipper related to the management and operation of

RPG.

Q    Now, separate from your analysis of the unjust enrichment

analysis, have you prepared a second analysis and a different

measure of damages?

A    Yes.  The other measure of damages is what is called a

reasonable royalty.  And what a reasonable royalty is is under

the assumption, it's a hypothetical assumption, that the two

parties in this case, Clipper on the one side being the alleged

misappropriator and Hallmark on the other side as the owner of

the trade secrets, would agree to license them or Hallmark

would grant a right to Clipper to do what they did with the

trade secrets and there would be a price for that license and

that's the reasonable royalty.

Q    Can you give us an example or two of how royalties in this

kind of setting work in the real world?

1  A    In the real world royalties can take place in a number of

2  settings.  I mean, a simple example of that is usually related

3  to patents.  So, for example, consider if we had an inventor

4  of, take for example, a technology related to a hybrid engine

5  for a car.  And the inventor has that technology and is granted

6  a patent.  So what the patent is is granting the inventor an

7  exclusive right to exploit that technology.  Well, an inventor

8  isn't a car manufacturer.  So the inventor can't really overly

9  benefit from his invention.  The car company can overly benefit

10  by incorporating that invention in cars.  So those two parties

11  will negotiate with each other and a license, in certain

12  instances, will be granted by the inventor to the auto maker to

13  use that technology in building cars that use that hybrid

14  engine.  And there will be a fee for that and that's a royalty.

15  Q    So in this case you mentioned that the analysis you've

16  done of the reasonable royalty is in the context of a

17  hypothetical negotiation between Clipper on one side of the

18  table and Hallmark on the other?

19  A    Yes.  It's hypothetical in the sense that this didn't

20  happen and these two parties aren't really sitting at a table

21  doing this.  But in terms of a structure and this is a common

22  structure that is used in economic damages related to

23  intellectual property, how are we going to come up with the

24  price?  Well, what we're trying to do is think about what

25  would, essentially, a comparable scenario where the two parties

1   do sit down at the table and what would they have come up with?

2   And that hypothetical negotiation isn't really a real world

3   negotiation for a number of reasons.  Number one, it didn't

4   happen and probably wouldn't happen.  But, second, there are

5   certain rules under which the analysis of that hypothetical

6   negotiation would take place.  Such rules are that it would

7   take place on the eve of the bad act happening.  So in this

8   case on the eve of misappropriation, before it actually

9   happened the two parties would sit down and say, okay, let's

10  negotiate a price for this.

11  Q    Why is that date significant?  What is the date of the

12  negotiation you've used in this case?

13  A    The date I've used is approximately September 1, 2005.

14  Q    Why then?

15  A    Because that's right in between the two sets of

16  presentations.  The first e-mail with the first three

17  presentations was August 25, I believe.  And the second e-mail

18  was in the first week of September.  I took right in the middle

19  there.

20  Q    And you understand, Dr. Serwin, as we saw in the Exhibit

21  487, the first three presentations were sent to Mr. Doctoroff

22  and Mr. Kim at Clipper and members of the standing case team.

23  Do you know what that means?

24  A    Yes, I do.

25  Q    And the second two presentations that were part of Exhibit

1   488 were sent to the standing case team itself, true?

2   A    That's correct, yes.

3   Q    So between those two e-mails is September 1, 2005 and

4   that's when in your analysis you constructed this hypothetical

5   negotiation between Hallmark on the one hand and Clipper on the

6   other?

7   A    Yes.

8   Q    Let's have slide 3, please.

9         So just as an overview before we get into the nuts

10  and bolts on these two measures of damages, Dr. Serwin, tell us

11  what you have concluded with respect to each analysis you've

12  done?

13  A    Yes.  With respect to the unjust enrichment with the two

14  parts the avoided costs and the fees received.  That in total

15  is $17.6 million.  Alternatively, my calculation of the

16  reasonable royalty is a lump sum of $29.2 million.

17  Q    Now, let's start the breakdown of these numbers with the

18  unjust enrichment.  Okay?

19         And we'll go to slide 4, please.

20         So explain to the Court and jury, please, Dr. Serwin,

21  what we see on slide 4?

22  A    Yes.  Well, of the $17 million, approximately $17 million

23  of unjust enrichment, 17.6, 11.3 of that is from costs that

24  Clipper avoided incurring associated with the five presentation

25  trade secrets.  And that is split into two parts.  One is the,

1   as I mentioned, monies that Clipper avoided incurring to obtain

2   comparable recommendations and conclusions from consulting

3   services that were in the five presentation trade secrets.  And

4   that portion is $5 million.  Then the other portion is the cost

5   that Clipper avoided incurring from not having to create,

6   itself, the underlying research, the results of which were

7   synthesized or summarized in the five presentations.

8   Q    In the context of this case and the record as you

9   understand it, when would those costs have been incurred?

10          MR. MANCHEL:  Objection.

11          THE COURT:  Step up.

12          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

13  PROCEEDINGS WERE HAD:)

14          MR. MANCHEL:  Offering opinion, conclusion, Your

15  Honor, that he's never offered in his report or in his

16  testimony.

17          MR. GERMAN:  He's going to say the cost would have

18  been incurred in the due diligence process.  That's what the

19  report says.  That's what the testimony has been.

20          THE COURT:  Objection overruled.

21          (THE PROCEEDINGS RETURNED TO OPEN COURT.)

22  BY MR. GERMAN:

23  Q    Again, Dr. Serwin, in the context of this case, the record

24  as you understand it, when would these costs have been

25  incurred?

1   A    Well, in order to carry out the due diligence on the

2   acquisition or potential acquisition of RPG that was taking

3   place in and around September 1 of 2005, the recommendations

4   and conclusions that were in the five presentations were used

5   and the understanding of the results of the research were used

6   and so this would have had to have been created or obtained by

7   Clipper at around that same time.

8   Q    During the due diligence process?

9   A    Yes.

10  Q    Now, let's focus on the comparable consulting component of

11  $5 million.  We've heard Mr. Strickland testify that that

12  constituted fees that Hallmark paid to Monitor.  Are you

13  assuming that Clipper would have hired Monitor to do the

14  consulting work?

15  A    No, that's not a necessary assumption.  What I'm assuming

16  is that Clipper used and benefited from recommendations,

17  conclusions that came from a strategy consulting firm that had

18  been incorporated, a large number of inputs, and taken those

19  inputs related to the greetings industry, the research that

20  they had, other inputs that they had, and they then compiled

21  that and created these recommendations, conclusions for

22  Hallmark.

23       So in order for Clipper to benefit from those same

24  recommendations and conclusions Clipper would have to be able

25  to obtain comparable consulting results.  Now whether they

1  would get them from Monitor or somewhere else is not a

2  necessary assumption.

3  Q    So why are you using the Monitor charges to Hallmark in

4  your analysis?

5  A    I believe they are a reasonable proxy for the costs that

6  Clipper would have to incur to get comparable results.  The

7  cost that Hallmark incurred with respect to its engagement or

8  engagement it made with Monitor Consulting was one where a

9  major greeting card company with all of the available input

10  that a greeting card company that's been in business as long as

11  Hallmark has brought to bear and provided to Monitor Consulting

12  and the interactions that Hallmark and its executives and its

13  knowledge were able to combine with Monitor Consulting's

14  strategy consultants are probably the lowest cost that would be

15  incurred to generate comparable results from that consulting

16  project.  So I felt that was a reasonable proxy or estimate for

17  the cost that Clipper would incur.

18  Q    Okay.  Thank you.

19        MR. MANCHEL:  Your Honor, move to strike.

20        THE COURT:  Overruled.

21        MR. MANCHEL:  May I approach.

22        (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

23  PROCEEDINGS WERE HAD:)

24        MR. MANCHEL:  I'm sorry, Your Honor.  I have to keep

25  a record going.  This gentleman just testified these are the

1  costs that Clipper incurred.  I asked him specifically who do

2  you think is going to incur the cost, sir?

3       ANSWER:  With respect to this, it didn't -- under the

4  assumption I was asked to operate, it didn't matter.  So the

5  assumption who ever incurred, who, I'm sorry, who ever avoided

6  the cost, Monitor Clipper would be liable.

7       He's never offered the opinion that Monitor Clipper

8  and I didn't make any objection when they were talking about

9  the theories and the numbers but now we're starting to dive

10  down below.  It's I don't know what.

11       MR. GERMAN:  That's just simply not the case.  The

12  report on every single page I have, I'll show you the report,

13  says Clipper and Doctoroff avoided the costs.  He's saying if

14  the costs were incurred, they would have been incurred by

15  Clipper and Doctoroff.  It's been consistent.  It's their

16  theory of the case they can shift the cost off to somebody

17  else, not ours.

18       MR. MANCHEL:  Your Honor, I read the report.  I saw

19  the language.  I asked him the question on what do you base

20  your conclusion that they were incurred?  And his answer was,

21  on the instructions of counsel from Hallmark.

22       THE COURT:  Well, and I expect you'll ask him that

23  question on cross-examination, Steve.  I'm --

24       MR. MANCHEL:  Your Honor, it's not an impeachment

25  issue.

1          THE COURT:  If he said different in his deposition,

2    if he said something different in his report you can confront

3    him with those.  This all goes to credibility and the

4    reliability of his opinion.

5          MR. MANCHEL:  With all due respect, Your Honor, this

6    isn't an impeachment issue or liability issue.  Your specific

7    order was they may not offer at trial any new opinion.  It's

8    not so.  I'll show that it's a new opinion and maybe at that

9    point the testimony will be struck.  But with an expert witness

10   I don't think the standard is the same as impeachment or

11   reliability.  I think --

12         THE COURT:  Mr. Manchel, I don't argue with

13   attorneys.  I made my ruling.  Step back.

14             (THE PROCEEDINGS RETURNED TO OPEN COURT.)

15   BY MR. GERMAN:

16   Q    Okay.  Now, Dr. Serwin, I'm going to hand you what is

17   marked as Exhibit 547D.  Can you identify that exhibit for the

18   Court and jury?

19   A    Yes.  This is an exhibit from my updated and revised

20   report.

21   Q    And this catalogs the total costs of the BMR that was part

22   of your analysis of the $5 million consulting fee?

23   A    Yes.

24         MR. GERMAN:  Your Honor, we'll offer 547D, please.

25         MR. MANCHEL:  Same objection, Your Honor.

1           THE COURT:  Pardon?

2           MR. MANCHEL:  Continuing my objection.

3           THE COURT:  Yes.  We'll show your objection as

4   continuing.  547D is admitted over defendant's objection.

5   BY MR. GERMAN:

6   Q    So, Dr. Serwin, explain to the jury what you see in

7   Exhibit 547D?

8   A    Yes.  These are the costs of the entirety of the BMR

9   project that Hallmark engaged Monitor Consulting to perform.

10  It is broken out into the five sub-components and of those five

11  sub-components, as I understand it, the five presentations

12  reflect the totality of the first two components, the greetings

13  and the channel analysis.  The total of which was $5 million.

14  Q    Hand you now Exhibit 547C.  Ask you to identify this

15  exhibit for the Court and jury, please?

16  A    Yes.  This is another exhibit from my updated and revised

17  report.

18  Q    And this substantiates your back up for the $5 million

19  figure?

20  A    Yes.

21          MR. GERMAN:  Your Honor, offer 547C.

22          THE COURT:  547C is admitted over defendant's

23  continuing objection.

24  BY MR. GERMAN:

25  Q    Now, explain then, Dr. Serwin, what we see in Exhibit

1    547C?

2    A    This is essentially very similar to the prior schedule

3    except this one has just the costs related to the greetings and

4    the channel components of the BMR project.

5    Q    Now, at the upper right of Exhibit 547C it says updated

6    and revised.  Can you explain that for us, please?

7    A    Yes.  I had a prior report, a March report that was

8    different than the May report that I provided.  And there was a

9    change and actually a reduction related to this exhibit and

10   others.

11   Q    You reduced the number from some higher number down to

12   5 million?

13   A    Yes.

14   Q    That was based on what?

15   A    That was based on an initial understanding which proved to

16   be incorrect that there was, that the five presentations also

17   incorporated work from one of the other three components of the

18   BMR project, aside from the greetings and channel components.

19   Q    Finally, let me hand you Exhibit 547E.  Identify this for

20   us, please?

21   A    Yes.  This is another schedule from my updated and revised

22   report.

23   Q    What does this show?  547E?

24   A    547E isn't up there yet.

25   Q    I know.  It's in your hand.

1  A     This is another schedule from my report.

2  Q     What does it show?

3  A     This schedule, it just breaks out the actual payments from

4  Hallmark to Monitor for the various components of the BMR

5  project by month.

6  Q     Okay.  Where did you obtain the information that we see on

7  Exhibit 547E?

8  A     On 547E I obtained that information from the documents in

9  this case.

10  Q     Is this part of your interview with Mr. Strickland?

11  A     This was part of my interview with Mr. Strickland, was

12  about the information.  And the information, itself, was in the

13  record that I received.

14          MR. GERMAN:  Your Honor, offer 547E.

15          THE COURT:  547E will be admitted over defendant's

16  objection.

17  BY MR. GERMAN:

18  Q     Now, Dr. Strickland, tell us then what we're seeing on

19  this Exhibit 547E?

20  A     What we're seeing on this one is just by category of the

21  various component projects.  As you see, if you can look over

22  on BMR category, it says which of the component categories of

23  the total BMR project we're looking at.  And it shows by month

24  the payments that were made from Hallmark to Monitor for that

25  component.

1  Q    And we see a number down at the bottom right, a little

2  fuzzy.  Can you read that for us?

3  A    Yes.  I believe $10,280,000.

4  Q    And that was the total fees for the entire, just fees for

5  the BMR?

6  A    Yes.  The fee portion, the agreed upon fee portion between

7  Hallmark and Monitor.

8  Q    No expenses in there?

9  A    Not in that number, no.

10  Q    Do the expenses represent the difference between the

11  contract number and the $12 million number we looked at a

12  moment ago?

13  A    Yes, they do.

14  Q    Now, with respect to the channel analysis and the

15  greetings business model?

16  A    Yes.

17  Q    We see that the billings continued to May of 2002.  What

18  was your understanding of that process?

19  A    My understanding of that process is that was a mechanism

20  to arrive at the fixed fee payments from Hallmark to Monitor.

21  And I queried whether or not those payments related directly to

22  work performed in that particular month.  And I was told they

23  did not directly relate necessarily to the work performed in

24  that month but rather that was the billing mechanism that was

25  performed by Hallmark and Monitor to have the fixed fee come

1  out at the end.

2  Q    And who provided you that information?

3  A    Mr. Strickland provided that information.

4  Q    So what is your understanding of when the work that we see

5  in the five presentations was completed?

6  A    My understanding is that the entirety of the work on the

7  greetings and channel project was completed and reflected in

8  the five presentations.

9  Q    When?

10 A    As of the date of the presentations.

11 Q    Now, did you examine the underlying documentation for the

12 data that we see on Exhibit 547E?

13 A    Yes.

14 Q    All right.  Let's go back to slide 4, please.

15       Now, I'd like to move the discussion, Dr. Serwin, to

16 the right hand side of your pie chart to the comparable

17 research, the $23 million number?

18 A    Yes.

19 Q    Where did you obtain the information that builds to the

20 $6.3 million?

21 A    That information was provided to me by Mr. Maynard of

22 Hallmark.

23 Q    Did you examine the underlying documentation, bills

24 payroll reports and so forth to build to that number?

25 A    I believe staff under my direction looked through the

1    underlying business documents that were provided to us for

2    those payments.

3    Q    I'll hand you now Exhibit 547A.  Identify that document

4    for the Court and jury, please?

5    A    Yes.  This is another schedule, Schedule B2, from my

6    updated and revised report.

7    Q    What does it reflect?

8    A    This schedule reflects the, a number of things.  It

9    reflects the, all of the underlying research that was performed

10   by Hallmark related to the information that was provided to

11   Monitor Consulting as part of the BMR project.  That's one

12   thing it has.

13         Then it has the portions of that totality of research

14   that Mr. Maynard identified was actually reflected in the five

15   Power Point presentations, which is less than all of it.  And

16   then this document also has a reflection which of the Power

17   Point presentations reflected that research.

18   Q    So the exhibit then, 547A, was prepared by you and under

19   your direction?

20   A    Yes.

21   Q    From the documents received in the case?

22   A    From the documents received in the case and from

23   Mr. Maynard.

24   Q    And Mr. Maynard.

25         With that, Your Honor, we'll offer 547A.

1          THE COURT:  547A is admitted over defendant's

2    objection.

3    BY MR. GERMAN:

4    Q    I'm not going to go through all of the details on the

5    document, Dr. Serwin.  But just so the jury and Court get a

6    sense of the format, tell us how it's laid out column by

7    column?

8    A    Well, the, on the far left what you're seeing are every

9    item of research that was performed by Hallmark that underlay

10   the research that was provided to Monitor Consulting.  And that

11   is totaled in the first bolded column which says subtotal.

12   Right there.  And that amount adds up to --

13   Q    We'll get to the numbers.

14   A    Then the next bolded column is the amount of that research

15   that was actually in the five presentations.

16   Q    You see the five presentations here to the far right?

17   A    Right.  So the second bolded which is next to subtotal is

18   the total of that particular category of research that was

19   incorporated in the five presentations.  And then to the right

20   are those five presentations to show which ones of the five

21   that research was actually reflected in.

22   Q    Okay.  And you've done that for each category of research

23   throughout the document?

24   A    Yes.

25   Q    So then let's go to the, Cindy, to the final page of the

1    document.  Page 8.

2              And so as you scroll down through the analysis,

3    tracing the, all of the research from the BMR into the five

4    presentations, what then can you see at the bottom, the

5    numbers?

6    A    So what we have under that subtotal column all the way in

7    the bottom blue line, I know it's hard to see there is the

8    total of all the research which was 10 point, approximately

9    $10.4 million.  And then the, next to it is the total of that

10   10.4 approximate, how much was in the five presentations and

11   that's $6.3 million.

12   Q    And the 6.3 million is shown where, sir?

13   A    If I can, it's in that right there.  Yes.

14   Q    Have to get a different color.  Now, let's move off of the

15   fees and the research, I'm sorry, the consulting fees and the

16   research and over to the next component of your unjust

17   enrichment analysis, the fees paid to Clipper, okay?

18   A    Okay.

19   Q    Tell us what we see on slide 5?

20   A    This is the portion of the unjust enrichment that is

21   related to fees that were received by Clipper.  Those fees are

22   in two categories.  One is the fee, it's labeled here success

23   fees or transaction fees, I believe it's in the contract as

24   transaction fees, that Clipper received as a result of the

25   successful transaction to acquire RPG.  And that is

1    $4.76 million.

2    Q    Let's stick with that one for just a moment.

3              THE COURT:  Just a moment.

4              MR. MANCHEL:  Same objection.

5              THE COURT:  Overruled.

6    BY MR. GERMAN:

7    Q    Let's stick with that left-hand side of the pie chart for

8    the moment.  And may we have Exhibit 420, please?

9              Dr. Serwin, Exhibit 420 is a stipulated or agreed

10   exhibit in the case.  Can you tell the jury what we see here?

11   What this is?

12   A    Yes.  This is, reflects the $4.76 million transaction fee

13   that was received by Clipper.  It's based on the ultimate

14   purchase price of $317,500,000 and that's calculated as

15   1.5 percent of that.

16   Q    While we're here, what is the number that we see just

17   below that, that $52,000 number?

18   A    That is the other component of fees received by Clipper

19   was the management fees related to its management and operation

20   of RPG and that is, I believe, the first payment of that.

21   Q    Let's focus on the $4.7 million and we see the footnote 1

22   out to the right there?

23   A    Yes.

24   Q    If we can skip over in the exhibit, Cindy, please, to the

25   page that has that footnote.  There we go.

1          Now, how do we know, Dr. Serwin, that the success fee

2   of $4.7 million was paid to Clipper?

3   A    Well, as reflected in this document, it was paid into the

4   bank account of Monitor Clipper Partners L.L.C.

5   Q    And this number says 4.8 million.  What is the difference?

6   A    If you go back up to that first page, there were two items

7   in footnote one.  And that is the sum of those two items of

8   footnote one.  One of them being the $4.76 million transaction

9   fee.

10  Q    If we could have the first page of Exhibit 420, please, to

11  show that.

12          So it's the 4.7 million plus this reimbursement of

13  MCP out of pocket expenses of 101,000?

14  A    That's correct.

15  Q    And that money was wired directly into Clipper's bank

16  account?

17  A    That's what the document reflects.

18  Q    Okay.  Now, back to the pie chart, please, slide 5.

19          Now, let's look at the right-hand side of the pie

20  chart, fees received to manage RPG 1.55 million.  What does

21  that represent again?

22  A    That reflects there was a contractually agreed upon

23  management fee for Clipper from RPG.  And that is the sum of

24  those management fees over the time period that Clipper managed

25  RPG.

1  Q    What documentation did you examine to derive that number?

2  A    I believe I examined the actual invoices from Clipper to

3  RPG.

4  Q    Did you prepare a schedule of that?

5  A    Yes, I did.

6  Q    I'll hand you Exhibit 547H.  Tell us what we see on 547H,

7  please, Dr. Serwin?

8  A    On here is a listing of the invoices for the management

9  fees listing them out.

10  Q    That's based on your examination of the invoices submitted

11  by Clipper to RPG?

12  A    Yes.

13          MR. GERMAN:  Offer Exhibit 547H.

14          MR. MANCHEL:  Same objection.

15          THE COURT:  547H is admitted over defendant's

16  objection.

17  BY MR. GERMAN:

18  Q    Now, the 1.55 million that we showed on the pie chart on

19  the management fees, do you see it on the schedule?

20  A    Yes.

21  Q    And the 4.7 million transaction fee we looked at earlier?

22  A    That is also on the schedule.

23  Q    For a total of $6.3 million?

24  A    Yes.

25  Q    And that $6.3 million is the Clipper fee portion of your

1    unjust enrichment analysis?

2    A    That is the portion of my analysis that is the fees

3    received by Clipper, yes.

4    Q    Did your analysis include any consideration of what

5    Clipper did with those fees after they were paid?

6    A    No, it did not.

7    Q    So I'll hand you Exhibit 547G.  Tell us what you see on

8    Exhibit 547G, sir?

9    A    This is a summary of the items that we've seen on the pie

10   chart before that had the two components of the unjust

11   enrichment, one being the two items of avoided costs and the

12   other being the fees received.

13            MR. GERMAN:  Your Honor, offer 547G.

14            THE COURT:  547G will be admitted over defendant's

15   objection.

16   BY MR. GERMAN:

17   Q    Display, please.

18            So just to recap where we are through the unjust

19   enrichment analysis, you told us about the costs incurred to

20   create research?

21   A    The cost that would have been incurred and therefore

22   avoided.

23   Q    And those are the costs of the research that are traced

24   into the five presentations?

25   A    That's correct.

1    Q    Then we see a $5 million number and that is the fees paid

2    to Monitor for the five presentations?

3    A    That is the, well, that is the 5 million is the fees paid

4    by Hallmark to Monitor Consulting and that's reflective of the

5    consulting fees that would have been incurred by Clipper and

6    were avoided.

7    Q    And then on the fees earned of the analysis we have the

8    deal fee, success fee of 4.67 million?

9    A    Yes.

10   Q    Plus the management fee?

11   A    That's correct.

12   Q    So these two numbers together were where we started in the

13   presentation, $17.6 million?

14   A    That's correct.

15            MR. MANCHEL:  May I approach?

16            THE COURT:  Yes.

17            (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

18   PROCEEDINGS WERE HAD:)

19            MR. MANCHEL:  Your Honor, you ruled they may not

20   combine these costs into the $17 million figure.  They -- to

21   pick either or.  He just presented these, if you combine these

22   two figures together 17 million.  Your rulings have been

23   consistent on this issue.  It's either or in terms of the

24   presentation the jury cannot pick both.  Now, they're looking

25   at a $17 million figure.  I don't know if it's something to

1    handle in terms of instructions, in limine instruction but I
2    wanted to raise it now for the record.
3                THE COURT:  I'm not sure I understand, Steven.  The
4    unjust enrichment consists of both avoided costs and gains.
5                MR. MANCHEL:  Correct.
6                THE COURT:  The avoided costs here were 11 million
7    the gains were 6 million dollars.
8                MR. MANCHEL:  Your Honor has ruled they have to pick
9    either.  They can't say the unjust was 17 million because
10   you've got one if not two rulings directly on this issue.  They
11   must choose one or the other.
12               MR. GERMAN:  No, that's not.  What Your Honor held in
13   the orders is that there can be no double counting, no
14   duplication of the fees.  Cited a case in the footnote said
15   some times there are, you have to separate.  But here we have
16   very carefully separated the two so there is no overlap between
17   the two components of the unjust enrichment.
18               THE COURT:  Which order are you talking about, Steve?
19               MR. MANCHEL:  I believe it's in the motion in limine
20   order.  If I can go back to the table I can double check for
21   you.
22               Here it is, Your Honor.
23               THE COURT:  He appears to be right.
24               MR. GERMAN:  I don't think so, Your Honor.  If I'm
25   thinking of the order, I don't have it handy.  It is the

1    Salisbury Laboratories footnote that you, that you cited at

2    page 6 of the expert Daubert order.  The situation where the

3    cost savings are used to value the defendant's gain.  There

4    can't be any double counting.  We're not using their cost

5    savings as their gain.  We're using their cost savings gains,

6    the fees that were paid are entirely separate from the cost

7    gain.  We're not using one as the other.  There's no connection

8    between--

9            THE COURT:  Rather than delay the trial further I'm

10   not going to rule your objection at the moment but I will rule

11   it.  If I agree with you, I will tell the jury to disregard one

12   or the other.

13           MR. GERMAN:  Or if that is the Court's ruling we

14   could deal with it in instructions.

15           MR. MANCHEL:  Thank you, Your Honor.

16              (THE PROCEEDINGS RETURNED TO OPEN COURT.)

17   BY MR. GERMAN:

18   Q    Okay --

19           THE COURT:  Just a moment.

20           Mr. Manchel, what was the document number again?

21           MR. MANCHEL:  Document 384.

22           THE COURT:  You may proceed, Mr. German.

23           MR. GERMAN:  Thank you, Your Honor.

24   BY MR. GERMAN:

25   Q    Okay.  I believe that concludes the presentation on the

1 unjust enrichment presentation, Dr. Serwin.

2 A    Yes.

3 Q    Let's move to the reasonable royalty calculations you've

4 done.  Just so everybody understands where we're going with

5 this.  Is the reasonable royalty an alternative measure of

6 damages to the unjust enrichment?

7 A    Yes, it is.

8 Q    You don't combine them?

9 A    No.  They're not combined or aggregate.

10 Q    One or the other?

11 A    One or the other.

12 Q    Okay.  Have you done this reasonable royalty kind of

13 analysis before in other trade secret cases or intellectual

14 property cases in general?

15 A    I've done it in other trade secret matters.  I've done it

16 in patent matters.  I've lectured on it.  I've actually written

17 on it.

18 Q    Let's have slide 7, please.

19         Now, just so we get a frame work here, explain to the

20 Court and jury what we see on slide 7?

21 A    What this slide does is just, I'm trying to help you

22 understand the context of this thing called a hypothetical

23 negotiation.  So what we're doing here is we're, as I said, on

24 the eve of misappropriation, so around the first of September

25 2005, we're putting Clipper, the defendants, in a room with

1    Hallmark and they're going to negotiate over a license for the

2    misappropriated trade secrets.  Each side in the negotiation is

3    going to have their own view point.  On one side we've got

4    Hallmark, who is going to be looking at this and saying, well,

5    what is going to happen?  What are we, do we anticipate

6    happening if we license these trade secrets to the defendants.

7    And as the green balloon on the left shows they could expect to

8    lose profits.

9          On the other side of the table is the defendants and

10   what are they going to be viewing with respect to obtaining a

11   license to the trade secrets.  And they're going to be viewing

12   this is going to provide financial benefits.

13         Now, what is one thing to keep in mind about

14   hypothetical negotiations that is very, very important besides

15   the date of the negotiations.  Probably everybody's negotiated

16   for a new car or a house, you know, other things.  And you have

17   your side and you know what you're willing to pay.  You don't

18   really what the other side's position is.  You're sort of

19   bargaining.  Each side has their cards close to the vest.

20   You're going to come out with an answer and both sides,

21   hopefully, will be satisfied with that bargain.  But you don't

22   really know where the other's position was.

23         That's not the rules under which we conduct this

24   hypothetical negotiations.  The cards are down.  So in this

25   particular negotiation Hallmark knows what Clipper would expect

1    to gain.  And Clipper knows what Hallmark would expect to lose.

2    All the facts are open to both sides in this negotiation.

3    Q    Now, are there different kinds of royalties that are

4    analyzed in trade secret cases or intellectual property cases,

5    generally?

6    A    Well, the royalty can take two different forms.  Royalty

7    can take the form of, we'll call it a lump sum.  So, all right,

8    we're going to give you a license.  Here's a check.  We're

9    done.  You have a license, you can do with it what you will.

10   That's one type of royalty, a lump sum royalty.

11            The other type of royalty is, okay, we'll call it a

12   running royalty.  We'll put some percentage of something and

13   you'll pay us over time.  So in many cases it's a percent of

14   sales.  And the royalty will be 5 percent of your sales per

15   year and you write the check every year.  So those are the two

16   types.

17   Q    And have you computed in this case both types of

18   royalties?

19   A    I have.  I computed the reasonable royalty as both a lump

20   sum and as a running royalty.

21   Q    I'm going to hand you, Dr. Serwin, 547F.  Tell us what

22   we're seeing in 547F, please?

23   A    Yes.  This is another schedule from my updated revised

24   report.  This is the ultimate summary schedule from that

25   report.  And on here, besides a calculation of those numbers

1  we've already looked at for unjust enrichment, there is the

2  number for what the reasonable royalty as a lump sum would be

3  and there is also a number here for what the reasonable royalty

4  as a running royalty would be.

5          MR. GERMAN:  May I approach the bench for just a

6  moment, please, Your Honor?

7          THE COURT:  Mr. Manchel.

8          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

9  PROCEEDINGS WERE HAD:)

10         MR. GERMAN:  I just noticed this exhibit did not have

11 the confidentiality stamp at the top taken off as we agreed to

12 do so I'm not going to offer it at this time.  I'd like to get

13 it cleaned up maybe later today and put it in the record.  I'll

14 just ask him what the numbers are now.

15         THE COURT:  While you're here, I'm satisfied that

16 Steven is correct, that you can't recover both for costs

17 savings and profit returned so how do you want to be handle

18 that?

19         MR. GERMAN:  Instructions.  If we go back to it, I

20 don't intend to go back to it in the testimony.

21         THE COURT:  Steven?

22         MR. MANCHEL:  I think they should be told something

23 contemporaneously that the $17 million figure has to be split

24 into two pieces.  That it can't be cumulative.  I'm happy to

25 have Charlie do that with the witness, through the witness.  I

1   don't know if it's appropriate for Your Honor to make a

2   statement at this point in terms of granting the motion to

3   strike and as a result of that speak with the jury on the

4   issue.

5          THE COURT:  I assume that you're going to be asking

6   for the larger of the two numbers.

7          MR. GERMAN:  Yes, if we have to, Your Honor.  But I

8   would like to be heard a little bit on this.  That is not the

9   way we read the order or the Salisbury Lab case.

10         THE COURT:  We'll deal with it later.

11             (THE PROCEEDINGS RETURNED TO OPEN COURT.)

12  BY MR. GERMAN:

13  Q    So, Dr. Serwin, we're looking at Exhibit 547F that I

14  handed to you and we're not going to display it at this time

15  but what are the two royalty numbers that you have computed?

16  A    The royalty as a lump sum is approximately $29.2 million

17  and the royalty as a running royalty is approximately

18  $23 million.

19  Q    We saw the $29.2 million at the beginning of your

20  presentation, right?

21  A    That's correct.

22  Q    So which type of royalty in this case do you believe is

23  the more appropriate one?

24  A    I believe a lump sum royalty is economically more

25  appropriate in this matter.

1  Q    Let's go to slide 8, please.

2         Tell us, Dr. Serwin, why it is you believe that a

3  lump sum is more appropriate analysis in the facts of this

4  case?

5         MR. MANCHEL:  Objection, Your Honor.  May we

6  approach?

7         THE COURT:  Yes.

8         (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

9  PROCEEDINGS WERE HAD:)

10         MR. MANCHEL:  The fourth bullet point, no capital

11  constraint to pay lump sum.  His testimony was that the absence

12  of capital constraint to pay the lump sum would be because Fund

13  II had assets or borrowers other than Clipper would be able to

14  borrow the money.  There is absolutely no testimony or evidence

15  in the case that Clipper would not have a capital constraint

16  and that's as a basis for his -- primarily he offered for his

17  opinion.

18         MR. GERMAN:  He will refer to Exhibit 105 which is in

19  the case already.  That's the initial offer letter from July of

20  2005.  Clipper letterhead signed by Bill Young on behalf of

21  Clipper.  It states specifically that capital or finance is not

22  an issue that we have.  He offers $305 million.  There's no

23  debt commitment in place.  There's no equity in place.  It's

24  Clipper and Clipper alone, July 2005, saying that capital is

25  not a constraint.

1          MR. MANCHEL:  That's my exact point.  That's never

2   been offered.  I'm giving the Court my word that has never been

3   offered.

4          MR. GERMAN:  It's an exhibit in the case.

5          MR. MANCHEL:  The letter has never been cited by

6   Dr. Serwin.

7          MR. GERMAN:  It's been cited.

8          MR. MANCHEL:  That it supports his argument there is

9   no capital constraint?

10          THE COURT:  You can cross-examine him on it.

11   Objection overruled.

12          (THE PROCEEDINGS RETURNED TO OPEN COURT.)

13   BY MR. GERMAN:

14   Q    Explain to the Court and jury, please, why you believe the

15   lump sum royalty is a more appropriate measure in this case.

16   A    In general from an economic point of view the reasons why

17   one may have a running royalty instead of a lump sum royalty,

18   the primary reason is a question of risk sharing.  In

19   situations where it's uncertain how valuable the licensed

20   property is going to be and how much money could potentially be

21   made from the licensed property, then it's more likely that the

22   two parties will share the risk and sharing of the risk is more

23   for a running royalty.  Because if you say, well, we'll put a

24   percent of sales on it and see how much the sales are.  If the

25   sales are big, there's a lot and if the sales are low, there's

1    a little.  So that's sharing the risk.

2           If the parties are going to be willing participants

3    in sharing that risk and if the situation related to the

4    property is more uncertain.

5           This is a situation where the second two bullet

6    points note, it's not that uncertain.  Hallmark at the time of

7    this negotiation has already incorporated the recommendations

8    and conclusions of the -- that are in the presentations trade

9    secrets that successfully changed aspects of their business

10   from incorporating those recommendations and conclusions.  And

11   as I said at this hypothetical negotiations both sides know the

12   cards are down.  So both sides know this information was

13   valuable and beneficial and it is working.

14          It's also a situation where it's not like a brand new

15   technology.  I'll go back to the hybrid car example I gave you.

16   You don't really know how many people are going to buy hybrid

17   cars or are not going to buy hybrid cars.  Think of the Chevy

18   Volt, for example, which we don't know, it didn't work as well

19   as people thought it would work.  This isn't that kind of

20   situation.  The greeting cards industry is a very stable,

21   mature market.  How many cards are sold every year is pretty

22   clear and known but by both parties here and how it may grow or

23   not grow, the overall market that this intellectual property

24   that is incorporated in the presentation trade secrets could

25   generate is known pretty well by both sides.

1    The other thing is the first bullet point which is

2  very important which is Hallmark is going to be much more risk

3  averse with respect to this license than the negotiating

4  position of Clipper and the defendant.  Because Hallmark has a

5  trade secret and a trade secret is valuable intellectual

6  property as long as it is secret.  And compared to a patent,

7  for example, if you have a patent, everybody knows what the

8  patent is.  It's published.  It's right there.  There is no

9  secret about it but there is legal protection.  Simply put, you

10 can't use my patent.  If you want to do this, you have to

11 license it or you simply can't do it.  The government comes in

12 and protects.

13    Trade secret, once it's public, not secret any more.

14 So Hallmark is licensing something that once it licenses it,

15 okay, there is a huge risk of this getting out and that's it,

16 it's gone.  And so if it turns out that from the license RPG

17 doesn't have the success, so say we're in a running royalty,

18 going to be 5 percent of sales.  And RPG doesn't have success

19 with this, okay, there's no big money to Hallmark.  It's gone.

20 It doesn't get it.  But it's trade secrets are gone.  That's

21 Hallmark's view point.  They're much more risk averse than

22 Clipper and the defendants are going to be in this negotiation.

23    The fourth point is no capital constraint.

24 Obviously, for a lump sum you have to be able to pay it.  If

25 you can't pay it, it's not likely you're going to have a lump

1    sum payment if there is no money to pay it.  So you have to be

2    able to.  And in this situation I don't see that there would be

3    a capital constraint to pay the lump sum.

4    Q    On that point, Dr. Serwin, are you saying that at the time

5    of this hypothetical negotiation, September 1, 2005, Clipper,

6    itself, could pay, or Clipper and Mr. Doctoroff, could pay

7    $29.2 million?

8    A    From what I've seen in this case it doesn't appear to me

9    that Clipper could not have obtained the money to pay the lump

10   sum.

11   Q    Let's look at Exhibit 105, please.

12        Do you recognize Exhibit 105, Dr. Serwin?

13   A    Yes.

14   Q    Tell us what it is, please?

15   A    This appears to be the first letter reflecting the first

16   bid of Clipper for RPG.

17   Q    So this letter is, was written to William Blair which was

18   the investment bank trying to sell RPG?

19   A    That's what I understand, correct.

20   Q    And in July 2005, who is making the offer?

21   A    Monitor Clipper.

22   Q    Let's look at the signature line, please, Cindy.

23        And who signed the offer letter?

24   A    That's William Young.

25   Q    Managing director of Monitor Clipper Partners L.L.C.?

1    A    Yes.

2    Q    Any other parties to that, no CC, no other parties

3    addressed?

4    A    Not that I see on the letter, no.

5    Q    Let's go back a page, please.

6            Question of financing?  Why is the financing

7    paragraph relevant to your belief that Clipper did not face a

8    capital constraint at the time of the negotiation?

9    A    That according to this letter Clipper was representing

10   that they did not have any problem obtaining necessary

11   financing for a $305 million payment for RPG.  And so based on

12   that it doesn't seem that they would have a problem if they

13   needed to borrow and finance the $29.2 million lump sum royalty

14   that they couldn't have obtained those funds.

15   Q    Back to the first page, please.

16           Just looking for the 305.  Where they offer

17   $305 million in the first offering?

18   A    I believe so.

19   Q    Second page, please?

20   A    Yes.  The range of 290 to 305 million.

21   Q    And that was in July of 2005?

22   A    That's correct.

23   Q    July 2005, there was obviously no deal to buy RPG, was

24   there?

25   A    No, there was not.

1  Q     No equity commitment from investors?

2  A     Not that I'm aware of, no.

3  Q     No binding contract commitment from lenders?

4  A     Not that I'm aware of, no.

5  Q     And RPG at that time was still independently owned by

6  Mr. Keiser and Mr. Friedman?

7  A     That's what I understand, yes.

8  Q     So at the time, July 2005, when Clipper and only Clipper

9  submits this proposal, it's the only party at the bargaining

10 table with Hallmark?

11 A     Well, at the bargaining table in September 2005, but yes.

12 Q     So.  Let's go blank.

13        Let's start then in the hypothetical negotiation on

14 September 1, 2005 with the Clipper side of the table.  Okay?

15 A     Okay.

16 Q     What are the relevant factors that Clipper, on its side of

17 the table, is going to consider in this negotiation?

18 A     Clipper is going to consider the benefits that are going

19 to be received by virtue of being able to have and use the five

20 presentation trade secrets in the ownership and management of

21 RPG.  That's the key thing and how that, those presentation

22 trade secrets are going to provide a benefit over and above any

23 other benefit associated with owning and operating RPG.

24 Q     Now, Clipper, itself, is not going into the card business,

25 is it?

1   A    No, it's not.

2   Q    So what are the economic benefits that Clipper and only

3   Clipper takes into account at the bargaining table?

4   A    At the bargaining table Clipper is taking account of all

5   of the benefits that are going to accrue from the ownership and

6   management of RPG utilizing the presentation trade secrets in

7   essentially the same way that Clipper is bargaining to purchase

8   RPG.  It is taking into account all of the benefits of both

9   having RPG and the inherent organic benefits of RPG, a company

10  that is in business with greeting cards that has a certain

11  amount of sales and a certain amount of profit.  And it is

12  putting in a bid to buy that at a total of, you know, hundreds

13  of millions of dollars and incorporated into that bid, the

14  benefit that it foresees will accrue to these presentation

15  trade secrets.

16  Q    So just as Clipper, in offering a purchase price in July

17  of 290, $305 million, considering all of the economic benefits

18  on the buy side, it would consider all of the economic benefits

19  on the licensing side as well?

20  A    Yes.  It's the same symmetrical relationship that when

21  Clipper is out there being the party that is negotiating to buy

22  RPG, it's considering all of the benefits in that price.  And

23  when it's negotiating a license it would be considering the

24  same comparable, all the benefits from the intellectual

25  property.

1           MR. GERMAN:  May we have Exhibit 108, please?

2           THE COURT:  Mr. German, if you reach a breaking point

3    in the next 5 or 10 minutes, let me know.

4           MR. GERMAN:  This is a good place.

5           THE COURT:  All right.  We're going to take our

6    morning break a little bit early.  We'll see you back here in

7    about 15 minutes.  Please keep an open mind until you've heard

8    all of the evidence.  We'll be in recess.

9                               (Witness temporarily excused.)

10          (The following proceedings were had OUT OF THE

11   PRESENCE AND HEARING OF THE JURY:)

12          THE COURT:  One of our jurors was uncomfortable.

13   We'll see you in 15 minutes.

14          (The following proceedings were had OUT OF THE

15   PRESENCE AND HEARING OF THE JURY:)

16          THE COURT:  So you won't be alarmed, Juror No. 4 is

17   going to move up to the front row because the glare is too

18   sharp.  Juror No. 5 will move up to the front row.  They'll be

19   in same order.  She's just going to move away from the glare.

20   Okay, Eva.

21          (The following proceedings were had IN THE PRESENCE

22   AND HEARING OF THE JURY:)

23          THE COURT:  Please be seated.

24          Mr. German, you may resume.

25                     KENNETH SERWIN, RESUMED

CONTINUED DIRECT EXAMINATION

BY MR. GERMAN:

Q    Dr. Serwin, we were just starting to talk about how in the hypothetical negotiation on the Clipper side of the table the total economic benefits would be evaluated.  So what do you assess that Clipper's point of view was for what it intended to do if RPG could be acquired?

A    My understanding from the documents is that the intention was that RPG would be managed and operated for approximately 5 years and then a sale would be effectuated of RPG.

Q    In that frame work then you have evaluated or tried to quantify the benefits that Clipper would take into account two ways?

A    I have.

Q    What are they, very generally?

A    Very generally, there is one way is what is called an analytical approach.  What the analytical approach is, is trying to look at, in this case, look at RPG and the value of RPG without the benefit of the, all of the IP that Monitor Clipper would have anticipated it could bring to the transaction for RPG that others could not.

       And then the other way is to do what is called a discounted cash flow analysis which is actually to try to look at what was the anticipated additional dollars that Clipper would have anticipated would have resulted from employing the

1  intellectual property that it anticipated it could bring to RPG

2  and doing what we call bringing that back to present value so

3  you have monies that you would earn in the future and what are

4  those monies worth to you today.  Because money today is worth

5  more than money in the future.

6  Q    So let's go to slide 9, please.

7       Tell us, Dr. Serwin, what we're looking at on slide

8  9?

9  A    This slide is reflecting that there were two rounds of

10  bidding for RPG.  And this slide is looking at two of the

11  bidders, Monitor Clipper and Kelso.  As I understand at the end

12  of the day in the second round bidding, those were the only two

13  bidders who actually bid for RPG.  In the first round there

14  were more than just these two bidders but this is comparing

15  those two bidders in the first round and the second round and

16  showing the differential between the Monitor second round bid

17  and the Kelso second round bid of $87 million.

18            THE COURT:  Just a moment.

19            MR. MANCHEL:  Objection, Your Honor.

20            THE COURT:  Step up.

21            (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

22  PROCEEDINGS WERE HAD:)

23            MR. MANCHEL:  The hearsay issue, Your Honor, on the

24  two bids.  He said he understands.  There is no evidence in the

25  case that the only other bid in the second round was Kelso.  He

1    can say that he knows Clipper has a bid and Kelso has a bid but

2    he's trying to create the impression from the bid that Kelso

3    was the next best bid or only other bid.  There's no evidence

4    in the case.

5         MR. GERMAN:  He's going to explain that.  I'm really

6    surprised at this.  Kelso is the only other bid.  They

7    subpoenaed the documents from Blair.  30,000.  We all got them.

8    We then looked at those documents and saw there were eight.

9    There were initially 15 in the first round.  Eight were invited

10   to go to the Chicago meet --

11        THE COURT:  Blair's records?

12        MR. GERMAN:  Yes.

13        THE COURT:  Says Kelso is the second bidder?

14        MR. GERMAN:  Shows eight firms were invited to the

15   second round.  We then contacted and subpoenaed the eight.  And

16   once that had -- documents produced them to us, Kelso is the

17   only other bid.  And he's got a schedule on that.

18        MR. MANCHEL:  That's the issue.  And we looked at

19   every single deposition where this has been raised we have

20   objected to it there is no surprise here.  We objected each

21   time.  If my memory serves me correctly, and I could be wrong,

22   there is actually a memorandum in one of the documents that

23   talks about the possibility of there being other bidders.  It

24   is absolutely true Kelso was a second bidder.  They can compare

25   the two bids.  But what we object to is unduly prejudicial

1   based on hearsay is the notion it was the only other bid or

2   next best bid. There is no evidence in the case of that.

3           MR. GERMAN: There is evidence.

4           THE COURT: I'm going to allow it. Overruled.

5               (THE PROCEEDINGS RETURNED TO OPEN COURT.)

6   BY MR. GERMAN:

7   Q    Dr. Serwin, how do you know or on what do you base the

8   statement that you made that Kelso and Clipper were the only

9   two bidders in the final round?

10  A    I have been provided a large amount of documentation that

11  I understand was produced in this matter from both William

12  Blair, the investment banker that handled the transaction for

13  RPG, related to the bidding for that. And I've also reviewed,

14  been provided and reviewed documentation with respect to a

15  number of parties that were invited to participate in the

16  second round bidding and I've looked at all of that

17  documentation. And what I found is the only second round bid

18  that was actually provided to William Blair in addition to the

19  Monitor Clipper bid was that of Kelso.

20  Q    You prepared a schedule to that effect, sir?

21  A    I believe so, yes.

22  Q    I'll hand you Exhibit 547N. Ask you to please identify

23  547N for the Court and jury, please?

24  A    Yeah. This is schedule E1 from my updated and revised

25  report.

1    Q    What does it show?

2    A    What this schedule has is from --

3    Q    Don't give us the contents.  Just tell us.

4    A    This shows who the first round bidders were and what their

5    bids were and the second round bidders.

6    Q    And is this the documentation on which you have based your

7    testimony we see on slide 9?

8    A    Yes.

9          MR. GERMAN:  Your Honor, offer Exhibit 547N.

10          THE COURT:  Defendant objected to 547N.  It will be

11    admitted over defendant's objection.

12    BY MR. GERMAN:

13    Q    We don't need the footnotes but blow up the top, please.

14    Thank you.

15          All right.  So here is the initial bid and final bid.

16    Explain to us what we're seeing there?

17    A    Yes.  In the left-hand side are all of the initial bids.

18    These are the parties from the documentation that I reviewed

19    that provided initial bids.  And then on the right-hand side

20    are three parties.  There is Monitor Clipper that actually

21    provided a second round bid of $305 million.  There is Kelso,

22    who actually provided a second round bid of $218 million.  Then

23    additionally there was a third party, Fremont Alaira, that from

24    the documentation I reviewed said that they were prepared to

25    provide a second round bid of between 215 and 220 but did not,

1     in fact, provide that bid.

2     Q     And the initial bids, that Exhibit 105 that we looked at a

3     moment ago, the initial Clipper letter 290 to 305 or 280 to

4     305?

5     A     Yes.

6     Q     That was in July?

7     A     That's correct.

8     Q     And the second round bids were when?

9     A     In September.

10    Q     In September?

11    A     Yes.

12    Q     And the hypothetical negotiation is then between those two

13    on September 1?

14    A     Yes, it is.

15    Q     Let's look at slide 10.

16            Explain to the Court and jury, Dr. Serwin, what we

17    see on slide 10.  You mentioned earlier the analytical method.

18    Explain your methodology?

19    A     That's correct.  This is a graphical representation, the

20    analytical method.  By way of example think about the

21    following.  Suppose that you are going and you're buying a car.

22    And there is one car that has a navigation system.  And

23    otherwise it's whatever model car and it's got the same trim

24    levels of leather, whatever kind of stereo system, etc.  And

25    let's say, you know, the price of that car is $24,000.  And you

1    want to know how much of that $24,000 you're paying for the

2    navigation system.  Let's just say you don't have the invoice

3    in front of you that actually lays out that.  You want to know.

4    But what you do know is that there is another car right next to

5    it, exactly the same.  It's the same color, same model, same

6    year, same leather, doesn't have a navigation.  It cost 20,000.

7    How much do you think you're paying for the navigation system?

8    You're paying the $4,000 difference.  That's the one item

9    that's different between them.

10           That is the logical frame work we're working with

11   here.  That Kelso is a private equity firm that is viewing as a

12   market basis and made a bonafied offer for RPG based on what it

13   was able to acquire.  RPG, the organic company with its

14   business and the profits that its business was going to

15   generate under the management of Kelso private equity firm.

16   They bid $218 million.  So taking that as the value of RPG

17   without the extra IP that Clipper believed it could bring to

18   RPG, Clipper bid $305 million.  It was buying the same exact

19   thing that Kelso was buying for 218 and it had this extra,

20   anticipated having this extra intellectual property that it

21   could put to this and the returns that it would get from having

22   that extra intellectual property.  And it bid 305.  The

23   difference, the $87 million, is the value of that extra

24   information.

25   Q    Are you saying, Dr. Serwin, that the $87 million

1   difference between these two bids is attributable to the five

2   presentations?

3   A    No, I'm not.

4   Q    Are you saying that's some portion of the 87 million?

5   A    Some portion of the 87 million is attributable to the five

6   presentations.  Because the $87 million reflects everything

7   that Monitor Clipper thought at the time that it would be able

8   to bring to RPG that is over and above what Kelso would have

9   thought it could bring.

10          Now, if you remember back to that first slide with

11  the big black circle and the small circle with the five

12  presentations in it.  At the time Clipper, it's reasonable to

13  anticipate they would have thought we're going to get

14  everything we need from Monitor Consultants.  That's our

15  approach.  That's our investment strategy.  We leverage off

16  what Monitor Consulting could bring.  Monitor Consulting did

17  this big project with Hallmark.  We anticipate we'll get

18  everything and we'll be able to get the value of everything.

19          Now, what, what I valued is just the five

20  presentations which as I said is a subset of what the totality

21  of what it might have anticipated bringing.  And so the

22  $87 million is going to be inclusive of everything it would

23  have anticipated, not just the five presentations.

24  Q    I'm sorry to interrupt.  But how do you know or --

25          THE COURT:  Mr. German, just a moment.

1          MR. MANCHEL:  May we approach?

2          THE COURT:  Yes.

3          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

4    PROCEEDINGS WERE HAD:)

5          MR. MANCHEL:  Move to strike the last answer.  He

6    just suggested to the jury Clipper anticipated getting all of

7    the trade secrets generated by Hallmark.  The first slide

8    Clipper anticipated getting all of it, everything.  He referred

9    specifically back to that first slide that showed only the

10   presentations at issue in this case.  And then all the other

11   presentations that supposedly have been done in the case.  His

12   testimony in front of the jury he believed Clipper anticipated

13   getting all of those terms but he's only seeking damages for

14   this.  I move to strike.  It's beyond his expertise.  It has no

15   relevance to the case.  It's unduly prejudicial.  And he's not

16   here to testify on that.

17         MR. GERMAN:  I think he was overstating.

18         THE COURT:  All right.  I'll sustain the objection.

19   I'll tell the jury to disregard.

20         (THE PROCEEDINGS RETURNED TO OPEN COURT.)

21         THE COURT:  Ladies and gentlemen, I've sustained the

22   defendant's objection to the witness's statement that Monitor

23   Clipper anticipated getting all of Hallmark's trade secrets and

24   you're instructed to disregard that testimony.

25   BY MR. GERMAN:

1    Q    Dr. Serwin, on what do you base your conclusion that some

2    portion of the $87 million bid differential is attributable to

3    the five presentations?

4    A    The conceptual frame work under which I approached this

5    was to look at the position that Monitor Clipper as a

6    negotiating party would have been in at the hypothetical

7    negotiation.  And at the hypothetical -- or I'm sorry.  Let me

8    take that back.  This is the, the situation when they bid for

9    RPG, and when they bid for RPG they anticipated or would likely

10   have anticipated having more than they had in their hands.  And

11   that the totality of their bid is reflective of the totality of

12   everything they may have anticipated.

13   Q    And what do you base that on, that observation?

14   A    Well, I base that on the documents of Monitor Clipper

15   reflecting why they bid what they bid for RPG.

16   Q    Let's go to the next slide, please.

17        This was admitted previously in the case, Exhibit 55.

18   Is this one of the documents?

19   A    Yes, it is.

20   Q    And what do you infer from Exhibit 55.

21   A    What I infer from Exhibit 55 is why Monitor Clipper was

22   willing to pay more than Kelso was willing to pay.  The

23   statement that they, Monitor Clipper, believe that their

24   consulting arm has unparalleled experience, the consulting arm

25   being Monitor Consulting, in the greeting card industry

1    including work they have done for Hallmark.  So that is

2    everything they have done for Hallmark.  That because of that

3    they, Monitor Clipper, can derive growth and produce higher

4    cash flow from RPG than others.  The others being the other

5    private equity firms that bid for RPG.  Therefore, this

6    statement of why they bid what they bid wasn't based simply on

7    five presentations.  This was based on Monitor Consulting's

8    totality of experience in the greeting card industry from the

9    totality of the work they did for Hallmark.

10   Q    And you accept the notion, I take it, that Monitor

11   Consulting, so long as it's not using Hallmark information can

12   consult with Monitor Clipper?

13   A    As long as it's not using anything that is proprietary to

14   Hallmark it's not illegal to use, yes.

15   Q    Let's look at the next slide, please.

16        This was admitted previously as Exhibit 112 from

17   Mr. Yoon at Clipper.  What do you infer for your damages

18   analysis from Exhibit 112?

19   A    This is, again, reflective of this bid that they're making

20   isn't a bid that is only incorporating five presentation trade

21   secrets.  This bid is incorporating the fact that Monitor

22   Clipper would have anticipated having all of the benefit of all

23   of the work that Monitor Consulting did for Hallmark.  And

24   that's more than just the five presentations and that's why.

25   Q    Okay.  Let's go to --

1          THE COURT:  Just a moment.

2          MR. MANCHEL:  Same objection, Your Honor.

3          THE COURT:  Well, the exhibit says what it says.

4     I'll allow it.

5          MR. MANCHEL:  I object, Your Honor, to the witness's

6     characterization of the exhibits and what they mean.

7          THE COURT:  The jury will disregard the witness's

8     characterization of it but the exhibit stands for itself.

9     BY MR. GERMAN:

10    Q    My question, Dr. Serwin, is not asking you to interpret

11    the exhibit.  What did you take from the exhibit and include in

12    your analysis?

13    A    In my analysis I took from the exhibit that the

14    $87 million was the value of more than just the five

15    presentation trade secrets.

16    Q    Let's go to the next slide, please.  Let's go to the next

17    one.  Okay.

18         Now explain to the Court and jury what we see here as

19    you start to separate the bid differential, separate the five

20    presentations out of that $87 million?

21    A    Yes.  The first thing is that Monitor Consulting is a

22    renowned international consulting firm that has inherent

23    intellectual property and competencies that could be brought to

24    bear separable and apart from what they know about Hallmark.

25    In fact, Hallmark, in the greetings card industry, hired

1    Monitor Consulting to bring to bear those competencies and that

2    intellectual property that Monitor Consulting had separate and

3    apart from the greetings industry.  As I understand it before

4    Monitor Consulting did the work for Hallmark, they hadn't

5    worked in the greetings industry.  So clearly they had

6    something that could be brought to bear to the greetings

7    industry.  And it had value to a greetings card company.

8            Now they're going to be bringing that to bear,

9    Monitor Clipper is owning and operating RPG and they have their

10   relationship with Monitor Consulting, that likely will be

11   brought to bear and it's the value of that intellectual

12   property and competencies separate and apart from what they

13   knew about Hallmark that needs to be separated from the

14   $87 million because that would be incorporated in the

15   $87 million.  And I estimated the value of that Monitor IP is

16   labeled there, $11.7 million.  So first we take that off.

17   Q    And that is, what you're saying is there could be Monitor

18   value brought to the Clipper side of the negotiation, the same

19   kind of value that Hallmark paid $12 million for for the BMR?

20   A    That's correct.

21   Q    Let's go to the next slide.

22           So if you take off from the 87 million the

23   $11.7 million that you attributed to the appropriate Monitor

24   Consulting relationship, what is the next step in breaking that

25   $87 million down?

1    A    Okay.  Well, then we've got about $75 million after we

2    take the 11.7 million off.  Now, the five presentations were

3    only part of the BMR project.  And Monitor Clipper knew that

4    Hallmark had the entire BMR project.  So we need to separate

5    out any potential value from the rest of the project from the

6    five presentations that are being valued.  And I allocated the

7    value of the presentation trade secrets out of the total by

8    taking the dollar amounts of consulting fees that were for the

9    greetings and channel project, relative to all of the BMR fees.

10   So 5 million divided by 12 million is 41.5 percent.  So I

11   estimated that the presentation trade secrets are 41.5 percent

12   of the amount after the Monitor IP was taken off.

13   Q    Okay.  Next slide, please.

14        Then you conclude what?

15   A    Then I conclude from this method of looking at the

16   benefits that what Clipper would have been taking into account

17   at the negotiating table is expected benefits of

18   $31.25 million.

19   Q    Now, you told us that in addition to this bid differential

20   analytic method that you've just taken us through, you also did

21   what you referred to as discounted cash flow analysis?

22   A    That's correct.

23   Q    And we're still talking about Clipper on its side of the

24   hypothetical negotiating table thinking of the benefits that it

25   can derive in the negotiation?

1  A    That's correct.

2  Q    So let's go to the next line.  Tell us what we see here?

3  A    Well, when you're doing an evaluation of anything you try

4  and look at the different approaches if it's possible, if you

5  have the information available to you to do different

6  evaluations.  Another common method to evaluating intellectual

7  property, if you have information available to you, is, well,

8  how much profit is expected to be derived from the intellectual

9  property over a period of time and discount that back to

10 present day and how much in a lump sum is that worth.

11         So what I did was I looked and said is there anything

12 in the record in this matter that would indicate to me the

13 beliefs of Monitor Clipper at the time of the hypothetical

14 negotiation that would enable me to do a discounted cash flow

15 method, enable me to actually look at dollars and profits and

16 discount from that.  And based on my review of the

17 documentation in the case I found that it was possible to do so

18 because there was indications that Clipper expected that they

19 would be able to double the market share of RPG as a result of

20 the value that was being brought by this unique IP.

21 Q    So what are, explain to the Court and jury what are the

22 numbers we see on your slide 17?

23 A    Sure.  So if you look at the first five bars that add up

24 to $91.5 million or arrive at 91.5, at the time that Monitor

25 Clipper was looking at RPG, the bid time, the revenue of RPG

1    was $91.5 million.  So to double that revenue would be doubling

2    another 91.5 million on top of whatever they're going to get.

3         Now I did not assume that they would double it

4    immediately, the day they acquire it all of a sudden it is

5    $83,000,000 -- $183,000,000 revenue.  I assume that that

6    additional amount over and above what RPG is expected to earn

7    by what Kelso expected them to generate will gradually increase

8    by years.  So I took the 91.5 and divided it by 5.  So in the

9    first year the additional amount of revenue would be

10   $18.3 million.  In the second year the additional amount of

11   revenue would be 36.6 and so on for the five years until in the

12   fifth year the additional amount of revenue that would be

13   derived from all of the unique IP that Clipper could bring

14   would be 91.5.

15        What I then did, those are revenue bars.  Then what I

16   did was say, well, how much profit would be derived from that

17   additional revenue?  So in the first year how much profit from

18   18.3 million additional revenue?  In the second year how much

19   profit from the 36.6 million additional revenue?  And so each

20   of those first five bars were then converted to a profit.  And

21   so that's the first five years of additional profit.

22        Additionally, at the end in the fifth year when

23   Clipper intended that RPG would be sold, RPG would be sold and

24   it would be a firm that would have $91 million a year and the

25   associated profit with that, additional, over and above what

1    others would expect.  And so what a discount cash flow does is

2    say what is the value of that?  How much more would they be

3    able to sell RPG for?  Then what would be expected Kelso would

4    be able to sell it for?  And that would be 145,800,000 more.

5          So then we take that, and to be clear that profit

6    that's the additional profit that they would get.  And then we

7    take that and we take the profit from those first five bars and

8    we bring all of that back to present day and that's the

9    additional value at the time of the negotiation that Clipper

10   would have anticipated for the unique IP that it would bring.

11   Q    Dr. Serwin, here's what we have marked as 547L.  Ask you

12   to, please, explain to the Court and jury what we see in this

13   exhibit?

14   A    This exhibit has the two different approaches at arriving

15   at the expected benefit from the unique IP that Monitor Clipper

16   would have anticipated could bring to RPG under the two

17   different methods.

18   Q    This is the actual quantification of the two approaches

19   you just described?

20   A    That's correct.

21          MR. GERMAN:  Your Honor, we offer 547L, please.

22          MR. MANCHEL:  One moment please.

23          Your Honor, we object.

24          THE COURT:  547L will be admitted over defendant's

25   objection.

1        MR. MANCHEL:  May I state the basis for the objection

2   on the record?  Objection is hearsay.

3        MR. GERMAN:  Your Honor, is that overruled?

4        THE COURT:  Yes.

5   BY MR. GERMAN:

6   Q    Let's, please, display 547L.  Again, we don't need the

7   footnotes but just give us the top half.

8        So, Dr. Serwin, we were just looking at the bar

9   graphs of the five year revenues starting at $18 million

10  increase over the base, culminating in a doubling of revenues

11  in year 5.

12  A    That's correct.

13  Q    Then you describe the sale price where $145 million of

14  additional sale price attributable to those revenues is

15  calculated into the factors Clipper would be considering in the

16  negotiation?

17  A    That's correct.

18  Q    And when you bring that back to present value, what,

19  explain how that works to get this $82 million number we're

20  looking at?

21  A    Well, you take the additional profit that will be in each

22  of these years in the future and you bring that back.  That's

23  what is called a discount rate to the present time.  And

24  bringing that back to the present arrives at a value of

25  $82 million.

1    Q    So you're adding, after you apply these discount factors,

2    you add them up to become $82 million?

3    A    That's correct.

4    Q    And in the prior method the differential method that

5    $82 million number compares to the $87 million number, is that

6    correct?

7    A    That's correct.

8    Q    On both you have subtracted $11.7 million of what you call

9    Monitor IP?

10   A    That's correct.  And what this particular schedule stops

11   at subtracting 11.7 from both of them.  The next step is to

12   then apportion these total to the five presentations by the

13   41.5 percent.

14   Q    Let's pause there for just a moment.  Explain to us, you

15   said that the expectation was that RPG would be sold again at

16   the end of five years.  What do you base that on?

17   A    Based on the representations that I've seen in the record

18   of the desires and expectations of Clipper to exit from the

19   transaction by selling RPG within five years.

20   Q    Selling to whom?

21   A    Selling to a strategic buyer in the market.

22   Q    And what does that mean?  Strategic buyer?

23   A    A strategic buyer is an entity that is not necessarily

24   just buying the dollars of profit that this particular or any

25   particular purchase would provide for.  But it's also taking

1  into account that by buying that particular entity, whatever it

2  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

5  xxxxxxxxxxxxxxxxxxxxx

6  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9  Q    xxxxxxxxxxxxxxxxxxxxxxxxxx

10           xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

12  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14  xxxxxxxxxxxxxxxxxxxxxxxxxx

15  A    xxxxxxxxxxxxxxxx

16  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17  xxxxxxxxxxxxxxxxx

18  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21  xxxxxxxxxxxxx

22  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
          xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxx
          xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

     MR. MANCHEL:  xxxxxxxxxxxxxxxxxxx

      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

     MR. MANCHEL:  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxx

     MR. GERMAN:  If I may, it's really kind of apples and
oranges.  What we've been talking about previously on lost
profits was whether they should be permitted to establish that
Hallmark didn't lose any sales or customers or profits from the
theft of the trade secrets.  And since we're not making a claim

1    for damages for that.  And that's what you ruled.

2            Now, here we're talking about hypothetical

3    negotiation.  And it's a frozen point in time, September 1,

4    2005.  What do the parties do at that time?

5            THE COURT:  Don't hit the bench.

6            MR. GERMAN:  What do the parties at that time have in

7    their mind to try to hammer out this license?  And at that time

8    just like they thought RPG was going to be a success and it

9    wasn't.  At that time Hallmark would have believed that they

10   were successful, we would not be.  And that's the dynamic back

11   and forth in the license.  It's not a lost profits claim for

12   him to now say but that didn't happen.  That's looking, that's

13   the Monday morning quarterback looking back.  Didn't happen.

14   But at the time of the negotiation setting the price, that's

15   what they would have expected.

16           MR. MANCHEL:  I think it goes to credibility.  He's

17   not saying Hallmark expected that.  I'm saying I believe

18   Hallmark would expect that I want to say how could Hallmark

19   have expected that do you know for a fact, sir, there are no

20   actual losses from the use?  Your expectation, the center piece

21   of your expected losses is not reliable for the jury.

22           THE COURT:  I think the problem with your argument,

23   Steven, this is a hypothetical negotiation.  It assumes a lot

24   of things that didn't turn out to be true including the fact

25   RPG was going to be successful and it wasn't.  I think that

1    it's okay for him to make that assumption at the time of the

2    hypothetical negotiation.  What happened afterward doesn't make

3    any difference as to the negotiations itself.  So I'm going to

4    deny the objection.

5            MR. MANCHEL:  Can I, one other issue, under that

6    logic then going back to this nxtMove document from 2006 which

7    is the doubling document we've objected to under that same

8    logic, they ought to be able to say that in 2005 something that

9    occurred in 2006 is part of what the expectation would be.  I

10   mean, I'm willing to --

11           THE COURT:  What is the date of the double document?

12           MR. GERMAN:  2006.

13           MR. MANCHEL:  I think it's November, full year beyond

14   their hypothetical negotiation that's the basis for their

15   doubling argument.

16           MR. GERMAN:  Not the only basis.

17           MR. MANCHEL:  I'll demonstrate on cross in his report

18   and at his deposition that is the only basis offered.  But my

19   point is so I don't have to come back, I'll do it on cross but

20   my only point is if that's the line and I don't want to have to

21   keep coming back up, that's the line, I'm okay with it.  But I

22   ask it apply to, you know, quote, unquote, our expectations as

23   well.

24           THE COURT:  What other evidence of the doubling is

25   there, Charlie?

1    MR. GERMAN:  Charles Yoon testified he believed they

2    would be able to double revenues and there are several

3    documents that speak of a market share movement from 1 to

4    2 percent or 2 to 4 percent, 5 or 6 of them.  Dr. Serwin was

5    asked in his deposition, challenged in his deposition, show me

6    the document.  And he did.

7    THE COURT:  All right.  If that objection were made I

8    would overrule it and allow you to cross-examine.

9    Oh, step up.  As you folks have sensed from the

10   pattern of my rulings I'm going to allow pretty broad

11   cross-examination of both experts in this case.

12   (THE PROCEEDINGS RETURNED TO OPEN COURT.)

13   BY MR. GERMAN:

14   Q    Dr. Serwin, I'm going to hand you now Exhibit 547K.  And

15   please explain to the Court and jury what you see here?

16   A    This is Schedule D2 to my updated revised report and this

17   reflects the mechanics of the calculation that arrived at the

18   $67 million.

19   MR. GERMAN:  Your Honor, move 547K.

20   THE COURT:  Over defendant's objection, 547K is

21   admitted.

22   BY MR. GERMAN:

23   Q    Okay.  In the black space you see the $67 million,

24   correct?

25   A    That's correct.

1 Q    And just explain to the jury at the top line we see the

2 same revenue numbers that we saw in the previous exhibit when

3 you were on the Clipper side of the negotiation?

4 A    Right.  Those are the anticipated increases in RPG

5 revenue.

6 Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8 A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

12 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16 Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17 A    xxxxxxxxxxxxxxx

18 Q    xxxxxxxxxx

19       THE COURT:  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22       THE WITNESS:  Absolutely.  This is a question of what

23 would have been anticipated in around September 1, 2005.

24 BY MR. GERMAN:

25 Q    Are there any other factors in your analysis, Dr. Serwin,

1    that on the Hallmark side of the hypothetical negotiation that

2    would be of concern to the Hallmark negotiators?

3    A    Yeah.  The $67 million is a question of actually

4    quantifying an expected amount, as I said expected amount of

5    lost profit from the actual gain that RPG would have been

6    anticipated to make.

7         Now, these trade secrets would enable or could

8    possibly enable RPG to go out to Hallmark customers and compete

9    for those customers.  In the case where they win those

10   customers, those are the increased sales and the anticipated

11   losses from Hallmark.  But there would likely be situations

12   where providing that information and competing, say for CVS

13   Pharmacies, that RPG wouldn't win but CVS would get on the

14   phone to Hallmark and say, hey, we need a better deal than

15   we're getting.  We're getting strong competition and they're

16   telling us that, you know, you're overcharging us.  And in

17   those circumstances it's likely that in some of those sales

18   Hallmark would maintain so RPG wouldn't get sales.  Hallmark

19   wouldn't have losses directly attributable to those sales which

20   were calculated in 67 but Hallmark would likely anticipate,

21   well, we're going to have to lower our prices to that customer

22   and so we'll lose other profit that way.  That's not

23   incorporated in the $67 million but that would be incorporated

24   in Hallmark's mind.

25   Q    Let's go to slide 19, please.

1        So, Dr. Serwin, you have taken us to both sides of
2    the negotiating table, the Clipper side and its economic
3    expectations and the Hallmark side and its expectations.  Tell
4    us what we see on slide 19.
5    A    So on slide 19 you have the two left-hand balloons there,
6    the expected benefit balloons from the bid differential and the
7    RPG growth and sale approach are the 87 and the 82 from the
8    Clipper side of the table that we talked about.  And on the far
9    side is that quantification of anticipated lost profit on the
10   Hallmark side and where I've determined the reasonable royalty
11   would be based on the $82 million benefit that Clipper would
12   have anticipated that the trade secrets would or that all of
13   the unique IP would benefit and then break that down to the
14   five presentations.
15   Q    If you had done the same computation taking off the
16   Monitor IP and then allocating down to the five presentations,
17   over in this column under the bid differential approach, well,
18   did you do that computation?
19   A    That computation we saw in the earlier slide.  That was
20   31.25 million.
21   Q    And between the 31 and the 29.2 why did you select the
22   29.2?
23   A    I selected the 29.2 because it would be the more
24   conservative number.
25   Q    Go to the next slide, please.

1    So, Dr. Serwin, at the conclusion of the hypothetical

2  negotiation, what is your opinion of a reasonable royalty that

3  Hallmark would demand and then Clipper would agree to?

4  A    It's a lump sum royalty of 29.2 million.

5  Q    Do you hold that opinion, Dr. Serwin, to a reasonable

6  economic certainty based on the record and your review of the

7  record in this case?

8  A    I do.

9        MR. GERMAN:  That's all I have.

10       THE COURT:  Mr. Manchel.

11       MR. MANCHEL:  Thank you, Your Honor.

12                    CROSS-EXAMINATION

13 BY MR. MANCHEL:

14 Q    Hello, again, Dr. Serwin.  We've met before?

15 A    We have.

16 Q    Let's start with some of the things you said then I'll

17 move into some of my prepared comments.  Let me ask you first

18 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22 xxxxxxxxxxxxxxxxxxxx

23 A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24 Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
1   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4   A    xxxx

5   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11  xxxxxxxxxxxxx

12  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20  xxxxxx

21  A    To the extent that RPG was already winning and this is a

22  known fact to the bidders for RPG, meaning both Kelso and

23  Monitor Clipper, then that's incorporated into both of their

24  bids.  And so this is not additional growth of RPG that would

25  be generated from the unique IP that Clipper would anticipate
```

1    it could bring to RPG.  But instead that's the organic growth

2    of RPG.  And so this, everything that I've calculated is on top

3    of that.

4    Q    Sir, is your answer to my question yes?  I had a very

5    simple question.  RPG was winning, wasn't it?  Yes or no?

6    A    Winning is a relative term.

7    Q    Well, it was winning at Walgreens, right?

8    A    I don't know that that is winning.  May be their

9    interpretation.

10   Q    So you don't think that RPG going into 1200 stores to

11   replace Hallmark is winning?  That's how your definition,

12   following your definition of winning?

13   A    I didn't have an opinion of winning or losing in my

14   calculation.

15   Q    Now, there was another way you could have calculated what

16   Hallmark anticipated losing which is that for every year for

17   four or five years before the RPG deal RPG was going up almost

18   11 percent a year, isn't that right?

19   A    I don't have the exact calculations of every year's

20   growth.  They were growing.

21   Q    They were growing 10.9 percent, isn't that right, sir?

22   Does that number sound familiar to you?

23   A    They were growing at a rate approximately that.

24   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

1  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

5  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

7  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10 A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

12 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13 xxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14 Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16 xxxxxxxxxxxxxxx

17 A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18 Q    Wouldn't you have wanted to know whether, in fact, that

19 happened?  Just let me finish.  Wouldn't you have wanted to

20 know if that in fact would have happened in the 5 years that

21 RPG grew?

22 A    Not necessarily.  It wouldn't necessarily matter.

23 Q    Okay.  Now, you said, I tried to write it down as best I

24 could, how much profit is expected to be derived?  That's one

25 of the expectations, right?  How much profit?

1  A   On the second approach it's a calculation of the profit,

2  yes.

3  Q   You were very, very careful though not to say who expected

4  the profit, isn't that right?  You didn't name anybody, did

5  you, sir?

6  A   I'm not sure I understand your question.

7  Q   When you said that the profit would be expected, you

8  identified the profit that would be expected, you did not say,

9  as best I can recall, that that expectation would be that

10  Clipper would get the profit, isn't that right?

11  A   What I said was that at the negotiating table Clipper

12  would be negotiating with Hallmark and the result of that

13  negotiation would be a royalty that took into account that

14  expected profit.

15  Q   Sir, do you think that Clipper, Clipper paid $29 million

16  out of its own pocket, do you think on September 1, Clipper

17  would have an expectation of making profit on that money?

18  A   I didn't do a calculation that related to who exactly was

19  going to, at the end of the day who would have the empty

20  pocket.

21  Q   Let's be clear about this so the jury can take this in

22  steps.  No. 1, you never concluded, you've never told this jury

23  that Clipper would have expected a profit if Clipper had to pay

24  $29 million, isn't that right?

25  A   That's correct.

1  Q    No. 2, you actually did identify in your report and at

2  your deposition you identified who would expect a profit if

3  they were forced to pay $29 million, didn't you, sir?

4  A    I'm not sure exactly that those two things were combined.

5  Q    Sir, your $29 million figure was used in your second

6  report and at your deposition, right?

7  A    The 29.2 million is the result of the negotiation between

8  Clipper and Hallmark.

9  Q    Sir, I'm asking you, I know that's what you say.  I'm

10  asking you because I think you brought other people to the

11  party.  So I'm asking you a question about expected profits.

12  You just represented to this jury that the deal can't happen

13  unless the party to the license expects a profit, right?

14  A    What I said was that at that negotiation Clipper would be

15  the negotiating party and Clipper would negotiate a royalty

16  that is based on the totality of the benefits.

17  Q    Well, let's be clear, sir, because there's a lot of money

18  at stake.  Clipper is not negotiating.  Clipper is the party,

19  correct?

20  A    Clipper is the negotiating party.

21  Q    Clipper is the party to the contract.  This jury may not

22  assume that anybody else is party to these negotiations, isn't

23  that right?

24  A    In the same way that Clipper was negotiating the purchase

25  of RPG, the $305 million that it bid in the second letter and

1    the $317 million that was ultimately paid, Clipper negotiated

2    that.  And Clipper would also have negotiated the royalty in

3    the same symmetrical relationship.

4    Q    So your theory, sir, is the numbers on which your theory

5    is based is Clipper sits at the table negotiating for others,

6    right?

7    A    I don't know.  I don't have an opinion on that.

8    Q    Now, which is it?  Are they the party to the license or

9    are they negotiating?

10   A    They would be the party to the license.

11   Q    So let's go back to my first question.  They're the party

12   to the license.  No one else, right?

13   A    The defendants in the case are the parties to the license.

14   Q    Mr. Doctoroff is a party to the license?

15   A    Yes.

16   Q    Do you conceive of a scenario under which Adam Doctoroff

17   could pay $29 million and make a profit?

18   A    Monitor Clipper was a party to the license.  What I have

19   seen is that Monitor Clipper had access to capital and could

20   pay the $29.2 million.

21   Q    Sir, I know you want to jump around to these different

22   issues.  I'm just asking about profit.  I'll get to your --

23            MR. GERMAN:  I object to the argument in the

24   question.  I know it's cross-examination but.

25            THE COURT:  I'm going to, as I've indicated to you,

1    I'm going to allow broad cross-examination but, please, don't

2    argue with the witness.

3              MR. MANCHEL:  Thank you, Your Honor.

4    BY MR. MANCHEL:

5    Q    I'll get to the capital constraint.  I promise.  Right now

6    I'm talking about your conclusion of expected profit.  Let's

7    establish for the jury, I think we just did, the only party to

8    this license on this side is Clipper and, in your view, Adam

9    Doctoroff, correct?

10   A    That's correct.

11   Q    Can you tell me, strike that.  When you were deposed you

12   said, just as you did today, that 29.2 million was the right

13   price, correct?

14   A    That's correct.

15   Q    And you said that the reason 29.2 million was the right

16   price was because the beneficial owners of the income stream

17   would pay that amount of money, isn't that right?

18   A    I said that the profit stream would accrue to the owners

19   of that profit stream.

20   Q    Sir, you said the beneficial owners would pay the

21   29.2 million, didn't you, sir?

22   A    I don't recall whether I used those exact words or not.

23   Q    Go to the Serwin deposition, please.  Would you go to,

24   looks like to page 258, line 10.  Blow up lines 10 through

25   looks like 25.  Go one more page, Jeff.  It's line 29, page

1    258, line 29.  The bottom of this page right here.

2              Well, now, sir, to be clear, regardless of the entity

3    that generates the revenue, the owners of the profit stream

4    that would be derived from that -- go to the next page.

5    Derived from the revenue are the parties who would be paying

6    the royalty.  Do you see that?

7    A    I do.

8    Q    That's what you said at your deposition, right?

9    A    That is in response to that question there.

10   Q    Well, sir, did you say that the parties who get the

11   revenue would be the parties that pay the price?  That's your

12   testimony, right?

13   A    That was the testimony in response to your question there,

14   yes.

15   Q    Let me ask you a question now here.  Isn't it true, sir,

16   that under your theory the party that would pay the

17   29.2 million are the parties that would get the revenue and

18   profits?

19   A    That is what my response was there, yes.

20   Q    I'm asking you now.  Now that you've seen your response,

21   let's forget that question for a second.  I'm asking the

22   question.  Isn't it true, sir, that your $29.2 million number

23   is based on the assumption that the parties who get the profit

24   stream and the revenue stream would pay the 29.2 million?

25   A    That may be the ultimate resolution.

1  Q    Is that a yes, sir?

2  A    That is what I said in my deposition.

3  Q    And you're saying it again now?

4  A    That's what I said in my deposition so I'm not changing my

5  testimony.

6  Q    So the answer is yes?

7  A    Yes.

8  Q    Okay.  Now, Clipper is not one of the parties that gets

9  any of the revenue or profit, isn't that right?

10 A    I don't know that that's true.

11 Q    Sir, when a greeting card is sold, when the revenue comes

12 in from the sale of an RPG card, who gets the sale money?

13 A    That's, the sale of the card is RPG.  What I said there is

14 the owners of the profit stream.

15 Q    I'll get there, sir, I promise.  My question to you was

16 when RPG sells cards, RPG gets that revenue, right?

17 A    When RPG sells cards, RPG gets that revenue.

18 Q    And you know Clipper doesn't get that revenue, right?

19 Just RPG, right?

20 A    RPG gets that.

21 Q    Under your theory RPG would somehow use these trade

22 secrets and become so profitable that it would be sold for a

23 lot of money at some point, right?

24 A    The theory is that at the hypothetical negotiation at

25 which Clipper is negotiating a license with Hallmark that this

1  would be anticipated by both parties to the negotiation and

2  that the royalty that would result from that negotiation would

3  be based on those anticipations.

4  Q    My question to you, sir, is according to you, the two

5  people sitting at the table, Hallmark and Clipper and Adam

6  Doctoroff would expect that RPG would do really, really well

7  and sales revenues would go up and up and up and RPG would be

8  sold in five years for a lot more money than it was purchased

9  for, right?  That's the assumption?

10 A    Yes.

11 Q    Okay.  You then have to assume that Clipper thinks in that

12 scenario Clipper is going to make a profit, right?

13 A    What I would assume is that Clipper is negotiating and

14 they are the party negotiating this royalty and that the result

15 of that negotiation is going to be this royalty.

16 Q    Okay.  Now, we're back to Clipper as the negotiator, sir.

17 I'm asking about Clipper as the party to the license?

18 A    Clipper is also the party to the license.  There was no

19 one else at the time of this negotiation.  There was Clipper.

20 There was no other entity because there had been no

21 transaction.

22 Q    Well, there was Fund II, right?  Fund II existed?

23 A    Fund II existed.  I don't know that there was any

24 commitments or responsibilities of Fund II with respect to this

25 at the time of the negotiation prior to the transaction

1  purchase of RPG.

2  Q    Sir, you know full well that Fund II is the 80 percent

3  owner of RPG, isn't that right?  You know that, right?

4  A    After the transaction took place that is who the ultimate

5  owner was.

6  Q    And you know that on day one the assumption that Clipper

7  would have had sitting at the table is that Fund II was going

8  to be the one buying RPG, isn't that right?

9  A    At the table Clipper is doing the negotiating.

10  Q    I understand Clipper is doing the negotiating, sir.  My

11  question to you is when Clipper is sitting at the table doing

12  the negotiation, Clipper's expectation is Fund II would be

13  doing the buying, correct?

14  A    I'm not in their head.

15  Q    Well, you know Fund II bought it.  You know Fund II had an

16  $800 million fund, right?

17  A    Yes.

18  Q    And you know that Fund II is the one that went out and

19  paid the hundred million dollars and you know that Fund II is

20  the one that went out and got the financing for $200 million,

21  right?

22  A    The latter part, I'm not sure who got the financing.

23  Q    So you think Clipper is sitting on September 1 not knowing

24  any of that?  Not having those expectations?

25  A    It's reasonable to suggest that they would have had those

1    expectations.

2    Q    Correct.  And Clipper also knows that in your scenario

3    when these trade secrets are supposedly used and the revenue

4    goes up and the price goes up in 5 years, that when that is

5    sold in this hypothetical world, when that sold the money goes

6    to Fund II, what percentage of Fund II is Clipper, sir?

7    A    I know they were a small percentage.

8    Q    If I suggest to you that even if we use the $29 million

9    price, if Clipper is sitting there at that moment, what is

10   Clipper's percentage?  It's under 2 percent, isn't it, sir?

11   A    I believe that Clipper's ultimate ownership of Fund II is

12   under 2 percent.

13   Q    And Clipper's ultimate indirect ownership of RPG was what,

14   sir?  Do you remember?

15   A    I don't.

16   Q    It's 1.4 percent, isn't that right?

17   A    I remember that percentage.

18   Q    What is 1.4 percent, sir, of $29.2 million?

19   A    I don't have a calculator with me.

20   Q    If I suggest to you that it's $406,000 would that sound

21   about right?

22   A    That's probably correct.

23   Q    So sitting at the table for itself and apparently

24   negotiating for others for this hypothetical license, the

25   expectation of Clipper would have been that if 29 million is,

 1    in fact, the right price, its piece, its price would be

 2    1.4 percent of that or $406,000, right?

 3    A    I don't know that that would be what they were thinking.

 4    Q    Well, in fact, sir, the only thing you know is that the

 5    29.2 million would be paid by other people who are not in this

 6    case, isn't that right?

 7    A    I didn't do a determination of who would be the ultimate

 8    pockets that that would come out of.

 9    Q    Well, you don't have to do a determination, sir.  The

10    beneficial owners of the profit and the revenue do not include

11    Clipper, isn't that right?  You used the word beneficial

12    owners.  Doesn't include Clipper, does it?

13    A    I think you just said that they're incorporated in there

14    by their ownership.

15    Q    Well, they're incorporated as a limited partner of that

16    giant fund, right?

17    A    I think all of the legal arrangements and contractual

18    arrangements between all of the various lettered parties in

19    this are outside of the scope of my analysis.

20    Q    Well, no, sir, they weren't outside of the scope of your

21    analysis.  You were given instructions by Hallmark's counsel

22    what to do about all of this, weren't you?

23    A    The scope of my expertise is not with respect to the legal

24    structure of private equity or their various holdings and

25    investment companies and funds and etc. and I did not make any

1    opinion one way or the other on that.

2    Q    Sir, you're a PhD in economics from UCLA.  Are you telling

3    this jury that you couldn't figure out precisely what Clipper

4    owned indirectly of RPG?  You could figure that out, right?

5    A    I didn't say that.  I said that understanding this complex

6    legal structure is something that is not what an economist does

7    and I didn't do that.  I asked counsel for instruction on that.

8    Q    Well, again, I like to be clear because there is a lot at

9    stake here.  You could have figured out the 1.4 percent, isn't

10   that right?  I mean, I figured it out.  I'm not a PhD.  You

11   could have figured it out, right.

12            MR. GERMAN:  I object to that question.

13            THE COURT:  Sustained.

14   BY MR. MANCHEL:

15   Q    You could have figured out the 1.4 percent, couldn't you?

16   A    I don't know if I could have or not.  I didn't do that

17   analysis.

18   Q    All you had to do is figure out how many limited partners

19   there are in Fund II.  How much Fund II has.  And how much

20   Clipper put in, right?  That would tell you exactly what their

21   interest is.

22   A    I don't know.  You represented a way to calculate it.  I

23   didn't do that analysis.

24   Q    I know you didn't do it.  I'm agreeing with you.  My

25   question is you could have, right?

1  A    I don't know that I could have or not.  I didn't do it.

2  Q    The reason you didn't do it is because Hallmark's lawyers

3  told you not to do it.  Isn't that right?

4  A    No, that's not right.

5  Q    Well, what Hallmark lawyers told you was, we're going to

6  see this all throughout your testimony as I walk you through my

7  prepared statements.  What Hallmark's lawyers told you to do

8  was every single time, every time that there was any question

9  of money and who owed what money, you were to assume that

10  Clipper was liable for it even though others got it, isn't that

11  right?

12  A    I was working under the assumption that Clipper was liable

13  for the damages in this case.

14  Q    Well, specifically, sir, they told you, the Hallmark

15  lawyers told you that when you get up and testify you are to

16  make no difference between Fund II, RPG, RPGI, RPGI Holding.

17  They're one in the same, right?

18  A    I don't agree with your characterization of telling me how

19  to testify.  They didn't tell me how to testify.

20  Q    Do you think -- I'm sorry?

21  A    I was, my analyses were performed in a way that did not

22  take a distinction and make a distinction between those various

23  parties in the analyses.

24  Q    Your analyses were formed without making a distinction

25  between, that's because the Hallmark lawyers told you to do

1  that, correct?

2  A    What I asked was whether or not my analyses should be

3  performed on the basis of drawing such a distinction.  I was

4  told my analyses shouldn't.

5  Q    Sir, you didn't ask.  You know, let's be simple about

6  this.  You know that Fund II, the companies that make up Fund

7  II are legally different from Clipper, right?  You know that?

8  A    That's a legal distinction which is outside of the scope

9  of my expertise.

10  Q    Sir, I asked you a question at your deposition.  We'll get

11  to it this afternoon if we have to.  I asked you, do you

12  understand that Fund II is legally distinct from Clipper?  And

13  you said yes.

14  A    Yes, it's legally distinct from Clipper.

15  Q    So it's not a legal -- you know that, right?

16  A    It's its own legal entity.

17  Q    It's its own legal entity.  And you know the same is true

18  for RPG, right?  RPG is not Clipper.  It's a separate legal

19  entity, right?

20  A    Yes.

21  Q    You know the same is true for RPGI and RPG Holdings,

22  right?

23  A    I believe they are, yes.

24  Q    They're all different, separate companies, right?

25  A    They all have their own legal status.

1   Q    But you were told, I want to be clear so the jury

2   understands how you formed your opinions.  You were told by

3   Hallmark's counsel to treat them all as one and the same and

4   ignore all those legal distinctions, weren't you?

5   A    For the purpose of my damage calculations.

6   Q    Right.  So all your damage calculations are based on you

7   ignoring the differences between these companies, correct?

8   A    You know, that's a broad statement.  My determination of

9   the ultimate damages did not take those distinctions into

10  account.

11  Q    Let's be real clear, again, sir.  Your unjust enrichment

12  damages, the avoided costs, didn't matter to you.  Those were

13  the words you used.  Didn't matter to me who, in fact, saved

14  the costs?  Isn't that right?

15  A    I think what I said was at the end of the day I didn't

16  draw a distinction of what the final empty pocket would have

17  been.

18  Q    Sir, did you say in plain English, it didn't matter to me

19  who avoided the cost?

20  A    I don't know if I used exactly those words.  If I did,

21  they're in there.  I don't know.

22  Q    We'll look at them.  Then as regards the realized gains,

23  that $4.8 million, your testimony was, didn't matter to me who

24  got that benefit, isn't that right?

25  A    Who ultimately received it.

1    Q    Didn't matter to you, right?

2    A    Under the assumptions that I performed my analyses I

3    identified the amount of fees that were received.

4    Q    No, sir.  You identified the amount of fees that went out.

5    You didn't care who ultimately received the benefit, isn't that

6    right?

7    A    No.  They went out to Monitor Clipper.  And what the

8    ultimate distribution of them, after they went out to Monitor

9    Clipper, was not part of my analyses.

10   Q    Are you going to tell the jury that that was your

11   testimony at your deposition, sir?

12   A    I'd have to look at exactly what you're speaking to but my

13   analysis didn't take into account the ultimate disposition of

14   those fees.  It took into account where they went.

15   Q    Did you read your deposition, sir, before you came to

16   testify today?

17   A    I did.

18   Q    When is the last time you read it?

19   A    A few days ago.

20   Q    Now, you've testified a lot as an expert witness, isn't

21   that right?

22   A    I've testified a few times.

23   Q    And the rules, you understand the rules are, as your

24   attorney said to you right in the beginning, you give us your

25   report, right?

1  A    Yes.

2  Q    So you write it all out and we read it, right?

3  A    I provided my report.

4  Q    And then we send our reports back, right?

5  A    There are reports from other experts, yes.

6  Q    There are reports from other experts on your report,

7  right?

8  A    The reports that came back had rebuttal of my report and

9  other things.

10  Q    So you did receive reports about your report, correct?

11  A    Yes.

12  Q    And then you have to submit to a deposition, right?

13  A    I did give a deposition in this matter, yes.

14  Q    At your deposition you're suppose to answer all of my

15  questions and tell me all of your theories, right?

16  A    I answered your questions.

17  Q    You're not suppose to come here today and talk about new

18  stuff, right?  If I asked you something in your deposition you

19  said it's A.  Not suppose to come in here and say it's now B,

20  right?

21            MR. GERMAN:  Object.

22            THE COURT:  Sustained.

23  BY MR. MANCHEL:

24  Q    Sir, I'll ask you again.  When you talk about the wiring

25  that went out, did you care who ended up with that benefit when

1  you did your analysis?

2  A    Care isn't, wouldn't put that into it.  My analysis didn't

3  take into account what happened after the wire went into the

4  MCP bank, no.

5  Q    You also said, talked about the bids.  And you said,

6  again, I wrote this down as best I could.

7         Jeff, would you pull up, please, I believe it's

8  Plaintiff's Exhibit 547N.

9         Now, sir, when you were brought to this, as best as I

10  could take my notes, you said, parties were invited to

11  participate in a second round bid, right?  So there was a first

12  round then parties were invited to participate, right?

13  A    As I understand it, yes.

14  Q    And you based your bid differential testimony on, I think

15  you said your review of all of the bid materials and

16  depositions that had been collected from the various bidders,

17  right?

18  A    That were provided to me, yes.

19  Q    Well, were you not, do you think you got the documents and

20  depositions of all the bidders or do you think you created an

21  opinion with less than all of the documents?

22  A    I received what I received and I created my opinion based

23  on what I received.

24  Q    I want to be clear.  Do you think your opinion is based in

25  fact on you having looked at the documents from the other

1  bidders and read their depositions?

2  A    What I was provided was what I used for my opinion.

3  Q    I don't know what you were provided, sir.  So my question

4  is do you believe that before you came up with this bid

5  differential theory that you looked at the documents produced

6  by the other bidders, that you looked at the documents from the

7  other bidders, they're all listed there, and you looked at the

8  depositions of those bidders who were deposed, did you look at

9  all of that before you came up with your opinion?

10 A    I looked at everything that I was provided.  I can't look

11 at things that I don't have.

12 Q    I know that, sir.  But what I'm saying, I don't know what

13 you were provided.  Do you remember, let me ask you this.  Were

14 you provided with the documents from the bidders and the

15 depositions of the bidders?

16 A    What I was provided is referenced in my expert report.

17 Q    Well, your expert report and we went through this at your

18 deposition, lists thousands of documents, doesn't it?

19 A    There were thousands of documents in this case.

20 Q    And you remember me asking at your deposition how can I

21 tell from the thousands of documents what you actually looked

22 at?  Do you remember me asking you that?  You just read it a

23 couple days ago.

24        MR. GERMAN:  Could we have page and line, please?

25        MR. MANCHEL:  I don't have it in front of me right

1   now.  I'm asking if he remembers me asking that question.

2           THE WITNESS:  I think you did ask questions about the

3   documents.

4   BY MR. MANCHEL:

5   Q    So I can't tell.  My question is can you tell me now, yes

6   or no, that you looked at the documents submitted that you

7   received from these bidders and the depositions of the bidders

8   before you came up with your $87 million theory?

9   A    Well, I can tell you that the initial bid information was

10  taken from a William Blair document that provided that

11  information.  And that the footnotes to this exhibit, which

12  aren't on this, indicate where I got the other information that

13  I got.  And I do recall reading depositions from the second

14  round, I or my staff, from the second round bidders whose

15  depositions were provided to us.

16  Q    You remember reading the deposition of that top bidder

17  there, the one that paid the most money of everybody, Fremont?

18  A    I believe we reviewed that.

19  Q    I think the man's name is Williamson?

20  A    I don't recall sitting here, off the top of my head.  But

21  I recall we reviewed that deposition.

22  Q    Do you remember what he said about why Fremont dropped out

23  of the bidding?

24  A    I don't have a direct recollection at the moment.

25  Q    Remember he said that Fremont dropped out of the bidding

1  because he thought it would go very high above $300 million?

2  Do you remember hearing that?

3  A    If that was in there, I don't have that in front of me.

4  Q    Okay.  And if he said that, that would be another bidder

5  thinking that the price of RPG would be over $300 million?

6  Isn't that right?

7  A    Not necessarily.  That said that the most they were

8  willing to pay as reflected in their willingness to put a

9  second round bid in that they did not actually submit was

10  between 215 and 220.

11  Q    Let me see if I can refresh your recollection about what

12  was said.  This is the deposition of Mark Williamson,

13  September 8, 2011, page 142, line 17.  Well, I think that --

14          MR. GERMAN:  I'm going to object.  It's not

15  impeachment.  It's not his testimony.

16          THE COURT:  He has indicated that he reviewed it, so

17  I'll allow cross-examination on that issue.  Proceed.

18          MR. MANCHEL:  Thank you, Your Honor.

19  BY MR. MANCHEL:

20  Q    Well, I think that, you know, we knew it was 280 to 310.

21  So cleared the first round.  So I suspect we felt that

22  something in that range would be necessary to buy at this

23  point.

24  A    You know, it sounds like he's talking about the first

25  round bid, not the second round bid.

1  Q    He said so cleared the first round?

2  A    I'd have to read the entire context of that.  I know he's

3  referencing the first round.

4  Q    You started to go a little while back to the question of

5  what we call, well, what you called capital constraint.  Do you

6  remember the little bullet points said there would would be no

7  capital constraint?

8  A    I'd have to look on another exhibit.  No capital

9  constraint, what the exact words were.  But I didn't feel that

10  there would be a capital restraint problem.

11  Q    I want to be clear now, you testified today that you

12  didn't think there would be a capital constraint problem for

13  Clipper, right?

14  A    Yes.

15  Q    And let me show this jury, to show them there would be no

16  capital constraint was the first indication of interest letter

17  from July, correct?

18  A    That is what was put in front of me, yes.

19  Q    Now, in your deposition when I asked you why there

20  wouldn't be capital constraint, you said there wouldn't be

21  capital constraint because the beneficial owners other than

22  Clipper would have the wherewithal to pay, isn't that right?

23          MR. GERMAN:  Could I have page and line on that,

24  please?

25          MR. MANCHEL:  I'll get to it in a moment.

1          THE COURT:  Let's show him the testimony.  Let's be
2     fair.
3          MR. MANCHEL:  Jeff, turn to Serwin deposition, page
4     247, line 5.  I'm sorry, Jeff.  Question starts at 246, line 23
5     and runs from lines 23 to 25 and then from lines 1 to 8.
6          QUESTION:  Would you take a look at paragraph 137,
7     please?  About halfway down you write MCP would not face a
8     significant capital constraint as evidenced by its ability to
9     finance the majority of the RPG acquisition.  Do you see that?
10          I do.
11          What do you mean by that?
12          That were to be the case that RPG would need to
13     finance its acquisition, it had the ability to do so as
14     evidenced by the fact that it was able to finance it.
15          Right.
16     A    Yes.
17     Q    So at your deposition --
18          MR. GERMAN:  Your Honor, for completeness I think he
19     ought to read the next question and answer, put it in context.
20          THE COURT:  Let's put it in context.  Read the next
21     question and answer, please.
22          MR. MANCHEL:  Well, actually, we can go all the way
23     down the page.
24          So the next one is Question --
25          Could I first ask a question about the question I

1    asked, Your Honor?

2           THE COURT: You can ask the question about the

3    question you asked but then fill in the blanks.

4           MR. MANCHEL: Then I will go to the next. Thank you,

5    Your Honor.

6    BY MR. MANCHEL:

7    Q    So the first response we see here is that RPG would be the

8    one financing it, correct?

9    A    If that were to be the case, RPG would need to finance the

10    acquisition, yes.

11    Q    RPG is not Clipper, right?

12    A    No, RPG is not Clipper.

13    Q    So that position doesn't solve the capital constraint

14    issue for Clipper, correct?

15    A    I'm trying to determine what I meant by the its. There

16    were a lot of its in there.

17    Q    Okay. We'll keep going. Your counsel would like, I'll

18    keep going. So let's go now, Jeff, to lines 9 through 25.

19           QUESTION: Well, sir, what you're talking about in

20    paragraph 137 is the running royalty analysis, correct?

21           Yes. While I'm talking about it, what type of form

22    of the royalty would take?

23           QUESTION: Right. And the form being addressed is

24    when you talk about would not face a significant capital

25    constraint that's as regards the running royalty, correct?

1          ANSWER:  No.  It's with respect to, if so a lump sum

2    is a large up front payment so it was a question of would a

3    licensee have the wherewithal to pay the large amount up front.

4    If they don't have the wherewithal then the negotiation, it's

5    hard to imagine that it would result.  You know, if you tell

6    me, you know, I've got a thousand dollars in the bank and I

7    need to pay 10,000 for something and the bank won't loan me the

8    9,000, it's just not going to happen.  So in terms of liquidity

9    constraint that's the context I'm thinking of.  And the fact

10   that Monitor Clipper had relationships with large banks,

11   investment banks, such as Credit Swiss First Boston and was

12   able to finance its acquisitions, it had access to liquidity

13   and it was a borrower that banks like Credit Swiss First Boston

14   saw as a viable debtor from their point of view.

15          Do you see all of that?

16   A    I do.

17   Q    Then I said to you, is Monitor Clipper Partners the

18   borrower for Credit Swiss?

19          And you said, I imagine Fund II was.  And as I

20   mentioned throughout this, they're -- my analysis does not draw

21   distinction between Monitor Clipper Partners L.L.C. and Fund

22   II.

23          That's what you said, right, sir?

24   A    Yes.

25   Q    And that's true.  When you were talking about capital

1    constraints, you didn't draw a distinction between Fund II and

2    Monitor, isn't that right?  Clipper, isn't that right?

3    A    What I said was Clipper has the ability through its

4    relationship with banks that it can get loans.  That's one

5    thing.

6    Q    Who could it get a loan for, sir?  Using your terminology,

7    who did it get the loan for?

8    A    It didn't get a loan.

9    Q    It didn't get a loan?

10   A    That isn't what I was saying.  I was saying whether it had

11   the ability to get a loan to finance a lump sum royalty.  This

12   is not about what actually happened.  This is about would they

13   have been able to get a loan to pay that amount of money, if

14   necessary.

15   Q    Jeff, would you highlight on page 248, would you bring up

16   the next, we didn't get to read it, the next line 17 through

17   19?

18         So even when it comes to borrowing, you don't draw a

19   distinction?

20         No, I don't.

21         That was part of your analysis, right, sir?

22   A    In the ultimate analysis did not draw distinctions between

23   MCP and Fund II, no.

24   Q    Sir, that was how you did your analysis was by not drawing

25   a distinction, isn't that right?

1    A    For the overall analysis, I didn't draw a distinction, no.

2    Q    And you didn't draw a distinction because Hallmark's

3    lawyers told you not to draw a distinction, isn't that right?

4    A    I was under the instruction that there was not a

5    distinction to be drawn for purposes of damages.

6    Q    In fact, sir, you have to draw a distinction, don't you?

7    A    I don't know that.

8    Q    You don't know, sir, in testifying today you have to say

9    only the benefits and the royalties that would have been

10   received or paid by Clipper and no one else?  You don't know

11   that?

12   A    The testimony I'm giving today is what the reasonable

13   royalty that would have been negotiated by Clipper and would

14   have been agreed to by Hallmark and what that is.

15   Q    My question to you, sir, is do you understand that to this

16   jury the only thing you're suppose to talk about is Clipper and

17   Adam Doctoroff, when we talk about who got what benefit and who

18   would pay what?

19   A    What I've done is I've prepared an analysis of the

20   hypothetical negotiation that would have been between MCP and

21   Doctoroff on one hand and Hallmark on the other and what the

22   resolution of that negotiation would have been in terms of a

23   reasonable royalty.

24   Q    I agree with you.  And the resolution of what that would

25   have been is a price that folks, besides Clipper, who are not

1  in this case would have paid, isn't that right?

2  A    I didn't do an analysis of where the ultimate dollar would

3  come from.

4  Q    Right.  You didn't do an analysis of whether Clipper would

5  pay it, did you, sir?  It's going to come from somewhere,

6  right?

7  A    I did an analysis of what the royalty that would be agreed

8  upon would be.

9  Q    Well, let's be clear about this.  You did an analysis of

10 what you thought the price should be.  Isn't that right?

11 A    The royalty is the price for the license.

12 Q    But you never concluded and you've offered no opinion

13 that, in fact, Clipper would agree to pay that price, isn't

14 that right?

15 A    In terms of where it ultimately at the end of the day

16 would have come from, I don't have an opinion as to that.

17 Q    Well, in fact, sir, you did have an opinion.  Your opinion

18 was it would be paid by the beneficial owners of all of the

19 profits and revenue, isn't that right?

20 A    I'd have to look back at that section you were talking

21 about.  But my analysis is based on that at the time the

22 parties in the negotiation are Clipper and Doctoroff and

23 Hallmark.  There's going to have to be a royalty paid and that

24 is what the royalty is.

25 Q    And that is exactly what your opinion is, sir.  Your

1    opinion is there's going to have to be a royalty paid and then

2    you determined that the people that have to pay that royalty or

3    would pay that royalty were not going to be Clipper or Adam

4    Doctoroff, isn't that right?

5    A    At the ultimate resolution at the end of the day, I think

6    we looked at my testimony already.

7    Q    Which is the beneficial owners would pay, right?

8    A    Yes.

9    Q    So that's Fund II, RPG, RPGI and RPG Holdings, right?

10   A    I didn't look at that distinction.

11   Q    You didn't even look to see which of the companies would

12   pay it but it's amongst those companies, right?

13   A    That wasn't part of my analysis.

14   Q    Now, you were retained by Hallmark, in your words, to be

15   an economic expert, correct?

16   A    That is what I do, yes.

17   Q    And you said to the jury in response to a question that

18   was phrased to you that in essence that you, let's take it in

19   two pieces.  You do a lot of testifying, don't you, sir?

20   A    I do economic testimony as part of my employ, yes.  I do

21   other work that doesn't involve testimony as well.

22   Q    You said in response, if I remember correctly, to your

23   counsel's question that you testified a number of times about

24   reasonable royalties, correct?

25   A    I've testified in deposition about them, yes.

1   Q    You've never testified in a case, have you, sir?

2         MR. GERMAN:  Objection.

3   BY MR. MANCHEL:

4   Q    I'm sorry.  At trial.

5   A    At trial, I don't believe that I've testified in trial

6   about a reasonable royalty, not yet, no.

7   Q    Then you testified that you wrote a lot about economic

8   damage analyses, correct?

9   A    I don't think I said a lot.  I think I said I have written

10  on it.

11  Q    You have written on economic damages, haven't you, sir?

12  A    I have at least one publication out on it.

13  Q    And we looked at your C.V.  You have a lot of articles,

14  too, right?  Publications and working papers and presentations,

15  there's all sorts of stuff there, right?

16  A    There is a difference between publications and

17  presentations.  And the publication that I have is with respect

18  to the issues surrounding royalties is the one, Don't Feed the

19  Trolls.  That is the publication related to it.  And then I've

20  done presentations in the past.

21  Q    Sir, the jury hasn't yet had the opportunity to see your

22  resume.  Is it fair to say that substantially all, all except

23  maybe one of your publications, presentations and like are

24  about patents?

25  A    Your characterization of my publications that are listed

1  on here, there are 4 publications, 3 of which are as an

2  economist.  They don't relate to damages at all.

3  Q    I'm sorry.  I meant to talk only about the ones that go to

4  damages?

5  A    I've done a lot of work on patent in the context of

6  reasonable royalty.  Reasonable royalty comes up very

7  frequently in patents.  And it's a very debated and talked

8  about topic and I've been involved in that conversation.

9  Q    But reasonable royalties for patents are different than

10  reasonable royalties for trade secrets, right?

11  A    Patent infringement is patent infringement.  Trade secrets

12  is trade secrets.  As I understand it a remedy in a trade

13  secret matter can be a reasonable royalty and I performed a

14  reasonable royalty calculation using methodologies that are

15  commonly used in patent and they are commonly used, transferred

16  over to trade secrets.

17  Q    Now, the defendant in this case, the corporate defendant

18  is Monitor Clipper Partners L.L.C., right?

19  A    And Mr. Doctoroff.

20  Q    I said, I'm sorry, the corporate defendant?

21  A    Okay.

22  Q    You understand that, right?

23  A    I take your representation.

24  Q    Do you have any reason to believe that Monitor Clipper is

25  not the defendant in this case?

1  A    No, I don't.  You're putting a qualifier on it.  It's not

2  my expertise so if they're the corporate defendant, they're the

3  corporate defendant.  I don't know that Doctoroff is not a

4  corporate defendant.  I don't have an understanding.

5  Q    So do you understand that the two defendants are Monitor

6  Clipper Partners and Adam Doctoroff, right?

7  A    Yes.

8  Q    And you're not an expert, you're not here to testify as an

9  expert on how private equity firms work, right?

10  A    I am not.

11  Q    And you're not here to testify on how private equity firms

12  raise money or capital, right?

13  A    I'm not.

14  Q    And you're not here to testify on how private equity firms

15  sponsor funds like Funds II, correct?

16  A    I am not.

17  Q    Now, when we look at your economic analysis, I want to

18  make sure I understand what trade secrets you claim are

19  supposedly at issue in this case.  For purposes of your

20  economic damages analysis, Hallmark's lawyers told you to

21  assume Clipper misappropriated and used all of the trade

22  secrets embodied in the presentations at issue in this case,

23  isn't that right?

24  A    That is probably what I wrote.

25  Q    Do you have any reason, I'm happy to show you your

1 testimony, sir.  Do you have any reason to believe that's not

2 true?

3 A    No.

4 Q    Okay.  And you discussed at length with Hallmark the trade

5 secrets that Hallmark thinks are in the presentations, correct?

6 A    I wouldn't characterize it that way.  I understand that

7 the compilation that is the five presentations provide certain

8 benefits and that they would be benefits to others who would

9 use them and they're benefits to Hallmark.

10 Q    I'm asking a slightly different question, sir.  I know you

11 want to call these things compilations but my question to you

12 is, you talked about, you talked with Hallmark about what you

13 call the trade secrets that are in the presentations, isn't

14 that right?

15 A    The presentations embodied trade secrets.

16 Q    Jeff, could you pull up, please, page 69, lines 16 through

17 19.

18         ANSWER:  Well, I discussed at length the

19 presentations with the individuals at Hallmark to ask them what

20 are the trade secrets that you allege are in here.

21         Do you see that?

22 A    I see.

23 Q    That's your answer?

24 A    Okay.

25 Q    Is that the truth, sir?

1    A    That is what I asked, yes.

2    Q    So you met with Hallmark so that Hallmark could take you

3    through the presentations and show you the trade secrets that

4    Hallmark claims are in the presentations, right?

5    A    That was my answer to the question, yes.

6    Q    Is it right?

7    A    I asked them, I understood these presentations, I take it

8    the assumptions, I'm not here to identify what trade secrets

9    are at issue.  I take that, that's outside the scope.  I work

10   under an assumption that there are trade secrets and that the

11   defendants are liable for misappropriation of the trade

12   secrets.  I understand that the five presentations are

13   compilations of things and I said, well, let's look inside what

14   kind of things are in here.

15   Q    Well, I'm not saying, sir, we'll get to this in a little

16   bit.  I'm not saying, sir, that you can identify the specific

17   trade secrets.  Hallmark told you what they thought were trade

18   secrets.  I'm just trying to figure out what it is that you

19   were told when you did your analysis.  And this is one of the

20   things that you were told.  You were told about the trade

21   secrets that were in the presentations.  I understand you were

22   told about this compilation thing but you were also told about

23   the trade secrets Hallmark claims were in the presentations,

24   right?

25   A    There were specific items in there.  I said, well, what

1   kind of things are we talking about?  What kind of things would
2   be beneficial.
3   Q    You didn't say what kind of things.  You said what are the
4   trade secrets that you allege are in here?
5   A    My answer was what my answer was.  I'm explaining that
6   answer right now.
7   Q    Now, sir, you don't even know if the presentations were
8   provided directly to Clipper, isn't that right?
9   A    I understand that the first three were provided directly
10  to Clipper.
11  Q    Jeff, would you go, please, to page 20, line 16 through
12  23.
13       Did you assume, sir, that all five presentations were
14  provided directly?
15       I don't know necessarily whether I made that
16  assumption or not.  I, for purposes of my analysis, I have been
17  asked to assume that Monitor Clipper is liable for all of
18  Hallmark's allegations.
19       Do you see that answer, sir?
20  A    I do.  I also know there were other places you asked me
21  about the three and the two and I specifically answered that I
22  know the first three went to Clipper and the other two went the
23  to standing case team.
24  Q    You specifically answered that, sir?
25  A    I believe I did.

1    Q    Didn't we go round and round for all sorts of minutes

2    about whether they were delivered to Adam Doctoroff or the

3    standing case team?  Do you remember that line of questioning?

4    A    I believe we went round and round on a lot of things, yes.

5    Q    Yeah, we did.

6    A    And I believe I told you there's an e-mail that has three

7    presentations attached to it.  Two of the addressees of the

8    e-mail are Doctoroff and Kim.  Doctoroff and Kim were at MCP so

9    those three went to MCP.

10            There are two other presentations.  They have

11   individuals on them that aren't employees of MCP.  They're

12   members of the standing case team.  They went to the standing

13   case team.

14            For purposes of damages I do what an expert witness

15   does.  I don't have any say on liability whatsoever in this

16   case.  I don't intend to say anything about it.  I asked what

17   are the allegations in the case and I do an assessment of

18   damages based on those allegations.  The allegations are there

19   are five presentations as I understand the allegations in this

20   case.  That's what I do.

21   Q    My question is real simple, sir.  You understand the

22   assumptions under which you work is that one e-mail went to

23   Clipper and the other two e-mails at issue in this case, the

24   other e-mail at issue in this case did not go to Clipper, isn't

25   that right?

1    A    I think I just said that.

2    Q    Okay.  So let's just make sure we're clear because you

3    said a lot of other things.  I just have a simple question.

4    Isn't it true that in this whole case, everything you looked at

5    as regards the communications, one e-mail with three

6    attachments went to Clipper, correct?

7    A    I believe that's correct, yes.

8    Q    And one e-mail with two attachments did not go to Clipper,

9    correct?

10   A    One e-mail went to individuals that I understand are on

11   the standing case team.

12   Q    So is the answer to my question, yes?

13   A    I believe I have answered your question.

14   Q    The second e-mail did not go to Clipper, did it, sir?

15   A    I don't recognize any of those individuals as being

16   employees of Clipper.

17   Q    Is that a yes?

18   A    All I know is what I can read in e-mails.  Okay?  So that

19   e-mail didn't go to individuals that were employees of Clipper.

20   Do I know what happened to it after that?  I don't know.

21   Q    You don't know, do you, sir?

22   A    No.

23   Q    And when you sat down with Hallmark for them to show you

24   what were the trade secrets that were in the presentations,

25   they described for you the recommendations and conclusions that

1  were in those presentations, isn't that right?

2  A    That was my understanding that the presentations included

3  recommendations and conclusions, yes.

4  Q    I want to be clear about that.  Those were the trade

5  secrets, sir, the recommendations and the conclusions, that was

6  your assumption, right?

7  A    My assumption is that the trade secrets that are alleged

8  by Hallmark to have been misappropriated were misappropriated

9  and that's what I worked under.

10  Q    I understand that.  But I'm still trying to figure out

11  what it is your numbers are based on.  I understand you didn't

12  pick out the trade secrets but you were told that the trade

13  secrets in this case were the recommendations and conclusions

14  that were in the presentations, right?

15  A    I was told that's what the beneficial aspects of them

16  were, yes.

17  Q    And you assumed in your analysis that Clipper in 2005

18  would have gone out and acquired or recreated all of the

19  information in all of the presentations, correct?

20  A    No, that's not what I said.

21  Q    What you called comparable.  I don't mean word for word

22  but everything, your analysis assumes that everything in 2005

23  in the presentations would have been recreated in some

24  comparable form, right?

25  A    No.  What I assume is that Clipper would have to go out

1    and independently obtain consulting work that would generate

2    comparable recommendations and conclusions.  And that Clipper

3    would have to go out and generate underlying research that

4    would enable the syntheses or summaries of that research that

5    are included in the presentation.

6    Q    And I guess maybe I asked the question imprecisely.  Who

7    ever did the work, your assumption is that in 2005, whether

8    it's Clipper or Clipper hiring people, the result of the

9    project in 2005, you assume had to be the recreation of a

10   hundred percent of what is in the presentations?

11   A    That's not what I said.  I said that there are

12   recommendations and conclusions that are of value.  And in

13   order to get those recommendations and conclusions they would

14   have to engage consulting services, on one hand, that would get

15   them comparable recommendations and conclusions.  And they

16   would have to create research that would enable them to get the

17   comparable syntheses and summaries of research that are in it.

18   It could be the case that you have to go out and get lots of

19   data to make a chart that is only a part of that data.  You

20   can't make that chart that's a part of the data unless you get

21   all the data.

22   Q    I'm just trying to get a handle, sir, on what the goal is.

23   The goal in your hypothetical analysis is the recreation in

24   substance of the five presentations, right?

25   A    No.  The goal of the recreation is of the necessary and

1    beneficial recommendations and conclusions and syntheses and

2    summaries of research that are incorporated in those

3    presentations.

4    Q    So the goal is to be able to have the conclusions and the

5    recommendations, hypothetically, from the presentations and

6    what ever you need to do to do that, that's what is going to

7    happen, right?

8    A    Yes.

9    Q    But it's a hundred percent across the board.  In your

10   theory, your analysis, I can't pick like one conclusion that I

11   really like.  I have to go, under your analysis, do the work

12   for all the conclusions?

13   A    Well, the allegations, as I understand it, is that all of

14   them were misappropriated so my analysis says if they were all

15   misappropriated, what would be necessary to get all of them.

16   Q    What if I could get in 2005, strike that.  You talked to

17   Hallmark about what folks could do in 2005 to go out and get

18   those conclusions, what they would have to do to get those

19   conclusions and recommendations, right?

20   A    Well, I talked to Hallmark about what was necessary to get

21   the research that would generate the syntheses and summaries of

22   the research that were in the presentations.  And I asked them

23   about what their costs were for the consultant.

24   Q    And you asked them, sir, was there comparable information

25   out in the world that would allow Clipper to have the

1    conclusions and the recommendations or did Clipper have to go

2    and redo all of the work, right?

3    A    I didn't ask that specific question.

4    Q    Were you told there was no comparable research available?

5    A    I was told that the results of the research that Hallmark

6    had in the presentations were not publicly available.

7    Q    I didn't ask you that, sir.  My question was, did someone

8    at Hallmark say to you, in substance, you can't find these

9    conclusions and recommendations anywhere.  There is nothing

10   comparable out there?

11   A    I mean that exact answer?  No.  What I asked was, is it

12   necessary to perform the research that you guys performed to

13   get the summaries and syntheses of information and the answer

14   was yes.  Portions of that research were things that were

15   actually purchased.  So they purchased research.  So they

16   purchased things.  If it's out there, they purchased them.

17   They went and had to get this over here and this over here and

18   this over here and buy all that and gave people to do surveys

19   of other people.  And they put it altogether and it cost them a

20   certain amount to put all that together so that they could get

21   a chart here or summary there.  That's really important.

22          Sometimes you go out to get a lot of information to

23   get a really important conclusion.  Or a really important

24   summary.  And that's what they did to get this information.

25   And that was something that if it wasn't handed over that

1    Clipper would have to go do to get the same thing.

2    Q    So the really, actually, my question was did someone at

3    Hallmark said there wasn't comparable information but I'll come

4    back to that in a second.  The really important thing you just

5    mentioned, if I heard everything you're saying correctly, is

6    the conclusion, right?  That's really important, right?  All

7    the work they had to do to get the conclusion.  It's the

8    conclusion that's the ultimate trade secret, isn't it, sir?

9    A    You know I'm not here to say what the ultimate trade

10   secret is.  The value and the benefits that come are based on

11   what you're able to do and conclusions enable you to do

12   something.

13   Q    Okay.  Would you go to page 47, Jeff, lines 8 through 18,

14   please?

15        QUESTION:  All right.  What steps did you take to

16   determine what comparable information was available to Clipper

17   in 2005?

18        You know, I discussed with Hallmark whether or not

19   the syntheses and summaries of the research reflected

20   information that would be otherwise available to Monitor.  And

21   it was my understanding from Hallmark that it would not be.

22   And that the only way to arrive at those would be to do the

23   same research or comparable research that Hallmark had done.

24        That was your answer in the deposition, sir, right?

25   A    Yes.

1   Q   I'll ask you, again, Hallmark told you that there was no

2   comparable information out in the market place in 2005, didn't

3   it?

4   A   Yes.

5   Q   You never looked, did you, sir?

6   A   I'm not an expert in market research or surveys or

7   anything of the sort.

8   Q   My question to you, sir, is, did you look for comparable

9   information before you told this jury there's no comparable

10   information?

11   A   I relied on Hallmark.

12   Q   Did Hallmark tell you, since you relied on Hallmark, did

13   Hallmark tell you that the conclusions from these presentations

14   had been released to the public by Hallmark to Hallmark

15   competitors?

16   A   No.  Hallmark did not tell me that.

17   Q   Have you been reading the daily transcripts from this

18   trial, sir?

19   A   No, I have not.

20   Q   So you haven't heard about Don Hall's testimony that

21   conclusions from the BMR were given to the Greeting Card

22   Association and American Greetings?

23   A   I have not heard any such thing.

24   Q   Would that change your testimony, sir, if you knew

25   Hallmark was giving the conclusions from the BMR out to the

1   public?

2   A    It wouldn't change my conclusions one way or the other.  I

3   assumed liability in this case so liability is that these are

4   valid trade secrets and that these trade secrets have been

5   misappropriated.

6   Q    I know you assumed liability, that's clear.  But you

7   assumed liability because Hallmark told you there was no

8   comparable information out there.  And you assumed liability

9   because Hallmark told you that the conclusions and

10  recommendations in these presentations were still secret, isn't

11  that right?

12  A    No.  I assumed liability because that's what a damages

13  expert does.  I'm not here to speak to liability one way or

14  another.  If there is not liability, there is not damage and

15  that's it.  I'm here to speak under the assumption that

16  liability is found for the allegations in this matter what the

17  damages would be.

18  Q    Sir, you know, because you told me at your deposition, you

19  know that if something is not secret, it's not a trade secret,

20  right?  You know that?

21  A    Yes.

22  Q    And you know that if something is made public, it's not a

23  trade secret, right?

24  A    In general that's my understanding as a lay person.  It's

25  not a legal understanding.  I'm not here to make legal

1    opinions.  I'm not here to opine as to what is or is not a

2    legal trade secret or whether or not they were misappropriated.

3    I'm here to assume that there were trade secrets and I've

4    defined the trade secrets that I did my analysis on and that

5    the defendants are liable for misappropriation.  I don't have

6    any other opinion and it's outside the scope of my

7    understanding or ability to do so.

8    Q    And you know, sir, that when a company just uses its,

9    let's call it secret information, just the use of it results,

10   the lawful use results in the disclosure of information and

11   conclusions, isn't that right?

12   A    I don't know that.

13   Q    You don't know that today or you didn't know it during

14   your deposition?

15   A    I'm not sure I understand the question.

16   Q    The question to you is, sir, you understand that the

17   lawful use of secret information by, trade secret information

18   by a company, the lawful use results in the disclosure of the

19   information, doesn't it?

20   A    I don't know.  Is it possible it can?  It's possible it

21   can.  I don't know that in every circumstance it does.  You

22   have companies that every day have trade secrets and use their

23   trade secrets and they still are trade secrets.  Some times it

24   could be, depends what the use is and what happens with it.

25   Q    Right.  And if the use results in the public disclosure of

1    the conclusion, you know that it's no longer a trade secret,

2    right?

3    A    No, I don't know that.

4    Q    So just to be clear, your assumption though is their trade

5    secret is conclusions in the BMR, is conclusions in the

6    presentations were trade secrets because they were still

7    secret, right?

8    A    No.  I don't know anything with respect to other than that

9    I was told to assume these are trade secrets and to assume that

10   the defendants are liable for them.

11                MR. MANCHEL:  That's all I have, Your Honor.

12                THE COURT:  Let's take about an hour for lunch.

13   Don't talk about the case.  Wait until you hear all the

14   evidence.  We'll see you back here about 1:10.  We'll be in

15   recess.

16                            (Witness temporarily excused.)

17           (The following proceedings were had OUT OF THE

18   PRESENCE AND HEARING OF THE JURY:)

19                MR. GERMAN:  Your Honor, may we see you about 5

20   minutes before the jury comes back?

21                THE COURT:  -- because 5 minutes before the jury

22   comes back seems to turn into longer.

23                MR. GERMAN:  I just wanted to revisit the colloquy we

24   had at the bench on the unjust enrichment issue on whether the

25   plaintiff is entitled to ask for both of what it cost and gains

1    or whether you have to choose one or the other.  The discussion

2    in that order was in the context of addressing objections we

3    had raised to Dr. Blaydon.  And in that passage of your order

4    you cited a treatise in Salisbury Labs case for the proposition

5    that in a typical case you can get avoided costs or gains but

6    not both.  And you dropped the footnote citing the Salisbury

7    Labs case for that point, to avoid double counting, that's the

8    reason.  And the reason for from the treatise and in this was

9    the case in the Salisbury Labs case, sometimes in a trade

10   secret case the avoided costs are what enables the defendant to

11   earn more profits.  And so the avoided costs might be a hundred

12   dollars and as a result of not having spent the hundred dollars

13   your profits go from 20 to 30.  So you could get either the

14   hundred or the 10.  But you can't get 110 because that would

15   double count.  Okay?  That's the way we read your order.

16   That's what Salisbury Labs holds.

17           In our case, they're entirely different.  Because the

18   gains we're talking about were not achieved by Clipper as a

19   result of them not having to incur costs for research or

20   consulting fees.  But rather because they closed the deal.  So

21   the two stand independently.  There is no double counting at

22   all.  And that's why the presentation was presented as it was

23   and proceeded as it was, presented in the expert report and in

24   the motions for summary judgment as they were.

25           THE COURT:  The problem I have with your analysis,

1    Charlie, is that if Clipper had spent the money to hire

2    consultants and if they had done the research, then it would

3    have earned the management fee and the transaction fee.  And if

4    you assume that's true then they shouldn't be punished for the

5    transaction fee or the management fees.  That shouldn't be a

6    component of the damages.

7         Now, I sent Steve back to the books while we were

8    working this morning.  He and I haven't talked so there may be

9    some additional, may be some additional information I'm not

10   aware of but that's my view at the moment.  He and I will talk

11   over lunch hour and I'll come back and tell you what my final

12   thought is.

13        MR. GERMAN:  Thank you.

14        MR. MANCHEL:  I think the parallel is their argument

15   is but for the use of the trade secrets the deal wouldn't have

16   happened.  So it's either got to be one or the other.  I think

17   it's actually the Salisbury case directly which they claim we

18   avoided costs and as a result we got a gain.  So I think--

19        THE COURT:  We'll talk about it.  I'll be back about

20   1.

21                    (Noon Recess)

22        (The following proceedings were had OUT OF THE

23   PRESENCE AND HEARING OF THE JURY:)

24        MR. DONOVAN:  Your Honor, if we're just addressing

25   the -- I don't want to hold up the Court.

1          THE COURT:  I looked at some additional case

2    authority over the lunch hour.  And I am persuaded that I was

3    right in what I thought before we left.  I don't think that

4    Hallmark can recover both for the avoidance costs and the fees

5    earned by Monitor Clipper after the transaction closed.  I

6    think that the transaction fees and the management fees would

7    have been earned in any event had Monitor Clipper spent the

8    $6.2 million to replicate the research testified to by

9    Mr. Maynard and the $5 million that was paid for the greeting

10   card aspect of the BMR.  And so I will instruct the jury at the

11   appropriate time that they can't award both.  I assume that

12   Hallmark will want to submit the 11 million dollar figure.

13        Then the question becomes how does the defendant want

14   me to handle that now?  I can go back and tell the jury that

15   they can disregard that portion of the testimony or we can

16   simply deal with it as an instructional issue at the

17   appropriate time.

18        MR. MANCHEL:  If the management fee piece of that

19   dropped then I wouldn't ask for an instruction, just go to the

20   jury on that one cost piece.  We don't have to make a big deal

21   about it.  I can actually adjustment my questions today and

22   just move on, period.  If both are going to still be put forth

23   then I think there should be something relatively soon in

24   connection of time with what was said, maybe after I've done my

25   cross, just to let the jury know maybe they shouldn't be

1   looking at both.

2          THE COURT: Well, the instruction will allow the jury

3   to award damages for unjust enrichment based on the avoided

4   cost only.

5          MR. MANCHEL: Okay. That was my question, is if

6   plaintiff's in fact are going to, which I assume they will,

7   drop that piece.

8          MR. GERMAN: Drop it? We'll make an appropriate

9   record for Your Honor but understand the Court's ruling and I

10   think it's an instructional issue.

11          THE COURT: I think it is, too. The question is what

12   do we do about the evidence the jury has heard and I'm hearing

13   you say, don't emphasize it.

14          MR. MANCHEL: I think if your instruction is going to

15   be it's for the cost, I'm okay with just moving forward.

16          THE COURT: All right. And if you become very

17   uncomfortable, let me know we'll take a break.

18          MR. GERMAN: What we will do, Your Honor, is submit

19   an instruction that we think --

20          THE COURT: I think you already have.

21          MR. GERMAN: If that instruction is refused then that

22   will be our record. That will be fine.

23          THE COURT: Yes. We've got about 10 minutes if you

24   want to mill around, feel free to do that. Five minutes. I'm

25   sorry.

1                    (Recess)

2           (The following proceedings were had IN THE PRESENCE

3    AND HEARING OF THE JURY:)

4           THE COURT:  Welcome back.  Be seated, please.

5           Mr. Manchel, when you're ready.

6           MR. MANCHEL:  Thank you, Your Honor.

7                    KENNETH SERWIN, RESUMED

8                  CONTINUED CROSS-EXAMINATION

9    BY MR. MANCHEL:

10   Q    Dr. Serwin, the presentations at issue in this case were

11   created by Monitor Group, correct?

12   A    By who?

13   Q    Monitor Group?

14   A    That's my understanding.

15   Q    Clipper had nothing to do with the creation of the

16   presentations, correct?

17   A    Not that I'm aware of.

18   Q    And the presentations at issue in this case were created

19   in the 2001, 2002 time period?

20   A    That's my understanding, yes.

21   Q    Would you put up on the screen, please, Jeff, Plaintiff's

22   Exhibit 487.

23           This was the e-mail with the presentation attachments

24   that were sent to Adam Doctoroff, correct?

25   A    I believe so, yes.

1  Q    And these are the only presentations you're aware of that

2  were sent directly to Clipper, correct?

3  A    These are the only ones that I have seen an e-mail that

4  went to individuals or employees of Clipper, yes.

5  Q    Are you aware of any other presentations at issue in this

6  case that went directly to Clipper?

7  A    I don't know any other ones that went directly to Clipper.

8  Q    Would you put up, Jeff, please, Plaintiff's 488?

9        This is the e-mail that attaches the other two

10 presentations at issue in the case, correct?

11 A    I believe so.

12 Q    Do you have any reason to believe it's not, sir?

13 A    No.

14 Q    The two presentations attached to this e-mail were sent

15 only among Monitor employees, correct?

16 A    They were sent to employees that I understand were members

17 of the standing case team.

18 Q    My question to you, sir, was, they were sent only to

19 Monitor employees, correct?

20 A    I believe these are only Monitor employees.

21 Q    Thank you.  Now, as you just said the Monitor employees

22 who received this e-mail were on the standing case team,

23 correct?

24 A    That's my understanding.

25 Q    And you also understand, sir, that the Monitor standing

1  case team was made up of Monitor employees, not Clipper

2  employees, correct?

3  A    That's my understanding that they were Monitor employees

4  who worked with Clipper.

5  Q    I didn't ask you who they worked with.  My question was,

6  do you understand, can you tell this jury, these are Monitor

7  employees who are on the standing case team but they're Monitor

8  employees, not Clipper employees, correct?

9  A    That's my understanding.

10  Q    Now, as we just discussed your damages theories, your

11  damages theories assumes that Clipper received and used

12  100 percent of the trade secrets embodied in the presentations,

13  correct?

14  A    My damage theory assumes that the five presentations are

15  the trade secrets at issue and that Clipper is liable for

16  misappropriating those trade secrets.

17  Q    Well, you understand the trade secrets at issue, that's

18  part of it.  But my question to you though is, were you also

19  told to assume, let's break it up for the jury.  No. 1, you

20  were told to assume the five presentations we just looked at

21  are the presentations at issue, correct?

22  A    Yes.

23  Q    No. 2, you were told to assume by Hallmark's attorneys

24  that the five presentations were misappropriated and used by

25  Clipper, correct?

1    A    Yes.

2    Q    And you have that assumption because the lawyers told you

3    to work under that assumption, correct?

4    A    Yes.

5    Q    Now, you know for a fact though that Clipper didn't

6    misappropriate and use all of the trade secrets in this

7    presentation, isn't that right?

8    A    I don't know that in fact.

9    Q    Well, we just talked a moment ago about the notion that it

10   was Monitor who created these presentation trade secrets,

11   right?

12   A    Yes.

13   Q    So Monitor is the entity that put the work into them,

14   created them, formed them, all that good stuff, for the BMR,

15   right?

16   A    Well, Monitor is a consulting firm that was engaged by

17   Hallmark and incorporating inputs provided by Hallmark

18   including the Hallmark employees that worked with the Monitor

19   consulting team, because that's how consultants work, because

20   they don't do their work in isolation.  They were there, I

21   understand, and working with Hallmark employees.  And as a

22   result of all of that work and all the input these

23   presentations came out of it.

24   Q    Jeff, would you go back to 487, please?  And go to the

25   first presentation, page 93.

1          I just want to be clear about kind of who's doing

2    what.  This is one of the presentations at issue in the case,

3    correct?

4    A    Yes.

5    Q    This is a presentation that was physically created, put

6    together by Monitor, correct?

7    A    Monitor certainly was deeply involved in putting this

8    together, yes.

9    Q    Well, now, I'm not challenging your view, sir, on the

10   notion that Hallmark provided people and help and research.  My

11   question is Monitor is the one that presented and created this

12   document, right?

13   A    To the best of my understanding, yes.

14   Q    So Monitor, we don't know who but Monitor made the

15   decisions about what is going in there for this OEC

16   presentation, right?

17   A    You know, I don't know that, I don't know for a fact

18   whether only Monitor employees were the ones who made the

19   decisions or whether or not it was a combination of Monitor and

20   a Hallmark team in there working.  I don't know.

21   Q    Okay.  And in this case, before Clipper supposedly used or

22   took anything, Monitor actually went through these

23   presentations and determined whether and to what extent

24   anything was still relevant, isn't that right?

25   A    I don't know if that's true or not.

1    Q    Well, let's take a look at Defendant's 125, please, Jeff.

2    Would you highlight the top, please, Jeff, including the body

3    of the e-mail?  Thank you.

4              Now, this is an e-mail only among Monitor employees,

5    correct?

6    A    That's what it appears to be, yes.

7    Q    So there is Jeff Pauker, who the jury saw.  Grant Brown

8    and Megan Kahn and the subject is Levin decks condensed.

9    They're actually referring to the presentations that went to

10   Adam Doctoroff, aren't they?

11   A    I expect that's what they're referring to.

12   Q    Are they referring to any other presentations?

13   A    I don't know.

14   Q    Okay.  Now, according to this e-mail they're going through

15   the presentations to condense the most salient information into

16   a 30-deck slide, right?

17   A    That -- the e-mail speaks for itself.

18   Q    Well, in fact, sir, you looked at the 30-deck slide as

19   part of your work, didn't you, sir?

20   A    I did.

21   Q    And you could see that out of hundreds and hundreds of

22   pages of the other exhibits, the other attachments, somebody

23   made the decision that this, these 30 slides were the salient

24   slides, right?

25   A    What is written here is from Mr. Pauker and that

1    apparently is a statement he made.

2    Q    Well, it's not what is just written, sir, you actually

3    looked at it, too.  Right?  You could see that those 30 slides

4    came from the other documents that were dramatically larger,

5    right?

6    A    I can see that those 30 slides came from the other

7    presentations.  That much I can see.

8    Q    And can we agree that in kind of less high level English

9    salient means relevant?

10   A    Salient means salient.

11   Q    What does it mean to you?  I just don't want to use a

12   definition that you're not using, sir.

13   A    You know salient can mean important.

14   Q    Okay.  Let's use that.  I'm fine with that.  So the

15   company that created the presentations, let me ask you this,

16   you're not aware of any participation by Clipper in pulling up

17   the 30 important slides, are you?

18   A    No.

19   Q    So the company that created the presentations, Monitor,

20   went through them all and picked out 30 slides from everything

21   that those folks, at least, thought were important, right?

22   A    It appears that Megan Kahn and Mr. Pauker.

23   Q    Do you have any reason to believe that it wasn't done,

24   sir?

25   A    No.  I believe that whatever they said in that e-mail is

1   what they did.

2   Q    Now, you actually looked, as I said, at this 30-deck slide

3   before you got, came to your opinion about what Clipper

4   misappropriated and used, right?  You looked at this?

5   A    No.  I didn't have a opinion about what Clipper

6   misappropriated and used.  I was asked to work under an

7   assumption and I did.  I said before and I'll tell you again, I

8   don't have any opinions with respect to liability.  I wasn't

9   asked to make any opinions with respect to liability.  I asked

10  what are the trade secrets that Hallmark is alleging and I was

11  asked to assume what they are and that the defendants are

12  liable for misappropriating.  That is a starting point

13  assumption that all economic experts use.

14  Q    Well, I want to be clear, again, sir, your assumption

15  whether it's based on what Hallmark told you or not, fine.  But

16  the assumption under which your theories were built was that

17  all of the presentations were misappropriated and used,

18  correct?

19  A    My work is predicated on the assumption of what the trade

20  secrets at issue are and that the defendants are liable for

21  misappropriation and use.

22  Q    I know you keep saying liability but I'm just trying to be

23  able to piece it out a little.  When you say liability, you

24  mean because they were misappropriated and used, correct?  And

25  I know it's an assumption.

1    A    Liability means that they were misappropriated and used.

2    Q    Okay.  Now you went through this slide and --

3            Jeff, would you put up, please, 125, Defendant's 125,

4    please.  I'm sorry.  Plaintiff's 488.

5            When you went through the 30-deck slide, you didn't

6    see any presentations in it from the two that went only to

7    Monitor, correct?

8    A    Well, the slides are from the three that were at issue

9    prior to the dates.  As I looked at those e-mails, the e-mail

10   that went to the individuals that included the Clipper

11   employees was August 25 and it appeared that the other one you

12   just showed me was prior to this September 7 when the second

13   set of presentations were sent.

14   Q    Let's go to Plaintiff's 487, please.

15           Now, of the three presentations attached to this

16   e-mail, when you looked at the 30-deck slide you determined

17   that one of the presentations in its entirety wasn't reflected

18   in the 30-deck slide, correct?

19   A    That may be the case.

20   Q    Now, you believed that the three presentations would

21   provide economic value to RPG, correct?

22   A    The information that I understood from discussions with

23   Hallmark is that the three presentations would provide economic

24   value to RPG, yes.

25   Q    And RPG isn't a defendant in this case, right?

1  A     That's correct.

2  Q     And isn't it true, sir, that you know that despite what

3  you were told to assume, it's impossible that all of the

4  information in the three presentations would provide economic

5  value to RPG, isn't that right?

6  A     I don't know that one way or another.

7  Q     Well, there is a section in the presentation on gifts,

8  right?

9  A     I believe there is one that has some information about

10  gifts.

11  Q     And did anyone tell you that RPG was thinking about going

12  into gifts?

13  A     I believe there was a question of whether or not they were

14  interested in expanding into gifts.

15  Q     Sir, someone from Hallmark told you that RPG was

16  interested in going into gifts?

17  A     I believe that I was shown a document where there was a

18  reference to gifts, question mark.

19  Q     Jeff, would you pull up line, sorry, page 40, line 4 to 7.

20         QUESTION:  I didn't ask you, sir.  I'm asking you did

21  someone at Hallmark tell you that in 2005 RPG was considering

22  going into a gifts line?

23         ANSWER:  No.

24         Is that still true, sir?

25  A     Well --

1                    MR. GERMAN:  That was not the question.

2                    THE COURT:  Sustained.

3      BY MR. MANCHEL:

4      Q    Sir, did anybody tell you that RPG was going into a gifts

5      line?

6      A    I believe I was directed to a document that had a

7      reference to gifts and Hallmark and that I did review that.

8      Q    Did you review that before you gave this testimony?

9      A    Yes.  If you go back to page 39 of my deposition, there

10     was a question about discussions with Mr. Strickland and your

11     question was, did they go into a level of detail about

12     ornaments and gifts and how that might be of interest to

13     Clipper?  And my answer was, with respect to gifts I think

14     there was a general discussion about the fact that for RPG to

15     grow and should it choose to go into the gifts line -- this

16     would be beneficial.

17     Q    I understand there was a question, sir, in fact, we saw

18     the question the other day.  I'm asking did someone at Hallmark

19     tell you, besides the question, that in 2005 RPG was

20     considering going into a gifts line?  Your answer was no,

21     correct?

22     A    I don't believe someone at Hallmark told me that, no.

23     Q    Did someone at Hallmark tell you that RPG was considering

24     going into ornaments?

25     A    No.

1 Q Did anyone at Hallmark say, strike that. Did you ever see

2 any information that suggested that RPG was interested in

3 operating captive stores?

4 A I don't believe I did.

5 Q Now, the presentations were created in 2001, 2002, is that

6 right?

7 A That's my understanding.

8 Q And they were created as part of what we've been calling

9 in this case the BMR?

10 A That's my understanding.

11 Q And between the time they were created in 2001, 2002 up

12 until, according to Hallmark still, 2005, Hallmark used the

13 presentations, correct?

14 A That's my understanding.

15 Q And according to you Hallmark started publicly

16 implementing the recommendations in the presentations as far

17 back as 2001, isn't that right?

18 A I don't know if I would use the word publicly but I know

19 that, my understanding from discussions with Hallmark is that

20 Hallmark incorporated certain of the recommendations and

21 conclusions that came out of the BMR project into its overall

22 business.

23 Q Now, the use of these presentations started about 4 years

24 before they were supposedly misappropriated and used by

25 Clipper, correct?

1   A    No, I can't --

2   Q    Three and a half?

3   A    I don't know what the exact time line on that is.  It was

4   before 2005.

5   Q    And you believe, sir, that just by using the presentations

6   the trade secret information embodied in them gets disclosed

7   publicly, isn't that right?

8   A    No, that's not correct.

9   Q    Jeff, would you pull up page 309, line 24 through page

10  310, line 22.

11       So let's put this in context for the jury.  And you

12  said it on direct with your counsel.  One of the reasons you

13  argued for that $29 million lump sum license was because of the

14  risk you claimed that with the license could come the public

15  disclosure of the trade secrets, correct?

16  A    Yes.

17  Q    And I asked you, so you built into, when you say should

18  the information get out, you mean information released with

19  Clipper using it appropriately under the license, correct?

20       Yes.

21       All right.  So what you built into the lump sum

22  analysis you used is an assumption that as the holder of the

23  license Clipper would use the information and the information

24  as a result of the use would become public?

25       ANSWER:  Yes.

1          And if it became public lawfully --

2          Then you said or part or parts of it would become,

3    you know --

4          But lawfully.

5          But lawfully.

6          Your assumption is that Clipper gets the exclusive

7    license and uses it.  And as a result of the use of the

8    license --

9          Keep going, Jeff.

10         The license information becomes public and,

11   therefore, it's of lesser value.

12         Correct?

13   A    It can happen, yes.

14   Q    You didn't say it can happen.  You said it does happen?

15   A    It very well could happen.

16   Q    And that's true.  Right?  So if the presentation trade

17   secrets, as you call them, are used by Hallmark, one by-product

18   of that is they will become public?

19   A    You asked me a question and the question was whether or

20   not Clipper's use of them would make them public.  Hallmark

21   uses its information in a way and its operational activities to

22   keep this information a trade secret.  And under the assumption

23   this information is a trade secret, they've kept it secret.

24   Clipper's use of it wouldn't necessarily be worried about

25   keeping it as a secret.

1  Q    Well --

2  A    It's a difference between Hallmark using their own

3  information, information that they try to keep secret.  And

4  Clipper saying, we have a license, we can go do what we want.

5  We can go compete with Hallmark with this information.

6  Q    I'm not talking about competing, sir.  You just made a

7  long statement about the notion that Hallmark would have the

8  information but Hallmark would keep it secret.  And Clipper

9  would pay $29 million, supposedly, for the information but they

10  wouldn't keep it secret, is that right?

11  A    So let's look at, for example, the proprietary financial

12  information which is information that would enable Clipper in

13  its operation of RPG to know what Hallmark is charging

14  Walgreens versus what it charges CVS in different amounts.  So

15  that would enable Clipper in operating RPG to go into those

16  stores and represent to those stores and say, well, this is

17  what Hallmark is doing with you this way and that way.  Let's

18  work on that.  We can do better.

19          Well, Hallmark doesn't use its information to go and

20  tell CVS what they're giving to Walgreen.  So it's a difference

21  in how Clipper is going to use certain information rather than

22  how Hallmark is using it.

23  Q    Sir, that's the second time you talked about the fact that

24  if Clipper knew what Hallmark was doing with its customers,

25  that the sales terms it has, what the prices would be, that it

1  could hurt Hallmark, right?

2  A    That may be the second time I spoke of it, yes.

3  Q    But you know, sir, that's not an issue in this case,

4  right?

5  A    I'm not sure what you mean.

6  Q    Let me read you Hallmark's interrogatory answer.  Subject

7  to and without waiving these objections and its general

8  objections, Hallmark states that when Monitor had access to

9  Hallmark's terms of sale, Hallmark has no evidence at this time

10  that Clipper received any of Hallmark's terms of sale with

11  Hallmark's customers.  Did you know that's the position

12  Hallmark took, sir?

13  A    I think we discussed this in my deposition.  My

14  understanding of terms of sales were different than the profit

15  margins and costs that were reflected in the presentation trade

16  secrets.

17  Q    So you're talking about going in and knowing what profit

18  margins are but not going in and knowing what the deal Hallmark

19  has with the customer?

20  A    I think the information that is in the presentation trade

21  secrets with respect to the pricing and the profit margins is

22  adequate to know how to undercut Hallmark.

23  Q    Now, if the information becomes public, if it's not secret

24  then according to you it's not protectable, right?

25  A    You know I'm not here to make legal opinions one way or

1    another on what is protectable, what is not.  I'm not a lawyer.

2    I don't have the expertise or the scope to do so.  And as I've

3    said in this case I was asked to make assumptions with respect

4    to that and I did.

5    Q    Jeff, would you pull up page 60, starting at line 9,

6    please?  Nine through, I'm sorry, 6 through 19.

7           Now, I'm going to take you to this page in a second.

8    It's one of the charts that we've looked at a bunch in this

9    case.  But I asked you the question, so using that

10   understanding let's turn back to page 7 of the Greetings

11   Business Model 1329C that we were just looking at.  And I'll

12   ask you, again, if the conclusion identified on page 7 was made

13   public by Hallmark voluntarily, would the slide still be a

14   trade secret in your view?

15          ANSWER:  In general, I can't speak to whether or not

16   the overall characterization of your question but in general if

17   information is public information then I don't understand

18   public information to public, something that is directly public

19   in the totality and specificity of that information, then I

20   don't know how that's a trade secret.

21          That was your answer, sir, right?

22   A    Yes.

23   Q    And?

24          MR. GERMAN:  The answer continues.

25          MR. MANCHEL:  Your Honor.

1          THE COURT:  If there is more of the answer, let's see

2     it.

3          MR. MANCHEL:  Go down, Jeff, to the bottom, please.

4     BY MR. MANCHEL:

5     Q    I do understand that public information can become, that

6     is incorporated into something else that is a trade secret

7     doesn't obviate the trade secret value of the thing that it's

8     incorporated into.

9          Let's talk about that for a second.  This statement

10    right here, what you're saying by this statement is if I take

11    something from the public and I pull it into my private world,

12    the fact that a piece of my private world came from the public

13    still means I have a trade secret, right?

14    A    You know you're asking me questions about what is and

15    isn't a trade secret.  You asked me questions in my deposition

16    and I many times said I have no legal opinion about this.  I'm

17    not an expert in this.  You were asking lay interpretations and

18    I was doing the best to answer your questions in the

19    deposition.  I'm not a legal expert.  I don't purport to be

20    one.  And I do not purport to say what is or isn't a trade

21    secret and when something that is secret becomes not secret.

22    That's not, it's outside of the scope and I didn't do that

23    here.

24    Q    I appreciate that, sir.  But this is something your lawyer

25    just asked to be read to the jury.  I'd like to spend some time

1  on that?

2  A    That's fine.

3  Q    What you're saying here is if we take something from the

4  public and we bring it into a private work, as long as the work

5  stays private, the fact that it has a public piece in it from

6  the public doesn't mean that it's not a trade secret, right?

7  It's still private.  That's what you're saying here?

8  A    I said that is my lay understanding.

9  Q    I understand.

10 A    If I told you how an engine works and I say it wrong, I'm

11 wrong because I'm not an engineer and I don't build engines.

12 Q    I didn't say you said that wrong.

13 A    I'm just saying as a general fact you're asking me

14 questions that are legal interpretations and legal opinions

15 that I'm not here to make.  I've never purported to make them.

16 I'm not purporting to make them.  And that's not the analysis I

17 performed or the testimony that I've given.

18 Q    And if something that is secret is released to the public

19 you understand that that's no longer secret, correct?

20 A    No, I don't understand it's no longer secret.  It may or

21 may not be.

22 Q    Now, if parts of the presentations were found not to be

23 trade secrets, you could make adjustments in your damage

24 analysis, right?

25 A    I did say that I could apportion in certain ways depending

1  on certain findings of the jury.

2  Q    I'm going to try to keep it simple if I can.  If it turns

3  out, if it turned out that parts of the presentations were not

4  trade secrets, you could adjust the numbers that you gave to

5  the jury this morning, right?

6  A    I said that if it turned out that one or two or some set

7  of the presentations themselves then I could apportion amongst

8  the presentations, not within a presentation.

9  Q    And you didn't make any of those adjustments, right?

10 A    Well, there are no adjustments to make.  I provided a road

11 map and a mechanism by which those could be made.  The analysis

12 that I performed was done under the assumption that all of the

13 alleged trade secrets are found misappropriated and used.

14 Q    No.  I understand that.  My question to you is if that

15 assumption proves wrong, you haven't given the jury a way to

16 change the numbers you used, correct?  You didn't do that?

17 A    I have done that in my report.

18 Q    You have given alternate numbers for less than all of the

19 presentations being trade secrets?

20 A    I've given a mechanism and it's in one of the schedules in

21 my report explains how to do that.

22 Q    Now, Jeff, would you put up on the screen, please, 153,

23 line 6 through 10.  And if you could also put up on the screen

24 at the same time, Jeff, page 151, line 8 through 12.

25           This is the testimony that you gave at your

1    deposition on top.  It says, I understand that the

2    presentations would allow RPG to piggy back on Hallmark's new

3    marketing efforts.  Do you see that?

4         I do.

5         Then you said RPG's knowledge that Hallmark would

6    spend its advertising dollars at the category level would allow

7    RPG to avoid spending its own marketing dollars on similar

8    initiatives.

9         Do you see those quotes, sir?

10   A    I do.

11   Q    You were told that by Wayne Strickland, correct?

12   A    Yes, I was.

13   Q    Now, is it really your opinion, sir, having looked at this

14   material that someone having the presentations at issue in this

15   case in 2005 would be able to piggy back on Hallmark's new

16   marketing efforts?

17   A    You know, I don't have an independent opinion with respect

18   to that beyond my understanding from Mr. Strickland.

19   Q    And is it true that if I had these presentations in 2005,

20   I would know what Hallmark would be spending its marketing

21   dollars on?  Is that true?

22   A    I'm sorry.  I don't understand your question.

23   Q    Looking at the second quote.  Is that a true statement,

24   sir?

25   A    Which one?

1    Q    The one blown up there?

2    A    Which page are you looking at, please?

3    Q    That was page 153, lines 6 through 10.

4    A    That is an understanding I have from Mr. Strickland.

5    Q    Sir, what was the name of the ad campaign Hallmark did as

6    a result of these presentations?

7    A    I believe at least one ad campaign was the Remembrance

8    Campaign.

9    Q    I believe it's called Remembering.  Does that sound right?

10   A    All right.

11   Q    That was the ad campaign that focused on getting people to

12   buy greeting cards as opposed to Hallmark cards, right?

13   A    That's my general understanding about the campaign.

14   Q    The Remembering Campaign was put out by Hallmark based on

15   the work that had been done by Monitor as reflected in some of

16   the presentations at issue in this case, right?

17   A    That's my understanding.

18   Q    But that ad campaign, the Remembering Campaign came out

19   before 2005, didn't it, sir?

20   A    I believe it did.

21   Q    It came out in 2002, didn't it?

22   A    I believe it did.

23   Q    And did anybody tell you, sir, we heard from Wayne

24   Strickland that the ad campaign only lasted for ten months when

25   it came out?

1  A    I haven't had any access to any testimony in this case so

2  I wouldn't know that.

3  Q    So in terms of the ad campaign that came from these

4  presentations, everybody knew what it was, right?

5  A    Everybody may have known in a general sense that Hallmark

6  was advertising to buy cards.

7  Q    Sir, you don't know of a single campaign, a single new

8  marketing effort based on the presentations that occurred after

9  2005, isn't that right?

10 A    I'm not aware of, personally aware of any.

11 Q    And you know that whatever was done before 2005 RPG would

12 know about it, right?

13 A    RPG would have what was available to know publicly or

14 looking at what ads Hallmark was putting out there.

15 Q    They would also know the reasons for it according to this,

16 isn't that right?

17 A    In 2005?

18 Q    Yeah.

19 A    In 2005 they know the reasons for it.

20 Q    They knew the reasons when it came out, right?

21 A    Not necessarily.

22 Q    Jeff, would you put up page 154, lines 1 through 13.

23       According to my understanding from Mr. Strickland

24 they would have an understanding of the overall strategy that

25 Hallmark was implementing and the detailed aspects of that

1  strategy.

2        QUESTION:  Going forward?

3        ANSWER:  Currently and going forward.

4        QUESTION:  Do you mean past, currently and going

5  forward, right?

6        ANSWER:  Well, whatever is past, it was past.  They

7  would know what was done.  They would know the reasons for

8  whatever was observed.  They would know what was going on and

9  they would have insight into what's going on.

10       True statement, sir?

11  A    Yes.  What Mr. Strickland explained to me was that RPG by

12  having, in 2005 having these presentations would then be able

13  to go aha, well, that's why they did it.  They were focusing

14  this way.  Okay.  Now, they did this and they've done this.  So

15  they would be able to in 2005 looking at that road map where

16  before what they saw was a stop sign over here and path over

17  here.  All of a sudden, now, they have the full map.  They can

18  see where everything is going.  This is why they did that.

19  This is where they're going next.  They did this over here in

20  2002.  Then they did this in 2003.  And they have a plan and

21  likely they'll go over here going forward.  That's what I'm

22  speaking to.

23  Q    You just used the word aha which makes me believe you did

24  speak to Mr. Strickland because we heard aha moments a number

25  of times when he spoke.  But the aha moment here, sir, occurred

1    in 2002, isn't that right?

2    A    I've not spoken to Mr. Strickland.  I have no insight into

3    any of the testimony that was done here.  Aha is my word.  If

4    he used it, good for him.

5    Q    You did speak to Mr. Strickland about all this, that's

6    where you get it from, right?

7    A    I spoke to him before I did my report.

8    Q    I understand.

9    A    You just said I spoke to him --

10   Q    I said I believe you spoke to him because you both used

11   the aha?

12   A    That's not what you just said.

13   Q    But my question is, all of this aha, this aha moment

14   occurred in 2002 when the Remembering Campaign came out, right?

15   A    No.  This aha is RPG sitting there now, in 2002 they saw

16   this happen.  The Remembering Campaign.  Wonder why they did

17   that?  You know, that's what they did.  Now, in 2005 they get

18   this stuff and they see that's why they did it.  They did it

19   because they were doing this and they're doing this now and

20   this is likely where they'll go in the future.  So something

21   happened in the past, they had a question mark in their head

22   why are they doing it?  Now in 2005 they get these materials,

23   they know.  Their question is answered.

24   Q    Do you know if any of that happened, sir?  Just made a

25   full statement to the jury about what Clipper did or didn't do.

1    A    This is --

2    Q    Excuse me, sir.  Do you know whether any of that happened?

3    A    That's not the issue of what the analysis I performed.

4    This is a question of at the hypothetical negotiation if they

5    had this information in hand and they knew what the information

6    would do, what benefit would they anticipate getting from it.

7    It's a different situation.  It's this hypothetical thing and

8    it's a construct that's putting everybody back at a certain

9    point in time before this happened and saying, we have open

10   books.  We know what is going on.  What is this worth?  What

11   actually happened is different than what is going on at that

12   negotiation.

13   Q    Well, we weren't talking about the negotiation, sir.  We

14   were just talking about the presentations.  So let's be clear

15   for the jury.  But all the stuff you said is hypothetical,

16   right?

17   A    It's what, the value of what this information would be.

18   Q    Is it hypothetical, sir?

19   A    Yes.

20   Q    Now, you also are asking the jury on behalf of Hallmark to

21   award cost savings that were supposedly avoided by Clipper,

22   right?

23   A    I've identified cost savings that otherwise Clipper would

24   have had to incur funds to generate comparable information.

25   Q    I just want to, I think I just said that.  You're asking

1  this jury to award Hallmark damages based on cost savings

2  supposedly avoided by Clipper, correct?

3  A    What I've done, I was asked to do is perform an analysis

4  and I provided the jury with that analysis that I performed of

5  what costs Clipper would have otherwise incurred.

6  Q    In fact, sir, you did nothing to determine if Clipper

7  would be the one saving any costs, isn't that right?

8  A    My analysis is that Clipper would have, at the time

9  Clipper would have had to do this.  There was no other entity

10  at the time.  I've done no analysis beyond that.

11  Q    Sir, my question to you was, you did nothing to even

12  determine if Clipper would be the one saving the cost, isn't

13  that right?

14  A    No.  I just said Clipper at the time would have initially

15  been the one to have to spend the money to do this.

16  Q    Jeff, would you put up, please, page 81, lines 5 through

17  13.

18        QUESTION:  Well, who did you think was going to incur

19  the costs, sir?

20        With respect to this, it didn't, under the assumption

21  that I was asked to operate under it didn't matter since I was

22  asked to assume that Monitor Clipper Partners would be liable

23  whether they paid it, Fund II paid it or RPGI paid it, whoever

24  paid it.  That was the assumption I was asked to work under and

25  that's what I did.

1          That is the only testimony you offered on this issue
2     at your deposition, isn't it, sir?
3     A    I'm not sure.  I would have to look back at the whole
4     deposition.
5     Q    I asked you a pretty simple question.  Who did you think
6     was going to incur the cost?  And your answer was as I
7     represented before lunch, it didn't matter.  That's the truth,
8     sir, too, it didn't matter to you, did it?
9     A    No.  What I was getting at was it didn't matter in terms
10    of my analysis at the end of the day where the final dollars
11    came from.  There was a question of reimbursement and I did not
12    do any analysis of reimbursement.
13    Q    Sir, Clipper had a contract with Fund II, isn't that
14    right?
15    A    Clipper had a lot of contracts.  I believe they had one
16    with Fund II.
17    Q    And you know the contract showed who would pay the
18    expenses, right?
19    A    I believe there was language about reasonable expenses.
20    Q    Sir, even though the contract showed who would pay the
21    expenses, before you gave your opinion in your report and at
22    your deposition, you did not even attempt to look at the
23    contract, isn't that right?
24    A    No, I don't think I didn't attempt to look at the
25    contract.  I did not attempt to interpret the contract.

Q    Jeff, put up page 78, lines 8 through 21.

ANSWER:  My understanding is Clipper did the due diligence and during the due diligence period Clipper would have incurred those costs.

QUESTION:  Well, before you reached that understanding did you attempt to look at the contracts under which Clipper was operating?

ANSWER:  No, I did not.  And as I stated earlier I was asked to work under the assumption that the legal distinction between the various Clipper entities, Clipper L.L.C., Fund II, I believe, RPGI, etc. were not relevant for purposes of my damages calculation that Monitor Clipper Partners L.L.C. and Mr. Doctoroff would be liable for any damages in this case.

That's what you said, right, sir?

A    Yes.  And I did say no --

THE COURT:  Just a moment.

MR. GERMAN:  Excuse me.  I think the next question and answer are right on point and clarify.  I'm asking for context permission to read.

THE COURT:  Let's see the next question and answer, please.

MR. MANCHEL:  Well, I'm not asking you that, sir. I'm asking you specifically about avoided costs.  Did you look at the contracts?  There are two contracts that provided

1  specifically the costs incurred by Clipper will be reimbursed.

2  Did you review those contracts?

3          ANSWER:  I believe I've seen those contracts.

4  A    Yes.  And that's as I said, I didn't do an analysis of the

5  contracts to try to interpret them.  I did see the contracts.

6  Q    Sir?

7  A    If I may, on lines, I believe, 8 through 10 of page 78 and

8  my answer to your question, your question was on 67, what do

9  you base your conclusion that Clipper would have incurred these

10 costs?  And my answer was, my understanding is Clipper did the

11 due diligence and during the due diligence period Clipper would

12 have incurred these costs.

13         So you had asked me before if there was somewhere

14 else in my deposition where I talked about who was going to

15 incur the costs, so that's right there.

16 Q    Sir, if you.

17         Jeff, would you go, continue down on this page.  If

18 you go to page 80 the answer to your question.  Page 80, line 3

19 through 11.

20         As I stated it's a legal opinion that I'm not

21 prepared to make here.  I was asked to work under the

22 assumption that for purposes of my damage calculation that

23 Monitor Clipper Partners was responsible for all costs in this

24 particular situation, avoided costs that would be incurred by

25 any of those other entities.

1           Is that true?

2  A    Yes.  This is, you were asking a lot of questions.  This

3  is a timing issue.  And the timing issue is as follows.

4  They're in due diligence period.  Monitor Clipper is the one,

5  the only party there.  Monitor Clipper needs to do this work to

6  determine what they want to do.  Monitor Clipper would be the

7  one, if these items were replicable, would be the ones to

8  replicate it and they would incur the costs.

9           There were lots of questions about reimbursement

10 after the fact.  And I said I didn't do anything to evaluate

11 the reimbursement.  You were asking questions about, well, if

12 so-and-so had to pay this back, then they incurred the cost.  I

13 said, look, I didn't do anything past that first point.  And I

14 didn't.

15 Q    You're telling the jury that was your testimony during the

16 deposition, sir?

17 A    That's, I believe what I'm answering for you here.

18 Q    Sir, what you said was you believed that they were

19 incurred then you knew they were reimbursed, isn't that right?

20 A    I didn't say I knew they were reimbursed.  You were

21 telling me they were reimbursed.

22 Q    I thought you read the contract?

23 A    As I said, I didn't interpret the contract.

24 Q    So you read it but you didn't interpret it?

25 A    That's not my scope of understanding or work.

1  Q    Let's take a look at some of the costs that you claim that

2  someone said.  Would you put up Plaintiff's 547A, please?

3  A    Is this one I have up here?

4  Q    You were given it, yes.

5          MR. GERMAN:  Schedule B2.

6  BY MR. MANCHEL:

7  Q    This identifies the research costs, correct, sir?

8  A    Yes.  This is the information I was provided by

9  Mr. Maynard.

10  Q    My next question is, this is Hallmark provided

11  information, right?  You didn't go out and do this yourself?

12  A    Did not go out and do this myself.

13  Q    And Hallmark told you what to assume in terms of the costs

14  to use in your analysis.  I understand you used them in various

15  ways but the underlying costs that you used, you were told by

16  Hallmark to use them, correct?

17  A    I was told by Hallmark what the costs of the research that

18  they identified that were used or would be, were used to

19  generate the syntheses and summaries of research that was in

20  the presentations that these are the costs that they incurred

21  to generate that.

22  Q    That was my next question.  My next question was, they

23  told you that the reason you should use all of these costs was

24  you were to assume that all of the research identified by

25  Hallmark was, in your words, synthesized into the

1  presentations, correct?

2  A   Well, I re-characterized the circumstance.  I asked them

3  what research would be, did they have to do to yield the

4  syntheses and summaries that were in presentations.  They told

5  me this is what it was.

6  Q   Sir, did you assume for purposes of your analysis that the

7  information reflected on this schedule is synthesized into the

8  presentations?

9  A   That was an assumption, yes.

10 Q   And that assumption was given to you by Hallmark, correct?

11 A   That was their answer to the question and I took that

12 answer, yes.

13 Q   Is that the assumption given to you by Hallmark, sir?

14 A   Well, assumption, it's an assumption I made based on this

15 was the answer to the question and this is what I used.

16 Q   Let's take a look at some of these research expenses that

17 Hallmark told you to use.

18         It's a little hard to see, Jeff, but about halfway

19 down there is an entry for the purchase diary 1995.  Can you

20 highlight that?  Let's just focus, let's look at the internal

21 payroll costs.

22         There are diary study costs that are built into your

23 analyses, correct?

24 A   These are the costs that were used in my analysis.

25 Q   And they include what we've called here the diary study

1  costs, correct?

2  A    That's correct.

3  Q    And the diary study as we heard the other day was the

4  research mechanism that Hallmark used where all sorts of stuff

5  went out to households.  It came back.  Then it was morphed

6  into research and conclusions and recommendations, right?

7  A    Well, morphed isn't the right word.  When you go out, you

8  do a survey, you get data, you ask people questions.  You get

9  answers to those questions and then there are people that

10 understand how to compile that information to get the specific

11 nuggets out of it that they are looking for.

12 Q    And the diary studies that were used and the expenses that

13 are here are diary studies from 1993 up until 2000, correct?

14 A    That does appear what's is on there, yes.

15 Q    Now, in those diary studies, in each of those diary

16 studies there were a number of things that were researched,

17 correct?

18 A    I believe so, yes.

19 Q    Well beyond greeting cards, right?

20 A    There were other things beyond greeting cards.

21 Q    There was research on cups and napkins and ornaments?

22 A    You know, I don't have a complete recollection but I know

23 there was more than greetings, yes.

24 Q    Research on dinnerware, balloons, and party needs?

25 A    As I say, I don't have the diary in front of me so I can't

1    say exactly what it was but there was more than greetings.

2    Q    In fact, there was, obviously, research on greeting cards,

3    right?

4    A    Yes.

5    Q    But even though greeting cards was a piece of each diary

6    study, for the purposes of your work you included 100 percent

7    of the costs of each diary study, didn't you, sir?

8    A    These were the costs that I was provided.

9    Q    I understand they were the costs you were provided, sir,

10   but did you just pass them on without thought?

11   A    No, I didn't pass them on without thought.

12   Q    So here's my question.  You understood that the diary

13   studies looked at all sorts of things besides greeting cards,

14   correct?

15   A    That's, the characterization would seem to suggest that

16   the diary studies looked as much at balloons or cupware as it

17   did greetings and that's not my understanding.  My

18   understanding is that the vast majority of the diary study

19   would be greetings and there were other things in there as

20   well.

21   Q    Well, I didn't suggest anything, sir.  My question was

22   very simple.  Each diary study looked at a bunch of things in

23   addition to greeting cards, correct?

24   A    Yes, it did.

25   Q    And even though each diary study looked at a bunch of

1　things other than greeting cards, you incorporated into your

2　damages, because Hallmark told you to do it, 100 percent of the

3　costs of each diary study, correct?

4　A　I wouldn't characterize it that way.  What I did and,

5　again, this isn't to say that Clipper was going to do exactly

6　what Hallmark did.  What my analysis was, was to say, well,

7　Clipper needs to come up with comparable syntheses and

8　summaries of research.  So what is in the presentation has

9　these nuggets we talked about.  How are they going to get those

10　nuggets?  And what is the cost that Clipper is going to incur

11　to go out and do that?  I said, what is the best proxy for

12　that?  I don't know.  I'm not an expert in market research.

13　I'm not going, I couldn't undertake a study, say, okay, I've

14　got this and what exact things are they going to have to do?

15　So I said, what is my best estimate of what this amount is?

16　Well, Hallmark is in the greetings industry.  Hallmark is the

17　biggest player in the greeting industry.  Hallmark has been

18　doing this for years upon years upon years.  Hallmark has a

19　huge research department.  Hallmark, it's reasonable to

20　suggest, is going to be able to do this kind of research at the

21　lowest cost of anybody to get this kind of research because

22　they've done it and they're building upon past research.  And

23　so in terms of, well, if this is what it cost Hallmark to do,

24　is this reasonable to suggest that this amount is what it would

25　cost Clipper to do?  I think it's conservative to suggest this

1  is what it would cost Clipper to do.

2  Q    It's a simple question, sir.  Did you include in your

3  analysis a hundred percent of each of the diary costs?

4  A    I did.

5  Q    And did you understand at the time you included in your

6  analysis 100 percent of each of the diary costs that, in fact,

7  each diary study addressed things other than greeting cards?

8  A    I did.

9  Q    Did you understand that?  Thank you.  Now, Hallmark

10  actually misled you about the diary study costs, didn't it?

11  A    I don't know that they did.

12  Q    Well, when you calculated the research costs for the diary

13  study, in each diary study from 93 on there was an item that

14  was called internal payroll costs, wasn't there?

15  A    Yes.

16  Q    And you assumed when you did your analysis that those

17  internal payroll costs were actual, isn't that right?

18  A    I don't know that I assumed that they were actual or not.

19  There is a research department at Hallmark and as I understand

20  it these were allocated costs.

21  Q    You understand they were allocated costs, sir?

22  A    They were allocated in terms of the internal payroll

23  costs.  This is an allocation of salaries, for example, for an

24  individual.

25  Q    Sir, when you calculated the internal payroll costs, you

1  calculated your damages figures, you believed that Hallmark had

2  identified the people who were assigned to work on the diary

3  study and determined how many hours those people worked and the

4  actual cost that Hallmark incurred, isn't that right?

5  A    No.  I didn't have that level of detailed assumption to

6  it.  These costs were provided to me.

7  Q    Jeff, would you pull up, please, page 93, lines 10 through

8  18.

9         QUESTION:  So your assumption when you prepared the

10 report we're looking at was that Hallmark had figured out the

11 people who were assigned to work on the diary study, how many

12 hours they had done and then the cost that was incurred as a

13 result?

14        That was the assumption.  But also with the

15 understanding from Hallmark and my discussions with Mr. Maynard

16 that while there were payroll costs in there, they are

17 generally understated.

18 A    Yes.  If I could add the previous question and answer in

19 here as context because you asked me, did you understand how

20 they were calculated?

21        And I said, I think it was more of an assumption that

22 internal payroll costs is some kind of allocation for the

23 individual people's time to an activity.  And at their cost to

24 the company for their salary and benefits is usually a way the

25 company uses such allocations.

1   Q    But it was an allocation of actual time, sir.  You thought

2   they were actual costs, didn't you?

3   A    These are, if you have somebody that's being paid $50,000

4   a year for a job and you have to say, well, now, I know that

5   they did four different activities over their time doing it.

6   How are you going to allocate their time?  Lot of companies

7   have different divisions, different divisions have individual

8   profit and loss for a division.  So I've got company A and it's

9   got divisions 1, 2, 3, and 4.  And you know the head of the

10  division 3, he's got his own profit and loss statement.  His

11  bonus is based at the end of the day on how good my company

12  did.  And he has how much revenue came into my division and he

13  has how much cost has to be, go against that revenue.  And it's

14  like, well, there was somebody that worked some time.  He's got

15  a $50,000 salary.  The company said we have an allocation

16  mechanism.  We're going to tell you how much of that person's

17  50,000 goes against your P and L, your revenue to determine how

18  good your division, division 3 did and how much of a bonus you,

19  Bob, you get for running division 3.  That's an allocation.

20  That's how it works in business whenever there are multi

21  divisions and there are individuals who work across them.  It's

22  my understanding that's what happened here.

23  Q    Jeff, would you pull up, please, page 94, lines 14 through

24  25.  Then line, page 95, lines 1 through 4, 95, lines 1 through

25  11.

1          QUESTION:  You, but you took it as an assumption that

2     those were costs actually incurred, didn't you?

3          ANSWER:  Yes.

4          QUESTION:  Okay.  And if I told you, sir, that those

5     costs weren't actually incurred, understated or not, would that

6     be a concern to you for purposes of your damages analysis?

7          ANSWER:  I'd have to ask Mr. Maynard to determine

8     what the actual costs incurred were and determine whether or

9     not those were, continue to be understated.

10         QUESTION:  Because you want to put in your analysis

11    actual costs, correct?

12         ANSWER:  To the extent that my understanding of what

13    I was looking at were actual costs, I'd like to have complete

14    actual costs.  That's not necessarily the case that I would

15    need actual costs for purposes of determining the, whether or

16    not this is a reasonable proxy for the avoided costs to Monitor

17    Clipper to the extent that that would be a reasonable

18    approximation of what it would take staff to manipulate and

19    address the research that's in here.

20         So I ask you, again, sir.  Did you believe that you

21    were given actual costs when you did the diary study?

22    A    I believe --

23    Q    To include the diary study?

24    A    I believed that what I was being given was Mr. Maynard's

25    correct calculation of what those costs were.

1    Q    Now, Jeff, would you pull up, please, Defendant's 604.

2    Just highlight the top, please.

3              This is a sample, sir, of what Hallmark gave us to

4    show us what a diary study survey looks like.

5              And, Jeff, highlight.

6              Thank you for continuing to participate in my study.

7    Please answer for these items.  Pre-printed greeting cards,

8    gift wrap and accessories, party goods, balloons, invitations

9    or disposal dinnerware, cups, napkins etc. ornaments.  Do you

10   see all of that?

11   A    I do.

12   Q    That's what we were talking about before.  We heard

13   testimony during the week that when these surveys go out they

14   go out to address a number of issues, right?

15   A    You know I'd have to look at a diary study from the years

16   that are at issue to know exactly what, what is being asked in

17   those years.  This one is talking about 2005.  And in 2005 they

18   were definitely asking about these items.

19   Q    Right.  And this is what we got from Hallmark to show us

20   what a diary study looks like.  You know that in the early

21   years it might be in 1993, they're not looking at cups or

22   napkins but can you agree with me, sir, that in each diary

23   study year to the best of your knowledge the survey goes to

24   things other than just greeting cards?

25   A    I believe the survey went to things other than greeting

1  cards.  I don't know all the items that were in each year's

2  survey.

3  Q    Now, did you ever say to Hallmark, in words or substance,

4  can you help me out here and make sure that in my analysis I

5  only use the cost of the diary studies for greeting cards?

6  A    No, I did not.

7  Q    And you know, sir, that if you asked that, Hallmark could

8  have done it, isn't that right?

9  A    I don't know that.

10 Q    Well, sir, you know, and we heard testimony this week what

11 Hallmark does with the cost of each diary study is Hallmark

12 divides it up internally in Hallmark, correct?

13 A    I'm not sure I have that depth of understanding.

14 Q    Well, sir, you know that Hallmark takes the cost of the

15 whole diary study and then spreads it out amongst its internal

16 units, don't you?

17 A    They probably do that if it's the same discussion as I was

18 just doing with company A and division 1, 2, 3, 4.

19 Q    Sir, it's a simple question.  Do you know that when

20 Hallmark does a diary study Hallmark takes the total cost of

21 that diary study and allocates it to each division that has a

22 piece of the diary study?  Not the same amount.  Different

23 amounts.  But it does it, right?

24 A    I think it does.

25 Q    So for this diary study, as an example, we could find out

1    from Hallmark, if we wanted, how much the division that handles

2    gift wrap and occasions, what expense of this diary study

3    belongs to that division, right?

4    A    I don't know.  That may be possible.

5    Q    Well, do you have any reason to think it's not, sir?

6    A    I just don't know.

7    Q    Okay.  We could know for party goods, balloons,

8    invitations and disposable dinnerware, what expense for that,

9    too, right?

10   A    I just don't know.

11   Q    But you never, even though you knew the diary studies

12   covered things beyond greeting cards and even though you knew

13   that Hallmark could tell you the allocated price of each unit,

14   you never asked for it, did you?

15   A    I asked for the costs that were, that Hallmark incurred to

16   create the research that was synthesized and summarized in the

17   presentations.  This is what I was given.  And as I said, I

18   felt that this was a reasonable proxy for what Clipper would

19   have had to incur because of the fact that Hallmark costs would

20   be the lowest possible to do this.

21   Q    Sir, the other part of your cost savings argument concerns

22   what Hallmark supposedly paid Monitor for the presentations at

23   issue in this case, correct?

24   A    Yes.

25   Q    And the Monitor charges that Hallmark told you to use were

1  wrong, weren't they?

2  A    I don't know that.

3  Q    Would you put up, please, Plaintiff's Exhibit -- which I

4  think we have as Defendant's Exhibit 1256.  Could you highlight

5  the charges, please, Jeff, the body of it?

6           Schedule B1.  The avoided costs, consulting fees, the

7  $5 million figure.  Do you see that?

8  A    I do.

9  Q    When you first did your report that number was a lot

10 higher, wasn't it?

11 A    Yes.  It included the cost of the INT project.

12 Q    I'll get there, sir.  When you first sent over your report

13 to defendants you were asking or arguing that over $7 million

14 had been paid to Monitor for the presentations at issue in this

15 case, correct?

16 A    My first report had that number in it.

17 Q    Is that a yes?

18 A    Well, my first report was based on my understandings from

19 discussions with Mr. Strickland about what consulting projects

20 were represented in the five presentations.  And my

21 understanding at that time was that the totality of the INT

22 project was also included in there.  That was information I was

23 provided by Hallmark and that was included in my report.

24           Subsequent to my report I was informed that was

25 incorrect and that the INT project was not represented in the

1  five presentations so I correctly removed it from my

2  calculation.

3  Q    Well, let's walk through this because I didn't ask those

4  questions.  You, your first report said that the defendant

5  should pay 7.3 million, approximately, for Monitor charges,

6  correct?

7  A    That number was in my first report.

8  Q    And when it was in your first report it was in your first

9  report to argue that $7.3 million should be paid by my clients

10  for Monitor charges, correct?  That's the reason it was in your

11  report?

12  A    You know, I will also point you to in my report on page 5,

13  paragraph 13.  The opinions expressed in this report are based

14  on facts currently known to me.  I reserve the right to rely

15  upon additional information that becomes available to me after

16  the date of this report and if necessary supplement and or

17  modify my opinions accordingly.  What I do that is normal

18  standard procedure for an expert.  We can only deal with what

19  we have and the information we have at the time.  If that

20  information is found to be incorrect or if there is different

21  information, I change my opinion.  I'm not here to do anything

22  but come up with the correct answer.

23  Q    The only information that came to you after you did your

24  first report, sir, was Hallmark told you that it couldn't put

25  the 2.275 million figure in because it came from the wrong part

1  of the BMR, isn't that right?

2  A    They provided me with information that they had mistakenly

3  told me that the INT project was represented in the five

4  presentations.

5  Q    So the answer to my question is, yes, they told you that

6  they made a $2.7 million mistake with regard to what the

7  presentations were at issue in this case, correct?

8  A    That's correct and I changed the analysis.

9  Q    Well, we'll get back to the $5 million figure in a second

10 but I want to, so now, now you're saying and this is what we

11 heard this week, now you're saying that the cost avoided in

12 terms of the Monitor fees are really $5 million, correct?

13 A    The opinion I have at this point is that they are

14 5 million.

15 Q    And of the $5 million, 3.8 million comes from what we call

16 here the greetings module or greeting side, right?

17 A    Yes.

18 Q    That's a hundred percent of the fees and costs that

19 Monitor charged Hallmark for the greetings portion of the BMR,

20 correct?

21 A    Yes.

22 Q    And that, according to you, was suppose to be charged for

23 three presentations, correct?

24 A    I have the basis for that is my discussions with

25 Mr. Strickland.

1   Q    I didn't ask you the basis, sir.  I just asked you, isn't

2   it true that you're seeking to charge as part of your damages

3   analysis $3.8 million for the three greetings presentations?

4   A    My calculation of the costs that Clipper avoided incurring

5   with respect to consulting services that they would have had to

6   replicate in order to arrive at the same recommendations and

7   conclusions that were reflected in the five presentations is

8   5 million.  3.8 comes from the greetings project.

9   Q    Jeff, would you pull up Plaintiff's 487, please?

10          These, the presentations attached to this e-mail were

11  the presentations that you're charging the $3.8 million from

12  the greetings, correct?

13  A    You know, your verbs that I'm charging, I'm not charging

14  anybody anything.  What I've done is I did an analysis of what

15  costs Clipper avoided incurring.  I'm not here to charge

16  anybody.  So your verb is incorrect.  But what I did was based

17  on an understanding that the totality of the greetings project

18  for which Hallmark paid $3.8 million to Monitor Consulting was

19  reflected in the presentations.

20  Q    Again, sir, we'll get to that.  Step No. 1 is the

21  $3.8 million claim that Hallmark is advancing against my

22  clients for greetings concerns the three attachments to this

23  e-mail, correct?  The greetings presentations, right?

24  A    Can you show me which of the three presentations?

25  Q    Sure.  OEC discussions for greetings?

1  A    Yes.

2  Q    Now, you know, though that there was more work done by

3  Monitor than just these three greetings presentations, isn't

4  that right?

5  A    No, I don't know that.

6  Q    Sir, are you sure that these three presentations do not

7  constitute 100 percent of Monitor's greetings work?

8  A    There were other presentations that were prepared

9  throughout the course of the greetings project.  And it's my

10 understanding from my discussions with Mr. Strickland, which

11 are the basis of my opinions here, that the totality of that is

12 reflected in the greetings presentations that are amongst the

13 five.

14 Q    So, again, let's break this down for the jury.  No. 1, it

15 is true, isn't it, sir, that the three greetings presentations

16 according to you are only some of a large number of other

17 presentations, correct?

18 A    That is correct.

19 Q    No. 2, you actually saw that some of these other

20 presentations were done after December of 2001, correct?

21 A    I believe there were presentations that may have been

22 after December 2001.

23 Q    No. 3, you had all of those presentations in your

24 possession, correct?

25 A    I did.

1    Q    And, No. 4, you claim that Wayne Strickland told you that

2    even though there were a large number of other presentations

3    including presentations done after December of 2001, all

4    $3.8 million for greetings should be argued as damages because

5    no other work was done after December 2001, correct?

6    A    Well, we were going fine there until the word argue came

7    out.  I sat down, actually a couple times, with Mr. Strickland.

8    And I sat there, I said, well, look, I've got other

9    presentations.  He said, I know you've got other presentations.

10   There was stuff but nothing in those other presentations wasn't

11   in these.  I said, look, I actually see that there are some

12   payments that occurred after December 2001 that say they went

13   to the greetings project.  He said, the work was done.

14   Greetings was over and if there were payments they were related

15   to the fixed fee and just an allocation of that fixed fee over

16   a certain time period.  That was his representation to me and I

17   took that representation.

18   Q    We'll get to invoices in a second, sir.  Right now I'm

19   just talking about work.  So my question to you is, Wayne

20   Strickland told you that even though there were a large number

21   of other presentations including presentations that were done

22   after December of 2001, 100 percent of all greetings work

23   should be charged in this analysis because, in fact, no work

24   was done after December of 2001, correct?

25   A    We get close to correct until you get to the shoulds and

1    woulds.  Mr. Strickland didn't tell me what to do in my damage

2    analysis.

3    Q    He told you --

4    A    Mr. Strickland told me that all of the work on greetings

5    was done as of that date and all of the work was reflected in

6    those presentations.  That's what Mr. Strickland told me.

7    Q    But I want to be clear for the jury.  He told you all the

8    work was done as of this date, right?  This is the last of the

9    presentations, December 12, 2001?

10   A    I believe so.

11   Q    So he told you all the work was done by then.  But, in

12   fact, you saw a large number of other presentations before and

13   after December of 2001, correct?

14   A    You know large, there were presentations, certainly more

15   presentations before.  I don't remember how many there were

16   after.

17   Q    Did you know, sir, that Mr. Strickland was reassigned off

18   of the BMR project in January of 2002.  Did you know that?

19   A    No, I did not.

20   Q    Did you know that Don Hall testified that the BMR work

21   didn't end until June of 2002?

22   A    No, I did not.

23   Q    Jeff, would you pull up Plaintiff's 488, page 7, please.

24        This is the presentation that someone at Hallmark

25   told you came from what is called the integration side of it,

1  correct?

2  A    Initially, they did.

3  Q    Sir, in your first report, you did a big report then kind

4  of a much smaller report, correct?  Supplemental report?

5  A    Yes.  Pages don't matter.  I did a report.  And in the

6  process of preparing my report I discussed all these issues.

7  And I asked what portions of the BMR project were represented

8  and that's what I was told.  And subsequent to that report I

9  was told that was an incorrect assignment and I changed it.

10  Q    I'll get there, I promise.  Part 1 of the story is you

11  were told by Hallmark that that document came from what was

12  called the integration portion of the BMR, correct?

13  A    That's correct.

14  Q    And Hallmark then told you, do you remember how many pages

15  were in this report, sir?

16  A    Not many.

17  Q    If I suggested to you 14, would that sound about right?

18  A    Yes.

19  Q    So Hallmark told you that because this 14-page

20  presentation was supposedly misappropriated and used and it

21  came from the integration portion of the BMR, Hallmark told you

22  that you should use in your damages analysis 100 percent of all

23  of the costs of the integration side, isn't that correct?

24  A    Again, they didn't tell me what I should use but I asked a

25  number of times what was reflected.  That is what they told me

1    so that is what I used.

2    Q    I think I just said that but let me just be clear.  You

3    were told three things by Hallmark regarding this document.

4    You were told, No. 1, it came from integration, correct?

5    A    Yes.

6    Q    You were told, No. 2, that 100 percent of integration fees

7    and charges were $2.275 million, correct?

8    A    Yes.

9    Q    Then you were told that that's the expense that you should

10   use for this document in your analysis, correct?

11   A    Again, that last piece, what I was told was that this

12   document reflected the totality of the integration project and

13   that's what it did and that's what I used.

14   Q    Jeff, would you put up Defendant's 1256, please?  Page 9.

15            Now, it's a little hard to see.

16            You can pull that back, Jeff, please.  Highlight the

17   column that shows the integration, please.

18            This is the chart that Hallmark prepared for you,

19   correct, sir?

20   A    Yes.

21   Q    And this is the chart that I identified the document we

22   just looked at as coming from integration, correct?

23   A    That's correct.

24   Q    And once it was identified as coming from integration, the

25   2.275 figure was used, correct?

1  A    Yes.  Well, I would say that's not how it was used.  I

2  asked Mr. Strickland what portion of the INT project is

3  reflected.  He said all of it.

4  Q    And, again, he said two things.  No. 1, it's in

5  integration.  And, No. 2, it's all integration?

6  A    That's right.

7  Q    So you realized that you had to drop the $2.275 million

8  figure after you read Clipper's expert report, isn't that

9  right?

10  A    Well, after I read Clipper's expert report and reviewed

11  more information about the INT, more information than I had

12  seen, I went back to Mr. Strickland and I said, I'm not sure

13  about this.  This doesn't look right.  I know what you told me

14  but I want you to go back and look at this because it doesn't

15  look right.  And after I asked to go back and look at it again

16  it came back that, no, that was a mistake.  And what we told

17  you was a mistake.  And what I did was, okay, if what you told

18  me is a mistake then this number is incorrect in my report and

19  I changed it.

20  Q    So, again, your answer to my question is, yes.  After you

21  saw Clipper's expert report, you realized this was a mistake

22  and you went and changed it, right?

23  A    No.  I just gave you, I can give you, again, after I saw

24  Clipper's expert report, I saw information that I wasn't aware

25  of.  And I went back to Hallmark and to Mr. Strickland and I

1  said I'm not sure about this, this doesn't look right.  I know

2  what you told me but could you go back and look at it again.

3  And they went back and looked at it again and then it was

4  changed.  The impetus was Clipper's expert report.  And then a

5  series of events occurred which culminated with me being told

6  that was a mistake and so I changed it.

7  Q    Jeff, would you pull up, please, Serwin 121, line 7

8  through 25.

9        ANSWER:  Well, I was told, I was told by Mr. Maynard

10  and Mr. Strickland, I don't know that they were the first

11  people to tell me.

12        Well, who were the first people to tell you?

13        I may have been told that by counsel.

14        And when were you told?

15        This was after Mr. O'Connell's report.

16        And Mr. O'Connell was a defense expert, correct?

17  A    Yes.

18  Q    This was after Mr. O'Connell's report was submitted and

19  the process of preparing for my deposition and reviewing

20  Mr. O'Connell's report, I said, you know, I brought this issue

21  up with you guys and you told me one thing and I'm looking at

22  what Mr. O'Connell says and I want to be sure that I have a

23  correct understanding.  And it came back to me that we have

24  looked at this again and that's not correct.  That's what

25  happened, isn't it, sir?

1  A    I believe that's what I just told the jury happened.

2  Q    Well, no, sir.  I'm sorry?

3  A    That I had asked about this before my report.  I was told

4  one thing.  Then Clipper's expert report came out and I said,

5  wow.  I'm seeing this.  Can you go back and look at it again?

6  They went back and looked at it again.  They came back and said

7  it's different.  I'm not sure what is different from what I

8  said in my deposition.

9  Q    What is different, sir, is that the reason you spotted the

10 mistake is because you got the expert report and you were about

11 to be deposed and you were being prepared by counsel, isn't

12 that right?

13 A    No.

14 Q    Isn't that what it says right there?

15 A    No.

16 Q    After Mr. O'Connell's report I took the issue up with you

17 guys, counsel told me?

18 A    No.  Where does it say counsel preparing for my

19 deposition?

20 Q    It says right there, counsel preparing for my deposition?

21 A    Where does it say counsel preparing for my deposition?

22 Q    It says right there.  Line 15.  And in the process of

23 preparing for my deposition.

24          Line 10, who were the first people to tell you?

25          I may have been told that by counsel?

1    A    Yes.

2    Q    That's what happened?

3    A    Well, Mr. O'Connell's report came out just prior to my

4    deposition.

5    Q    Now --

6    A    That is a stage of events.  Yes, I'm preparing for my

7    deposition.  I'm reviewing Mr. O'Connell's report and I'm

8    asking these questions.

9    Q    And even after you were told the $2.275 million number was

10   wrong, you still did nothing to check that number when Hallmark

11   sent it to you, again, isn't that right?

12   A    To check which number?

13   Q    The $2.275 million number, isn't that right?

14   A    Why would I check it again?  I took it out.

15   Q    Well, no, what you did was, you sent over a revised and

16   updated schedule, didn't you, sir?  We talked about this at the

17   deposition.  Do you remember that?

18   A    Oh, there was a mistake on the schedule.

19   Q    Let's walk through this slowly.  You sent over what you

20   believed was a revised schedule that had the same mistake on

21   it, again, isn't that right?

22   A    There was one of the schedules, the schedules I sent over

23   had new numbers and the numbers did not have 2.275.  There was

24   an exhibit that showed, I think we just looked at it with that

25   long stretch and it said the INT and it put a particular set of

1  slides into INT.  When I prepared those set of schedules, I
2  didn't flip that one.  I missed.  But the numbers were changed.
3  Q    What you did, sir, in your words, you got the schedule
4  from Hallmark and you stuck a header on it, quote, unquote,
5  stuck a header on it then you passed it along, isn't that
6  right?
7  A    Can you show me where that is?
8  Q    Jeff, pull up page 123, lines 7 through 11.
9        That's the mistake you're talking about, right?
10  A    That particular schedule, yes, that one is not my
11  schedule.  That was provided to me by Hallmark.  It's part of,
12  I mean, it's part of my report but it came from Hallmark and
13  so, yes, there was a mistake.
14  Q    Wait.  It is your schedule.  You just had Hallmark prepare
15  it, correct?  But it's your report, right?
16  A    It's my report and there was certain information that I
17  relied on in my report and that was one of the things I relied
18  on.  That information came from Hallmark.  I don't have the
19  ability to say which piece of information in any of the
20  presentations goes to which BMR project.  They were the ones
21  who told me that.  That is prepared for me.
22  Q    All you had to do was look at the schedule say, hello,
23  Hallmark, it's still being identified in integration.  Isn't
24  that right?
25  A    Well, you know, that would have been a great thing if I

1    had done that and we were rapidly trying to get this out the

2    door and there was a mistake made.

3    Q    $2.275 million at stake for my clients, sir, and you're

4    rapidly trying to get it out the door?

5    A    You can ask your experts about trying to get reports out

6    the door.  There are deadlines and the correct number was made.

7    The 2.275 was taken out.  This particular schedule I made a

8    mistake on.  It's a typo.

9    Q    Now, let's take a look, Jeff, pull up Plaintiff's 487,

10   please.  And page 203.

11          Now, this is another document that the subject of

12   your damages, included in, costs included in your damage

13   analysis, right?

14   A    The channel, yes.

15   Q    This is the channel.  Hallmark is seeking $1.2 million as

16   a result of just this document, correct?

17   A    Well, Hallmark is seeking $1.2 million with respect to the

18   cost that Clipper avoided incurring and would have had to incur

19   to come up with comparable recommendations and conclusions that

20   were in here.

21   Q    Sir, in plain English, that's the only document that

22   you're asserting comes from the channel analysis, channel side,

23   correct?

24   A    That's the only document I was told that came from the

25   channel side.

1   Q    Just for that document Hallmark is looking for

2   $1.2 million in damages, correct?

3   A    It's not just for the one document.  The question is, what

4   would the cost have been to Clipper to go out and achieve

5   through consulting services the same recommendations and

6   conclusions that are reflected in this document.

7   Q    Now, you were told that this document comes from channel

8   by Wayne Strickland, correct?

9   A    Yes.

10  Q    You said that this presentation was a comprehensive

11  representation of the work in the channel model, correct?

12  A    That's what he told me.

13  Q    Did anyone tell you, strike that.  Did you know, sir, that

14  Mr. Strickland was identified by Hallmark as a corporate

15  witness to testify on this issue?

16  A    I believe I may have known that.

17  Q    Do you know that Mr. Strickland at his deposition

18  testified that this came from the greetings side not the

19  channel side?

20          MR. GERMAN:  I'm going to object.  Improper

21  impeachment.  There's no transcript.  No foundation.  Can't

22  impeach him by what Strickland said.

23          THE COURT:  You shouldn't ask him to comment on the

24  testimony of another witness.

25              (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

1  PROCEEDINGS WERE HAD:)

2        MR. MANCHEL:  He was designated as their Clipper

3  witness so I think under Rule 32 I can use the deposition for

4  any purpose.

5        THE COURT:  You're asking this witness to comment on

6  the testimony of another witness and that's inappropriate.

7        MR. MANCHEL:  I think for Rule 32, I'm about to use

8  it for any purpose including impeaching him.  I'm going to show

9  five quotes from Wayne Strickland.  He said Wayne Strickland

10  told him it was from channel.  Because he's the corporate rep,

11  I think I can use it for impeachment.

12        THE COURT:  I think you can use it.  I don't think

13  you can use it for impeachment of this witness.  If you want to

14  read it in the record, I don't think it's fair to impeach this

15  witness.

16        MR. MANCHEL:  So I'm not permitted to show the jury

17  and this witness Mr. Strickland's testimony?  I can't put it up

18  on the screen?

19        THE COURT:  No.  You can show the jury your

20  testimony.  You just can't impeach this witness with it.

21        MR. MANCHEL:  Can I ask him if it refreshes his

22  recollection about whether, in fact, he was told.

23        THE COURT:  You can show it to him but you can't put

24  it up on the screen.

25              (THE PROCEEDINGS RETURNED TO OPEN COURT.)

BY MR. MANCHEL:

Q    Sir, would you take a look, please.

And, Jeff, do not put this up.

Take a look, please, at page, just read to yourself, sir, page 281, lines 3 through 7.

Let me know when you've read that.

A    Yes.

Q    Would you take a look at page 284, beginning at line 24 and going on to page 25?

A    Page 25?

Q    I'm sorry.  284, 285, line 4.  Then take a look at page 287, lines 15 through 17.  And then page 290?

A    I'm not done.

Q    Sorry.

A    I'm sorry.  What was the next one you wanted?

Q    I'm sorry?

A    You wanted something else?

Q    No.  Did you finish 290, 2 through 16?

A    No.  I was working my way up to there.  I was reading through some other stuff but 290, 2 did you say?

Okay.

Q    Sir, after reading those passages that I just put in front of you is it still your view that Mr. Strickland told you that this document came from channel?

A    Mr. Strickland is saying a lot of things on page 289.

He's saying, there was a question, which one is part of the channel analysis?

And he answered the one that said channel analysis.

Which one is that?

2.1 million.

There's other places he said other things. There is a confusing amount here. I had discussions with Mr. Strickland and I also had discussions with Mr. Maynard. And the combined of that was that there was greetings and channel and my discussions with Mr. Strickland focused most importantly on whether or not the work on it was done by the date of this presentation.

Q    And if, in fact, sir, it's determined that this document comes from greetings and not from channel, then your figures, your damage figures would be reduced by $1.2 million, correct?

A    If that were found that way, yes.

MR. MANCHEL: May I approach the bench, Your Honor?

THE COURT: Sure.

(COUNSEL APPROACHED THE BENCH AND THE FOLLOWING PROCEEDINGS WERE HAD:)

MR. MANCHEL: Two things. I don't know if you want to take a break, I'm going to a new section. Running a little bit earlier today.

Secondly, this would have been the point in time where I went into the fee portion of the issue which I'm not,

1  so I don't know if you want to put something on the record at

2  this point on that particular issue.

3          THE COURT:  I'm not tracking with you.  Start again.

4          MR. MANCHEL:  So two things.  One I can take a break

5  for the jury.

6          No. 2, this would have been the point in my

7  cross-examination where I addressed the management fee issue

8  which I understand is not something we're going to be working

9  through.  But he may want to make a presentation, a proffer or

10 I don't know if we left it, we're leaving it at the jury

11 instruction phase, that's fine.

12         MR. GERMAN:  That's our preference.

13         MR. MANCHEL:  I wanted to be sure I was clear on

14 that.  If Your Honor wants to take the break.

15         THE COURT:  I'm going to ask the jury if they need a

16 break.  If they don't, we'll let them out at 3:15 which will

17 shorten up the second half.

18         (THE PROCEEDINGS RETURNED TO OPEN COURT.)

19         THE COURT:  Let me ask you to step back up.

20         (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

21 PROCEEDINGS WERE HAD:)

22         THE COURT:  The instruction that I worked on over the

23 lunch hour will give the jury the option of charging, of

24 awarding damages as avoided costs or earnings that -- to the

25 Monitor Clipper, the management fees and transactions fees.

1  Now as a practical matter I assume the lower of those two

2  numbers is the management fee and transaction fee and submit.

3  But the instructions I intend at this moment to give gives the

4  jury the option of doing one or the other.  So I guess --

5          MR. MANCHEL:  That's why I was asking.

6          THE COURT:  I wanted to make sure you guys knew what

7  I was thinking.  So I award the avoided cost or the transaction

8  fees and management fees but not both.

9          MR. MANCHEL:  Right.  So the issue is I thought it

10  wasn't going to be pursued.  If it is, I'll have to take him

11  through the management fee work as well.

12          THE COURT:  The only evidence now is that the

13  avoidance, the cost avoidance numbers are larger.  I don't know

14  what your guy is going to say.  He may say that the management

15  fee and transaction costs are larger in that case then the jury

16  is going to have to pick.

17          MR. MANCHEL:  He's going to say the management fee

18  and transaction are in the negative.  As we went through one of

19  the motions in limine he can show the jury what happened with

20  the bankruptcy and the like, show that loss which is not

21  relevant on the avoided costs.

22          THE COURT:  At the moment I intend to do it in the

23  disjunctive.  The jury will have to pick.  You guys will have

24  to decide.

25          MR. MANCHEL:  If you want the jury to be offered

1    either or, I'll take him through it now.  If not, I'll move on.

2            MR. GERMAN:  Can we take a break on that so I can

3    confer?

4            THE COURT:  Yes.

5            MR. GERMAN:  Okay.

6            (THE PROCEEDINGS RETURNED TO OPEN COURT.)

7            THE COURT:  From the length of that bench conference

8    you might have concluded that it's time for a break.  So we'll

9    take a break.  About 15 minutes.  We'll see you back in here

10   about 3:10.

11                           (Witness temporarily excused.)

12                           (Recess)

13           (The following proceedings were had OUT OF THE

14   PRESENCE AND HEARING OF THE JURY:)

15           MR. GERMAN:  Your Honor, I'm not saying no but I just

16   can't make a call to drop a $6 million claim voluntarily

17   without checking with the general counsel at Hallmark.

18           THE COURT:  Then I think the answer is, Steve, you

19   probably need to go into the management fees.

20           MR. MANCHEL:  I'll be brief.

21           THE COURT:  All right.  If the jury is ready.

22           MR. GERMAN:  We'll get our witness back on the stand.

23           (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

24   PROCEEDINGS WERE HAD:)

25           MR. MANCHEL:  In this section I do plan on asking the

 1  witness, I want to make sure it's okay with the Court.  I have

 2  to take him through because he says he doesn't know, didn't

 3  matter to him where the fees went.  I'm going to take him

 4  through the corporate ownership structure and show he's

 5  testified he knows they're legally distinct entities and he

 6  also knows they were sued in this case and they are no longer

 7  defendants because I want to make it clear through him that he

 8  knows as the 30(b)(6) witness for Hallmark and their expert

 9  witness.

10         THE COURT:  I'm not sure what is added by the fact

11  they were sued and they're no longer defendants.

12         MR. MANCHEL:  Because it accomplishes, I think it

13  will establish in the jury's mind that they are legally

14  separate entities for which claims could have been brought

15  against.

16         THE COURT:  I don't think that's in dispute.  The

17  question is -- hold it just a minute, please.

18         MR. MANCHEL:  That's why I wanted to raise it.

19         THE COURT:  Question is not whether they're separate

20  legal entities but whether they functioned as one organization.

21  If I was Monitor I would be very fearful who the jury will see

22  through the various shell games and recognize that we're

23  talking about one party here.  I know that that's your theory

24  and I would be very concerned about that if I were Monitor.

25  But they are on paper different entities.  If he says they were

1    sued and they're no longer parties, it creates the impression

2    that they were dismissed based on the merits.  We all know

3    that's not the case.  It was because of a lack of personal

4    jurisdiction.  So I don't care if you ask him about the parties

5    but let's stay away from being parties in this lawsuit.

6                MR. MANCHEL:  That's why I wanted to raise it with

7    Your Honor.

8                THE COURT:  Wait.  Charlie, are you done?

9                MR. GERMAN:  I guess it's fair cross-examination but

10   the whole corporate structure, he didn't do any work on that,

11   it's not his area.

12               THE COURT:  He can say that.

13               MR. GERMAN:  That's their defense, not his but okay.

14               (The following proceedings were had IN THE PRESENCE

15   AND HEARING OF THE JURY:)

16               THE COURT:  Please be seated.

17               Mr. Manchel, when you're ready.

18               MR. MANCHEL:  Thank you, Your Honor.

19                       KENNETH SERWIN, RESUMED

20                   CONTINUED CROSS-EXAMINATION

21   BY MR. MANCHEL:

22   Q    Another type of damages that Hallmark is seeking in this

23   case you talked about, you talked about with your counsel on

24   the direct was for financial gains, correct?

25   A    Yes.

1    Q    And those were financial gains that came supposedly from

2    the misappropriation and use of the presentations, correct?

3    A    Yes.

4    Q    And once again, sir, you didn't really care who got the

5    financial gain, did you?

6    A    As I said at the end of the day whose pocket the funds

7    went into wasn't part of the analysis.

8    Q    So you didn't care if it went to Fund II or if it went as

9    a benefit to Clipper, isn't that right?

10   A    That was not part of my analysis.

11   Q    It didn't make a difference to you, right?

12   A    What I did identify is where these monies first flow and

13   that is where the analysis stopped.

14   Q    Well, sir, you were told by Hallmark to operate under the

15   theory that it didn't matter where the money went or who

16   acquired RPG, isn't that right?

17   A    I think what I said was that I didn't, my working

18   assumption was not to draw a distinction between those

19   entities.

20   Q    Jeff, would you pull up, please, page 149, lines 11

21   through 16.

22        So you had the theory beforehand that it didn't

23   matter where the money went or who acquired or what the legal

24   entity was for purposes of your damages analysis?

25             As I told you I was asked at the beginning of my

1  assignment to make this summation.

2  A    Yes.

3  Q    Did you probably mean you made this assumption?

4  A    I don't think summation is the right word.  I'm sure it

5  was assumption.

6  Q    But you know that Monitor and Clipper are distinct legal

7  entities, right?

8  A    Yes, I do.

9  Q    They're separate, right?

10 A    They're separate legal entities.

11 Q    All right.  Now, let's go back to talking about the

12 underpinnings of this particular claim.  You claim that had

13 Clipper not had access to the Hallmark information to rely on

14 RPG would not have been acquired, correct?

15 A    I think I said likely.

16 Q    Likely acquired?

17 A    Would likely not have been acquired by Clipper.

18 Q    Well, Clipper didn't buy RPG, correct, sir?

19 A    Clipper effectuated the transaction by which RPG was

20 acquired.

21 Q    Sir, did Clipper buy RPG?

22 A    Clipper effectuated the transaction by which RPG was

23 acquired.

24 Q    What does that mean?

25 A    They were the ones who negotiated.  They were the ones who

1  wrote the letters.  They were the ones who presented themselves

2  as bidding for it.

3  Q    Did they put in the final bid letter Clipper or was that

4  on behalf of Fund II, sir?

5  A    I'd have to look at the letter.

6  Q    Well, you just made a speech to the jury about what

7  Clipper did.  Do you know whether, in fact, Clipper put in for

8  Clipper the final bid letter?

9  A    I don't know if the words for Clipper.  I don't think the

10  words for Fund II were in there either.

11  Q    Now, before you rendered your opinion, sir, you didn't do

12  anything to determine what Clipper would have been paid if the

13  RPG deal never happened, right?

14  A    I'm not sure what you mean.

15  Q    Well, your argument, your theory is that Clipper's access

16  to the alleged trade secrets made it, made it likely, more

17  likely that the RPG deal could have occurred and as a result of

18  it having occurred there was a financial benefit that resulted

19  at the closing.  Is that roughly right?

20  A    Yes.  Essentially a revenue gain for Clipper as a result

21  of that transaction going through.

22  Q    So what would have happened if the RPG deal never

23  occurred?

24  A    I don't know.

25  Q    You don't know, do you, sir?

1  A    No, I didn't do that analysis.

2  Q    But, in fact, you know that there is a contract in place

3  that says exactly what happens and how Clipper gets paid if no

4  deal occurs, isn't that right?

5  A    I'm not sure.  I didn't review the contract to that

6  extent.

7  Q    Is this some of the contracts you saw and didn't analyze

8  or is this a contract you didn't see at all?

9  A    I don't know.  I'd have to look at it and tell you if I

10  saw it or not.

11  Q    Did you see any contractual language about the fact that

12  Clipper gets 2 percent as a fee of the amount the fund raised?

13  A    I don't recall that.

14  Q    So, first of all, you didn't do anything to figure out

15  what financial gain Clipper would have had if the RPG deal

16  never occurred, right?

17  A    I looked at the gain that Clipper did receive as a result

18  of the transaction going forward.

19  Q    Well, the issue though, sir, is did Clipper get something

20  from the RPG deal that it wouldn't otherwise get, right?

21  Because if it would have gotten it any way, that's not a gain,

22  correct?

23  A    I don't know that but they did receive the money--

24  Q    Well, sir, you're an economics damages expert.  If Clipper

25  received $5 when the deal closed but would have received $10 if

1   the deal never happened, there's no financial gain from the

2   deal, right?

3   A    Under your example that doesn't make any sense that anyone

4   would do that.

5   Q    But that's the way it works, right?  You have to show that

6   the closing actually gave Clipper a gain it otherwise wouldn't

7   have gotten, right?

8   A    What I did was I identified the gains they did get.

9   Q    But that wasn't my question, sir.  When you do a financial

10  gains damage analysis, like you've done, the issue is what did

11  the defendant get that it otherwise wouldn't have gotten,

12  correct?

13  A    I didn't do that analysis.  I identified the gains they

14  did get.

15  Q    Sir, I know you didn't do the analysis.  My question is

16  that's suppose to be the analysis, isn't it?

17  A    Not, the analysis I did is the analysis I did.

18  Q    So you just said, money went to Clipper and therefore it's

19  a financial gain?

20  A    It is a financial gain because it went to them.

21  Q    No. 1, you don't know what money would have gone to

22  Clipper if the deal never happen, right?

23  A    I think that's speculation.  I'm not here to speculate.

24  Q    It's not speculation.  There's a contract right on point,

25  isn't there, sir?

1  A    I'm not here to interpret contracts so --

2  Q    No. 2, you didn't look at what happens if the money is

3  used for another deal, as opposed to RPG.  If the Fund buys a

4  different company, you didn't look to see what Clipper would

5  get paid, right?

6  A    I don't know if the transaction fees from a different deal

7  would be the same.  I don't know what deal it would be.  I

8  didn't see another deal on the table.  Like I said, that would

9  be speculating.

10 Q    Next, you didn't look to see whether as of the moment of

11 the RPG deal Clipper was already owed money that those fees

12 from the deal were used as an offset, did you?

13 A    No, I did not.

14 Q    You didn't look to see that, in fact, did anybody tell

15 you, sir, that of the money that was wired out at least

16 80 percent of that was already due Clipper.  Had nothing to do

17 with RPG?

18 A    I didn't do that analysis.

19 Q    You didn't do it?

20 A    No.

21 Q    Now, the other thing, did anybody tell you about, by the

22 way, that RPG went into bankruptcy?

23 A    I do know that RPG went into a bankruptcy.

24 Q    And when RPG went to bankruptcy did anybody tell you that

25 Clipper lost money?

1  A    I know they went into bankruptcy.  I didn't see enough

2  financials to know one way or another what the end of the day

3  net was to Clipper.

4  Q    Sir, all the bankruptcy documents were produced, weren't

5  they?

6  A    I received a lot of bankruptcy documents.  That wasn't

7  part of my analysis.

8  Q    I understand that wasn't part of your analysis but if you

9  looked at the bankruptcy documents you would have seen that at

10  the end of the day with RPG, Clipper lost money, isn't that

11  right?

12  A    I don't know.  I didn't do that analysis.

13  Q    I know you didn't do it, sir.  The question is do you

14  know, sir, that is, in fact, true that Clipper is being sued

15  here for damages in a deal that it actually lost money on?  Do

16  you know that?

17  A    I didn't do the analysis so I don't know that.

18  Q    And you said to the jury that part of your management fee,

19  part of this financial gain were the so-called management fees,

20  right?

21  A    Yes.

22  Q    And the management fees, I wrote this down.  You said you

23  looked at the invoices for the management fees, right?

24  A    That's correct.

25  Q    You said the invoices totaled up to $1.5 million, correct?

1   A    That's correct.

2   Q    You didn't look to see whether they were actually paid,

3   did you?

4   A    I don't have the check stubs, no.

5   Q    In fact, if you had reviewed the bankruptcy materials you

6   would have seen materials in there saying they weren't paid,

7   isn't that right?

8   A    I believe a portion of them were part of the bankruptcy

9   proceeding.

10  Q    A portion?

11  A    Yes.

12  Q    Do you know how big the portion was?

13  A    I don't have that off the top of my head.

14  Q    If I suggested to you it was almost $700,000, would that

15  sound right?

16  A    That rings a bell.

17  Q    Why didn't you tell the jury when you were discussing this

18  with your counsel, why didn't you tell the jury it's not really

19  a million 5 number.  It's $700,000 less because you knew those

20  invoices hadn't been paid?

21  A    Because I don't know that they didn't receive that out of

22  the bankruptcy.

23  Q    You think they received it out of the bankruptcy, sir?

24  A    I don't know if they did or didn't.

25  Q    And you never figured out that not only did they not get

1   the invoices that you looked at, payment on those invoices, but

2   when the RPG bankruptcy was done, who ended up with RPG?

3   A    I believe American Greetings.

4   Q    Did you see any money flow from the bankruptcy --

5   A    I'm sorry?

6   Q    Did you see any money come out of the bankruptcy for any

7   of the entities that owned RPG?

8   A    No.  I didn't do an analysis of the final outcome.

9   Q    Now, you also testified, sir, about a reasonable royalty,

10  correct?

11  A    Yes.

12  Q    Now, reasonable royalty for our purposes here is, in

13  essence, a license, right?

14  A    Well, the reasonable royalty is a price for the license.

15  Q    And it's a license where one side in this case, it's a

16  license where one side contributes information and the other

17  pays for the right to use that information, correct?

18  A    That the reasonable royalty is the price for that license,

19  yes.

20  Q    I understand.  So the reasonable royalty is the price,

21  that $29.2 figure you used?

22  A    That's correct.

23  Q    But what is happening is one person to the negotiation

24  contributes information and the other person pays that price to

25  use it, right?

1   A    The other person agrees and if there is going to be a

2   price, that's what has to be paid.

3   Q    That's my next question.  There has to be an agreement,

4   right?

5   A    Well, but hypothetical is something that doesn't happen.

6   I mean the reality is when you do a hypothetical negotiation

7   you're doing it in litigation where the two parties are like

8   that because one did something wrong with somebody else's

9   information.  This isn't a case where, well, in the real world

10   they were going to get in there and this would have been an

11   agreement.  This is a hypothetical construct.  It's used as a

12   way to determine what the value of what was misappropriated or

13   in a patent case was infringed was worth.

14   Q    Well, again, sir, I'll get there.  My first question is

15   that there has to be a deal, right?  A deal has to be reached

16   for an agreed upon price, right?

17   A    Well, the hypothetical is the hypothetical negotiation and

18   the reasonable royalty construct is an assumption that there

19   has to be.  That's the result.  That's what we're doing here.

20   In the real world would there be a deal?  No.  That's not

21   required.

22   Q    I didn't say anything about real world or otherwise.

23   A    I'm just clarifying.

24   Q    I don't think I was unclear.  I'm just asking you, sir,

25   there has to be a deal, right?  We agree, there has to be a

1  deal?

2  A    The results of a hypothetical negotiation is license.

3  Q    Okay.  And as you keep saying, it's hypothetical, right?

4  A    Yes.

5  Q    So in this hypothetical license negotiation, the party

6  that is contributing the information is Hallmark, correct?

7  A    Yes.

8  Q    And the party that supposedly needs to agree to pay for

9  that license, pay the reasonable royalty, is Clipper and Adam

10 Doctoroff, right?

11 A    That isn't -- What I did is I calculated what the

12 reasonable royalty that Clipper and Doctoroff would have agreed

13 would be paid.

14 Q    But they wouldn't be the ones paying?

15 A    Well, at the time they probably would have had to pay it

16 in the same way that the costs for the research or the cost of

17 consulting would have had to have been paid because it had to

18 be paid at that time.

19 Q    So in order for there to be a deal and a price, a couple

20 of things have to happen.  First, they have to be able to

21 afford it, right?

22 A    As I said, they would have to be able to come up with the

23 money to pay it.

24 Q    I didn't ask you that, sir.  My question was they had to

25 be able to afford it, correct?

1    A    They would have to be able to pay it.  It would have to

2    make economic sense and they would have to be able to pay it.

3    Q    Have to make economic sense and have to be able to pay it.

4    In fact, at your deposition, sir, which we talked about this

5    morning, you gave us a really good example where you said if

6    one side wants a price of $10,000 but the other wants a price

7    of a thousand, that deal is never going to happen, correct?

8    A    No.  That's not what I said.

9    Q    Jeff, would you pull up page 247, line 18 through page

10   248, line 2.

11          Now here talking about the lump sum.  Do you see that

12   word, the second one, the lump sum?

13   A    Yes.

14   Q    Lump sum means one time payment once, right?

15   A    Yes.

16   Q    Big number.  29.2 million, right?

17   A    Yes.

18   Q    And your argument is that the $29.2 million lump sum

19   figure is the way to go in this case, right?

20   A    Yes.

21   Q    Now, what you said was, no, it's with, no, it's with

22   respect to if the -- so a lump sum is a large up front payment.

23   So it was a question of would a licensee have the wherewithal

24   to pay a large amount upfront.  If they don't have the

25   wherewithal then in negotiation it's hard to imagine that it

1  would result with, you know, if I, you tell me that, you know,

2  I've got a thousand dollars in the bank.  I need to pay 10,000

3  for something and the bank won't loan me 9,000, it's just not

4  going to happen, right?

5  A    Yes, I said that.

6  Q    Now, in this case you did absolutely nothing to determine

7  when you came up with that $29 million figure whether these

8  clients could afford that, isn't that right?

9  A    No.  I referenced this morning that these clients

10  represented to RPG that they could get financing necessary to

11  effectuate a $305 million purchase.  So if they could get

12  financing to do 305 million, I believe they could get financing

13  to do 29.2, if they didn't have that already in hand.

14  Q    Jeff, would you pull up page 197, lines 18 and 19.  Could

15  you go back to, lines 16 to 19.

16        Here we're talking about a $12 million fee connected

17  to the BMR project, correct?

18  A    This is talking about the value of the Monitor IP.

19  Q    And talking about RPG, right?

20        MR. GERMAN:  Your Honor, I'm going to object.  This

21  is not impeaching.  It is two completely different subjects.

22  This is not impeachment.

23        MR. MANCHEL:  I'll rephrase, Your Honor.

24  BY MR. MANCHEL:

25  Q    Now, you said, now, again, that Clipper was making the

1  representation that it would be able to get the money for the

2  deal, correct?

3  A    Yes.

4  Q    Did you do anything to see what assets Clipper had at the

5  time?

6  A    No.

7  Q    Did you see what money Clipper had in the bank at the

8  time?

9  A    No.

10  Q    Did you see if there was any bank that would loan any

11  money to Clipper in 2005, let alone these types of loans?

12  A    I relied on their representations that they made.

13  Q    Well, the representations you claim they made are that

14  they could go out and find money for the deal, correct?

15  A    We could pull up the letter, again, and see exactly what I

16  relied on.

17  Q    My memory is it would be no trouble getting financing for

18  the deal, correct?

19  A    If you could pull up or if I could have the letter in

20  front of me.

21  Q    I'm not sure which letter you refer to, sir.

22  A    The July 25 letter.

23  Q    You should have that in front of you.

24  A    I don't think I was handed the letter.  I think it was

25  just up on the screen.

1    Q    I don't have it with me, sir.

2    A    I can't speak to exactly what is in there without having

3    it.

4    Q    Well, you know, sir, that Clipper didn't get any loan in

5    connection with this case, right?  You know they weren't the

6    borrower, right?

7    A    In the actual transaction I know they weren't the

8    borrower.

9    Q    So who was the borrower?

10   A    I believe RPG in the end was the borrower.

11   Q    When you go out and get a house and you get a mortgage for

12   your house and a loan, the house is the collateral for the

13   mortgage, right?  Do you have a mortgage on your house?

14   A    I do have a mortgage on my house.

15   Q    The collateral for your mortgage is your house?

16   A    I believe it is, yes.

17   Q    What was the collateral for this loan?

18   A    I don't know.  I didn't analyze it that way.  What I

19   referred to was a representation by Clipper to William Blair

20   associated with the round one bid that they had no financial

21   constraints.  They could borrow money and they could borrow up

22   to $305 million.

23   Q    Who borrowed it, sir?

24   A    Who borrowed later on when the transaction occurred is a

25   different issue.  This is a question of Clipper representing

1   that they don't have the capital constraint.

2   Q    To put the deal together, right?

3   A    That's not what it said.

4   Q    You don't have any experience in the private equity world,

5   do you, sir?

6   A    I don't, no.

7   Q    Do you have any idea what would happen if every private

8   equity company was viewed as being the actual owner of these

9   companies?

10  A    You know, I think you asked me a similar question, I

11  don't.

12  Q    Yeah, you don't.  So the price that you claim should be

13  paid, if I'm getting this right, is $29.2 million lump sum,

14  correct?

15  A    Yes.

16  Q    And your argument is that now that Clipper is sitting at

17  the table, if I'm getting this right, negotiating for others?

18  A    Well, they're negotiating at the time.  They're the only

19  ones there.  There are no others at that time.

20  Q    But the others are the ones who are going to be paying,

21  right?  They're going to be beneficial owners as you said in

22  your deposition?

23  A    They may eventually pay, yes.

24  Q    Well, you didn't say in the deposition eventually, sir.

25  You said they would be the ones paying, isn't that right?

1  A    I believe what ever I said is what I said.

2  Q    Well, we looked at it this morning, didn't we?

3  A    Yes.

4  Q    So there was no eventually tucked in there?

5  A    There wasn't an eventual tucked in what I said, but as I

6  explained this was a timing issue.  That at that point in time

7  there was nobody else.  There was Clipper.  And similar to the

8  avoided costs we discussed it would have come out of their

9  pocket.  I didn't do any further analysis of what further

10  pocket it would have ended up.

11  Q    And in terms of ownership as we saw this morning of the

12  $29.2 million figure, if the jury decides that that's the right

13  price, Clipper's piece of that, actual piece is 1.4 percent,

14  isn't that right?

15  A    I don't know that.

16  Q    Well, the way the Fund works, do you know how many limited

17  partners there are in the Fund, sir?

18  A    I don't.

19  Q    How many?

20  A    I don't.

21  Q    Oh.  If I suggested to you that there were over 90 limited

22  partners in the Fund, would that sound about right to you?

23  A    I don't know if that sounds right or not.  I don't know.

24  Q    Do you know how many of them are large companies?

25  A    No, I don't.

1  Q    So but you do know that Clipper, from that whole big fund

2  what Clipper has is a 1.4 percent interest, right?  We talked

3  about that this morning?

4  A    You shared that with me, yes.

5  Q    And 1.4 percent of the 29.2, we agreed is $406,000,

6  correct?

7  A    That mathematical calculation is correct, yes.

8         MR. MANCHEL:  Your Honor, one second, please.

9         I'm sorry, Your Honor.

10  BY MR. MANCHEL:

11  Q    The next item or another item that has to be addressed in

12  this hypothetical negotiation, we touched on again this

13  morning, is there has to be an expectation of profit, right?

14  A    There has to be an expectation of benefit, yes.

15  Q    Not benefit, sir, profit, correct?

16  A    Well, the benefit in this case is profitability.

17  Q    So there has to be an expectation of profit, correct?

18  A    There has to be an expectation of profit, yes.

19  Q    And, again, these are the licensees, right?  These are the

20  people sitting at the table?

21  A    Yes.

22  Q    And you didn't determine in your analysis what profit

23  Clipper expected for itself, isn't that right?

24  A    That's correct.

25  Q    What you did was you determined in your analysis what

1  profit the non-party companies would have expected, correct?

2  A   No, I wouldn't put it that way.  What I did was I

3  evaluated the totality of the profit that would be generated by

4  the presentation trade secrets that was being negotiated for

5  between Hallmark and Clipper.

6  Q   No, you didn't figure out the totality of the profit.

7  Your job was, as part of the analysis was to figure out an

8  expectation of profit.  Because the rule is in our hypothetical

9  negotiation, the rule is that the person paying the money at

10  that moment, to use your phrase, at that moment has to have an

11  expectation that when all is said and done they will make a

12  profit.  They don't have to get one.  But sitting there at that

13  moment they have to have an expectation that they would get a

14  profit after payment, right?

15  A   I think that in this case Clipper is negotiating over the

16  entire benefit stream, the entire profit stream in the same way

17  that they were negotiating through William Blair for the

18  purchase of RPG, they were negotiating on behalf of others.

19  Q   Sir, I'll ask you, again, it is a rule in this

20  hypothetical world we're talking about where the party to the

21  license has to expect a profit upon the payment at the moment

22  the reasonable royalty is paid, right?

23  A   No.

24  Q   So let me get this straight --

25  A   You've set up, that's your rule.  The parties that are

1  negotiating this, both sides must expect that the position that

2  they're negotiating on is an economically reasonable position.

3  And the position that Clipper would be negotiating on at that

4  point is it's economically reasonable to pay $29.2 million for

5  a license given that having a license to this will enable this

6  IP to be used by RPG and will achieve benefits that we talked

7  about.

8  Q    So in your logic it would be, Clipper would say it's

9  reasonable for me to pay $29.2 million, using the words you

10 just used, because I'll get these trade secrets and they'll be

11 really beneficial for RPG, right?

12 A    Yes.

13 Q    So RPG will use the trade secrets that Clipper paid for

14 and only RPG will get the money, right?

15 A    Wrong.  As I understand it Clipper was managing RPG once

16 this transaction occurred.  Clipper is sitting there saying

17 we're going to use these things when we're managing RPG.  Now

18 while we're using these things, while we're managing RPG, RPG

19 is going to achieve these higher growth and higher cash flows

20 so this is what this is worth and that's the $29.2 million.

21 Q    Why are you assuming that Clipper is managing RPG?  What

22 are you basing that assumption on?

23 A    I believe after the transaction members of Clipper were in

24 charge of RPG.

25 Q    You do?

1   A    Yes.

2   Q    So do you know if any member of Clipper was the president,

3   vice president, or secretary of, corporate officer of RPG?

4   A    I believe they were on the board.

5   Q    They were on the board.  Do you know how many non-Clipper

6   members were on the board?

7   A    I don't.

8   Q    You know, so you don't know who was in control of RPG

9   correct?

10  A    Well, I don't know.  I don't have the ownership structure.

11  Q    You don't know who's on the board.  You don't know who is

12  the corporate officer.  You don't know the corporate structure.

13  But you just assumed that Clipper would pay $29.2 million

14  because it would help Clipper manage RPG, right?

15  A    Well, I looked at the, there one of my demonstratives that

16  had discussion points.  And Clipper was saying what Clipper was

17  going to do and there were we's.  Clipper was going to use this

18  information.  We are going to be able to do this.  That was

19  Clipper, what Clipper was going to be able to do.

20  Q    Okay.  So after Clipper was supposedly the manager but my

21  original question to you was after paying this money you agree

22  with me that all of the revenue from card sales and the like

23  goes to RPG, not Clipper, correct?

24  A    It goes to RPG.

25  Q    Then if things work really, really well and RPG is sold

1   and there is a profit, the money would go to the two former

2   owners, correct?  You know that, right?

3   A    It would, as I think I discussed, it would go to the

4   owners of the profit stream.

5   Q    Okay.  The owners of the profit stream are the two former

6   owners of RPG, correct?

7   A    I believe they had some shares, yes.

8   Q    Then it would go to Fund II, correct?

9   A    I believe Fund II owned --

10  Q    Clipper's piece of Fund II was 1.7 percent, correct?

11  A    I believe that's correct.

12  Q    And your argument is it would be economically reasonable

13  for a company to pay $29.2 million so at the end of the day to

14  get 1.7 percent of something?

15  A    I don't believe that is what I'm saying.  I'm saying

16  Clipper is negotiating and will come up with this royalty based

17  on the totality of these expected benefits.  And they are the

18  negotiator of this.  And that they could not put a deal

19  together that would work the way the deal they were trying to

20  do without this license.

21  Q    Now, in order for there to be any profit, we all need to

22  assume that it was expected that RPG's revenues would grow,

23  right?

24  A    Over time, yes.

25  Q    Sitting there in September, has to be an expectation that

1  RPG would make enough money that somewhere down the line it

2  would be sold for a high enough price so that the money would

3  go to, as you keep calling them, the beneficial owners, right?

4  A    Well, there is an expectation, both Kelso and Clipper had

5  an expectation, RPG had an expectation of a certain amount of

6  so-called organic growth.  They had been growing.  They were

7  going to continue growing along a certain path.  This is the

8  amount of growth over and above that growth and that's the

9  expectation.

10  Q    Well, you said, sir, that Clipper would have expected in

11  September 2005 that five years later the gross revenues of RPG,

12  the total revenues, would reach approximately $205 million,

13  isn't that right?

14  A    That's one of the two approaches that I used.

15  Q    I'm asking you about, let's look at the approach that you

16  used.  We talked about the bid differential approach.  The

17  other approach you used, one of the components of it was that

18  the total revenues of RPG, the assumption was to grow to

19  $205 million in five years, right?

20  A    That was the calculation, yes.

21  Q    Okay.  And you're telling the jury that that's what

22  Clipper expected in September of 2005, that's what you believe

23  it would have expected, right?

24  A    That is a calculation that is based on the expectation of

25  doubling the revenues from the Monitor IP, or not, excuse me,

1   all of the unique IP that was brought to bear by Clipper would

2   add $91 million and I added that to the Kelso base case which

3   is assuming the market expectation of how it would grow and the

4   result is 205 million.

5   Q    So is that a yes, sir.

6   A    That's the calculation.

7   Q    But my question was, I didn't ask for your calculation.

8   The question was, did you as part of your calculation or as the

9   conclusion of your calculation, did your analysis rest on the

10  notion that in five years when Clipper was sitting there in

11  September at this negotiation table, you're representing to the

12  jury that Clipper in September of 2005 would have expected the

13  revenues to grow to $205 million?

14  A    Not necessarily.  That is a calculation that was used to

15  come up with a running royalty rate which, as I discussed

16  earlier, there was a lump sum royalty and there was a running

17  royalty calculation.  And I made a series of assumptions in

18  order to calculate the running royalty.  And that calculation

19  you're referring to was in that.

20  Q    But you based that assumption on what you believe Clipper

21  would have expected, right?  Based on your view of the

22  materials?

23  A    That is what I believe was an appropriate way to calculate

24  a reasonable royalty rate.

25  Q    Now, in fact, sir, Clipper did all sorts of analyses,

1 financial analyses in the September 2005 time period, isn't

2 that right?

3 A    There were many, many, many financial analyses.

4 Q    Called LBO models?

5 A    I saw a lot of them.

6 Q    Saw a lot of LBO models, right?

7 A    Yes.

8 Q    See a single LBO model that had in it gross revenues of

9 RPG in five years of $205 million?

10 A    I don't believe so.

11 Q    You didn't, did you, sir?

12 A    No.

13 Q    Did you look at the LBO model, the financial model that

14 was done on September 16 of 2005, almost within moments of this

15 hypothetical negotiation?

16 A    As I said, there were so many I don't know which one

17 you're talking about without seeing it.

18 Q    Jeff, put up, please, Defendant's 73.

19         Did you look at this, sir?

20 A    I'm seeing, what I'm seeing I can't tell you.  I'd have to

21 look.

22 Q    Jeff, can you pull back?

23         Take a look at this model?

24 A    As I said, I looked at a lot of LBO models.  This,

25 given -- I looked at a lot of them, I probably looked at this

1    one.  I can't tell you.  I can't read it.

2    Q    Well, this is the model from two weeks, within two weeks

3    of your hypothetical negotiation, isn't it?

4    A    This is a model from within two weeks.  I believe there

5    were lots of models continually being performed.  And I believe

6    I looked at these and took information from the deposition of

7    Peter Kim of Clipper about these models.  And I don't know if

8    this is the model that was the one that was taken to the

9    investment committee of Clipper but he discussed that a model

10   was taken to the investment committee of Clipper which had

11   numbers which were lower than the numbers of 205 million in

12   year five.  And he said, yeah, we took that to it but everybody

13   who was there knew that this was conservative and we expected

14   much more.

15   Q    My first question which you answered was, you based the

16   theory on a sales revenue figure of $205 million which you

17   never saw in a single financial model that was run by Clipper,

18   right?

19   A    And I said that I didn't.  There was a separate

20   calculation in my analysis which was to arrive at a reasonable

21   royalty rate.  And in that analysis I performed a certain

22   calculation where I took the expected doubling of revenues and

23   I added that to the Kelso base case which was a conservative

24   way of coming up with the royalty rate.

25   Q    In fact, in this model which is two weeks away from your

1  hypothetical negotiation, not 205 million, there is 115 million

2  projected in sales, isn't that right?

3  A    I can't see it.

4  Q    If you look toward the right?

5  A    What I'm looking at is very, very small.

6  Q    I'll give you a copy, it's easier to read.

7          See the figure there?

8  A    In this model, I see that, yeah.

9  Q    So you have an analysis that says Clipper expected on

10 September 1 revenues of 205 million, but you didn't look at the

11 analysis that Clipper actually did on September 16 that said it

12 expected revenues of 115 million, right?

13 A    As I said, there were hundreds of these LBO models done.

14 I don't know which one this is.  You're putting one in front of

15 me.  This one does have those low numbers.  I don't know what

16 the result of this one is.  And as I said, I reviewed the

17 deposition of Peter Kim who said, yeah, we did one model which

18 we took to the investment committee to get okayed for the deal

19 and it was a conservative one and everybody knew that we were

20 low balling the numbers because it was going to be bigger and I

21 took that into account.

22 Q    Sir, but the jury just saw Peter Kim's deposition.  You

23 sure that comes from Peter Kim's deposition?

24 A    I'd have to look but I know he discussed going to the

25 investment committee and discussed what the view point was of

1  the model he took there.

2  Q    Do you know who Peter Kim was on the deal team, sir?

3  A    I believe he was an analyst.

4  Q    Do you know what position he held on the deal team?

5  A    No, I don't.

6  Q    Do you know he was either the most junior or second most

7  junior on the entire project person?

8  A    I don't know one way or the other.

9  Q    Do you know he had only been in the private equity world

10  for one year?

11  A    I don't know.

12        MR. GERMAN:  Objection to that.  I don't think

13  there's any evidence of that.  Counsel is talking about

14  things --

15        THE COURT:  The jury will recall the evidence.

16  Overruled.

17  BY MR. MANCHEL:

18  Q    Do you know, sir, I think, I could be wrong about this but

19  I think he joined Clipper in August of 2005.  Do you know that?

20  A    I don't know one way or the other.

21  Q    So is it your testimony that the most junior person on the

22  RPG team, who had been there a month, walked into the

23  investment committee presentation and announced that the

24  leveraged buy out models they're using were way conservative

25  and would be juiced up?

1    A    I didn't say he walked in the investment committee and

2    announced anything.  I said that in his deposition, as I recall

3    it, he reflected that models were taken to the investment

4    committee and that the people at the investment committee

5    believed that they were understated.

6    Q    Okay.  Jeff, would you pull up Defense Exhibit 487,

7    please?

8         This is a memo, sir.  Ever seen this?  This is Bill

9    Young who is running the RPG deal, Charlie Yoon, Paul Maxwell

10   and there is Peter Kim.  Do you see that?

11   A    I do.

12   Q    Did you look at this memo when you formed your opinion

13   about the $205 million?

14   A    You know I might have seen it.  As I sit here, I don't

15   recall.

16   Q    Jeff, pull it back.

17        Take a look at it, sir.  Do you see anywhere in the

18   memo $205 million?

19   A    No.

20   Q    Do you see what number they're using?

21   A    Well, $205 million is a one-year revenue for 2010 that's

22   in a schedule that I have in my analysis that calculates

23   reasonable royalty rate.

24   Q    I know you put a schedule together with that figure in

25   there.  I'm asking you as of this time period --

1  A    I'm scrolling through something.  Do you have a hard copy

2  I can look at and review the whole document?

3  Q    It's Defendant's Exhibit 487, please.  I think you'll find

4  the number on the second page, sir.  You'll find another one on

5  the third page.

6  A    Yes.

7  Q    What are those numbers 117, 117 million, right?

8  A    These are the low growth cases.  They did a number of

9  scenarios, they did lots of scenarios.  As I said, my

10  recollection of the Kim testimony is he discussed this low

11  growth case was taken to the investment committee and he said

12  that everybody understood that it would be bigger than this.

13  Q    So your analysis is based on what you think the most

14  junior person on the team said about what happened at the

15  investment committee but it is not based on an actual financial

16  model, one within two weeks of your hypothetical meeting or a

17  memorandum written by the people running the deal for Clipper

18  at the moment, is that right?

19  A    This memorandum simply has two low growth cases and it

20  doesn't have anything more than that.  It doesn't have the

21  other cases.  I said there were lots of models that were run.

22  And I did rely on the discussion of a party who was there doing

23  this, Peter Kim.  And I don't have the specific cite in front

24  of me.  I'm looking whether it's in my report.  But if you

25  would like me to sit and review the deposition of Peter Kim to

1  find the exact, I would be happy to.

2  Q    Did you ever find a model that Peter Kim did that had the

3  $205 million revenue figure in it?

4  A    No.

5  Q    Now, you also opined about a running royalty.  And the way

6  a running royalty works if I follow it is, we're still at the

7  hypothetical negotiation.  The way the running royalty works is

8  the agreement this time is each year Clipper will pay X amount

9  of dollars, millions of dollars as opposed to paying a really

10 big number once, right?

11 A    Yes.

12 Q    And your theory is that, okay, so Clipper pays the running

13 royalty on day 1 for a year, right?

14 A    Well, they don't pay that day 1.  They pay it whatever the

15 terms of the license would say whatever the measurement point

16 is.

17 Q    So this is a negotiation as well, right?

18 A    Well, the license comes out, usually there is something

19 that says we will have an audit at the end of the year and we

20 will be provided your audited financials and the royalty will

21 be based on that.  And real licenses have clauses within them

22 that say we have the right to go back and make sure it's right,

23 so on and so forth.  But it's a running so it's not up front.

24 It's something that would occur over time.

25 Q    So the way this works for you is Clipper would pay the

1    money and then the revenue that the money is based on would all

2    go to RPG, not Clipper, right?

3    A    Well, the royalty is based on a certain amount of revenue

4    and the base of that is the revenue of RPG.

5    Q    I think that's what I just said.  Every year you would

6    have Clipper pay a royalty fee, a running royalty fee but the

7    money would go to RPG, right?

8    A    As I said I didn't do the specifics of who would pay the

9    running royalty.  I didn't make an opinion one way or the other

10   on that.

11   Q    In fact, you assumed the running royalty would be paid by

12   parties other than Clipper, didn't you?

13   A    No, I don't think I assumed that either.

14   Q    Jeff, would you go to Serwin, page 258, line 10 through

15   259, line 5.  Would you highlight it, please?  258, line 10.

16        In your hypothetical license negotiations, why would

17   Clipper pay fees each year on a running royalty license when

18   the revenue is being captured by RPG?

19        ANSWER:  Because as I've told you, I was asked to

20   assume for purposes of my calculation that there is no

21   distinction between Monitor Clipper Partners L.L.C. and Fund II

22   which owned RPG.

23        Do you see that?

24   A    I do.

25   Q    So you know Fund II owned RPG, correct?

1  A    I think we talked about that earlier in this deposition

2  and yes, I do.

3  Q    Well, you're being asked to say there's no distinction

4  between Monitor Clipper Partners L.L.C., between the

5  partnerships that constitute Fund II, between RPG Holdings,

6  Inc. and between RPG Corporation, correct?

7         ANSWER:  So to be clear, regardless of the entity

8  that generates the revenue the owners of the profit stream that

9  would be derived from that revenue are the parties that would

10  be paying the royalty.

11        Do you see that?

12  A    I do.

13  Q    You don't say Clipper would pay it then someone else would

14  pay it afterward, do you, sir?

15  A    I said I didn't draw a distinction between any of them.

16  Q    No.  You said the parties who would be paying the royalty

17  are the parties who would be getting the revenue.  Isn't that

18  right?

19  A    No.  I said the owners of the profit stream that would be

20  derived from that revenue are the parties that would be paying

21  the royalty.

22  Q    Right.  And Clipper is not one of the owners of the profit

23  stream, is it, sir?

24  A    I believe they're certainly a part of it.  They have an

25  ownership in Fund II.

1  Q    Of 1.4 percent?

2  A    You said they don't have any.  That's, they are one of the

3  owners and they were the ones negotiating on behalf of

4  everybody.

5  Q    You don't say here and you didn't say in connection with

6  the lump sum that the way it would work is Clipper would pay

7  for a moment then someone would reimburse it.  Your theory is

8  that the owners of the profit stream would be the parties

9  paying the license, correct?

10  A    I think we're talking about the running royalty there.

11  Q    You said exactly the same thing with respect to the lump

12  sum, didn't you, sir?

13  A    I don't know if it was exactly but I didn't draw a

14  distinction.

15  Q    Sir, I'm not asking if you drew a distinction.  I'm asking

16  you did you say in regard to the lump sum that the beneficial

17  owners would pay the royalty?

18  A    I don't know if I said those exact words or not.

19  Q    Let's take a look.  Jeff, would you pull up page 258, line

20  10 through 259 line 5.

21          MR. GERMAN:  May we approach the bench, Your Honor?

22          THE COURT:  Yes.

23          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

24  PROCEEDINGS WERE HAD:)

25          MR. GERMAN:  I didn't want to interrupt the

1    questioning a moment ago but this is at least the third time

2    we've been back to pages 258 and 259.  This cross-examination

3    started at 11:00 o'clock this morning.  It's their case but it

4    is repetitive at this point.  This is the third impeachment

5    with this exact same testimony.

6           MR. MANCHEL:  It's my understanding it's the second

7    time.  I brought him in the beginning --

8           THE COURT:  It doesn't matter.  You guys both have

9    time allocated to you.  I have declined to intervene and direct

10   you on how you should use that time but you should both be

11   aware that we're running the clock.  How you choose to use your

12   time, I'm going to let you do it but you may regret it.

13           (THE PROCEEDINGS RETURNED TO OPEN COURT.)

14   BY MR. MANCHEL:

15   Q    Would you highlight line 23.

16           On what I'm, so to be clear regardless of the entity

17   that generates the revenue, the owners of the profit stream

18   that would be derived from that revenue are the parties that

19   would be paying the royalty.

20           Do you see that?

21   A    Yeah, I think we just looked at this.

22   Q    Well, this is different.  This is the lump sum piece.

23   A    No, it's not.  This is the exact same thing we just looked

24   at.  And it's right above it on page 258, line 10 says in your

25   hypothetical license negotiation why would Clipper pay fees

1    each year on a running royalty.

2    Q    I apologize, sir.

3    A    When the revenue is captured by RPG.  We just looked at

4    this.

5    Q    I meant to take you to a different page, sir.  I

6    apologize.  Everybody has a moment.  Apparently this one is

7    mine.

8         Sir, let me ask you a different question.  At the end

9    of the day do you know how much money Clipper would receive if

10   RPG hadn't gone to bankruptcy?  Do you have any idea how much

11   money Clipper would have received from your hypothetical sales

12   price?

13   A    How much Clipper, itself, the legal entity, Clipper?  No,

14   I don't.

15   Q    You keep saying the legal entity Clipper.  It's just

16   Clipper, right?

17   A    Well, you've drawn numerous distinctions today about the

18   different legal entities.  As I said and as we did just see in

19   258 and 259, I did not draw any distinction between them for

20   purposes of the damages calculation.  I made that clear.  You

21   made that clear.  So I did not do a specific calculation about

22   Clipper legal entity.

23   Q    And the reason you never figured out what Clipper would

24   actually make in your hypothetical license negotiations is

25   because the Hallmark lawyers told you not to do that, right?

1    A    Well, there was no, that analysis was not done by me.  It

2    was under the assumptions that I was asked to make.

3    Q    My question is --

4    A    -- not an analysis to perform.

5    Q    I understand you never figured out how much Clipper would

6    make.  My question to you is you never figured out how much

7    Clipper would make because the Hallmark lawyers told you not

8    to, right, from the beginning?

9    A    No.  You're saying they told me not to.  I was working

10   under an assumption about don't draw a distinction.  So if I'm

11   not drawing a distinction there was no need for me to do that

12   analysis.

13   Q    Well, who told you not to draw a distinction?

14   A    That was an assumption I was asked to make.

15   Q    Who told you to make it?

16   A    That was an assumption I was asked to make by counsel for

17   purposes of doing my analysis.

18   Q    The lawyers from Hallmark, right?

19   A    Yes.

20   Q    And if they told you, please figure out what Clipper would

21   have made on the profits in your hypothetical license, you

22   could have figured that out, right?

23   A    Perhaps.

24   Q    Any doubt in your mind, sir, that you couldn't have

25   figured that out?

1  A    I don't know if I would have had all of the data to do the
2  analysis or not.  I didn't do it.
3             MR. MANCHEL:  No further questions, Your Honor.
4             THE COURT:  Redirect?
5             MR. GERMAN:  Yes.  But not very much.
6                      REDIRECT EXAMINATION
7  BY MR. GERMAN:
8  Q    While I'm getting some papers around here, could we just
9  have Exhibit 55 pulled up, please.
10             Dr. Serwin, we looked earlier today during your
11  presentation at Exhibit 55 and you had this question and the
12  answer put into your slide show.  Do you recall that line of
13  questioning?
14  A    I do.
15  Q    Then during the cross-examination you were asked
16  repeatedly about Clipper not being the entity running RPG or
17  deriving any benefit from the ownership.  Did you consider
18  those issues when you looked at Exhibit 55?
19  A    Well, when I looked at Exhibit 55 what I saw was that MCP
20  believed that they were going to be able to derive growth and
21  produce high cash flow from RPG that others can't.  I don't
22  know how they are going to do that if they're not the ones
23  using this information and operationalizing this information.
24  Q    Now, I'd like to pull up Exhibit 422.  And just highlight
25  the top part of it.  First paragraph, please.  And the top, the

1    heading.  Well, I need to see the top part.  There you go.  And

2    the date, please, December 2005.  There.  Perfect.

3          Weil Gotshal Manges Law Firm in New York.  Are you

4    familiar with them, Dr. Serwin?

5    A    I know of the firm, yes.

6    Q    Have you seen this document, Exhibit 422, before?

7    A    I believe that I reviewed it.

8    Q    Okay.

9          MR. MANCHEL:  Your Honor, may we approach?

10          THE COURT:  Yes.

11          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

12    PROCEEDINGS WERE HAD:)

13          MR. MANCHEL:  Double check right now but I don't

14    think this has been admitted in evidence and I think we

15    objected to it on attorney-client privilege grounds.

16          MR. GERMAN:  We checked the list.

17          MR. MANCHEL:  We are pulling it right now.  This was

18    not admitted so it shouldn't be on the screen.

19          MR. GERMAN:  Let's take the exhibit down for a

20    moment, please.

21          MR. MANCHEL:  I'm going to double check unless you

22    have the list of --

23          THE COURT:  422.  Has not been admitted and it has

24    not been stipulated to.

25          MR. GERMAN:  I thought it was stipulated to

1  foundation.

2          THE COURT:  Stipulated as to foundation.

3          MR. GERMAN:  So only relevance objection?

4          THE COURT:  I don't know what the objection is beyond

5  foundation.

6          Let me have a hard copy of the exhibit.

7          Kristan Bopart at Weil.

8          MR. GERMAN:  Partner at Weil.

9          MR. MANCHEL:  We object to this on hearsay grounds.

10  I have no idea.  He says she's a partner.  I can't argue with

11  it but.

12          MR. GERMAN:  Your Honor, if you look at the bottom

13  right you'll see the MCP production number on this, was

14  produced to us by Clipper, part of the closing binder on the

15  RPG just like the flow of --

16          MR. MANCHEL:  I didn't say it was attorney-client

17  privilege, Your Honor.

18          THE COURT:  You're saying it's a business record?

19          MR. GERMAN:  It's a business record.

20          MR. MANCHEL:  I don't know what the foundation is,

21  how that's demonstrated.

22          THE COURT:  You stipulated to it as to foundation.

23  The objection to the 422 is overruled.  You may proceed.

24          (THE PROCEEDINGS RETURNED TO OPEN COURT.)

25          MR. GERMAN:  Put it back up, please.

1  BY MR. GERMAN:

2  Q   Now, you understand, Dr. Serwin, that the Weil Gotshal

3  Manges firm in New York represented --

4          Next paragraph 2, Cindy.  Please get rid of those

5  right here.

6          That Weil Gotshal represented buyer and Monitor

7  Clipper Partners.  Do you see that?

8  A   I see that, yes.

9  Q   Look at the first paragraph here.  No.  Up.  There you go.

10          So this is Clipper's counsel documenting and

11  describing the corporate transaction in which RPG was acquired.

12  Do you see that, sir?

13  A   I see that.

14  Q   Okay.  And what you told us throughout your

15  cross-examination is that these kinds of legal structures

16  documents were not part of the analysis you did?

17  A   They were not.

18  Q   Now, what we see in the closing memorandum is the

19  documentation of the acquisition by Monitor Clipper Partners

20  together with its affiliates of a majority interest in Recycled

21  Paper Greetings.  That occurred on Monday, December 5, that was

22  your understanding when the transaction closed?

23  A   Yes.

24  Q   December 5.  And it was done pursuant to a stock agreement

25  dated November 2, right?

1  A    That's what it says, yes.

2  Q    When was the hypothetical negotiation that is actually the

3  relevant date in this case?

4  A    September first of 2005.

5  Q    So this entire transaction, the creation of the buyer and

6  the investment holdings, signing of the contracts and the

7  closing of the deal takes place after the relevant date for the

8  hypothetical royalty, true?

9  A    That is true, yes.

10 Q    Let's skip down just a little bit to paragraph No. 2.  At

11 a prior time.  So at or prior to signing Clipper forms the

12 buyer.  Then the buyer forms acquisition for it.  Then the

13 memorandum goes through and documents, the steps of the

14 acquisition.  This is not relevant to your analysis?

15 A    Well, this is relevant to the extent that it shows that at

16 the time of the hypothetical negotiation the party that was

17 there and the only party that was there was Monitor Clipper.

18 Q    Now, Cindy, if you would, please, just skip over to the

19 second to the last page of this exhibit.  The schedule 1.  Post

20 closing.

21       And post closing, after the deal was done,

22 Dr. Serwin, we see that Recycled Paper Greetings, the target

23 company, the card company, has a board of directors composed of

24 William Young and Charles Yoon.  Who are they?

25 A    I believe they are part of Monitor Clipper.

1  Q    Okay.  And we see that Mr. Levine, who we heard about, and

2  two others are there.  But Charles Yoon, Clipper, is an officer

3  of the operating company as well, right?

4  A    That's what this indicates, yes.

5  Q    Then we see a company called RPG Holdings and its

6  directors are Yoon and Young, Clipper people, right?

7  A    Yes.

8  Q    And then we have RPG Investment Holdings.  And here we

9  have Calhoun, Young and Yoon from Clipper, right?  Are you with

10 me on that?

11 A    Yes.

12 Q    And then Friedman and Keiser, they're the sellers, right?

13 And then Mr. Levine and Mr. Murray and they are officers of the

14 operating company.  But it's these three people are Clipper,

15 right?  In RPG Investment Holding, Calhoun, Young and Yoon?

16 A    Yes.

17 Q    Then in that RPG Investment Holdings, Inc. Bill Young is

18 the president, Clipper guy, right?

19 A    Yes.

20 Q    Charles Yoon, secretary treasurer, the only two officers,

21 Clipper guys, right?

22 A    Yes.

23 Q    There is a couple of subsidiaries, Canada and Barnyard

24 Industries and RPG Canada, here the board of directors is Young

25 and Yoon, Clipper guys?

1  A    Yes.

2  Q    Barnyard Industries, Young and Yoon, Clipper guys?

3  A    Yes.

4  Q    Officers, Young and Yoon, Young and Yoon for both

5  subsidiaries, right?

6  A    Yes.

7  Q    So the corporate structure that came into being in

8  December, two months after your hypothetical negotiation,

9  creates all of these entities in which Clipper and its

10 affiliates have taken control of RPG?

11 A    Yes.

12 Q    But that's not part of what you considered in the royalty,

13 correct?

14 A    That's correct.

15 Q    Now, let's, I want to ask you about the Fund II side of

16 this.  And just to make things kind of simple I'm just going to

17 use a white board but you understand that Fund II is actually

18 comprised of two partnerships, right?

19 A    I believe so.  I've seen contracts that way but I don't

20 have a full legal understanding of that.

21 Q    We're just going to write Fund II?

22       THE COURT:  Just a moment.

23       MR. MANCHEL:  Objection.  I object to it.

24       THE COURT:  And the objection is.

25       MR. MANCHEL:  My objection is he's leading.  The

1   witness has testified he didn't look at this.  He didn't

2   analyze it.  And he said it's beyond his scope.

3            THE COURT:  This part is leading.  You want to

4   pursue -- may ask that --

5            MR. GERMAN:  For the leading question he was

6   cross-examined for an hour on Fund II.

7            THE COURT:  It was a leading question.

8            MR. GERMAN:  Okay.

9            THE COURT:  I'd like to hear from the witness what he

10  knows compared to what you know.

11           MR. GERMAN:  Fair comment, Your Honor.

12  BY MR. GERMAN:

13  Q    Do you know, Dr. Serwin, what the entities are that

14  comprised Fund II?

15  A    I believe there are two entities.  I don't know their

16  names off the top of my head.

17  Q    We'll just call them 1 and 2 then.  Are they limited

18  partnerships?

19  A    You know, I don't know.

20  Q    Do you know whether those two limited partnerships are run

21  by a general partner that is itself a limited partnership?

22           MR. MANCHEL:  Objection.

23           THE COURT:  Sustained.

24  BY MR. GERMAN:

25  Q    Do you know anything about the structure of Fund II?

1  A    Not much.

2  Q    Do you know, do you know whether individuals at Clipper

3  actually control every step of the governance process and

4  decision-making process of Fund II?

5            MR. MANCHEL:  Same objection, Your Honor.

6            THE COURT:  He's testified he's doesn't know.  That

7  may be as far as we can go with this witness.  Sustained.

8  BY MR. GERMAN:

9  Q    Do you know?

10 A    I'm sorry?

11 Q    Do you know?

12 A    I know that Monitor Clipper has a lot of control.

13 Q    Fair enough.

14            Let's pull up Exhibit 423.

15            Now, Exhibit 423, Dr. Serwin, is dated November 2,

16 2005.  Do you see that?

17 A    I do.

18 Q    And do you see the authors of the letter at the top,

19 Monitor Clipper Partners II LP and Monitor Clipper Partners

20 NQP2LP?

21 A    I do.

22 Q    Is that Fund II?

23 A    I believe it is Fund II.

24 Q    Okay.  So this is a letter from Fund II to whom?

25 A    To RPGI.

1    Q    RPG Investment Holdings?

2    A    Yes.

3    Q    And it's on November 2?

4    A    Yes.

5    Q    Okay.  May we have the first paragraph, please?

6              And so what we see is that these two entities, the

7    Fund, is pleased to offer a commitment to purchase equity

8    securities, stock of RPGI to be used to fund the acquisition of

9    Recycled Paper Greetings.  Is this what you call the equity

10   commitment?

11   A    I believe it's the equity commitment.

12   Q    And it was when?  November 2?

13   A    Yes.

14   Q    So on September 1, the date of the hypothetical

15   negotiation, there is no equity committee.  Is that your

16   understanding?

17   A    That's my understanding.

18   Q    Okay.  And here's the purchase price of 317 and a half

19   million dollars.  Okay.  Are you with me on that?

20   A    Yes.

21   Q    Okay.  Let's go the signature page of this November 2

22   letter.  Who signs on behalf of Fund II?

23   A    Bill Young.

24   Q    Who signs on behalf of the other Fund II?

25   A    Bill Young.

1    Q    And who signs on behalf of RPG Investment Holdings L.L.C.?

2    A    Bill Young.

3    Q    So Bill 1 and Bill 2 write a letter to Bill 3. Is that

4    what we're seeing?

5    A    That is what it appears to indicate.

6    Q    Okay. And is this anything that you considered for

7    purposes of the royalty analysis?

8    A    No.

9    Q    Why not?

10    A    It occurred after the date of the hypothetical.

11    Q    So if RPG, I'm sorry, if Clipper ends up with this small

12    percentage of ownership in the ultimate acquisition structure

13    of RPG, that is because of events that occurred after the

14    hypothetical negotiation?

15    A    All of the events that you've described occurred after the

16    date of the hypothetical.

17    Q    And they were structures that Clipper, itself, put in

18    place, true?

19    A    Yes.

20    Q    You were asked a question about what would happen to the

21    private equity industry if private equity firms were held

22    responsible or held to be owners of the companies they target,

23    something like that. Have you studied or considered that

24    question?

25    A    No.

1  Q    Is it relevant to the hypothetical analysis that you did?

2  A    The question isn't relevant to the hypothetical analysis.

3  The only thing that's relevant is that private equity company,

4  I'm no expert in private equity.  But we just had a gentleman

5  who was running for president who was the head of a private

6  equity company.  I think we all know about that.  And the whole

7  point of his claim to be able to do better for the economy is

8  he knows how to run businesses because as private equity they

9  go in and run businesses and turn businesses around.  That's

10  what they do.

11                THE COURT:  Just a moment.

12                MR. MANCHEL:  Objection, Your Honor.

13                THE COURT:  Sustained.

14                MR. GERMAN:  Withdrawn.

15  BY MR. GERMAN:

16  Q    I'll change subjects for a moment.  Let's call up Exhibit

17  547H that we looked at earlier, please.  Highlight, please.

18                Dr. Serwin, the question was asked of you on

19  cross-examination of whether all of these management fees that

20  we see totaled there at the top, that total to a million 5,

21  were, in fact, paid?

22  A    Yes.

23  Q    And it was suggested to you that only 700,000 or so were

24  paid.  Do you know that?

25  A    I don't.

1    Q    Then let's call up Exhibit D10, please.

2            Exhibit D10 is a stipulated exhibit.  The parties

3    have agreed that it may be admitted.  And this is the, well,

4    appears to be the Recycled Paper Greetings Amended Joint Plan

5    of Reorganization under Chapter 11.  Do you see that?

6    A    Yes.

7    Q    And you do understand, I think you testified on

8    cross-examination, that RPG went through this bankruptcy

9    proceeding, came out owned by American Greetings?

10   A    Yes, I do understand that.

11   Q    And that's where it is today, right?

12   A    Yes.

13   Q    RPG, Recycled Paper never shut their doors, did they?

14   A    No.

15   Q    So just went through the bankruptcy.  Came into the

16   bankruptcy owned by the Clipper organization affiliated

17   companies we've looked at.  Came out of the bankruptcy owned by

18   American Greetings?

19   A    That's my understanding.

20   Q    Do you know how long that took?

21   A    I don't.

22   Q    For our purposes here today though let's look, it's page 2

23   of the, I think it's actually page 9 of the exhibit.

24           And if you look, Dr. Serwin, actually 1.10 we see an

25   allowed Monitor Clipper Partners claim in the aggregate amount

1    of 750,000.  Do you see that?

2    A    I do.

3    Q    Then, Cindy, skip it over to page 20 of the exhibit,

4    section 5.9 of the plan.

5         Where the plan provided that the allowed Clipper

6    claim shall be classified as an allowed claim and paid in cash

7    in full within ten business days after the effective date in

8    full satisfaction of any claims Clipper may have.

9         Is this a document you looked at in connection with

10   your study of the management fees?

11   A    I've seen this document.

12   Q    Okay.  And was this part of the basis on which you relied

13   to say that the 1.5 million was the correct number?

14   A    Well, the basis was the invoices.  And to the extent that

15   Clipper received the totality of those invoices through direct

16   payments from RPG or through the resolution of the bankruptcy

17   doesn't change.  If they received it, they received it.

18   Q    Now, there was some questioning, pull up, please, Exhibit

19   487.

20        This is Exhibit 487 that we've all become familiar

21   with.  It has the three Power Points attached to it?

22   A    Yes.

23   Q    The three presentations.  And this is the third one, the

24   Gold Crown Channel analysis that we've been looking at.

25        Cindy, just skip over a couple pages into the text

1  please.  Okay.  Fine.  Stop anywhere.  Then highlight for us

2  the little footer down here at the bottom.

3          We looked at some footers the other day.  Let's look

4  at this one.  When you were looking at these documents,

5  Dr. Serwin, first, what is YWC?

6  A    I believe it's When You Care.

7  Q    When You Care.  And what is CHN?

8  A    I believe that reflects channel.

9  Q    So this document, this presentation, this is one of five

10 presentations.  Is that the only one that had the CHN

11 designation on it?

12 A    I'd have to look through them again but I believe so.

13 Q    And who put those designations on the document?

14 A    I believe that those designations came from Monitor

15 Consulting.

16 Q    And so you had 3.8 million of your 5 was over here on the

17 greetings side.  Then 1.2 million was on the channel piece

18 which was this presentation, right?

19 A    Yes.

20 Q    Okay.  Now you talked on the cross-examination when

21 Mr. Manchel asked you about an error that had been made in

22 classification which resulted in you reducing the fees part of

23 your analysis from 7.2 million down to 5 million.  Do you

24 recall that?

25 A    I do.

1   Q   So, Cindy, put up for us, please, Exhibit 488. And go to

2 the second.

3        This is the 488, has the other two presentations on

4 it, Dr. Serwin, we've been looking at. This is the second one.

5 Do you recall the Small Competitors and the Deep Discount

6 Space?

7   A   Yes.

8   Q   Skip over a couple pages, that's fine. Stop. Then go,

9 well, make sure it's not covered up. Get one of those footers

10 for me. Okay.

11        Has the When You Care, right, see that?

12   A   Yes.

13   Q   And then it has another module code from the BMR and what

14 was that?

15   A   INT.

16   Q   That was a code placed on there by Monitor?

17   A   That's what I understand.

18   Q   Does that coding have anything to do with the confusion

19 over whether this was part of greetings or something else?

20   A   Well, from my point of view in reviewing the documents

21 when asking questions about whether or not the fees for the INT

22 portion of the BMR project were reflected in the presentations,

23 this document said INT. So when I was told by Mr. Strickland

24 that, yep, they're reflected in there, I didn't have a reason

25 to think, well, it says GRT or it says CHN or it says any of

1  the other ones.  So from that point of view, I had no reason to

2  dispute the representations made by Mr. Strickland to me.

3  Q    But, initially, it was thought that when it said INT that

4  meant it came from the integration module and that's why those

5  fees were brought into your analysis, right?  Initially?

6  A    Initially, as I looked at these documents I saw they had

7  documents that were GRT, had document CHN and INT.  I then

8  asked questions of Hallmark about these.  And I was told the

9  three projects and the consulting was done for the three

10  projects was reflected in these presentations.  I had no reason

11  to dispute that.

12  Q    Then when the question was raised by the defense of

13  whether that was appropriately classified as INT, you went

14  back, examined or asked Mr. Strickland to examine again and you

15  all determined that, in fact, that small competitors was part

16  of the greetings project, right?

17  A    Something like that.  Specifically I believe that the

18  defendant's expert said that there were two portions of the INT

19  project, that it wasn't all one.  And then said that this

20  particular presentation belonged in one portion, not in the

21  other.  And so disputed a portion of the 2 point whatever for

22  the totality of the INT and said, well, it could only be this

23  portion, it can't be this portion.  I went back and said, okay,

24  there's more here going on.  I don't understand it all.  Let's

25  get down to it.  And based on that discussion that's where it

1    came back and said, no, it's not in there at all.

2    Q    So when you conducted that further review then and

3    determined that the small competitors was actually part of the

4    GRT or greetings module, that was the 3.8 million?

5    A    Yes.

6    Q    You then, the 2.2 million, that you had originally put on

7    this document, you just took out, right?

8    A    Yes.  Well, I didn't determine, I was told.

9    Q    Strickland determined?

10   A    Strickland told me this was not part of INT.  And so I

11   said then there is no INT.  So I lowered the number.

12   Q    You lowered it from 7.2 million down to the 5 million

13   that's in the report that we're here about today?

14   A    Yes.

15   Q    Do you understand why the defense is complaining the

16   2.2 million was reduced from the claim?

17   A    I don't know.

18          MR. GERMAN:  Your Honor, I think we'll stop there.

19   Thank you.

20          THE COURT:  Recross.

21                    RECROSS-EXAMINATION

22   BY MR. MANCHEL:

23   Q    Dr. Serwin, your counsel took you through a whole bunch of

24   corporate entities that were created after the September 1

25   date, right?

1  A    Yes.

2  Q    And the question to you was but they didn't exist on

3  September 1.  The only thing that existed on September 1 was

4  Clipper, right?

5  A    Yes.

6  Q    First of all, that's just flat out wrong because on

7  September 1 Fund II existed, didn't it?

8  A    Fund II existed, yes.

9  Q    Nothing was created new with respect to Fund II on

10  September 1, was it?

11  A    I think what he was showing me was the equity commitment

12  from Fund II had not occurred at that point.

13  Q    Sir, he took you through a bunch of companies that were

14  created post September 1 and then he said to you the only

15  entity around at the time was Clipper and you said yes?  Isn't

16  that right?

17  A    If that's what I said and that was the structure of the

18  question, that is incorrect.  Fund II existed at the time.

19  Q    So the moment Clipper is sitting at this hypothetical

20  table, Clipper knows, and by the way Fund II is the owner of

21  RPG, we established that, right?  The 80 percent owner?

22  A    At the end of the day they were.

23  Q    At the beginning of the day they were sitting there, too.

24  They were in existence, right?

25  A    But they weren't sitting there.  There was no equity

1  commitment on their part to this.

2  Q    Now, you said, and it's true, the corporations were formed

3  later on.  That's true, isn't it?

4  A    The other corporations.  As I just said Fund II was, I

5  don't believe was formed later on.

6  Q    But the test, and I want to make sure we make this clear

7  for the jury, the test isn't what existed or didn't exist on

8  September 1, sir.  The test is what did Clipper expect would

9  come to be on September 1.  Isn't that right?  We don't look to

10  the future.  We look at what the parties sitting there believe

11  at that moment, what they would have expected, isn't that

12  right?

13  A    We are looking at expectations of the parties at the

14  table.

15  Q    Are you going to tell this jury that a private equity firm

16  sitting at the negotiation table in September 1 didn't expect

17  that there would be corporations formed to own it that were not

18  that private equity fund, that's not your testimony, is it,

19  sir?

20  A    No.

21  Q    And, in fact, everything you've seen in this case,

22  everything, led you to conclude, you have to conclude that when

23  Clipper was sitting there on September 1 the expectation of

24  Clipper would be that Fund II would be an owner, other

25  companies would own it and Clipper would not, isn't that right?

1   A    I don't know one way or another what their ultimate

2   expectations of how the legal entities would have played out at

3   that point in time.

4   Q    You have to know that.  You have to know the parties

5   expectations on September 1 or you can't do the analysis, isn't

6   that right?

7   A    On September 1 they hadn't successfully achieved a

8   successful bid.  So in order to continue and come up with a

9   number that would be successful and reflect their expectations

10   and the expectations of what would happen after, they would

11   have needed a license from Hallmark.

12   Q    On September 1, they didn't know RPG would go bankrupt

13   either, did they, sir?  They didn't know that, did they?

14   A    No, they did not.

15   Q    So the jury can't assume that Clipper knew on September 1

16   RPG would go bankrupt, right?

17   A    I don't believe they can.

18   Q    And the jury can't assume that on September 1 Clipper

19   didn't think there would be a deal, can it?  Clipper thought

20   there would be a deal on September 1, didn't it, sir?

21   A    I would think Clipper hoped there would be a deal.

22   Q    Clipper thought there would be a deal on September 1,

23   didn't it, sir?

24   A    Clipper thought if they received that license in the

25   hypothetical, if they were able to get that license, then there

1  would be a deal.

2  Q    And Clipper's expectation when it was getting ready to pay

3  this $29.2 million, the expectation was that there would be a

4  deal, right?  Because you have no evidence whatsoever that

5  Clipper would have paid $29.2 million without that expectation.

6  Isn't that right?

7  A    I think what I just said was if they wanted to make this

8  all happen, they would expect, if we get this license then we

9  will be able to get the deal.

10  Q    I asked what the expectation was, sir?

11  A    That's what I --

12  Q    The expectation was if I pay this, it's, the deal is going

13  to get done, right?

14  A    If I pay this the deal is going to get done.

15  Q    The expectation was the deal is going to get done,

16  according to you, the deal is going to get done.  There will be

17  companies that own RPG and it's not going to be Clipper, isn't

18  that right?

19  A    I don't know why you're saying that's according to me.

20         MR. MANCHEL:  No further questions, Your Honor.  We

21  do have an issue for the bench, not for the witness.

22         THE COURT:  All right.  Dr. Serwin, you may step

23  down.

24                                    (Witness excused.)

25         THE COURT:  Folks, do you want to go ahead the next

1  18 minutes or would you like to go home?

2  We're going to stop for the day.

3  I'll tell you that we have a matter to take up late

4  tomorrow afternoon so my expectation is that tomorrow you will

5  work until 4:00 p.m. and be released until Tuesday.  So,

6  please, don't discuss the case.  Keep an open mind until you've

7  heard all the evidence.

8  (The following proceedings were had OUT OF THE

9  PRESENCE AND HEARING OF THE JURY:)

10  THE COURT:  Okay.

11  MR. MANCHEL:  I'm not quite sure but I want to be

12  careful.  And I'm going to ask you for one exception to your

13  two lawyers jumping up rule because this is an area that I

14  don't purport to know much about.  But I want to raise with the

15  Court the notion that to the extent that Dr. Serwin's testimony

16  came in about expectations and the like, we don't have an

17  objection to it.  To the extent there's going to be the

18  suggestion, the argument or the evidence purportedly,

19  supposedly go to some type of collapsing of the entities or

20  piercing of the veil, my understanding, number 1, we object.

21  But my understanding is under Missouri law that has to be pled

22  and it was not in this case.  Again, if I could indulge the

23  Court's permission and ask Stacey to address this because it is

24  not a subject on which I'm conversant.  Thank you.

25  MS. GILMAN:  Your Honor, our concern is they've never

1    pled piercing of the corporate veil and obviously in the midst

2    of trial is not an appropriate time to do it.  There were a

3    series of questions that were asked about Bill Young and other

4    people who have an interest in Monitor Clipper and also have an

5    interest in other entities.  There were some allusions to it in

6    the opening if I recall correctly and we do not want to let

7    those issues seep into this case.  We think they're improper

8    and it is unduly prejudicial and misleading to have the expert

9    on the stand be asking those questions and suggesting that

10   there is, that it would be appropriate to assume a collapsing

11   of the entities.  As Your Honor is aware, they have sued some

12   of individuals and entities previously and either recovered

13   from them or have dismissed them and made the election not to

14   pursue them.  You have said there's no joint or several

15   liability in this case and we therefore, I guess --

16       MR. MANCHEL:  I can't argue about whether it's being

17   brought in to show the expectations but I want to make it very

18   clear that we don't want to see pleadings conforming to the

19   evidence argument, that we're going on the record saying that

20   if, in fact, plaintiff is offering this for a piercing of the

21   veil or collapsing type of argument, we view it as being

22   inappropriate.

23       MR. GERMAN:  Do I have to respond?  I will.  The

24   legal structure that Clipper created to do the private equity

25   was of their making.  And it's their defense.  It's nothing

1    we've done.  It's their defense.

2         Our position is and has always been that these

3    Monitor companies operate as a single enterprise.  They draw

4    pictures and their internal documents, the circle of friends I

5    call it, all the little Monitor companies around one of which

6    is Clipper, one of which is the Monitor Group, they call

7    themselves the Monitor companies.  All of that evidence is in.

8    I suspect that we will ask questions of Ms. Evans, if she

9    testifies, or Dr. Blaydon about capitalization of these

10   companies, who they are, who their boards are.  Fund II is a

11   group of investors.  Sure, it is.  It's a private equity fund.

12   But it's managed by a limited partnership.  That limited

13   partnership is called Monitor Clipper Partner II LP.  The

14   general partner of that limited partnership is called MCP2GP,

15   Inc.  That's the general partner of the limited partner.  That

16   is the general partner of the two limited partners.  When you

17   get up to the top, that company that is the general partner of

18   the limited partnership that is the general partner of the two

19   Fund II entities, the board of directors of that corporate

20   general partner are -- they're the Clipper principals.

21        So we're not arguing to pierce the corporate veil per

22   se.  I mean, we never argued that.  But it's their position

23   that, first it was their position it was a matter of law the

24   Court had to respect that.  The Court has held that that's an

25   argument for the jury.  And we're going to argue to the jury

1   that it doesn't mean anything.  Because we're not looking to

2   collect the judgment against Clipper by going to Fund II, at

3   least not now.  But not in this case we're not.  We're looking

4   to assess a royalty damages that Clipper would have agreed to

5   taking into account all of the benefits of all these entities.

6   That's what the Court has held.  So we're not piercing the veil

7   per se.  We're responding to a defense.

8           MS. GILMAN:  I think this is a very fine line and

9   that's why we're trying to be careful about it.  And as

10  Mr. Manchel said, we are mindful that there may be issues that

11  some of this evidence is relevant to other than piercing.  When

12  they have the damages expert on the stand and they're asking

13  him questions that Your Honor has made it very clear that

14  damages in this case must be limited to this defendant and he's

15  talking about arguments to the jury about all of the entities,

16  that's what is causing us to stand up and talk about this

17  today.  Because they tried to argue the joint and several

18  liability.  They know these are not the same entities.  They

19  tried to sue multiple of the entities.  They cannot be treated

20  as the same.  All of the entities are not here.  Only Clipper

21  and Mr. Doctoroff are here as defendants.  So any suggestion

22  that damages, I know he's saying they're not trying to collect

23  from the other entities, I think what they're trying to do is

24  collect from these defendants all of the damages that would

25  have been recoverable from the whole group of entities.  And

1  that's not permissible.

2         So, again, we're raising the issue now because we do

3  have concerns about it and want the record to be clear.

4         MR. GERMAN:  I would only say, Your Honor, that

5  Dr. Serwin was pounded for two and a half hours on these very

6  issues.  You didn't consider this entity.  You didn't consider

7  this entity.  So I think the evidence that came out from the

8  expert was very fair redirect exam in response to two and a

9  half hours of cross.  I'm not sure why we're arguing or making

10  a record at this point.  I don't hear the defendants asking for

11  any relief.  I assume this might be a preview of an argument

12  for tomorrow afternoon but if we're not, I mean, if there is a

13  point to this, I'd like to know what it is.  I haven't heard it

14  yet.

15         THE COURT:  Well, piercing the corporate veil has not

16  been pleaded to my knowledge unless you can direct me to it.

17  It is not in the case.  It is not a basis for imposing

18  liability on anyone other than the two defendants that are in

19  the case.  The defendants have said that there are these other

20  entities involved in the case and some of them are responsible,

21  that's a summation of the argument, but some of them are

22  responsible and we're not responsible or if we are, we're not

23  responsible for it all.

24         In response to that I think the jury is entitled to

25  see the big picture, the whole picture and know who owns those

1    companies and who directs and manages those companies.  So I'm

2    going to allow that evidence in.  I will not allow the

3    plaintiff to ask the jury to pierce the corporate veil or

4    impose liability on anyone other than the two defendants in

5    this case.

6            And with that, I will see you tomorrow morning.

7            Tomorrow, Charlie, take the white board down.

8            MR. GERMAN:  Yes, sir.

9            MR. MANCHEL:  Your Honor, for tomorrow at 4, were you

10   putting aside for us?

11           THE COURT:  Yes.

12           MR. MANCHEL:  Their case won't be done.

13           MR. GERMAN:  No.

14           THE COURT:  But I'll receive your motion and I'll

15   hear your arguments tomorrow and I'll rule it at the end of the

16   case.

17           MR. MANCHEL:  Which motion?

18           THE COURT:  I assume you're going to move for motion

19   for judgment as a matter of law.  They may well ask me to take,

20   to declare these five compositions or five compilations trade

21   secrets.  I'll take those things under advisement and announce

22   my ruling at the close of the plaintiff's case.

23           MR. MANCHEL:  I'd prefer to wait.  They have a very

24   important witness going on.  Their general counsel is the last

25   witness on Tuesday.

1          THE COURT:  You know what he's going to say?

2          MR. MANCHEL:  No.

3          THE COURT:  Should know what he's going to say.

4          MR. GERMAN:  He's a 30(b)(6) witness.  His testimony

5    was outlined in writing.  That was marked as an exhibit and

6    there is a long deposition.  That's what he is going to say.

7          THE COURT:  I'd like to have your written materials

8    tomorrow and if you want to supplement those on Tuesday, you

9    may.

10                            (Recess)

11         THE COURT:  I'm told you want me back.

12         MR. MANCHEL:  Your Honor, I'm sorry.  I'm not sure

13   either personally or professionally I can physically do a

14   motion by tomorrow.  I thought I would have until Tuesday.

15   I'll get it into you early.  I'm having some personal issues.

16   I got Nick, who's been quarterbacking this, is moving today.

17   So I just don't think.  I'll get it in before the last witness,

18   I'll even get it in on Monday if that helps the Court.  But for

19   me to do this by 4:00 tomorrow, I don't think I can do justice

20   to my client.  I'm sorry.

21         THE COURT:  What if I asked you to have it in --

22         MR. MANCHEL:  I can do it by first thing Monday

23   morning.  I'll have it delivered wherever you want.

24         THE COURT:  No.  Just file it.  I can access it.  If

25   we have it by Monday morning.

1          MR. MANCHEL:  Monday by 9, I'll have it.  Thank you,

2    Your Honor.

3          MR. GERMAN:  Same for plaintiff?

4          THE COURT:  Yes.

5                          *    *    *