IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF MISSOURI
2                      WESTERN DIVISION

3

4   HALLMARK CARDS, INC.,            )
                                     )
5                       Plaintiff,)
                                     )
6          vs.                       )Case No. 08-00840-CV-W-ODS
                                     )
7   MONITOR CLIPPER PARTNERS, LLC.,  )
                        et al.)  November 9, 2012
8                                )  Kansas City, Missouri
                    Defendants.)
9

10           TRANSCRIPT OF JURY TRIAL PROCEEDINGS
             BEFORE THE HONORABLE ORTRIE D. SMITH
11            UNITED STATES SENIOR DISTRICT JUDGE

12                     VOLUME 5 OF 10

13  APPEARANCES:
    FOR THE PLAINTIFF:          Mr. Charles W. German
14                              Mr. Daniel E. Blegen
                                Rouse Hendricks German May PC
15                              1201 Walnut, 20th Floor
                                Kansas City, Missouri 64106
16
                                Mr. John C. Aisenbrey
17                              Stinson Morrison Hecker LLP
                                1201 Walnut Street, Suite 2800
18                              Kansas City, Missouri

19          (APPEARANCES CONTINUED ON NEXT PAGE)

20

21  COURT REPORTER:             Ms. Cynthia M. Johnson, RMR
                                U.S. Court Reporter
22                              400 East 9th Street, Room 8552
                                Kansas City, Missouri 64106
23                              (816)512-5657

24

    Proceedings reported by computer stenography; transcript
25  produced by computer.

```
 1                    (APPEARANCES CONTINUED)

 2   FOR THE DEFENDANTS:          Mr. David F. Oliver
                                  Ms. Stacey R. Gilman
 3                                Berkowitz Oliver Williams Shaw
                                  2600 Grand Blvd. Ste. 1200
 4                                Kansas City, Missouri 64108

 5

 6                                Mr. Steven L. Manchel
                                  Mr. Michael G. Donovan
 7                                Manchel & Brennan, PC
                                  199 Wells Avenue, Ste. 301
 8                                Newton, MA 02459

 9                         *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                         I N D E X

2
                                                          Page No.
3
     NOVEMBER 5, 2012 - DAY 1
4
     RECORD..............................................    2
5
     INSTRUCTIONS NOS. 1 - 6 READ........................   34
6
     OPENING STATEMENT BY MR. AISENBREY..................   34
7
     OPENING STATEMENT BY MR. MANCHEL....................   53
8
                         PLAINTIFF'S EVIDENCE
9
     WITNESSES:
10
            DON HALL, JR.
11          Direct Examination by Mr. Aisenbrey.............   72
            Cross-Examination by Mr. Manchel................   99
12          Redirect Examination by Mr. Aisenbrey...........  148
            Recross-Examination by Mr. Manchel..............  161
13
            WAYNE STRICKLAND
14          Direct Examination by Mr. German................  168
            Continued Direct Examination by Mr. German......  227
15          Cross-Examination by Mr. Donovan................  234

16   NOVEMBER 6, 2012 - DAY 2

17   WITNESSES:

18          WAYNE STRICKLAND - RESUMED
            Continued Cross-Examination by Mr. Donovan......  283
19          Redirect Examination by Mr. German..............  322
            Recross-Examination by Mr. Donovan..............  334
20
     RECORD..............................................  338
21
     VIDEO DEPOSITION OF MARK THOMAS.....................  347
22
     WITNESSES:
23
            ADAM DOCTOROFF
24          Direct Examination by Mr. Aisenbrey.............  347
            Continued Direct Examination by Mr. Aisenbrey...  387
25
```

```
1                          INDEX (Continued)

2                                                        Page No.

3    VIDEO DEPOSITION OF BILL YOUNG......................    400

4    VIDEO DEPOSITION OF PETER KIM.......................    401

5    RECORD.............................................    401

6    CONTINUING VIDEO DEPOSITION OF PETER KIM............    410

7    VIDEO DEPOSITION OF CHARLES YOON....................    411

8    RECORD.............................................    411

9    NOVEMBER 7, 2012 - DAY 3

10   RECORD.............................................    413

11   VIDEO DEPOSITION OF SEAN GARDNER...................    429

12   WITNESSES:

13       JOHN MAYNARD
         Direct Examination by Mr. Blegen...............    430
14       Continued Direct Examination by Mr. Blegen.....    482
         Cross-Examination by Mr. Donovan...............    482
15       Redirect Examination by Mr. Blegen.............    527

16   RECORD.............................................    531

17   VIDEO DEPOSITION OF GRANT BROWN....................    532

18   VIDEO DEPOSITION OF JEFFREY PAUKER.................    533

19   RECORD.............................................    533

20   CONTINUING VIDEO DEPOSITION OF JEFFREY PAUKER......    534

21   RECORD.............................................    534

22   NOVEMBER 8, 2012 - DAY 4

23   RECORD.............................................    536

24

25
```

```
 1                         INDEX (Continued)

 2                                                        Page No.

 3    WITNESS:

 4        DR. KENNETH SERWIN
          Direct Examination by Mr. German................    548
 5        Continued Direct Examination by Mr. German......    599
          Cross-Examination by Mr. Manchel................    627
 6
      RECORD...........................................    675
 7
      WITNESS:
 8
          DR. KENNETH SERWIN – RESUMED
 9        Continued Cross-Examination by Mr. Manchel......    680
          Continued Cross-Examination by Mr. Manchel......    746
10        Redirect Examination by Mr. German.............    784
          Recross-Examination by Mr. Manchel.............    801
11
      RECORD...........................................    806
12
      NOVEMBER 9, 2012 – DAY 5
13
      RECORD...........................................    814
14
      VIDEO DEPOSITION OF STEVE LEVIN.....................    824
15
      VIDEO DEPOSITION OF MARK POCHARSKI..................    826
16
      RECORD...........................................    826
17
      CONTINUING VIDEO DEPOSITION OF MARK POCHARSKI........    835
18
      VIDEO DEPOSITION OF LARRY EARLEY....................    836
19
      VIDEO DEPOSITION OF JAN MURLEY......................    840
20
      RECORD...........................................    842
21
      WITNESS:
22
          PAUL MAXWELL
23        Direct Examination by Mr. Blegen................    848
          Continued Direct Examination by Mr. Blegen......    861
24        Cross-Examination by Mr. Donovan................    889

25
```

```
 1                          INDEX (Continued)

 2                                                      Page No.

 3     NOVEMBER 13, 2012 – DAY 6

 4     WITNESSES:

 5          PAUL MAXWELL – RESUMED
            Continued Cross-Examination by Mr. Donovan......    905
 6          Redirect Examination by Mr. Blegen..............    928

 7     VIDEO DEPOSITION OF LAURA STEINBERG.................    937

 8     VIDEO DEPOSITION OF PATRICK O'TOOLE.................    938

 9     WITNESSES:

10          JOHN MALLERY
            Direct Examination by Mr. Blegen................    941
11          Cross-Examination by Mr. Oliver................    980

12     RECORD.............................................    992

13     WITNESSES:

14          BRIAN GARDNER
            Direct Examination by Mr. Aisenbrey.............    994
15          Cross-Examination by Mr. Manchel................   1034
            Continued Cross-Examination by Mr. Manchel......   1067
16
       NOVEMBER 14, 2012 – DAY 7
17
       RECORD.............................................   1121
18
       WITNESS:
19
            BRIAN GARDNER – RESUMED
20          Continued Cross-Examination by Mr. Manchel......   1122
            Redirect Examination by Mr. Aisenbrey...........   1160
21          Recross-Examination by Mr. Manchel..............   1186

22     RECORD.............................................   1193

23     PLAINTIFF RESTS

24                         DEFENDANTS' EVIDENCE

25
```

1                          INDEX (Continued)

2                                                          Page No.

3    WITNESSES:

4         ADAM DOCTOROFF – RECALLED
          Direct Examination by Mr. Donovan...............    1194
5
     MOTIONS...........................................    1251
6
     COURT'S RULING....................................    1264
7
     WITNESS:
8
          ADAM DOCTOROFF – RESUMED
9         Continued Direct Examination by Mr. Donovan.....    1267
          Cross-Examination by Mr. Aisenbrey..............    1322
10        Redirect Examination by Mr. Donovan.............    1364

11   NOVEMBER 15, 2012 – DAY 8

12   INSTRUCTION CONFERENCE..............................    1368

13   RECORD.............................................    1391

14   VIDEO DEPOSITION OF MARK WILLIAMSON.................    1394

15   WITNESS:

16        APRIL EVANS
          Direct Examination by Mr. Donovan...............    1396
17        Cross-Examination by Mr. German................    1421

18   RECORD.............................................    1469

19   WITNESSES:

20        APRIL EVANS – RESUMED
          Continued Cross-Examination by Mr. German.......    1471
21
          JAY DITTMAN
22        Direct Examination by Mr. Donovan...............    1518

23   OFFER OF PROOF.....................................    1530

24

25

1                    INDEX (Continued)

2                                                   Page No.

3  WITNESSES:

4      JAY DITTMAN – RESUMED
       Continued Direct Examination by Mr. Donovan.....   1532
5      Cross-Examination by Mr. Blegen.................   1538

6      DR. COLIN BLAYDON
       Direct Examination by Mr. Manchel...............   1541
7
   RECORD...........................................   1572
8
   NOVEMBER 16, 2012 – DAY 9
9
   RECORD...........................................   1574
10
   WITNESS:
11
       DR. COLIN BLAYDON – RESUMED
12     Continued Direct Examination by Mr. Manchel.....   1576
       Cross-Examination by Mr. German.................   1602
13
   RECORD...........................................   1636
14
   WITNESS:
15
       DR. COLIN BLAYDON – RESUMED
16     Continued Cross-Examination by Mr. German.......   1639
       Redirect Examination by Mr. Manchel.............   1649
17
   RECORD...........................................   1652
18
   MOTIONS..........................................   1653
19
   COURT'S RULINGS..................................   1654
20
   DEFENDANTS REST
21
   INSTRUCTIONS NOS. 9 – 29 READ.......................   1655
22
   CLOSING ARGUMENTS BY MR. GERMAN....................   1657
23
   CLOSING ARGUMENTS BY MR. MANCHEL...................   1692
24
   CLOSING ARGUMENTS BY MR. GERMAN....................   1722
25
   JURY RETIRED......................................   1728

```
 1                          INDEX (Continued)

 2                                                    Page No.

 3   NOTE FROM JURY.....................................  1729

 4   NOTE FROM JURY.....................................  1731

 5   NOTE FROM JURY.....................................  1733

 6   NOVEMBER 19, 2012 – DAY 10

 7   NOTE FROM JURY.....................................  1734

 8   RECORD.............................................  1734

 9   NOTE FROM JURY.....................................  1735

10   RECORD.............................................  1736

11   NOTE FROM JURY.....................................  1739

12   VERDICT............................................  1740

13   JURY POLLED........................................  1742

14   RECORD.............................................  1743

15   CERTIFICATE OF REPORTER............................  1745

16                        *    *    *

17                     INDEX OF EXHIBITS

18   PLAINTIFF'S EXHIBITS             OFFERED    RECEIVED

19   No. 40 (e-mail)               341 in part 343

20   No. 49 (e-mail)                  1345       1345

21   No. 55 (Q & A sheet)             343        345

22   No. 62 (e-mail)                  403        403

23   No. 115 (e-mail)                 868        868

24   No. 122 (Strategy & Action plan) 819        823

25   No. 125 (e-mail)                 923        923
```

```
 1                    INDEX OF EXHIBITS (Continued)

 2   PLAINTIFF'S EXHIBITS                 OFFERED      RECEIVED

 3   No. 128 (e-mail)                       814        818

 4   No. 128A (e-mail)                      814        818

 5   No. 150 (e-mail)                       423        425 cond.

 6   No. 173 (affidavit)                    403        404 rej.

 7   No. 186 (metadata)                     404        406 rej.

 8   No. 202 (e-mail)                       407        407

 9   No. 203 (e-mail)                       407        407

10   No. 204 (e-mail)                       423        425 cond.

11   No. 217 (e-mail)                       408        409

12   No. 241 (e-mail)                       870        870

13   No. 246 (contact report)              819        823

14   No. 266 (e-mail)                       428        429

15   No. 270S (letter)                     1046       1046

16   No. 281 (e-mail)                       346        346

17   No. 306 (e-mail)                       871        871

18   No. 307 (contact report)              819        823

19   No. 313 (consulting agreement)        882        882

20   No. 319 (consulting agreement)        814        818

21   No. 334 (e-mail)                       814        818

22   No. 342 (e-mail)                      1460       1460

23   No. 346 (e-mail)                       819        823

24   No. 349 (letter)                      1009       1009

25   No. 360 (letter)                       814        818
```

```
 1                    INDEX OF EXHIBITS (Continued)

 2    PLAINTIFF'S EXHIBITS                    OFFERED     RECEIVED

 3    No. 361 (letter)                          814         818

 4    No. 363 (letter)                          814         818

 5    No. 364 (e-mail)                          814         818

 6    No. 370 (e-mail)                          814         818

 7    No. 371 (consulting agreement)            814         818

 8    No. 375 (letter)                          836         839

 9    No. 376 (contact report)                  819         823

10    No. 383A (BKD report)                     964         965

11    No. 386 (Shredder random overwrite)       974         974

12    No. 422 (letter)                          785         786

13    No. 429 (brochure)                       1440        1440

14    No. 430D (Shredder pop-up window)         976         976

15    No. 430E (Shredder pop-up window)         976         976

16    No. 440 (report)                          979         979

17    No. 442 (directory listing)               978         978

18    No. 443A (detailed report)                967         967

19    No. 443B (link file report)               961         961

20    No. 443C (log)                            966         966

21    No. 449 (e-mail)                         1467        1467

22    No. 475 (e-mail)                          887         887

23    No. 487 (e-mail)                           83          83

24    No. 488 (e-mail)                           84          84

25    No. 489 (spreadsheet)                     453         453
```

```
 1                    INDEX OF EXHIBITS (Continued)

 2   PLAINTIFF'S EXHIBITS                OFFERED      RECEIVED

 3   No. 546A (resume)                     550         550

 4   No. 547A (schedule)                   575         575

 5   No. 547C (schedule)                   570         570

 6   No. 547D (schedule)                   223         570

 7   No. 547E (schedule)                   572         572

 8   No. 547G (summary)                    581         581

 9   No. 547H (list of invoices)           580         580

10   No. 547K (schedule)                   623         623

11   No. 547L (diagram)                    615         615

12   No. 547N (schedule)                   603         603

13   No. 649 (photo)                       848         848

14   No. 651 (financial statement)        1530        1531

15   No. 652 (financial statement)        1530        1531

16   No. 653 (financial statement)        1530        1531

17   No. 654 (financial statement)        1530        1531

18   No. 655 (financial statement)        1530        1531

19   No. 656 (financial statement)        1530        1531

20   No. 658 (spreadsheet)                 463         463

21   No. 659 (e-mail)                     1453        1453

22   No. 660 - 673 (transcripts)         1638        1638

23   No. 674 (schedule)                   1675        1676

24   No. 674A (schedule)                  1675        1676

25   No. 676A & 676B (videos)            1638        1638
```

```
 1                    INDEX OF EXHIBITS (Continued)

 2    PLAINTIFF'S EXHIBITS                 OFFERED     RECEIVED

 3    No. 1505 (e-mail)                     1183        1183

 4                           *    *    *

 5    DEFENDANT'S EXHIBITS                 OFFERED     RECEIVED

 6    No. 327 (Giftbeat Magazine)           1246        1246

 7    No. 412A (data room info)             1282        1282

 8    No. 1016A (e-mail)                     894         894

 9    No. 1022 (e-mail)                      426         427

10    No. 1255A (transcript – Mark          1655        1655
                     Williamson)
11
      No. 1275D (DVD – Williamson depo.)    1655        1655
12

13                           *    *    *

14

15

16

17

18

19

20

21

22

23

24

25
```

1   NOVEMBER 9, 2012 - DAY 5

2           (The following proceedings were had OUT OF THE

3   PRESENCE AND HEARING OF THE JURY:)

4           THE COURT:  Good morning.  What do we have this

5   morning?

6           MS. GILMAN:  Your Honor, we've got a series of

7   deposition exhibit objections.  I've tried to tighten up my

8   presentation and stream line it.

9           THE COURT:  Okay.

10          MS. GILMAN:  First, with respect to the deposition of

11  Jan Murley.  May I hand the Court a stack of exhibits?

12          I've advised Mr. Blegen in advance of the exhibits

13  that are at issue in all of these depositions.  The ones I have

14  handed to you are 128, 128A, 319, 334, 335, 360, 361, 363, 364,

15  370 and 371.

16          Mr. Blegen has advised that they are not seeking to

17  admit 335 so that's not at issue.

18          All of these documents relate to Ms. Murley's conduct

19  and her employment negotiations with RPG.  And we have

20  discussed that with the Court and briefed that with the Court

21  multiple times why we do not believe that that evidence is

22  relevant.  We believe it's unduly prejudicial.  These relate to

23  20A through E and her alleged sharing of information with RPG.

24  No evidence has been offered and there is none to attribute her

25  conduct to the defendant here.  I understand the Court

1  indicated to plaintiffs that they needed to make a connection

2  between those presentations and the alleged presentation trade

3  secrets.  They've only shown the slides that are the same in

4  each but have not made any connection between them.  And, in

5  fact, despite any apparent overlap in the information, the fact

6  that Ms. Murley's testimony today will be she got the

7  information she had from Hallmark.  She took it with her.  She

8  did not get any information from defendants whatsoever.  And

9  she will say that unequivocally.  There has been no contrary

10  evidence in the case to suggest that she got it from any source

11  other than what she's claiming.  In fact, they sued Ms. Murley

12  on the basis that she had, in fact, retained it from Hallmark.

13  Accordingly we would object to all of those exhibits coming in.

14  And we previously have been overruled on our objections to her

15  deposition but we don't believe that any of that is relevant.

16  We do believe it is unduly prejudicial.

17          THE COURT:  Thank you.

18          MR. BLEGEN:  Your Honor, this is the same thing we've

19  discussed several times here.  The exhibits here connect the

20  slides that Mr. Maynard testified about the other day as we

21  discussed at length to the transmittal from Ms. Murley.  They

22  show that she was, in fact, they have argued and will argue to

23  the jury that RPG hired Jan Murley.  This evidence shows that,

24  in fact, Clipper brought her in, negotiated her contract and

25  presented her to RPG as the consultant that they were going to

1    use.  It shows they were in the middle of the transmittal of

2    this Exhibit 150, the Power Point information.  It shows that

3    Monitor Clipper, without knowledge of RPG, modified her

4    contract to include false language that claimed that she hadn't

5    brought 150 and hadn't shown 150 to anybody after that event

6    had occurred.  So that is the nature of the documents at issue.

7    They go directly to Clipper's control of the situation, control

8    of RPG, use of the Hallmark trade secrets, which we've already

9    shown were the same ones that existed in the five Power Point

10   compilations and the cover up which ultimately involved

11   computer erasures and spoliation, which have been addressed and

12   will be submitted to the jury.  So we believe all of these

13   documents in that stack should come in.

14         THE COURT:  What was the actual involvement of

15   Clipper in the operation of RPG after the closing?  I know they

16   consulted.  I know there were overlaps in the directors.  But

17   what was the actual involvement?

18         MR. BLEGEN:  The actual involvement was Monitor

19   Clipper, as we learned yesterday, was, essentially comprised

20   the directorship of the controlling corporations and the

21   operating company.  Mr. Yoon and Mr. Young were on it.

22   Mr. Maxwell, who will testify today, was regularly involved in

23   the management of RPG and the operations of RPG.  He is the one

24   who negotiated the contract with nxtMove to come in and

25   consult.  He's the one who negotiated the contract of Jan

1    Murley to come in and consult.  Both of those consulting

2    entities were brought in to and presented to RPG by Monitor

3    Clipper as the consultants they were going to use.

4            As we saw yesterday, Monitor Clipper then filed a

5    claim in bankruptcy saying they had earned all of these

6    hundreds of thousands of dollars in management fees based upon

7    their management of RPG and were ultimately paid those out of

8    the RPG bankruptcy in 2009.

9            MR. MANCHEL:  If I may, Your Honor.  There was an

10   independent management agreement between RPG and Clipper which

11   is the fees they're talking about.  It's a pure consulting

12   contract.

13           THE COURT:  Did you say independent?

14           MR. MANCHEL:  Yes, Your Honor.  The way this works

15   is, I think the testimony was in the case already, I was just

16   going to say of the seven board members of RPG, only three were

17   Clipper and that's done purposely so that the company always

18   retains control.  There's no domination by Clipper of RPG.  In

19   fact, two of the original owners, if my memory serves me

20   correctly, were still on the board.  That's the model.

21           They're trying to make it look like a control issue

22   but the model is that by design Clipper does not control.  It's

23   very important I think --

24           THE COURT:  The three Clipper people, two founders

25   and owners.  Who were the other two?

1          MR. MANCHEL:  The other investor, Levine, the

2     original RPG people and then Mark Murray.  So the RPG people,

3     the way it's set up and if we have to argue it to the jury, we

4     will.  But it's set up by design so Clipper is not in control

5     and that management agreement runs directly between RPG and

6     Clipper for defined services outside the daily operations of

7     Clipper.

8          So Murley is a perfect example of where -- they keep

9     saying Clipper did this, Clipper did that.  As a head hunter,

10    Clipper recommended, no question about it, to the head hunter

11    that Murley would be a good candidate for RPG.  All of the

12    interviews were done by RPG personnel, the founders, the

13    president, and Levine.  All of that stuff.  The contract was

14    with RPG.  The payments were from RPG.  The daily interactions,

15    RPG.  So I really, I know they've created the aura, I'll deal

16    with it if I have to deal with it.  But those are the facts,

17    Your Honor.

18          THE COURT:  All right.  I'm going to admit the

19    exhibits.  I don't know whether Clipper controlled RPG or not.

20    It seems to me that is the, one of the ultimate questions the

21    jury is going to be asked to decide and I don't know how they

22    decide it without seeing these exhibits.  Moreover, I think the

23    use of Hallmark's information some five or six years after the

24    fact shows that they did have some value.  And then, finally,

25    to the extent the jury buys the spoliation argument, it could

present a basis for the award of punitive damages.  So I'll

admit them.

MS. GILMAN:  The next deposition is that of Larry

Earley.  And in this deposition the exhibits at issue are 122,

246, 307, 346, 375 and 376.  Also included in the packet that

I'm about to hand the Court are 206 and 320.  Plaintiffs have

indicated they are not seeking admission of 206 or 320.

THE COURT:  Thank you.

MS. GILMAN:  All of these documents relate to

nxtMove, which was Mr. Earley's employer, and Ms. Murley.

Again, they are 20A through E and relate to non-party conduct.

There's one in particular that I want to call the Court's

attention to.  And I have placed that one in the front.  It is

Exhibit 375.  And this exhibit, on the second page, the second

paragraph, has a reference that says the first sentence with an

extremely limited marketing staff RPG has grown its business to

approximately $100 million.  Second sentence, in an effort to

double its share from 2 to 4 percent in increased margins, a

more deliberate and actual marketing strategy is required.

The plaintiffs intend to present for the truth of the

matter asserted that there was, in fact, an effort to double

RPG's market share from 2 to 4 percent.  That is hearsay coming

out of this document.  There was not a business record

foundation laid or any other exception to hearsay.  This

witness said he did not know where that information came from.

1    That that statement could have come, quote, from discussions or

2    from documents provided by the client or from anywhere.  And

3    therefore we object to that.  And, again, we also object to all

4    of them on the basis of their undue prejudice and lack of

5    probative relevance.

6         MR. BLEGEN:  Your Honor, this Earley evidence,

7    somewhat like what we discussed with Murley, goes directly to

8    RPG's argument which I believe was in statements that they had

9    no control, they did not have any involvement and that 2 to

10   4 percent thing could have been RPG's plan.  What 375 shows us

11   and the testimony today from Mr. Earley and Mr. Maxwell will

12   show us is that 375 was drafted before Mr. Earley and nxtMove

13   had any contact of any form with RPG.  It was the result of

14   edits provided by Mr. Maxwell to the proposal that preceded

15   Exhibit 375.  So the only source, and he does testify he

16   doesn't know precisely where it came from.  But he said it

17   would have come from, I can't remember his exact language, but

18   essentially it would have come from materials provided by the

19   people I was talking to.  He also testifies, and that's what

20   Exhibit 122 is, that he received that presentation from Chris

21   Casey of Monitor and that presentation bears the footer of the

22   RPG investment presentation prepared by the standing case team

23   back in 2005 which Mr. Maxwell sent to Mr. Casey at Monitor in

24   January of 2006 and was apparently modified, it's not the same

25   text, but the footer is the same, showing it came from the same

1    document.  And Mr. Casey provided that to Mr. Early.

2    Mr. Earley used it to draft the proposal, the 2 to 4 percent,

3    in there is what Mr. Yoon testified the other day as his

4    expectations of what they were going to be able to do with the

5    company.  This was a month and a half before RPG and nxtMove

6    ever spoke to each other.  This is entirely being done by

7    Clipper and Monitor.  Has nothing to do with RPG.  And we

8    believe it is a business record.  It's a letter that was sent

9    by Mr. Earley of nxtMove, received by Mr. Yoon and Mr. Maxwell

10   of Monitor Clipper.  And we believe that it should be admitted

11   because it goes directly to issues that are being argued by the

12   defendants in this case.

13          There are two other ones I'd like to highlight on

14   there, well, three, Exhibit 246, 307.  The other one may have

15   come up in Murley.  They are what are called contact reports by

16   nxtMove.  They're documents maintained by Mr. Earley and

17   nxtMove in the ordinary course.  I lay a business records

18   foundation for those documents.  He testifies they're accurate.

19   He testifies they're created contemporaneously with the events

20   stated in them and that he believes them to be accurate.  They

21   reflect contact and communications between Clipper and nxtMove

22   about the very facts in this case.  So we believe they are

23   admissible as well.  They're not hearsay.

24          MS. GILMAN:  If I might, one more on Exhibit 375, to

25   respond to that.  The entirety of Mr. Earley's testimony on

1    that exhibit, called business records exception, he identifies

2    it as a presentation that they submitted.  That's all.  There

3    is nothing about how, whether it's prepared in the ordinary

4    course.  There's nothing beyond just simply identifying it as a

5    presentation that was prepared and submitted, period.  And as

6    to representation of counsel about where he said that

7    information came from, I quoted the line from Mr. Earley's

8    deposition.  And he specifically said, it could have come from,

9    quote, anywhere.  He does not know the source of that

10   information.  He cannot be a sponsor for its admission.

11           THE COURT:  I'm a little concerned about the business

12   record foundation.  Although it appears that the parties have

13   stipulated as to foundation unless I'm misreading the exhibit

14   list.

15           MS. GILMAN:  I'm not contesting foundation, Your

16   Honor.  But I am contesting that it qualifies as a business

17   record with the exception of hearsay which is separate from

18   foundation.

19           MR. BLEGEN:  And just to clear that up, this goes

20   back to the conversation I had with Mr. Mesker from the Boston

21   office.  When they were doing the stipulations, they read your

22   order to mean that hearsay was not part of the foundation

23   stipulation, it was part of the admissibility stipulation.  So

24   I'm not representing and this shouldn't represent that they

25   have agreed that it's not hearsay by stipulating foundation.

1    We had some confusion over the negotiation --

2            THE COURT:  I'm glad you cleared that up for me

3    because I considered it to be part of the foundation for the

4    admission of the document.

5            MR. BLEGEN:  I just want to make clear, we're not

6    representing that they have said there is no objection on it on

7    hearsay.

8            THE COURT:  All right.  I will, as to 375 I will

9    listen to the deposition at the appropriate time and the

10   hearsay objection can be re-asserted prior to the admission of

11   the document.  I'll have it in context.  Otherwise, the

12   exhibits will be admitted.

13           MS. GILMAN:  Thank you, Your Honor.

14           The next deposition.

15           THE COURT:  Are these depositions we're going to get

16   to before noon?

17           MS. GILMAN:  Probably not before noon.

18           MR. BLEGEN:  The next two are not actually.  I would

19   ask, the issue on O'Toole, we need to look at our copy of the

20   transcript that just arrived.  We'd rather take that up very

21   briefly after lunch, if that's okay.

22           THE COURT:  Okay.  Let's plan on that after the

23   morning session.

24           MS. GILMAN:  Thank you.

25           (The following proceedings were had IN THE PRESENCE

1    AND HEARING OF THE JURY:

2          THE COURT:  Good morning.  Welcome back.  Please be

3    seated.

4          Mr. Aisenbrey?

5          MR. AISENBREY:  Good morning, Your Honor.  The

6    plaintiff calls Steve Levin by videotape deposition.

7          THE COURT:  Proceed.

8          (The video deposition is being played for the jury.)

9          MR. AISENBREY:  Your Honor, that concludes the

10   deposition of Steve Levin.

11         Next witness is the deposition of Mark Pocharski.

12         MS. GILMAN:  Your Honor, may we approach?

13         THE COURT:  Yes.

14         (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

15   PROCEEDINGS WERE HAD:)

16         MS. GILMAN:  The issue with the slides that are being

17   put up to indicate which party has designated the testimony,

18   they're not being put up consistently.  And even if they're

19   attempting to put them up consistently, it's really not

20   indicating to the jury which portions were designated by either

21   party and we believe it's misleading.  I would like to stop

22   using those.

23         MR. AISENBREY:  Your Honor, we've been doing it

24   pretty religiously.  Occasionally when there is a context from

25   the other people, we don't switch it but --

1          THE COURT:  How would you guys like to stand up when

2     the testimony you're sponsoring is played to the jury?  Is

3     there a better way to do it?

4          MS. GILMAN:  I don't think it's necessary, the Court

5     said in the order previously I don't think it's important to

6     let the jury know who designated what testimony.

7          THE COURT:  You propose to pull them out?

8          MR. AISENBREY:  We just listened to 45 minutes of

9     testimony about 35 of it was irrelevant, had nothing to do with

10    the case, designated by them.  I don't think because Mr. Blegen

11    called it, Blegen in the deposition asked questions that we're

12    asking the jury to consider that information.  I mean, if this

13    was real testimony, their lawyer would have to stand up and ask

14    those questions and that's why we think those are appropriate

15    and they're not that big of deal.  Frankly --

16         THE COURT:  Here's what we'll do.  We'll leave them

17    in.  If during the playing of any deposition you think it's

18    late or it's misleading to the jury, stand up and we'll stop

19    the deposition.  You come up here and I'll instruct the jury.

20         MS. GILMAN:  Thank you.

21          (THE PROCEEDINGS RETURNED TO OPEN COURT.)

22         MR. AISENBREY:  May we proceed, Your Honor?

23         THE COURT:  Yes.

24         MR. AISENBREY:  This is the video deposition of Mark

25    Pocharski.

1          (The video deposition is being played for the jury.)

2          THE COURT:  Stop.  Step up.

3          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

4     PROCEEDINGS WERE HAD:)

5          MS. GILMAN:  I wasn't going to, there are a few

6     issues, frankly, I was not going to bring to your attention

7     until the last one came up.  The answer was not played in our

8     designation.  That has happened on multiple occasions.  We have

9     talked to them about the technical, but it's only happened in

10    our designations and it happened on some questions that were

11    blended together.  Made it seem like an answer to a question

12    was responding where there was Hallmark confidential

13    information.  That was not the question that had been posed.

14    And as I said, we haven't raised this before and is now at

15    least the third time it happened on our questions.

16         The other thing is Mr. Aisenbrey leaned over to me

17    and offered they would pop the screen up every time we were

18    asking a question and answer, if we wanted them to do that.

19    They had not been doing that previously so it was giving the

20    appearance that they were designated blocks of testimony on a

21    certain subject then just designating on those he offered to do

22    that which is what we wanted.  Mr. Blegen told me they would

23    not.

24         MR. AISENBREY:  I don't know what Mr. Blegen told

25    you.

1          MS. GILMAN:  Then let me just raise the final issue.

2     You can respond to all of that.  The objections are still

3     coming through on the tape.

4          MR. AISENBREY:  First, Your Honor, I noted one of our

5     answers was not played there because of the editing.  I don't

6     know how the answer got missed.  I'm happy to, the one I think

7     she's talking about just now had to do with Bill Young.  And

8     Bill Young testified at length the other day.  I don't know why

9     we bothered to designate that part but with respect to the

10    designations, I don't know what Mr. Blegen said.  I asked

11    Ms. Gilman, do you want us, I mean there are times where they

12    would designate what I would call completeness, where there is

13    a long period of our designations and they have six lines then

14    it goes back.  I didn't think you wanted us doing this kind of

15    flip flop like that.  I thought we were going to do it for

16    large blocks of testimony.  I don't know what the topics are.

17    I have actually not, I'm reading this deposition for the first

18    time as I watch it.  So the signals aren't designed to have

19    anything to do with topics.  I asked Ms. Gilman, do you want us

20    to do every single one or just longer blocks.  I'll be happy to

21    do it with every single one.  There are occasions like 4 lines

22    designated by the defendant and by the time we get it up and

23    down the lines have come and gone.  Nobody will even know what

24    it was.  That's what I was trying to avoid.

25          MS. GILMAN:  If you were happy to do that, that would

1   solve it.

2           MR. AISENBREY:  I'll do every single one.

3           THE COURT:  I don't know what you're asking me to do

4   about omitted oral answers.  The written answer is on the

5   screen.  You know unless you're accusing Hallmark of

6   deliberating doctoring these depositions to their advantage,

7   seems to me it's an inadvertence.  I don't know that there is

8   anything that should be done about it until such time as it

9   becomes apparent to everyone that the videos are being

10  doctored.  I don't believe that.

11          MS. GILMAN:  I don't either, Your Honor.  And I only

12  raised it because it was happening again now, today.  And I

13  think we've made a record of it that has happened on occasion.

14  If it rises to the level and becomes an issue we believe in the

15  case, we'll bring that back to your attention.  I agree with

16  you, I don't think we can ask you to do anything at this point

17  in time.  But I would ask, I suppose, for some instruction.

18  The video must be as accurate as possible and --

19          THE COURT:  You're asking for an instruction?

20          MS. GILMAN:  I want the videos to be as accurate as

21  possible and the objections to come out.

22          THE COURT:  Yeah, so do I.

23          MR. AISENBREY:  I do, too, Your Honor.

24          THE COURT:  Let's make it happen.

25          MR. AISENBREY:  I can tell you, Your Honor, staff

1    members are doing this.  We're trying to check it now.  It's,

2    if they make a mistake, it's not because we directed them.

3    Mr. Donovan's objections are very soft.  I think maybe they

4    miss them.  I mentioned it to them this morning, these

5    objections have to come out.  We'll look --

6            THE COURT:  Mention it to her again.

7            MR. AISENBREY:  I'll do more than mention it to her.

8            MS. GILMAN:  Thank you.

9             (THE PROCEEDINGS RETURNED TO OPEN COURT.)

10           MR. AISENBREY:  May we continue, Your Honor?

11           THE COURT:  Yes.

12            (The video deposition is continuing to be played for

13   the jury.)

14           THE COURT:  Let's go ahead and take our morning

15   break.  We'll see you back here in about 15 minutes.  Please

16   don't make up your mind yet.  We'll be in recess.

17            (The following proceedings were had OUT OF THE

18   PRESENCE AND HEARING OF THE JURY:)

19           MR. AISENBREY:  Your Honor, the very last question,

20   the reason I stood up, when they edited they cut the answer

21   off.  I proposed to Ms. Gilman when the jury comes back we'll

22   just read the question and read the answer so they get the

23   answer.  It was on the screen but they didn't hear him say it.

24           THE COURT:  Sounds reasonable to me.

25           See you in 15 minutes.

1                          (Recess)

2              (The following proceedings were had OUT OF THE

3    PRESENCE AND HEARING OF THE JURY:)

4              MR. BLEGEN:  Your Honor, we want to take a minute

5    before the jury was ready to come back to address the state of

6    the depositions and some technical issues that we've been

7    having with them.  And just backing up a second.  This issue of

8    the designation thing came up last Friday after the jury

9    selection.  And at that point in time I tried to explain that

10   we couldn't physically transferring it from one Q and A to

11   another particularly when there is a document being discussed,

12   it would be very difficult to do.  We are trying to do that.

13   We're trying to make sure she knows exactly where it happens

14   and all that.

15             What we're running into now and we apologize for the

16   technical issues.  This is a hand edit process.  When they get

17   the rough cut they have to listen to it and sometimes if you're

18   not exactly right, cut some things off, you might have an

19   objection that stays in.  The staff is trying mightily to get

20   it done.  Every time we take a break, they stay and she's right

21   now actually listening through, making sure the rest of this

22   deposition is as clean as possible.

23             What we're running into now has to do with Jan

24   Murley.  Our plan today was to finish Mr. Pocharski, play Larry

25   Earley.  Play Jan Murley.  Take lunch.  Come back --

1          Yesterday, midday, we received additional edits to

2    Jan Murley from the defendants to their designations which we

3    have tried to incorporate.  Last evening we sent them a version

4    which we believed was complete.  On the first break they came

5    up to our paralegal and said there are things that need to be

6    changed.  Well, we can't physically change those in the time

7    between the first break and when it's to be played.  It was

8    suppose to come up in the next segment.  We are trying mightily

9    but this morning it's been objection to how we're doing the

10    designations by screens.  It's objections because it's not

11    perfect and this is just disruption.  We're trying to do the

12    best we can here.

13          I don't know how to deal with the Murley issues.

14    We're trying to figure out if they come up late in the

15    deposition we may be able to start it, play as far as we can,

16    get to lunch then fix those issues over lunch then come back.

17    At this point it's 10:30.  We have maybe 10 more minutes of

18    Mr. Pocharski.  Mr. Larry Earley is about an hour.  Maybe we

19    could take an early lunch, make sure we have cleaned up all the

20    issues over lunch with Ms. Murley and come back.  That may work

21    since it's a 4:00 end today.  We're trying the best we can but

22    these issues, we've been playing them this way all week and

23    this is the first time they said, well, you have to play

24    designated by Defendant for one Q and A that's between

25    plaintiffs and plaintiffs.  Just, technologically, it doesn't

1    work.

2             THE COURT:  Well, we could always go back to the old

3    way of doing it.  Put you on the witness stand.  Let

4    Mr. Aisenbrey, put Charlie on the witness stand.  That's an

5    option.  What are you asking me to do, Stacey.

6             MS. GILMAN:  I didn't think I was asking you to do

7    anything at this point.

8             THE COURT:  Are you just complaining?

9             MS. GILMAN:  No, Your Honor.  I didn't ask for this

10   time now.  We have been trying to work out these issues.  And I

11   did feel it had reached the level today that I needed to bring

12   it to the Court's attention, particularly because we were still

13   having some of the problems we had seen earlier like objections

14   bleeding through.

15            I have been trying to work those out with counsel.

16   Mr. Blegen asked for the time with you now to talk about this

17   issue with Ms. Murley.  I called my colleague, Laura Brooks for

18   it because she's been dealing with that, frankly, behind the

19   scenes.  We've not been trying to bring it to the Court to

20   complain or have you take any action on it.  There have been a

21   lot of errors in the videos that they've been prepared.  They

22   don't match the designations.  We're getting these like the

23   night before they're playing or the morning they're playing or

24   whatever.  We haven't had a lot of notice.  We've done a good

25   job up to today, I think, collectively, working together to try

1    to make them up to what the designations are.  This is the

2    first time hearing of this issue with the Murley video.  And

3    I'm mindful of the fact this is something that is done by hand,

4    not an easy process.  Sounds like Mr. Blegen has a solution

5    that he's proposed to the Court.  I don't have a problem with

6    it if you're going to start playing it, the break before --

7         Ms. Brooks was suppose to be on a call with our

8    counsel in Boston to try to resolve this.  I think it's

9    question for Mr. Blegen, what he's asking for the Court to do.

10        MR. BLEGEN:  The issue arises, Your Honor, is that I

11   don't want to be done with, I wanted them to raise it now.  We

12   don't want to be done with Mr. Earley at 11:30, have not

13   finished resolving the issues with Murley and have no place to

14   go on with because I'm not even sure if the next live witness

15   will appear.  He's a former employee of the defendants.  We

16   anticipated he'd come up after lunch.  He may be here, he may

17   not.  I'm not sure.  I just wanted to raise it now and explain

18   why we are where we are.  We didn't receive Murley's final

19   changes, confirmed from the defendants, until seven or eight

20   last evening and we're doing the best we can to get that issue

21   solved.

22        THE COURT:  In the absence of a specific request from

23   the defendants for some action, I'm going to do nothing.  I am

24   going to ask you to please be careful and try to honor the

25   agreement that you've reached with the defendant, try to play

1   the video and the audio together, not omit the audio.  We'll

2   see how it goes.  If we need to take an early break for lunch,

3   that's fine with me, because we're letting the jury go early

4   today.  So I would say start Murley and if you get to a problem

5   area, let's stop, take lunch.  Perhaps you can fix it over

6   lunch.  Is that okay?

7           MR. BLEGEN:  Thank you, Your Honor.

8           THE COURT:  Kelly?

9           MR. AISENBREY:  Your Honor, when the jury gets back

10  I'll read the last question and tell them what the answer was

11  and proceed to the next section.  I think that's acceptable.

12          MS. GILMAN:  That's fine.

13          (The following proceedings were had IN THE PRESENCE

14  AND HEARING OF THE JURY:)

15          THE COURT:  Please be seated.

16          Ladies and gentlemen of the jury, you will have

17  noticed some problems with the video depositions where an

18  answer is not, you don't hear the answer but you see the answer

19  on the screen.  So I'll encourage you to keep an eye on the

20  screen.  We've tried to eliminate that.  We haven't got it all

21  worked out.

22          In just a moment Mr. Aisenbrey will read you the last

23  question and answer but watch the screen because you'll see the

24  answer to the questions on the screen.

25          There have also been signs go up when ever the

1    defendant has designated depositions and signs go up when the

2    plaintiff has designated depositions.  That's just the side

3    that wants you to hear that testimony.  Those haven't always

4    gone up promptly but if you watch the screen, you'll be able to

5    tell a difference in the voice of the questioner or simply by

6    virtue of the information that comes through the deposition.

7              Mr. Aisenbrey.

8              MR. AISENBREY:  One second, Your Honor.

9              Thank you, Your Honor.

10             Ladies and gentlemen, the last answer to the last

11   question was not, the audio did not play.  The question --

12             And I have to back up a second because it has a

13   pronoun, Your Honor, they won't know what it's talking about.

14             There was a series of questions that ended with, is

15   it your understanding that that was the policy, the

16   confidentiality policy at Monitor was up through 2006?

17             ANSWER:  Yes.

18             Okay.  And you understood that you were to abide by

19   that policy, correct?

20             ANSWER:  Yes.

21             And did you endeavor to do so in your dealings?

22             ANSWER:  Yes.

23             THE COURT:  Okay.  Proceed.

24             (The video deposition of Mark Pocharski is continuing

25   to be played for the jury.)

1          MR. AISENBREY:  Your Honor, that completes the

2    deposition of Mark Pocharski.

3          THE COURT:  Who is next?

4          MR. AISENBREY:  Much shorter deposition is Larry

5    Earley.  May we proceed, Your Honor?

6          THE COURT:  Yes.

7          (The video deposition is being played for the jury.)

8          MR. AISENBREY:  Your Honor, that concludes Larry

9    Earley's deposition.

10         We would move the admission now of Defendant's

11   Exhibit 375, Plaintiff's 375 which was, you had indicated you

12   wanted to hear the video.

13         THE COURT:  Step up, please.

14         (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

15   PROCEEDINGS WERE HAD:)

16         THE COURT:  That's the July 28?

17         MR. AISENBREY:  Yes, sir.  I think the objection was

18   it had a section in it that talked about the 2 to 4 percent

19   increase on page 2.  During the video the defendants offered

20   and put in evidence, Defendant's Exhibit 1072, which has the

21   same line so we don't think there's any basis to exclude 375.

22         MS. GILMAN:  Your Honor, first of all, on 375 I do

23   want to treat this separately but in 375 his testimony very

24   clearly did not establish a business records exception as to

25   the 2 to 4 percent.  He only, he said, no, it could have come

1    from anywhere.  It started as an RPG initiative.  That's his

2    testimony on page 36 of the deposition.  The exhibit that they

3    are referring to is an exhibit they put into evidence in the

4    deposition.  Then was questioned about subsequently in the

5    questioning by Mr. Manchel.  We were going to ask that the

6    language from that exhibit be redacted from it.  We are not

7    opposing the admission of the exhibit.  It is the executed copy

8    of this.  But we are opposing that paragraph being included in

9    it because there is absolutely no testimony in here that would

10   take that out of the hearsay objection or establish where it

11   came from.  And it is unduly prejudicial in the manner in which

12   they plan to use it.

13        MR. AISENBREY:  Your Honor, 1072 was stipulated as

14   admissible and that's the document.  That has the paragraph in

15   it.  They didn't offer it as a document with the paragraph

16   missing.

17        Second, to address the issue of the hearsay

18   objection, near the end Mr. Earley very clearly said that

19   information had to come from RPG.

20        MS. GILMAN:  I don't believe that's the testimony.

21   And I would also renew our, I guess I would move to strike now

22   the testimony on the 2 to 4 percent which we had previously

23   objected to coming in to begin with.

24        THE COURT:  Let me be sure I understand this.  You

25   object to 375.  You say that 1072 can come in but you want to

1    redact the portion on the second page that refers to the 2 to

2    4 percent margin increase?

3              MS. GILMAN:  Correct.

4              THE COURT:  Where is that shown in your stipulation

5    to admit 1072.

6              MS. GILMAN:  It is not shown in there, Your Honor.

7              THE COURT:  1072 is identical to 375?

8              MS. GILMAN:  It's not identical.  It's sent to a

9    different person and it's the executed version.

10             Which is why 1072 has independent relevance because

11   it is the executed copy.  375 is not executed and there is no

12   basis to admit it.  Again, we're not opposing admission which

13   is why we stipulated to the admission of 1072.  But we would

14   want either that paragraph redacted would be our preference or

15   limiting instruction that paragraph is not to be accepted for

16   the truth of the matter asserted because of hearsay and that

17   paragraph cannot be used in that manner.

18             THE COURT:  Anything else, John?

19             MR. AISENBREY:  I think they've stipulated to it.

20   But I also think 375 is admissible because it's the same

21   paragraph and it shows that the document which was the initial

22   proposal went to Monitor Clipper.

23             THE COURT:  All right.

24             MS. GILMAN:  Again, it's being offered for the truth

25   of the matter asserted, not notice.  So it cannot cure the

1    hearsay objection.  It was sent to Monitor Clipper.

2            MR. AISENBREY:  Goes to the point Clipper knows what

3    was being proposed as he said in the testimony, I would have

4    gotten from client and July 28 he was talking to Clipper.

5            THE COURT:  375 will be admitted.

6            MS. GILMAN:  I just want to make sure that the record

7    is clear and that we have a ruling.  I think I know what your

8    ruling is but that you are also denying our motion to strike

9    the testimony and denying our request for a limiting

10   instruction and request for redaction or alternative request

11   for redaction of 1072?

12           THE COURT:  Yes, ma'am.

13           MR. AISENBREY:  The next video is Murley.  Might, I

14   don't know if you want to stop a little earlier but we'll be

15   able to get the editing done I think.

16               (THE PROCEEDINGS RETURNED TO OPEN COURT.)

17           THE COURT:  Because today is a shorter day we'll take

18   an earlier lunch.  We'll see you back here about, why don't we

19   see you back here at 1:00.  And at that time we'll resume with

20   the deposition of Jan Murley.  Don't talk about the case.

21   Don't make up your mind.  We'll see you back here.

22           (The following proceedings were had OUT OF THE

23   PRESENCE AND HEARING OF THE JURY:)

24           THE COURT:  We'll see you at 1.

25                       (Noon Recess)

1          (The following proceedings were had OUT OF THE

2  PRESENCE AND HEARING OF THE JURY:)

3          THE COURT:  Is everyone ready?

4          MR. AISENBREY:  I am.

5          THE COURT:  Are we ready?

6          MR. AISENBREY:  I think we are ready, Your Honor.

7  I'm sorry.  I didn't know if they had something to take up.

8          (The following proceedings were had IN THE PRESENCE

9  AND HEARING OF THE JURY:)

10          THE COURT:  Please be seated.

11          Mr. Aisenbrey.

12          MR. AISENBREY:  Thank you, Your Honor.

13          The plaintiff calls Jan Murley by video.

14          (The video deposition is being played for the jury.)

15          THE COURT:  Does someone have a phone?

16          MR. AISENBREY:  I think it's on the tape.

17          THE COURT:  Well, if it's your phone, turn it off.

18  If it's on the tape, let's resume.

19          (The video deposition is continuing to be played for

20  the jury.)

21          THE COURT:  Stop the depo, please.

22          MR. AISENBREY:  Your Honor, that was -- two lines we

23  left out.  Right after I asked Ms. Murley, that refers to

24  Hallmark diary, doesn't it?

25          And she said yes.

1          Then my next question was, a diary study is a

2     research tool?

3          Her answer was, it's a very standard research tool.

4          Then we moved on to something that's you were -- back

5     on the tape and I apologize to the Court.

6          THE COURT:  Okay.

7          (The video deposition is continuing to be played for

8     the jury.)

9          MR. AISENBREY:  Your Honor, that concludes the

10    deposition of Jan Murley.  However there was an omitted, just a

11    short part was omitted.  I'll read it with the Court's

12    permission.

13         THE COURT:  Go ahead.

14         MR. AISENBREY:  For context it was when we were

15    discussing, the context was, let's take a look, if you will, at

16    Exhibit 334.  I'm going to jump around a little bit.  I

17    apologize.

18         Then by Mr. Manchel, this is a consulting agreement

19    that you signed, right?

20         Yes.

21         And it's a consulting agreement between you and RPG,

22    correct?

23         Yes.

24         THE COURT:  Okay.  Mr. Manchel, did you have

25    something?

1          MR. MANCHEL:  May we approach?

2          THE COURT:  Yes.  Step up.

3          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

4    PROCEEDINGS WERE HAD:)

5          MR. MANCHEL:  Your Honor, at this time we renew our

6    motion to Murley and Earley.  As the Court has seen there were

7    three references in this entire -- to the documents brought the

8    information from Hallmark.  Each reference making it very clear

9    she provided what ever information she provided directly to RPG

10   or to nxtMove.  And each reference made it clear that she and

11   she on her own decided that for whatever purpose she was using

12   it, she thought there was value to it, which was an issue the

13   Court had raised before, that it could be used to show the

14   value of the trade secrets.

15          So what we have here now, after all of this, we have

16   Jan Murley took information from what she claims was a

17   compilation, not the compilation at issue in this case.  Jan

18   Murley gave that information to nxtMove for use.  NxtMove who

19   was hired and contracted to RPG.  Jan Murley who used

20   apparently three slides from this other compilation because Jan

21   Murley thought it had value.  It's being put into this case

22   along with a, quote, unquote, former Hallmarker hired by RPG to

23   suggest the value of the compilations that are different than

24   what they're calling compilations.

25          There's been no connection made to the Exhibit 20

which has been the fundamental issue we had before the Court.
And the Court has asked repeatedly that Hallmark show a nexus
between Exhibits 20A through E, and at the end there and
Exhibit 20, and I would submit that at this time having gone
through Earley and having gone through Jan Murley, that no such
nexus would be made.  So we move to strike both on the basis of
Your Honor's order on this issue.  And we think under 403 it is
unduly prejudicial to the defendants.

MR. AISENBREY:  Your Honor, to begin with it has
several different issues that are relevant.  No. 1, as
Mr. Earley testified, he was hired by Clipper people to do this
work.  It shows the control of Clipper.  You may remember two
days ago there was testimony by, I think, Mr. Yoon that Monitor
Consulting would not work with Clipper as of the middle of 2006
because they were in litigation with Hallmark.  And so that's
when, as Ms. Murley just testified, she was approached by
Monitor Clipper to be the CEO of RPG.  And later today
Mr. Levine will testify he was fired by Monitor Clipper people
as CEO to be replaced by her.  When she is brought in as a
consultant she used, I think it's six or seven, not three pages
from that Power Point she was just discussing, came, identical
to pages that are in the exhibit, what we're calling Exhibit
20.  You guys, it's actually 487.  I think you saw the other
day how they compare.  When Mr. Maynard was on the stand we
compared two slides.  What we were comparing, slides from

1    Ms. Murley's presentation to the Hallmark cases that are at

2    issue here.  Ms. Murley comes in there.  She uses the stuff.

3    She tells them how useful it is.  She had previously sent it to

4    the Clipper people who then bring her in, the same time bring

5    her in to work with the Monitor, excuse me, the RPG people.  It

6    shows that the material they were using still had value.

7          Now, Mr. Manchel cross-examines her and she says

8    because she's not exactly happy about Hallmark, she says I

9    think this was old.  But she also admits it allowed them to

10   start five steps down the road in the research they were going

11   to do.  It shows continued use.  And Clipper knew it had

12   continued use.  When they couldn't use Monitor Group, they

13   brought in Ms. Murley to do it.

14         MR. MANCHEL:  Your Honor, brought to show, No. 1,

15   this information came from Clipper and No. 2 that it had value

16   to Clipper.

17         THE COURT:  I'm not sure about the first one, Steve,

18   but go ahead.

19         MR. MANCHEL:  I believe your order, Your Honor, I

20   could be wrong but I believe the order was that it had to be a

21   nexus to Exhibit 20, the Monitor material that was accessed or

22   used or given to Clipper.  And I believe the representation to

23   Your Honor before we went into this whole Murley exercise was

24   they would show a nexus to Exhibit 20.  So what we have here is

25   we have, I don't care if it's 3 slides or 6 slides, it's from

1    an earlier compilation.  It was taken by Jan Murley with no

2    involvement whatsoever from Clipper or Monitor.  It was

3    purportedly used by Jan Murley directly with RPG, not with

4    Clipper, not with Monitor.  And it's being offered to show the

5    value of something else.  And more pointedly the value to

6    Clipper.  There is nothing in here that talks about the value

7    to Clipper.

8           And Your Honor was very clear that if at the end of

9    the day this exercise is about 20A through E, it's not

10   relevant.  And we think it's not relevant.  And it's unduly

11   prejudicial.  I mean when I read Your Honor's order from last

12   week, I don't know what else it would apply to other than

13   something like this.  I believe, in fact, Your Honor, the

14   motion that, the motion on which your order was based, there

15   was an argument that they would show this information came from

16   Clipper.  I'm almost certain that was the basis of the argument

17   they made before Your Honor because there was some discussion

18   in it about a letter that wasn't part of anything else.  And

19   your instruction was, you're going to need to show this was

20   from Clipper, if my memory servings me correctly, and their

21   response, we will, and now we're done.  It shows from Jan

22   Murley from Hallmark.  Nobody at Clipper saying this has value.

23   I have your order, Your Honor, if it helps.

24          And as I said, I'm almost certain that the briefing

25   in advance of Your Honor issuing this order, the argument made

1   by Hallmark is we will show that this information might have

2   come from Clipper.

3           MR. AISENBREY:  Your Honor, we talked about this last

4   Friday or Monday.  We talked about this order.  And at that

5   time you said if the slides are the same slides, that was

6   sufficient.  I think, I won't repeat everything I've said but

7   the 403 argument, the undue prejudice would have to

8   substantially outweigh relevance, not undue prejudice.  I think

9   it shows the relevance of the use.  It shows the part about

10  where she got her contract revised to act like there was

11  something that didn't happen that had happened was all handled

12  by Mr. Maxwell who is a Clipper person, whose primary contact

13  with RPG, quote, unquote, was Mr. Maxwell, a Clipper person.

14  She testified he was her primary contact.  He put her in touch

15  with the people at nxtMove.

16          MR. MANCHEL:  At most, Your Honor, I'm sorry.  I'm

17  sorry.

18          My issue, Your Honor, is how does Jan Murley,

19  deciding that material from another compilation might have use

20  in an exercise that she's conducting, how is that relevant to

21  whether Clipper thought the information was relevant and of

22  value?  Even if you accept the notion that you can use pieces

23  from a different, quote, unquote, compilation to show the value

24  of the compilation at issue.  All the actions are being taken

25  by Jan Murley and all of the information comes from Hallmark.

1    Not from any of the exercises that are at issue in this case.

2            THE COURT:  Hallmark's theory of the case is that

3    Clipper people put into action the use of Ms. Murley,

4    Ms. Murley's experience and knowledge in order to help grow

5    RPG's revenue and its value ultimately.  Ms. Murley brought

6    information that is, some of it in any event, is a part of the

7    five presentations.  That indicates to me that she and Clipper

8    believed that those presentations had some value.  Moreover the

9    revised contract which changed the terms and included

10   warranties and representations that were not a part of the

11   original contract, suggest, and a jury might conclude, a guilty

12   state of mind.  And that Clipper was trying to cover up what it

13   had done previously with respect to Murley.  I think all of

14   that is relevant.  And it is a jury issue as to whether the

15   plaintiff should, the plaintiff's theory should prevail or the

16   defendants.  The evidence is in the record.  I'm not going to

17   strike it.  Motion overruled.

18           MR. MANCHEL:  Thank you, Your Honor.

19            (THE PROCEEDINGS RETURNED TO OPEN COURT.)

20           THE COURT:  Mr. Blegen?

21           MR. BLEGEN:  Your Honor, the plaintiffs call Paul

22   Maxwell.

23           THE COURT:  We'll work until about 2:30, find a

24   breaking point then we'll come back, folks, and work until 4.

25   Then you're excused.

                    PAUL MAXWELL, PLAINTIFF'S WITNESS, SWORN

1

2                              DIRECT EXAMINATION

3    BY MR. BLEGEN:

4    Q     Good afternoon, Mr. Maxwell.

5    A     Good afternoon.

6    Q     Just to get a little background here.  Do you have a

7    bachelors in business administration from the University of

8    Kansas, correct?

9    A     That's correct.

10   Q     And you spent some time out east.  You joined Monitor

11   Clipper Partners in 2003, is that right?

12   A     That's correct.

13   Q     Then in 2010 you left Monitor Clipper and the east coast

14   and came back here to Kansas City?

15   A     Yes.

16   Q     And what is the name of your current employer?

17   A     It's called Great Range Capital.

18   Q     I'll hand you Exhibit 649 and ask you if you can tell me

19   what the picture in 649 is?

20   A     This is a picture of the office building in Cambridge,

21   Massachusetts, where Monitor Clipper Partners was located.

22           MR. BLEGEN:  Your Honor, I offer 649.

23           MR. DONOVAN:  No objection.

24           THE COURT:  649 is admitted without objection.

25   BY MR. BLEGEN:

1  Q    Okay.  So as you indicated this is the picture.  We've

2  heard about Cambridge.  We've heard about the building.  But

3  this is a picture from the street of the Monitor office

4  building in Cambridge, Massachusetts, correct?

5  A    That is correct.

6  Q    And it's about a 5-story building, right?

7  A    That's correct.

8  Q    And you were, when you were with Monitor Clipper you were

9  on the fourth floor, I believe, correct?

10  A    That's correct.

11  Q    And Monitor Consulting, the company we've also heard about

12  today, is also headquartered in that building, right?

13  A    That's correct.

14  Q    Now, you started as an associate with Monitor Clipper,

15  correct?

16  A    Correct.

17  Q    But by the time you left you had moved up to principal?

18  A    That's correct.

19  Q    What is the level of principal?

20  A    At what point in time?

21  Q    How about in 2005?

22  A    In 2005 I believe it was managing director.

23  Q    And you were an associate still when RPG was acquired,

24  right?

25  A    That's correct.

1   Q    And during the course of 2006 you were elevated to the

2   level of principal, right?

3   A    That's correct.

4   Q    And you were also, during the time there, an investor in

5   Fund II which we've also heard about?

6   A    Yes.

7   Q    And one of your jobs at Monitor Clipper was to participate

8   in the due diligence and analysis of acquisitions for Monitor

9   Clipper, correct?

10  A    That is correct.

11  Q    And in that role you had interactions and worked with the

12  standing case team?

13  A    That's correct.

14  Q    And that standing case team would provide services to

15  Monitor Clipper and its evaluation of those potential

16  acquisitions, right?

17  A    Yes.

18  Q    And that standing case team would also provide services to

19  portfolio companies of Monitor Clipper, correct?

20  A    In certain instances, yes.

21  Q    And in 2005, the year we've been talking about, you

22  interacted during that with the standing case team, right?

23  A    I did.

24  Q    So the jury can understand where you fit into this

25  process, by the time you got involved, well, let's start over.

1  You were ultimately involved in the RPG due diligence process,

2  right?

3  A    That is correct.

4  Q    But by the time you got involved the purchase price was

5  already arrived at, correct?

6  A    That is correct.

7  Q    And you don't have any knowledge then or recollection as

8  to the, how that $305 million purchase price was arrived at, is

9  that fair?

10  A    No, I wouldn't say that's fair.  No.  I was working on the

11  transaction more actively in its later stages but I was

12  attending meetings before that in which the transaction was

13  discussed.

14  Q    But you don't recall anyone ever explaining to you

15  specifically how the $305 million number was derived, is that

16  correct?

17  A    I'd say that's correct.  I don't recall anyone explaining

18  it to me specifically.

19  Q    And you were not a member of that investment committee

20  when the RPG acquisition came up for decision, right?

21  A    I was not.

22  Q    But you did attend that investment committee meeting,

23  right?

24  A    I did.

25  Q    You recall and we heard earlier today, you do recall Mark

1    Pocharski speaking at that investment committee, right?

2    A    I do recall.

3    Q    Now, your primary work on the pre-closing side, the

4    acquisition and due diligence side was around the financing of

5    the deal, right?

6    A    Yes.

7    Q    And you worked with Credit Swiss or Credit Swiss First

8    Boston as it's been referred to, right?

9    A    I did.

10   Q    And Credit Swiss was the primary lender for the deal who

11   then brought in other lenders to buy part of the debt to spread

12   it around, right?

13   A    That's correct.

14   Q    And you were in that role, directly involved with

15   discussions with those rating agencies that we've heard some

16   about, right?

17   A    I was.

18   Q    And you were involved in preparing the materials that were

19   presented to the rating agencies?

20   A    I was.

21   Q    And so everyone may recognize the names, those were like

22   Moody's and Standard and Poors.  Those were the ratings

23   agencies at issue here?

24   A    That's correct.

25   Q    And the purpose of the credit agency meetings was so they

1  could assign a rating to the RPG entity that was being

2  acquired, right?

3  A     Yes.

4  Q     And that rating would be used by some lenders in

5  evaluating whether to buy that debt, right?

6  A     That's right.

7  Q     And you were also directly involved in discussions with

8  lenders, right?

9  A     That's correct.

10  Q     And you were involved with preparing the materials for

11  those discussions, right?

12  A     I was.

13  Q     And in those meetings that a Power Point presentation was

14  made for the lenders, correct?

15  A     For certain of those meetings, yes.

16  Q     And it's also your understanding that those lenders would

17  ask Credit Swiss questions about the transaction, right?

18  A     Yes.  I believe that's true.

19  Q     And Credit Swiss would turn to Clipper or RPG and ask the

20  question to them so Credit Swiss could give that information to

21  the lender, right?

22  A     Yes.  In some circumstances, yes.

23  Q     And, in fact, you had a series of discussions with Credit

24  Swiss that covered a lot of different topics related to the RPG

25  acquisition, right?

1    A    That's right.

2    Q    And you don't recall any instances in which you told

3    Credit Swiss that you would not answer a question, right?

4    A    I don't recall that.  No.

5    Q    And in answering those questions you would not have lied

6    to Credit Swiss.  Is that fair?

7    A    No, I don't believe I would.

8    Q    And you would not have intentionally given an inaccurate

9    answer to Credit Swiss.  Is that fair?

10   A    I believe that's fair.

11   Q    Now, the deal closed in December of 2005, right?

12   A    Yes.

13   Q    I have put in front of you Exhibit 235.  And that is an

14   e-mail that starts December 7, 2005 with an e-mail from Travis

15   Metz to Charles Yoon and April Evans seeking information,

16   seeking a one pager and a memo to the limited partners about

17   the RPG acquisition, right?

18   A    That's right.

19   Q    And then you forwarded that to Peter Kim on the 7th of

20   December, right?

21   A    That's correct.

22   Q    And on later that day Peter Kim responded to you and

23   that's the e-mail at the top of the page, right?

24   A    That's right.

25   Q    And he says, hey, Paul, see attached.  Grant and I already

1  put together a good working draft of the more detailed LP memo

2  a few weeks back so we should be in pretty good shape there.

3  Then attached to this, the first attachment is the one pager,

4  right?

5  A    Yes.

6  Q    And this is a draft at this point in time, right?  This

7  isn't the final version, is that fair?

8  A    Yes.

9  Q    So in this version, which is a memo to the advisory board

10 members from Monitor Clipper Partners L.L.C. dated December 8,

11 2005, regarding acquisition of Recycled Paper Greetings.  Is

12 that correct?

13 A    Yes.

14 Q    I'd like to turn to the bottom paragraph.  In this

15 paragraph of this draft provided by Peter Kim to you, it states

16 MCP emerged as the winner of a competitive auction process

17 based on management's preference, the value we are able to

18 bring to bear and Monitor Group's deep knowledge of the

19 greeting card industry.  That's what it says in this draft,

20 right?

21 A    That's right.

22 Q    It goes on, the investment in RPG is highly consistent

23 with our strategy of investing in companies where Monitor Group

24 expertise provides confidence in a firm's market position and

25 growth opportunities.  That's the next sentence, right?

1   A    Yes.

2   Q    It goes on, Monitor had historically worked for one of the

3   major greeting card manufacturers and MCP was able to glean

4   industry insights from Monitor Group.  Is that the next

5   sentence?

6   A    It is.

7   Q    And, finally, this knowledge base will enable MCP to work

8   with the company to identify growth prospects, operational

9   improvements and brand marketing strategy.  Is that the last

10  sentence of that draft?

11  A    It is.

12  Q    I'm handing you now Exhibit 236.  And in this e-mail, it

13  starts on December 9, 2005 with an e-mail from Peter Kim to you

14  with a carbon copy to Charles Yoon, right?

15  A    Yes.

16  Q    And Peter says, the attached draft incorporates yours and

17  Charlie's comments.  Let me know if you have any other

18  comments.

19          Are you with me?

20  A    Yes.

21  Q    Okay.  And then you forward that on to Bill Young later in

22  the day on the 9th.  And you say, Bill, attached is a brief

23  memo that Travis and April would like to send to the advisory

24  board.

25          Now that's referring back to the one pager that we

1    just looked at a moment ago, right?

2    A    I believe so, yes.

3    Q    And, finally, Bill Young responds to you at 5:52 that

4    evening, given Hallmark's gratuitous shot across the bow, would

5    like to tone down the Monitor industry angle in the final

6    paragraph.

7              Do you see that?

8    A    I do.

9    Q    Now, Hallmark had expressed concerns at that point about

10   some reports in the press that Monitor Clipper was acquiring

11   RPG.  Are you aware of that?

12   A    I'm aware of that now, yes.

13   Q    Do you think Hallmark would be rightfully concerned about

14   someone gleaning industry insights from its trade secrets?

15   A    I guess it depends on the nature of the insights and

16   whether or not they were from trade secrets.

17   Q    Okay.  What about, do you think Hallmark would be

18   rightfully concerned about someone using Hallmark trade secrets

19   as a knowledge base with which to assist a competitor of

20   Hallmark's?  Do you think that would concern Hallmark?

21   A    If they were trade secrets then, yes, I believe that if

22   they were specific to Hallmark, then yes.

23   Q    Well, or even if they were Hallmark's trade secrets about

24   the industry, those would still be trade secrets, right?  They

25   would potentially be harmful to Hallmark if they were used as a

1  knowledge base to assist a competitor in that industry, right?

2  A    Potentially.  Without knowing what the trade secrets are,

3  it's difficult to answer that question.

4  Q    To be clear, Mr. Young talks about toning down the Monitor

5  industry angle.  But no one ever said that the final paragraph

6  was untrue.  Is that right?

7  A    I don't recall if anyone said that.

8  Q    But the only thing that is said in the e-mail from Mr.

9  Young is just simply to tone down the Monitor industry angle in

10  that final paragraph, right?

11  A    Yes, that's what it says in his e-mail.

12  Q    Now, I placed in front of you Exhibit 190.  And here we

13  are continuing to discuss one pagers and information to be

14  provided about the acquisition, right?

15  A    Right.

16  Q    And then on January 2, 2006, the second e-mail on the

17  list, right there, you're e-mailing Charlie Yoon and you're

18  telling him, I'd revisit this to tone down the Hallmark factor,

19  right?

20  A    Yeah.  I believe it said to water down the Hallmark

21  factor.

22  Q    Oh, you're right.  Water down the Hallmark factor.  Thank

23  you for clarifying.

24          And here we are on January 4, 2006, in another

25  version of the one pager.  Actually the sentence at the bottom

1    is added here about contacting Charlie Yoon with questions.

2              Oh, I'm sorry.

3              So where in the first instance there was a comment in

4    the first sentence MCP emerged as the winner based on

5    management's preference, the value we are able to bring to bear

6    and the Monitor Group's deep knowledge of the greeting card

7    industries.  In the January version, all they say is, MCP was

8    introduced to the company by former Monitor Consulting Partner

9    Tom Keiser whose brother Mike Keiser was one of the owners of

10   the RPG, right?

11   A    I see that.  Yes.

12   Q    Whereas in the first version it talks about the investment

13   being highly consistent with the strategy of investing in the

14   companies where Monitor Group's expertise provides confidence

15   in the firm's market position and growth opportunities.  Now it

16   talks about the Keiser family plus Monitor's, MCP's

17   relationships with retailers and potential new customers and

18   expertise in consumer products rather than the industry.

19   Enable us to emerge as the preferred partner, right?

20   A    I see that.

21   Q    Whereas in the original version when it talked about

22   Monitor having historically worked for one of the major

23   greeting card manufacturers and Monitor Clipper being able to

24   glean industry insights from Monitor Group and that knowledge

25   base will enable MCP to work with the company to identify

1   growth prospects, operational improvements and brand marketing

2   strategy, now it just says it's highly consistent with our

3   strategy of investing in companies where Monitor Group and MCP

4   can add value post transaction.  We are confident that we will

5   work with the company to identify growth prospects, operational

6   improvements and brand marketing strategies.

7           So would you agree that you were able to sufficiently

8   water down the Hallmark factor from the original version to the

9   final version?

10  A    Well, to me as I look at these two exhibits, they're to

11  two different audiences.  So one is to the advisory board

12  members and the subsequent one to is Monitor leaders.

13  Q    Do you believe that the language in 235, the original one,

14  stayed in the version 2, whatever version may have gone off to

15  the advisory board members or do you believe the language in

16  the watered-down 191 was what was finally disclosed to people

17  outside the deal?

18  A    I believe that the second version here is more closely

19  what went out to the advisory board members, yes.

20          MR. BLEGEN:  Your Honor, this is as good a time as

21  any if you would like to break?

22          THE COURT:  All right.  Let's go ahead and take about

23  15 minutes, folks.  We'll see you back here at 2:45.  We're in

24  recess.

25                          (Witness temporarily excused.)

1                          (Recess)

2              (The following proceedings were had OUT OF THE

3     PRESENCE AND HEARING OF THE JURY:)

4              THE COURT:  Kelly, would you see if the jury is

5     ready?

6              (The following proceedings were had IN THE PRESENCE

7     AND HEARING OF THE JURY:)

8              THE COURT:  Please be seated.

9              Mr. Blegen, you may resume.

10             MR. BLEGEN:  Thank you, Your Honor.

11                      PAUL MAXWELL, RESUMED

12                   CONTINUED DIRECT EXAMINATION

13    BY MR. BLEGEN:

14    Q    Okay.  Mr. Maxwell, when we took our break we were at

15    about December, the closing of the transaction.  Do you

16    remember that?

17    A    I do.

18    Q    Okay.  Now, you continued to have a role with regard to

19    RPG after the acquisition closed, didn't you?

20    A    That's right.

21    Q    And were you secretary to one of the boards, if I recall

22    correctly?

23    A    That's correct.

24    Q    What board?

25    A    I believe the name of the entity was RPG Investment

1  Holdings L.L.C.

2  Q    Now, I've handed you Exhibit 422 which was discussed

3  yesterday.  And if you'll turn to schedule 1 which is about the

4  fifth page of the exhibit.  And there's been discussion about

5  these entities.  But which one of these was the one you were

6  secretary to?

7  A    It would be the bottom one, RPG Investment Holdings L.L.C.

8  Q    And that's the operating company, well, I'm sorry.  So the

9  Recycled Paper Greetings operating company, the entity that

10  actually sold greeting cards reported up to that holding

11  company, correct?

12  A    Yes.  Effectively, yes.

13  Q    And the board that you were secretary to, now just to be

14  clear, it indicates there that Mr. Yoon of Monitor Clipper is

15  officially the secretary as far as the officers are concerned,

16  right?

17  A    That's right.

18  Q    But as far as the board proceedings, you were the

19  secretary to the board.  You attended the meeting and you

20  performed the function of the secretary, right?

21  A    That's correct.

22  Q    You keep meeting minutes.  You make sure the books and

23  records of the business were correct, right?

24  A    I did keep the minutes, yes.

25  Q    And there's been some discussion.  Who is Mr. Calhoun

1   there on the board of directors of the investment holdings

2   entity?

3   A    Bob Calhoun or Robert Calhoun worked with Monitor Clipper

4   Partners L.L.C.

5   Q    He had a position at Monitor Clipper Partners, right?

6   A    He did, yes.

7   Q    So he wasn't from the acquired entity side.  He came from

8   the Monitor Clipper side to serve on the board of the holding

9   company, right?

10  A    That's correct.

11  Q    And was he on the board from the beginning of the

12  operations of RPG as an entity under Fund II?

13  A    I don't recall definitively.  He may have come on after

14  the fact.

15  Q    Now, do you know, did he leave the board of the holding

16  company during the time you were still involved with the

17  holding company?

18  A    He may have, I don't recall.

19  Q    Your best recollection today is that he remained on the

20  board the whole time you were involved with that board?

21  A    I don't recall him leaving that position.

22  Q    And did you eventually become a board member of that

23  entity?

24  A    I did.

25  Q    And so you attended the board meetings that were held for

1    the holding company, right?

2    A    I did, yeah.  I attended the meetings for, many of the

3    meetings for RPG Investment Holdings L.L.C.

4    Q    Now, while we're on that document, I want to ask you a

5    question I believe you will be able to answer for the jury.

6    Yesterday Mr. Manchel in questioning Dr. Serwin and, obviously,

7    you weren't here.  You wouldn't know what the exact testimony

8    was but he made a suggestion to the jury that RPG did not own

9    any retail stores.  But, in fact, RPG did own retail stores,

10   right?

11   A    I believe either RPG or an affiliated entity or the former

12   owners had an interest in retail stores at some point.

13   Q    It was a subsidiary but it was a subsidiary called

14   Barnyard Industries, right?

15   A    That sounds familiar, yes.

16   Q    And if you'll turn, actually, back to the third page of

17   the exhibit itself.  If you'll highlight paragraph 12.

18          Now, paragraph 12 in this, what's been identified as

19   a memorandum of closing, indicates company, small i, acquired

20   from the sellers all of the outstanding capital stock defined

21   as the Barnyard shares of Barnyard Industries, Inc, an Illinois

22   corporation.  That's the entity that held the retail stores

23   that you're familiar with, right?

24   A    I don't recall specifically but I believe that could be

25   the case, yes.

1    Q    Your best recollection is Barnyard Industries was the

2    retail store arm of RPG, right?

3    A    That's right.

4    Q    If you'll turn back to schedule 1, just two pages later in

5    the document.  And look up the second entity on schedule 1, is

6    in fact, the entities we've been discussing, Barnyard

7    Industries, right?

8    A    I see that, yes.

9    Q    That one indicates that Bill Young and Charles Yoon are

10   directors of that entity, right?

11   A    Yes.

12   Q    And Bill Young and Charles Yoon are also the sole officers

13   of that entity, the retail store entity, right?

14   A    I see that, yes.

15   Q    Next, just to close the loop on something, a document,

16   this will only take a moment.  I'm going to hand you Exhibit

17   62.  Now, this is at the bottom an e-mail from you to the

18   entirety of Monitor Clipper as well as Grant Brown, Megan Kahn,

19   Jeff Pauker, Jonathan Rider and Daniel Yang on December 5,

20   2005, right?

21   A    That's right.

22   Q    And the individually listed folks are Monitor employees,

23   right?  Well, put it this way.  Were they all standing case

24   team members at this time?

25   A    Many of them were.  The only one I don't recall is if

1  Daniel Yang was on the case team or not at that time.

2  Q    Here you are December 5, the date of closing, announcing

3  the closing of the company, right?  The closing of the sale,

4  the acquisition, right?

5  A    That's right.

6  Q    And so you're telling everybody at the company MCP

7  provided 105 million of equity along with the 26 million the

8  founders put in, right?

9  A    Correct.

10 Q    And this is the financing part you worked on, CSFB, that's

11 Credit Swiss, right?

12 A    That's right.

13 Q    Provided a first term lien loan of 120 million and a

14 second lien loan of 77 million, right?

15 A    That's right.

16 Q    So that's the debt, the leverage that was used along with

17 the contributions of Fund II to acquire the entity, right?

18 A    Right.  And the contributions of the two sellers as well

19 but yes.

20 Q    Thank you.  You're right.  And now you're noting at the

21 bottom, we're having the first board meeting in Monitor Clipper

22 offices this coming Thursday on December 8, right?

23 A    Yes.

24 Q    And among other topics the board plans to discuss ways in

25 which the company can benefit from Monitor Group as well as

1  MCP's due diligence findings?

2  A    I see that, yes.

3  Q    And that board you're referring to is the one you were to

4  become secretary of, right?

5  A    That's correct.

6  Q    Now, I placed in front of you, Mr. Maxwell, Exhibit 113.

7  And that's identified, well, could you tell us what that

8  document is?

9  A    This says to RPG board of directors from MCP.  December 5,

10  2005.  Subject is agenda for RPG board of directors meeting on

11  December 8, 2005.

12  Q    And this is the agenda circulated for the meeting you

13  referenced in your announcement of the acquisition, right?

14  A    That looks like the case, yes.

15  Q    And down the first item on the list is board appointments

16  and the second one on the list is meeting secretary.  And

17  that's you, right?

18  A    I believe that's the case.  Yeah, I believe that was at

19  this meeting, yes.

20  Q    And the 6th item on the list is identified information

21  sharing, paren, RPG, MCP and Monitor, right?

22  A    I see that, yes.

23  Q    But you don't recall today what on that topic was

24  discussed at the board meeting, is that accurate?

25  A    No, I do not.

1  Q    Mr. Maxwell, I've handed you what has been marked as

2  Exhibit 115.  Can you identify that document for me?

3  A    This is an e-mail from me on December 15, 2005 to Len

4  Levine with a copy to Charles Yoon and to Peter Kim and the

5  subject is agenda for RPG MCP call.

6  Q    And who is Len Levine?

7  A    At the time Len Levine was the CEO of RPG.

8  Q    And it lists two attachments.  One is RPG work plan, Len.

9  And the other is RPG work plan, management.  Do you see that?

10 A    I do.

11 Q    Attached to that exhibit there is one memo to Len Levine

12 that says RPG work plan, confidential.  Do you see that?

13 A    I do.

14 Q    To be fair only one of the two attachments appears in this

15 e-mail?

16 A    Yes.

17 Q    But the only difference between the two is that the other

18 version only has the first part of the memo and everything from

19 confidential down doesn't appear.  Is that the difference

20 between what was originally attached to this e-mail?

21 A    I don't recall.  I don't have the other version in front

22 of me.

23           MR. BLEGEN:  Your Honor, we'd offer Exhibit 115.

24           MR. DONOVAN:  No objection.

25           THE COURT:  Without objection 115 is admitted.

1    BY MR. BLEGEN:

2    Q    Go to the second page.  So this is what we were just

3    talking about before the jury saw it.  This is the memo to Len

4    Levine which is the confidential Len Levine version of whatever

5    the memo is for that meeting, right?

6    A    Okay.

7    Q    At the bottom of that page it starts the section

8    confidential, Len Levine only, right?

9    A    Yes.

10   Q    Okay.  Going to the next page, one of the things, the

11   bottom point, one of the things that is on tap for this

12   conversation which this was being sent to Mr. Levine in advance

13   of a conference call the Monday following Thursday,

14   December 15, right?

15   A    That appears to be right, yes.

16   Q    And the final thing on the list that you want to talk

17   about with Len Levine only is Monitor Group, right?

18   A    Yes.

19   Q    And the middle part of that has to do with marketing,

20   introduction of Monitor executives and strategy, right?

21   A    I see that.

22   Q    So at least as of December 15, 2005, discussions of

23   Monitor was on the agenda of things to do with Len Levine and

24   RPG, right?

25   A    Yes.

1  Q    Now I'm handing you, Mr. Maxwell, Trial Exhibit 241.  That

2  is a, it starts out with an e-mail from Chris Casey to Bill

3  Young.  Then Bill Young forwards that to you on January 20,

4  2006, right?

5  A    Yes.

6          MR. BLEGEN:  We offer Exhibit 241, Your Honor.

7          MR. DONOVAN:  No objection.

8          THE COURT:  241 is admitted without objection.

9  BY MR. BLEGEN:

10 Q    Now, the first e-mail in the chain, Chris Casey on

11 January 19, 2006, is e-mailing Bill Young.  And the subject is

12 RPG investor presentation.  And he's saying, Mr. Young.  Bill,

13 haven't received the investor presentation deck yet.  When

14 should I expect to receive it.  Do you see that?

15 A    I do.

16 Q    And then when Mr. Young forwards that to you, he says,

17 Paul, could you send an electronic version of our investment

18 committee presentation to Chris this PM?  Double check with me

19 before hitting the transmit button.  I'm checking a legal

20 question on this.  Do you see that?

21 A    I do.

22 Q    You did, in fact, send the RPG investor presentation to

23 Chris Casey later that day, right?

24 A    I don't know whether it was that day but I do recall that,

25 yes.

1    Q    So you can't, sitting here today, recall January 20, 2006.

2    But you do remember you did send the investment presentation

3    for the RPG acquisition to Chris Casey in this time period,

4    right?

5    A    Yes.

6    Q    Now, just before you testified the jury heard from

7    Mr. Larry Earley, actually this morning, they heard from Mr.

8    Larry Earley.  You're familiar with nxtMove in that it's a

9    consulting firm that works in market research, right?

10   A    I am.

11   Q    Now, and you, in fact, had involvement with Mr. Earley

12   during the summer of 2006 with regard to some potential

13   consulting on the RPG business, right?

14   A    Yes.  I recall discussions with Larry Earley.  I didn't

15   recall they were in the summer but yes.

16   Q    And I've handed you Exhibit 306.

17        Well, I'll offer 306.

18        MR. DONOVAN:  No objection.

19        THE COURT:  306 is admitted without objection.

20   BY MR. BLEGEN:

21   Q    Now, in Exhibit 306, on the bottom of the first page is

22   the transmittal information on an e-mail from you to Mr. Earley

23   on July 21, 2006.  Do you see that?

24   A    I do.

25   Q    And going on to the second page at the top, you say to

1    him, thanks again for your proposal.  Please take a look at the

2    attached document which reflects our thoughts and suggestions.

3    Do you see that?

4    A    I do.

5    Q    So at this point in time you had received a draft proposal

6    from Mr. Earley of nxtMove, right?

7    A    Yes, I believe that's right.

8    Q    And you had made comments on it and were sending it back

9    to Mr. Earley for nxtMove to incorporate their comments into

10   the next draft of that the proposal, right?

11   A    Yes.

12   Q    Now, there was discussion about, I'm going to hand you

13   Exhibit 375.  There was discussion this morning about Exhibit

14   375 or earlier this afternoon, perhaps.  And this is a proposal

15   from nxtMove to Charles Yoon of Monitor Clipper Partners,

16   July 28, 2006, correct?

17   A    Yes.

18   Q    So this is seven days after you have reviewed and

19   commented on a prior draft, this proposal is sent from nxtMove,

20   right?

21   A    That's right.

22   Q    And at the time of these proposals going back and forth in

23   July of 2006, RPG was not yet involved with nxtMove, right?

24   A    No.  I believe so.

25   Q    I'm sorry?

1    A    No, I don't believe so.

2    Q    And, in fact, RPG did not get involved with nxtMove until

3    late August 2006, right?

4    A    I don't recall the specific date.

5    Q    Well, does August 21, 2006 ring a bell?

6    A    It doesn't.  That could very well be the date, I just

7    don't recall when it was.

8    Q    Let's see if this helps.  We'll do our best to be precise.

9    You have in front of you Defendant's Exhibit 1021.  And on the

10   last page of Exhibit 1021 you are writing to Larry Earley on

11   August 8, 2005 asking him if he would be available to come meet

12   with RPG on August 21, right?

13   A    August 8, 2006 to meet on the 21st.

14   Q    You're right.  I apologize if I misspoke.

15   A    It's okay.

16   Q    Mr. Earley responds and says he's available.  He asked you

17   a question, is this to discuss our proposal or potentially kick

18   off the project?  So he wants to know the status, right?

19   A    Yes.

20   Q    And so you respond and you're telling him that you're

21   getting a schedule.  It will be about an hour.  You're

22   identifying for him the RPG people that he'll be meeting for

23   the first time, right?  Mr. Levine, Mr. Murray and Mr. Stassen?

24   A    Yes.

25   Q    So it was, in fact, Clipper and not RPG who actually

1    brought nxtMove into the equation for consulting with RPG,

2    right?

3    A    Well, Clipper had initial meetings with nxtMove and then,

4    obviously, then there were subsequent meetings with RPG.  So

5    Clipper did have some of the initial meetings, yes.

6    Q    In fact, received proposals, commented on the proposals,

7    received revised proposals, all before RPG was involved with

8    nxtMove, right?

9    A    What I don't recall is whether or not there was any RPG

10   involvement prior to this August 21 meeting but yes.

11   Q    But if Mr. Earley believed there had been no prior

12   meetings with RPG, would you have any reason to dispute that

13   testimony?

14   A    No, I would not.

15   Q    Now, after the nxtMove involvement, nxtMove's contact, Jan

16   Murley was brought in to be a consultant with regard to RPG,

17   right?

18   A    Yes.  I don't recall specifically when she was brought in

19   but yes.

20   Q    And prior to that she was being discussed as a possible

21   CEO of RPG, right?

22   A    Again, I don't recall when exactly those conversations

23   happened in sequence but I do recall discussions about the

24   possibility of her being a potential CEO.

25   Q    And you thought Jan Murley's experience in the greeting

1    card industry should be helpful in the context of consulting

2    with RPG, right?

3    A    I believe that's correct, yes.

4    Q    In the course of her consulting work you did not tell Jan

5    Murley that you didn't want her to have or bring anything from

6    her time at Hallmark with regard to that consulting work,

7    right?  You don't recall telling her that?  You don't recall

8    telling her, don't bring anything from Hallmark?

9    A    I don't recall verbally having a conversation like that

10   with her, no.

11   Q    Now, just want to close the loop on a few things so, I'm

12   going to hand you both Exhibit 128A and Exhibit 150.  They have

13   both been discussed.  Now 128A is an e-mail from Jan Murley to

14   Paul Maxwell, Charles Yoon, Larry Earley, Ed Stassen, Emma

15   Reece, Mary George and Len Levine on October 31, 2006, right?

16   A    Right.

17   Q    And attached to that is an agenda for a meeting on

18   October 31 and a Power Point presentation, right?

19   A    Yes.

20   Q    And just so we're clear, if you look at Exhibit 150 and if

21   you need a moment to compare them, the Power Point presentation

22   that has been discussed previously as Exhibit 150 is the same

23   one that is attached to the e-mail that you received

24   October 31, 2006, right?

25   A    Should I flip through both of them?

1  Q    Whatever you need to do to be comfortable answering the

2  question.

3  A    Yes, they appear to be the same.

4  Q    You can put those aside.  Next, Mr. Maxwell, I'm handing

5  you two exhibits.  One of which you may be familiar with, the

6  other one I know you will not.  But we'll get to that shortly.

7  The shorter one is Exhibit 204.  That was discussed earlier

8  today.  And that is an e-mail from October 20, 2006 from Jan

9  Murley to you and Mary George and Charles Yoon titled nxtMove

10  proposal discussion, right?

11  A    Yes.

12  Q    And that was identified by Ms. Murley earlier today.  But

13  I want to talk a little bit with you about some of the content

14  in here.  Now, if you'll look for me --

15         And, Cindy, if you can on the left-hand side on 487

16  go to page 99.  And then highlight for me the bullet points

17  under demographic trends in the middle of 204.

18         I will tell you, Mr. Maxwell, it may be a little

19  easier if you look at that computer screen or the big screen

20  because sometimes the print is pretty small on these

21  documents.

22         Now, what Ms. Murley is sending to you in Exhibit

23  284, this first part on demographic trends, the first bullet

24  point, historically greeting card unit declines have centered

25  on erosion among women under 45.  Do you see that statement?

1    A    I do.

2    Q    If you look at the chart, there is a line for young

3    couples, I'm sorry, and parents with kids and households older,

4    middle, young, that both show decline in women under 45 in the

5    market?

6    A    I'm sorry.  Could you repeat that?

7    Q    Well, let's, actually I think it makes more sense to

8    combine it with the next one.  From 1999 onwards the greatest

9    erosion has shifted to women 45 plus who account for about

10   35 percent of all card sending and are the fastest growing

11   consumer segment.  Now, if you look at the top line, on the top

12   line you'll see that it's showing that for 1999 to 2000 the

13   greatest erosion has been among couples, singles, 45 plus,

14   right?

15   A    I see that, yes.

16   Q    And the final bullet point, the only segment showing an

17   increase in unit sales is younger singles under 35.  That blue

18   line, in fact, reflects that young, middle, singles, there is

19   an increase in sales going across the years in the chart?

20   A    I see that.

21   Q    Next on the left, if you'll move to page 45.  I'm sorry.

22   44.  And blow up that chart, greeting card penetration and

23   trends.  Then blow up both charts on the left.

24          What she's telling you in this part of her e-mail,

25   91 percent of households participate in the category.  And if

1    you look to the far left of the green bar chart, it, in fact,

2    shows 91 percent total participation, right?

3    A    I see that.

4    Q    The next line down, birthday has 78 percent household

5    penetration.  That shows that in the green bar chart.  Birthday

6    has 78 percent household penetration, right?

7    A    Yes, I see that.

8    Q    All other occasions and relationships enjoy 25 to

9    49 percent, which is, roughly there are a few that are 23 but

10   that's the range that is shown in the green bar chart, right?

11   A    I guess the only discrepancy I see is penetration versus

12   participation.  I don't know if that's the same or not but,

13   yes, I see that.

14   Q    Okay.  You don't know that it's different.  You're just

15   noting they are different words?

16   A    Yes.

17   Q    And then she goes on to say the largest declines, 16 to

18   22 percent, are in Easter, Christmas, baby, girlfriend,

19   Mother's Day and Valentine's Day.  Do you see that?

20   A    I do.

21   Q    That corresponds with the orange bar chart on the

22   right-hand side of the page, right?

23   A    Yes.  I see overlap, yes.

24   Q    And I'm not going to go through all of the bits and pieces

25   on here but if you'll go to the page 45 of the Power Point and

1    page 2 of Exhibit 204.  And the second, right below the first

2    paragraph or so there is the consumer buying process is

3    anchored in the middle grid.

4             And then if you'll blow up the whole thing all the

5    way down to the yellow box.

6             It's talking about the more expected occasions for

7    inner circle and outer circle relationships.  That's what is

8    shown on the color chart, right?

9    A    I see that.

10   Q    And more expected inner circle amounts to 45 percent of

11   card volume.  If you just follow the chart, more expected inner

12   circle down to the yellow box, it's 45 percent, percent of

13   total paper volume, right?

14   A    I see that.

15   Q    More expected outer circle, she indicates is 34 percent

16   card volume and that's what it shows on the chart, right?  Just

17   following down, less expected inner circle is 11 percent,

18   right?

19   A    Yes.

20   Q    Then less expected outer circle is 10 percent, right?

21   A    Yes, on less expected outer circle, yes, I see that.

22   Q    Now, I want to hand you Exhibit 400, Mr. Maxwell.  And if

23   you need to refer to 204, that's fine, but this is the same

24   document, the same e-mail that Jan Murley sent to you on

25   October 20, 2006 with the information we've just been going

1  through a moment ago, right?  The font looks a little

2  different.  I think formatting must have gone away at some

3  point.

4  A    Yes.  It appears to be the same e-mail, yes.

5  Q    Then in this e-mail in which the materials from Exhibit

6  487, those same numbers appear, right?  204, we just talked

7  about, the information we went through came off of that color

8  Power Point presentation we were just looking at, right?

9  A    Sorry.  You asked me if 204's numbers match the 400

10  numbers.

11  Q    No.  The 204 matches the color Power Point slides we were

12  just talking about on the screen.  I'm just confirming we just

13  talked about it, right?

14  A    Yes.

15  Q    Sorry.  I apologize if I confused you, sir.  And so you,

16  you're a Clipper employee at this time, right?

17  A    I am.

18  Q    And Ed Stassen is a Recycled Paper Greetings employee,

19  right?

20  A    That's correct.

21  Q    And so here on October 20, 2006 in this e-mail you, a

22  Clipper employee, are providing Hallmark information to Ed

23  Stassen, an employee of RPG, right?

24  A    I'm providing information that was provided by Jan Murley.

25  Q    So if that is Hallmark information, you are, in fact,

1  providing Hallmark information to Ed Stassen of RPG, right?

2  A    If it were Hallmark information, yes.

3  Q    Now, in this same time period or shortly after the October

4  time period you were involved in preparing and having Jan

5  Murley execute a consulting agreement, right?

6  A    That's correct.

7  Q    I'm going to hand you exhibit, Defense 1070.  That is an

8  e-mail from you to Jan Murley on November 6, 2006, regarding

9  the RPG consulting agreement, right?

10 A    Yes.

11 Q    You're indicating to her that you asked, I'm sorry, you

12 say, we asked our counsel to draw up a brief consulting

13 agreement that I've attached below.  Do you see that?

14 A    Yes.

15 Q    The counsel you're referring to is the Weil Gotshal firm,

16 right?

17 A    I believe that's correct.

18 Q    Next I'm going to hand you Exhibit 313.  And that is --

19          MR. DONOVAN:  Your Honor, could we approach?

20          THE COURT:  Sure.

21          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

22 PROCEEDINGS WERE HAD:)

23          MR. DONOVAN:  I just want to make sure I note for the

24 record, I object to this Murley document.  Seems like they're

25 going into, I know the first couple have been ruled already in

1  these.  I don't want to have to keep interjecting and

2  interrupting him.

3          THE COURT:  Unless the exhibit sheet shows

4  admissibility is stipulated to it, I'm admitting them over your

5  objection.

6          MR. DONOVAN:  Okay.  I'll tell you each time.

7          THE COURT:  No.  You don't need to.  If you want to

8  you can.

9          MR. DONOVAN:  No, that's fine.  I didn't want to

10 interrupt his examination or cause more attention on the issue

11 already.  I just wanted to make sure we're all on the same

12 page.

13         THE COURT:  If admitted at all, they're admitted over

14 your objection.

15             (THE PROCEEDINGS RETURNED TO OPEN COURT.)

16         MR. BLEGEN:  Maybe and if I haven't already, I'll

17 offer Exhibit 313.

18         THE COURT:  313 will be admitted over defendant's

19 objection.

20 BY MR. BLEGEN:

21 Q    Exhibit 313 that you have in front of you, is the executed

22 version of the initial consulting agreement from November 2006,

23 right?

24 A    I see the agreement signed by Jan Murley, yes.

25 Q    At some point however a concern was raised about materials

1    that had been received from Jan Murley, right?

2    A    That's correct.

3    Q    And I'm going to hand you Exhibit 334.  And that Exhibit

4    334 is you on January 17, 2007, forwarding to Jan Murley a

5    clean and black-lined version of the consulting agreement,

6    right?

7    A    Right.

8    Q    And you're stating in your cover e-mail, you'll see that

9    the attached agreement proposes extending the period of time

10   beyond 12/31/06, right?

11   A    Yes.

12   Q    But there were also additional terms added to that

13   consulting agreement, right?

14   A    That's right.

15   Q    And those additional terms were about the possession and

16   use of materials related to a prior employer, right?

17   A    Yes, that's right.

18   Q    Okay.  And, in fact, that revised version was ultimately

19   executed by Ms. Murley, right?  Those versions that I have in

20   front of you are not executed but do you remember that those,

21   in fact, were executed?

22   A    Yes, I do.

23   Q    And in this revision you worked directly with the

24   attorneys at Weil Gotshal on the issue of needing the new

25   contract, right?

1   A    Yes.

2   Q    That was Patrick O'Toole that you worked with, right?

3   A    Yes.

4   Q    Now, you worked with RPG throughout 2006, right?

5   A    Off and on throughout 2006.

6   Q    You had other responsibilities but RPG was one of your

7   responsibilities during 2006, right?

8   A    Yes.

9   Q    And on top of your ordinary salary you earned a bonus for

10  2006, right?

11  A    Yes.

12  Q    Your bonus for 2006 was $125,000, right?

13  A    I don't recall that but --

14  Q    Well, Mr. Maxwell, I'm going to show you a document that

15  the purpose I'm showing it to you is to see if that might help

16  refresh your recollection.  If you would look at the third page

17  of that document.  And there is a, I'm going to direct you to a

18  part where your name appears, right?

19  A    Yes.

20  Q    And ask you to read to yourself what is under your name?

21  A    Yes.

22  Q    When you're done if you could tell me?

23  A    Yes, it says the bonus amount.

24  Q    I'm not going to ask you to read it.  I'll ask you just

25  read it to yourself.

1    A    Okay.  Okay.

2    Q    Does that refresh your recollection that you received a

3    $125,000 bonus for 2006?

4    A    Yes.

5    Q    Thank you.

6         You can set that aside.  Actually I'll take that back

7    to avoid confusion.

8         Okay.  Your computer at the time of the RPG

9    acquisition was a laptop, right?

10   A    That's right.

11   Q    And you had saved some documents on your hard drive of

12   that laptop, right?

13   A    Yes.

14   Q    You created documents or you created a folder on your C

15   drive for the RPG acquisition, right?

16   A    I believe that's correct.

17   Q    You received e-mails about RPG due diligence in the course

18   of your work, right?

19   A    That's correct.

20   Q    And you received electronic documents that were related to

21   due diligence, right?

22   A    I think that's correct.

23   Q    And you created electronic documents that were related to

24   due diligence, right?

25   A    That's correct.

1    Q    And you received e-mails after the acquisition closed

2    about RPG management issues, right?

3    A    That would be correct.

4    Q    And we looked at a few of them a moment ago, right?

5    A    Correct.

6    Q    You received electronic documents about RPG management,

7    right?

8    A    Yes.

9    Q    And you created electronic documents about RPG management,

10   right?

11   A    I believe that's correct.

12   Q    And you received e-mails from Jan Murley?

13   A    I did.

14   Q    And you received electronic documents from Jan Murley?

15   A    I did.

16   Q    You created electronic documents related to Jan Murley and

17   her work, right?

18   A    I don't know that I did.

19   Q    You may or may not.  You don't recall today, is that fair?

20   A    I don't.

21   Q    Now, earlier in the case there was a discussion about, it

22   was called an image and purge process.  But you remember in

23   January of 2007 a computer vendor in connection with Patrick

24   O'Toole of Weil Gotshal gathered electronic evidence from your

25   computer, right?

1   A    I didn't recall the specific timing but, yes, I do recall

2   that happening.

3   Q    Okay.  And your understanding is that your computer was

4   imaged at that time, a copy was made of the computer at that

5   time, right?

6   A    Yes.

7   Q    Now, Mr. Maxwell I'm handing you Exhibit 475.

8            I would offer Exhibit 475 at this time, Your Honor.

9            THE COURT:  475 is admitted over defendant's

10  objection.

11  BY MR. BLEGEN:

12  Q    Now, 475 if you go to the bottom of that first page, it's

13  a one pager.  It's that same January 17 e-mail that we

14  discussed a moment ago about the consulting agreement, right?

15  The clean and black-line version?

16  A    Yes.

17  Q    But in that e-mail the final sentence was I'd like to

18  discuss this with you when you are available for a brief call?

19  A    Yes.

20  Q    And then Jan Murley responds, thanks for reaching out to

21  me.  I'm available Thursday.  And then this is Wednesday,

22  January 17, 2007, you respond, let's plan on 10:00 a.m.

23  tomorrow.  So you're setting up the conversation for Thursday,

24  right?

25  A    Yes.

1  Q    And you're telling her that you'll call her landline

2  unless you prefer otherwise, right?

3  A    Yes.

4  Q    And so you had a call on January 18, 2007, with Jan Murley

5  at least according to these records, right?

6  A    According to this, yes.

7  Q    Then your image was made on January 25, 2007.  Does that

8  sound about right?

9  A    I don't recall that date.

10 Q    Do you recall that Jan Murley's computer was imaged on

11 January 29, 2007?

12 A    No.  I don't recall the specific dates.

13 Q    And prior to that date, I believe we discussed this in

14 your deposition, you said you may or may not have deleted the

15 document off your computer.  You just don't recall.  Was that

16 your memory at that time?  Is that your memory today?

17 A    I'm sorry.  For what time frame are you referring to?

18 Q    Okay.  Prior to the date of your computer image, when ever

19 that was, and I understand sitting here today, you don't

20 remember exactly when the computer person showed up to copy

21 your computer.  But is it accurate to say you may or may not

22 have deleted documents off of your computer.  You just don't

23 recall.  Is that your memory here in 2012?

24 A    Yes.  I would say through my normal course of day-to-day

25 business I would add files, delete files, yes.

1    Q    But isn't it true, sir, that on January 24, 2007, the day

2    before your computer was to be imaged, you ran a document

3    erasure secure delete program called Shredder on your computer?

4    A    I don't recall running Shredder on that day.

5              MR. BLEGEN:  Pass the witness, Your Honor.

6              THE COURT:  Mr. Donovan.

7                        CROSS-EXAMINATION

8    BY MR. DONOVAN:

9    Q    Hello, Mr. Maxwell.

10   A    Hello.

11   Q    I want to go over some, start with some of the things that

12   Mr. Blegen had shown you which were these e-mails from Jan

13   Murley.  And then he skipped forward since there was a concern

14   that was raised.  So I just want to go back.  When you received

15   the e-mails from Jan Murley did you have any knowledge that

16   they contained Hallmark confidential information?

17   A    I did not.

18   Q    Did you have any knowledge that they contained any

19   Hallmark information?

20   A    I did not.

21   Q    Mr. Blegen asked you when you had your initial

22   conversations with Ms. Murley, he asked you, did you tell her

23   specifically not to bring with her any information from

24   Hallmark.  Do you recall that?

25   A    I recall him asking me that, yes.

1  Q    And your response was you didn't specifically recall

2  telling her that, correct?

3  A    Correct.

4  Q    Why is that?

5  A    I just don't remember having a specific verbal

6  conversation on that topic that he cited in his question.

7  Q    When ever you hire someone do you always tell them do not

8  bring confidential information into my office?

9  A    No.

10 Q    Why is that?

11 A    In a business setting and dealing with other

12 professionals, I would assume it's their obligation to know

13 what is confidential, what is not confidential, just like it's

14 my obligation to know if I'm bound to any type of

15 confidentiality and be mindful of that.

16 Q    And when did you first hear of an issue with respect to

17 anything that Jan Murley had brought to RPG as part of her

18 consultancy for RPG?

19 A    The first time I recall it being raised as a concern is

20 from a phone call with Ed Stassen at RPG.

21 Q    And Ed Stassen, what was his position at RPG?

22 A    He was the chief financial officer at RPG.

23 Q    What concern did he raise?

24 A    He raised concern about whether any of the materials that

25 Jan had shared were sensitive in any way, that RPG shouldn't be

1    seeing them.

2    Q    And what did you do in response to that?

3    A    I recall speaking with both Charles Yoon and Bill Young at

4    MCP, Clipper, and subsequently we, some subset of us, I don't

5    recall exactly who, but some subset of Bill, Charlie and I had

6    conversations with Weil Gotshal, the law firm, on the topic.

7    Q    And who at that law firm?

8    A    I believe it was Patrick O'Toole.

9    Q    And was that what precipitated this imaging of computers?

10   A    I believe so.

11   Q    And what was the purpose of the imaging the computers?

12   A    I don't have a full appreciation for what Weil and the

13   vendor they brought in did but my understanding of the process

14   of imaging a computer is so that you can effectively take a

15   snapshot of all of the information that's available on any

16   given computer and have that log so you can see all of the

17   information and files on that computer.

18   Q    So it was to preserve the information that was on the

19   computer?

20   A    Yes.

21   Q    So you were the person that reached out to Weil that

22   started that process, correct?

23   A    Yes.  I believe it was either myself, Bill or Charlie,

24   yes.

25   Q    And with Mr. Stassen, what did he do to your knowledge?

1    Did he have conversations with Patrick O'Toole as well?

2    A     I don't recall if he did or not.

3    Q     And did you ever, you, yourself, ever determine whether,

4    in fact, Ms. Murley had brought information from Hallmark that

5    was inappropriate to share with RPG?

6    A     No, I did not.

7    Q     So what you knew was that there was an issue that had been

8    raised?

9    A     That's correct.

10   Q     Then you took action by calling counsel?

11   A     That's correct.

12   Q     Now, another thing back to the question with Ms. Murley,

13   have you spoken with consultants, other consultants that have

14   experience in a certain industry in which you're also doing

15   some work in that industry?

16   A     Yes.

17   Q     In other words, Ms. Murley was coming from or not coming

18   from but she had previous experience in the greeting card

19   industry, correct?

20   A     Correct.

21   Q     You were speaking with her about potentially doing work

22   for RPG, correct?

23   A     That's correct.

24   Q     And my question is, do you have occasion where you speak

25   with other consultants that have experience in a particular

1    industry in which you're looking at?

2  A    Yes.

3  Q    Placed in front of you is marked as Defendant's Exhibit

4  2001.  Do you see that, sir?

5  A    I do.

6  Q    Do you recognize it?

7  A    I do.

8  Q    And what is it?

9  A    This is a correspondence between myself and Tom Hays from

10  the New England Consulting Group.

11  Q    And what is it about, sir?

12  A    Tom says, it was a, Paul, it was a pleasure to talk with

13  you earlier regarding the greeting card industry with which

14  we're familiar.

15         THE COURT:  Stop.  Just a moment.

16         Mr. Donovan, I don't find this exhibit on your list.

17  This is a new exhibit.  Defendant's Exhibit 2001.

18         MR. DONOVAN:  I'm sorry.  1001.

19         THE COURT:  That may explain it.

20         Proceed.

21  BY MR. DONOVAN:

22  Q    I'm sorry.  So you were saying?

23  A    Yes.  The e-mail is from Tom Hays of the New England

24  Consulting Group to me.  E-mail reads, Paul, it was a pleasure

25  to talk with you earlier regarding the greeting card industry

1    with which we are very familiar.  Congratulations on your

2    recent acquisition of Recycled Greetings.  I checked our

3    schedule and myself and another of our principals with

4    significant experience in the greeting card business will be in

5    Boston and available on Thursday, March 16.  If that matches

6    with your schedule or we're pleased to target another day at

7    your earliest convenience.  Cordially, Tom.

8    Q    And did you end up meeting with the New England Consulting

9    Group?

10   A    I did.

11   Q    And with who?

12   A    Tom Hays and I believe he brought a colleague of his whose

13   name I don't recall.

14   Q    And this was regarding RPG, correct?

15   A    That's correct.

16   Q    I placed in front of you 1016A which is new.  I just took

17   off the first page from 1016.

18            MR. BLEGEN:  No objection.

19            THE COURT:  Without objection 1016A is admitted.

20   BY MR. DONOVAN:

21   Q    Does this Power Point presentation look familiar to you,

22   Mr. Maxwell?

23   A    I believe this is the presentation that New England

24   Consulting Group shared with me in the Clipper offices in

25   Boston.

1    Q    What was the purpose of the meeting?

2    A    It was following up to the previous correspondence I read

3    in regards to one, New England Consulting Group's experience

4    working in the greeting card industry.  Two, their experience

5    working with private equity firms and additionally they cite

6    clients they've worked with in the past and industries they've

7    worked in in the past.  And this was all in the context of RPG.

8    Q    So if you could go to page 16, Jeff.  Actually, back it up

9    to page 13.  And the next page.

10             And this is a list here.  It says private equity

11   clients.  Did he talk to you about that, sir?

12   A    Yes.  This would have been covered in our conversation.

13   Q    Then two pages further up.  Pages 16, 17.

14             What does this identify?

15   A    This is due diligence, which the process we undergo before

16   acquiring a company.  That basically it says for our work in

17   private equity due diligence we go well beyond a simple go, no

18   go recommendation to ascertain the key variables, conditions or

19   changes which would transform the acquisition into a go.

20   Q    So this would be service that would be provided to a

21   private equity firm prior to an acquisition?

22   A    That's correct.

23   Q    In this case that wasn't the situation though, correct?

24   A    That's correct.  This was subsequent to the acquisition.

25   Q    So if we go two pages further, page 18.

1            Now, this is post acquisition.  That's more what

2   we're talking about in the situation with respect to RPG?

3   A    That's correct.

4   Q    And then the next page, page 19.

5            That page says greeting cards NECG has extensive

6   experience in the greeting card industry.  Twenty plus diverse

7   projects, multiple companies including Hallmark and American

8   Greetings, all channels.  This expertise is further reinforced

9   by considerable work with key retailers such as Wal-Mart.

10            Do you see that, sir?

11  A    Yes.

12  Q    Did they discuss that with you in the meeting?

13  A    I believe they did.

14  Q    Is that something they were trying to stress was something

15  they could bring to the table?

16  A    They were.

17  Q    And did they discuss what work they had done for Hallmark

18  or American Greetings?

19  A    I don't recall that they discussed specifically what work

20  they had done.

21  Q    In that conversation with them did you specifically tell

22  them not to discuss with you anything to do with any of the

23  work you did at Hallmark or American Greetings?

24  A    No.

25  Q    Why not?

1    A    It wouldn't have occurred to me to do that.  Again, I

2    would have assumed that they, if they did talk with us about

3    any work they had done with previous clients that they would be

4    thoughtful about what was shared with us.

5              MR. DONOVAN:  I'd like to offer that, Your Honor.

6              MR. BLEGEN:  Is it in?  I didn't hear.  We have no

7    objection.

8              THE COURT:  You're talking about 1016A was admitted.

9    BY MR. DONOVAN:

10   Q    Sir, I want to back up to the discussion of when you

11   became involved with respect to RPG.  Can you tell me when was

12   it that you kind of came on the team that would be dealing with

13   RPG?

14   A    I don't recall the specific date but, generally, I believe

15   it was in September of 2005.

16   Q    And can you tell us, can you tell the jury, we've heard

17   the term due diligence.  Can you describe, first off, is there

18   a due diligence leading up to an actual acceptance of a bid and

19   then a due diligence afterward?

20   A    Yes.  It would be safe to say that due diligence occurs

21   throughout the acquisition process.  We, a private equity firm

22   will do due diligence, essentially the investigation the

23   private equity firm undertakes to understand a specific company

24   or investment idea and private equity firm could, it's possible

25   to your question, submit a bid on a particular company or

1  investment idea, continue to do further due diligence, further

2  learnings about a company and then subsequently submit an

3  additional bid based on whatever new information that's been

4  learned in due diligence.

5  Q    And if I heard you correctly, you said that your focus on

6  the RPG transaction was with respect to the financing, is that

7  right?

8  A    That's correct.  I was brought on in September of 2005.

9  Really toward more of the end stages of the pre-acquisition

10  process.  And my primary, I guess, work stream was around the

11  financing related to the acquisition.

12  Q    Could you describe to the jury what that consists of?

13  A    At the time we were going, in addition to putting the

14  private equity fund dollars into the transaction to fund the

15  investment, we were also going to borrow capital from lenders

16  to finance the investment.  And as part of that process there

17  is a series of interactions with potential lenders to RPG, the

18  company, and one of my main areas of focus during that time was

19  to interact with those potential lenders, provide them with

20  information about RPG, answer any questions they may have about

21  RPG.  And in some cases make presentations to those lenders so

22  they could better evaluate whether or not they had an appetite

23  to loan money to RPG.

24  Q    And we've heard talk about models in this case.  Describe

25  for me what a model is in a private equity world?

1    A    Sure.  So a model can mean many different things but for

2    the purposes of, for RPG and the financing process, a model is

3    effectively, it's an Excel spreadsheet where the private equity

4    firm will maintain basically several pages of information,

5    mostly financial information, regarding a company, in this case

6    RPG.  So the model will have its financial statements, its

7    income statements, its cost sheet, its cash flow statement,

8    both historically so how RPG had performed in the past.  Then

9    also the model Excel spreadsheet would have financial

10   projections for RPG.  And the other purpose of the model is to

11   basically capture the transaction itself.  So in addition to

12   showing financial projections and different scenarios for RPG

13   we would also show in the spreadsheet how we were going to

14   finance the transaction, how much equity was going to fund the

15   transaction, how much debt would fund the transaction.  And

16   ultimately the model usually goes out about 5 years with

17   financial projections that will basically take a set of

18   assumptions that we put into the model around things like will

19   RPG's revenue grow with customer A, customer B, customer C?  By

20   how much and when?  Will the profitability margins of RPG be

21   consistent or change over time?  And what will the various cash

22   flow needs be of RPG over time?

23   Q    And are those models what's used with the actual lenders?

24   A    That's correct.  A significant part of the interaction

25   with the lenders would be using some of the data and numbers

1   that are in that financial model so that the lenders could

2   understand the historical and the projected financial

3   performance for RPG.

4   Q    And that would also be, data from that would also be

5   shared with the rating agency, correct?

6   A    That's right.

7   Q    We discussed earlier and can you describe for the jury the

8   role of the rating agency in the lending process?

9   A    Certain lenders will look to the rating agencies which are

10  called S and P or Moody's to provide an evaluation of the

11  particular loan as it relates to RPG, for example.  The rating

12  agencies will undertake to evaluate the loan, all of its

13  characteristics, take a perspective on the potential for RPG to

14  realize the financial projections that the lenders are

15  considering when thinking about the loan.  And the rating

16  agencies will take that and evaluate the overall transaction,

17  thinking about how the loan looks relative to perhaps other

18  comparable loans in the market and assign a rating or a grade

19  for that loan that will allow certain lenders to rely on the

20  rating agencies and their perspectives to take an opinion on

21  what the rating is ascribed to RPG and will use that as a data

22  point in thinking about whether or not they may want to make

23  that loan to RPG.

24  Q    Now, you were involved with the modeling that was done

25  post investment presentation, is that right?

1    A    I was.

2    Q    And Attorney Blegen gave you a large document there,

3    Exhibit 487?

4    A    Yes.

5    Q    Have you ever seen that document?  Did you use that

6    document in any way to prepare the models?  Does that have any

7    RPG related information?  Let me move forward.  It's going to

8    take too long.

9    A    Okay.

10   Q    To prepare your models, you're using RPG related

11   information, correct?  Is that what you just described?

12   A    Yes.  The model is an analysis of RPG.

13   Q    Do you recognize this document, sir?

14   A    I do, yes.

15   Q    And at the top it says RPG management projections versus

16   MCP projections?

17   A    Yes.

18   Q    Is that something that sounds familiar to you as far as

19   the management of RPG had their own projections and Clipper had

20   their own projections?

21   A    Yes, that's correct.  RPG, as part of selling the company,

22   created its own set of financial projections.  Monitor Clipper

23   would evaluate those projections but ultimately derive its own

24   perspective on which projections to use for purposes of

25   analyzing the potential acquisition.

1   Q    Is that what is being described in the document where it

2   talks about management is projecting this and, then the next

3   line, MCP is projecting that?

4   A    That's correct.

5   Q    And are these what you were describing, the factors here

6   where we have different retailers are selling RPG products?

7   A    That's correct.  This is a list of retailers with which

8   RPG was doing or planned to do business with.  And as you said,

9   it lays out some of the assumptions that RPG management had

10  made for their financial projections and then subsequently it

11  lists MCP's different take on management's assessment of the

12  financial projections.

13  Q    What is the date?

14  A    This is October 7, 2005.

15  Q    I'm now handing you what is marked as Defendant's Exhibit

16  487.  What is the date on that, sir?

17  A    This is October 14, 2005.

18  Q    And so is there, are you performing work on these models,

19  the Clipper models during this time period in October?

20  A    Yes.

21  Q    Is that in preparation for what we discussed the lender

22  meetings and the rating agencies meetings?

23  A    Yes, that's correct.

24  Q    And what changes are being made to the model?

25  A    Well, as we would continue our due diligence, as any new

1    findings come about, we would work to incorporate any new

2    findings into our financial models.  For example, if in our

3    analysis we thought that the first customer listed here,

4    Target, if we thought that the sales potential at Target was

5    greater or less than what was in a previous version of the

6    model we would take that new information and put it in the

7    model to have a different result for the financial projections.

8    It was an ongoing interactive process.

9    Q    Here it's saying it's comparing a model at the investment

10   committee versus a current model, is that right?

11   A    That's correct.

12   Q    And within the document it's talking about those

13   alterations that are being made based on new events, is that

14   right?

15   A    That's correct.

16   Q    So what is happening is you're trying to compare what it

17   looks like today versus what it was like at the time of the

18   investment committee presentation?

19   A    That's correct.

20            THE COURT:  Mr. Donovan, it's 4:00.

21            How much longer would you, folk, be spending on

22   Mr. Maxwell?

23            MR. BLEGEN:  If he was to turn it over to me now

24   maybe about 3 minutes.

25            MR. DONOVAN:  I probably have another 20 minutes.

1          THE COURT:  Mr. Maxwell, we'll see you at 8:30,

2    Tuesday morning.

3          Ladies and gentlemen, please don't talk about the

4    case among yourselves or with anyone else over the weekend.

5    Don't make up your mind about the case.  Don't do any

6    independent research.  We'll see you at 8:30 Tuesday morning.

7    Have a great weekend.

8          (The following proceedings were had OUT OF THE

9    PRESENCE AND HEARING OF THE JURY:)

10          THE COURT:  Good night, folks.

11                              (Witness temporarily excused.)

12                    *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25