1            IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF MISSOURI
2                  WESTERN DIVISION

3


4  HALLMARK CARDS, INC.,          )
                             )
5                  Plaintiff,)
                             )
6       vs.                  )Case No. 08-00840-CV-W-ODS
                             )
7  MONITOR CLIPPER PARTNERS, LLC.,  )
                 et al.)  November 13, 2012
8                     )   Kansas City, Missouri
                 Defendants.)
9

10         TRANSCRIPT OF JURY TRIAL PROCEEDINGS
         BEFORE THE HONORABLE ORTRIE D. SMITH
11        UNITED STATES SENIOR DISTRICT JUDGE

12                VOLUME 6 OF 10

13  APPEARANCES:
    FOR THE PLAINTIFF:        Mr. Charles W. German
14                   Mr. Daniel E. Blegen
                   Rouse Hendricks German May PC
15                   1201 Walnut, 20th Floor
                   Kansas City, Missouri 64106
16
                   Mr. John C. Aisenbrey
17                   Stinson Morrison Hecker LLP
                   1201 Walnut Street, Suite 2800
18                   Kansas City, Missouri

19      (APPEARANCES CONTINUED ON NEXT PAGE)

20

21  COURT REPORTER:           Ms. Cynthia M. Johnson, RMR
                   U.S. Court Reporter
22                   400 East 9th Street, Room 8552
                   Kansas City, Missouri 64106
23                   (816)512-5657

24

    Proceedings reported by computer stenography; transcript
25  produced by computer.

```
 1                    (APPEARANCES CONTINUED)

 2   FOR THE DEFENDANTS:           Mr. David F. Oliver
                                   Ms. Stacey R. Gilman
 3                                 Berkowitz Oliver Williams Shaw
                                   2600 Grand Blvd. Ste. 1200
 4                                 Kansas City, Missouri 64108

 5

 6                                 Mr. Steven L. Manchel
                                   Mr. Michael G. Donovan
 7                                 Manchel & Brennan, PC
                                   199 Wells Avenue, Ste. 301
 8                                 Newton, MA 02459

 9                         *    *    *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           I N D E X

 2
                                                    Page No.
 3
     NOVEMBER 5, 2012 - DAY 1
 4
```

```
     RECORD............................................     2
 5
     INSTRUCTIONS NOS. 1 - 6 READ........................    34
 6
     OPENING STATEMENT BY MR. AISENBREY..................    34
 7
     OPENING STATEMENT BY MR. MANCHEL....................    53
 8
                       PLAINTIFF'S EVIDENCE
 9
     WITNESSES:
10
             DON HALL, JR.
11           Direct Examination by Mr. Aisenbrey.............    72
             Cross-Examination by Mr. Manchel................    99
12           Redirect Examination by Mr. Aisenbrey...........   148
             Recross-Examination by Mr. Manchel..............   161
13
             WAYNE STRICKLAND
14           Direct Examination by Mr. German................   168
             Continued Direct Examination by Mr. German......   227
15           Cross-Examination by Mr. Donovan................   234

16   NOVEMBER 6, 2012 - DAY 2

17   WITNESSES:

18           WAYNE STRICKLAND - RESUMED
             Continued Cross-Examination by Mr. Donovan......   283
19           Redirect Examination by Mr. German..............   322
             Recross-Examination by Mr. Donovan..............   334
20
     RECORD............................................   338
21
     VIDEO DEPOSITION OF MARK THOMAS.....................   347
22
     WITNESSES:
23
             ADAM DOCTOROFF
24           Direct Examination by Mr. Aisenbrey.............   347
             Continued Direct Examination by Mr. Aisenbrey...   387
25
```

                        INDEX (Continued)

                                                     Page No.

1  VIDEO DEPOSITION OF BILL YOUNG......................   400

2  VIDEO DEPOSITION OF PETER KIM.......................   401

3  RECORD..............................................   401

4  CONTINUING VIDEO DEPOSITION OF PETER KIM............   410

5  VIDEO DEPOSITION OF CHARLES YOON....................   411

6  RECORD..............................................   411

7  NOVEMBER 7, 2012 – DAY 3

8  RECORD..............................................   413

9  VIDEO DEPOSITION OF SEAN GARDNER....................   429

10  WITNESSES:

11     JOHN MAYNARD
       Direct Examination by Mr. Blegen................   430
       Continued Direct Examination by Mr. Blegen......   482
       Cross-Examination by Mr. Donovan................   482
       Redirect Examination by Mr. Blegen..............   527

12  RECORD..............................................   531

13  VIDEO DEPOSITION OF GRANT BROWN.....................   532

14  VIDEO DEPOSITION OF JEFFREY PAUKER..................   533

15  RECORD..............................................   533

16  CONTINUING VIDEO DEPOSITION OF JEFFREY PAUKER.......   534

17  RECORD..............................................   534

18  NOVEMBER 8, 2012 – DAY 4

19  RECORD..............................................   536

1

INDEX (Continued)

2                                                                    Page No.

3   WITNESS:

4       DR. KENNETH SERWIN
        Direct Examination by Mr. German................    548
5       Continued Direct Examination by Mr. German......    599
        Cross-Examination by Mr. Manchel................    627
6
    RECORD...........................................    675
7
    WITNESS:
8
        DR. KENNETH SERWIN – RESUMED
9       Continued Cross-Examination by Mr. Manchel......    680
        Continued Cross-Examination by Mr. Manchel......    746
10      Redirect Examination by Mr. German..............    784
        Recross-Examination by Mr. Manchel..............    801
11
    RECORD...........................................    806
12
    NOVEMBER 9, 2012 – DAY 5
13
    RECORD...........................................    814
14
    VIDEO DEPOSITION OF STEVE LEVIN.....................    824
15
    VIDEO DEPOSITION OF MARK POCHARSKI..................    826
16
    RECORD...........................................    826
17
    CONTINUING VIDEO DEPOSITION OF MARK POCHARSKI........    835
18
    VIDEO DEPOSITION OF LARRY EARLEY....................    836
19
    VIDEO DEPOSITION OF JAN MURLEY......................    840
20
    RECORD...........................................    842
21
    WITNESS:
22
        PAUL MAXWELL
23      Direct Examination by Mr. Blegen................    848
        Continued Direct Examination by Mr. Blegen......    861
24      Cross-Examination by Mr. Donovan................    889

25

```
 1                        INDEX (Continued)

 2                                                      Page No.

 3   NOVEMBER 13, 2012 – DAY 6

 4   WITNESSES:

 5       PAUL MAXWELL – RESUMED
         Continued Cross-Examination by Mr. Donovan......    905
 6       Redirect Examination by Mr. Blegen..............    928

 7   VIDEO DEPOSITION OF LAURA STEINBERG.................    937

 8   VIDEO DEPOSITION OF PATRICK O'TOOLE.................    938

 9   WITNESSES:

10       JOHN MALLERY
         Direct Examination by Mr. Blegen...............    941
11       Cross-Examination by Mr. Oliver................    980

12   RECORD.............................................    992

13   WITNESSES:

14       BRIAN GARDNER
         Direct Examination by Mr. Aisenbrey............    994
15       Cross-Examination by Mr. Manchel...............   1034
         Continued Cross-Examination by Mr. Manchel......   1067
16
     NOVEMBER 14, 2012 – DAY 7
17
     RECORD.............................................   1121
18
     WITNESS:
19
         BRIAN GARDNER – RESUMED
20       Continued Cross-Examination by Mr. Manchel......   1122
         Redirect Examination by Mr. Aisenbrey..........   1160
21       Recross-Examination by Mr. Manchel.............   1186

22   RECORD.............................................   1193

23   PLAINTIFF RESTS

24                    DEFENDANTS' EVIDENCE

25
```

```
 1                      INDEX (Continued)

 2                                                    Page No.

 3   WITNESSES:

 4        ADAM DOCTOROFF – RECALLED
          Direct Examination by Mr. Donovan...............   1194
 5
     MOTIONS.............................................   1251
 6
     COURT'S RULING......................................   1264
 7
     WITNESS:
 8
          ADAM DOCTOROFF – RESUMED
 9        Continued Direct Examination by Mr. Donovan.....   1267
          Cross-Examination by Mr. Aisenbrey..............   1322
10        Redirect Examination by Mr. Donovan.............   1364

11   NOVEMBER 15, 2012 – DAY 8

12   INSTRUCTION CONFERENCE..............................   1368

13   RECORD..............................................   1391

14   VIDEO DEPOSITION OF MARK WILLIAMSON.................   1394

15   WITNESS:

16        APRIL EVANS
          Direct Examination by Mr. Donovan...............   1396
17        Cross-Examination by Mr. German................   1421

18   RECORD..............................................   1469

19   WITNESSES:

20        APRIL EVANS – RESUMED
          Continued Cross-Examination by Mr. German.......   1471
21
          JAY DITTMAN
22        Direct Examination by Mr. Donovan...............   1518

23   OFFER OF PROOF......................................   1530

24

25
```

INDEX (Continued)

Page No.

WITNESSES:

    JAY DITTMAN – RESUMED
    Continued Direct Examination by Mr. Donovan..... 1532
    Cross-Examination by Mr. Blegen................. 1538

    DR. COLIN BLAYDON
    Direct Examination by Mr. Manchel............... 1541

RECORD............................................ 1572

NOVEMBER 16, 2012 – DAY 9

RECORD............................................ 1574

WITNESS:

    DR. COLIN BLAYDON – RESUMED
    Continued Direct Examination by Mr. Manchel..... 1576
    Cross-Examination by Mr. German................. 1602

RECORD............................................ 1636

WITNESS:

    DR. COLIN BLAYDON – RESUMED
    Continued Cross-Examination by Mr. German....... 1639
    Redirect Examination by Mr. Manchel............. 1649

RECORD............................................ 1652

MOTIONS........................................... 1653

COURT'S RULINGS................................... 1654

DEFENDANTS REST

INSTRUCTIONS NOS. 9 – 29 READ..................... 1655

CLOSING ARGUMENTS BY MR. GERMAN................... 1657

CLOSING ARGUMENTS BY MR. MANCHEL.................. 1692

CLOSING ARGUMENTS BY MR. GERMAN................... 1722

JURY RETIRED...................................... 1728

```
 1                         INDEX (Continued)

 2                                                      Page No.

 3    NOTE FROM JURY.......................................  1729

 4    NOTE FROM JURY.......................................  1731

 5    NOTE FROM JURY.......................................  1733

 6    NOVEMBER 19, 2012 - DAY 10

 7    NOTE FROM JURY.......................................  1734

 8    RECORD...............................................  1734

 9    NOTE FROM JURY.......................................  1735

10    RECORD...............................................  1736

11    NOTE FROM JURY.......................................  1739

12    VERDICT..............................................  1740

13    JURY POLLED..........................................  1742

14    RECORD...............................................  1743

15    CERTIFICATE OF REPORTER..............................  1745

16                        *    *    *

17                      INDEX OF EXHIBITS

18    PLAINTIFF'S EXHIBITS               OFFERED    RECEIVED

19    No. 40 (e-mail)                 341 in part 343

20    No. 49 (e-mail)                    1345        1345

21    No. 55 (Q & A sheet)               343         345

22    No. 62 (e-mail)                    403         403

23    No. 115 (e-mail)                   868         868

24    No. 122 (Strategy & Action plan)   819         823

25    No. 125 (e-mail)                   923         923
```

```
 1                    INDEX OF EXHIBITS (Continued)

 2    PLAINTIFF'S EXHIBITS                OFFERED     RECEIVED

 3    No. 128 (e-mail)                      814       818

 4    No. 128A (e-mail)                     814       818

 5    No. 150 (e-mail)                      423       425 cond.

 6    No. 173 (affidavit)                   403       404 rej.

 7    No. 186 (metadata)                    404       406 rej.

 8    No. 202 (e-mail)                      407       407

 9    No. 203 (e-mail)                      407       407

10    No. 204 (e-mail)                      423       425 cond.

11    No. 217 (e-mail)                      408       409

12    No. 241 (e-mail)                      870       870

13    No. 246 (contact report)             819       823

14    No. 266 (e-mail)                      428       429

15    No. 270S (letter)                    1046      1046

16    No. 281 (e-mail)                      346       346

17    No. 306 (e-mail)                      871       871

18    No. 307 (contact report)             819       823

19    No. 313 (consulting agreement)       882       882

20    No. 319 (consulting agreement)       814       818

21    No. 334 (e-mail)                      814       818

22    No. 342 (e-mail)                     1460      1460

23    No. 346 (e-mail)                      819       823

24    No. 349 (letter)                     1009      1009

25    No. 360 (letter)                      814       818
```

```
 1                    INDEX OF EXHIBITS (Continued)

 2    PLAINTIFF'S EXHIBITS                 OFFERED    RECEIVED

 3    No. 361 (letter)                       814        818

 4    No. 363 (letter)                       814        818

 5    No. 364 (e-mail)                       814        818

 6    No. 370 (e-mail)                       814        818

 7    No. 371 (consulting agreement)         814        818

 8    No. 375 (letter)                       836        839

 9    No. 376 (contact report)               819        823

10    No. 383A (BKD report)                  964        965

11    No. 386 (Shredder random overwrite)    974        974

12    No. 422 (letter)                       785        786

13    No. 429 (brochure)                    1440       1440

14    No. 430D (Shredder pop-up window)      976        976

15    No. 430E (Shredder pop-up window)      976        976

16    No. 440 (report)                       979        979

17    No. 442 (directory listing)            978        978

18    No. 443A (detailed report)             967        967

19    No. 443B (link file report)            961        961

20    No. 443C (log)                         966        966

21    No. 449 (e-mail)                      1467       1467

22    No. 475 (e-mail)                       887        887

23    No. 487 (e-mail)                        83         83

24    No. 488 (e-mail)                        84         84

25    No. 489 (spreadsheet)                  453        453
```

```
 1                    INDEX OF EXHIBITS (Continued)

 2   PLAINTIFF'S EXHIBITS                    OFFERED     RECEIVED

 3   No. 546A (resume)                        550         550

 4   No. 547A (schedule)                      575         575

 5   No. 547C (schedule)                      570         570

 6   No. 547D (schedule)                      223         570

 7   No. 547E (schedule)                      572         572

 8   No. 547G (summary)                       581         581

 9   No. 547H (list of invoices)              580         580

10   No. 547K (schedule)                      623         623

11   No. 547L (diagram)                       615         615

12   No. 547N (schedule)                      603         603

13   No. 649 (photo)                          848         848

14   No. 651 (financial statement)           1530        1531

15   No. 652 (financial statement)           1530        1531

16   No. 653 (financial statement)           1530        1531

17   No. 654 (financial statement)           1530        1531

18   No. 655 (financial statement)           1530        1531

19   No. 656 (financial statement)           1530        1531

20   No. 658 (spreadsheet)                    463         463

21   No. 659 (e-mail)                        1453        1453

22   No. 660 - 673 (transcripts)            1638        1638

23   No. 674 (schedule)                      1675        1676

24   No. 674A (schedule)                     1675        1676

25   No. 676A & 676B (videos)               1638        1638
```

```
 1                    INDEX OF EXHIBITS (Continued)

 2    PLAINTIFF'S EXHIBITS                 OFFERED      RECEIVED

 3    No. 1505 (e-mail)                     1183        1183

 4                              *    *    *

 5    DEFENDANT'S EXHIBITS                 OFFERED      RECEIVED

 6    No. 327 (Giftbeat Magazine)          1246        1246

 7    No. 412A (data room info)            1282        1282

 8    No. 1016A (e-mail)                    894         894

 9    No. 1022 (e-mail)                     426         427

10    No. 1255A (transcript – Mark         1655        1655
                      Williamson)
11
      No. 1275D (DVD – Williamson depo.)   1655        1655
12

13                              *    *    *

14

15

16

17

18

19

20

21

22

23

24

25
```

1    NOVEMBER 13, 2012 - DAY 6

2             (The following proceedings were had OUT OF THE

3    PRESENCE AND HEARING OF THE JURY:)

4             THE COURT:  Good morning.

5             Do we have a jury?

6             All right.  Let's bring them in.

7             Whose first this morning?

8             MR. DONOVAN:  I need to finish with Paul Maxwell who

9    is on the stand.

10            (The following proceedings were had IN THE PRESENCE

11   AND HEARING OF THE JURY:)

12            THE COURT:  Good morning.  Welcome back.  Please be

13   seated.

14            Mr. Donovan, you were cross-examining Mr. Maxwell.

15            MR. DONOVAN:  Thank you, Your Honor.

16                  CONTINUED CROSS-EXAMINATION

17   BY MR. DONOVAN:

18   Q    Good morning, Mr. Maxwell.

19   A    Good morning.

20   Q    I'd like to pick up where we left off.  Exhibit 59?

21   A    Okay.

22   Q    And, briefly, we had gone over that document that is

23   titled RPG management projections versus MCP projections,

24   correct?

25   A    Correct.

1  Q    Then we had moved on to Exhibit 487 which is October 14,

2  2005, e-mail from Charles Yoon, Paul Maxwell, Peter Kim to Bill

3  Young.  Do you see that?

4  A    Yes.

5  Q    That title is MCP low growth case, investment committee,

6  versus current MCP low growth case, right?

7  A    Correct.

8  Q    Then if we could turn to the second page.  Can you

9  describe what that is for the jury?

10  A    Yes.  This is a summary of one of the financial cases

11  running in the RPG model.  It provides historical financial

12  information for three years and then it also provides projected

13  financial information, revenue and earnings, for approximately

14  five years.

15          The bottom of the page there is what is called an IRR

16  summary which IRR stands for internal rate of return.

17  Basically the bottom half of the slide shows what that IRR or

18  internal rate of return would be under various scenarios when

19  the investment was exited.

20  Q    And the title here, this investment committee presentation

21  is that what you're drawing from?

22  A    Yes, that's correct.

23  Q    And, again, the date of this report is October 14, 2005,

24  the cover page, correct?

25  A    Correct.

1  Q    Do you recall when the investment committee presentation

2  was?

3  A    I don't recall the specific date.

4  Q    Do you remember what month?

5  A    I believe it was September.

6  Q    Okay.  And, Jeff, if you could pull up Defendant's Exhibit

7  100.  And if we could pull in on the date.

8         Do you see the date on that, Mr. Maxwell?

9  A    Yes.  October 14, 2005.

10 Q    So that's the same date as this memo that's Defendant's

11 Exhibit 487, correct?

12 A    That's correct.

13 Q    And then if we could go to, can you describe what this

14 document is, Mr. Maxwell?

15 A    This is the model or the Excel file we spoke about last

16 week with the various spreadsheets across the bottom here that

17 are all part of the financial model.  The slide that we were

18 just discussing is derived from this financial model.

19 Q    Okay.  And if you could just point out the bottom, I'm not

20 sure if everyone is familiar with how Excel files are kept,

21 what those tabs are at the bottom?

22 A    Yes.  So the tab that's highlighted right now, that says

23 fin model, is basically one worksheet among, as you can see

24 across the bottom, many different worksheets that all basically

25 are contributing to the overall model here.  So each of these

1    is effectively a spreadsheet in and of itself but part of the

2    overall model file.

3    Q    Okay.  And the data that's on 487 is drawn from this

4    model, is that right?

5    A    That's correct.

6    Q    And where is it within that model?

7    A    The financial summary at the top of the page may be on

8    this summary output worksheet which is the, yes.  So, yes, it

9    looks like that's exactly right.  This slide is effectively, I

10   believe, cut and pasted into the exhibit here.

11   Q    So the projections there that go up to 2010, what is the

12   value there?

13   A    In 2010, are you --

14   Q    For the total revenue figure?

15   A    The total revenue is approximately $115 million.

16   Q    And that page is coming from all of those other tabs, the

17   data in those other tabs?

18   A    Yes, that's correct.  Some of the other tabs will be the

19   drivers of what ultimately contributes to the summary output

20   with the total revenue here.

21   Q    And so this is, these projections are projections made by

22   Clipper?

23   A    Yes, that's correct.  We have multiple sets of projections

24   but ultimately Clipper derives its own projections for RPG.

25   Q    And at this time on October 14 the projections for the

1  total revenue figure in 2010 was what?

2  A    2010, the total revenue is approximately $115 million.

3  Q    And that's based off of, where it says title, what it was

4  at the time of the investment committee presentation, is that

5  correct?

6  A    That's correct.

7  Q    So now if we could go back to Defendant's 487, the third

8  page.

9        Now, could you explain what the title on this means,

10  sir?

11  A    Yes.  This is, again, MCP low growth case summary,

12  investment committee presentation, modified.  And, again, it is

13  similar in that it shows summary financial information along

14  with the IRR summary.

15  Q    And what is the projections here, is it the same concept

16  projections?

17  A    The same concept, yes.  The numbers look slightly

18  different but the same concepts.

19  Q    And now that projection, 2006 through 2010, ends at 2010

20  at what number?

21  A    Looks like $117,850,000 for the revenue.

22  Q    And so that's up approximately 2 and a half million

23  dollars more than it was in the prior slide?

24  A    That's correct.

25  Q    Then just go to Defendant's Exhibit 99.  Come in on the

1    date on that.

2              What is that date, Mr. Maxwell?

3    A    October 14, 2005.

4    Q    So that's the same date as the memo again?

5    A    That's correct.

6    Q    And would you describe this spreadsheet?

7    A    Again, this is the financial model for RPG.  That

8    financial model was an innovative work in process, as we

9    discussed last week, as we would continue to do our due

10   diligence.  This is the file we would continually update.

11   Q    If we could go back to that page on the summary output

12   page like we did on the other one.

13             Now, this one is similar to the other one except this

14   is the investment committee presentation modified, is that

15   right?

16   A    That's correct.

17   Q    And the figure in 2010 is what, sir?

18   A    In 2010 the total revenue is $117,850,000.

19   Q    And so that matches what we saw on the Defendant's Exhibit

20   487, correct?

21   A    That's correct.

22   Q    So 487 was pulled from the actual model work that was

23   being done in October, is that correct?

24   A    That's correct.

25   Q    And you were involved in preparing these models?

1    A    That's correct.

2    Q    And the numbers would change based off of what the inputs

3    are, correct?

4    A    That's right.

5    Q    What were the things that would be inputted that would

6    change say here, for example, the revenue figure?

7    A    For example, with the revenue we would look at the

8    customers of RPG and make assumptions about the projected

9    financial performance on a customer level for RPG and there are

10   other assumptions that go into it as well but effectively the

11   total revenue would be a summation of the various customer

12   assumptions.

13   Q    Go back to Defendant's Exhibit 487, please.  The first

14   page.

15            So that's what is being described there on the

16   Target, FedEx, Kinkos, Walgreens, that's describing some of the

17   changes that were made to inputs to the model, correct?

18   A    That's correct.  Those were each key customers of RPG.

19   These are some of the assumptions that were made in the model

20   to drive the revenue growth.

21   Q    So from the time of the investment committee presentation

22   until now, mid October, that approximately month period, there

23   was new data coming in on Target, FedEx, Walgreens, is that

24   correct?

25   A    That's correct.

1    Q    And that new data would be input into the model?

2    A    Correct.

3    Q    That would cause in some of the cases here, if it was

4    revenue based, could cause the revenue to change from what it

5    was to what you're showing here now in the middle of October?

6    A    That's correct.

7    Q    If we could go to Defendant's Exhibit 96, please.  Would

8    you take a look at that and tell me what that is, Mr. Maxwell?

9    A    This is the Recycled Paper Greetings presentation to

10   Moody's Investor Services which was one of the debt rating

11   agency services.

12   Q    And what is the purpose of making a presentation to a debt

13   rating service?

14   A    In this case Recycled Paper Greetings was presenting to

15   the rating agencies in an effort to obtain a rating on any

16   loans that were to be provided to RPG as part of our

17   transaction.

18   Q    And those loans were going to be provided to close the

19   transaction, is that correct?

20   A    That's correct.

21   Q    And did you participate in the preparation of the

22   materials for the presentation?

23   A    I did.

24   Q    And if we could draw your attention, sir, to page 39.

25         And actually, I'm sorry, Jeff, back to the first page

1    to get a date on what this is.

2  A    The front page says October 21, 2005.

3  Q    Okay.  So that's about a week after the memos that we were

4  looking at, the October 14 memo?

5  A    Correct.

6  Q    487.  And if we go to page 39, please.

7          Jeff, if we could blow up the projected revenue.

8          Can you explain what this is, Mr. Maxwell?

9  A    This is, again, the revenue projections for RPG extending

10  this time until 2012.

11  Q    And, now, if we look at the 2010 figure, do you know what

12  that is?

13  A    Yes.  It's $116.1 million in 2010.

14  Q    And that's the same metric we were looking at before that

15  was 115 million at the investment committee presentation?

16  A    That's correct.

17  Q    Then it was 117 million about a week earlier than this?

18  A    That's correct.

19  Q    And now, at this point it's 116 million?

20  A    Correct.

21  Q    And that's, again, based off of whatever changes may be

22  taking place?

23  A    That's right.

24  Q    And that represents what, sir, those projections?

25  A    Again, these are the financial projections for RPG.  In

1  this case it's the projected revenue figure.

2  Q    And if we could pull up Defendant's 4.

3         I need to ask you a question before we look at

4  Defendant's Exhibit 4.  Did RPG get a rating from the rating

5  agencies?

6  A    It did.

7  Q    And then how was that used with respect to raising the

8  debt?

9  A    Certain lenders would look for a rating from one or both

10  of the rating agencies as part of their evaluation of whether

11  or not they wanted to participate in the loan financing for the

12  transaction.

13  Q    Okay.  Now, if we look at Defendant's Exhibit 4, can you

14  tell us what that is?

15  A    This is the Recycled Paper Greetings, Inc. funds flow as

16  of December 4, 2005.

17  Q    And what is a funds flow?

18  A    The funds flow is a document that is used to describe the

19  overall flow of funds in conjunction with closing the

20  transaction.  So this basically describes the inputs and the

21  outputs that document where the funds are going and who they're

22  coming from.

23  Q    And this is when the transaction's closing, is that

24  correct?

25  A    That's correct.

1  Q    And if I could go to what was, you were questioned on in

2  your examination by opposing counsel, Plaintiff's Exhibit 422.

3  And the fifth page in, this is the schedule, sir, correct?

4  A    Beg your pardon?

5  Q    Do you recall them bringing you to this schedule here?

6  A    Yes, I recall it.

7  Q    There are a couple things I just want to talk about.  The

8  first is the RPG Investment Holdings L.L.C.  That was a company

9  that you attended board meetings, correct?

10 A    That's correct.

11 Q    Then eventually you became a member of the board?

12 A    That's correct.

13 Q    And that entity is where within that structure?

14 A    I would describe it as being at the top of that structure.

15 So the RPG Investment Holdings was effectively at the top with

16 the other entities being beneath that, the top entity of RPG

17 Investment Holdings.

18 Q    And then there was some discussion about potential retail

19 stores.  Do you recall that?

20 A    I do.

21 Q    And there is something listed there, Barnyard Industries,

22 Inc.  Do you see that?

23 A    I do.

24 Q    Do you recognize what this is, sir.

25 A    I do.

1    Q    What is it?

2    A    This is the confidential memorandum, July 2005, drafted by

3    William Blair and Company which was the group representing RPG

4    in this transaction before it closed.

5    Q    And if we could go to page 65, Jeff.  I think blow up in

6    the middle paragraph.

7              There it says, in addition the company leases space

8    to operate four retail stores in the Chicago area which were

9    originally set up as testing centers for RPG product.  The

10   location of the space under lease are as follows.  Do you see

11   that?

12   A    I do.

13   Q    Is that the retail stores that you were discussing back on

14   Friday?

15   A    That's correct.

16   Q    So there were only four retail stores, is that right?

17   A    That's correct.

18   Q    Then if we could go down underneath that block, Jeff.

19             And all four of those were in Chicago?

20   A    That's correct.

21   Q    There it says, at the current time the company does not

22   plan to renew the leases for this space, all of which expire

23   over the next 1 to 2 years.  Operating results related to these

24   operations are netted together and presented on the income

25   statement in interest expense and other below the operating

1  results.  And last it says, the company plans to discontinue

2  these operations since they have served their original purposes

3  as for models for our ROCS stores.  Do you see that?

4  A    I do.

5  Q    Do you recall that, sir?

6  A    I recall in retrospect seeing the language, I do recall

7  this, yes.

8  Q    Was that the system when you were assisting RPG that the

9  retail stores were being phased out?

10  A    Yes.

11  Q    Jeff, put up 1008.

12        This is e-mail from Charles Yoon in February of 06.

13  It says, I would like to recommend Mary George as a potential

14  candidate for the independent board position.  Mary has the

15  marketing consumer products and mass channel background that

16  would be very helpful to RPG.  Her strength is sales and

17  marketing.

18        Do you see that?

19  A    I do.

20  Q    Do you recall Mary George?

21  A    I do.

22  Q    Do you recall her being suggested as an independent board

23  position?

24  A    I do.

25  Q    Is what is on here consistent with your knowledge of what

1    her background was?

2    A    Yes, it is.

3    Q    And attention to the second paragraph.

4           Over the past 4 years she has been serving on boards

5    of several fast moving consumer products companies.  She

6    currently serves as an independent director of two public

7    boards.

8           Were you aware of that?

9    A    I was at the time, yes.

10   Q    Now, Charles Yoon was a part of Clipper, correct?

11   A    Correct.

12   Q    And he's identifying her as a potential candidate for the

13   board of, that we looked at earlier, the Recycled Paper

14   Greetings Investment Holdings, correct?

15   A    That's correct.

16   Q    Now, this is Exhibit 1005, Defendant's.  Now, this is an

17   e-mail from Len Levine, March 2006.  Who is Len at that time?

18   A    Len was the CEO of RPG.

19   Q    He was also one of the board members, correct?

20   A    Correct.

21   Q    He's sending this to Mike Keiser, Phil Friedman.  Tell the

22   jury who they were?

23   A    Mike Keiser and Phil Friedman were the two owners of RPG.

24   They were the sole owners before the transaction and subsequent

25   to the Clipper transaction, they were minority owners of RPG.

1   Q    And they were board members on that chart of Recycled

2   Paper Greetings Investment Holdings, right?

3   A    That's correct.

4   Q    Then the CC is to Mike Murray.  Can you tell us who Mike

5   Murray is?

6   A    Mike was the president of RPG.

7   Q    And he was also a board member, correct?

8   A    Correct.

9   Q    I draw your attention down to No. 3.  The line says,

10  potential independent board member has been identified by

11  Monitor.  She is a former CEO of marketing type that is very

12  familiar with the mass market including Wal-Mart.  First step

13  is for Bill and me, do you know who he is referring to as Bill?

14  A    I believe that's Bill Young from Clipper.

15  Q    Who is also a board member, correct?

16  A    Correct.

17  Q    To meet her since Charlie is the one who knows her.  If

18  she seems good then Bob and you would meet her.  Do you see

19  that?

20  A    I do.

21  Q    And then Bob and you, meaning you meaning the people that

22  are on the e-mail, correct?

23  A    Correct.

24  Q    The other board members?

25  A    Correct.

1    Q    And you recall, in fact, they did meet with her?

2    A    I don't recall the meeting specifically but I believe that

3    they did.

4    Q    If we could go to Defendant's 1010.  Pull up the top

5    there.

6              Can you tell the jury what this is, sir?

7    A    These are the minutes of the meeting of the board of RPG

8    Investment Holdings L.L.C. from April 12, 2006.

9    Q    And then if we could go down under where it says resolved

10   and then next.

11             There it says, next Mr. Yoon introduced Mary George

12   to the board.  So she was present for the meeting?

13   A    Correct.

14   Q    Then do you recall whether Ms. George became affiliated

15   with RPG?

16   A    She did.

17   Q    If we could go to Defendant's 505.  Can you tell me what

18   that is, sir?

19   A    This is a consulting agreement with Mary George.

20   Q    And the consulting agreement between Mary George and whom?

21   A    RPG.

22   Q    And that came as a result of her introduction to the board

23   at the board meeting?

24   A    That's correct.

25   Q    And then go to Defendant's 1087.  Before we get to that --

1          So one of the functions of Clipper was to identify

2    talent for RPG, correct?

3    A    That's correct.

4    Q    And this is an example of that?

5    A    That's correct.

6    Q    And then the board voted Recycled Paper Greetings

7    Investment Holdings would make a decision as to whether they

8    wanted to utilize her services?

9    A    Yes.

10   Q    And then now look at Defendant's 1087, it's another board

11   meeting, correct?

12   A    Correct.

13   Q    And then at the bottom there it says, Mary George is

14   present.

15            Go down to the resolved, the two resolves.

16            You were present at the meeting, sir, right?

17   A    I was.

18   Q    It says resolved that Mary George is appointed as chairman

19   of the board.  Do you recall that?

20   A    I do.

21   Q    This is November.  So she had become consultant in May and

22   by November the board decided to make her not only a member of

23   the board but also chairman of the board?

24   A    That's correct.  I didn't recall the date of her

25   consulting but, yes, that's correct.

1    Q    She would have been elected that by an election of the

2    seven members of the board, right?

3    A    That's correct.

4    Q    Jeff, put up Defendant's 125.  Need to blow that up.

5         Talk about Ms. Murley for a moment.

6         No, that's the wrong one.  Sorry.  Plaintiff's

7    Exhibit 125.

8         When you were questioned earlier there was some

9    discussion about a Janet Murley.  Do you recall that?

10   A    I do.

11   Q    And you were involved in arranging some meetings for

12   Ms. Murley, correct?

13   A    I was.

14   Q    This is an example of the arranging the meetings for her,

15   correct?

16   A    That's correct.

17   Q    And who were these meetings being arranged with?

18   A    In this instance Mike and Phil, Mike Murray was the

19   president of RPG.  Phil Friedman was the, one of the former two

20   owners, full owners of RPG, and subsequently a minority owner

21   of RPG also on the board.  And Len, the reference is to Len

22   Levine, who was the CEO of RPG, also on the board of RPG

23   Investment Holdings LLC.

24   Q    So these meetings were being set up with the board members

25   of RPG Investment Holdings?

1    A     That's correct.

2    Q     What was the purpose of the meetings to your

3    understanding?

4    A     I don't recall specifically but my, what I do recall is to

5    have each of the board members meet her and become familiar

6    with Jan and her background.

7    Q     And eventually a decision was made to bring her on as a

8    consultant?

9    A     That's correct.

10   Q     And then, Jeff, would you put up Defendant's 1084?

11            THE COURT:  I don't show 122 as being pre-admitted.

12   Did you intend to offer it?

13            MR. DONOVAN:  The one we just looked at, Your Honor?

14            THE COURT:  Plaintiff's Exhibit 122.

15            MR. DONOVAN:  It was Plaintiff's Exhibit 125.

16            THE COURT:  I'm sorry.  125 is not pre-admitted.

17            MR. DONOVAN:  Yes, I'm sorry, I would.

18            THE COURT:  Is there an objection?

19            MR. BLEGEN:  No objection.

20            THE COURT:  125 is admitted.

21   BY MR. DONOVAN:

22   Q     This is an e-mail from Mary George to Bill Young, Charles

23   Yoon and yourself.  It says, I had a long talk with Jan today.

24   Bottom line, she's interested in CEO position if she can start

25   full-time on March 1 and commute for a few months.  Then later

1  she says, however if we decide to go with Jude she would

2  happily accept the fourth consulting position.  Do you see

3  that?

4  A    I do.

5  Q    Then there is a response to it, up above.  It says,

6  Thanks, Mary.  Given the urgency of CEO need in the business, I

7  think we need to go with Jude.  I'll talk to Keiser and

8  Friedman about Jan joining the board.

9         Do you recall a time where Janet Murley in November

10 was saying she did now want to be CEO?

11 A    I do recall that, yes.

12 Q    That did not happen, right?

13 A    It did not.

14 Q    What is the reference to Jude?

15 A    Jude is Jude Rake, who did become the CEO of RPG

16 subsequent to Len Levine.

17 Q    Then Mr. Young here is saying, yeah, we'll talk to Keiser

18 and Friedman about Jan joining the board.

19         Keiser and Friedman were the other two board members?

20 A    Yes.  Mike Keiser and Phil Friedman, yes.

21 Q    Did Jan come with you to the board?

22 A    No, she did not.

23 Q    Go to Defendant's 1017.  Or actually go to Plaintiff's

24 306.

25         This was a document that had been discussed with you

1    in your prior testimony, with Hallmark's counsel.  E-mail from

2    Larry Earley to you.

3              Go to that first paragraph, Jeff.

4              It says, I appreciate your comments and see the logic

5    in sequencing the engagement.

6              Just to set the table here this is in the summer of

7    2006 and discussions that you were having with nxtMove to do

8    work for RPG.  Do you recall that this morning?

9    A    I do.

10   Q    It says, we are certainly familiar with and have

11   participated in developing customer portraits, capital C,

12   capital P, identifying key leverage points.  In the past

13   Monitor Group incorporated our data and analysis into that

14   portion of its deliverable.  NxtMove is very comfortable taking

15   responsibility for that deliverable given access slash --

16   permission slash access to Monitor Group's format.  We have

17   less exposure in the area of Monitor Group's activation

18   strategies but, again, very confident that we can begin that

19   process for RPG with some initial activation strategies.

20             Can you tell me, sir, what your understanding of that

21   given permission slash access to Monitor Group's format is

22   referring to?

23   A    I believe that's referring to the frame work that Monitor

24   uses in this context.  So customer portraits, for example, I

25   believe is what the reference is to here.

1    Q    And what is customer portraits?  Are you familiar with

2    that phrase?

3    A    I do recall that phrase but I can't say I'm familiar with

4    what, exactly what customer portraits are in this context.

5    Q    Go to Defendant's 159.  This is a Power Point from Monitor

6    Group, correct?

7    A    Correct.

8    Q    And if we could go to page 12?

9              THE COURT:  That has not been admitted.

10             MR. DONOVAN:  Objection?

11             MR. BLEGEN:  Well, yes, with this witness.

12             THE COURT:  Step up, please.

13             (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

14   PROCEEDINGS WERE HAD:)

15             MR. DONOVAN:  I'm just using it to refresh his

16   memory, page 12, of what the terminology is.

17             THE COURT:  You can use it to refresh his memory but

18   don't display it or --

19             MR. DONOVAN:  If he has knowledge of the trade mark.

20             THE COURT:  You can, first of all, let's make sure he

21   doesn't have an independent recollection.

22             MR. DONOVAN:  He just said.

23             THE COURT:  You can show the document to refresh his

24   recollection.  It is his recollection refreshed that is

25   admissible, not the exhibit.

1          (THE PROCEEDINGS RETURNED TO OPEN COURT.)

2    BY MR. DONOVAN:

3    Q    If you look, Mr. Maxwell, page 12, and ask you there is a

4    reference to the customer portrait.  Do you see that?

5    A    I do.

6    Q    Does that refresh your recollection of what customer

7    portrait is, capital C, capital P?

8    A    Yes, I see it capitalized with the trade mark and the

9    summary output --

10              THE COURT:  Sustained.

11              MR. BLEGEN:  Objection.

12              THE COURT:  Sustained.  The jury will disregard the

13   answer.

14              You may try again, Mr. Donovan.

15   BY MR. DONOVAN:

16   Q    Do you recall that customer portrait was a phrase used by

17   Monitor?

18   A    I don't recall that specifically, no.

19   Q    And then if we can go to --

20              You can put that down.

21              Defendant's Exhibit 1018.  This is a July 21 e-mail

22   from Larry Earley to yourself and to some other individuals.

23   It says, is it your intention that we conduct the analysis with

24   or without the support of Monitor Group.  If without there may

25   be issues using terminology such as customer portrait, customer

1    activation strategy, etc.  That doesn't represent a problem for

2    us as we can eliminate the Monitor Group language from our

3    proposal in the deliverable using similar nxtMove analysis and

4    corresponding terminology.

5              Do you see that, sir?

6    A    I do.

7    Q    Do you recall that e-mail?

8    A    I don't recall it.  Only now having it in hand, do I

9    recall it, yes.

10   Q    Do you recall what the solution was?

11   A    I don't recall what the solution was.

12   Q    Nothing further.

13             THE COURT:  Redirect?

14                       REDIRECT EXAMINATION

15   BY MR. BLEGEN:

16   Q    Good morning, Mr. Maxwell.

17   A    Good morning.

18   Q    Just as a preliminary matter, because the jury heard a

19   little about this earlier, you are now with a private equity

20   firm, Great Range Capital, that's here in Kansas City, right?

21   A    That's correct.

22   Q    In fact, you are one of the two managing partners.  You

23   run the company, right?

24   A    That's correct.

25   Q    And even though you left Monitor Clipper, you still

1  maintain your contacts with Monitor Clipper, isn't that right?

2  A    Some contacts, yes.

3  Q    In fact, Mr. Yoon, who we heard about, is on the advisory

4  board to your current company, right?

5  A    That's correct.

6  Q    Now, you were discussing at some length last Friday as we

7  ended the day and then again this morning about models.  And

8  the models that were in those October memos.  Do you remember

9  that?

10  A    I do.

11  Q    But you, in fact, you did not prepare the model that was

12  used to arrive at the purchase price in September of 2005,

13  right?

14  A    That's correct.

15  Q    And, in fact, I think we covered this on Friday but in

16  case we did not, you don't recall anyone ever explaining to you

17  how the $305 million number was derived, right?

18  A    I don't recall anyone explaining to me specifically, no.

19  Q    And that model was created by Peter Kim and Adam

20  Doctoroff, right?

21  A    I believe that's correct.

22  Q    You were not involved in deciding what inputs went into

23  the model they used and then presented to the investment

24  committee and then that was ultimately used to set the purchase

25  price, right?

1   A    At that time I was not, no.

2   Q    And you discussed earlier Exhibit 59.  But you were not

3   involved in Exhibit 59, right?

4   A    I believe that I was involved with this.

5   Q    Well, Mr. Maxwell, I'm going to hand you a copy of your

6   deposition and you recall being deposed, right?

7   A    I do.

8   Q    You recall I was the one who deposed you, right?

9   A    I do.

10  Q    Would you, please, turn to page 77 of your deposition?

11  Let me know when you're there?

12  A    Yes, I'm here.

13  Q    And on page 77 there is testimony where I'm showing you

14  this very exhibit, right, Exhibit 59?

15  A    Yes.  And we talked about what it is.  Then I asked you do

16  you recall being involved in preparing this 2-page memo.

17          Then you gave an answer to that question.  Can you

18  read the answer for the jury, please?

19  A    Yes.  It says, I don't recall being specifically involved

20  in producing this.

21  Q    Then I went on to ask you, do you recall being involved in

22  discussions with RPG about the differences between RPG's

23  management projections and Monitor Clipper's projections and

24  what was your answer there?

25  A    My answer was, I don't recall specific conversations

1   around it.

2   Q     Thank you.

3         Now, on this memo there is a from line.  It's to RPG

4   management but there is a from line, right?

5   A     Yes.

6   Q     And the first 3 letters are MCP.  What does that stand

7   for?

8   A     Monitor Clipper Partners.

9   Q     And the second three letters are TMG.  What does that

10  stand for?

11  A     I believe it may stand for The Monitor Group.

12  Q      And that's the consulting side, right?

13  A     That's correct.

14  Q     And this memo is dated October 7, 2005.  That's after the

15  purchase price was set, correct?

16  A     That's correct.

17  Q     Now, Defendant's 487 is the memo which your name does

18  appear on that you discussed.  And that is dated even later in

19  October, further away from the date that the purchase price for

20  this deal was set, right?

21  A     That's correct.

22  Q     And this is comparing low growth cases, correct?

23  A     Correct.

24  Q     And, in fact, there was, there were three cases that were

25  in the model that Mr. Kim prepared.  Do you remember that?

1   A    I don't recall specifically how many cases there were.

2   Q    Do you recall, are you familiar with the phrase,

3   management case?

4   A    I am.

5   Q    And that refers to what the seller in this case, RPG, was

6   projecting, correct?

7   A    That's correct.

8   Q    And then are you familiar with the term, base case?

9   A    I am familiar with that term.

10  Q    What does that mean?

11  A    It can mean a case that's used by our group or the Clipper

12  group in assessing the transaction.

13  Q    And then low growth case would indicate a projection, if

14  the growth is low?

15  A    It could mean that.  It could also mean lower growth

16  relative to other cases.

17  Q    And one of the issues being addressed in this October 14

18  memo, at least the attachments to it, is how much to pay Len

19  Levine as he goes on as the head of the successor RPG entity,

20  right?

21  A    I'm sorry.  Where are you looking?

22  Q    Do you have 487 in front of you?  He just discussed it

23  with you.

24  A    Yes.

25  Q    If you go to the fourth page.  And the fifth page.

1    A    Okay.

2    Q    Those have to do with Len Levine's compensation, correct?

3    A    Correct.

4    Q    At this point in time after the deal is set in motion but

5    before closing, there is also a negotiation going on with

6    regard to how much to pay Len Levine, the former RPG person who

7    is going to be the president and head or CEO of the successor

8    entity, right?

9    A    I don't recall if there is a negotiation or discussion but

10   yes.

11   Q    And whatever was presented in Mr. Kim's model to the

12   investment committee, the jury heard Mr. Kim testify last week

13   that the feedback he received from the investment committee was

14   they thought that was too conservative and that they would do

15   better than whatever the financial model that was presented to

16   the investment committee.  Did you have discussions about that

17   with Mr. Kim?

18            MR. DONOVAN:  Objection.  May we approach?

19            THE COURT:  Yes.

20            (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

21   PROCEEDINGS WERE HAD:)

22            MR. DONOVAN:  I don't believe it's an accurate

23   characterization of what the testimony was of Mr. Kim.

24            THE COURT:  Well, the question, the question.

25            MR. DONOVAN:  Did he have discussions but the leading

1    answer.

2            THE COURT:  Going to start over -- Sustain the

3    objection.

4            MR. BLEGEN:  I will withdraw that and I may just find

5    the transcript quick and read it.

6            (THE PROCEEDINGS RETURNED TO OPEN COURT.)

7            THE COURT:  The objection is sustained.  The question

8    is withdrawn.  The jury will disregard.

9    BY MR. BLEGEN:

10   Q    Now, one of the things that is shown in those financial

11   models that you were discussing with Mr. Donovan, the plan for

12   Clipper was to flip RPG to a new buyer in five years.  That's

13   why you're projecting what the returns would be in five years?

14   A    That's correct.

15   Q    And you've been talking to the jury about the role of the

16   LBO model, leveraged buy out model.  But in the time period

17   that you were working on it, the role of the leveraged buy out

18   model was to secure positive ratings, secure financing, to try

19   to convince outsiders to loan money to the deal so the deal

20   could be closed, right?

21   A    With my involvement with the model, yes.

22   Q    It was not about how much are we going to pay for RPG.  It

23   was how do we get the people out there to loan the money for

24   that?

25   A    With my involvement, yes.

1   Q    Now, getting back to that question I asked previously.

2   Mr. Kim testified last week?

3              MR. DONOVAN:  Objection.

4              THE COURT:  Objection is?

5              MR. DONOVAN:  Multiple times we tried to read someone

6   else's deposition.  It's not impeaching him.

7              MR. BLEGEN:  It's testimony already in the case.

8              THE COURT:  Let's get to the question.

9   BY MR. BLEGEN:

10  Q    If Mr. Kim had, if his memory was that the investment

11  committee thought that the model that was presented was too

12  conservative and that they could do better than that, do you

13  have any reason to believe that testimony is untrue?

14             MR. DONOVAN:  Objection.

15             THE COURT:  Sustained.

16  BY MR. BLEGEN:

17  Q    Well, let's talk a little bit more about the modeling.

18  When considering a deal, Monitor Clipper would look at a

19  variety of different metrics and how to consider that deal,

20  right?

21  A    Correct.

22  Q    Could you give the jury some examples of the type of

23  metrics that the Monitor Clipper would be looking at?

24  A    Sure.  There are many metrics but in the context of a

25  model we are looking at projected financial performance, the

1    projected financial scenarios, the potential exit scenarios.

2    Q    Clipper would look at anything that could change the

3    potential outcomes for the future capital of that company,

4    right?

5    A    Could you clarify that?

6    Q    Sure.  In considering whether to make a deal Clipper would

7    look at anything that it thought could impact the outcome of

8    the deal.  Whether they would make money or not, how much

9    money, would it be successful?  Would that be fair?

10   A    That's fair.

11   Q    Some of the things that can be evaluated can be

12   incorporated into that leveraged buy out, right?

13   A    Right.

14   Q    But in addition to that there are also just conversations

15   about the merits of the deal and it's potential, right?

16   A    That's correct.

17   Q    And some of those merits are subjective and could not be

18   translated into inputs to go into a financial LBO, correct?

19   A    In some cases, yes.

20   Q    And resident knowledge about the sector from Monitor's

21   prior experience could be one of those subjective

22   considerations that's used to set first trusts, right?

23   A    Possibly.

24   Q    No further questions.

25            THE COURT:  Recross?

1          MR. DONOVAN:  No questions.

2          THE COURT:  Thank you, Mr. Maxwell.  You're excused.

3                                        (Witness excused.)

4          MR. BLEGEN:  Your Honor, the plaintiffs call Laura

5     Steinberg by video deposition.

6          (The video deposition is being played for the jury.)

7          THE COURT:  Stop just a moment.  Thank you.  Step up.

8          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

9     PROCEEDINGS WERE HAD:)

10         THE COURT:  Worked out something?

11         MR. MANCHEL:  Yes, we did.  That's why we didn't need

12    you this morning.

13          (THE PROCEEDINGS RETURNED TO OPEN COURT.)

14         MR. BLEGEN:  May we continue?

15         THE COURT:  Yes, you may.  You might back it up for

16    the question and answer I stepped on.

17         MR. BLEGEN:  Rather than risk that, I believe the

18    question, the question we were in the middle of is, had you by

19    January 6, 2006 spoken with Mr. Peter Kim?

20          And the answer is, in case that's cut off, it's

21    possible.  I just don't remember.

22          (The video deposition is continuing to be played for

23    the jury.)

24         MR. BLEGEN:  Your Honor, that concludes the testimony

25    of Laura Steinberg.

1           THE COURT:  All right.

2           MR. BLEGEN:  Our next witness is about a 30-minute

3   deposition.  Do you want to start it or wait?

4           THE COURT:  Are you folks okay?  Yeah?  Go ahead and

5   start it.

6           MR. BLEGEN:  Hallmark calls Patrick O'Toole.

7           (The video deposition is being shown to the jury.)

8           THE COURT:  Let's stop while you're working on that.

9   We'll take our first break this morning.

10          Please don't discuss the case.  Keep an open mind

11  until you've heard all the evidence.  We'll see you back here

12  in 15 minutes.  We'll be in recess.

13                              (Recess)

14          (The following proceedings were had OUT OF THE

15  PRESENCE AND HEARING OF THE JURY:)

16          THE COURT:  Are you fixed?

17          MR. BLEGEN:  Oh, yeah.

18          THE COURT:  Bring the jury in, please.

19          (The following proceedings were had IN THE PRESENCE

20  AND HEARING OF THE JURY:)

21          THE COURT:  Please be seated.

22          Mr. Blegen, you may resume.

23          MR. BLEGEN:  Thank you, Your Honor.

24          (Continuing to play the video deposition of Patrick

25  O'Toole.)

1          MR. BLEGEN:  Your Honor, that completes the testimony

2     of Mr. O'Toole.

3          MR. MANCHEL:  Your Honor, may we approach please?

4          THE COURT:  Yes.

5          (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

6     PROCEEDINGS WERE HAD:)

7          MR. MANCHEL:  Your Honor, defendant's renew their

8     objection as regards testimony concerning spoliation, Jan

9     Murley, Paul Maxwell and move to strike the portions of the

10    deposition that refer to those issues.  I think it's now been

11    established over and over that either these actions were taken

12    by attorneys or by attorneys who failed to act or they go

13    specifically again to this 20A through E that we've been

14    calling the Murley opportunities.  Just want to preserve for

15    the record the objections we made, request, again, and move to

16    strike.

17         MR. BLEGEN:  I believe that's been addressed and

18    settled.  I think the testimony is consistent with the Court's

19    prior ruling on scope and put in as we represented.

20         THE COURT:  Your objection is on the record.

21         MR. MANCHEL:  Thank you, Your Honor.

22          (THE PROCEEDINGS RETURNED TO OPEN COURT.)

23         MR. BLEGEN:  Your Honor, the plaintiffs call John

24    Mallery.

25         MR. OLIVER:  Your Honor, could I ask Mr. Blegen one

1   question which maybe we don't have to come to the bench.

2           THE COURT:  The two of you can talk any time you

3   like.

4           MR. OLIVER:  Judge, may we approach?

5           (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

6   PROCEEDINGS WERE HAD:)

7           MR. OLIVER:  Mr. Mallery is an expert identified by

8   the plaintiff.  He did work in the Janet Murley case that was

9   tried in front of Judge Fenner.  I think it is irrelevant he

10  did a report in that case.  He also did a report in this case.

11  I think it is irrelevant to this case what Ms. Murley did with

12  her computer.  There is no evidence that she told Monitor, told

13  Clipper, excuse me, what she did with her computer.  There is

14  no link between them.  Mr. Mallery in his deposition believes

15  that the two reports are related.  But when asked, they're

16  related because Dan told them, told him they were related.  And

17  so I think injecting her report into this case about what she

18  did with her computer is irrelevant and highly prejudicial to

19  my client.

20          MR. BLEGEN:  Just so it's clear on the facts, that

21  report was also disclosed in this case at the same time or

22  prior to the report he did on the Clipper computers.  He was

23  deposed about it.  So all that information is in the case.  The

24  relevance of the testimony about Jan Murley's computer has to

25  do with timing and inferences of intentional activity.  As we

1    saw yesterday Mr. Maxwell forwarded to Murley and Murley signed

2    her revised contract January 17.  They set up -- call

3    January 18.  And Mr. Maxwell said, testified he did talk to her

4    on the 18 of January.  On the 24 of January the Shedder program

5    was ran on the computer.  On the 25 of January his computer was

6    imaged.  Between the 27 and 29 of January there were documents

7    specifically in the title deleted from her computer.  Then her

8    computer image was made on the 29.  Gives an inference for the

9    jury that that was not innocent and that they were

10   coordinating.

11            THE COURT:  I'm going to let the jury hear it.

12   Overruled.

13            MR. OLIVER:  Thank you.

14            (THE PROCEEDINGS RETURNED TO OPEN COURT.)

15            JOHN MALLERY, PLAINTIFF'S WITNESS, SWORN

16                      DIRECT EXAMINATION

17   BY MR. BLEGEN:

18   Q    Good morning, Mr. Mallery.  Can you introduce yourself to

19   the jury?

20   A    My name is John Mallery.  I'm a computer forensic expert

21   and I live in Overland Park, Kansas.

22   Q    How are you currently employed?  What is your business?

23   A    I'm president of the firm Mallery Technical Training and

24   Consulting.

25   Q    And how long have you, well, what is the speciality of

1    Mallery Technical Training and Consulting?

2    A    The firm specializes in practical applications of computer

3    security and computer forensics as well as training and

4    consulting related to those services.

5    Q    And how long have you been with Mallery Technical Training

6    and Consulting?

7    A    Officially since February of 2011.

8    Q    And that's, are you the sole employee?

9    A    I am the sole employee, yes.

10   Q    And prior to forming Mallery Technical Training and

11   Consulting, what was your employment?

12   A    I was a managing consultant at the accounting firm of BKD.

13   Q    What is BKD?

14   A    BKD is one of the 10 largest accounting firms in the

15   United States.  Approximately 32 offices in twelve states.

16   Q    And you mentioned your position but what were your job

17   responsibilities?

18   A    I managed and marketed the firms national computer

19   forensic practice.

20   Q    And so you left BKD in January, February of 2011 and

21   formed your own company, correct?

22   A    That is correct.

23   Q    And why did you leave BKD?

24   A    It was a mutually agreed upon separation.

25   Q    Was that mutually agreed upon separation, did it in any

1  way relate to the work you performed in computer forensic

2  analysis?

3  A    No, not at all.

4  Q    And you still work with BKD, right?

5  A    I do as a subcontractor.

6  Q    And BKD was retained by Hallmark to look at some issues in

7  this case, right?

8  A    That's correct.

9  Q    That was after you left BKD, right?

10  A    That's correct.

11  Q    So how did you become involved?

12  A    BKD selected me as the person responsible for doing the

13  analysis in this particular project.

14  Q    So you're the person to whom BKD gave the responsibility

15  for the work Hallmark requested, right?

16  A    That is correct.

17  Q    So is your testimony today as a representative of Mallery

18  Technical Training and Consulting or of BKD?

19  A    BKD.

20  Q    Are you prepared today to discuss the opinion and

21  conclusions you reached?

22  A    Yes, I am.

23  Q    Before we get to that I want to talk to the jury a little

24  bit about you.  How long have you been involved in the field of

25  computers?

1    A    Computers, since approximately 1996.

2    Q    And is that what you studied in college?

3    A    No.  I have a double major in marine science and biology

4    and a minor in chemistry.

5    Q    When did you get that and where?

6    A    I graduated in May of 1980 from the University of Tampa.

7    Q    So that was well before you moved into the computer

8    forensics?

9    A    Yes, very well before.

10   Q    And, briefly, if you would, between receiving that degree

11   and becoming involved in computers, what did you do?

12   A    I performed mostly.

13   Q    And what type of performing?

14   A    I toured the country as a comedy juggler.

15   Q    Do you still perform?

16   A    I perform once a year with my family at the Kansas City

17   Renaissance Festival.

18   Q    What kind of show is it?

19   A    It's a family show.  I started doing the show with my

20   family in 1991 and as children were born, they were added to

21   the show.

22   Q    So your entire family has, your wife and your children

23   have all been involved in your show?

24   A    My youngest son and youngest daughter performed every day

25   of their lives.

1    Q    And in that, so, that show involves juggling.  What else?

2    A    Juggling, comedy, knife-throwing.  I throw knives around

3    my wife.  I used to lie on a bed of nail while my son stood on

4    my chest and juggled 5 torches.

5    Q    So let's move on from performing to your work in

6    computers.  When did you first get involved in computers?

7    A    Approximately 1996.  I was working at a private

8    investigation security consulting firm working undercover and

9    initially got involved in computers doing research for my

10   investigation.

11   Q    And how did that, explain how that came about?

12   A    I was working undercover at a firm called Clarence Kelly

13   and Associates and I was at the time working undercover, was

14   doing research.  It got to the point where I just couldn't do

15   undercover work any more and the firm actually engaged me to

16   work as their network engineer.

17   Q    And then, now, specifically, here we're here to talk about

18   computer forensics.  When did you first get involved in

19   computer forensics?

20   A    I attended my first computer forensics conference in 1998

21   and worked the first computer forensics case in, I believe, the

22   fall of 1999.

23   Q    If you could explain to the jury, what computer forensics

24   means?

25   A    Well, the standard definition for computer forensics or I

1    should say my definition of computer forensics is the art of

2    recovering evidence in the manner that will withstand courtroom

3    scrutiny.

4    Q    And evidence from computers?

5    A    From computers and digital devices, yes.

6    Q    What did you do to learn about computer forensics?

7    A    Initially when I started there was limited training

8    available.  Most of my training was done by attending

9    conferences, networking with other computer forensic experts.

10   And I eventually hired a former examiner from the Kansas Bureau

11   of Investigation and working directly with him is where I got

12   my initial training.

13   Q    Mr. Mallery, I'm going to hand you Exhibit 431?

14   A    Yes.

15   Q    And ask you to identify that?

16   A    This would be a copy of my C.V.

17   Q    And it's seven pages in length?

18   A    Yes, I believe so.  Yes.

19   Q    I'm not going to go through all of it with you today but I

20   do want to ask you about a few things.  On the second page of

21   the resume itself, on the third page of the exhibit, there is a

22   list of professional affiliations and certifications?

23   A    Yes.

24   Q    Tell us, the first one is High Technology Crime

25   Investigation Association, Mo-Kan Chapter, president 2006 and

1   2007?  Explain what the High Technology Crime Investigation

2   Association is.

3   A    Yes.  The High Technology Crime Investigation Association

4   is one of the original cyber crime investigation organizations.

5   It's made up of 50 percent law enforcement and 50 percent

6   private sector individuals.

7   Q    And the second one, ASIS International.  What is that?

8   A    It used to be called American Society for Industrial

9   Security.  It's the largest security trade association, I

10  believe, in the world.

11  Q    And the next section of your resume is, starts at the

12  bottom of that second page, goes to the top of the third, it's

13  on professional training and outlines your specific

14  professional training?

15  A    Those are specific formal classes that I took.  It does

16  not include sessions at various conferences.  Those would be

17  numerous.

18  Q    Then the next section on the next page is publications and

19  that continues on for several pages, correct?

20  A    Yes.

21  Q    In that grouping I see a series of publications in a

22  journal called Security Technology and Design.  Can you tell

23  the jury what that is?

24  A    That magazine is now called Security Executive.  I was

25  actually a senior technical editor for that publication.  It's

1   targeted primarily to senior security professionals directing

2   the security of large organizations.  I was asked to write

3   technology-related articles for that publication.

4   Q    And turn to the next page.  On that page there is also a

5   significant number of articles for that same publication,

6   right?

7   A    Yes.

8   Q    And then the next page, there is a section after the

9   publications called white papers.  What is white paper?

10  A    White paper is a term used to describe unique research,

11  the results of unique research.  This particular white paper,

12  Secure File Deletion, Fact or Fiction, is a white paper that I

13  wrote as part of the requirements for achieving a particular

14  security certification.

15  Q    And I see you have a submitted date and an updated date.

16  Why do you have two dates on it?

17  A    It was originally submitted in July of 2001.  I was

18  contacted, I believe, in early 2006 to update the white paper.

19  Apparently it was one of the 25 most read white papers on the

20  Sans security website.

21  Q    And the next section of resume is entitled books.  The

22  first one is Computer and Information Security Handbook.  What

23  can you tell us about that book?

24  A    Yes.  The editor for that book, John Vacca, contacted

25  security experts with special areas of expertise and each

1    expert contributed a chapter to that book.  I contributed the

2    first chapter, Building a Secure Organization.  It came out in

3    2009.  I actually rewrote that chapter this year and a new

4    edition is coming out next year.

5    Q    Then the second book, Hardening Network Security.  Can you

6    tell us about that book?

7    A    Yes.  It was a series of security books published by

8    McGraw Hill.  I was the lead author and contributed 5 chapters

9    in the lead material for that book.

10   Q    The next section of your resume has, is entitled

11   presentations and it's a variety of presentations you've done

12   as well as the audiences that have been, to whom you've made

13   these presentations.  I want to ask you about one in

14   particular, the Federal Financial Institutions Examination

15   Counsel Conferences.  What is the Federal Financial

16   Institutions Examination Counsel?

17   A    The acronym FFIEC, Federal Financial Institutions

18   Examination Counsel, is a multi agency organization that

19   basically develops the standards for the examination of

20   financial institutions.

21   Q    So who is the audience at those conferences?

22   A    Those conferences are bank examiners from various

23   government agencies around the country and occasionally from

24   around the world.

25   Q    That includes, for example, the FDIC, the Federal Deposit

1    Insurance Corporation?

2    A    Yes.  Could also include examiners from the Office of the

3    Forensics Controller and the Federal Reserve Board as well.

4    Q    You're teaching, in that instance, federal government

5    examiners about the computer forensic analysis, right?

6    A    Primarily how computer forensic analysis can be a tool in

7    investigating fraud investigations.

8    Q    And other than the presentations like we see here to the

9    FFIEC have you done any formal teaching on computer forensic

10   analysis?

11   A    Yes.  I developed two classes for the Johnson County

12   Community College, Introduction to Computer Forensics as well

13   as Advanced Computer Forensics.

14   Q    Have you been retained as an expert witness on computer

15   forensics prior to this matter?

16   A    Yes, I have.

17   Q    Have you given sworn testimony on computer forensics?

18   A    Yes, I have.

19   Q    Have you testified in federal court about computer

20   forensic analysis?

21   A    Yes, I have.

22   Q    Now, if you could set that aside, I want to move on now to

23   the present dispute.  I want to ask you about the work you did

24   related to Monitor Clipper's computers.  I placed in front of

25   you, Mr. Mallery, Exhibit 430 for your reference.  Is that the

1   report that you prepared related to this dispute with Monitor

2   Clipper.

3   A    Yes.

4   Q    And in connection with that you were sent five hard

5   drives, computers, connected to Monitor Clipper, correct?

6   A    Five forensic copies, yes.

7   Q    What were you told about those hard drives?

8   A    That those forensic images, copies of the hard drives,

9   were copies of hard drives that belonged to Monitor Clipper

10  employees.

11  Q    When did you receive the hard drives connected to Monitor

12  Clipper's employees?

13  A    I received two on October 7, copies of Charles Yoon and

14  William Young's computers.  Then on December 3 I received

15  forensic images for Robert Calhoun, Paul Maxwell and Thomas

16  Perkins' computers.

17  Q    And you said October 7 and December 3.  What year was

18  that?

19  A    I'm sorry.  2011.

20  Q    And what did you do first with these computer images you

21  received?

22  A    The very first thing was to make backup copies in case the

23  original copy I was provided failed for some reason.  I made

24  backup copies and verified that they were actually as they had

25  been presented to me.  They were actually copies of the hard

1  drives described.

2  Q   And just briefly, some terms have been used but what is an

3  image of a hard drive?

4  A   In forensic terminology we take a subject hard drive, we

5  make a forensic copy of it.  Forensic examiners will call that

6  an image.  A standard tool to make that image is something

7  called Incase.  Makes a bit by bit exact copy of the subject

8  hard drive.  We call that an image.  So we actually analyze the

9  image as opposed to the original drive.

10 Q   And you mentioned Incase.  What is Incase?

11 A   Incase is one of the industry standard tools for imaging

12 and analyzing digital information.

13 Q   Is that a program you're familiar with?

14 A   Yes, it is.

15 Q   And you've use that in other matters?

16 A   Yes.  Many times.

17 Q   And did you compare what you saw electronically to what

18 you were told would be arriving throughout those computers?

19 A   Yes.

20 Q   And was what you saw electronically, what you were

21 provided consistent with what you expected?

22 A   It was consistent with what I expected, yes.

23 Q   What were you asked to do with those computers?

24 A   I was asked to analyze those computers, those computer

25 images, using a variety of search terms and phrases and to

1    search for data destruction activities.

2    Q    And did you perform those tasks with regard to the Clipper

3    computers?

4    A    Yes, I did.

5    Q    And what did you do to complete that search task, the

6    first task you indicated?

7    A    The very first thing was I was provided with a variety of

8    search terms and phrases.  Took those, imported them into the

9    tool Incase, made some modifications to them to allow for

10   misspellings or variations of those terms.  That was the first

11   thing that we did, I did.

12   Q    Mr. Mallery, I have handed you Exhibit 432?

13   A    Yes.

14   Q    And can you identify that for us?

15   A    This would be the key word list that was provided for me

16   to use in this matter.

17   Q    And turning, after the cover page, to the first page.

18   These are the key words that you were provided that you then

19   imported into the computer software to conduct the searches,

20   right?

21   A    That's correct.

22   Q    And it included, for example, terms, broad terms like

23   greeting, Hallmark, Recycled, terms like that, right?

24   A    That is correct.

25   Q    Did you also search e-mails with regard to those

1  computers?

2  A    Yes, I did.

3  Q    And did you search e-mails with the Incase program?

4  A    No.  I used a product called Intella manufactured by Vound

5  software.  If the e-mail was in a format called Lotus Notes and

6  the file extension was .nsf Intella is better at, it's a better

7  tool for analyzing and searching .nsf files, e-mails and their

8  attachments.

9  Q    So on these five computers you received, where did you

10 search?

11 A    The search terms were run across the entire hard drive

12 image from the very first sector of the drive to the very last

13 sector of the drive.

14 Q    Does that include more than just the e-mails and the My

15 Documents folder?

16 A    On a computer hard drive there's other areas of the drive

17 that are not presented through the graphical user interface

18 when someone uses a computer.  So in addition to the file

19 structure that you would normally see when you use a computer

20 there are other areas of the drive that we have access to with

21 our tools such as an area like unallocated clusters which is

22 essentially an unstructured area of the drive that is kind of a

23 dumping ground for the operating system.  There's other files

24 like highrofi.sys file that you might find on a laptop computer

25 and a variety of system files in addition to what the normal

1  user might see.

2  Q    Could you expand on, please, you mentioned unallocated.

3  As best you can, explain to the jury unallocated?

4  A    What most people would identify with unallocated clusters,

5  folks would refer to it as free space.  It's not really free

6  space.  That area of the hard drive has data in it that is not

7  allocated to active files that the user can see and interact

8  with.  There's data there that's not allocated to any active

9  files and is available to be over-written when the operating

10  system is ready to over-write it with new data.

11  Q    Why did you search in the unallocated area?

12  A    As I said previously it's essentially the dumping ground

13  for the operating system.  So deleted files, deleted file

14  fragments, deleted system files, some of these files that are

15  deleted intentionally by a user, some could be deleted as a

16  normal process of work of the computer.

17  Q    So in searching for evidence, searching for documents, you

18  searched across every possible place they could be, is that

19  what you're saying?

20  A    I believe so, yes.

21  Q    What did you do once you had run the searches?

22  A    Once the search terms are run, we look at the results.

23  The term that we use is we looked at files that contain a hit,

24  meaning that that particular file or file fragment contains one

25  of the key words that we used for the search.

1        At that point we'll review that hit and make an

2   attempt to verify whether it's a false hit or potentially

3   relevant piece of material for the litigation.

4   Q    And what is the difference in this process between false

5   hit and potentially relevant document?

6   A    A false hit is something that to us, obviously, it's not,

7   very obviously it's not related to the litigation.  An example

8   might be that you might see a term in a dictionary file.  You

9   might see a term in a recipe file.  You might see the term in

10  communications between parent and child or other family

11  members.  The things we can determine are obviously false hits

12  we don't include reproduction to counsel.

13  Q    What if you're just not sure about a particular document?

14  A    If something is in a gray area and we're not certain

15  whether it's potentially relevant, we error on the side of

16  caution and produce that for review.

17  Q    Were there documents on the computer that could not be

18  searched using those search terms we showed?

19  A    Historically, image files, JPEG files, some PDF files,

20  other image formats need to be manually reviewed because search

21  terms can't be run across those files.

22  Q    What did you do with those types of files?

23  A    Manually reviewed those documents.

24  Q    So you looked at every image?

25  A    The method is to select all files in the case.  Then you

1  go into Incase and look at the gallery view which basically

2  presents you with a screen that you can scroll through to look

3  at thumbnails of the images.

4  Q    One of the computers that you reviewed belonged to a board

5  member of RPG we discussed earlier, Robert Calhoun, is that

6  correct?

7  A    That is correct.

8  Q    And that computer, you searched for documents on that

9  computer with that list of terms, right?

10  A    Yes, I did.

11  Q    Was there anything noteworthy in your search results about

12  that search you did on the Calhoun computer?

13  A    We didn't find, I didn't find any potentially relevant

14  materials on that computer.

15  Q    And your search would have included Recycled, it would

16  have included Hallmark, the terms we saw on the exhibit

17  previously?

18  A    Yes.

19  Q    When did that computer come in to use?

20  A    In November of 2003.

21  Q    And when was the image of that computer made?

22  A    2007.

23  Q    And did the computer show signs that it had been used

24  during that time period?

25  A    Yes.  There was Internet history activity, over 100,000

1    Internet history artifacts.

2    Q    And were they, were they over that entire time period or

3    were they in --

4    A    They ranged from 2003 to 2007.

5    Q    And were there, did you find e-mails on that computer?

6    A    I believe there were 126 e-mails in the .nsf file.

7    Q    Did you find any documents, like Microsoft Office type

8    documents?

9    A    There were six -- Word documents, other than Word

10   documents that were license agreements or help files.

11   Q    Could you explain what you mean by that?

12   A    Well, there is, on every Windows computer there are more

13   Office related documents on the computer than those that are

14   actually created by the end user.

15   Q    So it may come pre-loaded with a Microsoft Word document

16   that's an instruction or something?

17   A    It could be instruction.  It could be a template.  It

18   could be a variety of things.

19   Q    And you indicated earlier you searched the Calhoun

20   computer using all the search terms, right?

21   A    That's correct.

22   Q    Did you find anything that was potentially related to

23   Recycled Paper Greetings or Hallmark?

24   A    There were numerous hits on the www.Hallmark.com web

25   address but that was it.

1   Q    Did you find any e-mails or documents that were

2  potentially responsive to the RPG or Hallmark matters?

3  A    No.

4   Q    After receiving those initial results did you perform any

5  other searches on the Calhoun computer?

6  A    Yes, I did.  I was provided copies of e-mail

7  communications that had included Mr. Calhoun as one of the

8  parties.  I constructed a list of search terms from those

9  e-mail messages and also ran those across the Calhoun forensic

10  image.

11  Q    Did you find anything using that secondary search related

12  to RPG or Hallmark?

13  A    No.

14  Q    But you found potentially responsive documents on all four

15  of the other Clipper computers, right?

16  A    Yes, I did.

17  Q    After all that searching, were you able to look at any

18  potentially responsive documents on Mr. Calhoun's computer?

19  A    No.

20  Q    The second task, after the search process that you

21  indicated earlier you performed, was to inspect the computer

22  for evidence of document deletion, disk wiping, things like

23  that, right?

24  A    That's correct.

25  Q    Give us some examples of how you search for that?

1    A    We can look at a variety of places on the hard drive.

2    Probably the first place we look is in the program files

3    directory.  Often those programs will be installed, will have

4    names like wipe, shred, that kind of thing so we can manually

5    identify those.  We'll look in a directory called the pre-fetch

6    directory that contains information relating to applications

7    that have been run on the computer.  We'll also run search

8    terms across the hard drive such as wipe, shred, that type of

9    thing to see if there are any Internet searches looking for

10   those particular tools.

11   Q    We're going to talk about that process next.  But first I

12   want to turn briefly to Jan Murley.  Have you also analyzed an

13   image made of Jan Murley's computer?

14   A    Yes, I did.

15   Q    Was that image also made by Use-a-data?

16   A    Yes, it was.

17   Q    What were you asked to do with that computer?

18   A    The analysis was similar to what I was asked to do with

19   the Monitor Clipper computers.

20   Q    Did you complete the search and the analysis of Jan

21   Murley's computer?

22   A    Yes, I did.

23   Q    Now, what is a link file?

24   A    A link file is a shortcut file that is created when ever

25   you open an application or a file such as a Word document and

1    it has dot lnk file extension.

2    Q    I've, well, did you do any analysis of link files on the

3    Murley computer?

4    A    Yes, we did.

5    Q    And I've handed you Exhibit 443B.  Can you identify that

6    document for us?

7    A    Yes.  This is a link file report from the Murley analysis.

8              MR. BLEGEN:  Your Honor, I offer 443B.

9              MR. OLIVER:  Judge, could we approach?

10             THE COURT:  Yes.

11             (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

12   PROCEEDINGS WERE HAD:)

13             THE COURT:  Is this a separate exhibit?

14             MR. BLEGEN:  Not on your list?  It's a subset that

15   has actually been, a different copy of it I think stipulated.

16   That one hasn't been.

17             MR. OLIVER:  Is this just a different copy of the one

18   that has been stipulated to?

19             MR. BLEGEN:  Just easier to read.

20             MR. OLIVER:  I have no objection.

21             THE COURT:  443B is admitted.

22             (THE PROCEEDINGS RETURNED TO OPEN COURT.)

23   BY MR. BLEGEN:

24   Q    And why did you generate the link file report with regard

25   to the Jan Murley computer?

1    A    The link file reports are often generated in attempts to

2    identify drives, hard drives, USB devices that have been

3    connected to the computer.

4    Q    And did you see any such devices that had been connected

5    to the Murley computer?

6    A    Yes.

7    Q    What did you see?

8    A    That an external hard drive had been connected to the

9    computer.

10   Q    Where did that information lead you?

11   A    That led to the identification of a back-up program called

12   Syncback.

13   Q    We'll get to Syncback in a minute.  But, first, I want to

14   take a look at, just if you could bring up--

15         Just to orient everybody, the first column, what is

16   shown in the first column?

17   A    That's the, would be the name of the link file.

18   Q    And then the second column?

19   A    That's the full path on the driver where the link file was

20   located.

21   Q    And then skipping the size column, there's a created date,

22   last written date, last accessed date.  Do you see that?

23   A    I do.

24   Q    What are those dates?

25   A    Within a link file those dates actually refer to the

1   target file that shortcut file is pointing to.

2   Q    Just to make sure we're clear.  The link file itself is

3   not the document, right?

4   A    No, it is not.

5   Q    But it points to the document?

6   A    Yes, it does.

7   Q    And these dates here under created, written and accessed

8   relate to the document itself they're pointing to, is that

9   right?

10   A    Yes.

11   Q    And then finally there is a base path over a little

12   further.  What is base path?

13   A    That would be, it's difficult to read, but that would be

14   the target file name and location.

15   Q    So where on the computer that target file was stored at

16   the time of the link file?

17   A    Yes.

18   Q    And that last access date, what does that tell us about

19   that target document?

20   A    That last access date would tell you that document existed

21   on the drive at that particular time.

22   Q    Now, part of what you spoke of a minute ago with regard to

23   the link file report was the external drive.  I believe you

24   indicated you found evidence of a program called Syncback?

25   A    Yes.

1    Q    What is Syncback?

2    A    Syncback is a software program designed for backing up the

3    files on your computer so in the event of, I'll say disaster,

4    the computer fails, you still have access to your files.  You

5    don't lose them if the computer fails.

6    Q    What was the significance of your discovery of this

7    back-up program to your analysis of the Murley computer?

8    A    It provided the ability to identify that the files had

9    been deleted.

10   Q    And how does Syncback tell you that files have been

11   deleted?

12   A    You look at the last log or the log for the last time it

13   was run and it will show you a list of files that have been

14   deleted.

15   Q    I've handed you, Mr. Mallery, Exhibit 383A?

16   A    Yes.

17   Q    Can you tell us what 383A is?

18   A    This is a graphical representation of how Syncback

19   functions, the default functionality of Syncback.

20   Q    And would 383A help you explain to the jury how Syncback

21   works?

22   A    Yes, it will.

23            MR. BLEGEN:  Your Honor, offer it for demonstrative

24   purposes.

25            MR. OLIVER:  No objection.

1          THE COURT:  383A is admitted.

2   BY MR. BLEGEN:

3   Q    Now, 383A is in front of the jury.  Can you walk the jury

4   through that document and explain Syncback to them?

5   A    Yes.  Syncback uses, the default format for backing up is

6   a format called mirror write, meaning that the back-up device

7   will keep an exact copy of exactly what is on the computer.  So

8   in image 1 it shows in this particular situation the device is

9   an exact copy of what is on the laptop.

10          In image 2 it shows that a file had been deleted from

11   the laptop.

12          In image 3, because of the mirror write configuration

13   of Syncback, this would show because the file's been deleted

14   from the laptop, it also then becomes deleted from the storage

15   device.

16          Then figure 4 shows then syncronized mirror copies of

17   each other.

18   Q    So as this back-up program is run to back up the external

19   drive, if the user deletes a document off their computer, it

20   remains on that back-up device until the back-up program is run

21   again?

22   A    That's correct.

23   Q    At that point in time when it's run again then it's also

24   deleted off of the back-up drive, right?

25   A    Yes.

1  Q    And how, you indicated the Syncback log, how does the

2  Syncback log tell you documents have been deleted?

3  A    When the step in figure 3 occurs, the log file actually

4  shows destination deleted.  It has the file name.  Then the log

5  says destination deleted meaning it's been removed from the

6  target device.

7  Q    I'm going to hand you Exhibit 443C.  And ask you what

8  Exhibit 443C is?

9  A    This would be a Syncback log file, summary file for the

10  Syncback log summary.

11  Q    And is it a log that you located on the Murley computer?

12  A    Yes.

13          MR. BLEGEN:  Your Honor, I offer Exhibit 443C.

14          MR. OLIVER:  No objection.

15          THE COURT:  443C is admitted.

16  BY MR. BLEGEN:

17  Q    Now, looking at 443C you indicated it was off the Murley

18  computer.  What does that tell us, this report tell us about

19  the running of Syncback?

20  A    It shows it was run on January 29 of 2007.  It was started

21  at 3:06 a.m. and finished at 3:08:15 a.m. on the 29th as well.

22  Q    Is that the day the image was made?

23  A    Yes, it was.

24  Q    So this is in the wee hours of the morning before the

25  image is made, the computer is running a back-up process?

1   A    Yes.

2   Q    Next I'm going to hand you Exhibit 443A and ask if you can

3   identify that document for me?

4   A    Yes.  This would be a detailed Syncback log.

5   Q    And is it a detailed log for a particular running of

6   Syncback?

7   A    It would correspond with the summary log file.

8   Q    And if you would go back to 443C.

9         So 443A is the detail log for the back-up that was

10  run on January 29, 2007 at 3:00 a.m. on the Murley computer,

11  correct?

12  A    Yes.

13  Q    And going down on 443C, there is a log report run totals.

14  What does that tell us?

15  A    It shows as a summary of the files that were deleted and

16  shows the number of files that were copied.

17  Q    And does Exhibit 443A reflect more information about those

18  numbers right there?

19  A    Yes, it does.

20         MR. BLEGEN:  Your Honor, offer 443A.

21         MR. OLIVER:  No objection, Your Honor.

22         THE COURT:  443A is admitted.

23  BY MR. BLEGEN:

24  Q    So go ahead and turn to page 9 of 443A.  There are

25  helpful, luckily they're in color to help here, three entries

1   at the top that identify source copy.  Do you see that?

2   A    Yes.

3   Q    What does source copy mean?

4   A    It means that a new file was created on the computer and

5   was then copied to the back-up drive.

6   Q    And then if you'll go down to the next entries, they're

7   indicated as destination deleted.  What does destination

8   deleted mean?

9   A    It means it had been deleted from the computer hard drive

10  and at this point during the back-up process it was then

11  deleted from the back-up drive.

12  Q    So this is that mirror process you explained a moment ago

13  with your graph, correct?

14  A    Yes.

15  Q    Let's look at the second entry there that has destination

16  deleted.  Can you read the file extension and name of that

17  document?

18  A    It's a .doc extension indicating it would be a Microsoft

19  Word document and the file name was 083002 - bus plan meeting

20  sum - JM.

21  Q    Moving two down from there, there is another one, 30137

22  that is in the My Documents slash Documents slash Work slash

23  Hallmark slash business plans.ppt, right?

24  A    Yes.

25  Q    That's also shown as destination deleted?

1    A    Yes, it is.

2    Q    Go two more down.  There's one in that same documents,

3    work Hallmark folder, entitled key business priorities for

4    balance 2002.doc and that's also shown as destination deleted,

5    correct?

6    A    Yes.

7    Q    Does this log tell you when those three documents were

8    deleted?

9    A    Not specifically, no.

10   Q    Do you know, do you, Mr. Mallery, know precisely when

11   those documents were deleted?

12   A    Not specifically, no.

13   Q    If you'll turn back, Exhibit 443D that link file report we

14   discussed a moment ago.

15            THE COURT:  443B as in boy?

16            MR. BLEGEN:  A as in apple.

17   BY MR. BLEGEN:

18   Q    Where we looked at the three files in the Hallmark folder

19   and go to -- Okay.  Were you able to identify in the link file

20   report those three documents we saw in the Syncback folder?

21   A    Yes.

22   Q    And if you will turn to page 12 of the link file report?

23   A    Okay.

24   Q    Which I think is page 13 at the top.  The fifth entry

25   down?

1  A     Yes.

2  Q     It may be easier to read on your copy but is that the same

3  base path of the 083002 bus plan document?

4  A     It appears to be.

5  Q     And that same box, if you'll go to the left on Exhibit

6  443B, are those the created, accessed, and modified dates with

7  regard to that bus plan meeting summary document?

8  A     Yes.

9  Q     And I see it says date up there of 1-27-2007.  Do you see

10  that?

11  A     I do.

12  Q     So what does that tell us about that document on Jan

13  Murley's computer?

14  A     That it existed on that hard drive in that location at

15  that date and time.

16  Q     So January 27, 2007, it existed.  January 29, 2007, it no

17  longer existed, right?

18  A     That is correct.

19  Q     And go down four from there.  Once again just the base

20  path.  Okay.  And there you go.

21         You have the business plans dot ppt document.  Is

22  that the same base bath that we saw on the other, on the

23  Syncback log?

24  A     Yes, it appears to be.

25  Q     And just slide on 443B over to the last access date.

1          Does that also show last access date for that

2   document as January 27, 2007?

3   A    It appears to, yes.

4   Q    And you've seen cleaner copies of these documents,

5   correct?

6   A    Yes, I have.

7   Q    You have verified that those dates and files are the same,

8   right?

9   A    Yes, I have.

10  Q    In the third document we looked at in the Syncback log,

11  you also located on Exhibit 443B, right?

12  A    Yes.

13  Q    And it also had a last access date of January 27, 2007,

14  right?

15  A    I believe so, yes.

16  Q    And so is it, can we conclude from that then that those

17  documents existed on Jan Murley's computer on January 27, 2007

18  because of their existence in the link file report?

19  A    Yes.

20  Q    And can we conclude from that that those documents had

21  been deleted from that computer by the time of the back-up on

22  the morning of January 29, 2007?

23  A    Yes.

24  Q    Now, I hand you the document that was discussed the other

25  day so we can have a point of reference.  You have in front of

1  you, Mr. Mallery, Exhibit 335?

2  A    Yes.

3  Q    And on Exhibit 335 what is the date of that?

4  A    Date shows Friday, January 19, 2007 at 10:52 a.m.

5  Q    Okay.  And actually I meant the e-mail that started that

6  chain at the bottom I may have told you wrong.

7         Would you put up Exhibit 475?  Okay.

8         Now, this exhibit at the bottom there is an e-mail

9  from Paul Maxwell to Jan Murley that was discussed on Friday.

10 So for point of reference it's discussing sending to Ms. Murley

11 a revised contract, right?

12 A    Yes.

13 Q    And then the next two e-mails are discussion between

14 Ms. Murley and Mr. Maxwell about a conversation to be had on

15 January 18, 2007, right?

16 A    The dates I see here are January 17.

17 Q    Talking, about talking tomorrow at 10:00 a.m., right?

18 A    Yes.

19 Q    And then you spoke a moment ago that an image was made of

20 the Murley computer on January 29, 2007, right?

21 A    Yes.

22 Q    And also on January 29, 2007 there were three documents

23 that were indicated as having been deleted by 3:00 a.m. on that

24 day, right?

25 A    Yes.

1    Q    But on January 27, 2007, those documents existed on that

2    computer, right?

3    A    Yes.

4    Q    Now, with that point of reference, one of the computers

5    you analyzed for file deletion belonged to Paul Maxwell,

6    correct?

7    A    That is correct.

8    Q    Did you find any evidence related to file deletion on

9    Mr. Maxwell's computer?

10   A    Yes.  I identified that a program named Shredder had been

11   run on that computer.

12   Q    And what is Shredder?

13   A    It's a data wiping tool for securely removing data from a

14   hard drive.

15   Q    And did you perform any investigation of that particular

16   piece of software with its developer?

17   A    Shredder?

18   Q    Yes.

19   A    I did research on the website and downloaded the tool.

20   Q    Do you recall what the developer says about its product

21   called Shredder?

22   A    I believe it's in my report.  Yes.  Try this state of the

23   art secure file delete utility.  Simply drag and drop files or

24   entire folders to Shredder's icon on your desk top, confirm

25   file deletion and nobody can find out what this file is about.

1  Q     How does Shredder work?

2  A     The default setting for Shredder is to overwrite the

3  specific file or folder seven times with random characters.

4  Q     And what do you mean by random characters?

5  A     Just that, random characters, numbers, letters, symbols in

6  random, not pre-defined order.

7  Q     I'm going to hand you Exhibit 386.  Can you just tell the

8  jury what Exhibit 386 is?

9  A     386 is an example of the random characters that Shredder

10  uses to overwrite the data.

11  Q     Is that an example that you prepared as part of your

12  analysis?

13  A     Yes.  I tested the functionality of Shredder.  This is the

14  results of that testing.

15            MR. BLEGEN:  Offer 386 for demonstrative purposes.

16            MR. OLIVER:  No objection.

17            THE COURT:  386 is admitted.

18  BY MR. BLEGEN:

19  Q     So now the jury can see this.  It says Shredder random

20  overwrite.  That's the title you put in, right?

21  A     Yes.

22  Q     What are we seeing above that title?

23  A     Random characters that are existing on the drive where a

24  Word document used to be.

25  Q     So that is what would be found in place of a document on a

1  hard drive?

2  A     Yes.

3  Q     So it makes it impossible to see what that document was?

4  A     Yes, that's correct.

5  Q     Is it standard to use random characters in these wiping

6  tools?

7  A     My research in wiping tools for the white paper that was

8  mentioned and subsequent research, tools can use a variety of

9  patterns.  They can use a pattern of 1s or 0s.  Will often

10 allow the user to define a specific pattern.  Then other tools

11 like Shredder will also use random characters.

12 Q     Is there a practical difference between random characters

13 and a pattern of characters?

14 A     With a pattern of characters, if it's a specific pattern

15 it's often possible to identify the tool being used by

16 identifying that pattern on the hard drive.

17 Q     You have in front of you, Mr. Mallery, Exhibit 430D?

18 A     Yes.

19 Q     What does that document show us?

20 A     This is a confirmation window when you're preparing --

21 Q     Without going into it, what is Exhibit 430D?

22 A     It's a pop up window.

23 Q     Is it related to Shredder?

24 A     Yes, it is.

25 Q     Does it demonstrate something about the use of Shredder?

1   A    It asks if you want to confirm deletion.

2   Q    Without reading it, it's related to your analysis of

3   Shredder?

4   A    Yes, it is.

5            MR. BLEGEN:  Your Honor, I offer Exhibit 430D.

6            MR. OLIVER:  No objection.

7            THE COURT:  430D is admitted.

8   BY MR. BLEGEN:

9   Q    Now, all right, so what is Exhibit 430D?

10  A    It's a pop up window from Shredder.  It would be a

11  confirmation window, asking if you seriously want to wipe a

12  particular file.

13  Q    And what does it say on there?

14  A    Caution.  It will be impossible to recover your data.

15  Q    And to proceed after this point you have to affirmatively

16  click the yes button, is that right?

17  A    Yes, that's correct.

18  Q    Now, 430E, you also have in front of you.  Is that another

19  piece of information related to Shredder?

20  A    Yes, it is.

21  Q    Is it something that you created to help illustrate your

22  testimony in this case?

23  A    Yes, it is.

24           MR. BLEGEN:  Your Honor, I offer 430E.

25           MR. OLIVER:  No objection.

1    THE COURT:  430E is admitted.

2  BY MR. BLEGEN:

3  Q    So here we go.  We're in 430E.  What is this box?

4  A    This is when you're looking to overwrite a particular

5  folder or directory, this is where you would select that

6  particular folder.

7  Q    And what does it ask you as far as the actions you're

8  taking?

9  A    It says, please select folder to destroy.

10  Q    And once again, after you selected a folder what do you

11  need to do to actually act?

12  A    Once you select the folder then you will need to click on

13  the okay button.

14  Q    Putting those aside, what did you find about Shredder on

15  Paul Maxwell's computer?

16  A    That it had been used on the computer.  It had been used

17  on the computer.  It was run on the computer on January 24,

18  2007.

19  Q    Now, Mr. Mallery, I'm handing you Exhibit 442.  Ask if you

20  could please identify what that document is?

21  A    Yes.  This is a report showing the contents of the prefix

22  directory from the Maxwell computer.

23  Q    What is a prefix directory?

24  A    Microsoft Windows operating system prefix directory stores

25  specific files with a dot PF extension.  When you open an

1    application, theoretically those PF files are created to allow

2    that application to load faster in the future.

3    Q    Was this report, this directory listing something

4    generated out of the Maxwell computer?

5    A    Yes, it is.

6              MR. BLEGEN:  Your Honor, I offer Exhibit 442.

7              MR. OLIVER:  No objection.

8              THE COURT:  Exhibit 442 is admitted.

9    BY MR. BLEGEN:

10   Q    Turning to the third page of the directory, this is the

11   fourth page of the document.  There is a highlighted entry on

12   there.  Do you see that?

13   A    I do.

14   Q    What is that highlighted entry?

15   A    It's shows the Shredder dot exe, shows information for

16   that particular application.

17   Q    And does this show us when Shredder was run?

18   A    It was run at 8:30 am on 1-24-07.

19   Q    Does this tell us how many times Shredder was run on the

20   Maxwell computer?

21   A    Yes.  It was run one time.

22   Q    Shredder, if it had been run multiple times would that

23   number 1 there be more than one?

24   A    Potentially, yes.

25   Q    So it appears Shredder was not being run as a regular

1   thing?

2   A    That would be correct.

3   Q    Do you know, did Maxwell delete documents that day?

4   A    Shredder doesn't allow me to make that determination.

5   Q    What do you mean by that?

6   A    Well, it covers tracks of a particular file that it's

7   wiping.  It also doesn't keep a log of its activities.

8   Q    Now, I've handed you Exhibit 440.  Can you identify what

9   that document is?

10  A    Yes.  This is a report showing the specific information

11  relating to the acquisition, the copying of the original hard

12  drive.

13  Q    Is that something that was generated out of Incase?

14  A    Yes, it is.

15            MR. BLEGEN:  Your Honor, I offer 440.

16            MR. OLIVER:  No objection, Your Honor.

17            THE COURT:  440 is admitted.

18  BY MR. BLEGEN:

19  Q    So turning past the cover page to the second page there,

20  what does this document show?

21  A    It shows that the forensic copy of the Maxwell hard drive

22  was made on January 25, 2007 at 11:35 a.m.

23  Q    And just to make sure my chart is up-to-date, I believe

24  we're now at January 24, 2007 Shredder is run on Maxwell's

25  computer, right?

1    A     Yes.

2    Q     On January 25, the image is made of Maxwell's computer,

3    correct?

4    A     That is correct.

5    Q     So roughly 24 hours or so prior to the image being made

6    Maxwell ran Shredder on his computer for the one and only time

7    it was ever run, right?

8    A     Yes.

9    Q     And the only person who can tell us whether documents were

10   deleted or whether that was innocuous is Mr. Maxwell, right?

11   A     Yes.

12          MR. BLEGEN:  Your Honor, pass the witness.

13          THE COURT:  Cross-examination?

14          MR. OLIVER:  Yes, Your Honor.

15                    CROSS-EXAMINATION

16   BY MR. OLIVER:

17   Q     Mr. Mallery, my name is David Oliver.  I represent Adam

18   Doctoroff and the Monitor Clipper defendants in this case.

19   A     Yes, sir.

20   Q     Jan Murley is not a party to this lawsuit, is she?

21   A     It's my understanding, no.

22   Q     Who are the parties to this lawsuit?

23   A     It's my understanding that it's Monitor Clipper, Paul

24   Maxwell, let me grab my report here.  Get the first names

25   correct.  It's my understanding the parties to the lawsuit are

1    Monitor Clipper, Charles Yoon, William Young, Robert Calhoun,

2    Paul Maxwell and Thomas Perkins.

3    Q    Well, I will let you know, Mr. Mallery, that's not

4    correct.  The only defendants in this case are Monitor Clipper

5    and Adam Doctoroff.  Okay?

6    A    Okay.

7    Q    You did not do any work on any computer of Adam

8    Doctoroff's, did you?

9    A    No.

10   Q    You did do work on five Monitor Clipper computers though,

11   correct?

12   A    That's correct.

13   Q    And which were those five?

14   A    The ones I read were Charles Yoon, William Young, Robert

15   Calhoun, Paul Maxwell and Thomas Perkins.

16   Q    Okay.  Now, I want to go back first to a couple of things

17   that Mr. Blegen asked you.  You're still doing work for BKD?

18   A    Yes, I am.

19   Q    Is anyone from BKD coming to testify in this case?

20   A    It's my understanding, no.

21   Q    Did you let BKD know that you would be testifying today?

22   A    Yes, I did.

23   Q    And who did you tell?

24   A    I told Shauna Woody Coussens and Jim Snyder.

25   Q    When did you tell them?

1   A    Probably at the beginning of last week or the end of the

2   previous week.

3   Q    And you are a subcontractor for BKD?

4   A    That's correct.

5   Q    But neither of those two individuals are coming in to

6   testify, are they?

7   A    No.

8   Q    Did anybody at BKD assist you in the work you did in this

9   case?

10  A    No.

11  Q    You did all the work yourself?

12  A    Yes, I did.

13  Q    Where did you do this work?

14  A    In my lab.

15  Q    And where is your lab?

16  A    Right now it's Corporate Woods.  For this work it was in

17  my house.

18  Q    And in your house did you have like an in-house office?

19  A    I did.

20  Q    And how did you store your computers?

21  A    I had a locked closet where I kept the computers.

22  Q    In a storage locker?

23  A    I'm not certain I understand the question.

24  Q    I'm sorry.  In a locked closet?

25  A    Locked closet, yes.  I'm sorry.  I thought you said

1   storage locker.  Sorry.

2   Q    That equipment is your equipment.  It is not BKD

3   equipment?

4   A    That's correct.

5   Q    Did you use any equipment of BKDs?

6   A    No, I did not.

7   Q    Now, you told Mr. Blegen that you, I think you used two

8   types of software and you need to understand while I enjoy

9   using technology I'm not a geek.  Okay?

10  A    I do understand.

11  Q    All right.  I respect geeks but I'm not a geek.

12  A    I understand.

13  Q    But you used, I think you said you used two programs.

14  Incase, correct?

15  A    That's correct.

16  Q    And Intella?

17  A    That's correct.

18  Q    And I'm correct that in Incase, that is something that you

19  use that allows you to search the image that you have obtained

20  of the hard drive, correct?

21  A    That is correct.

22  Q    And I believe you said that Intella is something that you

23  use, you used the terms to manually search e-mails?

24  A    If I said manually, it's a tool that's used that provides

25  indexing and searching capabilities for e-mail files.

1  Q    Right.  And so what it does, you've still got a screen.

2  You're not going through paper e-mails doing this, right, with

3  Intella?

4  A    That's correct.

5  Q    It's up on the screen and Intella somehow let's you go

6  through all of those e-mails kind of one by one but you've got

7  to be the one who's looking for the hits?

8  A    That is correct.

9  Q    Okay.  Which version of Incase did you use when you did

10 your work on back-up to the imaging software?

11 A    Well, the imaging software I used for the analysis, I

12 believe it's Incase, Version 6.  May have been 619 or 617.  I'm

13 not certain.

14 Q    And at the time you used that, whatever the version was,

15 was that the most current version of Incase?

16 A    No.  I'm sorry.  Yes.  Yes, it was at that time.

17 Q    It was at that time the most current available version of

18 Incase?

19 A    There is a newer version that came out during this

20 process.

21 Q    But you did not use that newer version?

22 A    No, I did not.

23 Q    Now, with Intella, when you used the Intella software was

24 it the then most current version of Intella when you performed

25 your work?

1   A    Yes.

2   Q    You spent quite a bit of time talking about the work you

3   did on Jan Murley's computer, correct?

4   A    Yes.

5   Q    And you were hired separately from this engagement to do

6   that work in the case Hallmark had against Ms. Murley, correct?

7   A    That is correct.

8   Q    But you know Ms. Murley is not a defendant in this case,

9   don't you?

10  A    I do understand that, yes.

11  Q    Now, you mentioned, you talked a little bit about

12  deleting, the deleted files and that unallocated space you

13  called free space, correct?

14  A    I said it's what the average user would refer to it as.

15  Q    Right.  That's what I would use.  I may not even be the

16  average user but it's free space.  It's not within a file or

17  within a particular program.  It's somewhere on the hard drive

18  that you all know where it is but I would never know where that

19  was?

20  A    Theoretically, yes.

21  Q    And you also referred to it as a dumping ground of deleted

22  files.  Did I get that right?

23  A    I said it's a dumping ground for the operating system,

24  yes.

25  Q    And sometimes when things are deleted, I do this myself, I

1  will intentionally delete something because I don't want it any

2  more.  And are you telling the jury then that will go, that can

3  go into unallocated space?

4  A    If you simply hit the delete key, it will go to the

5  recycle bin, the trash folder.

6  Q    And then also I know at the end of the day when I shut my

7  computer down and it asks me if I want to delete certain

8  things.  I don't know what it's deleting because it's just

9  doing something.  A little pop up comes up.  Is that also, I

10  think you talked about how the computer normally deletes

11  information as well.  Is that what you're talking about there?

12  A    No, it is not.

13  Q    Okay.  Could you describe for the jury what you meant when

14  I believe you said that some times things are intentionally

15  deleted but then they are deleted normally by the computer.

16  I'm curious what that meant?

17  A    As an example when you open up Microsoft Word, 15

18  temporary files are created in the background.  It allows for

19  Microsoft Word to function more effectively.  Those temporary

20  files, when you're done editing that particular document, many

21  of those temporary files are automatically deleted by Microsoft

22  Word.

23  Q    Okay.  And those things will go into unallocated space?

24  A    Yes.

25  Q    Now, in the work that you did, I realize that you, and I'm

1    not asking you to describe what you talked to your attorneys

2    about, but the Rouse Hendricks firm hired you to do work,

3    correct?

4    A     Specifically, they hired BKD but yes.

5    Q     Okay.  In doing your work you were provided these images

6    of the hard drives, correct?  The five hard drives?

7    A     That is correct.

8    Q     You never spoke to any of the people from whose computer

9    that image was taken, did you?

10   A     No, I did not.

11   Q     You had no contact with them?

12   A     No, I did not.

13   Q     You don't know anything about their usage of the computer,

14   do you?

15   A     No, I do not.

16   Q     Now, you mentioned that really what you're doing, you

17   didn't mention this.  I'm going to ask you.  What you're really

18   doing.  Actually you mentioned it in your deposition but you

19   didn't mention it on the stand.  You really are not here today

20   to express opinions to the jury.  You are here just to state

21   the facts of what you found in your work, correct?

22   A     In my deposition when I was asked about whether I was

23   expressing facts or opinions, I was -- I misunderstood the

24   legal definition of an opinion.  And so, yes, I'm prepared to

25   present opinions.

1   Q    Well, and if you did express opinions, you did that with

2   Mr. Blegen in direct today, correct?

3   A    That would be correct.

4   Q    Now, I'm correct, aren't I, that you do not know who

5   installed, I'm focusing now just on Mr. Maxwell's computer.  I

6   heard what you said about Ms. Murley but I'm just going to

7   focus on Mr. Maxwell?

8   A    Okay.

9   Q    You don't know who installed the Shredder, can I call it

10  Shredder application?

11  A    You can call that, yes.

12  Q    But you don't know who installed that on his computer, do

13  you?

14  A    No, I do not.

15  Q    Now, you used some terms with Mr. Blegen in which you said

16  Shredder was used.  I'll put that in quotes.  You said Shredder

17  was run.  Can you describe, can you tell the jury what you mean

18  by the -- your use of the word that Shredder was used?

19  A    In -- computer people often use the term used and run

20  interchangeably.  The term is run.  It will appear as a running

21  process if you look in task manager.  But we use it

22  interchangeable.  Running is probably a more accurate term

23  here.

24  Q    Now, I'm not a computer person so I'm going to do a

25  pantomime here.  I'm opening up a laptop.

1   A    Okay.

2   Q    I want you to assume on my laptop is Shredder.

3   A    Okay.

4   Q    Somebody has put it on there.

5   A    Okay.

6   Q    I've opened up my computer.  I have turned the computer

7   on.

8   A    Okay.

9   Q    And I find where the Shredder application is.  I'm giving

10  myself that competence.  Then I click it and it comes up on the

11  screen?

12  A    Yes.

13  Q    Okay.  Are you saying that that means it was used and it

14  was run if that's all I do?

15  A    In this context, yes, running, as I said previously is a

16  more accurate term.

17  Q    But in reality Mr. Maxwell, Mr. Maxwell could have just

18  done what I just described, correct?

19  A    Potentially, yes.

20  Q    Potentially, yes.  You don't know one way or the other, do

21  you?

22  A    As I said previously Shredder doesn't keep track of its

23  activities.

24  Q    So what ever you told the jury, it doesn't mean that

25  anything was actually shredded by Mr. Maxwell, does it?  None

1  of your testimony goes that far, does it?

2  A    I was not able to make that determination, no.

3  Q    By shredded, you mean deleted?

4  A    No.  I mean overwritten with random characters.

5  Q    Okay.  That one page that's got all those interesting

6  hieroglyphics on it?

7  A    Yes.

8  Q    Now, I think in one of the exhibits that was used by

9  Mr. Blegen there was a list of files that Mr. Maxwell had?

10 A    I'm not certain which document you're referring to.

11 Q    Well, let me look.  Maybe I'm wrong.  My mistake.  You

12 were talking about Murley, not Maxwell.  Didn't have anything

13 to do with Mr. Maxwell.  Excuse me.

14          The recycle bin, I would like you to describe how

15 things get into a recycle bin?

16 A    There's several ways.  One can be simply highlight a

17 document or file and hit the delete key.  The default

18 configuration is for it then to wind up in the recycle bin.

19 You can also drag files and folders to the trash icon on your

20 desk top.

21 Q    Now, in contrast to your very detailed analysis of what

22 Ms. Murley did with her computer or someone did, I mean you

23 can't say it was Ms. Murley.  I want to go back to that.  You

24 can't say whatever you said was deleted from Ms. Murley's

25 computer, you can't say she did that?

1  A    I don't know who was sitting at the keyboard at the time,

2  no.

3  Q    Right.  But you didn't do any of that type of work on

4  Mr. Maxwell's computer, did you?

5  A    I'm not certain I understand the question.

6  Q    Well, Mr. Blegen didn't show anything about any deleted

7  files of Mr. Maxwell's, did he?

8  A    We didn't show, Syncback wasn't installed so no log files

9  were there, no.

10 Q    Totally different types of computer applications and

11 software involved in Ms. Murley's and Mr. Maxwell's?

12 A    Yes.

13 Q    So, again, just to close, while you can say that the

14 Shredder application was on Mr. Maxwell's computer and that it

15 was, I'm going to use the term, opened on that day, you cannot

16 tell the jury that anything was shredded or deleted from that

17 computer?

18 A    That is the nature of the tool, yes.

19 Q    Thank you.  I don't have any other questions.

20            THE COURT:  Redirect?

21            MR. BLEGEN:  None, Your Honor.

22            THE COURT:  None?

23            Okay.  Thank you, Mr. Mallery.  You may step down.

24                                    (witness excused.)

25            THE COURT:  What is next?

1        MR. AISENBREY:  Your Honor, next witness is Brian

2   Gardner.

3        THE COURT:  You know this is probably a good time to

4   break for lunch before we start with Mr. Gardner.

5        Please don't talk about the case.  Keep an open mind.

6   We'll see you back here at 1:15.  We'll be in recess.

7                       (Noon Recess)

8        (The following proceedings were had OUT OF THE

9   PRESENCE AND HEARING OF THE JURY:)

10       THE COURT:  You folks ready?

11       MR. MANCHEL:  Your Honor, one housekeeping matter if

12  we could we discussed it during the break.  The defendants

13  would like oral argument on the judgment motion and motion in

14  limine.  And as we stated in the brief that we filed yesterday

15  we do intend to submit the brief once the evidence actually

16  closes with Mr. Gardner.  Rather than interrupt the jury at all

17  the proposal we agreed to, if it's all right with the Court,

18  we'll proceed on with the first witness which is probably the

19  only witness we'll get to today, given the time changes of

20  during the break as long as the Court would note in the record

21  the judgment motions have been timely filed.  What we

22  requested, if we could have from 7:30 to 8:30 tomorrow, each

23  side a half hour.  That way the jury won't be interrupted.

24       THE COURT:  You have a half hour of stuff to say to

25  me you haven't already told me in writing?

1          MR. MANCHEL:  Well, I probably have about 15 minutes,

2   if I sit down and look through it between what we're hearing

3   today, what I think we'll hear from Mr. Gardner, a couple legal

4   issues worth highlighting, I probably have realistically 15

5   minutes or so.  Rather than disrupt the jury I would ask since

6   these were filed in advance of the evidence that we be able to

7   do so.  Both sides have agreed if it's okay with Your Honor.

8          THE COURT:  I mean, I'm always hesitant not to accept

9   something that is agreed to by the parties but I don't, I would

10  think I've looked at your submissions.  I would think you don't

11  have a lot to say you haven't already told me.  I would think

12  you would put important stuff in your written submissions.

13         Here's what we'll do.  We'll start at 8 tomorrow

14  morning.  I'll give each side 15 minutes to supplement what

15  ever they've told me in writing.  If you want to supplement

16  what you provided in writing, you may do that.

17         MR. MANCHEL:  We'll --

18         THE COURT:  I'll show both sides motions filed at the

19  close of the plaintiff's case.

20         MR. MANCHEL:  Thank you, Your Honor.

21         THE COURT:  Eva.  Bring the jury in, please.

22         (The following proceedings were had OUT OF THE

23  PRESENCE AND HEARING OF THE JURY:)

24         THE COURT:  Please be seated.

25         MR. AISENBREY:  Plaintiff calls Brian Gardner.

1        BRIAN GARDNER, PLAINTIFF'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3              MR. AISENBREY:  May I proceed, Your Honor?

4   BY MR. AISENBREY:

5   Q    Mr. Gardner, would you introduce yourself to the jury and

6   tell them where you're employed?

7   A    My name is Brian Gardner and I'm the general counsel of

8   Hallmark Cards here in Kansas City.

9   Q    And very briefly what does it mean to be the general

10  counsel?

11  A    I'm in charge of Hallmark's legal matters.

12  Q    Briefly, Mr. Gardner, would you give the jury an overview

13  of your education after high school and your employment history

14  before Hallmark?

15  A    I went to college at Iowa State University in Ames, Iowa

16  and went to law school at the University of Iowa, in Iowa City,

17  Iowa.  Following law school I came down to Kansas City and

18  began working for a law firm, Morrison and Hecker.  And in

19  2001, 2002 that firm merged with another law firm here in town

20  which is now Stinson, Morrison, and Hecker.  And I was there

21  for a year before I began my employment at Hallmark Cards.

22  Q    And so you've been general counsel at Hallmark since?

23  A    2003, December of 2003.

24  Q    Mr. Gardner, when did you first learn, Hallmark first

25  learn of the acquisition of RPG that was involved with Monitor

1  Clipper?

2  A    We first learned of that in, I believe, November of 2005

3  from an article that appeared in, I think, a Moody's report

4  that said that Monitor Clipper Partners had purchased Recycled

5  Paper Greetings.

6  Q    What was your reaction on learning that?

7  A    Well, we were concerned.  The business group at Hallmark

8  contacted the legal division and asked us to look into the

9  matter.

10 Q    And what did your investigation consist of?

11 A    Well, we first pulled up our contract that we had with

12 Monitor Consulting Group and reviewed it.  And then we obtained

13 a Dun and Bradstreet report that --

14 Q    What's a Dun and Bradstreet report?

15 A    Dun and Bradstreet is an organization that's been around

16 since the 1800s that assembles corporate information, both

17 financial information for corporations and also assembles

18 corporate governance information, corporate governance

19 structure information.  So we obtained a report from Dun and

20 Bradstreet with respect to be Monitor Clipper and its

21 relationship to Monitor Group.

22 Q    From that what did you understand the relationship to be?

23 A    That report indicated that Monitor Clipper Partners was a

24 subsidiary of the Monitor Group.

25 Q    Now, did this news of the acquisition of RPG concern you?

1    A    Well, as we began to investigate it, we learned that the

2    documentation that we had provided to Monitor and the work that

3    they had done was still residing at Monitor.  And as we looked

4    into the web pages that Monitor Clipper had and Monitor, there

5    was a clear suggestion that Monitor Group shared its

6    information with Monitor Clipper.  And that concerned us a

7    great deal because they had done this consulting work for us

8    back in the 2001, 2002 time frame.

9    Q    When you say they, you mean Monitor Consulting?

10   A    Monitor Consulting had done that, yes.

11   Q    Now, as a result of your investigation did you write a

12   letter?

13   A    Yes, I did write a letter to Monitor.

14   Q    Can you tell us if Exhibit 233, which I've handed to you,

15   is that letter?

16   A    Yes, this is the letter that I sent.

17            MR. AISENBREY:  Your Honor, it's stipulated.

18   Plaintiff's Exhibit 233.

19            THE COURT:  Yes.  It's already admitted.

20   BY MR. AISENBREY:

21   Q    Mr. Gardner, it's up on the screen there or you can refer

22   to the paper copy.  What was your purpose in writing this

23   letter?

24   A    Well, we really had several purposes in writing the letter

25   to Monitor.  One, we wanted to return, have returned to us from

1    Monitor the information that we had shared with them as part of

2    the consulting group work and we wanted also the work product

3    that they had produced for us returned to us.  That was the

4    first thing that we wanted.

5            The second was that we wanted their assurance that

6    they had shared none of our confidential information with

7    Monitor Clipper.

8            And then, finally, we put them on notice that they

9    should retain and keep and preserve their internal

10   documentation that they had.

11   Q    The notice at the top of your letter there, it has two big

12   all capital headings.  One says notice and obligation to retain

13   document.  Is that what you're referring to?

14   A    Yes.

15   Q    Is that sometimes referred to as a litigation hold?

16   A    Yes, it is.

17   Q    Then the other thing you asked for is demand for the

18   return of all Hallmark related documents?

19   A    Yes, that's correct.

20   Q    Can you explain how they could return everything Hallmark

21   related and still have a litigation hold?  What is your

22   understanding of how that would work?

23   A    Well, we wanted back all of our original information that

24   they had in their possession.  And it's common in that

25   situation that a copy of that information could be maintained

1    forensically and kept separate from any Monitor people and with

2    their attorneys so that they would have a record of what they

3    returned to us.  But we also, beyond that, wanted them to

4    maintain the e-mail correspondence that they may have shared

5    with Monitor Clipper along with any other documentation that

6    they had relating to the acquisition and their involvement in

7    the acquisition of Recycled Paper.

8    Q    I think I meant to ask you this.  What do you mean by

9    litigation hold?

10   A    Well, a litigation hold is a term that we use that is to

11   preserve the evidence that a company may have with respect to a

12   specific matter that's at issue.  That means to keep computer

13   records and e-mails and the computer systems intact and hold

14   any documents that might be related to the issue at hand.

15   Q    Does that include paper files as well?

16   A    Yes, it does.

17   Q    Now, when you wrote this letter did Hallmark initiate a

18   litigation hold?

19   A    Yes, we did.

20   Q    Did you write a letter similar to this letter to Clipper

21   at the time, to Monitor Clipper similar to Exhibit P233?

22   A    We did not because we included in this letter a specific

23   reference to Monitor Clipper.  We had understood that they were

24   a subsidiary of Monitor and we specifically, I'm looking for it

25   in the document, but we specifically requested that they advise

1  Monitor Clipper that they should also put the same litigation
2  hold in place.
3  Q    And on the screen we're highlighting from page, I think it
4  is, 3.
5  A    Yes.  That's the language I was referring to.
6  Q    And you refer to them, whatsoever form including
7  electronic, whether in the custody or control of Monitor
8  Company Group LP, is that the consulting firm?
9  A    Yes.
10 Q    Or any of its operating companies including Monitor
11 Clipper, is that right?
12 A    Yes, that's correct.
13 Q    Could we go to the first page, please?
14          Now, in the first page of this letter you opened by
15 telling them you were shocked to learn that you, being Monitor
16 Group, are entering into direct competition with Hallmark
17 Cards.
18          Why did you think Monitor Group was entering into a
19 competition with Hallmark?
20 A    We believed at the time, based on the information we
21 received in the Dun and Bradstreet report, it was a direct
22 subsidiary, wholly owned by the Monitor Consulting Group.
23 Q    I see.  You said you looked at their website?  We've got
24 some quotations here in the second paragraph.  In the second
25 sentence you say, Monitor and Monitor Clipper are located in

1   the same building.  Monitor dot com website reveals that

2   Monitor Clipper has privileged access to the proprietary

3   resources of the Monitor Group.  And the close proximity of the

4   group companies within the Cambridge office allows for ready

5   collaboration.  Where did you get those quotes?

6   A    Those were taken from their websites that were in place at

7   the time.  That was part of the research we did to see what was

8   going on with respect to this acquisition by Monitor Clipper.

9   Q    Next page at the top, please.  Page 3.

10          We were just looking at it.  It also says Monitor

11  Clipper identifies a substantial number of its potential

12  investments through Monitor's business relationships and

13  through initiatives to target industries where Monitor has

14  significant knowledge and expertise.

15          Where did you get that quote?

16  A    That was from Monitor Clipper's website, I believe.

17  Q    So you wrote this letter to Monitor and you told us why

18  you didn't write one to Monitor Clipper.  Were you trying to

19  prevent Monitor Clipper or Monitor from competing with Hallmark

20  through RPG?

21  A    No, we were not.

22  Q    Was it your understanding that Monitor was free to consult

23  with any company in the greeting card industry they wanted to

24  in the fall of 2005?

25  A    We reviewed the contract that we had with Monitor.  And we

1  understood that they had the right to consult with other

2  people.  But the contract specifically prohibited them from

3  sharing any of our confidential information that we had shared

4  with them or any of the confidential information they had

5  prepared for us as part of a business model review.  That was

6  our concern.

7  Q    What is the importance of making sure that somebody, some

8  other company doesn't have Hallmark's trade secrets?  The legal

9  importance, from your point of view as a chief legal officer,

10 why are you trying to protect trade secrets?

11 A    We have an obligation if we have trade secrets to maintain

12 their confidentiality.  And if we learn that someone may have

13 had access to them to take immediate steps to cut that off at

14 the pass so that we can preserve the status of those trade

15 secrets.

16 Q    Your letter requested assurances.  Did you get any

17 assurances from Monitor that you requested?

18 A    Well, Monitor told us that they had not shared any of our

19 information with Clipper.

20 Q    Mr. Gardner, this is Exhibit 284.  It was admitted for use

21 this morning.  And can you tell the jury what this is?

22 A    Well, this is a letter from Monitor's lawyer, Laura

23 Steinberg, to you, Mr. Aisenbrey.

24 Q    And it was written on January 6, 2006?

25 A    That's right.

1    Q    And if you could turn to the third paragraph on the first

2    page there.

3    A    Yes.

4    Q    She writes that on Monitor's behalf I have spoken with

5    members of the Monitor Clipper Partners L.L.C., Monitor Clipper

6    team, who worked on the RPG acquisition.

7            Then near the end of the paragraph she states, my

8    client Monitor had no involvement in William Blair's outreach

9    to Monitor Clipper nor was Monitor involved in Monitor

10   Clipper's ensuing analysis of the RPG investment opportunity.

11   Based on my inquiries of Monitor personnel, it appears that no

12   confidential or proprietary information of Hallmark in

13   Monitor's possession has ever been shared with Monitor Clipper.

14   So this is the reply you got from Monitor?

15   A    Yes.

16   Q    And did you, you said you didn't write a letter to Monitor

17   Clipper.  Did you take any steps to contact Monitor Clipper?

18   A    Our counsel took steps to contact Monitor Clipper's

19   counsel directly.

20   Q    Mr. Gardner, I've handed you Exhibit D925.

21           Which I believe is stipulated, Your Honor.

22           THE COURT:  Say the number again.

23           MR. AISENBREY:  D925.

24           THE COURT:  It's been pre-admitted.

25

1    BY MR. AISENBREY:

2    Q    Can you tell the jury, Mr. Gardner, what -- this is an

3    e-mail, is that right?

4    A    Yes.  It's an e-mail from James Westra, who was an

5    attorney for Monitor Clipper, to you.

6    Q    And if we look at the paragraph text of this first e-mail

7    he writes, we represented Monitor Clipper Partners in

8    connection with its acquisition of RPG.  In accordance with the

9    request made in your letter of 17 January 2006 Laura Steinberg,

10   counsel for Monitor Company, furnished me with copies of your

11   correspondence.  I have spoken with representatives of MCP who

12   have assured me that no confidential information of Hallmark

13   has been supplied to MCP nor will it be in the future.

14          It goes on to say, he's in London and talk later if

15   he could.

16          Is that the e-mail that came to your attention in

17   January of 2006?

18   A    Yes.  It did come to my attention that they were advising

19   us that they had not received our information and would not

20   utilize it in the future.

21   Q    And he recites in there, as Ms. Steinberg did, that they

22   have spoken with representatives of MCP, is that right?

23   A    That's correct.

24   Q    She said she had spoken with representatives who worked on

25   the acquisition, is that correct?

1    A    Yes, she said that.

2    Q    Mr. Gardner, on the screen is Exhibit 487.  The regular

3    copy of that is sitting in front of you by the microphone.

4    Have you seen this document before?

5    A    Yes, I have.

6    Q    This is the e-mail that Mr. Doctoroff received on

7    August 25, 2005 from Mr. Pauker, is that right?

8    A    Yes, that's what it is.

9    Q    So this is, August 25 would be three, little over four

10   months before Ms. Steinberg and Mr. Westra both reported to you

11   about Monitor Clipper, is that correct?

12   A    That's correct.

13   Q    Now, when did you learn about the contents of Exhibit 487?

14   A    I learned about the contents of this e-mail, 487, Exhibit

15   487 in May of 2008, almost two and a half years later.

16   Q    Now, one of the things you asked for in your letter to

17   Monitor, Exhibit P233, was that they return all the documents,

18   right?

19   A    Yes, that's correct.

20   Q    Did they do that in a prompt fashion?

21   A    No, they did not.

22   Q    What did you do in response?

23   A    Again, as I mentioned earlier, we had a duty to proceed

24   quickly to try to make sure that our trade secrets were

25   corralled.  And so because they were dragging their feet and

1    getting documentation back to us that we had requested in

2    November, we filed an arbitration action at the end of January

3    specifically seeking return of our documents.  And that's what

4    we asked for in that arbitration action.

5    Q    And when you filed it, did you, what was the prayer, what

6    were you asking the arbitrator to do?

7    A    To order them to return our documents to us.

8    Q    Now, that arbitration ultimately concluded in March of

9    2007, is that right?

10   A    That's correct.

11   Q    And as a result of that, there was an injunction,

12   Ms. Steinberg explained an injunction for Monitor to make an

13   exhaustive search of its offices, is that correct?

14   A    Yes, there was that injunction that was entered.

15   Q    After that arbitration was concluded, did you have further

16   communications with Monitor Clipper?

17   A    Yes.  Right after that arbitration was concluded our

18   counsel contacted Monitor Clipper to follow up with them.

19   Q    I've handed you what has been previously admitted as

20   Exhibit P348.  Is this the letter that counsel, is this the

21   letter you just referred to?

22   A    Yes, that's the letter that --

23   Q    That's May 14, 2007?

24   A    That's correct.

25   Q    And in the letter at the top, it's a letter, excuse me, I

1   have to introduce it to the jury.  It's a letter that's from

2   Mr. German to William Young and Patrick O'Toole, is that right?

3   A    That's correct.

4   Q    And Mr. Young, you understand to be one of the leaders of

5   Monitor Clipper, do you not?

6   A    Yes.  He was the head of Monitor Clipper is my

7   understanding.

8   Q    And if we could go to the top of page 3, please.

9        It actually is a sentence that carries over from the

10  page before it but it's just a little bit.

11       It starts out because the Monitor injunction does not

12  cover the electronic systems of its affiliates such as MCP,

13  servers about which Mr. Doctoroff testified, you are advised

14  that your legal duty to preserve, retain and protect all

15  possibly relevant evidence including electronic evidence in

16  whatever form and wherever it resides is continuing.

17       Did you approve this in advance?

18  A    Yes, I did.

19  Q    What did you mean by it's continuing?

20  A    It was continuing from the notice that we had sent out in

21  my November letter to them.

22            MR. MANCHEL:  Objection, Your Honor.

23            THE COURT:  Step up.

24            (COUNSEL APPROACHED THE BENCH AND THE FOLLOWING

25  PROCEEDINGS WERE HAD:)

1       MR. MANCHEL:  It's pretrial about using the testimony

2   of a witness to talk about the, what did you mean by when you

3   say it's continuing.  Not this witness's letter.  This is a

4   letter witnessed by counsel.

5       MR. AISENBREY:  He approved it in advance.  I asked

6   him that question.

7       MR. MANCHEL:  Question to which I objected, what did

8   you mean by is continuing.  The only person who can testify

9   about what that means is the author of the letter.

10      THE COURT:  Well, I'll allow the witness to testify

11  as to what his understanding is.

12      MR. AISENBREY:  I'll ask him that.  That was a poor

13  question.  I'll rephrase it.

14      MR. MANCHEL:  For the record, so it won't keep coming

15  up, the continuing objection is that's why we believe we should

16  have been permitted to take the deposition of the counsel who

17  wrote that and that they should not have been attorneys

18  representing in this case.  And the warning from the Court was

19  if you need the testimony of counsel in order to make out your

20  claims, it's not going to be permitted.  So here we are with a

21  perfect example of spoliation claim on a letter that went to

22  Monitor, not Clipper.  And they're bootstrapping that letter on

23  now what this letter says.  Sent a letter to Monitor and saying

24  it's continuing.  Clipper was put on notice of spoliation.  We

25  have not been able to take the deposition of actions --

1    MR. AISENBREY: Mr. German could only say, if he

2  testified, the issue is what Mr. Young knew. Mr. Young

3  testified he had the letter from November 22. He saw it, read

4  it. The jury can decide if he should have acted on it or not.

5    THE COURT: The record will reflect your continuing

6  objection.

7    MR. MANCHEL: Thank you, Your Honor.

8    (THE PROCEEDINGS RETURNED TO OPEN COURT.)

9  BY MR. AISENBREY:

10 Q   Mr. Gardner, now I believe the question is, what did you

11 understand the text of the letter that you approved in advance,

12 the sentence I just read, I'm not going to read the whole thing

13 but has to do with the issue of duty to retain evidence being

14 continuing. What was your understanding of that?

15 A   Well, we had sent a notice out in my November letter, we

16 saw that earlier, to preserve their documentation and

17 specifically called out that Monitor Clipper should do exactly

18 that. And we did not want them to in any way, shape or form

19 think that the obligation to do that ended because the

20 arbitration was over. This was a continuing obligation for

21 them to maintain and preserve the documentation that would have

22 been in existence back in the November 2005 time frame and

23 thereafter.

24 Q   Mr. Gardner, this is Exhibit P349 which I believe is also

25 in evidence.

1    THE COURT:  Plaintiff's Exhibit 349?

2    MR. AISENBREY:  Yes, sir.

3    THE COURT:  I don't show it as --

4  BY MR. AISENBREY:

5  Q    Can you identify the letter, please, sir?

6    Apologize, Your Honor.

7  A    Yes.  It's a letter dated June 15 to Mr. German from

8  Monitor Clipper's lawyer, Patrick O'Toole.

9  Q    Did that letter come to your attention?

10 A    Yes, it did.

11   MR. AISENBREY:  Your Honor, the exhibit is stipulated

12 as authentic and I offer it.  The authenticity is stipulated.

13   MR. MANCHEL:  Same objection, Your Honor.

14   THE COURT:  The objection is overruled.  The exhibit

15 is admitted.

16 BY MR. AISENBREY:

17 Q    If you could turn, well, first of all, this first

18 paragraph, Mr. O'Toole is the author of this letter, is that

19 right?

20 A    That's correct.

21 Q    And he says he's counsel for Monitor Clipper Partners and

22 responding to Mr. German's letter that we just saw a few

23 minutes ago which was Exhibit 348, is that right?

24 A    Yes, that's correct.

25 Q    And in the first paragraph there he says in the second

1  sentence, based on our understanding to date we are aware of no

2  basis to suggest that either MCP employees accessed

3  confidential information from Monitor Company Group Limited

4  Partnership, Monitor, or that Monitor employees delivered such

5  information to MCP employees.

6  A    Yes, I see that language.

7  Q    And then on the second page, the next to last paragraph.

8  You also included Mr. Gardner's letter of November 22, 2005 to

9  Monitor.  And he writes as we believe Mr. Gardner was informed

10  MCP is not and never has been a subsidiary of Monitor.  To our

11  knowledge, prior to your May 14, 2007 letter, Hallmark had

12  never requested MCP to produce or preserve any documents.

13  That's what Clipper responded, is that right?

14  A    Yes, that's part of their response.

15  Q    And in the letter, Mr. German's letter, Exhibit 348, he

16  cites and I think you have it there, there is a copy of your

17  letter of November 22, 2005 sent to Clipper, is that right?

18  A    That's right.

19  Q    In that letter we saw this morning you had requested that

20  Monitor notify or tell its operating companies, including

21  Monitor Clipper, that they had a duty to retain documents.  Do

22  you recall that testimony you just gave?

23  A    Yes.  That was in my original letter of November 22.

24  Q    But you wrote a letter to Mr. Samuelson of Monitor, didn't

25  you?

1    A    Yes.

2    Q    Your letter of November 22?

3    A    And to Mr. Lurie, I believe.

4    Q    Because you understood Clipper was a subsidiary at the

5    time that you explained, is that correct?

6    A    Yes.

7    Q    Now, Exhibit 274S, --

8         MR. AISENBREY:  P274S is a letter which I believe was

9    admitted this morning, Your Honor.

10        THE COURT:  Yes.

11   BY MR. AISENBREY:

12   Q    Tell the jury just briefly, I think they saw it this

13   morning, what this is?

14   A    It's dated July 16 and it's to Mr. German and it's from

15   Monitor Clipper's counsel, Mr. O'Toole.

16   Q    In the first paragraph he states to Mr. German, thank you

17   for your June 29, 2007 letter and our July 10 and 12, 2007

18   discussions.  I believe our meeting and discussions have been

19   productive and demonstrate Monitor Clipper Partners' good faith

20   attempts to address Hallmark's concerns regarding whether

21   Monitor provided MCP with allegedly confidential information

22   relating to the 2001, 2002 Monitor Hallmark engagement.

23        You got a copy of this letter, is that right?

24   A    Yes, I did.

25   Q    What was your understanding of the situation that, what

1  was your understanding of what Mr. O'Toole is trying to tell

2  Hallmark?

3  A    Well, we were concerned, remained concerned that Monitor

4  Clipper may have obtained our confidential information.  And we

5  were trying to work out a protocol to insure that even if they

6  had received some information that might have been not --

7  Hallmark information but yet our information that we got that

8  information back and off of their computers.  So we were trying

9  to work out an arrangement where we could confirm that they, in

10 fact, had not received the Hallmark confidential information.

11 To confirm what Mr. Doctoroff had testified to back in his

12 deposition in August of 2006.

13 Q    The bottom of the first page of this letter, Mr. O'Toole

14 goes on and with the letter he encloses some, I think the term

15 is redacted but it means certain information blocked out, some

16 e-mails from Mr. Doctoroff, does he not?

17 A    Yes.

18 Q    At the bottom of the letter on the first page he states

19 these e-mails demonstrate that MCP, specifically, did not

20 request Hallmark confidential information from Monitor.  He

21 goes on to describe the e-mails, right?

22 A    Yes, he does.

23 Q    Did you focus on the fact that he, in the third paragraph,

24 he says, specifically, did not request, while in the top

25 paragraph he started by saying this represents our good faith

1   attempt to address Hallmark's concerns regarding whether

2   Monitor provided MCP with allegedly confidential information.

3   Did you catch the distinction between the first and third

4   paragraphs?

5   A    I did not.

6   Q    Now, we've heard testimony about a confidential agreement.

7   Can you tell us what that is?

8   A    Well, as I mentioned in this letter, July 16, there was

9   ongoing discussions with Monitor Clipper.  We were trying not

10  to have to get into any additional litigation with anyone with

11  respect to our documentation.  We were trying to get a

12  confirmation that they didn't have any of our confidential

13  information in their possession or on their computer systems.

14  And we were trying to negotiate a protocol where we could get

15  assurances that their systems had been checked and that on

16  those systems nothing had been retained and that they, in fact,

17  had not received any of our Hallmark confidential information.

18  Q    Now, did you reach that agreement with Clipper?

19  A    Well, ultimately, we did.  In October of 2007 we entered

20  into what is referred to as a confidential agreement.

21  Q    Now, before we get to the agreement itself.  Was that a

22  subject of some negotiation?

23  A    Lengthy, lengthy negotiation, yes.

24  Q    Do you recall when it started?

25  A    It would have started, I think, in the May June time frame

1  right after Mr. German's letter to Mr. O'Toole.

2  Q    This is Exhibit D516.  Is that the confidential agreement

3  that we've been talking about?

4  A    Yes.  That's a copy of the agreement.

5         MR. AISENBREY:  Your Honor, I believe this is in

6  evidence.

7         THE COURT:  It's been pre-admitted.

8  BY MR. AISENBREY:

9  Q    Now, Mr. Gardner, I want to talk to you a little bit about

10  Hallmark's purpose in entering into this agreement.  You told

11  us you wanted to assure yourself that Clipper did not have

12  information from Hallmark, is that right?

13  A    That's correct.

14  Q    And it has a procedure in it for Clipper to conduct a

15  search though, doesn't it?

16  A    Yes, it does.

17  Q    And if you didn't think they had any of your materials

18  what were they going to search for?

19  A    Well, we had through the arbitration proceeding and

20  limited discovery that had gone on there, gotten little bits

21  and pieces of information that Monitor Clipper people were

22  talking to Monitor people.  And we learned that there was a

23  standing case team that worked solely for Monitor Clipper.  And

24  we thought that if there was any information on their system,

25  even if it was information that was not designated and

1 highlighted so they could know it was Hallmark information, we

2 wanted to get that off their system and we wanted that

3 information back to us. So we were wanting to confirm what

4 they had said repeatedly to us, that they hadn't obtained any

5 of our information and we wanted a check of their systems to

6 confirm that.

7 Q    And the date of this agreement is October 17, 2007. At

8 that time Clipper was still involved in the management of RPG,

9 was it not?

10 A    Yes, they were.

11 Q    Paragraph 1 of the agreement, it is going to be very hard

12 to read, but this is the part that deals with the search, is

13 that right?

14       Excuse me. I misspoke. This is the part that deals

15 with a review of the investment overview, is that correct?

16 A    Yes. We learned in the arbitration that there was some

17 sort of an investment presentation that was made as part of the

18 purchase of RPG. And we wanted to make sure that there was

19 none of our confidential information that was in that

20 presentation.

21 Q    So it starts off with paragraph 1 says, MCP will produce

22 portions of the September 2005 MCP investment committee

23 presentation regarding RPG transaction to Hallmark's outside

24 counsel, Charles German and John Aisenbrey, and then we're

25 defined as the outside counsel, is that correct?

1    A    That's correct.

2    Q    And then if you would highlight, there is a sentence that

3    starts with respect to any review, do you see that?

4         With respect to any review or procedure by MCP

5    relating to this paragraph, MCP shall be able to withhold from

6    this disclosure only data that came from RPG, MCP or from any

7    sources other than Monitor, other Monitor entities or other

8    employees or former employees.

9         Is that right?  So what was the intent of this?

10   A    Well, it was two-fold.  One, Monitor Clipper was very,

11   very concerned that we not see any confidential Recycled Paper

12   information.  We were not interested in seeing any of that.

13   And they were going to be able to keep that out of anything

14   they were going to present to us.  But with respect to any

15   information that may have come from Monitor, they were not

16   allowed to redact that so we could take a look at that.

17   Q    When you say redact, you mean block out?

18   A    Block it out, yes.

19   Q    Paragraph 8 on page 4.

20        The first line says, the goal of this process is to

21   avoid litigation.

22        Do you agree with that?

23   A    Absolutely.  We weren't interested in having another

24   prolonged litigation.

25   Q    Neither party makes any admission by entering into this

1  confidential agreement.  Then it goes on, as material

2  consideration for MCP's entering into this confidential

3  agreement, except with respect to claims based on evidence of

4  intentional misconduct and or breach of the representations and

5  warranties in this confidential agreement relating to the

6  procedures described in steps 1 through 6 or the confidential

7  mutual release, Hallmark in its own behalf and then it has a

8  lot of what I'll characterize as legal language, leads down to

9  Hallmark will issue this release, is that right?

10  A    Yes.

11  Q    So if there is evidence of intentional misconduct, they

12  don't get the release?

13  A    They don't get the release.  We have an absolute right to

14  bring a lawsuit against them.

15  Q    And if there is a breach of representations and warranties

16  in the agreement, they don't get their release there either?

17  A    They don't get the release there and we have an absolute

18  right to bring a lawsuit.

19  Q    Are representations, I didn't mean to interrupt you.  I'm

20  sorry.  Are representations and warranties, is that just

21  promises made in the agreement, statements made in the

22  agreement?

23  A    Basically, yes, yeah.

24  Q    Now, we're here so we know Hallmark actually brought the

25  lawsuit in November of 2008, right?

1 A    Yes, we did.

2 Q    Why?

3 A    Well, in May of 2008, let me back up just a moment.  In

4 October we signed this agreement.  And for a long period of

5 time there were negotiations over search terms.  It was

6 ongoing.  And simultaneously with that, Monitor was complying

7 with the injunction that had been issued to search their

8 computers and remove any Hallmark information and advise us if

9 they had sent it out to any third party.

10          In May 2008, we received word from Monitor that they

11 had identified the e-mail that was sent from Jeffrey Pauker to

12 Adam Doctoroff, Grant Brown, Megan Kahn and Peter Kim

13 forwarding our business model review materials to Monitor

14 Clipper.  And we learned that in May of 2008.

15          So at that point we were dismayed that that

16 information had, in fact, been shared directly to Monitor

17 Clipper.  We were in the middle of the protocol to look, to

18 have them continue to do a search.  We contacted them and

19 advised them of this and asked for an explanation.  Not much of

20 an explanation was forthcoming from them with respect to that.

21 And then in late August of that summer of 2008, we learned that

22 from a filing of Laura Steinberg, an affidavit or declaration

23 she filed here in the court in Kansas City, that she had

24 advised Monitor Clipper that this e-mail had been sent back in

25 July of 2007 when we were negotiating the confidential

1  agreement and that they had known for over a year that this

2  e-mail had been sent with these attachments.  And we asked that

3  where the status of the search was a couple more times.  We

4  didn't hear anything of any consequences back from them.  And

5  we believed that we had overwhelming evidence of intentional

6  misconduct on the part of Monitor Clipper and we proceeded.

7  Q    You said that you learned from Monitor in May of 08.  Is

8  that the communication that Laura Steinberg made?

9  A    Yes.  She contacted, I believe, you, Mr. Aisenbrey, and

10  advised you that she had located an e-mail.  It took her awhile

11  to get more of the details to us but we finally got those later

12  in May and began to see a broader picture here.

13  Q    Handing you Exhibit D973.  Can you identify that?

14  A    Well, it's a group of e-mails between, I think, Mr. Blegen

15  and Patrick O'Toole, a lawyer for --

16         I'm sorry.

17  Q    That's fine.  So this is a several page document, is that

18  right?  If you look at the first page, well, first of all,

19  let's cover who it's from.  This is from Mr. O'Toole, who we

20  heard from this morning, to DB at RHGM.  Do you know that to be

21  Dan Blegen's e-mail address?

22  A    Yes, it is.

23  Q    In his first paragraph he says, the local replica of the

24  Lotus notes mailbox as well as the local mail archive were

25  searched.  The mailbox has been fully synced with the server.

1  They're talking about the search terms, is that right?

2  A    I believe so, yes.

3  Q    And in paragraph 2 he says, we assume that the e-mail was

4  deleted because we have been unable to locate the e-mail in the

5  mailbox or elsewhere on the laptop.  The only reference we have

6  found to the e-mail is in a Blackberry back-up.

7       And the e-mail that's the subject of this is

8  discussed on the second page, that's the e-mail that

9  Ms. Steinberg had told Hallmark about, is that right?

10 A    Yes, that's correct.

11 Q    If you turn to the second page, an earlier e-mail in the

12 bottom of page 2, Mr. O'Toole is writing, again, earlier.  This

13 is on June 2, is that right?

14      There it is on the screen.  June 2, Mr. O'Toole

15 writes to Mr. Blegen?

16 A    Yes.

17 Q    And he's giving him information about the search.  In the

18 middle he says, however we have found evidence that the e-mail

19 was received.  Based on an analysis of the Doctoroff machine

20 we've not discovered any indication or evidence that the e-mail

21 was forwarded or that the attachments were opened, saved or

22 printed.  We do not have access to the Kim machine.  You

23 understand that's Peter Kim?

24 A    Yes.  Peter Kim who was on the same e-mail with

25 Mr. Doctoroff.

1    Q    And it says he left MCP in July 2006 and his computer was

2    wiped clean.  So they're not going to find anything on Mr. Kim

3    either, is that right?

4    A    Apparently not.

5    Q    Then let's look at Ms. Steinberg's declaration you

6    referred to.  This is Exhibit P269S.  This is the declaration

7    of Laura Steinberg in opposition to plaintiff's motion for

8    relief from judgment.  You've seen this before, is that right?

9    A    I have.

10   Q    If you would turn to page 31, please.

11   A    Did you say 31?

12   Q    31, yes.  Paragraph 68.  Steinberg described how she was

13   concerned as to the import of Hallmark's query regarding Megan

14   Kahn.  My understanding was that Ms. Kahn had only nominally

15   participated in the RPG due diligence efforts.  I therefore ask

16   to have Ms. Kahn's e-mail reviewed so that I could try to

17   determine whether there was any financial information that

18   would need to be pursued.  I received a printed out copy of the

19   results of searching Ms. Kahn's e-mail with the search terms

20   that were then under discussion.  I looked through those items

21   on July 5, 2007.  It was then that I learned for the first time

22   that Steve Levin of Monitor had electronically transmitted

23   three Hallmark presentations to a Monitor employee, Jeffrey

24   Pauker, who was then assigned to the Monitor case team that did

25   work for Monitor Clipper in August 2005.  And that Mr. Pauker

1  had in turn forwarded those presentations to Grant Brown who

2  was a leader of the Monitor case team and to Megan Kahn who was

3  another junior member of that case team and also to two Monitor

4  Clipper employees, Adam Doctoroff and Peter Kim.

5          She goes on and said she had no inkling of that prior

6  to learning that.  She also learned, in the next sentence, from

7  my review over the next several days that Grant Brown had in

8  fact received copies of the documents that Annica Blake had

9  saved to her desktop with the new Grant names.  Do you know

10 what she's referring to there?

11 A    I believe those are two other parts of the Monitor work

12 that they did for us with respect to the industry and small

13 competitors and the like.

14 Q    Then in paragraph 69, after informing Monitor's management

15 of this new information, I undertook an investigation with the

16 goal of developing as much information as possible as to what

17 had happened, who had been involved and what document trail

18 there was.  Over the next months I took the following actions.

19 The first bullet is.  She says in mid July 2007 I advised

20 lawyers for Monitor Clipper of this information and requested

21 that they cause a search to be undertaken of Monitor Clipper's

22 electronic systems to determine whether Monitor Clipper had

23 evidence of having received, retained or used any of these or

24 any other Hallmark documents.  In order to facilitate such a

25 search I arranged to have Monitor Clipper receive information

1    as to the search terms that Monitor expected to use.  I

2    suggested individuals whose computers and networks spaces I

3    thought should be examined.

4         Then in the next bullet she says, I asked Monitor

5    Clipper's lawyers to interview certain present and former

6    Monitor Clipper employees.  I analyzed the contents of the

7    documents that I had learned had been shared with Monitor

8    Clipper and then met with a Monitor Clipper lawyer to share

9    specific facts about those documents with him.  I did this to

10   place Monitor Clipper's counsel in a position to conduct

11   meaningful interviews.

12        When you got this declaration, Mr. Gardner, what was

13   your reaction to it?

14   A    Well, I was dumbfounded that they had all of this

15   information back in 2007 and did not share it with us in 2007.

16   They clearly had had the information back in 2005 and 2006.

17   Monitor was aware of it.  And Mr. O'Toole, who was

18   corresponding with us in 2007 and negotiating the confidential

19   agreement, knew all about this Adam Doctoroff e-mail and also

20   knew about the fact that Grant Brown had obtained other

21   information from Annica Blake and shared that with Monitor

22   Clipper.

23   Q    You got this, this is dated August 21, 2008, is that

24   right?

25   A    Yes.  I received it some time after that.

1    Q    And that came from a filing that Monitor made in court, is

2    that right?

3    A    That's correct.

4    Q    Had Clipper ever communicated to your knowledge any of

5    this information to Hallmark before this, you got this

6    declaration?

7    A    Well, Monitor Clipper never shared any of this with us.

8    The only information we had when this was filed was what we had

9    from what Ms. Steinberg had shared with us in May of 2008.  We

10   did not know anything about her correspondence and

11   communications with Clipper, what they --

12            MR. AISENBREY:  Your Honor, may I use the board?

13            THE COURT:  Yes.

14   BY MR. AISENBREY:

15   Q    So I want to get this chronology down briefly,

16   Mr. Gardner.  In January of 2006 we saw Ms. Steinberg for

17   Monitor and Mr. Westra for Monitor Clipper, both denied that

18   Clipper had received any Hallmark confidential information, is

19   that right?

20   A    That's right.

21   Q    Then you're aware Mr. Doctoroff gave a deposition in the

22   arbitration you referred to, are you not?

23   A    Yes.

24   Q    That was in August 23, 2006?

25   A    Yes.  I reviewed his testimony.

1   Q    And Mr. Doctoroff's position about whether he received any

2   Hallmark information in that deposition was what?

3   A    He specifically denied that he had received any

4   information, any Hallmark confidential information from

5   Monitor.

6            Mr. Aisenbrey, I can't see that as far back as you've

7   got it.  Sorry.

8   Q    Well, it's really for the jury's benefit.

9   A    Okay.

10  Q    Then June 15, you saw Exhibit 314, 349, Mr. O'Toole wrote

11  to Mr. German, June 15, 2007, is that right?

12  A    Yes.

13  Q    And he denied it, again?

14  A    Yes, that's correct.

15  Q    Then in July of 2007 to October of 2007, you're

16  negotiating the confidential agreement, is that right?

17  A    Yes, that's correct.

18  Q    And then you told us in May, late some time in May 2008

19  Ms. Steinberg advised of the e-mail, advised Hallmark of the

20  e-mail, is that right?

21  A    Yes.  She sent it in early May but before we were able to

22  put together the puzzle of what she was saying to us it took us

23  until the end of May to determine that.

24  Q    Then August 21 she writes this declaration, is that right?

25  A    Yes, that's correct.

1  Q    2008?

2  A    Yes.

3  Q    Now, until she writes the declaration, you've never heard

4  from Clipper about any of these e-mails, is that right?

5       487 and the small competitor documents, Clipper has

6  not told Hallmark they have the documents?

7  A    About the small competitor?

8  Q    Industry trends, small competitors are the ones that are

9  included in Exhibit 487?

10  A    Yes, that's correct.

11  Q    And then Ms. Steinberg advises you, she tells you that in

12  that section we just read it, was in mid July 2007, she talked

13  to Clipper's lawyers and advised them of it?

14  A    Yes, that's correct.

15  Q    So when you got the declaration in 2008, you realized that

16  Clipper has known about this from before the time of the

17  negotiations even started?

18  A    Right.  Well, right, we were just getting started in July

19  of 2005 time frame in terms of the discussion and that's when

20  we learned of it, yes.

21  Q    You mean July of 2007?

22  A    I'm sorry.  July of 2007.

23  Q    So as a result of learning what Ms. Steinberg advised you,

24  what did you conclude about Clipper's bonafides in this

25  negotiation of confidential agreement?

1    A    Well, they certainly weren't operating in good faith as

2    they had suggested.  And they had tried to con us into an

3    arrangement whereby they would do a search and be released from

4    any litigation if the search didn't show any evidence of

5    potential misconduct.  And we had been told from the outset

6    that they had not received any of our information.  Indeed,

7    Mr. Doctoroff had testified to that.  And we had no reason to

8    believe their credibility.

9    Q    So you told us that you authorized the filing of the

10   lawsuit?

11   A    Right.

12   Q    Now, it was Mr. Young who signed the confidential

13   agreement for Clipper, wasn't it, that's Exhibit D516, I

14   believe?

15   A    I believe that's his signature, yes.

16   Q    We saw his signature the other day.  And it says, I can't

17   read his signature but he also wrote it out William Young, is

18   that right?

19   A    That's correct.

20   Q    And aside from the fact that you felt that this was

21   evidence of potential misconduct, what other reasons, if any,

22   did you have for filing a lawsuit, believing there was a breach

23   of the confidential agreement?

24   A    Well, we believed by the time frame that had occurred in

25   June of 2008, right after we found out from Ms. Steinberg about

1 the Adam Doctoroff e-mail, we advised them that time was of the

2 essence, that we needed to have the search completed as soon as

3 possible and we were checking on that throughout the summer and

4 by the end of August we got the declaration.  We followed-up in

5 early September, and I don't believe we ever heard from them

6 after that.  And we concluded that certainly to the extent that

7 a reasonable time had elapsed, it had done so by the time we

8 filed suit.

9 Q    Now, since the lawsuit was filed, have you discovered any

10 other what you regard as breaches of the representations and

11 warranties in Exhibit 516?

12 A    The confidential agreement incorporates the release which

13 says that Monitor Clipper hadn't furnished any information, any

14 Hallmark confidential information to Recycled Paper Greetings

15 and we subsequently learned sometime later the fact that Jan

16 Murley had shared some of the Monitor information with both

17 Clipper and they had forwarded it on to RPG.  So we believed

18 that was a breach of that representation that's contained in

19 the release agreement that had been executed by Mr. Young as

20 well.

21        And then we learned with respect to the investment

22 presentation that they had deleted or redacted and didn't show

23 to us a piece of Monitor information that they were not

24 entitled to withhold from us under the privileges of the

25 confidential agreement.

1    Q    I handed you a copy of Exhibit 400, P400, which I'm

2    informed has been admitted.

3              THE COURT:  Do you show that as admitted?

4              THE COURTROOM DEPUTY:  Yes.

5              THE COURT:  400?

6              Proceed.

7    BY MR. AISENBREY:

8    Q    I've handed you Exhibit P400.  We saw parts of this the

9    other day.  The bottom e-mail is dated 20 of October 2006.  And

10   it's actually, yeah, scroll up so you can see who it's from.

11             It's sent by Jan Murley to Paul Maxwell, Mary George,

12   Charles Yoon.  Do you see that?

13   A    Yes.

14   Q    The bottom of the text of it is stuff we saw in

15   Ms. Murley's deposition testimony the other day describing

16   Hallmark information.  And then the top of this e-mail,

17   Mr. Maxwell sends it on to Ed Stassen at Recycled Paper

18   Greetings, is that right?

19   A    Yes, that's correct.

20   Q    Is that what you were referring to just now, about sending

21   additional information?

22   A    That is certainly a piece of the information that we know

23   of that was sent.

24   Q    And then you mentioned the investment overview.  I'd like

25   to show you Exhibits D956 and D958.

1    I'll wait for a second I believe that's been

2    stipulated, Your Honor.

3         THE COURT:  Those have been pre-admitted.

4    BY MR. AISENBREY:

5    Q    Before we look at them, can you identify these two

6    letters?

7    A    Well, they're letters to you, Mr. Aisenbrey, regarding the

8    investment presentation that you were to look at as part of the

9    process that you had set up.

10   Q    The stuff we discussed in paragraph 1, Exhibit D516, is

11   that right?

12   A    Yes.

13   Q    The confidential agreement?

14   A    That's right.

15   Q    And when did you first see these letters?

16   A    My recollection is in this year some time when I was

17   preparing for my testimony.

18   Q    The purpose of these letters is to transmit the redacted

19   pages of the investment overview that contain Monitor

20   information, is that your understanding?

21   A    That's my understanding.

22   Q    Now, one other preliminary thing, the second, Exhibit 958

23   is actually a, replacing the first exhibit, right, with

24   different, Mr. O'Toole is adding some additional information

25   that is not present in the first one.  Do you understand that?

1    A    Yes.

2    Q    So we can just look at D958, please.  If you would scroll

3    just through the pages, please.

4         When it says redacted, that means, is that what you

5    understand to be blocked out?

6    A    Yes.

7    Q    And occasionally in the bottom there will be a source that

8    says Monitor analysis.  Do you see that down there?

9    A    Yes, I do.

10   Q    You understood that they were not to block out anything

11   that was from Monitor, is that right?

12   A    That's right.

13   Q    Now, Mr. Gardner, when you're done with that, let me hand

14   you what has been marked as Exhibit 52 and Exhibit 53, both of

15   which have been admitted.  And Exhibit 52 --

16        THE COURT:  Go ahead.

17   BY MR. AISENBREY:

18   Q    Exhibit 52, the front page is from Grant Brown to

19   Mr. Pauker and Ms. Kahn.  Says, investment pres, subject,

20   latest and the date is September 15 at 8:29 in the morning?

21   A    That's what it says.

22   Q    Could you turn, Cindy, to the 14th page of Exhibit 52 and

23   highlight the right-hand block.

24        Can you tell us, the right-hand block refers to

25   Monitor Insight.  Do you see that?  I'll wait till you get

1    there on paper. It's easier to read that way.

2          I think you went past it.

3    A    I just found it. Yes, that's what it says, Monitor

4    Insight.

5    Q    We've seen this before. I'm not going to read through the

6    whole thing. But this information you see here is listed under

7    the block heading, Monitor Insight, is that right?

8    A    Yes.

9    Q    And if you could look down at the footer that describes

10    the source, it says Monitor analysis, Hallmark website, RPG

11    competitor profiles memo, right?

12    A    Yes.

13    Q    So as you understood the confidential agreement that page

14    would not be redacted, would it? If that was in the final

15    presentation?

16    A    No, it would not be.

17    Q    Now, if you look at Exhibit 53, which is the final

18    presentation. Are you with me, Mr. Gardner? Let's stay at the

19    first page of 53.

20    A    Yes.

21    Q    Grant Brown to Jeffrey Pauker, Megan Kahn, again. And now

22    he says, please print pages 1-73 on the Xerox printer with

23    binder clips. 18 copies.

24          Testimony has been that this is the final

25    presentation?

1   A    Right.  It's the next day.

2   Q    The following day?

3   A    Right.

4   Q    Turn to page 15 of this document.  And the right-hand

5   block is now called what?

6   A    Now called company strategy.

7   Q    And have you compared this block on page 53 to the block

8   on page 52?

9   A    I have.

10  Q    There are some minor changes, are there not?

11  A    Yes, there are.

12  Q    In substance though does it still talk about growing

13  industry, not increase share, etc. etc.?

14  A    Yes, it does.

15  Q    Would you show us the footer, please?

16       Now the footer only says Hallmark website and RPG,

17  doesn't it?

18  A    That's right.

19  Q    So when you received or when Mr. German and I received

20  Exhibit 958, this page was not listed in it, was it?

21  A    It was not.

22  Q    Even though we know from the draft that Monitor Insight

23  was really the source of that block on the right, wasn't it?

24  A    That's correct.

25  Q    Now, in conclusion, Mr. Gardner, two areas, two short

1  areas.  Did you warn Monitor Clipper before you filed a

2  lawsuit?  Did you call them and say we're going to sue you?

3  A    No, we didn't.  I believe they were anticipating that.

4  Q    Had you known in October of 2007 when you executed the

5  confidential agreement, had you known then that they had, in

6  fact, received these five Hallmark presentations in the summer

7  of 2005, they had, in fact, used them to evaluate RPG.  That a

8  few months later through their lawyer, they denied it.  And

9  then the following August Mr. Doctoroff, who received them,

10  denied it in a deposition under oath.  And that they knew about

11  these e-mails when they started negotiating the confidential

12  agreement.  If you knew all that, would you have ever entered

13  into this agreement?

14  A    Absolutely not.

15  Q    That's all I have.  Thank you.

16          THE COURT:  Cross-examination?

17          MR. MANCHEL:  Yes, Your Honor.  Thank you.

18                  CROSS-EXAMINATION

19  BY MR. MANCHEL:

20  Q    Good afternoon, Mr. Gardner.

21  A    Good afternoon.

22  Q    I want to just see if we can agree on a few things before

23  we go into some of the details.  The discussion here about the

24  lawyers who said this and lawyers who said that, these are in

25  terms of Clipper, that's the Weil Gotchal Law Firm, Patrick

1    O'Toole, Jim Westra?

2    A    They work for the Weil Gotchal Law Firm, right.

3    Q    Not my law firm, right?

4    A    I don't believe so.

5    Q    Do you have any reason to believe, sir, that there weren't

6    representations from Weil Gotchal that were made to Hallmark?

7    A    Do I have any reason to believe that there weren't

8    representations from Weil Gotshal --

9    Q    Correct?

10   A    -- to Hallmark?  No, I believe there were representations

11   to us on behalf of Monitor Clipper.

12   Q    And there weren't representations from me and my firm,

13   right?  I wasn't even on the scene, right?

14   A    In what time frame?

15   Q    When these representations were made in 2006?

16   A    In 2006, I don't believe you were.  I'm not aware that you

17   were on the scene.

18   Q    And can we also agree on one other thing before we start

19   into some of the details you discussed?  Can we agree, sir,

20   that from the moment this dispute started, back to Monitor, Jan

21   Murley, now Clipper, you've been involved since all the way

22   back from the beginning, right?

23   A    Pretty much.

24   Q    It's been a dispute that goes back to 2005, right?

25   A    Yes.

1    Q    And it involved the Monitor arbitration, the Jan Murley

2    litigation and now this litigation, right?

3    A    Part of it, yes.

4    Q    So you've been involved in all of it, right?

5    A    I have been.

6    Q    To this day, are you aware of a single document in

7    Clipper's possession other than the one e-mail to Adam

8    Doctoroff that constitutes the Hallmark misappropriated

9    confidential information that's at issue in this case?

10   A    Am I aware of anything more than the one document?

11   Q    Correct?

12   A    That was in Clipper's possession?

13   Q    Correct?

14   A    Yes.

15   Q    What other document was in Clipper's possession that's

16   part of the five presentations at issue in this case, sir?

17   A    Well, the information that the standing case team

18   assembled on behalf of Monitor Clipper, they were working

19   exclusively for Monitor Clipper, that information was the small

20   competitor's information and understanding the industry.  So

21   that would have been other information in addition to all of

22   this.

23   Q    We'll get to that in a minute.  My question though is

24   Clipper.  In the possession of Clipper.  Not the possession of

25   the standing case team at Monitor.  In Clipper's possession,

1    are you aware of a single document that is involved in the five

2    presentations of this case other than the one e-mail to Adam

3    Doctoroff?

4    A    Well, the investment presentations as we just saw has some

5    of the information summarized from the presentations.

6    Q    And I promise you, sir, I'll walk you through that

7    document as well.  Those are two.  Can you think of another

8    one?

9    A    I think at this juncture I'm not aware of any specific

10   documentary evidence that we have that places any more of

11   Hallmark's confidential information in the possession of

12   Clipper.

13   Q    So just to be clear, after seven years of litigating this

14   issue, according to you in Clipper's possession we're down to

15   summary of information you claim is in the investment overview

16   and a single e-mail to Adam Doctoroff in terms of what is in

17   Clipper's possession?

18   A    Well, you're talking about written documentation as

19   opposed to information that they learned through oral

20   conversations.  Are you distinguishing between the two?

21   Q    I'm talking about documents, yes.

22   A    If you're just talking about documents, those are the only

23   ones that seemed to have survived since there was a litigation

24   hold was put in place.

25   Q    Now you just mentioned oral communications but on direct

1    examination from your lawyers, you didn't mention any oral

2    communications passing on any information, did you, sir?

3    A    I don't know that I was asked about oral communications

4    passing on information but I'd be happy to share what I know

5    about that with you, Mr. Manchel.

6    Q    In fact, sir, at your deposition you were asked about oral

7    communications and what you said was you assumed that they had

8    taken place, isn't that right?

9    A    Well, do you have a copy of my deposition?  I'd be happy

10   to take a look at it.

11   Q    Do you remember saying that, sir, yes or no?  If not, I'll

12   take you to it, I promise.

13   A    I'd like to look at my deposition.  May I do that?

14   Q    My question to you, sir, is do you have a memory today,

15   now, of saying at deposition that you assumed the conversations

16   had taken place.  You either do or you don't?

17   A    I assume that there were oral conversations that took

18   place with respect to the documentation, with respect to the

19   interviews.  And I also at my deposition incorporated Exhibit

20   No. 1502 which set forth all of the various oral communications

21   and written communications back between Monitor Clipper and

22   Monitor.  So the details in Exhibit 1502 that I incorporated

23   throughout the deposition, Mr. Manchel.

24   Q    Now, you testified to your attorneys that you first

25   learned that Clipper had purchased RPG in November of 2005,

1   correct?

2   A    That's correct.

3   Q    First of all, sir, before you became the general counsel

4   of Hallmark you were a corporate partner, right?

5   A    That's not correct.

6   Q    You were an in-house lawyer, correct?  You worked at a law

7   firm?

8   A    I worked at a law firm but I was not a corporate partner.

9   Q    Did you do corporate work, sir?

10  A    No.  I did litigation work.

11  Q    In fact, the law firm that you were in before you went to

12  Hallmark was Mr. Aisenbrey's law firm, wasn't it?

13  A    For a period of time, yes.

14  Q    Okay.  And, sir, you know, as a partner in a law firm, you

15  know what a subsidiary is, right?

16  A    I do.

17  Q    And what is your definition of a subsidiary, sir?

18  A    My definition of a subsidiary is it's an affiliated

19  company of a company that's up above it, typically.

20  Q    An affiliated company, sir, not a wholly owned company?

21  A    It can be wholly owned but it's affiliated.

22  Q    Well, affiliated in the sense it has to be controlled by

23  the parent company.  If you have a subsidiary then by

24  definition there is a parent, correct?

25  A    Yes.

1  Q    Is it your testimony, sir, that you thought that the

2  parent company of Clipper was Monitor Group?

3  A    That's what we had obtained from our search with Dun and

4  Bradstreet, that it was a subsidiary, yes.

5  Q    Is it your testimony, sir, that you read a Dun and

6  Bradstreet report, you, personally, read a Dun and Bradstreet

7  report that showed Clipper as a subsidiary of Monitor?

8  A    Yes.

9  Q    Did you produce that document in this case, sir?

10 A    I'm not aware whether we did or not.  Mr. Aisenbrey has a

11 copy of it.

12 Q    Mr. Aisenbrey has a copy of the Dun and Bradstreet report

13 showing Monitor Clipper as a subsidiary?

14 A    Yes.

15 Q    Did you give it to him?

16 A    Yes.

17 Q    Do you know whether it's been produced in this case?

18 A    I don't know.

19 Q    Did you, when you were trying to figure out if Clipper was

20 a subsidiary, did you go to the secretary of state's office and

21 take a look?

22 A    Not sure that we did.

23 Q    You know the secretary of state's office would show the

24 exact corporate status of Clipper, isn't that right?

25 A    If you could find the right secretary of state's office,

1   yes.

2   Q    Well, in fact, sir, Hallmark knows full well that Clipper

3   is a separate entity from Monitor, isn't that right?

4   A    Subsequently heard that, learned that.

5   Q    How did you learn it?

6   A    I believe Ms. Steinberg advised us of that at some point.

7   Q    Ms. Steinberg advised you of that at some point.  Sir, you

8   knew that there were two sets of lawyers for both of these

9   companies within days of sending your November letter, isn't

10  that right?

11  A    Yes.

12  Q    In fact, you got a response from Monitor's lawyer and then

13  you got a response from Clipper's lawyer, correct?

14  A    Yes.

15  Q    Two completely separate law firms, right?

16  A    They were taking the position at the time that they didn't

17  speak to one another and that they were completely separate.

18  So we learned that when we got their first responses that they

19  were taking that position, yes.

20  Q    Sir, did Ms. Steinberg's law firm ever represent Clipper?

21  A    I don't know.

22  Q    Do you have any reason to believe that Ms. Steinberg's law

23  firm represented Clipper?

24  A    I'm not aware of any specific circumstance, no, sir.

25  Q    And you know that Weil Gotshal represented Monitor, right?

1  I'm sorry.  Represented Clipper?

2  A    It wouldn't surprise me that they represented Monitor.

3  Q    Do you have any information that they ever did?

4  A    No, not specifically, other than your statement.

5  Q    So you have two law firms representing two companies.  Did

6  you say when you heard from Jim Westra, hey, how come you folks

7  are representing Clipper if you're a subsidiary of Monitor?

8  A    I don't recall us saying, hey.

9  Q    So you knew right away that they were separate companies,

10 isn't that true, sir?

11 A    They were taking the position early on that they were

12 separate entities, that were completely unrelated with one

13 another.

14 Q    I didn't ask you about completely unrelated.  They work

15 together.  I understand that.  You're a partner from

16 Mr. Aisenbrey's law firm.  You understand that they're separate

17 companies, right?

18 A    I understood that was the position that they were taking.

19 At the time we hadn't entered into any discovery specifically

20 to confirm that or not.

21 Q    And that position proved to be true, didn't it, sir?

22 A    I believe that we subsequently determined that Monitor

23 Clipper was not a specific subsidiary owned by Monitor, yes,

24 that's correct.

25 Q    And when you learned that, when you learned that Clipper

1   wasn't a subsidiary, Hallmark didn't send a letter to Clipper

2   saying, you need to retain documents, did it?

3   A    We didn't think we needed to do that since we had sent the

4   notice to them in the first instance.  And my understanding was

5   that Mr. Young received the letter shortly after we sent it.

6   Q    Well, you sent the wrong notice though, sir, right?  You

7   found out that Clipper wasn't a subsidiary and you never

8   corrected the notice, did you?

9   A    There wasn't any need to correct the notice, Mr. Manchel.

10  Q    Well, you didn't think there was any need to but Clipper

11  did, didn't it?  In fact, Clipper advised you that it didn't

12  put a litigation hold in place, isn't that right?

13  A    Sometime later I think in the 2007 time frame they were

14  taking that position, that's correct.

15  Q    Now, you also talked about not knowing until you saw Laura

16  Steinberg's affidavit in August that Clipper had known about

17  the Adam Doctoroff e-mail for quite a period of time, right?

18  The lawyers, Weil Gotshal, that's what you said, right?

19  A    I'm sorry.  Could you repeat that?

20  Q    Your testimony was that in August of 2008 after reading

21  Laura Steinberg's affidavit, you realized that the attorneys

22  for Clipper, Weil Gotchal, had known about the Doctoroff e-mail

23  for a long period of time, longer than you thought, right?

24  A    They had known about it since at least the summer of 2007,

25  correct.

1    Q    But in May of 2008, three months earlier, Hallmark was

2    given copies of that e-mail, isn't that right?

3    A    Yes, that's correct.

4    Q    So in May of 2008 you're given copies from Ms. Steinberg

5    of the e-mail showing that it went to Adam Doctoroff, correct?

6    A    That's correct.

7    Q    And there is not a single statement from Hallmark from

8    that moment on to Weil Gotshal saying, hey, did you folks know

9    about this?  Isn't that right?

10   A    No.  I don't believe that's correct.  I think that our

11   counsel inquired with Weil Gotshal very shortly thereafter.

12   Q    In writing, sir?

13   A    They had oral communications and I think there is an

14   e-mail back from, to Mr. Blegen about where that information

15   might have been located on there.

16            MR. MANCHEL:  Your Honor, I move to strike the

17   reference to oral communications between one of these attorneys

18   and some unnamed attorney.  This witness can't possibly testify

19   on that.

20            THE COURT:  Sustained.

21   BY MR. MANCHEL:

22   Q    Do you know, sir, of a writing, after Hallmark was told

23   Adam Doctoroff had received the e-mail, do you know of a

24   writing that says to Weil Gotshal, we just found out that Adam

25   Doctoroff got this e-mail, what did you guys know about it?

1   A    I know that there was an e-mail exchange that was between

2   Mr. Blegen and Weil Gotshal with respect to that specifically.

3   I think we may even have talked about it when Mr. Aisenbrey was

4   asking me questions.  We discussed that.

5   Q    And, in fact, sir, what happened was Hallmark was told

6   specifically that Adam Doctoroff had received e-mail.  And

7   Hallmark was told specifically that the standing case team had

8   accessed the other e-mail at issue in this case in May of 2008,

9   right, with hard copies?

10  A    Well, I know we were advised that all of this had come

11  forward.  I'd have to look at her letter to see if she advised

12  us of what other stuff had, his team was up to at the time.

13  Q    Then after Hallmark was told that --

14  A    After they were told what?

15  Q    After they were told about the Doctoroff e-mail and the

16  standing case team?

17  A    Wait a second.  Let me correct you.  I didn't agree with

18  your statement around the standing case team stuff,

19  Mr. Manchel.  I said, I think, well, I know they learned about

20  this e-mail from Mr. Doctoroff and all of that.  But I think

21  that you need to show me the letter from that time frame from

22  Ms. Steinberg as to whether the standing case team had received

23  that information.  I'm not saying that's not the case.  I'd

24  just like to see that communication.

25  Q    Sure.  Would you put up on the screen, please, Jeff,

1   Plaintiff's 270S.

2            Letter dated May 1, 2008 and it's from Laura

3   Steinberg, sir.

4   A    I need a copy if you don't mind.

5            THE COURT:  Mr. Manchel, I don't show this exhibit as

6   having been admitted.

7            MR. MANCHEL:  These are part of the Steinberg letters

8   this morning that we worked out an understanding on the terms

9   of the admissibility.

10           THE COURT:  Without objection then that exhibit is

11  admitted.

12           270S?

13           MR. MANCHEL:  Yes, 270S.

14           MR. AISENBREY:  I thought it was 277.

15           MR. MANCHEL:  No.

16  BY MR. MANCHEL:

17  Q    Sir, if you look at the third page, I'm sorry, page 4.

18  See these two paragraphs right in the middle?

19           Let's highlight the first one.

20           It says, first September 7.  See that paragraph, sir?

21  A    Yes.

22  Q    That's the e-mail that went to the standing case team

23  that's at issue in this case, you just mentioned the small

24  competitor's presentation, right?

25  A    Just give me a moment.  I'm reading it.

1    Q    Sure.

2    A    Yes, that's correct.

3    Q    So on May 18 Hallmark was told about the standing case

4    team e-mail, right?

5    A    It appears so, yes.

6    Q    Do you have any reason to believe that's not the case,

7    sir?

8    A    No, not since I had a chance to look at this.  Thank you

9    for sharing that.

10   Q    Let's look at the next paragraph.  Please take a moment to

11   read that if you haven't seen this letter before.

12   A    Yes, I see that.

13   Q    That's the e-mail of Adam Doctoroff, correct?

14   A    Well, I don't see Mr. Doctoroff's name being mentioned

15   here.

16   Q    Correct.  But the reference you know is to the Adam

17   Doctoroff e-mail, isn't that right?

18   A    I know that, yes.

19   Q    Because, in fact, shortly after this letter Hallmark was

20   sent hard copies of both of those e-mails, isn't that right?

21   A    I believe that's correct.

22   Q    Once Hallmark received notice of those two e-mails, the

23   very next thing Hallmark did was say to Clipper, let's go on to

24   the phase of the confidential agreement where we're going to

25   search for records and information, isn't that right?

1    A    We had been negotiating the search terms.  And, yes, we

2    proceeded.  We wanted to determine what other information we

3    might find through that search.

4    Q    So there is a big gap between May 1 and Laura Steinberg's

5    affidavit, isn't there, sir?

6    A    Well, yes, few months.

7    Q    So the real sequence here is Hallmark is told point blank

8    in the beginning of May, Clipper received one e-mail and the

9    standing case team accessed another e-mail, correct?

10   A    Well, not just e-mail, lots of information.

11   Q    And then the next step taken is the parties shake hands on

12   an agreement to search for information at Clipper, correct?

13   A    Well, the agreement had been entered into back in October

14   and had been negotiated, the search terms had been negotiated

15   for several months and, yes, we did proceed forward with that

16   search protocol.

17   Q    Well, you actually signed an agreement, didn't you, sir,

18   another search protocol agreement?

19   A    There was a search protocol agreed upon, yes.

20   Q    Why didn't Hallmark say to Clipper, stop.  We've been, in

21   your words, we've been conned.  We're not going forward one

22   more step with this process.  You've intentionally misled us.

23   The deal is off.

24   A    Well, because we had a protocol in place that allowed for

25   additional searching.  And at this juncture we did not

specifically have information that would suggest that Monitor
Clipper had found this information on their systems or had
confirmed it.  And we were asking them for information with
respect to what they had received and what had been done with
it.

We wanted that additional information.  If we could
be enlightened about what was going on under that protocol we
intended to do that.  We never received any information.

Q    Well, you never received any of the information, sir,
because Hallmark sued Clipper right in the middle of their
search, isn't that right?  Actually toward the end of their
search, isn't that right?

A    I don't know where the status of the search was because
after early September we never heard anything further from them
about it.

Q    Sir, Hallmark knew without question that Clipper was at
the senior level review of that search, isn't that right?

A    When was that?

Q    July, August, September.  Isn't that right?

A    I wouldn't say it was any of those dates.  There is a
document advising us the status of where they were at during
that time frame if you want me to look at it.

Q    There were lots of documents.  Hallmark was getting
updates from Clipper, isn't that right?

A    Yes.

1   Q    And Hallmark was told, point blank, Clipper is at the

2   senior level review but Patrick O'Toole said, I'm in the middle

3   of trial.  I promise you it's ongoing.  And while that was

4   occurring Hallmark sued without notice, isn't that right?

5   A    I don't think that's accurate.

6   Q    Let's take a look at Defendant's 79, please.

7            And if you go to the next page, please, Jeff.

8            This is the document that you just claimed, the other

9   document at Clipper that has Hallmark confidential information

10  in it, correct?  This is the investment overview, right?

11  A    Yes.

12  Q    And this document was put in front of you at your

13  deposition, wasn't it, sir?

14  A    Well, I believe it was but if you wouldn't mind I'd like

15  to take a look at my deposition to confirm that.  If you could

16  point me to that.

17  Q    Take a look, sir, at page 53, I'm sorry, 52, line 19

18  you'll see a reference to Deposition Exhibit No. 53 which in

19  this case has been marked as Trial Exhibit 79.

20           Do you need a hard copy, sir?  I believe you were

21  handed it by your counsel.

22           Now, at your deposition you were the person

23  identified by Hallmark as the one who was primarily responsible

24  for showing us what Hallmark said was the use of the supposed

25  trade secrets at issue in this case, right?

1  A     I believe so.

2  Q     Okay.  And then we put this in front of you, right, at

3  your deposition?

4  A     I believe so.

5  Q     Do you have any reason to believe that's not the case,

6  sir?

7  A     No.  I think I believe so.

8  Q     And then we walked you through that exhibit, isn't that

9  right?

10 A     That's my recollection, yes.

11 Q     In the first pages, pages 3 to 5, you can take a look at

12 it right there in front of you, you said on page 5, when you

13 saw that on your examination today, on page 5 you pointed out

14 the language, Monitor knowledge.

15       Go to page 5, please, Jeff.

16       You pointed this out at your deposition and you

17 pointed it out to your counsel today, right?

18 A     I believe so.

19 Q     And you said at your deposition and if you want to be

20 reminded you can look at page 55.  You said at your deposition

21 that even providing their perspective would have been sharing

22 Hallmark confidential information, isn't that right?

23 A     Can you point me to that?

24 Q     Page 55, lines 16 to 25 and 56, lines 1 through 3.

25 A     Yes.  I said that Monitor had no knowledge of the greeting

1    cards industry that I was aware of other than what they learned

2    from Hallmark.  So sharing the perspective in these areas,

3    which was specifically by the way the areas that are covered in

4    the five BMRs would likely be sharing our confidential

5    information.

6    Q    When Hallmark hired Monitor, Monitor had very, very little

7    experience in the greeting card industry, isn't that right?

8    A    Very little?

9    Q    Very little?

10   A    They had none that I'm aware of.

11   Q    And while Monitor worked on the Hallmark project, Monitor

12   gained all sorts of experience and expertise, isn't that right?

13   A    They learned a lot from Hallmark, you're correct about

14   that.

15   Q    And they learned a lot from just doing research and

16   interviews and reading reports and the like, isn't that right?

17   A    Yeah.  We shared an enormous amount of our research that

18   we spent millions and millions of dollars on with them.  Yes,

19   that's right.  And they reviewed that and studied it and

20   assessed it and developed a very expensive business strategy

21   for us from that, that's correct.

22   Q    They also went out into the world and did research and

23   interviewing and analyses, isn't that right?

24   A    Well, I'm not specifically aware that they did much of

25   that.  But if they did that, that was under our contract and we

1    owned the results of the research that they were doing because

2    we were paying for it.  And I believe our agreement with them

3    said that we owned all of the work product, Mr. Manchel.

4    Q    So you think you owned Monitor's expertise when it was

5    done?

6    A    We owned their expertise in the greeting industry that

7    they developed from our research and our work, yes.  They did

8    it under our contract.

9    Q    Who is the client, sir?  Is it you the lawyer for Hallmark

10   or is it Don Hall.  Who is the client?

11   A    Don Hall is my client.

12   Q    Right.  So if Don Hall says, Don Hall said to this jury

13   that Monitor was free to use its expertise after the BMR

14   project, that would be the testimony the jury should rely on,

15   right?  Not yours?

16   A    Well, do you have that specific testimony that he said

17   that they should go ahead and be free to share the greetings

18   expertise that they'd learned?

19   Q    I do, sir.

20          Jeff, put up on the screen, please, 11/5/2012, page

21   111, lines 5 through 14.  And then 112, lines 10 through 18.

22          Well, it's the work product that was developed for

23   the BMR would be our strategy, would be the information that we

24   would uniquely have, it would be our trade secrets, it would be

25   the knowledge that we uniquely possess.

1  QUESTION:  But the expertise that Monitor developed,

2  that Monitor would be free to share, right?  I mean people get

3  better and smarter and they learn stuff when they work on a

4  particular project, right?

5  Yes.

6  Now if Don Hall says that Monitor is free to share

7  its expertise with Clipper, the expertise that it built and

8  learned and got better at, working for Hallmark, that is what

9  counts, rights?

10  A    I don't read this to believe that he in any way, shape or

11  form thought that they could share what confidential

12  information they had obtained from us, Mr. Manchel.

13  Q    That I agree with, sir.

14  A    Their consulting expertise, their marketing expertise,

15  yes, they were free to share that.  But they're not free to

16  share any greeting information with anyone under our contract.

17  Q    And that I agree with, sir.  And that's why my question to

18  you was, did you believe that Hallmark owned Monitor's

19  expertise and your original answer was, yes, I do.  Now we see

20  what the client says which is, no, you don't.  Isn't that

21  right?

22  A    I don't believe that was my original testimony.  My

23  testimony was that Hallmark owned the greetings expertise that

24  Monitor developed.  Their marketing expertise, their consulting

25  expertise, so long as they weren't sharing any Hallmark

1  confidential information, they were free to consult with people

2  on marketing or consulting.  And I'm sure that's what Mr. Hall

3  meant.

4  Q    So let's look at the first bullet point on Defendant's

5  Exhibit 79.

6             We'll put it up on the screen for you.

7             Highlight the first bullet point, please.

8             Sir, you've seen and I'll represent to you we've seen

9  this language or variations of it all over the documents with

10  banks, lenders, rating agencies.  It's perfectly appropriate

11  for Monitor to say that, isn't it, sir?

12  A    I don't think it's appropriate for them to say that they

13  worked extensively in the industry, that was with Hallmark.

14  Q    And, in fact, sir, it's perfectly appropriate for Monitor

15  to tell people that its extensive work in the industry was with

16  Hallmark, isn't that right?

17  A    No.  I don't believe they were entitled to share anything

18  with anybody under their contract, honestly, Mr. Manchel.  Even

19  to tell third parties that they had, they had, in fact, worked

20  extensively with us.

21  Q    Sir, is it your testimony that Monitor working with

22  Hallmark was a trade secret?

23  A    No.

24  Q    In fact, Hallmark has worked with at least one other

25  consultant I know of that advertises the work that its done

1    with Hallmark, isn't that right?

2    A    I don't know that.

3    Q    You've heard of the New England Consulting Group, sir?

4    A    I have heard of it.

5    Q    Did you ever go to the New England Consulting Group's

6    website and see how they highlight the fact that they've done

7    work for Hallmark?

8    A    We've had no reason to go to that website.

9    Q    So your position is that Monitor couldn't even tell people

10   it did work for Hallmark 5 years prior, is that right?

11   A    My understanding was that they were limited to sharing any

12   information about what they had done for us outside the group

13   that had actually done the work.

14   Q    I'm not talking about sharing information, sir.  My

15   question is really simple.  Are you claiming that it's

16   inappropriate for Monitor and Clipper to say Monitor worked

17   extensively in the industry for Hallmark five years ago?

18   A    I would have to go back to our actual consulting agreement

19   that we entered into in 2001 to look at that to be sure what

20   they could do in that regard.  If that agreement said it was

21   permissible to utilize our name and to tell people that they

22   had done consulting work with us then they would be free to do

23   that but I'd want to look at that agreement and review it.

24   Q    So after seven years of litigation, you don't know the

25   answer to that question, right?

1    A    I'd like to look at the agreement.  I've seen thousands of

2    documents and I don't have an answer to every question you

3    post.  If you don't mind I'd be happy to look at that and

4    answer affirmatively.  I'm happy to do it right now if you have

5    the agreement.  I'm happy to look at the agreement and tell you

6    whether they could share that information or not.

7    Q    We'll get to it, sir.  I promise.  So the worry according

8    to you when you saw this was that Monitor had been mining the

9    Hallmark information, right?

10   A    Well, you've got just the top phrase.

11   Q    You can pull it back and look at the whole page.

12   A    Thank you.  That's what that would lead me to conclude.

13   Q    And your concern was that, you were concerned that they

14   were mining that information for the investment committee

15   meeting, right?

16   A    We were concerned that they were mining it for several

17   purposes, sir.

18   Q    You assumed, at your deposition you assumed that it had

19   been mined, isn't that right, sir?

20   A    Well, yes.

21   Q    Well, let's take a look at Gardner deposition page 54,

22   lines 24, 25 and 55, lines 1 through 15.

23   A    Fifty-four?

24   Q    We're going to put it on the screen for you.  Page 54,

25   lines 24 to 25 then 55, lines 1 through 15.

1   A    Okay.

2   Q    Now, that line 24, 25, that's what we were just looking

3   at, right?  Monitor worked extensively in the industry 5 years

4   ago, right?

5   A    Yes.

6   Q    Then there is the language from the rest of the bullet

7   points that were there, right?

8   A    I think so, yes, sir.

9   Q    And then it says, that work was done for Hallmark.

10  Monitor had no experience in the greeting card industry

11  whatsoever beyond the work it did for Hallmark.  So all of the

12  work that Monitor did, all of its knowledge in this area was

13  proprietary to Hallmark cards.  And I'm assuming that because

14  these items are being summarized that there was oral discussion

15  of all this and more at the meeting from Monitor personnel,

16  isn't that right?

17  A    Yes.  I think that accurately summarizes my assumption.

18  Q    And, sir, you were deposed four years after this lawsuit

19  was filed, isn't that right?

20  A    I believe so.

21  Q    And four years later the only proof you have is your

22  assumption that there was oral discussion at the meeting,

23  right?

24  A    Only proof I have of what, sir?

25  Q    Of the use of this investment overview at the meeting that

1    you're referencing there?  Isn't that right?

2    A    I think there's another page in here but, yes.  And

3    Mr. Pocharski, who had worked on the project, was in attendance

4    at that meeting as well.

5    Q    Sir, when you gave this testimony you didn't even know

6    there had been an investment committing meeting, isn't that

7    right?

8    A    When I gave this testimony?

9    Q    Right.

10   A    That's not right.  I knew there had been an investment

11   committee meeting.

12   Q    Okay.  Let's take a look at page 52, lines 19 to 25 and

13   53, lines 1 to 18.

14   A    Page 52?

15   Q    Yes.

16   A    Okay.  I'm on page 52.

17   Q    I placed in front of you --

18           Jeff, you can highlight that for a minute, right

19   there.

20           I placed in front of you what's been previously

21   marked as Exhibit 53.  That's the document we've been looking

22   at correct, sir?

23   A    Yes.

24   Q    Yes.  It appears to be on the first page of an e-mail from

25   Grant Brown to Jeffrey Pauker and Megan Kahn dated

1    September 16, 2005 with an attachment entitled Recycled Paper

2    Greetings investment overview September 16, 2005.

3         QUESTION:  And did you understand that there was an

4    investment committee meeting on September 16, 2005 at Monitor

5    Clipper Partners' office?

6         ANSWER:  I don't know whether there was a meeting or

7    not.

8         QUESTION:  Does Hallmark allege that the Hallmark

9    trade secrets were included in the presentation at the

10   investment committee meeting on September 16, 2005?

11        Well, that assumes that there was that meeting and

12   I'm going to assume that, that the record would reflect that

13   such a meeting occurred.  And I, I've been given to understand

14   there was an investment meeting at some point in time at

15   Monitor Clipper.  And if you have indicated September 16, I'm

16   willing to accept that.

17        You didn't even know there was a meeting of the

18   investment committee overview when you gave this testimony,

19   isn't that right, sir?

20   A    That is completely inaccurate.  I knew that there had been

21   a meeting of the investment committee.  I didn't know whether

22   it was on September 16 or not and I was willing to accept

23   Mr. Donovan's characterization it was on the 16.  But I knew

24   very well that there had been an investment committee meeting.

25   We knew about that during the arbitration.  So, yes, I knew

1    there was a meeting.  I didn't know whether it was on
2    September 16 or some other date.  That was the question that
3    was posed.
4    Q    Okay.
5            Let's take a look, Jeff, at page 7 of Defendant's
6    Exhibit 79?
7    A    I'm sorry, Mr. Manchel?
8    Q    We're going back to the investment committee overview,
9    turning to page 7.
10           And, Jeff, if you would highlight the third bullet
11   point.
12           Sir, at your deposition you identified this as
13   Hallmark trade secret information, didn't you?
14   A    Can you show me that just so I can refresh my memory?
15   Q    Page 65, lines 13 to 25 and 66, lines 1 through 7?
16   A    What were the lines again?
17   Q    13 through 25.  Where you said, let me take you back to
18   page 7.  I missed something.
19   A    Oh, I see that.  Uh-huh.
20   Q    If you go on to the next page you continue on, 1 through
21   7?
22   A    Yes.
23   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24   xxxxxxxxxxxxxxxxxxx
25   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxx

A     xxxx

Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

1   Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2   xxxxxxxxxxxxxxx

3               xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4

5               xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6   xxxxxxxxxxxxxxxx

7   A       xxxxxxxxxxxxxxxxxxxxxxx

8   Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9               xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

12  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22              xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24  xxxxxxxxxxxxxxxxxxxxxxxxx

25  A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

1 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

5 xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6 xxxxxxxxxxxxxxxxxxxxxx

7 Q    xxxx

8 A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9 Q    You were picked as the person at Hallmark who knew more

10 about the use of the information in this investment committee

11 presentation than anyone else, right?  You were put forth for

12 us to depose on this exact topic, isn't that right?

13 A    I was put forward to testify on the topic of what we knew

14 about the use of Hallmark trade secrets by Monitor Clipper.

15 And we've pieced together over years, painfully, lots of

16 information with respect to their use of our confidential

17 information, Mr. Manchel.  Part of what is in the investment

18 presentation.  A great deal of it is with respect to the BMRs

19 that Mr. Doctoroff received and the standing case team

20 received.

21 Q    Sir, all you had to do was take a look at the bullet point

22 and in your words go back and double check it, right?  I'd have

23 to go back and look at that.  That's all that needed to be

24 done, right?  Take a look at the investment overview which

25 Hallmark got years before your deposition.  Take a look at the

1   presentations at issue in this case which Hallmark got years

2   before this deposition.  And just say, does it come from there

3   or doesn't it?  Isn't that right?  That's all that had to be

4   done.

5   A    It's a summary.  It's an industry overview.  And it's

6   discussing e-card information and if there was a source other

7   than Hallmark, Clipper was perfectly able to come forward and

8   show us where they got that information.  All I was saying was

9   there was specific e-card analysis and information in our

10  business model review information and that they may have

11  reviewed that and utilized it in their investment overview

12  here.  That's all I said.

13  Q    That's right, that's all you said.  Isn't that right?

14  They may have.  You don't know.  Isn't that right?

15  A    That's right.  We don't have, unfortunately, enough

16  information.

17  Q    What more information did you need, sir?  I just asked you

18  that.  You have the presentations.  You have the investment

19  committee overview.  What more did you need to show to this

20  jury today that the information from the overview came from the

21  presentation?

22  A    Well, with respect to that, it would have been helpful to

23  have the information that was on the various computers of

24  people working on it at the time.

25  Q    Really?

1    A    We don't have that.  Yes.

2    Q    So like Peter Kim, right?  You would like to have Peter

3    Kim's computer help you?

4    A    Yes.  Very possibly help us.

5    Q    Possible.  Peter Kim's computer was erased, wasn't it,

6    sir?

7    A    Yes.

8    Q    And Hallmark knew it was erased before, long before Laura

9    Steinberg's affidavit was ever put in, isn't that right?

10   A    I don't know.  I can't remember the time.  I'd have to go

11   back and look at the documents, Mr. Manchel.  But it certainly

12   was erased, I won't dispute that.

13   Q    Neither will we.  But the issue was Hallmark was told it

14   was erased.  In fact, Hallmark was told that Peter Kim was no

15   longer a Clipper employee when Hallmark signed the confidential

16   agreement, isn't that right?  It's right in the agreement.

17   Peter Kim is no longer a Clipper employee, isn't that right?

18   A    It's in what agreement?

19   Q    The confidential agreement that your attorney put in front

20   of you?

21   A    I'd like to look at that.

22   Q    Sure.  Pull it.

23              THE COURT:  While he looks at that why don't we take

24   our afternoon break.  We'll be back in about 15 minutes.  We'll

25   be in recess.

1    (Witness temporarily excused.)

2    (Recess)

3    (The following proceedings were had OUT OF THE

4    PRESENCE AND HEARING OF THE JURY:)

5    MR. BLEGEN:  Your Honor, we have one very brief

6    housekeeping matters before the jury comes back in.  We are

7    comparing transcripts of what was played in the videotapes,

8    including who designated it and working with the defendants to

9    make sure they're accurate.  We're going to tender those as

10   exhibits to complete the record since they were not

11   transcribed.  But we won't have them ready at the time we close

12   of our case because we're working on some details.  I just

13   wanted to let you know.

14   MR. MANCHEL:  No objection.

15   MS. GILMAN:  We'll also tender the DVDs with that,

16   will be copies of what was actually played.

17   THE COURT:  Okay.  Thank you.

18   Eva?

19   (The following proceedings were had IN THE PRESENCE

20   AND HEARING OF THE JURY:)

21   THE COURT:  Please be seated.

22   Mr. Manchel.

23   MR. MANCHEL:  Thank you, Your Honor.

24                    BRIAN GARDNER, RESUMED

25                  CONTINUED CROSS-EXAMINATION

1   BY MR. MANCHEL:

2   Q    Before the break we were talking about Hallmark receiving

3   notice that Peter Kim had left Clipper.  I think your counsel

4   placed in front of you, and if he didn't, I'll bring it up,

5   Defendant's 975.  I know you've got quite a bit of paper going

6   on there.

7   A    Could you give me an idea which one it was?

8   Q    That's the electronic protocol agreement.

9   A    Is that the confidential agreement?  Okay.

10  Q    This is the electronic protocol agreement.  Sir, let me

11  start with do you recognize Defendant's Exhibit 975?

12  A    Yes.

13  Q    And this is the agreement that Hallmark and Clipper

14  reached on what search terms Hallmark wanted used as Clipper

15  went through its computers, correct?

16  A    I believe that's accurate, yes.

17  Q    Is there any reason to believe it's not accurate, sir?

18  A    No.  I said I believe it's accurate.

19  Q    Sometimes when you say you believe, I get a little

20  concerned that maybe you believe it could be something else.  I

21  just want to make sure is it to the best of your knowledge?

22  A    To the best of my knowledge it's accurate.

23  Q    Now the date on this is June 8, right?

24  A    That's right.

25  Q    So the search hadn't started yet, correct?

1 A Apparently not.

2 Q And if you turn to, Jeff, what I have is page number 3

3 which I believe for you is the fifth page into the document.

4 A Yes.

5 Q Identifies the people whose computers will be searched,

6 correct?

7 A Yes.

8 Q What does it say at the bottom, sir?

9 A It says Peter Kim is no longer an MCP employee.

10 Q And that's before any searching was done, right?

11 A Apparently so, yes.

12 Q Are you aware of Hallmark saying, in words or substance,

13 wait.  Before we start, Peter Kim's computer has been erased?

14 A No, I don't recall that.  Before we took the break I think

15 you said though that the fact that Peter Kim was no longer an

16 employee was in the confidential agreement.  And I looked at

17 that, I couldn't find anything in that at all.  It was in this

18 agreement you just handed me.

19 Q That's part of the confidential agreement, isn't it, sir?

20 It's what the parties called phase 2?

21 A It's not part of the confidential agreement.  It is a

22 piece of information that's being done as a result of the

23 confidential agreement.  Those are two different things and

24 this June document was not part of the confidential agreement

25 document.

1  Q    Sir, the June document was done pursuant to the

2  confidential agreement, correct?

3  A    It was done pursuant to it but it was not part of the

4  document.

5  Q    Is it a separate agreement that has nothing to do with the

6  confidential agreement?

7  A    Well, no, that's not what I said, Mr. Manchel.  I said it

8  was not, the confidential agreement was executed in October of

9  2007.  This was pursuant to it but it was executed in June of

10  2008.  And that was the distinction I was drawing.

11  Q    Would you go, please, Jeff, back to Defendant's Exhibit

12  79, continue going through the investment overview.  And let's

13  take a look at page 14.

14  A    I'll have to catch up with you here.

15  Q    Okay.  Going back to the investment committee overview,

16  we're going to page 14.

17  A    Okay.  I have that in front of me.

18  Q    That box on the right is the box that you went to with

19  your attorney, correct?

20  A    Yes.

21  Q    And at your deposition you claimed that that box contained

22  Hallmark trade secret information, isn't that right?

23  A    I believe it contains information that's distilled down

24  from the business model, that's correct.

25  Q    And, sir, why don't you take a look at your testimony on

1    page 58, lines 22 to 25 and 59, lines 1 through 18.

2    A    All right.  Page 58, I'm sorry?

3    Q    58 at the bottom?

4    A    Uh-huh.

5    Q    Jeff, would you put that up, please, lines 22 through 25.

6    Then 59, lines 1 through 18.  And so my question is the same as

7    before.  In that section, pages 6 through 17, I'd like for you

8    to go through and identify whether Hallmark contends that

9    there's Hallmark trade secrets within those pages.

10              ANSWER:  Okay.

11              That was through 17?

12              Yes.

13              Through 17, through page 17?

14              ANSWER:  Your question was does it contain any of

15    Hallmark proprietary confidential information?

16              QUESTION:  Any Hallmark trade secrets?

17              ANSWER:  Yes.

18              QUESTION:  Okay.  Can you please identify them?

19              ANSWER:  Well, on page 14 entitled industry overview

20    competition Hallmark.  The company strategy section on the

21    right-hand side in that box is Hallmark's proprietary trade

22    secret information.  That's the box we just looked at, right?

23    A    Yes.

24    Q    Right.

25              Is it Hallmark's position that that was Hallmark's

1    trade secret information as of September 2005?

2              ANSWER:  Yes.  The source is not from Hallmark's

3    website as indicated on that page.  That information is not on

4    Hallmark's website.

5              That was your testimony, right, sir?

6    A    I believe you just read it.

7    Q    Okay.  Did you check the website for 2005 before you gave

8    that testimony, sir?

9    A    No.

10   Q    So how would you know?

11   A    Well, I talk to people at Hallmark.  My charge as the

12   30(b)(6) witness was to gather, review an enormous number of

13   documents and talk with people and I discussed this with

14   people.  That is what they advised me, that sort of information

15   was not on the Hallmark website.

16   Q    Hallmark was told specifically who at Clipper prepared

17   that information, wasn't it?

18   A    I'm sorry?  Hallmark?

19   Q    Yes.  Hallmark was told, Hallmark found out in this case,

20   if you will, exactly who at Clipper prepared the information in

21   that box, isn't that right?  It's Peter Kim, wasn't it?

22   A    I don't know who prepared it but someone at Monitor

23   Clipper did.

24   Q    Do you know why Peter Kim was never asked by Hallmark at

25   his deposition if he used the presentations to come up with the

1    box on the right?

2    A    I don't.

3    Q    Let's take a look.

4    A    I don't know that, what he was asked at his deposition.

5    Q    Well, sir, you're the 30(b)(6) witness.  Was Peter Kim

6    deposed before you were deposed?

7    A    To the best of my knowledge he was, yes.

8    Q    And as a 30(b)(6) witness did you take a look at his

9    deposition to see where he said he got the information from

10   Hallmark's website?  You must have because you mentioned the

11   website, right?

12   A    I don't recall reviewing his deposition before my

13   testimony as a 30(b)(6) witness.  It was testimony from a

14   Monitor Clipper employee.

15   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18           xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxx

25   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
1    A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
2    Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
3    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
4    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
5    A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
6    xxxxxxxxxxxx
7    Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
8    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
9    A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
 1    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 2    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 3    Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 4    xxxxx
 5              xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 6    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 7    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 8              xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 9    xxxxxxxxx
10              xxxxxxxxxxx
11              xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13              xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15              xxxxxxxxx
16              xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21    xxxxxxxxx
22              xxxxxx
23              xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
1    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
2    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
3    A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
4    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
5    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
6    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
7            xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
8    xxxxxxxxxxxxxxxxxx
9            xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11   xxxxxxxxx
12   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17   xxxxxxx
18   A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24            xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
1    A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
2            xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
3    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
4    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
5            xxxxxxxxxxxxxxxxxxxxxxxxxxxxx
6    Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
7    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
8    A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
9    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16   Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17   xxxxxxxxxxxxxxxxxxx
18   A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21   Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24   A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
1   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
2   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
3   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
4   xxxxxxxxxxxxxxxxxxxxx
5            xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
6   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
7   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
8   A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
9   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15  xxxxxxxxxxxxx
16           xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18           xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19  A    xxxx
20  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

```
1    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
2    Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
3    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
4    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
5    A     xxxxxxxxxxxxxxxx
6    Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
7    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
8    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
9    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10   A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
17   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20   xxxxxxxxxxxxxxxxxxxxxxxxxx
21   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24   A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

1   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3   Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4   xxxxxxx

5            xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6   xxxx

7            xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8            xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9            xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

12  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16           xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18           xxxxxxxxxxxxxxxxx

19  A    xxxxxxxxxxxxxxxxx

20  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24  A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25  Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
 1           xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 2    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 3           xxxxxxxxxxxxxxxx
 4           xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 5    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 6    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 7    xxxxxxx
 8    A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
 9    Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
10           xxxxxxxxxxxxxxxxxxxxx
11           xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14    A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16    xxxxxxxxxxxxxxxxxxxxxx
17    Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18           xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20    A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21    Q    xxxxxxxxxxxxxx
22    A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
23    Q    xxxxxxxxxxxxxxxxxxx
24    A    xxxxxxxxxxxxxxxxxxxx
25    Q    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

1   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

3   A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4   Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

5   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6   A       xxxx

7   Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

8   xxxxxxxxxxxxxxxx

9   A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10  Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

11  xxxxxxxxxxxxxxxxxxxxxxxxxxxx

12  A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13  Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

14  xxxxxxxxx

15  A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16  Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

18  A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19  Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

21  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22  xxxxxxxxxxxxxxxxxxxxxxxxxxxx

23  A       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24  xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25  Q       xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

1   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

2   xxxxxxxxxxxxx

3   A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

4   xxxxxxxxxxxxxxxxxxxxxxxxxxxx

5   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

6   xxxxxxxxxxxxxxxxxxxx

7   A     xxxxxxxxxxxxxxxxxxx

8   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

9   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

10   xxxxxxxxxxxxxxxxxxx

11   A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

12   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

13   A     xxxxxxxxx

14   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

16   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

17   A     xxxxxxxxxxxxxxxxxxxxx

18   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

20   A     xxxxx

21   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

22   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

23   A     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

24   Q     xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

```
1    A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
2    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
3    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
4    xxxxxxxxxxxxxxxxxxxxxxxxxxxx
5    Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
6    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
7    A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
8    Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
9    A      xxxx
10   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
11   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
12   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
13   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
14   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
15   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
16   xxxxxxxxxxx
17   A      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
18   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
19   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
20   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
21   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
22   xxxx
23   Q      xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
24   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
25   xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

A    xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

Q    I'm talking about the small competitors.  You testified
that because Bill Young was the head guy on the project and was
intimately involved, he probably received whatever information
the standing case team thought was relevant.  Do you remember
testifying to that, sir?

A    I'm assuming that Mr. Bill Young was fully advised about
the due diligence work that the Monitor standing case team had
done which included looking at all of this information and
giving him what information they thought was relevant to the
due diligence because he was the guy making the decision.  He
was the guy that was pushing them to get out and check with
Monitor and get their information.

Q    So you just assumed it, right?  No proof.  Just
assumption.  Isn't that right?

A    I think there's a great deal of circumstantial evidence
about the information that was shared and the fact that people
who were making decisions were making their decisions based on
it and then subsequently utilized that to go out and bring in
investors.

Q    Sir, you're not aware of a single person who is a
decision-maker at Clipper that based any decision at all on the
presentations at issue in this case, are you?  Not one?

1  A    I think I just testified that I believe that they didn't

2  go through all of this exercise of getting and gathering our

3  information to analyze the viability of RPG and the competitive

4  market set and then didn't use any of it in their decision

5  making process.  I can't imagine the decision-makers at such a

6  top consulting firm would ignore the information that they

7  specifically set people out to gather for them to do their due

8  diligence and then tout it when they did this with their

9  investor in their presentation that they had this greeting card

10  information.

11  Q    Sir, you can't identify a single person at Clipper, not

12  one, who went out to, quote, unquote, get this information

13  about Hallmark, can you?  Not one?

14  A    Well, how about Mr. Doctoroff to start with and then how

15  about the standing case team that worked directly for Monitor

16  Clipper.  I'm not aware that the Monitor standing case team

17  worked for anybody other than Monitor Clipper.  They were

18  charged specifically to go out and get this due diligence work.

19  And they got the information on the documents you just showed

20  me and Mr. Doctoroff had already received that information.

21  And then they were talking to, let's see Annika Blake Juanita

22  Moore.  They had conversations with Mark Pocharski, who worked

23  on our scenario.  He's, in fact, at the investment

24  presentation.  And the, Steve Levin, did I mention Steve Levin?

25  He was intimately involved in our project.  And they were

1    talking to him at length.  And the idea that they did not

2    discuss the information that they set their due diligence team

3    out to get to me would be highly unusual for a group that was

4    doing this kind of work.

5    Q    The idea that they didn't discuss, let's be real clear

6    with this jury.  You don't know, in fact, if there was any

7    discussion.  You're just assuming that, right?  No. 1.  Is that

8    right?

9    A    I wasn't at any of the discussions so I can't testify as

10   to what they said during those discussions.

11   Q    Sir, you're identified by Hallmark as the primary person

12   who knows about the use of the trade secrets at issue in this

13   case.  And my question to you is you can't identify a single

14   communication between any of these employees showing the use of

15   this information, isn't that right?

16   A    No, that's not correct.  That is not correct at all.  We

17   have been through this, Mr. Manchel.  The information that

18   Mr. Doctoroff and Mr. Kim received were these three BMRs.

19   Let's start with that.  And then let's go to the fact that the

20   standing case team, Grant Brown and Jeffrey Pauker and Megan

21   Kahn were working for Monitor Clipper, who were charged with

22   going out and doing due diligence, were pinging on the Monitor

23   knowledge management system and obtained this information and

24   assessed it and assimilated that.  And then talked to the

25   people who they could find that were working on the project,

1   Juanita Moore, Stacy Raiche.  They talked to all of those

2   individuals.  And Mr. Doctoroff talked to Juanita Moore and

3   Stacy Raiche.  He was, I think, the self described quarterback

4   on this effort.  So we have had all these people out doing all

5   this work, gathering this information.  And, yes, my assumption

6   is that he knew about it and so did the other decision-makers.

7            Then we have then, after what was a time frame when

8   we sued them, we then learned about all of their statements in

9   their own documents about their information they have gathered

10  with respect to greeting industry and strategy.  And I think

11  that clearly shows a record that they have gathered our

12  information, utilized it in their due diligence and then

13  utilized it to gain investors to support their investment.

14  Q    Let's break it down because Hallmark likes to lump all

15  these things in together.  Question No. 1, the e-mail that Adam

16  Doctoroff got from Monitor, that contained three of the

17  presentations.  What did Adam Doctoroff do with that, sir?

18  A    Well, I'm assuming that he utilized it in his analysis.

19  But the computer records have been destroyed so we don't know

20  what he did with it after he received it.

21  Q    Adam Doctoroff's computer records weren't destroyed.

22  Hallmark doesn't claim that.

23  A    There wasn't any maintenance of the e-mails and e-mails

24  get erased after a certain period of time.

25  Q    Sir, they found the e-mail.  That's how Hallmark had it.

1   No question about it that Adam Doctoroff got the e-mail.

2   A     Monitor found the e-mail and turned it over to us, Monitor

3   Clipper didn't.

4   Q     Adam Doctoroff's computer wasn't erased.  There is no

5   claim by Hallmark it was erased.  What did Adam Doctoroff do

6   with the e-mail?

7   A     Well, he testified, first, that he never received any of

8   our information.  Now what he did beyond that, I do not know.

9   Q     Sir, I didn't ask you what his testimony was.  I

10  understand Hallmark talks about that.  My question to you is

11  what did he do with the e-mail?  You're the primary person at

12  Hallmark on use.  What did Adam Doctoroff do with that e-mail?

13  A     -- used it to gather the evidence that we were able to

14  assimilate after several years.  I recited that to you and

15  beyond the fact that he received it, I don't know what he did

16  with it.

17  Q     Exactly.  Beyond the fact that he received it there's not

18  a piece of evidence in this case that he did anything other

19  than delete it.  Isn't that right?

20  A     There's not a single piece of evidence?

21  Q     There's not a single piece of evidence in this case that

22  Adam Doctoroff, we'll get to the standing case team, but Adam

23  Doctoroff did anything with that e-mail other than delete it?

24  A     He testified right after the, in 2006 that he never

25  received any confidential information.

1   Q    I understand that.

2   A    Okay.

3   Q    I'm talking about is there, can you identify for this jury

4   a single thing that Adam Doctoroff did with that e-mail other

5   than delete it?  Yes or no?

6   A    I can't identify anything that says that he did delete it

7   or didn't, no.

8   Q    Then as regards the standing case team, the only thing

9   that you know that happened is that the standing case team got

10  an e-mail that Clipper wasn't shown, isn't that right?

11  A    The only thing that I know was that they got an e-mail and

12  they weren't shown it?  They were working.  They were Monitor

13  Clipper.  They were working for Monitor Clipper.  That's all

14  they did.

15  Q    Sir?

16  A    They were officing in the same offices with them.  I don't

17  know that we have any documentary evidence that they sent it

18  specifically on to somebody else.  But we know they received

19  it.  We know that they were utilizing it and analyzing it and

20  preparing their recommendations for the investment committee.

21  Q    How do you know that?  How do you know that they were

22  utilizing it and analyzing it in preparation for the investment

23  committee?  Show me anything.

24  A    There's an exhibit here, 488, from Grant Brown to Jeffrey

25  Pauker saying that he's going to go through the slides and then

1   they condense them down to a specific deck I believe and I

2   don't believe it was used for any other purpose.

3   Q    Did you see on the e-mail it says note, MCP is not being

4   copied on this?  Do you see that?

5   A    On which e-mail?

6   Q    488.

7   A    It doesn't say that.

8   Q    Are you looking at the 30-slide e-mail?

9   A    I'm looking at 488, the one you just mentioned.  It

10  doesn't say anything about that.

11  Q    Jeffrey, highlight the text of the body.

12       These are all Monitor employees, right?  Grant Brown,

13  Megan Kahn, Jeff Pauker?

14  A    I guess so.  That's the standing case team working for

15  Monitor Clipper.

16  Q    I know you want to keep saying they're working for Monitor

17  Clipper but my question to you, sir, was, these are Monitor

18  employees and you understand that, right?

19  A    That's my understanding, yes.

20  Q    In fact, when Monitor came to Hallmark and Monitor was

21  housed at Hallmark and was at Hallmark all the time and was a

22  hundred percent dedicated to Hallmark, that didn't turn the

23  Monitor employees into Hallmark employees, did it, sir?  They

24  were still Monitor employees, even though they were housed at

25  Hallmark, dedicated 100 percent to Hallmark, they're still

1   Monitor employees, right?

2   A    I don't know that they were housed at Hallmark or working

3   a hundred percent for Hallmark but they weren't Hallmark

4   employees, no.

5   Q    I believe the testimony the jury heard was they were there

6   at least 4 days a week with offices at Hallmark, working a

7   hundred percent of the time on Hallmark for the BMR.  Does that

8   sound about right?

9   A    They worked a lot, made them a lot of money.

10  Q    It says right here, MCP staff are not included in this

11  e-mail, right?

12  A    Yes.  That wasn't the e-mail though you were talking about

13  before.  That was 488.  This is a new one you put up.  I was

14  referring to 488.

15  Q    Can you tell this jury a single instance where this e-mail

16  or 488, either one, went from Monitor to Clipper?

17  A    We don't have any documentary evidence from the computer

18  records that shows where it went next.  We know they were

19  working for Clipper and doing the due diligence.

20  Q    Do you have a single piece of evidence that you could show

21  this jury that will show that the information from this e-mail

22  and the other e-mail you were looking at went from Monitor to

23  Clipper?

24  A    This information?

25  Q    Yes.  Can you point me to a single document in this case?

1  A    Which document are you referring to?

2  Q    Well, these are the two e-mails in this case in Monitor's

3  possession, right?  This is the exhibit I just put up in front

4  of you and you have an exhibit you already had, 488.  That's

5  it?

6  A    487.

7  Q    487.  That's it.  Those are the two documents of Monitor.

8  We already established you can't show those documents going to

9  Clipper.  Now, my question is different.  Can you tell this

10 jury a single piece of information from those two exhibits that

11 went to Clipper?

12 A    All the information went to Clipper.  This went to

13 Clipper, to Adam Doctoroff and Peter Kim.  All of this.

14 Q    We talked about that.  That's the one that was deleted,

15 right?  I'm talking about now the two that went just to

16 Monitor?

17 A    Who said it was deleted?  I didn't say it was deleted.

18 Q    Sir, the e-mail that went to Monitor that's at issue in

19 this case, you're holding it.  The e-mail that is only among

20 the Monitors employees.  Can you tell me --

21 A    Which one are you talking about?

22 Q    That's the Adam Doctoroff e-mail, sir?

23 A    This one?

24 Q    Correct.  The only other e-mail that has two presentations

25 in it.  Can you tell this jury a single instance where the

1  information from that was transmitted or transferred from

2  Monitor to Clipper?

3  A     Our belief is that it was transferred to Clipper when

4  Monitor standing case team received it.  That is what they were

5  doing.  They were working for them on this specific project and

6  nothing else.

7  Q     Can you tell me a single instance, went from the standing

8  case team, all of whom were Monitor employees, a single piece

9  of information went to any one who was a Clipper employee?

10 A     No.  Unfortunately the computer records no longer exist

11 with respect to the activity and the transfer of these

12 documents.  We only have fragments of the information,

13 Mr. Manchel.

14 Q     Let's take a look, please, at Defendant's Exhibit 516.

15 Highlight the top, please, Jeff.

16        This is the confidential agreement that was executed

17 between the Hallmark and Clipper, correct?

18 A     Yes.

19 Q     And it's dated October 17, 2007, correct?

20 A     Yes.

21 Q     Jeff, would you highlight the third paragraph, please.

22        And in this agreement Hallmark represents

23 specifically that it understood that Monitor and Clipper are

24 separate entities, correct?

25 A     2007, we understood they were separate legal entities,

1    yes.

2    Q    And you understood throughout this whole lawsuit, Hallmark

3    understood throughout this entire lawsuit that they're separate

4    entities, isn't that right?

5    A    Which lawsuit are you referring to?

6    Q    This one?

7    A    Yes.  Separate and legal.

8    Q    From the beginning of this lawsuit Hallmark has understood

9    that they're separate entities, right?

10   A    In this lawsuit we understood that they were separate

11   legal entities.

12   Q    And despite anything that a Hallmark witness might have

13   testified here, you know that every Hallmark witness understood

14   Clipper and Monitor are separate entities, right?

15   A    You're going to have to run that one by me again.

16   Q    If any witness here suggested or testified that Monitor

17   and Clipper are one in the same, they would be wrong, isn't

18   that right?

19   A    I said separate legal entities.  They had people that were

20   working, Mr. Young, Mr. Thomas and several other people were on

21   the board of Monitor Group and several of the people, there

22   were intersecting relationships.  And whether or not they

23   maintained the integrity of the corporate structure, I can't

24   say.

25   Q    How long did it take to negotiate this deal, sir?

1    A    Probably four or five months.

2    Q    Where do you see in this sentence MCP and Monitor are

3    separate legal entities?

4    A    That's what that means.

5    Q    You think that's what that means?  You just inserted the

6    word legal into the sentence?

7    A    No.  I think it means separate legal entities.

8    Q    You don't think it just means separate?  Different?  Not

9    the same?

10   A    Separate legal entities.

11   Q    Paragraph No. 5.  This is another thing that was

12   represented in this agreement.  Whereas Hallmark is concerned

13   that MCP may have received confidential data and information

14   belonging to Hallmark from Monitor or other Monitor entities or

15   their present or former employees which information Hallmark

16   represents came into possession of Monitor as a result of a

17   series of engagements and post engagement communications

18   extending through early November 2005, hereinafter Hallmark

19   confidential information.  Do you see that?

20   A    I do.

21   Q    Let's break it down a little bit for the jury.  First of

22   all, Hallmark, when it signed this agreement, was concerned

23   that Clipper might have received confidential information,

24   right?

25   A    Absolutely.

1   Q     No question in your mind.  You were really concerned about

2   that, weren't you, sir?

3   A     Yes.

4   Q     Even though Jim Westra and Laura Steinberg had told

5   Hallmark, nothing was happening, no information.  That's a year

6   earlier, Hallmark is not relying on that, is it, sir?  They're

7   not relying on these representations.  It's really still

8   concerned, right?

9   A     Well, we were relying on those, those representations,

10  Mr. Doctoroff's testimony, but there was information that came

11  up that suggested that there were, there was information that

12  Clipper had accessed and we had bits and pieces of that

13  information.  So we wanted to determine whether or not what we

14  heard from Ms. Steinberg and Mr. Westra and Mr. Doctoroff,

15  under oath, was true.  That's correct.  We wanted to go test

16  and verify to see if they were telling the truth.

17  Q     Absolutely right.  All of these people on the other side

18  of the fence had made a series of representations to you and

19  Hallmark was going to go find out whether they were true, isn't

20  that right?

21  A     We were going to find out whether or not they were true or

22  whether there had been some information that had been received

23  by Monitor Clipper that they might not even have known was

24  Hallmark confidential information.

25  Q     So the next part is, may have received confidential data

1   and information belonging to Hallmark from Monitor.  That's the

2   next piece, right?  The definition is, it has to be information

3   belonging to Hallmark from Monitor or other Monitor entities

4   with present or former employees, correct?

5   A    That's correct.  At the time we were negotiating this we

6   were unaware that they had received our confidential

7   information from Ms. Murley.

8   Q    Oh, you think they received confidential information from

9   Ms. Murley, sir?

10  A    Yes.

11  Q    Who received it?

12  A    Monitor Clipper and RPG.

13  Q    And where did Ms. Murley get the information, sir?

14  A    You know we didn't know for sure whether she just took it

15  with her when she left Hallmark or whether she got it from

16  Monitor.

17  Q    You didn't know for sure, that's the testimony you're

18  going to give to this jury?  You didn't know for sure whether

19  she got it from Hallmark or Monitor?  Is that your testimony,

20  sir?

21  A    When we were negotiating this in 2007, we didn't know she

22  had gotten any information from us, period.

23  Q    Sir, where did Jan Murley get the information from?

24  A    You know I think she may have testified that she got it,

25  she took it with her from Hallmark.  But we didn't know for

sure whether that testimony was accurate or not or whether she

might have gotten it from Monitor.  She had talked to Monitor

back in the time the due diligence was going on with Mr. Lurie

at Monitor.

Q    Sir, Hallmark sued Jan Murley, didn't it?

A    Yes, we did.

Q    Did you review the complaint that Hallmark put in before

it was filed?

A    Probably did, yes.

Q    Take a look at the complaint for a second.  Let me ask

you, sir, if you remember --

          MR. AISENBREY:  What's the number of the exhibit?

          MR. MANCHEL:  1246.

BY MR. MANCHEL:

Q    Do you remember, sir, that when Hallmark sued Jan Murley,

Hallmark represented to the Court in that case that Jan Murley

took the information from Hallmark.  Do you remember that?  Had

nothing to do with Jan Murley's testimony.  Do you remember

that?

A    I thought she had gotten it from us.  We thought she took

certain information from us.  We didn't know whether all the

information she had was from us or whether she had gotten some

from Monitor.

Q    From Monitor or from Clipper?

A    From one or the other.

1   Q    Sir, you sued her?

2   A    Yes.

3   Q    And throughout the entire lawsuit the claim that you made

4   to the Court was Jan Murley took the information from Hallmark

5   when she left, right?

6   A    We believed she had certain information from Hallmark that

7   she took with her, yes, that's correct.  But we don't know and

8   still don't know for sure whether or not she may have gotten

9   some other information from Monitor or Monitor Clipper.  We

10  don't know whether she did or not.  I believe she testified

11  that it was just information she took from Hallmark.

12  Q    And you've never seen, in fact, that's what Hallmark said

13  in the complaint and you've never seen anything otherwise,

14  right?  All from Hallmark, right?

15  A    Yes.

16  Q    But that's not what this covers.  This doesn't cover

17  information that comes from Hallmark.  This information covers

18  information that comes from Monitor to Clipper, correct?

19  A    Well, that's, it says it's information that went from

20  Monitor to Monitor Clipper.  Is it your position, Mr. Manchel,

21  that if Monitor Clipper gets our information from somebody

22  other than Monitor, our confidential information, shares it

23  with RPG, that's okay?  Is that your position?

24  Q    I'm not asking you whether it's okay, sir, but it's not a

25  violation of this.  My position is exactly that.  My position

1  is that if Clipper came into possession of Hallmark information

2  from a source other than Monitor, you might not be happy about

3  it but it has nothing to do with this agreement.  That's what

4  it says right there, doesn't it?

5  A    Well, it's Hallmark confidential information is Hallmark

6  confidential information that is Monitor information.

7  Q    No.  It's Hallmark confidential information that Clipper

8  got from Monitor.  That's what it says in plain English there,

9  doesn't it, sir?

10  A    I don't know that it's very plain but if that's your

11  position.  I think it's just Hallmark confidential information

12  that was prepared by Monitor.

13  Q    Now, as part of the agreement with Clipper --

14          Actually, Jeff, highlight the paragraph 6 so the jury

15  can see this as well.

16          Whereas MCP wants to be cooperative regarding

17  implementation of the injunction and both MCP and Hallmark

18  would like to avoid litigation over these issues.

19          Do you see that?

20  A    Yes.

21  Q    So Hallmark is representing that it wants to avoid

22  litigation over these issues, right?

23  A    That's right.

24  Q    And the issues are whether Clipper got confidential

25  information from Monitor, right?

1 A    Well, that's one of the issues, yes, certainly.  We were

2 trying to determine whether or not Monitor Clipper had gotten

3 our information from Monitor.

4 Q    And as part of this exercise to avoid litigation, Clipper

5 and Hallmark signed a general release, isn't that right?

6 A    Well, there was a release that was signed that was held in

7 escrow and was not to be released if we discovered evidence of

8 intentional misconduct by Monitor Clipper or if there was a

9 breach of the warranties and representations in the agreement.

10 If either of those things took place we had an absolute right

11 to sue Monitor Clipper.  And we discovered after we had

12 executed this that Mr. Doctoroff had received these documents.

13 We discovered that the standing case team had gotten our

14 information.  We discovered that the Monitor Clipper attorneys

15 and Monitor knew about the fact that they received this

16 information in 2005, which is another indicia of intentional

17 misconduct.  They hadn't disclosed it to us.  We didn't know

18 that they had at that same time gotten the information from Jan

19 Murley.  And then changed her confidential agreement after the

20 fact to suggest that they hadn't gotten the Hallmark

21 confidential information.  That's another piece of intentional

22 misconduct.  So we had an absolute right under this agreement

23 if there was evidence of intentional misconduct or if there was

24 a misrepresentation to bring a cause of action against Monitor

25 Clipper.  And it was not dependent solely upon whether or not

1    the only information that had come had come through Monitor to

2    Monitor Clipper.

3         MR. MANCHEL:  Your Honor, move to strike.  My

4    question was, did Monitor Clipper sign a general release.

5         MR. AISENBREY:  Objection, Your Honor.  That wasn't

6    the question.

7         MR. MANCHEL:  That was the question.  It's a simple

8    question.

9         THE COURT:  The question was and as part of this

10   exercise to avoid litigation Clipper and Hallmark signed a

11   general release, isn't that right?

12        MR. MANCHEL:  That was my only question.

13        THE COURT:  Well, I'm not going to strike it.

14   Overruled.

15   BY MR. MANCHEL:

16   Q    Let me see if I can try this, again, sir.  Clipper and

17   Hallmark executed a general release, correct?

18   A    Executed a release that was to be held in escrow and not

19   released unless all of the terms of the confidential agreement

20   had been met.  And I just articulated that they weren't.  So it

21   wasn't released.

22   Q    I promise you, sir, I'll get to your arguments about the

23   release.  I just want to make it clear to the jury that Clipper

24   and Hallmark signed a general release, isn't that right?

25   A    As part of that agreement, yes, we did.

1  Q    Jeff, would you put up Exhibit 955, Defendant's Exhibit

2  955.  And if you turn to the second page of the document.

3           This is the release, right?

4  A    Yes.

5  Q    And, in fact, sir, if you look to the back, this

6  particular document was only signed by Clipper, right?

7  A    Appears so.

8  Q    But you actually signed the other piece of it, didn't you,

9  sir?

10  A    Yes, I did.

11  Q    Put up Defendant's 954, please.  Second page.  Sorry.

12  Third page.

13           It's an e-mail from Charles German, this attorney,

14  right here, correct?

15  A    Yes.

16  Q    Saying that you signed it, correct?

17  A    Yes.

18  Q    So there is a fully signed general release, right?

19  A    Yes.

20  Q    And the deal is the general release would be held by these

21  attorneys, correct?

22  A    That's right.

23  Q    And, in fact, it's still being held by these attorneys,

24  right?

25  A    Yes, it is.

1    Q    Now, Jeff, would you, please, put up Defendant's Exhibit

2    925?  Highlight the top of the middle e-mail, please?

3         This is the moment when Jim Westra of Weil Gotshal

4    told Hallmark that he's been assured there is no confidential

5    information, correct?

6    A    I think that document speaks for itself.  Yes, I think

7    that's what it says.

8    Q    That's two years before Hallmark signed the general

9    release, correct?

10   A    I think that's about right.

11   Q    All right.  Jeff, would you go to Defendant's 928?

12        This is the letter your attorney took you to, the

13   May 14 letter that came from Rouse Hendricks and German.  Do

14   you remember looking at this?

15   A    Yes.

16   Q    The letter from this attorney here, correct?  Charlie

17   German?

18   A    Yes.

19   Q    Then if you go to the second page at the bottom, last

20   paragraph.

21        It is clear to us that Monitor Clipper likely has in

22   its possession, custody or control documents, information and

23   electronic or digitally stored data relevant to the

24   misappropriation and misuse of Hallmark confidential data by

25   Monitor and Monitor Clipper.

1    Do you see that?

2  A    Yes.

3  Q    That's five months before you signed the general release,

4  correct?

5  A    Yes.

6  Q    Now, if you turn the page to page 3.

7    This is another piece that your attorney took you to.

8    Jeff, please highlight the first bullet point.

9    Based on information obtained during the arbitration

10  we believe that relevant documents include, you're even

11  identifying the documents you think might be in Clipper's

12  possession, right?

13  A    I think we're talking about communications between them,

14  yeah.

15  Q    Five months before you signed the general release, right?

16  A    Right.

17  Q    And if you go to page 4 at the bottom, so you know about

18  all the things in this letter and this is what Attorney German

19  writes in the last paragraph.

20    As mentioned, Hallmark does not relish the thought of

21  additional litigation and would therefore welcome the

22  opportunity for meeting to discuss an appropriate procedure for

23  the search of relevant documents and potential resolution of

24  this matter, right?  That's what Hallmark wrote?

25  A    Yes.

1   Q    Okay.  Was it true?

2   A    Yes.  We were not looking for additional litigation

3   against Clipper if we could confirm that they, in fact, had not

4   received our information as they had represented to us.  We

5   were suspicious and we wanted to, we felt we had a duty under

6   our obligation to protect our trade secrets to make sure that

7   they did not receive any of our information.  And that's why we

8   set up this protocol, Mr. Manchel.

9   Q    Sir, you weren't suspicious.  You said it was clear to us

10  that Monitor Clipper likely has in its possession, custody or

11  control documents, information and electronically or digitally

12  stored data relevant to the misappropriation and misuse of

13  Hallmark confidential data.  It wasn't a suspicion.  You were

14  clear about it, right?

15  A    Clear, likely suspicion, yes, we believed.  As it turned

16  out, sure did.

17  Q    Sure did.  As it turned out, you knew all about that?

18  A    -- as it turned out, sure did.  We didn't know at the

19  time.  You denied it.

20  Q    Keep looking at what Hallmark knew at the time?

21  A    Okay.

22  Q    Take a look at Defendant's 933.

23       This is now three months before the general release

24  is signed, right?

25  A    Yes.

1    Q    This is a letter, again, from the attorney sitting right

2    here, Charles German, right?

3    A    Yes, it is.

4    Q    Let's look at what Mr. German is writing before Hallmark

5    signed the release.

6              Second paragraph, Jeff, would you highlight that,

7    please?

8              First, let me share with you our reaction to the

9    e-mails that you sent to me with your July 16 letter and thus

10   illustrate why it's important that we reach an agreement on the

11   data and document issues that we have been discussing.

12             Highlight the next paragraph, please.

13             For the next, sir, 1, 2, 3, 4, 5, 6, 7 paragraphs,

14   Mr. German details all of the acts that Hallmark is aware of

15   before it signed the general release.  Isn't that right?

16   A    I think he's outlining our suspicions about why we didn't

17   think their previous denial was accurate.

18   Q    Where do you see the word suspicion, sir?

19   A    Just summarizing what I think.

20   Q    Well, let's look at it.

21             Highlight the next paragraph, please.  The third full

22   paragraph, Jeff.  One that begins in early August.

23             In early August 2005 Mr. Doctoroff asked Monitor via

24   e-mail for any information that could be assessed for use in

25   the RPG bidding process.

1   So Hallmark knew that, right?  That's Adam Doctoroff

2  going out looking for Hallmark confidential information, right?

3  Hallmark knew?

4  A    I think we found that out, yes.

5  Q    It's July 18, sir?

6  A    No.  I'm saying I think we knew that.

7  Q    But it's four months before you sign the general release,

8  right?

9  A    Asking for information.

10  Q    Sir, you're stating in early August 2005 Mr. Doctoroff

11  asked Monitor via e-mail for any information that could be

12  assessed for use in the RPG bidding process, right?

13  A    Yes.  This is a letter in response to Mr. O'Toole's letter

14  which they were saying, again, they hadn't received any of our

15  information.

16  Q    Then you say, because Hallmark even knew that, Mark

17  Pocharski replied on August 4 that Monitor only had Hallmark

18  specific information and that Monitor had not done a lot of

19  industry background work, right?

20  A    That's what it says.

21  Q    But then it says within a couple of days or so however

22  Clipper and Monitor case team members Kim and Pauker searched

23  the knowledge management database for information relating to

24  Hallmark greeting cards, etc. and shortly after that

25  Mr. Doctoroff contacted at Monitor for information and

1   Mr. Pocharski agreed to attend the RPG management investment

2   meetings to ask questions and provide input, right?

3   A    That's what it says.

4   Q    That's all part of the speech you made about why the

5   general release is supposedly not enforceable, isn't it?  It's

6   all known four months before the general release is signed,

7   right?

8   A    No.  That's not what I said in my commentary.  These were

9   bits and pieces of information that we had that we had learned

10  through the arbitration process.  Monitor Clipper continued to

11  adamantly deny that they'd received any information.  This was

12  just information that was irrelevant.  That these things were

13  not in any way substantive.  And that was what Mr. German is

14  summarizing here that we have our continued suspicions and we

15  want to search to see if, in fact, you, Monitor Clipper, have

16  received our confidential information.  That's what the

17  protocol was about.  And what I said was that we did not know

18  that they had received this BMR set from Mr. Doctoroff.  We did

19  not know about the standing case team at this time.  We knew

20  little bits and pieces of the information but we have no idea

21  of the scope and size of what they were doing.  They continued

22  to deny that.  They denied it June 15.  And they denied it

23  immediately preceding this letter of Mr. German.  And he's just

24  outlining his response to the fact that they're saying, again,

25  we really didn't receive any information.  That's what he's

1    doing here.

2    Q    So highlight the next paragraph, please, Jeff.

3              On August 31, 2005 Mr. Doctoroff, despite the earlier

4    advice that Monitor only had Hallmark specific information,

5    sent an e-mail to Juanita Moore stating that he had already met

6    with Stacey Raiche and trying to set up a meeting with

7    Ms. Moore to discuss an investment in the greeting card space.

8              The next day on September 1 the confidential Hallmark

9    document analyzing consumer buying processes is accessed by

10   information resources.  Do you see that?

11   A    Uh-huh.

12   Q    So Hallmark knew exactly as it's been claiming in this

13   case, that Adam Doctoroff was told, we have nothing.  But Adam

14   Doctoroff kept pushing and meeting with Ms. Moore and

15   Ms. Raiche and all the rest, right?

16   A    Yes.

17   Q    This is four months before it signed the general release,

18   right?

19   A    Yes.  The general release was contingent on several

20   things.  They didn't get the release out of -- we weren't

21   releasing them unless they complied with the confidential

22   agreement.

23   Q    Then, Jeff, go to page 2, please, at the bottom.

24              To that end then here's an outline of the protocol

25   that we should reach agreement on in an attempt to avoid

1  litigation, right?

2  A    Yes.  He outlines that in the rest of his letter.

3  Q    So Hallmark knows all of these things, most of which the

4  jury has heard in this trial, four months before the release is

5  signed, right?

6  A    Well, we know things that Mr. German outlined here and we

7  were continuing to get denials from Clipper that they had any

8  information of any substance from Monitor.

9  Q    Now, Jeff, would you go, please, to the confidential

10 agreement which is Defendant 516.  And if you look, please, go

11 to paragraph No. 1 and highlight the first two sentences.

12        Your counsel took you to this language, didn't he,

13 sir?

14 A    Yes.

15 Q    This is the part of the deal that dealt with the

16 investment overview presentation and what --

17 A    Yes.

18 Q    -- what Clipper was suppose to do with it, right?

19 A    Yes.

20 Q    And the claim here is that Clipper didn't do what it was

21 suppose to do, right?

22 A    Yes.

23 Q    But, in fact, before this lawsuit was filed Hallmark said

24 that Clipper did exactly what it was suppose to do reluctantly

25 but it did what it was suppose to do, right?

1    A    I don't agree with that at all.

2    Q    Jeff, would you pull up D961, please.  Would you highlight

3    the first four sentences, first four lines.  First of all,

4    Jeff, highlight the top, please.  I want the jury to understand

5    who is getting and receiving this.

6              This is an e-mail from Charlie German, correct?

7    A    Yes.

8    Q    That's the gentleman sitting right here, correct?

9    A    Yes.

10   Q    It's from Patrick O'Toole who is the Weil Gotshal

11   attorney, right?

12   A    That's to him, right.

13   Q    It's a copy to Dan Blegen, that's the attorney sitting at

14   the end of the table, right?

15   A    Yes.

16   Q    It's a copy to John Aisenbrey, that's this gentleman,

17   right here, correct?

18   A    Yes.

19   Q    It's a copy to Dawn Johnson, the attorney in the back part

20   of the table, correct?

21   A    Yes.

22   Q    The subject is phase 2.  Right?

23   A    That's what the heading says, yes.

24   Q    Would you highlight, Jeff, the first four lines?

25              Patrick, happy new year to you and yours.  We have

1    considered the information that you gave us concerning the

2    September 2005 Power Point.  That's the presentation, right?

3    The overview?

4    A    Yes.

5    Q    And we reluctantly agree that this is sufficient for now.

6    I say reluctant because we continue to believe that the intent

7    of our agreement was for a much more robust disclosure from

8    Clipper.

9            So you're not really satisfied, right?  You thought

10   you would get more, right?

11   A    Yes.  Most everything is redacted.

12   Q    And you knew that, right?  You saw it was redacted and you

13   thought you would get more?

14   A    I haven't seen that but our counsel has, yes.

15   Q    Nevertheless we are prepared to proceed on now to phase 2

16   of the agreement which calls for physical and electronic

17   searches, right?

18   A    That's what it says.

19   Q    So Hallmark told, before this lawsuit was filed Hallmark

20   told Clipper we're not really happy about what you did with the

21   investment overview but we agree, let's go on to phase 2,

22   correct?

23   A    That's what that says.  Of course, we didn't know until

24   after we filed the lawsuit that they hadn't disclosed the

25   specific information that was Monitor related.  So Mr. German

1    would not have known that when he was writing this letter.

2    Q    And you didn't know that when you were looking at the full

3    copy of the investment overview at your deposition, did you,

4    sir, because it's not in there.  Isn't that right?

5    A    What's not in there?

6    Q    Where we started this afternoon was you were looking at

7    the investment committee overview.  Remember I put the document

8    in front of you, right?

9    A    Yes.

10   Q    That was the whole document, nothing redacted, wasn't it?

11   A    Yes.

12   Q    You couldn't identify any information in that document

13   that came from any of the presentations at issue in this case,

14   isn't that right?

15   A    No, that's not correct.  I believe I testified that the

16   information that they had, in fact, redacted was taken from our

17   BMRs, Mr. Manchel.  Then I had also summarized in some detail

18   that their one-page summary of their conversations with people

19   that worked on us was specific to our Hallmark work.

20   Q    Now, phase 2 of the agreement was the creation of the

21   search terms that we looked at, right?  The electronic protocol

22   agreement, right?

23   A    Yes.

24   Q    And then phase 2 meant that Clipper had to go out and

25   search all of the computers pursuant to those search terms,

1   right?  Agreed upon computers?

2   A    The agreed upon computers.

3   Q    It's a very expensive exercise, isn't it, sir?  You've

4   done it in this case, right?

5   A    Right.  It's an exercise they would have had to go through

6   if we sued them as well.

7   Q    It's a very expensive exercise, isn't it, sir?

8   A    Depending on the size, it can be quite expensive, yes.

9   Q    You have to have lawyers involved.  You have to have

10  electronic vendors involved.  Very pricy, isn't it?

11  A    As I say, if we had sued Monitor Clipper they would have

12  had to go through that expense as well.

13  Q    But the whole point of this was to avoid litigation,

14  right?

15  A    The point of this was to confirm that they had not, in

16  fact, received our trade secrets as they had represented to us.

17  That was the point of this.  And hopefully once they confirmed

18  that then we would not have to file a lawsuit.  That's what we

19  were trying to do.

20  Q    Would you put up, Jeff, please, Plaintiff's 487.

21       That's the big thick document you keep holding up for

22  the jury.  It's the one that went to Adam Doctoroff, correct?

23  A    Yes.

24  Q    And isn't it true, sir, that as of May 1, May 1, 2008,

25  Hallmark knew about this e-mail?

```
 1    A    I don't know if it was May 1 but it was in May of 2008,

 2    that's correct.

 3    Q    Would you take a look, please, at Exhibit 270S which I

 4    believe was put in front of you earlier in your deposition

 5    testimony.  The letter from Laura Steinberg.

 6    A    248S.

 7    Q    Should be 270S.

 8         Could you put that up on the screen, please, Jeff?

 9    A    Oh, May 1, I'm sorry.

10    Q    May 1 letter, yes.  We looked at that, right?

11    A    Yes, I believe we did.  Some time ago.

12    Q    And you agreed with me that this is the letter, if you

13    look at the fourth page, this is the letter where Laura

14    Steinberg told Hallmark flat out about the two e-mails that are

15    at issue in this case, isn't that right?

16    A    Yes.

17    Q    The big thick one you got there?

18    A    Yes.  I believe that's right.

19    Q    That's May 1 of 2008, right?

20    A    I don't think she attached them on May 1.  I think she

21    mentioned them.  I don't know if they were enclosed.  I don't

22    know if we'd seen them yet.

23    Q    You're exactly right, sir.  Let me hand you what has been

24    marked as 271S.

25         And, Jeff, if you would put that up on the screen,
```

1    please.  Highlight the body of it.

2              In the follow-up to our call late yesterday afternoon

3    I'm sending you copies of the Hallmark materials that were

4    described in the third paragraph on page 4 of my May 1, 2008

5    letter.  In lieu of clogging up the computer with voluminous

6    PDFs, I'm having the three documents delivered by Fed Ex.

7    That's one delivery of the documents, right?

8    A    It would appear so, yes.

9    Q    If you take a look at 272S.  Defendant 272S.

10             Jeff, highlight the bottom paragraph, please.  I'm

11   sorry.  Bottom paragraph to the top e-mail.

12             See the language?  Meanwhile I'm enclosing here with

13   a PDF of the two e-mails in question.  The computer data that

14   Monitor has shows only the one forwarded e-mail which is the

15   upper one on the PDF with the earlier e-mail which is the lower

16   one and the PDF attached to it.  Monitor has not found an

17   independent copy of the earlier e-mail.  Laura.

18             That's Laura Steinberg, right?

19   A    I believe so.

20   Q    So by May 19 Hallmark had in its possession all five of

21   the presentations that are in issue in this case and knows that

22   one was sent to Adam Doctoroff and the other was kept by the

23   Monitor case team, right?

24   A    I can't follow all of what Laura is saying here.  But I

25   believe we had received the e-mail from Mr. Doctoroff and to

1   Mr. Kim and the attachments and there was a reference to the

2   standing case team, yes, I think so.

3              THE COURT:  Is this a good --

4              MR. MANCHEL:  One more question, Your Honor.

5   BY MR. MANCHEL:

6   Q    Sir, at that moment are you aware of anyone at Hallmark,

7   yourself, all of these lawyers that received this information,

8   anyone, saying, my goodness.  There's been a breach.  Clipper

9   should not have this.  The standing case team should not have

10  this.  The deal is off.  Anybody say that in words or

11  substance?

12  A    Well, let me break that into two pieces because when we

13  saw this information we were dumbfounded that this information

14  had been transmitted over to Monitor Clipper.  We had been

15  suspicious of this from the get-go.  It had been denied and

16  denied and denied.  And when we got this information we were,

17  everyone who saw it was absolutely astounded that this

18  information had been sent over to Monitor Clipper.

19  Q    Did you tell anyone?  That's my question.  You say you

20  were dumbfounded.  Did you tell anyone at Clipper?

21  A    Our attorneys had conversations with Mr. O'Toole.  And the

22  conversations they had were I think expressing the

23  astonishment.  That's my understanding.

24             MR. MANCHEL:  Your Honor, I move to strike.  He can't

25  testify what the attorneys spoke to.

1       THE COURT:  Sustained.

2            We're going to stop.

3            MR. MANCHEL:  Thank you, Your Honor.

4       THE COURT:  Folks, please remember to keep an open

5   mind.  Don't do any research on your own.  You have to decide

6   the case based on what you hear and see in the courtroom.

7   We'll see you tomorrow morning at 8:30.  Good night.

8            (The following proceedings were had OUT OF THE

9   PRESENCE AND HEARING OF THE JURY:)

10       THE COURT:  You still want to do arguments at 8:30 in

11  the morning or would you rather do them during the noon hour?

12       MR. MANCHEL:  Whatever is convenient.  At this point

13  I've probably got another half hour to 45 minutes so I actually

14  could just use the time to get prepared as argument if it's all

15  right with the Court.

16       THE COURT:  Okay.  Why don't we just plan on hearing

17  it during the noon hour.  We'll take a 30-minute lunch break,

18  we'll come back in, I'll hear the arguments.

19            MR. MANCHEL:  Thank you.

20                      (Witness temporarily excused.)

21                *    *    *

22

23

24

25